UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 22-20104-CR-MARTINEZ(s)(s)(s)(s)

UNITED STATES OF AMERICA

vs.

CHRISTIAN E. SANON,

                              Defendant.
_____/

## UNITED STATES' MOTION TO REVOKE
## MAGISTRATE JUDGE'S RELEASE ORDER

The United States, by and through undersigned counsel, and pursuant to Title 18, United States Code, Section 3145 and Southern District of Florida Local Magistrate Judge Rule 4(a)(2), submits this motion to revoke the Magistrate Judge's Order Setting Bond (Docket 404) (the "Order").   For the reasons set forth below, the Order should be revoked and defendant Christian E. Sanon ("SANON") should be detained pending trial.

I.      **PROCEDURAL POSTURE**

On December 19, 2022, SANON was charged by complaint with Smuggling Goods from the United States, in violation of 18 U.S.C. § 554, Providing Unlawful Export Information, in violation of 13 U.S.C. § 305, and conspiracy to commit these crimes, in violation of 18 U.S.C. § 371.   Case No. 22-mj-04161-McAliley, docket 3 (the "Complaint").   The affidavit in support of the Complaint sets forth that SANON was a dual Haitian-American citizen at the center of efforts to depose President Jovenel Moise of Haiti, who was assassinated on July 7, 2021. Complaint, pp. 3-4.   These efforts included the unlawful exportation of ballistic vests into Haiti, the financing of private Colombian security forces, and efforts to acquire military weapons, including machineguns, RPGs, hand grenades, and ammunition—all so SANON could, himself,

assume the presidency.   *Id.*   At the time of the filing of the Complaint here in the United States, SANON was detained in Haiti, a country in which he remains under active investigation.

On January 31, 2023, after Haiti agreed to transfer custody of SANON to the United States so he could stand trial here, the Complaint against SANON was unsealed, he was transferred to the U.S. from Haiti under law enforcement supervision, and his initial appearance was set the next day.   Case No. 22-mj-04161-McAliley, dockets 6-7.   At that hearing, SANON stipulated to detention, reserving the right to revisit bail.   *Id.*, docket 7.   On February 14, 2023, SANON was indicted in a Third Superseding Indictment, along with codefendants Arcangel Pretel Ortiz, Antonio Intriago, Walter Veintemilla, James Solages, Joseph Joel John, Joseph Vincent, German Alejandro Rivera Garcia, Rodolphe Jaar, Mario Antonio Palacios Palacios, and Frederick Joseph Bergmann, Jr.   Case No. 22-cr-20104-MARTINEZ, docket 107.   SANON was indicted for the same crimes alleged in the Complaint and arraigned the next day.   *Id.*, docket 113.

The investigation continued, and on June 20, 2023, the United States filed a Fourth Superseding Indictment, accusing SANON and others of conspiring to take part in, and furnishing money for, a military expedition from the United States against a foreign state [Haiti] with which the United States was at peace, in violation of 18 U.S.C. §§ 371 and 960.   *Id.*, docket 330.   The Fourth Superseding Indictment also retained the three other charges pertaining to the illegal export of ballistic vests to Haiti.   *Id.*   The penalty sheet filed with the Indictment put SANON on notice that he faced an aggregate sentence of 28 years' imprisonment.   *Id.*, pp. 26-27.   SANON was arraigned on this Indictment on June 30, 2023.   Docket 360.

On September 12, 2023, SANON moved for release from custody, and a hearing was held before the Honorable Magistrate Judge Alicia M. Otazo-Reyes.   Docket 404.   The United States

opposed SANON's release, arguing that SANON posed a flight risk under 18 U.S.C. § 3142(f)(2). As part of the factual proffer in support of its motion, the United States called Federal Bureau of Investigation ("FBI") Special Agent Michael Ferlazzo and incorporated by reference the facts stated in the Complaint.   A transcript of the detention hearing was filed at docket 406 ("Tr.").

## II.    THE DETENTION HEARING

### A.    The United States' Proffer

#### 1.    Overview of the Conspiracy to Remove President Moise from Office

On July 7, 2021, the President of Haiti, Jovenel Moise, was assassinated in his residence in Port-au-Prince, Haiti.   That morning, armed assailants wearing ballistic vests entered the President's residence.   The President was shot twelve times and died as a result.   His wife, the First Lady, survived, but also suffered multiple gunshot wounds.   Tr. at 5.

The investigation into the events of July 7 revealed the President's assassination was the culmination of months of planning. Much of that effort was spearheaded by Arcangel Pretel Ortiz and Antonio Intriago, as principals of two related South-Florida companies, Counter Terrorist Unit Federal Academy and Counter Terrorist Unit Security (collectively "CTU"), which were funded by Worldwide Capital Lending Group ("Worldwide") through its principal, Walter Veintemilla.[1] Tr. at 5-6.

Ortiz, Intriago, and Veintemilla were each motivated by the expectation of vast financial opportunities in Haiti should they succeed in ousting President Moise and replacing him with their

---

[1]      SANON is charged in the Fourth Superseding Indictment alongside Ortiz, Intriago, Veintemilla, and others.   At their respective detention hearings, Ortiz and Veintemilla were ordered detained.   Dockets 128 and 132.   Intriago consented to detention.

intended successor.    For months, that intended successor was to be SANON—a Haitian political hopeful who had long opposed President Moise, who had attempted to seek the presidency on prior occasions, and who had amassed a number of supporters for his efforts.    Tr. at 6.    It was these two factions, working together, that set off a series of events which culminated in President Moise's murder.

Beginning in approximately February 2021, Ortiz and Intriago, as principals of CTU, agreed to support SANON's attempts to replace President Moise in Haiti.    As for Worldwide, by the end of April 2021, its principal (Veintemilla) had agreed to finance CTU's support of SANON, and extended a $175,000 line of credit to CTU.    In addition, witness interviews, flight records, seized electronic evidence, and documents confirm that CTU and Worldwide hosted meetings amongst coconspirators in South Florida in April and May 2021, which SANON attended.    Tr. at 6-7.

According to witness interviews and electronic evidence, at these meetings, the conspirators discussed how to forcibly remove President Moise and install SANON as President. Their discussions included how to acquire weapons and military equipment to facilitate their plan. Tr. at 7.    Initially, the conspirators planned to foment a public uprising aimed at providing cover as they ousted President Moise and installed SANON as President.    During the course of the conspiracy, the plan to install SANON as president involved attempts to physically remove President Moise from office.    To aid them in their efforts in Haiti, CTU retained and (with financial support from Worldwide) transported at least 20 ex-soldiers from the Colombian military to Haiti.    Tr. at 7.

Over time, the plan grew to encompass the possibility of arresting President Moise pursuant to an arrest warrant purportedly signed by Haitian authorities in 2019, as well as an unsuccessful effort to seize President Moise at the airport upon his return from a trip and spirit him away by airplane to a location outside of Haiti. Around the time the airport operation failed, the conspirators shifted their support away from SANON and instead sought to install Individual-2 as President Moise's successor. Tr. at 7-8.

The evidence shows that despite this shift in support to Individual-2, SANON retained the hope that the conspiracy's efforts would result in him gaining significant political office. Indeed, even as the conspiracy culminated in the President's assassination on July 7, the evidence shows SANON was discussing with his coconspirator Frederick Bergmann, Jr.[2] his expectation of being "hired," which appears to be a reference to taking public office in Haiti. Tr. at 8.

2.      April and May 2021 Operational Planning

Over the course of the conspiracy, coconspirators exchanged written and audio communications in furtherance of their operational planning. For example, messages sent on April 21, 2021, show coconspirators discussing their need of weaponry. Messages that day show co-defendant James Solages advising Ortiz: "I'm going to meet with J3 [known to be Joseph Joel John][3] to discuss the equipment that they have available and discuss on how we can purchase if necessary." That same day, Solages sent Ortiz and SANON a list of military equipment needed for the operation. The document identifying that equipment was titled "Fighter for the Liberation

---

[2]      Bergmann is also charged in the Fourth Superseding Indictment with the identical crimes as SANON. Docket 330. At his detention hearing, Bergmann was released on a $1.5 million bond. Dockets 128 and 132.

[3]      Solages and John are also coconspirators named in the Fourth Superseding Indictment.

of Haiti," and it included, among other things: "M-4" rifles, "M-60" machineguns, "Kalashnikov" rifles, "combat boots," "hand grenades," "gas mask," "full bulletproof [sic] vests," 6 "RPG" [rocket-propelled grenades], and over 20,000 rounds of ammunition.   The evidence shows SANON received and reviewed that document, responding, "who prepared?"   Tr. at 8-9.

Knowing full well the extent of the weapons being amassed for the operation to remove President Moise, SANON continued his active participation in the conspiracy.   In fact, SANON was so confident that he would assume the Presidency that as early as May 2021, at least one of his coconspirators was working on an acceptance speech.   On May 13, 2021, Bergmann sent SANON and others an email attaching a document titled "FreedomSpeech.docx."   There, Bergmann wrote, "[a]ttached as we discussed . . . the drafting of the speech was very careful to . . . [among other things] not have the appearance of a U.S. takeover: this is a Freedom initiative lead by community leaders, religious leaders, etc. . . ."   The speech appears intended to be used by SANON once he had assumed power in Haiti after a community uprising that the defendants originally hoped they could use to oust President Moise.   Significantly, the language of the speech makes clear that the group envisioned such ouster would *require* violence.   The speech states: "who could question your actions to defend yourselves and your family from the danger of the [sic] evil. . . . I take no pleasure in violence.   But the bible says that those that plow evil . . . . . [ellipses in original] and those who sow trouble . . . . [ellipses in original] reap it (Job 4)."   Tr. at 9-10 (emphasis added).

On or about May 17, 2021—days after this email, and nearly three weeks after Solages sent Ortiz and SANON the weapons list—CTU and SANON entered into a contract whereby CTU agreed to provide SANON with the equipment needed to support SANON's "private military"

forces.   SANON personally signed that document, as did Intriago.   Pursuant to this "consultant agreement," CTU provided approximately 25 ballistic vests, among other things, for use by those in Haiti, including the Colombian nationals hired by CTU in support of this contract.   Tr. at 10-11.

According to witness statements, on or about May 21, 2021, SANON and Intriago illegally transported approximately five CTU-branded ballistic vests aboard a private flight from the Southern District of Florida to Haiti and provided some of these vests to the Colombian nationals. Not long after, on May 28, 2021, SANON texted someone a resignation letter that purported to be for President Moise, stating "we have prepared it for him to sign."   Tr. at 11.

3.   June 2021 Operational Planning and Shipment of Ballistic Vests

By June, communications amongst the coconspirators make clear that they were contemplating a coup d'état.   For example, on or about June 2, 2021, an individual with knowledge of the coconspirators' activities texted Bergmann to ask: "What time is the next Coups [sic] meeting," followed by: "You can bridge me into the call with Cristian [sic]," a reference to SANON's first name.   Notably, a few hours after the assassination, Bergmann, who had been in communication with SANON, texted that same individual, stating "[i]t happened," and "Battle right now."   Tr. at 11.   There was no need for Bergmann to further explain what the "it" was that had happened, as witness testimony will establish the conspirators by this point knew and intended that the President was to be deposed, including by violence if necessary.

Further, references to a "battle" are consistent with the other evidence showing the coconspirators preparing for a forcible removal of President Moise.   For example, documentation of the funds that Worldwide extended to SANON included funding for ammunition or (as the

coconspirators referred to it in coded language) "screws and nails."   This is evidenced by a document titled "Loan Provided to Christian SANON," that Veintemilla forwarded to Ortiz on June 7, 2021.   Amongst other line items, the document specified an amount of $15,000 to "James [Solages] for screws and nails," and $250,000 for "100 Complete vest."   This is believed to be a reference to ballistic vests, and the investigation confirmed that CTU had a large number of these vests and planned to use them to outfit the Colombian nationals and others, for the benefit of SANON.   Tr. at 11-12.

Around that same time, on June 9, 2021, Veintemilla sent a text message to Bergmann, warning Bergmann that the operation to replace President Moise had likely leaked.   By then, SANON had held a number of meetings relating to his presidential aspirations, and Veintemilla warned that therefore the conspirators were risking arrest by the President's personnel. Veintemilla then urged Bergmann to help move the operation forward quickly because otherwise it was "very dangerous" for those involved if they were to "get caught."   Bergmann forwarded that text to SANON on the same day, followed by copies of the commercial invoice and shipper's letter of instruction that falsely claimed that the ballistic vests that the group was exporting were "medical x-ray vests." After receiving the documents, SANON responded: "I got it thank you." Tr. at 12-13.

Bergmann then texted SANON and Intriago regarding the ballistic vest shipping logistics, stating: "Christian [SANON] the plane arrives in Port-au-Prince at 2:30 PM tomorrow.   I assume that [Associate] will handle customs including any fees and the coordination of ultimate delivery of the supplies will be handled but [sic] you guys on the ground."   SANON replied: "Confirmed." SANON and Bergmann then used code to refer to the items, with Bergmann stating: "[t]hese guys

say they were ready and waiting for surgical instruments but no x-ray vests?" to which SANON said: "What?"   BERGMANN responded: "[t]he X-ray vests that are coming tomorrow: seems like they needed these?"   SANON replied: "Yes they do."   Contextually, these texts show SANON and Bergmann communicating, in code, about getting the ballistic vests to the Colombian nationals.   Tr. at 14-15.

The next day, June 10, 2021, Bergmann and Intriago shipped 20 CTU-branded ballistic vests from the Southern District of Florida to Haiti.   Bergmann arranged, paid for, and completed the shipping paperwork for the shipment of the ballistic vests.   Intriago delivered the packaged vests to the Shipping Company.   The shipment declarations and forms that Bergmann provided to the Shipping Company in relation to the export of the ballistic vests, which he had also provided to SANON, falsely stated that the items being shipped were "medical x-ray vests and school supplies" and that the value of the vests was $1,000 total, was an amount significantly below their actual value.   Tr. at 15-16.

Bergmann later texted SANON to see if the ballistic vests had cleared customs in Haiti, to which SANON replied "not yet."   Bergmann also worked to ensure that SANON knew what lie needed to be told to get the vests through customs, stating: "Please explain to [Associate] we have to use these type of vests so health care providers can be protected from harmful effects of x-rays?" SANON responded: "Ok I will let him know that."   Tr. at 16-17.   This evidence shows SANON fully embraced the lies Bergmann told in an attempt to get the vests, as controlled export items, out of the United States and into Haiti. In fact, SANON initially lied to law enforcement, then walked it back by attempting to claim in a post-*Miranda* statement that while he knew the ballistic vests were being shipped to Haiti, he assumed that his coconspirators had completed the paperwork

accompanying them truthfully. Tr. at 15.   This is demonstrably false: the above communications show that SANON explicitly discussed deceiving customs officials with respect to a shipment of export-controlled items.

           4.     The Conspirators Shift Support from SANON to Individual-2 for President

In or around mid-June of 2021, some of the conspirators decided that SANON lacked the necessary qualifications and/or support to serve as President of Haiti.   For example, on or about June 10, 2021, Ortiz messaged Rivera advising that SANON was barred from being President under Haiti's constitution, but simply had been intending to rewrite it.   Around this time, the conspirators began to shift their support to Individual-2 to serve as President of Haiti.   The investigation has established, however, that SANON continued to communicate with the conspirators and support President Moise's forcible removal in the hopes of obtaining a political position in the new Haitian government.   Tr. at 18.

On July 4, 2021, Intriago, still referring to SANON as "Mr. President," texted SANON asking for help obtaining funds for food and groceries for the Colombians who had initially been smuggled into Haiti to provide security and manpower in support of SANON's attempt to overthrow President Moise.   Even at this late stage—just three days before Moise would be murdered—SANON agreed to help, acknowledging that the Colombians were "our men."   Tr. at 18-19.   As with many other demonstrable falsehoods, SANON maintained in a post-*Miranda* interview in Haiti that he had no contact with the Colombians by around June 2021.   Tr. at 18-19.

5.    The Assassination

On July 6, 2021, prior to the assassination, several conspirators met at a home controlled by one of the conspirators (Jaar) which was located near President Moïse's residence.   At that meeting, firearms and equipment were distributed to conspirators, and Solages falsely announced to the group that it was a "CIA Operation," by which, he clarified in substance, he meant the mission would involve killing President Moïse.   Tr. at 19.   Several armed conspirators drove in a convoy to President Moïse's residence.   Once the group of conspirators arrived outside the residence, Solages falsely announced to those in the neighborhood and inside the President's residence that they were engaged in a "DEA Operation" in an attempt to ensure compliance by the President's security (some of whom had been bribed in order to comply with the conspirators' commands) and other civilians.   A subset of the Colombian conspirators—the very people SANON hired to protect himself and his interests in Haiti—was assigned to find the President and assassinate him.   They succeeded, seriously injuring the President's wife by shooting her as well. Tr. at 19-20.

6.    Aftermath

On or about July 7, 2021, after calling SANON multiple times, Ortiz messaged SANON asking SANON to intercede, and sent to SANON photographs of certain Colombian nationals and Solages hiding from Haitian authorities.   In these photographs, the Colombian nationals are wearing the very CTU-branded ballistic vests that were illegally shipped to Haiti with SANON's help.   Tr. at 20.

Phone communications show that Ortiz contacted or attempted to contact SANON repeatedly after the assassination, at 4:50 a.m.   The same pattern is evident between SANON's

phone and Bergmann's phone, at 4:59 a.m.   And in fact, it was after that last attempted communication, at 5:32 a.m., that Bergmann texted his associate stating, "battle right now."   Tr. at 20.

Later that morning, Bergmann texted SANON a news article stating that President Moise had been murdered and asked: "R u ok ????"   SANON responded: "Yes I am, [a]nd safe." Bergmann replied: "Thank god. What about the guys. I have been so worried."   Notably, as with so many other communications, Bergmann no attempt to explain who "the guys" were, evidently trusting that SANON would know exactly to whom he was referring. And indeed, SANON texted that: "There was a diplomatic vehicle that crossed over to reach them" and "I don't know what is happening."   Tr. at 20-21.

At this point, SANON appeared to have two goals, notwithstanding the brutal murder of the President of Haiti: to assist the Colombians who assassinated the President, and continue his pursuit of his own political ambitions.   After the above texts, Bergmann told SANON, "[I]t's time for people to hit the streets."   SANON replied: "[t]he leaders are working on that." Bergmann responded that: "we are all on standby once you know what is going on."   Tellingly, Bergmann looked to SANON as the leader of his loyal faction, and perhaps even more tellingly, SANON deleted these incriminating messages from his device, which were later recovered from Bergmann's phone.   Tr. at 21.

The next day, Bergmann asked SANON if he needed to hire "someone," a reference to legal counsel. SANON responded that he was not sure, because "I have not been hired."[4]   When

---

[4]     Contextually, this appears to be a reference to Sanon being offered a position within the Haitian government.

Bergmann asked SANON what his supporters were doing to help, SANON answered "financially nothing but their voice support count[s] a lot for the position we are waiting for at this time." Later SANON texted he was not "hired," and confirmed he needed a lawyer.   Tr. at 21-22.   In other words, once it became clear that the planned coup d'état had failed, and SANON would not be ascending to a position of political power in Haiti, he understood he needed to hire legal counsel to protect him from his actions.

SANON also forwarded Bergmann several pictures of the captured Colombians and told Bergmann to help them with a lawyer.   Bergmann responded, "what is [sic] Walter and Tony doing" (understood to be Walter Veintemilla and Antonio Intriago).   "Nothing," SANON wrote. Bergmann texted: "I have asked for someone to look (lawyers?).   But who will pay?   I don't know what happened or why but this will probably get back to them the three stooges. They are immoral and responsible for this mess; not sure what they were thinking."   SANON replied "I don't know who will pay.   But you are right about them."   Tr. at 21-22. The context of these messages clearly demonstrates that there was, as before, no need for Bergmann to identify the "three stooges"—SANON understood it was a reference to his partners in this enterprise, CTU (through Ortiz and Intriago) and Worldwide (through Veintemilla).

Shortly after the President's assassination, SANON was taken into Haitian custody. While there, he submitted to two voluntary, post-*Miranda* interviews with U.S. law enforcement, claiming (as he did before the magistrate judge) that he owned a property in Haiti which he estimated was valued at one million dollars; he also referred to his medical schooling in the Dominican Republic.   SANON remained detained in Haiti until January 31, 2023, when he was

transferred into United States custody and brought to the Southern District of Florida.    Tr. at 22-23.

7.    Other Evidence related to SANON

The Pre-trial Services Report noted that SANON became a naturalized U.S. citizen in 1982. Nevertheless, he spent significant periods residing outside the Southern District of Florida.

First, SANON reported attending medical school in the Dominican Republic in 1985.[5] Between 1991 and 1996, SANON reported living in Missouri, followed by a stint in South Florida from 1997 to 2000, then Tampa from 2000 to 2006.   He left the United States, claiming that he resided in Haiti for a period of six years from 2006 to 2012.   He next moved back to the Dominican Republic from 2012 to 2015, before relocating yet again to Florida from 2016 to 2020. Significantly, he reported that he traveled to Haiti in 2020 to reside there, which is consistent with his attempt to seek political office in that country.[6]

During the hearing, the United States advised Magistrate Judge Otazo-Reyes of a 2013-2014 bankruptcy proceeding in which SANON's debts where discharged, only to have that discharge revoked upon uncontested allegations that he defrauded the bankruptcy court to obtain that discharge.   For the Court's convenience, the relevant facts are as follows: SANON and his wife filed for bankruptcy in 2013.   Exhibit 1, at ¶ 4.[7]   Upon filing for bankruptcy in federal court,

---

[5]    While SANON claims in various places that he is a "licensed" physician, the United States has been unable to locate any such license or medical degrees, and some witnesses have cast doubt on whether he is a licensed medical doctor of any kind.
[6]    Indeed, the investigation has established that part of the perceived deficiency in SANON's ability to replace President Moise was SANON's residency in the United States, rather than Haiti.
[7]    There were three documents related to SANON's bankruptcy referenced in the detention hearing, all of which were marked as court exhibits.   Tr. at 4-5, 62-63.   They are attached hereto as Exhibits 1, 2, and 3.   Exhibit 4 is the draft contract provided to the bankruptcy trustee showing the proposed sale by SANON and his wife.

he advised under penalty of perjury that he owned only a single property valued under $150,000, and had no ownership or equity interests in any businesses.   After his debts were discharged by the bankruptcy court, the U.S. Trustee received a draft contract demonstrating that SANON was seeking to sell property he owned in Haiti—property which he failed to disclose in his bankruptcy proceedings.   *Id.* at ¶ 15; Exhibit 4.   Furthermore, months after that came to light, SANON made amended filings identifying that he had an ownership or equity interests in at least *seven business* which he had failed to disclose prior to his loans being discharged.   *Id.* at ¶ 16.   Notably, those disclosures included a business located in the Dominican Republic.   Exhibit 2.   In its filings, the U.S. trustee noted it had found at least an additional *four businesses* in which SANON held an interest and which he had never disclosed.   Exhibit 1, at ¶ 17.   As a result, the Trustee sought revocation of discharge, alleging SANON obtained the discharge through fraud.   *Id.* at ¶ 23-24. SANON did not contest these allegations, and the discharge was revoked.   Exhibit 3.

With respect to his finances, SANON reported that he purchased two properties in Haiti since 2015: (1) a home purchased in 2015 (the year *after* his failed effort at bankruptcy), which he estimated was valued at $120,000; and (2) 2.5 acres of land purchased in 2019, which he stated was worth $30,000.   This stands in stark contrast to SANON's post-*Miranda* statement to law enforcement, where he advised he owned property in Haiti valued at $1 million.   Additional questions about SANON's assets arose during the bail hearing, as the defense asserted that the property SANON *told Pretrial Services he had purchased* was actually owned by his father, and that SANON owned no assets in Haiti.   Tr. at 78.

According to the Pretrial Services Report, SANON identified that he has nine siblings residing in Florida, Pennsylvania, New York, Maine, Connecticut, and Missouri.   SANON also stated that he has three adult children who reside in Florida.   Pretrial Services Report, p. 2.

B.  Defense Arguments

During Agent Ferlazzo's cross-examination and subsequent argument, the defense relied heavily upon the fact that, unlike many of his codefendants, SANON was not directly charged with the assassination of the President (18 U.S.C. §§ 956(a) and 2339A).   Tr. at 25-26, 34, 36-37. From this, counsel argued the inference that SANON had no knowledge of a planned violent overthrow.   Tr. at 70.   During re-direct, however, Agent Ferlazzo clarified that SANON unquestionably received a weapons list titled "Fighter for the Liberation of Haiti" in April 2021, months before the assassination, and during the time that he was meeting with coconspirators in Florida.   Tr. at 54-55.

The defense also asked Agent Ferlazzo about a whiteboard that appeared to depict a planned assault on the presidential palace in Haiti, noting that the United States had not shown that SANON had received images of that whiteboard.   Tr. at 49.   On re-direct, however, the witness testified that, during his post-arrest statement, SANON referenced a plan to surround the presidential palace with SANON supporters, thereby forcing the president to resign—a plan that mirrored what was depicted on the whiteboard.   Tr. at 49.

The defense attempted to draw parallels between SANON and Bergmann, who faces the same charges and is currently out on bond.   However, Bergmann was not included on the communications involving firearms and weapons needed for the operation.   Tr. at 81.   Nor did Bergmann set the plan in motion by seeking to assume the presidency of Haiti.   In essence,

SANON recruited Bergmann into the conspiracy to help provide strategic and financial advice. It was SANON, on the ground in Haiti during most of the conspiracy, who maintained a direct line to Ortiz, Intriago, and Veintemilla.   By contrast, Bergmann remained in Florida the entire time, gathering information when he could and seeking to assist SANON, but not himself a focal point of the conspiracy.   Finally, Haitian authorities continue to pursue a criminal case on SANON, and they detained him in Port au Prince prior to the United States' filing of charges.   This provides an additional incentive for SANON to flee, which does not exist for Bergmann.

## III.    THE MAGISTRATE JUDGE'S RELEASE ORDER

After argument, Magistrate Judge Otazo-Reyes found that the United States had not met its preponderance of the evidence burden to demonstrate that SANON was a flight risk.[8]   Tr. at 82-88.   In so doing, Magistrate Judge Otazo-Reyes stated:

> because the government is traveling under risk of flight, then what we need to look at is has the government established, by a preponderance of the evidence, that the Defendant cannot be relied upon to appear in court as required.   So that's the standard that needs to be applied, and of course we look at the strength of the evidence, but we don't as – in danger to the community we don't look at the Defendant's prior history or anything like that, which we don't have.

Tr. at 83.   The Court also lent little weight to the attempted bankruptcy fraud because it was approximately 10 years old, as well as other dishonesty evidence due to the Court's stated practice of not considering such evidence for risk of flight.   Tr. at 83-84.

Accordingly, Judge Otazo-Reyes set a $500,000, 10% secured bond and a $1 million personal surety bond to be signed by SANON's wife, two sons, and his brother.   Otherwise, SANON was ordered to be on house arrest other than for medical needs, court appearances,

---

[8]      Under the charges SANON is presently facing, there is no presumption of detention pursuant to 18 U.S.C. § 3142(f)(1).

attorney visits, and religious worship.   The United States asked for a stay pending its decision to appeal, which Judge Otazo-Reyes granted and set for September 15, 2023, at noon.   Prior to that time, the United States filed its notice of appeal.   Docket 405.   This Court granted the stay on September 15.   Docket 407.

## IV.   LEGAL STANDARD

Upon the government's motion, the district court reviews a detention order *de novo*.   *See* 18 U.S.C. § 3145(a)(1); *see United States v. Hurtado*, 779 F.2d 1467, 1481 (11th Cir. 1985); *United States v. Niles*, 874 F. Supp. 1372, 1374 (N.D. Ga. 1994) (citing *United States v. King*, 849 F.2d 485, 490 (11th Cir. 1988)).   The district court must undertake an "independent consideration of all facts properly before it."   *United States v. Gaviria*, 828 F.2d 667, 670 (11th Cir. 1987) (citing *Hurtado*, 779 F.2d at 1480-81).   But while the review of the record developed before the magistrate court must be *de novo*, a *de novo* hearing is not required.   *Gaviria*, 828 F.2d at 670. *See also King*, 849 F.2d at 490-91 ("if the district court concludes that the additional evidence does not affect the validity of the magistrate's findings and conclusions, the court may state the reasons therefor and then explicitly adopt the magistrate's pretrial detention order.").   In the event that the district court concludes, after a careful review of both the parties' papers and the evidence presented at the detention hearing, that the evidence supports the Magistrate Judge's findings of fact, and the Magistrate Judge correctly applied the law, "[t]he court may then explicitly adopt the magistrate's pre-trial [release] order."   *King*, 849 F.2d at 490.

Pretrial detention is only appropriate where a defendant presents a danger to the community or a risk of flight such that there are no set of conditions sufficient to mitigate these risks.   *Id.* at 489-91. The Government must show that a defendant is a danger to the community by clear and

convincing evidence; only a preponderance of the evidence is required to establish that a defendant poses a risk of flight.  *Id.*  Nor does the Government need to establish both factors; either one, standing alone, presents a sufficient risk to justify detaining a defendant pending trial.  *Id.* at 488.

Among other considerations, the fact that a defendant will face significant penalties upon conviction is sufficient to support a judicial determination that the defendant poses a risk of flight. *See United States v. Shuklin*, No. 19-4171, 2020 WL 2992522, at *1 (6th Cir. Mar. 18, 2020) (observing that "significant penalties . . . provide a strong incentive to flee"); s*ee also United States v. Sabhnani*, 493 F.3d 63, 76 (2d Cir. 2007).

Even when the government moves for detention solely under 18 U.S.C. § 3142(f)(2), based upon flight risk, dangerousness remains a proper consideration.  Indeed, 18 U.S.C. § 3142(g) mandates consideration of "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."  18 U.S.C. 3142(g)(4).  *See United States v. Holmes*, 438 F. Supp. 2d 1340, 1351 (S.D. Fla. 2005) (holding that dangerousness is not excluded in cases involving detention hearings brought under 18 U.S.C. 3142 (f)(2), "based on a plain reading of the statute's unambiguous language and structure, the Act's legislative history, and [other courts'] analyses."); *accord United States v. Flores-Bocanegra*, 2021 WL 1215820 at *4 (S.D. Fla. Mar. 31, 2021); *United States v. Castellanos-Almendares*, 2019 WL 3937862 at *2 (S.D. Fla. Aug. 20, 2019).

In addition to considering dangerousness, the court must consider other factors, including the nature and circumstances of the offense charged; the weight of the evidence against the defendant; and the defendant's history and characteristics, including the person's character and conduct.  18 U.S.C. § 3142(g).  Each of the § 3142(g) factors will be discussed in turn.

## V.      APPLICATION

A.  <u>The Nature and Circumstances of the Offense Charged</u>

There are few offenses more serious than attempting to forcibly overthrow the president of a sovereign nation, ultimately resulting in his assassination.   To be clear, that is precisely what SANON is charged with doing, by virtue of his conspiring with others to take part in a military expedition against Haiti, a friendly nation.   While SANON is not presently charged with crimes that require the Government to prove at trial SANON was aware of when and how President Moise would be assassinated, the Government has amply demonstrated through the evidence cited herein and presented at the detention hearing, that SANON unquestionably understood that the overthrow of President Moise would be violent.

While the conspirators solicited by SANON ultimately realized that SANON had neither the popular support nor political cache to become president, SANON never ceased working toward his goal of assuming a position of power within Haiti. SANON waited, hopeful that he would receive some type of political appointment in the aftermath of the storm he set in motion.  *See, e.g.*, Tr. at 21 (SANON describing the position "we are waiting for at this time").   Thus, while he may not have directly plotted a murder in the final days before the President's assassination, make no mistake:  Without SANON's desperate political ambition, President Moise likely would still be alive.

Indeed, the investigation into the assassination is proceeding both here and abroad; Haiti works still to hold accountable all of the perpetrators of this terrible attack on its sovereignty. SANON was held in custody in Haiti to answer for these crimes, and while Haiti allowed SANON—a United States citizen, who is also criminally liable for his acts here—to be removed

so he could stand trial in the U.S., the prospect of Haiti seeking his return remains very much alive, regardless of what happens in the instant case.   This concern, as well, creates significant pressure for SANON's to flee.

B.  The Weight of the Evidence Against SANON

The evidence that SANON intended a violent coup to overthrow President Moise and take his place is compelling and includes: texts detailing military-grade weapons needed for the operation; speeches that acknowledged violence was necessary to take the presidency; copies of a resignation letter that he helped draft for President Moise to "sign"; references to the ex-Colombian military soldiers as "our men," and more.   Tr. at 18-19.   Perhaps most telling is SANON's complete lack of surprise or remorse when the assassination occurred.   On July 7, 2021, the entire world, upon hearing the news, was shocked and appalled by the brazen attack.   But upon awakening to the new world he had helped create, on July 7, 2021, SANON chillingly took it all in stride, as if all was going to plan.   For example, on the morning of the assassination, SANON and Bergmann discussed only their concerns regarding *the assassins*, not the President or his family.   Tr. at 20.   Against this backdrop, SANON remained focused on his own ambitions, waiting to be "hired" in the wake of the assassination due to the "support" of the people.   Tr. at 21; *supra* at II. A. 6.

The strength of the evidence underscores SANON's incentive to flee, given the potential penalties SANON faces.   During argument, the defense downplayed SANON's sentencing exposure, claiming it was less than five years.   However, there is no specific provision in the U.S.S.G. that addresses a violation of the Neutrality Act, 18 U.S.C. § 960.   In such cases, U.S.S.G. § 2X5.1 directs one to "apply the most analogous offense guideline"—here, it would be § 2A1.5,

conspiracy or solicitation to commit murder.   Per U.S.S.G. § 2A1.5(c)(1), the base level set forth in U.S.S.G. § 2A1.1 (First Degree Murder) is applied if the offense resulted in the death of a victim. As a result, the base offense level would 43 plus the 12-level terrorism enhancement[9] under U.S.S.G. § 3A1.4, resulting in a base offense level of 55 and a Criminal History Category VI.   *See* U.S.S.G. §§ 3D1.1, 3D1.4.   Thus, the guidelines prescribe a "total punishment" of life, which exceeds the statutory maximum for any count SANON is charged with.   Thus, under U.S.S.G. § 5G1.2 "if the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively . . . ." U.S.S.G. § 5G1.2(d).   As a result, consecutive sentences as advised by the guidelines means SANON faces a sentence of up to the 28-year potential statutory maximum if convicted of all counts.[10]   For a 64-year-old man, that is effectively a life sentence.

---

[9]      This Chapter 3 enhancement applies where, as in the instant case, the charge of conviction is a felony that was intended to promote a federal crime of terrorism such as 18 U.S.C. § 956(a)(1) and was calculated to influence or affect the conduct of government.   *See* 18 U.S.C. § 2332b(g)(5).   Thus, it should apply regardless of what cross-reference the Court finds applicable.

[10]      The defendant is charged with two counts of 18 U.S.C. §371 (5 year maximum sentence each), one count of 18 U.S.C. § 960 (three year maximum), one count of 18 U.S.C. § 554 (10 year maximum), and one count of 13 U.S.C. § 305 (5 year maximum).   On the export charges alone, which group separately from the Neutrality Act and conspiracy charges, the base offense level is 26. *See* U.S.S.G. § 2M5.1(a)(1).   The § 3A1.4 terrorism enhancement should apply, resulting in a total offense level of 38, and a criminal history category of VI, again far exceeding the maximum sentence under the charged offenses.   It bears noting that while defendant claimed that he had no knowledge of the assassination, and presumably would argue that he would not be subjected to this enhancement.   However, in this regard, it is significant to note that the government's burden of proving guideline enhancements is by a preponderance of the evidence.   *United States v. Grady*, 18 F.4th 1275, 1292 (11th Cir. 2021).   Obviously, this is a lower burden than proof beyond a reasonable doubt at trial, which helps explain why SANON is not currently charged with the crimes related to the assassination.   Indeed, the texts and evidence outlined above shows that SANON knew, by *at least* a preponderance of the evidence, that President Moise would be assassinated as part of the conspiracy he initiated.

C.  <u>SANON's History and Characteristics</u>

SANON's murky history and record of falsehoods weighs heavily in favor of finding him to be a risk of flight.   While Judge Otazo-Reyes stated that a propensity for dishonesty was not indicative of a defendant's inability to comply with court orders [Tr. at 84], many courts have held otherwise.  *See United States v. Haynes*, 2019 U.S. Dist. LEXIS 187464, *7-8 (S.D. Fla. October 28, 2019) ("the Court was particularly troubled by the fact that Defendant, a non-U.S. citizen, exhibited a pattern of lies and deception"); *United States v. Alvarez*, 2006 U.S. Dist. LEXIS 78365, *15-10 (S.D. Fla. October 27, 2006) ("based upon the nature of the offense here, based upon the commendations of the Cuban government . . . based upon the fact that they are facing a substantial period of incarceration . . . and the fact that it is a crime of deception . . . I think that it is likely that they would flee to Cuba where they are likely to be well-received for their efforts."); *United States v. Maucha*, 2023 WL 4131016, at *4 (D.D.C. June 22, 2023) ("the nature of the charged offenses, which are based on acts of deception, enhances the risk of flight").

First, it is significant that one of the charges SANON is facing, Submitting False or Misleading Export Information in violation of 13 U.S.C. § 305, is a crime of deception.   Second, SANON repeatedly failed to disclose, after having taken oath and under penalty of perjury, property that he and his wife were attempting to sell immediately after the bankruptcy, as well as his partnerships in various entities.

Defense counsel gave these representations short shrift, claiming SANON was confused. There was no confusion: over a significant period of time, SANON repeatedly make such false statements, over and over again.   These types of misrepresentations go to the heart of a defendant's suitability and trustworthiness to obey release conditions; indeed, they strike against

the Court's ability to craft appropriate conditions in the first place, as these conditions necessarily would have to rely upon SANON's forthrightness with the Pretrial Services officer.   SANON's prior statements in bankruptcy were statements made under penalty of perjury, during a time when SANON had everything to gain from his falsehoods.   After lying to the bankruptcy court, he tried the sell the property immediately after his debts were discharged in bankruptcy.   It was only after he was caught red-handed, in late 2014, SANON and his wife agreed not to be discharged in bankruptcy.   Exhibit 3.   And just a few short months later, SANON purchased another property in Haiti, according to the pretrial report.   Pretrial Services Report, p. 2 (noting purchase of home in Jacmel, Haiti in 2015).   This is fraud, plain and simple.

Judge Otazo-Reyes noted that "all that is approximately 10 years old" [Tr. at 83], and therefore discounted this evidence. But such a consistent pattern of deceit, after swearing an oath to the court, upon penalty of perjury, cannot and should not simply be set aside.   Moreover, such conduct is wholly consistent with SANON's recent lies to authority.   For instance, when interviewed in Haiti by the FBI shortly after the assassination, SANON made demonstrably false statements, including (i) lies about his role in and understanding of the importation of ballistic vests into Haiti, Tr. at 23; (ii) his knowledge of and communication with the Colombian security contractors days before the assassination, Tr. at 19; and (iii) his professed disinterest in violence or firearms during a time in which he was receiving text messages detailing the need for military-grade weapons and ammunition, Tr. at 9, and receiving drafts of his own speeches acknowledging that violence would be used to overthrow the President, Tr. at 10.   SANON also sought to delete or destroy evidence that could implicate him when President Moise was assassinated, such as his

text messages with Bergmann.   Tr. at 21.   All this deceptive and manipulative behavior demonstrates that SANON poses a serious risk of flight and weighs strongly in favor of detention.

The United States has also made repeated efforts to verify aspects of SANON's self-reported history, with little luck. For instance, the defendant claims to have received a medical degree in the Dominican Republic, but this appears to be the only evidence of him being a doctor. The United States has confirmed SANON has no license to practice medicine in Florida. Thus, defense counsel's suggestion that "he's a doctor, he may want to work," is simply untenable.   Tr. at 88.   Likewise, SANON's multitude of sprawling and seemingly inactive business affiliations and confusions about what equity, if any, he has in various property only contribute to this lack of clarity and underscore that he remains a risk of flight.   Notably, the defendant was in position to dissipate this confusion at the bail hearing, but instead this scrutiny only served to spawn new questions.   *See, e.g.*, Tr. at 78 (defense counsel claiming, contrary to SANON's representations to pre-trial services, that he did not own any property in Haiti, but his deceased father did); Exhibit 4 (a proposed sale agreement dated shortly after his bankruptcy discharge, which counters SANON's argument at the detention hearing that he did not own the property that the bankruptcy trustee alleged he was trying to sell [Tr. at 72]).   This supports the conclusion that SANON attempted to defraud the bankruptcy court, the prospective buyer, or both.

Given the morass of conflicting statements about SANON's ownership and acquisition of property, financial transactions, and travel destinations, there is no way the Court can determine what resources SANON would have available to him to support any attempt to flee the jurisdiction. In summary, SANON's history and characteristics militate strongly in favor of a finding that he is a flight risk.

D. <u>Dangerousness</u>

As discussed above, the Bail Reform Act requires consideration of the nature and seriousness of the danger to any person or the community that would be posed by the person's release. Nonetheless, the purported inability to consider this factor appeared to be a significant reason why Judge Otazo-Reyes made the bail determination she did: "I specifically asked the government, because the government seemed to be making such emphasis about the violence and the violence of the violation of the Neutrality Act. The government is not traveling under, you know, risk of violence, danger to the community, the government is traveling under risk of flight."

The government agreed with this characterization of its position, thereby inviting Judge Otazo-Reyes to disregard evidence of SANON's dangerousness. In so doing, the government erred. Upon fuller consideration, including an analysis of the authorities cited above, it is clear that this factor remains a relevant consideration that the Court must consider even when the Government seeks detention based upon risk of flight, and the government apologizes for any confusion. *Holmes*, 438 F. Supp. 2d 1340 (S.D. Fla. 2005) (finding that dangerousness as grounds for detention is not excluded in cases involving detention hearings brought under section 3142(f)(2) and that dangerousness may be considered in all cases whether arising under subsection (f)(1) or (f)(2)); 18 U.S.C. § 3142(g)(4); *see supra* at Section IV.

To be clear, the United States' position is not that SANON is a violent person himself and a personal threat to the community. But the fact that he can and has manipulated others to violence is a relevant consideration under this § 3553(a) factor. After all, despite being constitutionally unqualified, he garnered a $175,000 unsecured line of credit to support his effort to take the presidency and pay for the travel of the Colombian mercenaries, as well as their food,

lodging, ammunition ("screws and nails"), and ballistic vests.   SANON and his co-conspirators succeeded in violently overthrowing the Haitian leader (even though SANON was not successful in garnering a political position in the aftermath but instead was arrested by the Haitian police). Of course, the violence inherent in the crime is germane to this factor, but this was adequately addressed in the "nature and circumstances of the offense" factor, outlined above.   Nevertheless, this factor should be considered by the Court, and does weigh in favor of detention.

## **CONCLUSION**

For these reasons, the United States believes SANON presents a risk of flight such that there are no conditions that will reasonably assure his appearance at trial, as required by 18 U.S.C. § 3142. SANON should be detained.   Accordingly, the United States respectfully requests this Court to revoke the Magistrate Judge's release order or, alternatively, continue the stay of the order until whatever issues or questions the Court has that remain are addressed during its *de novo* review of the facts.

//

//

//

//

Respectfully submitted,

MATT G. OLSEN                                    JUAN ANTONIO GONZALEZ
ASSISTANT ATTORNEY GENERAL                       UNITED STATES ATTORNEY

By:   /s/ *Frank V. Russo*                       By:   /s/ *Andrea Goldbarg*
      /s/ *Jessica K. Fender*                           /s/ *Monica K. Castro*
      /s/ *Emma Ellenrieder*
      Trial Attorneys                                   Assistant United States Attorneys
      Court ID No. A5502917                             Court ID No. A5502556
      Court ID No. A5502919                             Court ID No. A5502776
      Court ID No. A5502918                             U.S. Attorney's Office
      National Security Division                        Southern District of Florida
      Department of Justice                             99 N.E. 4th Street
      950 Pennsylvania Avenue                           Miami, FL 33132-2111
      Washington, DC   20530                            Telephone: (305) 961-9000
      Telephone: (202) 307-2898                         Email: Andrea.Goldbarg@usdoj.gov
      Email: Frank.Russo2@usdoj.gov                     Email: Monica.Castro@usdoj.gov
             Jessica.Fender2@usdoj.gov
             Emma.Ellenrieder@usdoj.gov

## CERTIFICATE OF SERVICE

   **I HEREBY CERTIFY** that on September 25, 2023, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF.

                          /s/ *Frank V. Russo*
                          FRANK V. RUSSO
                          Trial Attorney

Page 28 of 28