UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 22-CR-20104-JB

UNITED STATES OF AMERICA, Miami, Florida

Plaintiff, April 21, 2026
DAY 29 - AFTERNOON SESSION
vs. 12:43 p.m. to 2:15 p.m.

ARCANGEL PRETEL ORTIZ, et al., Pages 1 to 77

Defendants.

______________________________________________________________

JURY TRIAL
BEFORE THE HONORABLE JACQUELINE BECERRA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT: SEAN THOMAS MCLAUGHLIN, ESQ.
DOJ - UNITED STATES ATTORNEY'S OFFICE
11200 NW 20th Street, Suite 101
Miami, Florida 33132
-and-
ANDREW BRIGGS, ESQ.
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue Northwest
Washington, DC 20530
-and-
JASON WU, ESQ.
ALTANESE PHENELUS, ESQ.
UNITED STATES ATTORNEY'S OFFICE
99 Northeast 4th Street
Miami, Florida 33132

FOR DEFENDANT ORTIZ: ORLANDO DO CAMPO, ESQ.
DANIELA JARAMILLO, ESQ.
DO CAMPO & THORNTON, P.A.
150 SE 2nd Avenue, Suite 602
Miami, Florida 33131
-and-

FOR DEFENDANT ORTIZ: DAVID A. HOWARD, ESQ.
DAVID A. HOWARD, P.A.
25 SE Second Avenue, Suite 1100
Miami, Florida 33131

FOR DEFENDANT INTRIAGO:
EMMANUEL PEREZ, ESQ.
EMMANUEL PEREZ & ASSOCIATES, P.A.
901 Ponce de Leon Boulevard, Suite 101
Coral Gables, Florida 33134
-and-
HECTOR L. FLORES, ESQ.
BARZEE FLORES, P.A.
Courthouse Center, Penthouse 1
40 Northwest Third Street
Miami, Florida 33128

FOR DEFENDANT VEINTEMILLA:
TAMA BETH KUDMAN, ESQ.
KUDMAN TRACHTEN ALOE POSNER, LLP
7108 Fairway Drive, Suite 130
Palm Beach Gardens, Florida 33418
-and-
MARISSEL DESCALZO, ESQ.
DESCALZO LAW, P.A.
150 SE Second Avenue, Suite 600
Miami, Florida 33131

FOR DEFENDANT SOLAGES: JONATHAN S. FRIEDMAN, ESQ.
JONATHAN S. FRIEDMAN, P.A.
101 NE 3rd Avenue, Suite 1500
Fort Lauderdale, Florida 33301
-and-
S. PATRICK DRAY, ESQ.
S. PATRICK DRAY, P.A.
1900 Biscayne Blvd., Suite 459
North Miami, Florida 33181

STENOGRAPHICALLY REPORTED BY:

PATRICIA DIAZ, FCRR, RPR, FPR
Official Court Reporter
United States District Court
400 North Miami Avenue, 11th Floor
Miami, Florida 33128
(305) 523-5178

# I N D E X


| WITNESSES FOR THE GOVERNMENT: | PAGE |
|---|---|
| GEORGE NUNEZ | |
| CONTINUED DIRECT EXAMINATION BY MR. WU | 4 |
| CROSS-EXAMINATION BY MR. HOWARD | 25 |

(Call to the Order of the Court.)

COURTROOM DEPUTY: All rise.

THE COURT: The jury is ready. Let's bring them in.

COURT SECURITY OFFICER: All rise.

(Jury in at 12:43 p.m.)

THE COURT: All right. Ladies and gentlemen, welcome back.

Don't worry, you are not the first group of people to have burned popcorn in the federal courthouse.

You might be the first people to have burned popcorn in the federal courthouse and not triggered the fire alarm, so that could be an accomplishment.

At any rate, don't worry about it, we are ready to go.

Mr. Wu.

MR. WU: Thank you, Your Honor.

Ms. Hamm, can I have the screen, please?

(Government witness, GEORGE NUNEZ, was previously sworn.)

CONTINUED DIRECT EXAMINATION

BY MR. WU:

Q. Agent Nunez, when we left off before for lunch, we were talking about this document, Government's Exhibit 1E2. Are the remaining pages of this document earlier illegal activity authorization forms?

A. I'm sorry, say that again.

Q. Are the earlier pages of Government's 1E2, the remaining pages of 1E2, are those earlier OIA admonishment forms?
A. Yes, sir.
Q. Now, you had mentioned in your morning testimony that confidential sources might sometimes participate in an operation, they may even conduct purchases of narcotics under the control of the FBI.
Is that correct?
A. That is correct.
Q. And when the time comes, however, to arrest the target of that kind of operation, what role would a confidential source play in conducting that arrest?
A. The confidential source will not have any role in the actual arrest of the subjected.
Q. So, imagine you get an arrest warrant in the United States from a U.S. judge, what role would a confidential source have in executing that warrant?
MR. DRAY: Speculation. Relevance.
THE COURT: Overruled.
THE WITNESS: So, essentially, once the warrant has been obtained and there is an operational plan to execute an arrest of the target subject, the CHS, the confidential human source, would not be present or participate in that arrest.
BY MR. WU:
Q. Would you ever give a confidential source a gun or ask them

to bring their own gun to escort you to an arrest?
A. I would not.
Q. Now, do confidential sources sometimes give you as their handler, bad intelligence, meaning false information?
A. It has happened in the past, yes.
Q. And is it possible that a confidential source may even deliberately lie to or try to deceive their handlers?
A. Yes.
Q. So how do you assess the accuracy of information that you are getting from a confidential source?
A. Well, at times what we would do is we would try to vet the information that is provided by our source by multiple means, such as possibly have a second source in play, or through other interviews, through other information or intelligence we have obtained to vet and verify the information that a source has given us.
Q. What would you do if you learned that, through those means that a confidential source had committed violent, unauthorized criminal activity?
A. Well, if the source had already committed some sort of violent criminal activity, the first thing I would do is debrief the source and possibly conduct a criminal investigation at that point.
Q. Okay.
Now, let's turn, I want to focus on the year 2021 and your

relationship with Defendant Ortiz. In other early 2021, did Ortiz mention that he might have useful information for the FBI about crimes occurring in Haiti?

A. He did.

Q. Who were the sources of that information, according to Ortiz?

A. A group of Haitians, Haitian nationals.

Q. Did he ask you to meet with this group of Haitian nationals?

A. He did.

Initially, this information had come through the co-case, that's Task Force Officer Daniel Gonzalez and that was relayed to me.

Q. Did you ultimately agree to meet with the sub-sources that Defendant Ortiz had identified?

A. I did.

Q. All right. And I use the phrase "sub-sources" or the word "sub-sources." Could you briefly explain to the jury what that means?

A. A sub-source basically could mean, essentially a source of a source. So, a sub-sources, they have contacts that we may not have so, at times, they will have some type of contacts that they will bring in to provide information to them and they would relay that to us, or they would bring these persons in so we can meet with them directly.

Q. But to be clear, do sub-sources have any formal relationship with the FBI?
A. They do not.
Q. So, let's talk about this meeting now. Do you recall when did this meeting occur?
A. This meeting occurred approximately April 6th of 2021.
Q. Where?
A. This was at FTU -- correction, CTU Inter -- Federal Academy Business in Doral, Florida.
Q. Whose business was that?
A. That is the business of Mr. Pretel Ortiz and Mr. Intriago.
Q. And had you ever been to Defendant Ortiz's business before this April 6th, 2021, meeting?
A. I had not, no.
Q. Did anyone else come with you to the meeting?
A. Yes, sir. I was accompanied by Special Agent Jonathan Bent and Language Specialist Pierre Basquin.
Q. And you just mentioned Mr. Basquin. To be clear, is he an agent or is he an language specialist? What does that mean?
A. He is a language specialist. Basically he helps us in translations when we need translations for a language, a specific language.
Q. What language were you anticipating that you would need translated?
A. Haitian Creole.

Q. From your perspective, what was the purpose of this meeting? Why were you going there?
A. The main purpose was to collect, obtain criminal intel information or national security intel or information.
Q. How many people attended the meeting?
A. Over five.
Q. I am going to show you some pictures and I want you to identify if you recognize some of these people as attendees of that meeting.
MR. WU: Publishing what is already in evidence as Government Exhibit 5A.
BY MR. WU:
Q. Do you recognize the person in that photograph?
A. I do.
Q. Who is that?
A. James Solages.
Q. Was he one of the attendees at the April 6th, 2021, meeting?
A. He was.
Q. Do you see Mr. Solages in the courtroom?
MR. DRAY: Judge, we will stipulate that he is here.
THE WITNESS: I do.
BY MR. WU:
Q. I am now though showing you what's already in evidence as Government Exhibit 4A. Do you recognize that person?

A. I do.
Q. Who is that?
A. Christian Sanon.
Q. Did he also attend the April 6th, 2021, meeting?
A. He did.
Q. Government Exhibit 6A already in evidence, do you recognize him?
A. I do.
Q. Who is it?
A. Joseph Joel John.
Q. When he was introduced to you at this April 6th meeting, how did the people in the group describe him?
A. As a former senator for Haiti.
Q. Okay. And going back to the previous photograph I showed you of Mr. Sanon, how was Mr. Sanon described when he was introduced at the meeting?
A. Mr. Sanon introduced himself as a presidential hopeful for Haiti.
Q. Showing you Government Exhibit 55 already in evidence, do you recognize this person?
A. I do.
Q. Who is that?
A. Mr. Marky Kessa. He introduced himself as the mayor of Jacmel City.
Q. What country is Jacmel in?

A. In Haiti.
Q. Did he attend the April 6th, 2021, meeting?
A. He did.
Q. Just two more photographs, Government Exhibit 48A. Do you recognize that person?
A. I do.
Q. Who is that?
A. That was a gentleman that I believe had introduced himself as a former member of the U.S. military.
Q. Did he attend the April 6th meeting?
A. He did.
Q. Finally, Government Exhibit 59A in evidence, do you recognize that person?
A. I do.
Q. Who is that?
A. That's a gentleman that introduced himself as a member of the Haitian community here in the United States.
Q. Now I want to jump back to Mr. Kessa, the purported mayor of Jacmel. When you sat down with this group during this meeting, what did Mr. Kessa say to you or what information did he provide to you?
A. So, Mr. Kessa basically explained that there was some criminal activity happening in the port there in Jacmel, that he believed there was a large amount of narcotics that was being brought in through the port and did not have a -- or

basically did not have enough intel or resources to conduct investigations or stop the narcotics coming in through the port.

Q. Was that information of potential relevance to your purposes?

A. It was.

Q. Why is that?

A. Again, what we primarily investigate is narcotics trafficking and the routes and the methods that narcotics are being brought from its origin, primarily Colombia, through many Caribbean and Latin American countries into the United States, so obtaining that information was valuable.

Q. I'd now like to ask you about Mr. Sanon.

Did Mr. Sanon speak at the meeting?

A. He did.

Q. What did he tell you or what information did he convey to you?

A. So the information that Mr. Sanon was primarily providing was information on an associate of his that had told him or was providing him information on Iranian and Syrian operations in Haiti. These included money laundering operations and human trafficking operations.

Q. During the meeting, did Sanon ever ask you, the FBI, for any help with becoming the president of Haiti?

A. He did not.

Q. Now I want to talk to you about the former Haitian senator, Joseph Joel John, did he speak at the meeting?
A. He did. He spoke in Creole.
Q. Once you learned what he was saying through the translation, what was he saying to you as precisely, as you remember it?
A. Primarily he was complaining about the political situation in Haiti and a lack of support by the United States.
Q. How did you respond when Mr. John began talking about the Haitian political situation?
A. Well, basically, between myself and Special Agent Bent, who also speaks Creole, we basically cut him off and explained that we weren't really interested in politics, we were just there for the intel and information on criminal activities or national security information.
Q. And as precisely as you can remember it, what did you say to them? How did you convey that you did not have interest in their discussion of Haitian politics?
A. Well, I did some hand gestures, basically cutting them off and just kind of telling them to stop. Primarily through hand gestures.
Q. Then did you say something orally, verbally to them as well?
A. Again, between myself and Mr. Bent, we basically told them that we weren't interested in talking politics or in any --

anything political and we were just there to record any criminal information or national security information.
Q. So during that meeting, did you ever suggest or promise that the U.S. Government would help resolve Haiti's early 2021 political situation?
A. I did not. As I recall, I continually repeated that the one thing I was going to do was I was going to record the information they provided me, write a report, and submit that report.
Q. So as the meeting wrapped up, did you understand the main purpose of the meeting to be getting the FBI's help with political change in Haiti or did you think the main purpose of the meeting was for the FBI to gather intelligence on potential crimes happening in Haiti?
A. For us, the main purpose was to obtain information and intel on criminal activities and national security information in Haiti.
Q. Earlier you mentioned a man named Antonio Intriago. I am showing you a photograph already in evidence as Government's Exhibit 2A. Do you recognize this person?
A. I do.
Q. Who is that?
A. Antonio Intriago.
Q. What was your understanding of Mr. Intriago's relationship with Mr. Ortiz?

A. They were business partners or Mr. Ortiz -- initially, I believe he was introduced to me as an employee of Mr. Ortiz or with Mr. Ortiz.
Q. Okay. Let's still talk about the April 6th, 2021, meeting.
When you had these sorts of contacts with Defendant Ortiz as your confidential source, how would you document these interactions?
A. We would document it on a report called an FD-302.
Q. I am also going to show you what's already in evidence as Government Exhibit 1E4. Do you recognize this type of document?
A. I do, and correction, for sources there is a different document that we write on. For non-sources, we write a 302 report. For information coming directly from a source, we would write it on a form called 1023.
Q. Okay. And is -- what I am looking at on the screen, is that an example of such a report?
A. It is. This is the CHS contact report.
Q. In particular, I am going to page 14 of Government Exhibit 1E4.
Agent Nunez, what is that?
A. That is a CHS contact report.
Q. For what contact?
A. For the date of April 6th, 2021.
Q. Where on the form did you report or summarize briefly the

nature of the meeting that you had?
A. At the bottom.
Q. Is that over here?
A. That is correct.
Q. Now, after this April 6th, 2021, meeting with the Haitian political hopefuls, did you have any suspicions that Defendant Ortiz was engaged in any unauthorized criminal activity in Haiti?
A. I did not.
Q. What would you have done if you suspected he was plotting to throw the overthrow the president of Haiti?
A. I would immediately attempted to intervene.
So the first thing I would do is debrief the CHS, bring him in for full debrief. Simultaneously, I would begin coordination with our FBI counterparts that oversee Haiti, who are located in Santo Domingo, Dominican Republic, and I would obviously run the information through my chain of command and then initiate coordination with the security officer down in the embassy in Haiti.
Q. I would like to now turn your attention to May 2021.
Did you ever interact with Christian Sanon, the man whose picture I showed you earlier, after April 6th, 2021?
A. Yes, I did.
Q. When?
A. On May 21st, I believe it was, I received a phone call on

my desk phone, which was odd to me because I usually get phone calls directly on my cell phone.

When I answered, to my surprise, it was Mr. Sanon who had called me.

Q. So during that April 6th, 2021, meeting, was that the first time you had met Sanon or did you know him before?

A. I had never met him before that day.

Q. Did you give him a business card or any contact information for you at that April 6th meeting?

A. I had not.

Q. So now could you describe a little more, you get this call from Christian Sanon on your desk phone. What did he say to you?

A. Well, he first told me that he was getting on a plane, getting ready to leave to Haiti and he asked me if we, the FBI, were going to help him.

Q. How did you respond to that?

A. I told him that the report was written and that that's pretty much, you know, where I had left off when we last spoke. So, what was written was submitted and, at that point, it was out of my hands.

Q. What, if anything, did Christian Sanon say to you on this phone call about planning to remove President Moise from power in Haiti?

A. That was never discussed.

Q. Did you ever imagine that Defendant Ortiz and Christian Sanon were planning to overthrow President Moise at that time?
A. Not at all.
Q. Now, you mentioned you spoke to Christian Sanon on the phone, at least that one time. Did you also speak sometimes to Defendant Ortiz on the phone as his handler?
A. I did.
Q. How about Defendant Intriago, have you ever spoken to him on the phone?
A. Never.
Q. How about Defendant James Solages?
A. Never.
Q. These contacts that you had with Ortiz and Sanon, what, if anything, did Defendant Ortiz and Christian Sanon tell you about organizing mass demonstrations to force President Moise out of office in Haiti?
A. That was never discussed.
Q. What, if anything, did they tell you about recruiting gangs to help them?
A. That was never discussed either.
Q. What, if anything, did Defendant Ortiz and Sanon tell you about grabbing President Moise while he was at his sister's house and forcing him to resign?
A. We never spoke about that.
Q. In late May 2021, did you learn something about CTU's

activities in Haiti from another government official?
A. I did.
Q. Who contacted you?
A. Approximately, May 27th I was forwarded an e-mail between the head security officer for the embassy of Haiti who had sent that e-mail to Special Agent Tim Augustyniak.
So, Special Agent Augustyniak worked the extraterritorial cases so he had a good relationship with the security officer out in Haiti.
So Agent Augustyniak forwarded me the e-mail and basically, in reading the e-mail, the security officer stated that two -- there was a couple of gentlemen that had gone to the embassy and Mr. Intriago was one of them, claiming that they were there to basically check in, register their company, and that a Special Agent of the FBI, George Nunez, had directed them to do so.
Q. Had you directed them to do that, Agent Nunez?
A. I never had.
Q. How did you react when you received that news?
A. I was extremely upset.
Q. What did you do next?
A. So, basically the security officer was asking if I was an actual agent and if I had actually directed them to do that. So I responded to --
MR. PEREZ: Objection. Hearsay.

THE COURT: The objection is sustained. Agent, just answer the question as directly as you can so you can avoid any hearsay in your testimony.

THE WITNESS: Yes, ma'am.

Basically I responded saying that I never -- I've only met this gentleman once and that I never directed him to do that and --

BY MR. WU:

Q. Well, let me ask it this way.

Did you do anything with regard to Defendant Ortiz specifically when you learned this news?

A. I did. So, I called Mr. Pretel Ortiz asking him why, or who was it or why was someone in Haiti mentioning my name on my behalf.

Q. What was the tone of that conversation you had with Defendant Ortiz?

A. Oh, I was very upset and it was very direct.

Q. Did you take any other steps to correct his behavior at that time?

A. I did. So, I admonished him over the phone and I told him that he was not to mention my name or talk about his relationship with the FBI, him or any of his employees were not to speak of the relationship that he had with the FBI.

Q. All right. Did you and your other case handlers take any additional steps to admonish Defendant Ortiz?

A. On the following day, we did admonish -- well, the task force officer and myself, we admonished Mr. Pretel Ortiz but, again, going back, he had also been admonished after the meeting on April 6th. We had admonished him a couple of days after, explaining to him that he is not to be talking about his relationship with the FBI.
Q. Could you actually tell us a little bit more about that?
So, April 6th, 2021, you had the meeting with these people from Haiti. What happened a few days later?
A. So, two days later we actually met with him and we gave him an admonishment, a verbal admonishment, explaining to him the risk of exposing his relationship with the FBI.
Q. You said that was two days later. Where did that happen?
A. That happened at a restaurant in Pembroke Pines. We had a physical meeting with him.
Q. Do you happen to remember the name of the restaurant?
A. Yes, Lime, actually.
Q. Who was at the meeting, just you and Mr. Ortiz?
A. Myself, Task Force Officer Daniel Gonzalez, and Mr. Ortiz.
Q. So getting back to this late May 2021, admonishment that we were discussing earlier, I am showing you on your screen Government's Exhibit 1E1, page 1. Do you recognize this document?
A. I do.
Q. What is it?

A. It is basically a general purpose insert. It's a report documenting the details of what happened on that date.
Q. And what's the date of the document?
A. May 28, 2021.
Q. You don't need to read this whole thing but what essentially --
MR. DRAY: Objection. Hearsay.
THE COURT: Overruled.
BY MR. WU:
Q. -- what is recounted in this document?
A. Basically that the CHS is no longer to seek or broker introductions between FBI agents and other persons.
Q. At this time, May 28th, 2021, did you think there was a risk that Ortiz was committing unauthorized criminal activity in Haiti or were you more concerned about the possibility that he appeared to be trying to use his role as a CHS to benefit his business?
MR. DRAY: Objection. Leading.
THE COURT: It is leading. Rephrase your question, sir.
BY MR. WU:
Q. What was the concern that motivated this admonishment in late May 2021?
A. Well, at that point we had no idea of any criminal activity being conducted by Mr. Pretel Ortiz, and it was more of a sense

that it seemed like he was trying to advance his position within his company, basically his relationship with the FBI -- he was trying to use his relationship with the FBI to advance his personal interests.

Q. Going into June and July of 2021, what, if anything, did Defendant Ortiz or Christian Sanon tell you about sending 22 Colombian former soldiers to Haiti?

A. Nothing at all. We had no idea.

Q. What, if anything, did they tell you about planning to capture or arrest President Moise?

A. Nothing. That was never discussed.

Q. What, if anything, did they tell you about planning to kill President Moise?

A. Again, that was never discussed.

Q. What would you have done if Ortiz or Sanon had told you about any of those things?

MR. DRAY: Objection. Speculation.

THE COURT: Sustained.

BY MR. WU:

Q. I am going to fast forward to July 7th, 2021. How did you learn that President Moise was assassinated on July 7th, 2021?

A. On that date I was on vacation and I had seen it on the news.

Q. Did Ortiz contact you after the assassination?

A. I believe he attempted to. I saw some missed calls from

Mr. Ortiz.
Q. Do you remember what time of day, roughly, he was trying to contact you?
A. It was early morning.
Q. Did you continue using Ortiz as a confidential human source after July 7th, 2021?
A. I did not.
Q. What do you do when you decide to stop using someone as a confidential source?
A. Well, there is a process where we close out the source and we make notes based on the reasons for the closure. Sometimes we will close a source but they can be used again. In this case, he was recommended permanent closure.
Q. When did you do that?
A. That was end of July, I believe it was, in July of 2021.
Q. Do you document that type of closure?
A. We do.
Q. I am now showing you what's in evidence as Government's Exhibit 1E6. What are we looking at?
A. That is the source closure documentation.
Q. The source closure documentation for who?
A. For Mr. Pretel Ortiz.
Q. What's the date?
A. July 27th, 2021.
Q. After July 27th, 2021, have you ever had any contact with

Defendant Ortiz since then?
A. I have not.
MR. WU: We pass the witness.
THE COURT: All right.
On behalf of Mr. Ortiz.
MR. HOWARD: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. HOWARD:
Q. Good afternoon, sir.
A. Good afternoon, sir.
Q. You were Mr. Pretel Ortiz's handler, you were telling us, since August of 2020?
A. Yes, sir.
Q. And you were his handler, you said, at least maybe a month before you actually met him on September 2020?
A. That is correct.
Q. How did you end up being assigned to someone you had never met?
A. Well, I had arrived on the squad and the former handler during that transition had been reassigned. So it's common for, at times, sources to be assigned primary handlers. It was during the transition, but co-case handlers are usually handing -- sources can be handed from handler to handler and sometimes there is overlap, sometimes there is not.
Q. So you discussed Mr. Pretel Ortiz with your predecessor

handler before you met Mr. Ortiz, kind of like in preparation for the person you were about to meet?
A. I had discussed Mr. Pretel Ortiz with multiple co-handlers and handler.
Q. Okay. Before you even met him?
A. Before I met him, yes.
Q. I take it none of them gave you a bad report?
A. There was some issues that there was in the past but primarily he was -- the consensus was that he was continuing to work. He was working on many cases, so he had a lot of active activity going on, whether it be FBI cases or DEA cases, he was active.
Q. So he was -- I think you said he first became a confidential source of information back in 2010. Right?
A. Yes, sir.
Q. And since 2010, he has worked on several cases for both the FBI and the DEA. Correct?
A. Yes.
Q. And I suspect he was of great value since he continued to be engaged in that fashion?
A. He was used a lot, yes, sir.
Q. Okay. I suspect he was of great value because he continued to be engaged in that fashion. Yes?
A. I'm sorry, which fashion?
Q. In the fashion of being a confidential source for the FBI

and the DEA dating back since 2010 working on several cases. He was of great value to you?
A. He was.
Q. And during that time, I think the U.S. Government was responsible for him being living in the United States.
Right?
A. That is correct.
Q. And that U.S. Government -- who first brought him over? Was it DEA or FBI?
A. My understanding, it was FBI that brought him over.
Q. And they brought him over on a special visa. Right? Significant public benefit parole visa.
A. Yes, sir, he was in the significant public benefit parole program.
Q. So, in order to achieve -- in order to bring him over, the FBI essentially had to vouch that they thought that this gentleman was of significant public benefit. Right?
A. Yes, sir, he was.
Q. And they don't only do it once. They renew that, that significant public benefit parole status lasts for how long?
A. Well, the deferred actions were given on a yearly basis based on a source's work and participation. A source must be active while in the process of giving him something permanent.
So, they are provided deferred action to not be deported on a yearly basis, up and until -- and a special visa can take

years.

So, every year that must be renewed up until the point where there is permanency. So, it might take five years, it might take ten years, but Mr. Pretel Ortiz was in that status.

Q. So, if they last, you say, for a year at a time, so, 2010, 2011, '12, '13, '14, '15, '16, '17, '18, '19, '20, up to the time he met you, the FBI or DEA kept vouching that this person qualified as somebody of significant public benefit essentially.

Right?

A. Essentially, yes.

I don't know when that began, but yes.

Q. Well, it would have began in 2010 when they brought him over. Right?

A. Well, 2010 was when he was signed up as a source.

Q. So, from 2010, every year for ten years plus, or for at least ten years, the FBI or DEA was saying, hey, this guy is of significant public benefit, please defer and keep him in the United States.

Right?

A. Correct.

Q. Because he is helping us with a lot of cases. Right?

A. Correct.

Q. So over that time, you were dependent on him, not just you but the FBI in general, you were dependent upon him to be in

connection, to provide you useful information.
Right?
A. I'm sorry?
Q. Strike that. My fault.
You were dependent on him to provide you useful information?
A. Well, we would -- wouldn't depend on him to provide information, but we would want him to provide significant information so we can continue to work with him.
Q. Well, I am not saying that if he didn't do it you'd be out of a job. That's not my point. Your job responsibilities go beyond the information he offers.
Right?
A. Correct.
Q. But you expect him to provide useful information and if he is not providing useful information, then he is of no value to you. Right?
A. Well, just because a source is not providing useful information at the time doesn't mean that he is no longer useful. It does not mean we are just going to close him off because he is -- I mean, he may not provide useful information, for example, for narcotics but he may be able to provide some useful information on a national security case or a fraud case. So, he may be of some value.
Q. So he's got to be useful some kind of way?

A. That is correct.
Q. And in order for him to be useful in providing you information concerning -- as an FBI agent -- strike that.
I'm sorry.
As an FBI agent, you investigate criminal conduct. Right?
A. As an FBI agent, me, personally, I primarily investigate criminal conduct, but as the FBI also investigate national security matters.
Q. Okay.
And for criminal conduct in order for Mr. Pretel Ortiz to provide you useful information on these matters, we have to stay somewhat connected to the worlds that you are trying to investigate.
Would that be correct?
A. Well, sometimes we would make that connection. Not necessarily he has to go out and make the connections on his own. It does happen sometimes but there are moments where we would place him in a situation where he makes those connections and he is able to further investigation.
Q. Fair enough.
So, sometimes the FBI or the DEA is taking Mr. Pretel Ortiz, who is not connected to any body of criminal activity or organization, and you will insert him into that world.
Right?
A. That could happen, yes.

Q. And when you insert him into that world, you would expect him to comport himself in a manner that makes him not stick out like a sore thumb.
Right?
A. Well, we would want to place the source somewhere where he would basically --
Q. Fit in?
A. -- fit in.
Q. Right. So the answer is yes. Right?
A. Yes.
Q. So, I mean, you don't want Mr. Pretel Ortiz sitting down at La Carreta with some people who might be doing -- having some discussions about something illegal looking like an accountant or somebody from the FBI.
You want him to blend in?
A. Well, yes. I mean, we -- looking like the FBI. We don't want a source to be compromised. In other words, we don't want a source where his, per se, cover is blown.
Q. Right.
A. We want a source to be able to --
Q. Blend in?
A. -- blend in, yes.
Q. So, and in order to blend in, you have to assume and adopt lingo and mannerisms that make you not stand out as someone who doesn't belong. Correct?

A. At times, yes.
Q. And so, being a human being, somebody who has made his living for, or at least partially with the FBI for ten years, adopting the lingo of criminal operations into which you insert him, you would not be surprised that he would have that kind of lingo or vernacular at times. Right?
A. Correct.
Q. So when you hear a record -- strike that.
$138,000 plus dollars, that sounds about right, as to how much money the FBI or DEA, somebody in the U.S. Government paid to Mr. Pretel Ortiz over the course of his tenure doing your bidding. Right?
A. It could be. I'd have to see the numbers but it could be.
Q. That sounds about right?
A. It sounds about right.
Q. Mr. Pretel Ortiz was working in this capacity for money, for the money you would pay him. Right?
A. His primary motivation was both financial as well as immigration benefits.
Q. And immigration benefits.
So, he was getting the immigration benefit of being allowed to reside in the United States.
That's one. Right?
A. Correct.
Q. And you were saying that may have been his primary

motivation, may or may not have been?
A. Correct.
Q. But the other one was that you were paying him and he was making an income off of --
A. Yes.
Q. Okay. What he was not doing is he was not working off a criminal sentence, he was not a convict. Right?
A. Correct.
Q. You didn't bring a criminal over here and say, we are going to make you work off your life sentence by assisting the U.S. Government. He was doing it for immigration and money. Right?
A. Immigration and financial benefits, yes.
Q. Okay. And you had no reason, at any point, to think that he had a criminal disposition of any kind?
A. No, we did not.
Q. Okay. And you formed an opinion -- would it be safe to say that you trusted him?
A. Well, there has to be a level of trust, yes, between a handler and a confidential human source.
Q. And would it be safe to say that he earned your trust, you don't just trust people willy-nilly?
A. Through years of working with a CHS, and constant assessments, you do have a certain level of trust.
Q. Right. I mean, there was trust that was earned by that gentleman over the course of ten years, persistently. Correct?

A. Well, a certain level of trust.
Q. I understand. A certain level of trust between law enforcement, DEA and FBI, over the course of ten years was earned by him. Correct?
A. Well, you could say that, yes.
Q. Okay. Can you say that?
A. I can -- well, from the time that I handled him, and based on the work he was doing at the time, yes.
Q. Okay. All right.
And you were his lead handler as of 2020 with respect to all matters dealing in Miami or nationwide?
A. Nationwide.
Q. So, as you were saying earlier that he had multiple, a confidential human source can have multiple handlers at the same time?
A. So, he can have co-handlers.
There is only one main handler. For example, if he is working a case with agents in New York, there would be -- that agent in New York would be added as a co-handler so that way that agent can also have access to his file and be able to work with Mr. Pretel Ortiz.
Q. Okay. But you were his main handler. You were -- everybody else came under your umbrella?
A. I'm sorry, under the what?
Q. Under your umbrella.

You were the main guy?
A. Yes, sir, I was the main handler.
Q. And you know that not only FBI and DEA but HSI -- what does HSI stand for?
A. Homeland Security Investigations.
Q. They were looking for his assistance, too, on occasion. Right?
A. Yes, sir.
Q. Okay. So, we have now at least three federal investigative agencies who are relying on this man and his trustworthiness, at least to a certain level?
A. Yes, sir.
Q. Were there any others or just those three?
A. I believe those were the main three.
Q. Okay. Now, when Mr. Ortiz met Christian Sanon and James Solages, he reported that. Right?
A. I don't know if he reported the exact moment he met them but he did speak to one of the co-handlers about talking with them and trying to bring them in.
Q. Okay. Daniel Gonzalez is who you are talking about?
A. Yes, sir, Task Force Officer Daniel Gonzalez.
Q. And Daniel Gonzalez was the person who probably had more contact with Mr. Ortiz than you did?
A. At the time, yes, that's correct.
Q. You were one level removed and did Daniel Gonzalez report

to you each of his communications with Mr. Pretel Ortiz?
A. No, sir, not each of the communication. As I said before, so, a source could be working many cases with many different co-handlers and, in this case, Mr. Pretel Ortiz was working with Task Force Officer Daniel Gonzalez on a specific case.
So based on the work they were doing together, they had a lot of contact that I didn't necessarily know exactly every one of those contacts or the specifics of those contacts.
Q. Okay. So you were a step removed. Daniel Gonzalez was the one who had more constant contact?
A. Based on the case that they were working together, yes, sir.
Q. And does -- after that -- you say it is not an FBI 302. What's the name of the form that you fill out?
A. The primary form we fill out for contacts is a 1023 but --
Q. So that the record is clear, the 1023 form is the form that documents the actual interactions with a specific confidential human source. Right?
A. Yes. Yes, overall.
Q. And when Daniel Gonzalez would document each of his interactions with Mr. Pretel Ortiz, would he provide a copy to you?
A. No, not necessarily.
So, once he documents, that goes into the file and as a case handler, any co-case can have access to the file and see

all the documents that are being uploaded to his file.
Q. Okay. So, even though you are in a leadership capacity, you are not reviewing these interactions of the confidential informants as they happen, but they are documented and put into a database that you can access?
A. Yes, sir.
Q. Okay. So, you don't know exactly when, then, Mr. Pretel Ortiz advised that he had been approached by Mr. Christian Sanon and James Solages?
A. I don't know exactly when that happened but I did -- based on the file, I do know that there was some indication of a meeting that was -- that happened early April, April 1st, I believe was the first document that I saw documenting contact with the Haitian nationals.
Q. Okay.
And -- so you reviewed the file now?
A. Yes.
Q. And so you were aware that when Mr. Pretel Ortiz first reported having met Mr. James Solages, he said Mr. James Solages is ex-military.
You are aware of that?
A. Mr. James Solages told me himself that he was ex-military.
Q. And Mr. Pretel Ortiz reported that he had been informed that he was ex-military?
A. It could be, yes.

Q. And because you are an FBI agent and you are a handler and so is Daniel Gonzalez, I suspect your part of the bargain is to go back and check this information out so that the confidential human source is properly informed.
Did you do that?
A. I'm sorry, say that again.
Q. I suspect that your part of the bargain, when a confidential human source comes and says, I met somebody who is ex-military, for you to have -- it would be your part of that bargain to go and check this information out so you can see whether the representations that were made to the confidential human source were accurate.
Did you do that?
A. No, sir. Not necessarily so. When a source comes in and says, hey, I made contact with all these different people and a certain person told me he is ex-military, I am not going to necessarily go back and check if that person is actually military.
Q. When is it necessary?
A. Well, if that person specifically comes in and tells me or provides intel or information that has to do with a military background, or if that person is providing me some type of criminal investigation that I can investigate.
Q. Okay. So, if Mr. Pretel Ortiz told you that he was introduced to somebody as ex-military, and he was relying upon

you to verify that information so that he would not be operating on a false premise, he would have been mistaken because you don't do that.
Right?
A. I'm sorry, I don't understand what the question is.
Q. If Mr. Pretel Ortiz came and reported to his handler that I met somebody who claimed to be ex-military. Right?
You got that part?
A. Got it.
Q. And he was under the impression that his handler, being a federal law enforcement FBI agent with endless resources, would have verified that information so that he is not operating on a false premise, if he was relying upon you to do that, he would have been mistaken because that's not what you do.
A. Not necessarily.
So, first of all, if Mr. Pretel Ortiz tells me that someone is former military, there is many people who are former military. So --
Q. And there are many who are not.
A. And there are many who are not.
Q. And you didn't check it out. I am just trying to verify that.
You didn't see the need?
A. I didn't see the need at the time, no, sir.
Q. Okay. I suspect since he is operating under your umbrella,

I guess if you don't see the need, he might not either. Fair enough?
A. I can't assume that, sir.
Q. But we know you didn't see the need. Right?
A. I did not see the need.
Q. All right. But you can assume that he would follow your lead as to the significance of such representations is what you're saying?
MR. WU: Objection. Speculation.
THE COURT: Sustained.
BY MR. HOWARD:
Q. So, you are advised that he has met Christian Sanon and James Solages and you are also advised that he has a private, he and his company have a private business relationship with them. You are advised of that?
A. Yes.
Q. So when you went to meet with them on August the 6th of twenty -- sorry, April the 6th of 2021, you were fully aware that Mr. Pretel Ortiz had developed a private business relationship with Mr. Sanon and Mr. Solages. Right?
A. Yes.
Q. And that that business relationship entailed him providing some measure or manner of security. You are aware of that?
A. I was.
Q. Because you knew he had a security company?

A. Correct.
Q. And -- so he didn't hide that from you either. Right?
A. Correct.
Q. When you got to that meeting, you were advised that Mr. Sanon was a presidential hopeful or presidential candidate?
How was it represented to you?
A. I recall saying -- I believe he told me he was a presidential hopeful.
Q. Hopeful.
A. Yes.
Q. And that it involved the transitional government from Jovenel Moise. You knew that?
That was told to you?
A. I'm sorry, that it involved --
Q. That it involved transitional government from the present president, Jovenel Moise.
A. Yes.
Q. You were advised of that?
A. Well, it was mentioned that he was a presidential hopeful and he was hoping to become president after Mr. Jovenel Moise's term.
Q. Actually, the word transitional was used, transitional government from Jovenel Moise, that was said to you at that meeting without reservation.
A. I don't remember those words being said.

Q. Well, one of the reasons you wouldn't have remembered is because you didn't put it in your report.
You make a 302. Right? Right?
A. Yes, I did.
Q. And a 302 is supposed to document the substance of interactions or meetings or events that you have as an FBI agent in that capacity?
A. Yes.
Q. And you wrote a report about that, an FBI 302 about that April 6th, 2021, meeting. Right?
A. I did.
Q. And in there, I think you mentioned the word "presidential candidate," right --
A. I may have.
Q. -- for Mr. Sanon, referring to him?
A. I may have. I have to look at the report to see exactly what I wrote.
Q. You didn't make any mention about a transitional government or anything like that?
A. I don't believe I did. I have to see the report.
Q. Okay. So at that meeting you said that there were various Haitian politicians who were voicing their interest. Right? Their interests as it pertains to that meeting. Right?
A. So, on the first -- I wrote two 302s.
Q. I am not talking about your 302 now. We will get to that.

At the first, at the meeting April 6th, 2021 --
A. Yes.
Q. -- there were Haitian politicians there talking there about their political interests, or at least the political interests of Haiti. Right?
A. Correct.
Q. And, I guess, lamenting that they were not having -- getting enough support from the U.S. Right?
A. There was one particular individual that was.
Q. That was who?
A. That was Mr. Joseph Joel John.
Q. The ex-senator?
A. Correct.
Q. And you shut that down because you are not State Department, you are FBI. Right?
A. Correct. Well, I shut them down because we weren't there to speak politics. We were there for information on criminal activity.
Q. Right, because you are not State Department. You are FBI. Your interests aren't political relations with foreign nations. It's the investigation of crimes.
A. Well, I was there for investigation of crime.
Q. Right, so whatever I -- Mr. Wu on direct was talking to you about the fact that it was not told to you how they were going to transition from Jovenel Moise and there was no discussion of

any arrest or anything like that.
Remember he asked you that?
A. Yes.
Q. You shut the conversation down anyway. So, had they intended to go into the details, you shut it down. Right?
A. I don't know what they intended to talk about.
Q. Because you shut it down?
A. Correct. I mean, whether they were or not, I shut it down.
Q. So you are not suggesting that they talked about a presidential candidate and about a transitional government from the present president, then president, but that they did not -- you are not suggesting they were hiding anything.
You are just saying the conversation did not materialize to that point or to any point, you don't know where it would have went because you shut it down.
MR. WU: Objection. Argumentative.
THE COURT: Overruled.
BY MR. HOWARD:
Q. Right?
A. So I shut down that conversation that my understanding was a political conversation.
Q. But the thing is when Mr. Wu was up here saying, hey, they didn't tell you about this, they didn't tell you about that, you don't know where the conversation would have gone because you shut it down. Right?

MR. WU: Objection. Argumentative.
THE COURT: Sustained. Asked and answered.
Let's move on.
MR. HOWARD: Okay. Thank you, Judge.
BY MR. HOWARD:
Q. And then -- tell me something. Did you or any of your colleagues get in trouble for attending that meeting at all, in any kind of way?
Were you admonished by your superiors?
A. I was not.
Q. Do you remember getting an e-mail from a judge in Haiti asking for your assistance?
Do you remember that?
A. I never received any mail from anyone in Haiti.
Q. Okay.
A. Except for the chief, the security officer from the Haitian Embassy.
Q. Do you remember, were you ever forwarded an e-mail or was an e-mail seeking your assistance from a judge in Haiti brought to your attention at all?
A. At one point, I believe I saw some type of document that had my name on it but I don't recall --
Q. What it said.
A. -- what it said. It was -- my understanding, I believe it was written in French.

Q. And you had it translated, I take it, so that you would understand how you were being referred to?
A. I never saw -- I never read the document. I never saw the translation of it.
Q. Okay. So you saw a document that had your name on it but it was in Creole, and you said, eh, and you just kept it moving?
A. Like I said, I didn't understand what it said. I was asked if I knew about it, I saw it, and my response was I don't know what that is. I don't understand Creole.
Q. So you wouldn't know what it is. So, in order to understand what it was saying, you'd get it translated by -- you had Haitian Creole-speaking colleagues. Right?
A. I did.
Q. And you brought it to their attention and said, hey, what is this saying referencing me?
A. No, I never brought it to anyone's attention because I never received it.
Q. I know, but you saw it?
A. I saw it. It was shown to me at one point, and I was asked if I knew about it and I said no.
Q. So when you say you didn't receive it, you saw it but the person took the piece of paper back?
A. Something like --
MR. WU: Objection. Relevance.

THE COURT: Overruled.
BY MR. HOWARD:
Q. The person showed you and took it back so you couldn't get it translated. Is that what happened?
A. Basically it was shown to me. I was asked if I had known about it. I said I have never seen that before, and that was the last time I saw it.
Q. All right. The next time that you had a communication regarding any of the people at the meeting of April 6th was when you got an e-mail from Special Agent Augustyniak down in Haiti. Right?
A. No.
Q. Or was it forwarded to you or how did that one go?
A. So, the e-mail went from the security officer in Haiti to Special Agent Augustyniak and that was forwarded to me.
Q. Okay. And it had reported that Antonio Intriago and Sanon and some other people showed up at the embassy down there?
A. It reported that Mr. Antonio Intriago and someone else, didn't specify who, had shown up to the embassy.
Q. And that your name was dropped?
A. Essentially, yes.
Q. And you were incensed. Right?
A. I was upset, yes.
Q. And it occurred to you at that time that there may have been some miscommunication as to why your name would be

dropped. Right?
A. I questioned why my name was being dropped, yes.
Q. And your main concern was that you were being outed as having a relationship, an FBI relationship with a confidential human source. It ain't confidential if the human source or people that are associated with him are dropping your name. Right?
A. Well, the main concern is that the source is leveraging his association with the FBI and any of his employees, and basically that could put the CHS at risk or any other handlers at risk.
Q. Okay. So that was your main concern, that he was leveraging his contact with you?
A. Well, not only leveraging the contact, but also exposing his relationship with the FBI.
Q. Okay. So there was a concern he was exposing his relationship with the FBI?
A. He and his employees.
Q. How would he -- if he went -- it was reported to you that Antonio Intriago, they were asking how to register a security business at the embassy. Right?
A. I'm sorry?
Q. It was reported to you that the purpose that Mr. Intriago, and whoever was with him, went to the embassy was for some guidance as to how to register a security company there.

That's what was reported to you?
A. It was reported that they were there reporting their or checking in with the embassy to register their company and that I had told them to do so.
Q. Okay. So, they were reporting to the embassy and checking in, right, and trying to register their company. Right?
A. Correct.
Q. And it was evident to you that they weren't there under any kind of shadow or trying to be secretive, they went straight to the embassy?
MR. WU: Objection. Argumentative.
THE COURT: Sustained.
BY MR. HOWARD:
Q. Did you form an impression as to whether or not, when Mr. Intriago and the people that were in his company went directly to the U.S. embassy to announce their presence, check in and ask for guidance as to how to register their security company, did it occur to you that they were not trying to do that outside of the knowledge of law enforcement or the U.S. Government?
Is it not obvious, sir?
A. I'm sorry, so --
MR. WU: Objection. Argumentative.
THE COURT: I think he can answer the first question.
THE WITNESS: Can you repeat that one more time, sir?

BY MR. HOWARD:
Q. They weren't hiding their presence in the -- they weren't hiding their presence in Haiti from the U.S. Government. Correct?
A. Correct.
Q. Nor were they hiding the fact that they were a security company. Correct?
A. I don't know if they were hiding whether they were a security company or not, but my understanding is they went to the embassy to --
Q. Register a security company?
A. -- register their company which I believe was a security company. Yes, sir.
Q. So you can extrapolate that they weren't hiding the fact that they were a security company in Haiti?
A. Correct.
Q. Okay. And you say that your primary concern was that he was trying to leverage his relationship with the U.S. Government in order to register a company in Haiti? Was that what your concern was?
A. My concern was for the CHS as far as leveraging -- one, leveraging his association with the FBI. Two, basically exposing himself or his relationship with the FBI or his employees or his sub-sources.
Q. How would him asking for guidance on how to register a

company be leveraging his relationship with the FBI?
A. Well, going into the embassy to register his company is one thing, but then saying he was there because he received or was told to do that by Special Agent George Nunez of the FBI, I would say are different things.
He didn't go in the embassy and ask about registering a company but --
Q. You need FBI approval or assistance in order to register a company?
A. He does not need FBI assistance or approval.
Q. So how would it be leveraging his relationship? What you were concerned about was that he was exposing that he was a confidential informant, that Mr. Ortiz was a confidential informant of yours or a confidential human source was your concern.
A. Well, one of his employees goes to an embassy of a foreign country and basically says that he was told to go there by FBI Special Agent George Nunez, the he is basically associating his company with the FBI, that there is contact, that there is some type of relationship there.
Q. Right, and to what end? How would that have furthered his interest? If there was a legitimate way to register a company, then how would knowing you help him out?
A. You would have to ask him.
Q. Or maybe that wasn't his objective.

MR. WU: Objection. Argumentative.

THE COURT: Sustained.

BY MR. HOWARD:

Q. Now, as far as the meeting with -- on August 6th, you -- did you tell Mr. Ortiz, look, don't introduce us to anybody anymore? Right?

A. Correct.

Q. Before he introduced you to these people, he ran it by you. You were the one that made the decision that it is okay.

A. He initially ran it by Task Force Officer Daniel Gonzalez.

Q. Who ran it by you?

A. Who ran it by me, yes.

Q. You were the one that showed up.

A. I did show up, yes, sir.

Q. So you made the decision that meeting these people would be okay.

A. Yes, sir.

Q. But then you turned around and you admonished him and you said that although he had good intentions, he shouldn't introduce you to people anymore.

A. Yes, so, Mr. Pretel Ortiz, he was very enthusiastic as far as the work that he did with us. Historically, he was very proactive, per se.

Q. With good intentions?

A. With good intentions. So, we looked at him that way. So

when he says, hey, I have some people that I want to bring in that may be able to provide some criminal information or criminal activity or information on criminal activity in Haiti and/or some national security information, well, that's going to interest us based on the work we have done with him in the past, so, absolutely, we would be interested in the information he is going to give us.

Q. Right. You would be interested in the information, but after meeting with these people, you had second thoughts and said, you know what, it might leak that you are a confidential human source, so don't do that again.

You are the one that realized that you had made a mistake?

A. No, sir, that's incorrect.

It wasn't right after we met with the group on April 6th.

We had met with the group. We had retrieved some information that I felt was valuable and I documented that on the 302, but then there were certain things that happened that was out of the ordinary.

For example, one, right after that meeting we felt like maybe he might not want to overexpose himself with so many people.

Maybe, you know, based on after the meeting he would want to limit the exposure he had to foreign nationals.

Q. To what? To foreign nationals?

A. To foreign nationals, so Haitians or people from other

countries or U.S. persons.
Q. Wait. When you came in and said, don't introduce us to people anymore, you were concerned about him being exposed to foreign nationals?
A. Not only foreign nationals but also U.S. personnel.
Q. You were concerned about his relationship with you being exposed, is what you were concerned about.
A. No, sir.
Q. Did you say to him that, although of good intentions, this practice could lead to a leak of the confidential human source's status of cooperation with the U.S. Government? If the confidential human source believes someone may have information pertinent to law enforcement, they should either lawfully collect that information or notify an agent?
You didn't tell him that. That wasn't the gist of your admonishment?
A. Well, I'm sorry, can you repeat that one more time.
Q. Although of good intentions, this practice could lead to a leak of the confidential human source's status of cooperation with the U.S. Government.
If the confidential human source believes someone may have information pertinent to law enforcement, they should either lawfully collect that information or notify agents who would then decide how best to approach the individual. Right?
A. We did tell him that.

Q. Right?
A. Yes.
Q. The concern was that he was exposing himself by bringing the FBI to a meeting with people that he is associated with.
That was the concern, not that he was exposing himself to foreign nationals?
A. Well, yes, that is the concern. That's one of many concerns that we had.
Q. That's the one you mentioned.
A. Yes.
Q. That is the only one you mentioned.
That's the only one you mentioned.
A. I'm sorry, I don't know exactly what you are asking me.
Q. You knew he had a business relationship with these Haitian politicians as security. Right?
A. Yes.
Q. You didn't tell them, stop doing business with them because we are concerned that you are overexposing yourself to foreign nationals. What you said is, don't introduce us to them because you might leak the fact that you are a confidential human source?
A. Correct.
Q. That was the source of your disgruntlement. Right.
MR. WU: Objection. Asked and answered.
THE COURT: It's asked and answered.

Move on, Counsel.

BY MR. HOWARD:

Q. You were telling us that on July 7th, the morning of July 7th, 2021, you were on vacay. Right? You were on vacation?

A. Yes.

Q. While you were on vacation, I guess you woke up that morning and saw that Mr. Ortiz had been trying to reach out to you?

A. I saw there were missed calls on my phone --

Q. How many, do you remember? Two, three; four, five?

A. Two or three maybe, but prior to going on vacation, I had instructed Mr. Pretel Ortiz to contact -- that I was going as to be on vacation and that anything happened, he was to contact TFO Daniel Gonzalez.

Q. But he was also, it appears, trying to contact you urgently in the morning of July 7th, 2021?

A. I had two or three missed calls from Mr. Ortiz.

Q. You called him back?

A. I did not.

Q. You didn't call him back?

A. I did not.

Q. Did he speak to you that day?

A. He did not.

Q. Because you were on vacation?

A. I was.

Q. When did you first speak to him them after July 7th, 2021, after not calling him back because you were on vacation?
A. I believe it was a Friday or a Saturday, I got in on Monday and I spoke to him shortly after.
Q. So you got back from vacation on a Monday and it wasn't until Friday that you decided to return one of these missed calls that you had?
A. No, I had spoken to Task Force Officer Daniel Gonzalez that day, as well as my supervisor, and my supervisor informed me that TFO Daniel Gonzalez was in contact with Mr. Pretel Ortiz.
Q. When you spoke to Mr. Pretel Ortiz, he spoke to you voluntarily or did he say, I want to take my fifth?
A. He spoke to me voluntarily.
Q. Did he say, before he I talk to you, I need to have a lawyer? Did he say that?
A. He did not.
Q. Did you sit down and have a conversation with him?
A. I did not.
Q. You did not. Did you attempt to get a detailed accounting of him of what had transpired?
MR. WU: Objection. Calls for hearsay.
THE COURT: Overruled.
THE WITNESS: I did not. That was being done by Task Force Officer Daniel Gonzalez.
BY MR. HOWARD:

Q. Task Force Officer Daniel Gonzalez did that?
A. Yes, sir.
Q. Did Task Force Officer Daniel Gonzalez indicate to you whether or not he had any resistance in his efforts to do that?
A. He did not.
Q. Did anybody, any other FBI agent come to you and say, hey, tell me something, tell me about your confidential human source, what's up with him?
Did anybody come and say that to you?
A. I don't recall.
Q. Did you go to anybody and say, look, man, this is a guy that we have engendered, trust and vouch for for ten years, what's going on?
Did you go in there and do that?
You didn't do that?
A. I know I spoke to Daniel Gonzalez as far as some of the communications that were going on, and some of the things that were going on, but I don't recall exactly what those conversations were.
Q. What about, did you have communications with Mr. -- strike that.
After this unfortunate murder/assassination occurred, you went back and supplemented your report from the meeting of April the 6th, 2021.
Right?

A. Yes, I did.
Q. How many times have you supplemented a report in your career?
Do you do that all the time?
A. Not often.
Q. Okay. You saw the need this time. Tell me why?
A. Well, the first 302 that I wrote was basically obtaining information and 302s, primarily, interview 302s are based on what the person being interviewed is providing, what information they are providing at the time of that interview.
If you notice on the second 302, it's more of my perspective and this is all based on post July 7th.
Q. Okay. But why would it be necessary if the only thing that was discussed was somebody saying that we'd like Haitian -- I mean, Haiti would like U.S. involvement and assistance with their political upheaval or turmoil or complications, why is it necessary for you to come back in August, it would appear, and say, let me just tell you what I saw when I was there.
Were you trying to cover you?
A. Well, like I said, initially the first 302 that was written was basically to obtain the information that they were providing. So this was more of a perspective of what they were saying, the intel we are getting.
Once the events of July 7th had occurred and I'm looking at the news and I start seeing individuals that are being

investigated, I realize -- I take note of, wow, these individuals were at this meeting.

So, seeing that, I spoke with the prosecutor at the time of the case and reviewed that meeting and saw that there was additional information that I put from my perspective on that 302.

Q. When you said you reviewed, you didn't review your 302. What did you review?

A. I'm sorry?

Q. When you say you reviewed and saw that there was additional information that you had not included in your original 302, it couldn't have been your original 302 because it wasn't included there.

What did you review in order to determine that you had been incomplete in your recitation of what occurred?

A. Well, when I sat down with the prosecutor at the time and spoke about that meeting as far as the individuals that attended that meeting, that many of these individuals I was seeing was obviously coming out on TV as far as -- or on the news as far as part of this investigation, sat down with the prosecutor and we agreed that we should document the additional information that hadn't been documented on the original 302.

Q. Which prosecutor told you you should document that?

A. I can't remember the original prosecutor on the case.

Q. You can't remember who it was? Was it a man or a woman?

A. It was a female.
Q. Woman. Were you trying to distance yourself from this group by saying, hey, let me make sure I add some stuff in a supplemental report?
Was that your objective?
A. Not at all. It was to document specifically who was at the room and certain details from my perspective versus the original 302 that was documenting information that was being provided by certain individuals at that meeting.
THE COURT: All right. Mr. Howard, it's already 2 o'clock. You can finish up tomorrow morning.
MR. HOWARD: Okay. Thank you, Your Honor.
THE COURT: I don't think you have much left, but if you don't mind, we will just finish --
MR. HOWARD: I do not, but tomorrow is fine.
THE COURT: We will finish in the morning.
Don't talk to anybody. Don't look anything up.
I hope to give you some direction tomorrow about the timing that's left, so hopefully I will be able to do that tomorrow.
COURT SECURITY OFFICER: All rise.
(Jury out at 2:04 p.m.)
THE COURT: All right, Agent.
Don't talk about your testimony with anyone. We will see you in the morning. Try to be here before 9:00.

We will start at 9:00.

All right. Everyone be seated, please.

All right. I don't think there is any motion to address today because we are still waiting for a response, I think, on the last expert and waiting for more of the expert motions.

I don't know, Ms. Descalzo, when you can get the jury instructions to me. Later today, maybe?

MS. DESCALZO: Yes, I will get them to you today, Your Honor.

THE COURT: I appreciate that.

MR. MCLAUGHLIN: Your Honor, we did receive two additional Touhy requests for FBI Special Agents Nick Rahmer and Agent Pavletic. We are going to challenge those. We will file something on that.

THE COURT: Did you receive the detail on the Touhy or was it just the form letter?

MR. MCLAUGHLIN: There is some detail, but we will still challenge.

THE COURT: Okay. All right.

MS. DESCALZO: Sorry, Your Honor, I am preparing an additional response to their motion to compel with the detail and I am just waiting for the Ortiz team to sign off on it and it will be filed.

THE COURT: All right.

Let me hear from the Government on what we should be telling the jury about timing and how they should proceed with their schedule.

MR. MCLAUGHLIN: I think what the Court envisioned telling them is fine with the Government. I think it helps them sort of start planning their lives and gives them the sense that we are nearing the end.

If they want to go longer next week, they asked for a week notice, we are giving them a week's notice. I think it's more than appropriate.

THE COURT: Let me hear from Ortiz's team.

MR. DO CAMPO: The plan would be to start going full days next week?

THE COURT: The plan would be to tell them that the Government looks like they are going to rest either Friday or maybe early in the week, that there may or may not be a defense case, but if there is, we don't expect it to be more than a week. And then, sometimes there is rebuttal, sometimes there is not. We will go to closing arguments and deliberations.

It might behoove us just to start going to full weeks next week or as soon as they can, unless they rather not go full week and they want to stay on the half week, that's fine by me. They can deliberate -- I am going to let them know, look, for deliberations, it's common to deliberate for as long in the day as you want.

Talk about it in terms of timing and let us know.

Look, they may like the schedule and don't care if this takes 13 weeks or 12 weeks or they might be ready to go full days.

MR. DO CAMPO: That's fine with Ortiz.

THE COURT: So I will just do something like that tomorrow without suggesting anything in particular about exactly how long we will be.

Anything with respect to the timing for Mr. Intriago?

MR. DO CAMPO: No, Your Honor.

THE COURT: On behalf of Mr. Veintemilla?

MS. KUDMAN: No, Your Honor.

THE COURT: On behalf of Mr. Solages?

MR. FRIEDMAN: No, Your Honor.

THE COURT: All right. So where are we, where is the defense with respect to timing?

Are we still thinking the defense case is more of a week than two weeks?

MR. HOWARD: Yes.

THE COURT: Mr. McLaughlin, you are standing.

MR. MCLAUGHLIN: One matter, Judge. There is a slight shuffle in our witnesses. I call them the "vest witnesses." We are going to call Mr. Gonzalez from IBC Airways prior to Officer Gonzalez from CBP. It's a switch of two people. They are both 15-minute witnesses. I just want to let the Court and

opposing counsel know that's the order now.

THE COURT: Okay. All right.

Anything further then on behalf of the United States?

MR. MCLAUGHLIN: No, Your Honor.

THE COURT: On behalf of Mr. Ortiz?

MS. JARAMILLO: No, Your Honor.

THE COURT: On behalf of Mr. Intriago?

MR. PEREZ: No, Your Honor.

THE COURT: On behalf of Mr. Veintemilla?

MS. DESCALZO: I have something, Your Honor.

THE COURT: Yes, ma'am.

MS. DESCALZO: Your Honor, on the Corrales designations, when we originally submitted your designations, Your Honor had stated that if the parties had not objected during the deposition, that you were not going to sustain those depositions, but I see an instance where a big chunk of objections by the Government that were made for designations was sustained, but was not made at the time of the deposition.

THE COURT: Let me see one because there was one that I saw that the objection was made later, but I don't know if we are talking with the same thing.

Which deposition are we talking about?

MS. DESCALZO: It's the Corrales. I apologize. It's Corrales.

THE COURT: I think I know which one you are talking

about because I looked at these like three times.

All right. Which page?

MS. DESCALZO: Your Honor, it's pages 162 through -- I'm sorry, well, I designated pages 162 through 165. The Government objects to leading on pages 163 to 164, and you sustained them, but they did not object at the time.

THE COURT: I know. But hold on.

I thought this was one where they later said something.

Give me a minute.

You are talking about page 163.

MS. DESCALZO: Right, to 164.

THE COURT: No, there is an objection.

I am looking at page 163, "Objection. First of all, Counsel is testifying. Second of all, he said you didn't know that the arrest warrant was signed by the judge."

Are you sure that's the page number?

MS. DESCALZO: Hold on. Let me pull it up again, Your Honor.

So, here is my issue. On page 163, which is the beginning of it, there is an objection, which I agree. Okay. That's sustained. But -- oh, so you are only -- I'm sorry. This is my fault. I apologize. I am looking at my whole chunk of what I designated. I apologize.

You are right. Sorry.

THE COURT: All right. Anything on behalf of

Mr. Solages?

MR. FRIEDMAN: No, Your Honor.

THE COURT: All right. We are in recess.

(Proceedings were concluded at 2:15 p.m.)

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

June 30, 2026
DATE

/s/Patricia Diaz

PATRICIA DIAZ, FCRR, RPR, FPR
Official Court Reporter
United States District Court
400 North Miami Avenue, 11th Floor
Miami, Florida 33128
(305) 523-5178

## $

**$138,000** [1] - 32:9

## '

**'12** [1] - 28:6
**'13** [1] - 28:6
**'14** [1] - 28:6
**'15** [1] - 28:6
**'16** [1] - 28:6
**'17** [1] - 28:6
**'18** [1] - 28:6
**'19** [1] - 28:6
**'20** [1] - 28:6

## /

**/s/Patricia** [1] - 68:9

## 1

**1** [3] - 1:7, 2:8, 21:22
**101** [3] - 1:15, 2:5, 2:17
**1023** [3] - 15:15, 36:15, 36:16
**1100** [1] - 2:2
**11200** [1] - 1:15
**11th** [2] - 2:24, 68:11
**12** [1] - 64:1
**12:43** [2] - 1:6, 4:5
**13** [1] - 64:1
**130** [1] - 2:12
**14** [1] - 15:19
**15-minute** [1] - 64:22
**150** [2] - 1:24, 2:14
**1500** [1] - 2:17
**162** [2] - 65:25, 66:1
**163** [4] - 66:2, 66:7, 66:10, 66:16
**164** [2] - 66:2, 66:8
**165** [1] - 66:1
**1900** [1] - 2:20
**1E1** [1] - 21:22
**1E2** [3] - 4:22, 5:1, 5:2
**1E4** [2] - 15:10, 15:20
**1E6** [1] - 24:19
**1st** [1] - 37:12

## 2

**2** [1] - 61:10
**2010** [7] - 26:14, 26:16, 27:1, 28:5, 28:13, 28:15, 28:16
**2011** [1] - 28:6
**2020** [3] - 25:12, 25:15, 34:10
**2021** [34] - 6:25, 7:1, 8:6, 8:13, 9:17, 10:4, 11:2, 14:4, 15:4, 15:24, 16:5, 16:20, 16:22, 17:5, 18:25, 21:8, 21:20, 22:4, 22:13, 22:23, 23:5, 23:20, 23:21, 24:6, 24:15, 24:24, 24:25, 40:18, 42:10, 43:1, 56:4, 56:16, 57:1, 58:24
**2026** [2] - 1:5, 68:9
**20530** [1] - 1:18
**20th** [1] - 1:15
**21** [1] - 1:5
**21st** [1] - 16:25
**22** [1] - 23:6
**22-CR-20104-JB** [1] - 1:2
**25** [2] - 2:2, 3:4
**27th** [3] - 19:4, 24:24, 24:25
**28** [1] - 22:4
**28th** [1] - 22:13
**29** [1] - 1:5
**2:04** [1] - 61:20
**2:15** [2] - 1:6, 67:1
**2A** [1] - 14:20
**2nd** [1] - 1:24

## 3

**30** [1] - 68:9
**302** [16] - 15:13, 36:13, 42:3, 42:5, 42:9, 42:25, 53:17, 59:7, 59:11, 59:20, 60:6, 60:7, 60:11, 60:12, 60:22, 61:7
**302s** [3] - 42:24, 59:8
**305** [2] - 2:25, 68:12
**33128** [3] - 2:9, 2:24, 68:11
**33131** [3] - 1:24, 2:2, 2:15
**33132** [2] - 1:15, 1:21
**33134** [1] - 2:6
**33181** [1] - 2:20
**33301** [1] - 2:18
**33418** [1] - 2:12
**3rd** [1] - 2:17

## 4

**4** [1] - 3:4
**40** [1] - 2:8
**400** [2] - 2:24, 68:11
**459** [1] - 2:20
**48A** [1] - 11:4
**4A** [1] - 9:25
**4th** [1] - 1:20

## 5

**523-5178** [2] - 2:25, 68:12
**55** [1] - 10:19
**59A** [1] - 11:12
**5A** [1] - 9:11

## 6

**600** [1] - 2:14
**602** [1] - 1:24
**6A** [1] - 10:6
**6th** [23] - 8:6, 8:13, 9:17, 10:4, 10:11, 11:2, 11:10, 15:4, 15:24, 16:5, 16:22, 17:5, 17:9, 21:4, 21:8, 40:17, 40:18, 42:10, 43:1, 47:9, 52:4, 53:14, 58:24

## 7

**7108** [1] - 2:12
**7th** [9] - 23:20, 23:21, 24:6, 56:3, 56:4, 56:16, 57:1, 59:12, 59:24

## 9

**901** [1] - 2:5
**950** [1] - 1:17
**99** [1] - 1:20

## A

**able** [6] - 29:22, 30:19, 31:20, 34:20, 53:2, 61:18
**above-entitled** [1] - 68:5
**absolutely** [1] - 53:6
**Academy** [1] - 8:8
**access** [3] - 34:20, 36:25, 37:5
**accompanied** [1] - 8:16
**accomplishment** [1] - 4:12
**according** [1] - 7:5
**accountant** [1] - 31:13
**accounting** [1] - 57:19
**accuracy** [1] - 6:9
**accurate** [2] - 38:12, 68:4
**achieve** [1] - 27:15
**action** [1] - 27:24
**actions** [1] - 27:21
**active** [3] - 26:10, 26:12, 27:23
**activities** [3] - 13:14, 14:16, 19:1
**activity** [12] - 4:23, 6:19, 6:21, 11:23, 16:7, 22:14, 22:24, 26:11, 30:22, 43:18, 53:3
**actual** [3] - 5:14, 19:23, 36:17
**add** [1] - 61:3
**added** [1] - 34:19
**additional** [6] - 20:25, 60:5, 60:10, 60:21, 62:11, 62:20
**address** [1] - 62:2
**admonish** [2] - 20:25, 21:1
**admonished** [6] - 20:20, 21:2, 21:3, 21:4, 45:9, 52:18
**admonishment** [6] - 5:2, 21:11, 21:20, 22:22, 54:16
**adopt** [1] - 31:23
**adopting** [1] - 32:4
**advance** [2] - 23:1, 23:3
**advised** [6] - 37:8, 40:12, 40:13, 40:15, 41:4, 41:18
**AFTERNOON** [1] - 1:5
**afternoon** [2] - 25:9, 25:10
**agencies** [1] - 35:10
**Agent** [15] - 4:21, 8:16, 13:11, 15:21, 19:6, 19:7, 19:10, 19:15, 19:17, 47:10, 47:15, 51:4, 51:18, 61:21, 62:12
**agent** [13] - 8:19, 19:23, 20:1, 30:3, 30:5, 30:6, 34:19, 34:20, 38:1, 39:11, 42:7, 54:14, 58:6
**agents** [3] - 22:12, 34:18, 54:23
**Agents** [1] - 62:11
**agree** [2] - 7:14, 66:17
**agreed** [1] - 60:21
**ain't** [1] - 48:5
**Airways** [1] - 64:20
**al** [1] - 1:7
**alarm** [1] - 4:11
**allowed** [1] - 32:21
**ALOE** [1] - 2:11
**ALTANESE** [1] - 1:19
**AMERICA** [1] - 1:4
**American** [1] - 12:11
**amount** [1] - 11:24
**ANDREW** [1] - 1:16
**announce** [1] - 49:16
**answer** [3] - 20:2, 31:9, 49:24
**answered** [4] - 17:3, 45:2, 55:24, 55:25
**anticipating** [1] - 8:23
**Antonio** [5] - 14:18, 14:23, 47:16, 47:18, 48:20
**anyway** [1] - 44:4
**apologize** [3] - 65:20, 66:19, 66:20
**appear** [1] - 59:17
**APPEARANCES** [1] - 1:12
**appeared** [1] - 22:16
**appreciate** [1] - 62:9
**approach** [1] - 54:24
**approached** [1] - 37:8
**appropriate** [1] - 63:8
**approval** [2] - 51:8, 51:10
**April** [24] - 1:5, 8:6, 8:13, 9:17, 10:4, 10:11, 11:2, 11:10, 15:4, 15:24, 16:5, 16:22, 17:5, 17:9, 21:4, 21:8, 37:12, 40:18, 42:10, 43:1, 47:9, 53:14, 58:24
**ARCANGEL** [1] - 1:7
**argumentative** [5] - 44:16, 45:1, 49:11, 49:23, 52:1
**arguments** [1] - 63:17
**arrest** [10] - 5:10, 5:12, 5:14, 5:15, 5:22, 5:23, 6:1, 23:10, 44:1, 66:11
**arrived** [1] - 25:19
**assassinated** [1] - 23:21
**assassination** [1] - 23:24
**assess** [1] - 6:9

**assessments** [1] - 33:23
**assigned** [2] - 25:17, 25:21
**assistance** [6] - 35:6, 45:12, 45:19, 51:8, 51:10, 59:15
**assisting** [1] - 33:10
**associate** [1] - 12:19
**associated** [2] - 48:6, 55:4
**ASSOCIATES** [1] - 2:5
**associating** [1] - 51:18
**association** [2] - 48:9, 50:22
**assume** [3] - 31:23, 40:3, 40:6
**attempt** [1] - 57:19
**attempted** [2] - 16:12, 23:25
**attend** [3] - 10:4, 11:2, 11:10
**attended** [2] - 9:5, 60:18
**attendees** [2] - 9:8, 9:17
**attending** [1] - 45:7
**attention** [4] - 16:20, 45:20, 46:15, 46:17
**ATTORNEY'S** [2] - 1:14, 1:20
**August** [4] - 25:12, 40:17, 52:4, 59:17
**Augustyniak** [5] - 19:6, 19:7, 19:10, 47:10, 47:15
**authorization** [1] - 4:24
**Avenue** [7] - 1:17, 1:24, 2:2, 2:14, 2:17, 2:24, 68:11
**avoid** [1] - 20:2
**aware** [4] - 37:18, 37:21, 40:18, 40:23

## B

**background** [1] - 38:22
**bad** [2] - 6:4, 26:7
**bargain** [3] - 38:2, 38:7, 38:10
**BARZEE** [1] - 2:7
**based** [10] - 24:11, 27:22, 34:7, 36:6, 36:11, 37:10, 53:5, 53:22, 59:8, 59:12
**basis** [2] - 27:21, 27:25
**Basquin** [2] - 8:17, 8:18
**Beach** [1] - 2:12
**became** [1] - 26:13
**BECERRA** [1] - 1:10
**become** [1] - 41:20
**becoming** [1] - 12:24
**BEFORE** [1] - 1:10
**began** [3] - 13:9, 28:12, 28:13
**begin** [1] - 16:14
**beginning** [1] - 66:17
**behalf** [9] - 20:14, 25:5, 64:9, 64:11, 64:25, 65:2, 65:4, 65:6, 66:22
**behavior** [1] - 20:18
**behoove** [1] - 63:18
**believes** [2] - 54:12, 54:21
**belong** [1] - 31:25
**benefit** [8] - 22:16, 27:12, 27:13, 27:17, 27:20, 28:8, 28:18, 32:21
**benefits** [3] - 32:19, 32:20, 33:12
**Bent** [2] - 8:16, 13:11
**bent** [1] - 13:24
**best** [1] - 54:24
**BETH** [1] - 2:11
**between** [6] - 13:11, 13:24, 19:4, 22:12, 33:18, 34:2
**beyond** [1] - 29:12
**bidding** [1] - 32:12
**big** [1] - 65:13
**Biscayne** [1] - 2:20
**bit** [1] - 21:7
**blend** [4] - 31:15, 31:21, 31:22, 31:23
**blown** [1] - 31:18
**Blvd** [1] - 2:20
**body** [1] - 30:22
**bottom** [1] - 16:2
**Boulevard** [1] - 2:5
**briefly** [2] - 7:18, 15:25
**BRIGGS** [1] - 1:16
**bring** [9] - 4:3, 6:1, 7:23, 7:24, 16:13, 27:15, 33:9, 35:19, 53:1
**bringing** [1] - 55:3
**broker** [1] - 22:11
**brought** [9] - 11:25, 12:10, 27:8, 27:10, 27:11, 28:13, 45:19, 46:15, 46:17
**burned** [2] - 4:9, 4:10
**Business** [1] - 8:9
**business** [12] - 8:10, 8:11, 8:12, 15:1, 17:8, 22:17, 40:14, 40:19, 40:22, 48:21, 55:14, 55:17
**BY** [21] - 2:21, 3:4, 3:4, 4:20, 5:24, 9:12, 9:23, 20:8, 22:9, 22:21, 23:19, 25:8, 40:11, 44:18, 45:5, 47:2, 49:13, 50:1, 52:3, 56:2, 57:25

## C

**CAMPO** [5] - 1:22, 1:23, 63:10, 64:3, 64:8
**candidate** [3] - 41:5, 42:13, 44:10
**capacity** [3] - 32:16, 37:2, 42:7
**capture** [1] - 23:10
**card** [1] - 17:8
**care** [1] - 63:25
**career** [1] - 59:3
**Caribbean** [1] - 12:11
**Carreta** [1] - 31:12
**CASE** [1] - 1:2
**case** [16] - 7:11, 20:24, 24:13, 25:22, 29:23, 34:18, 36:4, 36:5, 36:11, 36:25, 60:4, 60:24, 63:15, 64:15
**cases** [8] - 19:8, 26:10, 26:11, 26:16, 27:1, 28:22, 36:3
**CBP** [1] - 64:21
**cell** [1] - 17:2
**Center** [1] - 2:8
**certain** [8] - 33:23, 34:1, 34:2, 35:11, 38:16, 53:17, 61:6, 61:8
**certify** [1] - 68:3
**chain** [1] - 16:17
**challenge** [2] - 62:12, 62:17
**change** [1] - 14:12
**check** [6] - 19:14, 38:3, 38:10, 38:17, 39:21, 49:16
**checking** [2] - 49:3, 49:5
**chief** [1] - 45:16
**Christian** [11] - 10:3, 16:21, 17:12, 17:22, 18:1, 18:4, 18:14, 23:6, 35:15, 37:8, 40:12
**CHS** [9] - 5:22, 15:18, 15:22, 16:13, 22:11, 22:16, 33:22, 48:10, 50:21
**chunk** [2] - 65:13, 66:19
**City** [1] - 10:24
**claimed** [1] - 39:7
**claiming** [1] - 19:13
**clear** [3] - 8:1, 8:18, 36:16
**close** [3] - 24:10, 24:12, 29:20
**closing** [1] - 63:17
**closure** [5] - 24:11, 24:13, 24:16, 24:20, 24:21
**co** [8] - 7:11, 25:22, 26:3, 34:16, 34:19, 35:18, 36:4, 36:25
**co-case** [3] - 7:11, 25:22, 36:25
**co-handler** [1] - 34:19
**co-handlers** [4] - 26:3, 34:16, 35:18, 36:4
**colleagues** [2] - 45:7, 46:13
**collect** [3] - 9:3, 54:14, 54:23
**Colombia** [1] - 12:10
**Colombian** [1] - 23:7
**coming** [3] - 12:2, 15:14, 60:19
**command** [1] - 16:17
**committed** [2] - 6:18, 6:20
**committing** [1] - 22:14
**common** [2] - 25:20, 63:22
**communication** [2] - 36:2, 47:8
**communications** [3] - 36:1, 58:17, 58:20
**community** [1] - 11:17
**company** [22] - 19:14, 23:2, 40:14, 40:25, 48:25, 49:3, 49:6, 49:15, 49:18, 50:7, 50:9, 50:11, 50:12, 50:13, 50:15, 50:19, 51:1, 51:2, 51:7, 51:9, 51:19, 51:22
**compel** [1] - 62:20
**complaining** [1] - 13:7
**complications** [1] - 59:16
**comport** [1] - 31:2
**compromised** [1] - 31:17
**concern** [12] - 22:22, 48:3, 48:8, 48:12, 48:16, 50:17, 50:20, 50:21, 51:15, 55:3, 55:5, 55:7
**concerned** [6] - 22:15, 51:12, 54:3, 54:6, 54:7, 55:18
**concerning** [1] - 30:3
**concerns** [1] - 55:8
**concluded** [1] - 67:1
**conduct** [6] - 5:6, 6:22, 12:1, 30:5, 30:7, 30:10
**conducted** [1] - 22:25
**conducting** [1] - 5:12
**confidential** [34] - 5:5, 5:11, 5:13, 5:16, 5:22, 5:25, 6:3, 6:6, 6:10, 6:18, 15:6, 24:5, 24:9, 26:14, 26:25, 33:19, 34:14, 36:17, 37:3, 38:3, 38:8, 38:11, 48:4, 48:5, 51:13, 51:14, 53:10, 54:10, 54:12, 54:19, 54:21, 55:20, 58:7
**connected** [2] - 30:12, 30:22
**connection** [2] - 29:1, 30:15
**connections** [2] - 30:16, 30:18
**consensus** [1] - 26:9
**constant** [2] - 33:22, 36:10
**contact** [19] - 15:18, 15:22, 15:23, 17:8, 23:24, 24:3, 24:25, 35:23, 36:7, 36:10, 37:13, 38:15, 48:13, 48:14, 51:19, 56:12, 56:13, 56:15, 57:10
**contacted** [1] - 19:3
**contacts** [7] - 7:21, 7:22, 15:5, 18:13, 36:8, 36:15
**continually** [1] - 14:6

**continue** [2] - 24:5, 29:9
**continued** [2] - 26:19, 26:22
**CONTINUED** [2] - 3:4, 4:19
**continuing** [1] - 26:9
**control** [1] - 5:7
**conversation** [7] - 20:15, 44:4, 44:13, 44:20, 44:21, 44:24, 57:17
**conversations** [1] - 58:19
**convey** [2] - 12:16, 13:17
**convict** [1] - 33:7
**cooperation** [2] - 54:11, 54:19
**coordination** [2] - 16:15, 16:18
**copy** [1] - 36:21
**Coral** [1] - 2:6
**Corrales** [3] - 65:9, 65:20, 65:21
**correct** [33] - 5:8, 5:9, 16:4, 20:18, 25:16, 26:17, 27:7, 28:21, 28:23, 29:14, 30:1, 30:14, 31:25, 32:7, 32:24, 33:2, 33:8, 33:25, 34:4, 35:24, 41:1, 41:3, 43:6, 43:13, 43:16, 44:8, 49:7, 50:4, 50:5, 50:7, 50:16, 52:7, 55:22
**correction** [2] - 8:8, 15:12
**counsel** [1] - 64:23
**Counsel** [2] - 56:1, 66:10
**counterparts** [1] - 16:15
**countries** [2] - 12:11, 54:1
**country** [2] - 10:25, 51:17
**couple** [2] - 19:12, 21:4
**course** [3] - 32:11, 33:25, 34:3
**COURT** [46] - 1:1, 4:3, 4:4, 4:6, 5:19, 20:1, 22:8, 22:19, 23:18, 25:4, 40:10, 44:17, 45:2, 47:1, 49:12, 49:24, 52:2, 55:25, 57:22, 61:9, 61:12, 61:15, 61:19, 61:21, 62:9, 62:14, 62:18, 62:23, 63:9, 63:12, 64:4, 64:9, 64:11, 64:13, 64:17, 64:24, 65:2, 65:4, 65:6, 65:8, 65:16, 65:22, 66:4, 66:9, 66:22, 66:25
**Court** [7] - 2:23, 2:23, 4:1, 63:2, 64:22, 68:10, 68:10
**courthouse** [2] - 4:9, 4:11
**Courthouse** [1] - 2:8
**COURTROOM** [1] - 4:2
**courtroom** [1] - 9:20
**cover** [2] - 31:18, 59:19
**Creole** [6] - 8:25, 13:3, 13:12, 46:6, 46:10, 46:13
**Creole-speaking** [1] - 46:13
**crime** [1] - 43:22
**crimes** [3] - 7:3, 14:14, 43:21
**criminal** [24] - 6:19, 6:21, 6:22, 9:3, 11:23, 13:14, 14:2, 14:16, 16:7, 22:14, 22:24, 30:5, 30:7, 30:10, 30:22, 32:4, 33:7, 33:9, 33:14, 38:23, 43:17, 53:2, 53:3
**CROSS** [2] - 3:4, 25:7
**CROSS-EXAMINATION** [2] - 3:4, 25:7
**CTU** [1] - 8:8
**CTU's** [1] - 18:25
**cut** [1] - 13:12
**cutting** [1] - 13:19

## D

**Daniel** [18] - 7:12, 21:19, 35:20, 35:21, 35:22, 35:25, 36:5, 36:9, 36:20, 38:2, 52:10, 56:14, 57:8, 57:10, 57:24, 58:1, 58:3, 58:16
**DANIELA** [1] - 1:23
**database** [1] - 37:5
**DATE** [1] - 68:9
**date** [5] - 15:24, 22:2, 22:3, 23:22, 24:23
**dating** [1] - 27:1
**DAVID** [2] - 2:1, 2:1
**DAY** [1] - 1:5
**days** [6] - 21:4, 21:9, 21:10, 21:13, 63:11, 64:2
**DC** [1] - 1:18
**de** [1] - 2:5
**DEA** [10] - 26:11, 26:17, 27:1, 27:9, 28:7, 28:17, 30:21, 32:10, 34:3, 35:3
**dealing** [1] - 34:11
**debrief** [3] - 6:22, 16:13, 16:14
**deceive** [1] - 6:7
**decide** [2] - 24:8, 54:24
**decided** [1] - 57:6
**decision** [2] - 52:9, 52:15
**Defendant** [16] - 7:1, 7:15, 8:12, 15:5, 16:6, 18:1, 18:6, 18:8, 18:11, 18:14, 18:21, 20:10, 20:16, 20:25, 23:6, 25:1
**DEFENDANT** [5] - 1:22, 2:1, 2:4, 2:10, 2:16
**defendants** [1] - 1:8
**defense** [3] - 63:14, 64:14, 64:15
**defer** [1] - 28:18
**deferred** [2] - 27:21, 27:24
**deliberate** [2] - 63:21, 63:22
**deliberately** [1] - 6:7
**deliberations** [2] - 63:17, 63:22
**demonstrations** [1] - 18:15
**Department** [2] - 43:15, 43:19
**DEPARTMENT** [1] - 1:17
**dependent** [3] - 28:24, 28:25, 29:5
**deported** [1] - 27:24
**deposition** [3] - 65:12, 65:15, 65:19
**depositions** [1] - 65:13
**DEPUTY** [1] - 4:2
**Descalzo** [1] - 62:5
**DESCALZO** [10] - 2:13, 2:14, 62:7, 62:19, 65:7, 65:9, 65:20, 65:25, 66:8, 66:14
**describe** [2] - 10:12, 17:11
**described** [1] - 10:15
**designated** [2] - 66:1, 66:20
**designations** [3] - 65:9, 65:10, 65:14
**desk** [2] - 17:1, 17:12
**detail** [3] - 62:14, 62:16, 62:20
**detailed** [1] - 57:19
**details** [3] - 22:2, 44:5, 61:6
**determine** [1] - 60:14
**developed** [1] - 40:19
**Diaz** [1] - 68:9
**DIAZ** [2] - 2:22, 68:9
**different** [4] - 15:12, 36:3, 38:15, 51:5
**DIRECT** [2] - 3:4, 4:19
**direct** [2] - 20:17, 43:23
**directed** [4] - 19:15, 19:17, 19:23, 20:6
**direction** [1] - 61:17
**directly** [5] - 7:25, 15:14, 17:2, 20:2, 49:16
**discussed** [8] - 17:25, 18:17, 18:20, 23:11, 23:14, 25:25, 26:3, 59:14
**discussing** [1] - 21:21
**discussion** [2] - 13:18, 43:25
**discussions** [1] - 31:13
**disgruntlement** [1] - 55:23
**disposition** [1] - 33:14
**distance** [1] - 61:2
**DISTRICT** [3] - 1:1, 1:1, 1:11
**District** [2] - 2:23, 68:10
**DIVISION** [1] - 1:2
**DO** [5] - 1:22, 1:23, 63:10, 64:3, 64:8
**document** [19] - 4:22, 4:23, 15:6, 15:8, 15:11, 15:13, 21:23, 22:3, 22:10, 24:16, 36:20, 37:13, 42:5, 45:21, 46:3, 46:5, 60:21, 60:23, 61:5
**documentation** [2] - 24:20, 24:21
**documented** [3] - 37:4, 53:16, 60:22
**documenting** [3] - 22:2, 37:13, 61:7
**documents** [3] - 36:17, 36:24, 37:1
**DOJ** [1] - 1:14
**dollars** [1] - 32:9
**Domingo** [1] - 16:16
**Dominican** [1] - 16:16
**done** [4] - 16:10, 23:15, 53:5, 57:23
**Doral** [1] - 8:9
**down** [17] - 11:19, 16:18, 31:11, 43:14, 43:16, 44:4, 44:5, 44:7, 44:8, 44:15, 44:20, 44:25, 47:10, 47:17, 57:17, 60:16, 60:20
**DRAY** [7] - 2:19, 2:19, 5:18, 9:21, 22:7, 22:18, 23:17
**Drive** [1] - 2:12
**dropped** [3] - 47:20, 48:1, 48:2
**dropping** [1] - 48:6
**during** [8] - 11:19, 12:23, 14:3, 17:5, 25:20, 25:22, 27:4, 65:11

## E

**e-mail** [9] - 19:4, 19:6, 19:10, 19:11, 45:11, 45:18, 45:19, 47:10, 47:14
**early** [5] - 7:1, 14:4, 24:4, 37:12, 63:14
**earned** [3] - 33:20, 33:24, 34:4
**efforts** [1] - 58:4
**either** [6] - 18:20, 40:1, 41:2, 54:13, 54:22, 63:13
**Embassy** [1] - 45:17
**embassy** [15] - 16:19, 19:5, 19:12, 47:17, 47:19, 48:21, 48:24, 49:3, 49:5, 49:10, 49:16, 50:10, 51:2, 51:6, 51:16
**EMMANUEL** [2] - 2:4, 2:5
**employee** [1] - 15:2
**employees** [5] -

20:22, 48:9, 48:18, 50:24, 51:16
**end** [4] - 24:15, 25:17, 51:21, 63:5
**endless** [1] - 39:11
**enforcement** [5] - 34:3, 39:11, 49:19, 54:13, 54:22
**engaged** [3] - 16:7, 26:20, 26:23
**engendered** [1] - 58:12
**entailed** [1] - 40:22
**enthusiastic** [1] - 52:21
**entitled** [1] - 68:5
**envisioned** [1] - 63:2
**escort** [1] - 6:1
**ESQ** [13] - 1:14, 1:16, 1:19, 1:19, 1:22, 1:23, 2:1, 2:4, 2:7, 2:11, 2:13, 2:16, 2:19
**essentially** [7] - 5:20, 7:20, 22:6, 27:16, 28:9, 28:11, 47:21
**et** [1] - 1:7
**events** [2] - 42:6, 59:24
**evidence** [8] - 9:10, 9:24, 10:6, 10:19, 11:12, 14:19, 15:9, 24:18
**evident** [1] - 49:8
**ex** [8] - 37:20, 37:22, 37:24, 38:9, 38:16, 38:25, 39:7, 43:12
**ex-military** [7] - 37:20, 37:22, 37:24, 38:9, 38:16, 38:25, 39:7
**ex-senator** [1] - 43:12
**exact** [1] - 35:17
**exactly** [7] - 36:7, 37:7, 37:10, 42:16, 55:13, 58:18, 64:6
**EXAMINATION** [4] - 3:4, 3:4, 4:19, 25:7
**example** [4] - 15:17, 29:22, 34:17, 53:19
**except** [1] - 45:16
**execute** [1] - 5:21
**executing** [1] - 5:17
**Exhibit** [12] - 4:22, 9:11, 9:25, 10:6, 10:19, 11:4, 11:12, 14:20, 15:10, 15:20, 21:22, 24:19
**expect** [3] - 29:15, 31:1, 63:15
**expert** [2] - 62:3
**explain** [1] - 7:18
**explained** [2] - 11:22, 13:12
**explaining** [2] - 21:5, 21:11
**exposed** [2] - 54:3, 54:7
**exposing** [7] - 21:12, 48:14, 48:16, 50:23, 51:12, 55:3, 55:5
**exposure** [1] - 53:23
**extrapolate** [1] - 50:14
**extraterritorial** [1] - 19:7
**extremely** [1] - 19:20

## F

**fact** [4] - 43:24, 50:6, 50:14, 55:20
**fair** [2] - 30:20, 40:1
**Fairway** [1] - 2:12
**false** [3] - 6:4, 39:2, 39:13
**far** [7] - 50:21, 52:4, 52:21, 58:16, 60:17, 60:19, 60:20
**fashion** [4] - 26:20, 26:23, 26:24, 26:25
**fast** [1] - 23:20
**fault** [2] - 29:4, 66:19
**FBI** [57] - 5:7, 7:2, 8:2, 12:23, 14:13, 16:15, 17:15, 19:15, 20:22, 20:23, 21:6, 21:12, 22:12, 23:2, 23:3, 26:11, 26:17, 26:25, 27:9, 27:10, 27:16, 28:7, 28:17, 28:25, 30:3, 30:5, 30:6, 30:7, 30:21, 31:14, 31:16, 32:3, 32:10, 34:3, 35:3, 36:13, 38:1, 39:11, 42:6, 42:9, 43:15, 43:19, 48:4, 48:9, 48:15, 48:17, 50:22, 50:23, 51:1, 51:4, 51:8, 51:10, 51:17, 51:19, 55:4, 58:6, 62:11
**FBI's** [1] - 14:11
**FCRR** [2] - 2:22, 68:9
**FD-302** [1] - 15:8
**Federal** [1] - 8:8
**federal** [4] - 4:9, 4:11, 35:9, 39:11
**felt** [2] - 53:16, 53:19
**female** [1] - 61:1
**few** [1] - 21:9
**fifth** [1] - 57:12
**file** [7] - 34:20, 36:24, 36:25, 37:1, 37:11, 37:16, 62:13
**filed** [1] - 62:22
**fill** [2] - 36:14, 36:15
**finally** [1] - 11:12
**financial** [2] - 32:18, 33:12
**fine** [4] - 61:14, 63:3, 63:20, 64:3
**finish** [3] - 61:10, 61:13, 61:15
**fire** [1] - 4:11
**first** [18] - 4:8, 4:10, 6:21, 16:13, 17:5, 17:14, 26:13, 27:8, 37:13, 37:18, 39:16, 42:24, 43:1, 49:24, 57:1, 59:7, 59:20, 66:10
**fit** [2] - 31:7, 31:8
**five** [3] - 9:6, 28:3, 56:10
**Floor** [2] - 2:24, 68:11
**FLORES** [2] - 2:7, 2:7
**FLORIDA** [1] - 1:1
**Florida** [14] - 1:4, 1:15, 1:21, 1:24, 2:2, 2:6, 2:9, 2:12, 2:15, 2:18, 2:20, 2:24, 8:9, 68:11
**focus** [1] - 6:25
**follow** [1] - 40:6
**following** [1] - 21:1
**FOR** [7] - 1:14, 1:22, 2:1, 2:4, 2:10, 2:16, 3:2
**Force** [9] - 7:12, 21:19, 35:21, 36:5, 52:10, 57:8, 57:24, 58:1, 58:3
**force** [2] - 18:15, 21:2
**forcing** [1] - 18:23
**foregoing** [1] - 68:3
**foreign** [9] - 43:20, 51:16, 53:23, 53:24, 53:25, 54:4, 54:5, 55:6, 55:18
**form** [8] - 15:15, 15:25, 36:14, 36:15, 36:16, 49:14, 62:15
**formal** [1] - 8:1
**formed** [1] - 33:16
**former** [7] - 10:13, 11:9, 13:1, 23:7, 25:19, 39:17
**forms** [2] - 4:24, 5:2
**Fort** [1] - 2:18
**forward** [1] - 23:20
**forwarded** [5] - 19:4, 19:10, 45:18, 47:13, 47:15
**four** [1] - 56:10
**FPR** [2] - 2:22, 68:9
**fraud** [1] - 29:23
**French** [1] - 45:25
**Friday** [3] - 57:3, 57:6, 63:13
**FRIEDMAN** [4] - 2:16, 2:17, 64:12, 66:24
**FTU** [1] - 8:8
**full** [5] - 16:14, 63:10, 63:18, 63:20, 64:1
**fully** [1] - 40:18
**furthered** [1] - 51:21

## G

**Gables** [1] - 2:6
**gangs** [1] - 18:18
**Gardens** [1] - 2:12
**gather** [1] - 14:13
**general** [2] - 22:1, 28:25
**gentleman** [5] - 11:8, 11:16, 20:6, 27:17, 33:25
**gentlemen** [2] - 4:6, 19:12
**George** [3] - 19:15, 51:4, 51:18
**GEORGE** [2] - 3:3, 4:17
**gestures** [2] - 13:19, 13:21
**gist** [1] - 54:15
**given** [2] - 6:16, 27:21
**Gonzalez** [20] - 7:12, 21:19, 35:20, 35:21, 35:22, 35:25, 36:5, 36:9, 36:20, 38:2, 52:10, 56:14, 57:8, 57:10, 57:24, 58:1, 58:3, 58:16, 64:20, 64:21
**GOVERNMENT** [2] - 1:14, 3:2
**Government** [24] - 4:17, 9:11, 9:25, 10:6, 10:19, 11:4, 11:12, 14:4, 15:10, 15:19, 27:4, 27:8, 32:10, 33:11, 49:20, 50:3, 50:19, 54:11, 54:20, 62:24, 63:3, 63:13, 65:14, 66:2
**government** [6] - 19:1, 41:11, 41:15, 41:23, 42:18, 44:10
**Government's** [5] - 4:22, 5:1, 14:19, 21:22, 24:18
**grabbing** [1] - 18:22
**great** [3] - 26:19, 26:22, 27:2
**group** [8] - 4:8, 7:7, 7:8, 10:12, 11:19, 53:14, 53:15, 61:3
**guess** [3] - 40:1, 43:7, 56:6
**guidance** [3] - 48:25, 49:17, 50:25
**gun** [2] - 5:25, 6:1
**guy** [3] - 28:17, 35:1, 58:11

## H

**Haiti** [35] - 7:3, 10:13, 10:18, 11:1, 12:21, 12:24, 13:8, 14:12, 14:14, 14:17, 16:8, 16:11, 16:15, 16:19, 17:15, 17:24, 18:16, 19:1, 19:5, 19:9, 20:13, 21:9, 22:15, 23:7, 43:5, 45:11, 45:14, 45:19, 47:11, 47:14, 50:3, 50:15, 50:19, 53:3, 59:15
**Haiti's** [1] - 14:4
**Haitian** [15] - 7:7, 7:8, 8:25, 11:17, 13:1, 13:10, 13:18, 16:5, 37:14, 42:22, 43:3, 45:16, 46:13, 55:14, 59:14
**Haitians** [2] - 7:7, 53:25
**half** [1] - 63:20
**Hamm** [1] - 4:16
**hand** [2] - 13:19, 13:20
**handed** [1] - 25:23
**handing** [1] - 25:23
**handled** [1] - 34:7
**handler** [19] - 6:4, 18:6, 25:11, 25:14, 25:19, 25:23, 26:1,

26:4, 33:19, 34:10, 34:17, 34:19, 34:22, 35:2, 36:25, 38:1, 39:6, 39:10
**handlers** [10] - 6:7, 20:24, 25:21, 25:22, 26:3, 34:14, 34:16, 35:18, 36:4, 48:10
**hands** [1] - 17:21
**head** [1] - 19:5
**hear** [3] - 32:8, 62:24, 63:9
**Hearsay** [1] - 22:7
**hearsay** [3] - 19:25, 20:3, 57:21
**HECTOR** [1] - 2:7
**help** [6] - 12:24, 14:4, 14:11, 17:16, 18:19, 51:23
**helping** [1] - 28:22
**helps** [2] - 8:20, 63:3
**hereby** [1] - 68:3
**hide** [1] - 41:2
**hiding** [6] - 44:12, 50:2, 50:3, 50:6, 50:8, 50:14
**himself** [10] - 10:17, 10:23, 11:8, 11:16, 31:2, 37:22, 50:23, 53:20, 55:3, 55:5
**historically** [1] - 52:22
**hold** [2] - 66:4, 66:14
**Homeland** [1] - 35:5
**Honor** [18] - 4:15, 25:6, 61:11, 62:8, 62:10, 62:19, 64:8, 64:10, 64:12, 65:1, 65:3, 65:5, 65:7, 65:9, 65:10, 65:25, 66:15, 66:24
**HONORABLE** [1] - 1:10
**hope** [1] - 61:16
**hopeful** [5] - 10:17, 41:5, 41:8, 41:9, 41:19
**hopefully** [1] - 61:18
**hopefuls** [1] - 16:6
**hoping** [1] - 41:20
**house** [1] - 18:23
**HOWARD** [18] - 2:1, 2:1, 3:4, 25:6, 25:8, 40:11, 44:18, 45:4, 45:5, 47:2, 49:13, 50:1, 52:3, 56:2, 57:25, 61:11, 61:14, 64:16
**Howard** [1] - 61:9
**HSI** [2] - 35:3, 35:4
**human** [20] - 5:22, 12:21, 24:5, 32:2, 33:19, 34:14, 36:18, 38:4, 38:8, 38:12, 48:5, 51:14, 53:11, 54:10, 54:12, 54:19, 54:21, 55:21, 58:7

## I

**IBC** [1] - 64:20
**idea** [2] - 22:24, 23:8
**identified** [1] - 7:15
**identify** [1] - 9:8
**illegal** [2] - 4:23, 31:13
**imagine** [2] - 5:15, 18:1
**immediately** [1] - 16:12
**immigration** [5] - 32:19, 32:20, 32:21, 33:11, 33:12
**impression** [2] - 39:10, 49:14
**incensed** [1] - 47:22
**included** [3] - 12:21, 60:11, 60:12
**income** [1] - 33:4
**incomplete** [1] - 60:15
**incorrect** [1] - 53:13
**indicate** [1] - 58:3
**indication** [1] - 37:11
**individual** [2] - 43:9, 54:24
**individuals** [5] - 59:25, 60:2, 60:17, 60:18, 61:8
**informant** [2] - 51:13, 51:14
**informants** [1] - 37:4
**information** [64] - 6:4, 6:9, 6:12, 6:14, 6:15, 7:2, 7:5, 7:11, 7:23, 9:4, 11:20, 12:4, 12:12, 12:16, 12:18, 12:19, 12:20, 13:14, 13:15, 14:2, 14:8, 14:15, 14:16, 15:14, 16:17, 17:8, 26:14, 29:1, 29:6, 29:8, 29:9, 29:12, 29:15, 29:16, 29:19, 29:21, 29:23, 30:3, 30:11, 38:3, 38:10, 38:21, 39:1, 39:12, 43:17, 53:2, 53:3, 53:4, 53:6, 53:8, 53:16, 54:13, 54:14, 54:22, 54:23, 59:8, 59:10, 59:21, 60:5, 60:11, 60:22, 61:7
**informed** [3] - 37:23, 38:4, 57:9
**initiate** [1] - 16:18
**insert** [4] - 22:1, 30:23, 31:1, 32:4
**instance** [1] - 65:13
**instructed** [1] - 56:12
**instructions** [1] - 62:6
**intel** [7] - 9:3, 9:4, 12:1, 13:14, 14:16, 38:21, 59:23
**intelligence** [3] - 6:4, 6:14, 14:13
**intended** [2] - 44:5, 44:6
**intentions** [5] - 52:19, 52:24, 52:25, 54:9, 54:18
**Inter** [1] - 8:8
**interact** [1] - 16:21
**interactions** [5] - 15:7, 36:17, 36:21, 37:3, 42:6
**interest** [4] - 13:17, 42:22, 51:22, 53:5
**interested** [4] - 13:13, 13:25, 53:6, 53:8
**interests** [5] - 23:4, 42:23, 43:4, 43:20
**intervene** [1] - 16:12
**interview** [2] - 59:8, 59:10
**interviewed** [1] - 59:9
**interviews** [1] - 6:14
**INTRIAGO** [1] - 2:4
**Intriago** [12] - 8:11, 14:18, 14:23, 18:8, 19:13, 47:16, 47:18, 48:20, 48:23, 49:15, 64:7, 65:4
**Intriago's** [1] - 14:24
**introduce** [4] - 52:5, 52:20, 54:2, 55:19
**introduced** [9] - 10:11, 10:16, 10:17, 10:23, 11:8, 11:16, 15:2, 38:25, 52:8
**introductions** [1] - 22:12
**investigate** [6] - 12:8, 30:5, 30:6, 30:7, 30:13, 38:23
**investigated** [1] - 60:1
**investigation** [6] - 6:23, 30:19, 38:23, 43:21, 43:22, 60:20
**Investigations** [1] - 35:5
**investigations** [1] - 12:2
**investigative** [1] - 35:9
**involved** [3] - 41:11, 41:14, 41:15
**involvement** [1] - 59:15
**Iranian** [1] - 12:20
**issue** [1] - 66:16
**issues** [1] - 26:8

## J

**Jacmel** [4] - 10:24, 10:25, 11:19, 11:23
**JACQUELINE** [1] - 1:10
**James** [8] - 9:16, 18:11, 35:15, 37:9, 37:19, 37:22, 40:13
**JARAMILLO** [2] - 1:23, 65:3
**JASON** [1] - 1:19
**job** [2] - 29:11
**Joel** [3] - 10:10, 13:2, 43:11
**John** [4] - 10:10, 13:2, 13:9, 43:11
**Jonathan** [1] - 8:16
**JONATHAN** [2] - 2:16, 2:17
**Joseph** [3] - 10:10, 13:2, 43:11
**Jovenel** [5] - 41:12, 41:16, 41:20, 41:23, 43:25
**judge** [4] - 5:16, 45:11, 45:19, 66:12
**Judge** [3] - 9:21, 45:4, 64:18
**JUDGE** [1] - 1:11
**July** [14] - 23:5, 23:20, 23:21, 24:6, 24:15, 24:24, 24:25, 56:3, 56:16, 57:1, 59:12, 59:24
**jump** [1] - 11:18
**June** [2] - 23:5, 68:9
**Jury** [2] - 4:5, 61:20
**JURY** [1] - 1:10
**jury** [4] - 4:3, 7:18, 62:5, 62:25
**JUSTICE** [1] - 1:17

## K

**keep** [1] - 28:18
**kept** [2] - 28:7, 46:6
**Kessa** [4] - 10:23, 11:18, 11:20, 11:22
**kill** [1] - 23:12
**kind** [8] - 5:11, 13:20, 26:1, 29:25, 32:5, 33:14, 45:8, 49:9
**knowing** [1] - 51:23
**knowledge** [1] - 49:19
**known** [1] - 47:5
**KUDMAN** [3] - 2:11, 2:11, 64:10

## L

**lack** [1] - 13:8
**ladies** [1] - 4:6
**lamenting** [1] - 43:7
**language** [5] - 8:19, 8:20, 8:21, 8:22, 8:23
**Language** [1] - 8:17
**large** [1] - 11:24
**last** [4] - 17:19, 28:5, 47:7, 62:3
**lasts** [1] - 27:20
**late** [3] - 18:25, 21:20, 22:23
**Latin** [1] - 12:11
**Lauderdale** [1] - 2:18
**laundering** [1] - 12:21
**law** [5] - 34:2, 39:11, 49:19, 54:13, 54:22
**LAW** [1] - 2:14
**lawfully** [2] - 54:14, 54:23
**lawyer** [1] - 57:15
**lead** [4] - 34:10, 40:7, 54:10, 54:18
**leadership** [1] - 37:2
**leading** [3] - 22:18, 22:19, 66:2
**leak** [4] - 53:10, 54:10, 54:19, 55:20
**learn** [2] - 18:25, 23:21
**learned** [3] - 6:17, 13:4, 20:11
**least** [7] - 18:5, 25:14, 28:17, 32:3, 35:9, 35:11, 43:4
**leave** [1] - 17:15
**left** [4] - 4:21, 17:19, 61:12, 61:18
**legitimate** [1] - 51:22

**Leon** [1] - 2:5
**letter** [1] - 62:15
**level** [6] - 33:18, 33:23, 34:1, 34:2, 35:11, 35:25
**leverage** [1] - 50:18
**leveraging** [7] - 48:8, 48:13, 48:14, 50:21, 50:22, 51:1, 51:11
**lie** [1] - 6:7
**life** [1] - 33:10
**Lime** [1] - 21:17
**limit** [1] - 53:23
**lingo** [3] - 31:24, 32:4, 32:6
**lives** [1] - 63:4
**living** [2] - 27:5, 32:3
**LLP** [1] - 2:11
**located** [1] - 16:16
**look** [6] - 42:16, 52:5, 58:11, 61:16, 63:22, 63:25
**looked** [2] - 52:25, 65:23
**looking** [8] - 15:16, 24:19, 31:13, 31:16, 35:6, 59:24, 66:9, 66:19
**looks** [1] - 63:13
**lunch** [1] - 4:21

## M

**ma'am** [2] - 20:4, 65:8
**mail** [10] - 19:4, 19:6, 19:10, 19:11, 45:11, 45:14, 45:18, 45:19, 47:10, 47:14
**main** [12] - 9:3, 14:10, 14:12, 14:15, 34:17, 34:22, 35:1, 35:2, 35:14, 48:3, 48:8, 48:12
**man** [5] - 14:18, 16:21, 35:10, 58:11, 60:25
**manner** [2] - 31:2, 40:23
**mannerisms** [1] - 31:24
**MARISSEL** [1] - 2:13
**Marky** [1] - 10:23
**mass** [1] - 18:15
**materialize** [1] - 44:13
**matter** [2] - 64:18, 68:5
**matters** [3] - 30:8, 30:11, 34:11
**mayor** [2] - 10:23, 11:18
**MCLAUGHLIN** [6] - 1:14, 62:10, 62:16, 63:2, 64:18, 65:1
**McLaughlin** [1] - 64:17
**mean** [10] - 7:20, 8:19, 29:19, 29:20, 29:21, 31:11, 31:16, 33:24, 44:8, 59:15
**meaning** [1] - 6:4
**means** [3] - 6:12, 6:17, 7:19
**measure** [1] - 40:23
**meet** [5] - 7:8, 7:14, 7:25, 26:2, 40:17
**meeting** [52] - 8:4, 8:5, 8:6, 8:13, 8:15, 9:2, 9:5, 9:9, 9:18, 10:4, 10:11, 10:16, 11:2, 11:10, 11:20, 12:14, 12:23, 13:2, 14:3, 14:10, 14:11, 14:13, 15:4, 16:1, 16:5, 17:5, 17:9, 21:4, 21:8, 21:15, 21:18, 37:12, 41:4, 41:24, 42:10, 42:21, 42:23, 43:1, 45:7, 47:9, 52:4, 52:15, 53:9, 53:19, 53:22, 55:4, 58:23, 60:2, 60:4, 60:17, 60:18, 61:8
**meetings** [1] - 42:6
**member** [2] - 11:9, 11:16
**mention** [3] - 7:2, 20:21, 42:18
**mentioned** [9] - 5:4, 8:18, 14:18, 18:4, 41:19, 42:12, 55:9, 55:11, 55:12
**mentioning** [1] - 20:13
**met** [18] - 17:6, 17:7, 20:6, 21:10, 25:15, 25:18, 26:1, 26:5, 26:6, 28:7, 35:15, 35:17, 37:19, 38:8, 39:7, 40:12, 53:14, 53:15
**methods** [1] - 12:9
**MIAMI** [1] - 1:2
**Miami** [13] - 1:4, 1:15, 1:21, 1:24, 2:2, 2:9, 2:15, 2:20, 2:24, 2:24, 34:11, 68:11, 68:11
**might** [12] - 4:10, 5:5, 7:2, 28:3, 28:4, 31:12, 40:1, 53:10, 53:20, 55:20, 63:18, 64:1
**military** [12] - 11:9, 37:20, 37:22, 37:24, 38:9, 38:16, 38:18, 38:21, 38:25, 39:7, 39:17, 39:18
**mind** [1] - 61:13
**minute** [1] - 66:6
**miscommunication** [1] - 47:25
**missed** [4] - 23:25, 56:9, 56:17, 57:6
**mistake** [1] - 53:12
**mistaken** [2] - 39:2, 39:14
**Moise** [11] - 17:23, 18:2, 18:15, 18:22, 23:10, 23:13, 23:21, 41:12, 41:16, 41:23, 43:25
**Moise's** [1] - 41:20
**moment** [1] - 35:17
**moments** [1] - 30:17
**Monday** [2] - 57:3, 57:5
**money** [5] - 12:21, 32:10, 32:16, 32:17, 33:11
**month** [1] - 25:14
**morning** [8] - 5:4, 24:4, 56:3, 56:7, 56:16, 61:10, 61:15, 61:23
**motion** [2] - 62:1, 62:20
**motions** [1] - 62:4
**motivated** [1] - 22:22
**motivation** [2] - 32:18, 33:1
**move** [2] - 45:3, 56:1
**moving** [1] - 46:7
**MR** [54] - 3:4, 3:4, 4:15, 4:20, 5:18, 5:24, 9:10, 9:12, 9:21, 9:23, 19:25, 20:8, 22:7, 22:9, 22:18, 22:21, 23:17, 23:19, 25:3, 25:6, 25:8, 40:9, 40:11, 44:16, 44:18, 45:1, 45:4, 45:5, 46:25, 47:2, 49:11, 49:13, 49:23, 50:1, 52:1, 52:3, 55:24, 56:2, 57:21, 57:25, 61:11, 61:14, 62:10, 62:16, 63:2, 63:10, 64:3, 64:8, 64:12, 64:16, 64:18, 65:1, 65:5, 66:24
**MS** [10] - 62:7, 62:19, 64:10, 65:3, 65:7, 65:9, 65:20, 65:25, 66:8, 66:14
**multiple** [4] - 6:12, 26:3, 34:13, 34:14
**murder/ assassination** [1] - 58:22
**must** [2] - 27:22, 28:2

## N

**name** [10] - 20:13, 20:21, 21:16, 36:14, 45:22, 46:5, 47:20, 47:25, 48:2, 48:6
**named** [1] - 14:18
**narcotics** [6] - 5:6, 11:24, 12:2, 12:8, 12:9, 29:22
**national** [7] - 9:4, 13:15, 14:2, 14:16, 29:23, 30:7, 53:4
**nationals** [10] - 7:7, 7:9, 37:14, 53:23, 53:24, 53:25, 54:4, 54:5, 55:6, 55:19
**nations** [1] - 43:20
**nationwide** [2] - 34:11, 34:12
**nature** [1] - 16:1
**NE** [1] - 2:17
**nearing** [1] - 63:5
**necessarily** [6] - 30:16, 36:7, 36:23, 38:14, 38:17, 39:15
**necessary** [3] - 38:19, 59:13, 59:17
**need** [12] - 8:21, 8:23, 22:5, 39:23, 39:24, 40:1, 40:4, 40:5, 51:8, 51:10, 57:14, 59:6
**never** [20] - 17:7, 17:25, 18:10, 18:12, 18:17, 18:20, 18:24, 19:18, 20:5, 20:6, 23:11, 23:14, 25:17, 45:14, 46:3, 46:17, 46:18, 47:6
**New** [2] - 34:18, 34:19
**news** [5] - 19:19, 20:11, 23:23, 59:25, 60:20
**next** [5] - 19:21, 47:8, 63:6, 63:11, 63:19
**Nick** [1] - 62:11
**nilly** [1] - 33:21
**nine** [2] - 61:23, 61:24
**NO** [1] - 1:2
**non** [1] - 15:13
**non-sources** [1] - 15:13
**none** [1] - 26:7
**North** [3] - 2:20, 2:24, 68:11
**Northeast** [1] - 1:20
**Northwest** [2] - 1:17, 2:8
**note** [1] - 60:1
**notes** [1] - 24:11
**nothing** [2] - 23:8, 23:11
**notice** [3] - 59:11, 63:7
**notify** [2] - 54:14, 54:23
**number** [1] - 66:13
**numbers** [1] - 32:13
**Nunez** [6] - 4:21, 15:21, 19:15, 19:17, 51:4, 51:18
**NUNEZ** [2] - 3:3, 4:17
**NW** [1] - 1:15

## O

**o'clock** [1] - 61:10
**object** [1] - 66:3
**objected** [1] - 65:11
**objection** [18] - 19:25, 20:1, 22:7, 22:18, 23:17, 40:9, 44:16, 45:1, 46:25, 49:11, 49:23, 52:1, 55:24, 57:21, 65:17, 66:9, 66:10, 66:17
**objections** [1] - 65:14
**objective** [2] - 51:25, 61:4
**objects** [1] - 66:2
**obtain** [3] - 9:3, 14:15, 59:21
**obtained** [2] - 5:21, 6:15
**obtaining** [2] - 12:12, 59:7
**obvious** [1] - 49:21
**obviously** [2] - 16:17, 60:19
**occasion** [1] - 35:6

**occur** [2] - 8:5, 49:18
**occurred** [5] - 8:6, 47:24, 58:22, 59:24, 60:15
**occurring** [1] - 7:3
**odd** [1] - 17:1
**OF** [3] - 1:1, 1:4, 1:17
**offers** [1] - 29:12
**OFFICE** [2] - 1:14, 1:20
**office** [1] - 18:16
**Officer** [10] - 7:12, 21:19, 35:21, 36:5, 52:10, 57:8, 57:24, 58:1, 58:3, 64:21
**officer** [8] - 16:18, 19:5, 19:8, 19:11, 19:22, 21:2, 45:16, 47:14
**OFFICER** [2] - 4:4, 61:19
**Official** [1] - 68:10
**official** [2] - 2:23, 19:1
**often** [1] - 59:5
**OIA** [1] - 5:2
**once** [6] - 5:20, 13:4, 20:6, 27:19, 36:24, 59:24
**one** [35] - 9:17, 14:7, 18:5, 19:13, 32:23, 33:3, 34:17, 35:18, 35:25, 36:7, 36:10, 42:1, 43:9, 45:21, 46:20, 47:13, 49:25, 50:21, 51:2, 51:16, 52:9, 52:13, 53:12, 53:19, 54:17, 55:7, 55:9, 55:11, 55:12, 57:6, 64:18, 65:16, 65:22, 66:5
**operating** [3] - 39:2, 39:12, 39:25
**operation** [2] - 5:6, 5:11
**operational** [1] - 5:21
**operations** [4] - 12:20, 12:21, 12:22, 32:4
**opinion** [1] - 33:16
**opposing** [1] - 64:23
**orally** [1] - 13:22
**Order** [1] - 4:1
**order** [10] - 27:15, 30:2, 30:10, 31:23, 46:11, 50:19, 51:8, 60:14, 64:23
**ordinary** [1] - 53:18
**organization** [1] - 30:23
**organizing** [1] - 18:15
**origin** [1] - 12:10
**original** [5] - 60:11, 60:12, 60:22, 60:24, 61:7
**originally** [1] - 65:10
**ORLANDO** [1] - 1:22
**Ortiz** [66] - 7:1, 7:2, 7:6, 7:15, 8:11, 14:25, 15:1, 15:2, 15:3, 15:5, 16:7, 18:1, 18:6, 18:13, 18:14, 18:21, 20:10, 20:12, 20:16, 20:25, 21:2, 21:18, 21:19, 22:14, 22:25, 23:6, 23:15, 23:24, 24:1, 24:5, 24:22, 25:1, 25:5, 25:25, 26:1, 26:3, 28:4, 30:10, 30:22, 31:11, 32:11, 32:16, 34:21, 35:15, 35:23, 36:1, 36:4, 36:21, 37:8, 37:18, 37:23, 38:24, 39:6, 39:16, 40:19, 51:13, 52:5, 52:21, 56:7, 56:12, 56:17, 57:10, 57:11, 62:21, 64:3, 65:2
**ORTIZ** [3] - 1:7, 1:22, 2:1
**Ortiz's** [3] - 8:12, 25:11, 63:9
**outed** [1] - 48:3
**outside** [1] - 49:19
**overall** [1] - 36:19
**overexpose** [1] - 53:20
**overexposing** [1] - 55:18
**overlap** [1] - 25:24
**overruled** [5] - 5:19, 22:8, 44:17, 47:1, 57:22
**oversee** [1] - 16:15
**overthrow** [2] - 16:11, 18:2
**own** [2] - 6:1, 30:17

## P

**P.A** [7] - 1:23, 2:1, 2:5, 2:7, 2:14, 2:17, 2:19
**p.m** [5] - 1:6, 4:5, 61:20, 67:1
**PAGE** [1] - 3:2
**page** [7] - 15:19, 21:22, 65:24, 66:7, 66:10, 66:13, 66:16
**pages** [6] - 4:23, 5:1, 5:2, 65:25, 66:1, 66:2
**Pages** [1] - 1:7
**paid** [1] - 32:10
**Palm** [1] - 2:12
**paper** [1] - 46:23
**parole** [3] - 27:12, 27:13, 27:20
**part** [5] - 38:2, 38:7, 38:9, 39:8, 60:20
**partially** [1] - 32:3
**participate** [2] - 5:5, 5:23
**participation** [1] - 27:22
**particular** [3] - 15:19, 43:9, 64:5
**parties** [1] - 65:11
**partners** [1] - 15:1
**pass** [1] - 25:3
**past** [3] - 6:5, 26:8, 53:6
**PATRICIA** [2] - 2:22, 68:9
**PATRICK** [2] - 2:19, 2:19
**Pavletic** [1] - 62:12
**pay** [1] - 32:17
**paying** [1] - 33:3
**Pembroke** [1] - 21:14
**Pennsylvania** [1] - 1:17
**Penthouse** [1] - 2:8
**people** [24] - 4:8, 4:10, 9:5, 9:8, 10:12, 21:8, 31:12, 33:21, 38:15, 39:17, 47:9, 47:17, 48:6, 49:15, 52:8, 52:15, 52:20, 53:1, 53:9, 53:21, 53:25, 54:3, 55:4, 64:21
**per** [2] - 31:18, 52:23
**PEREZ** [4] - 2:4, 2:5, 19:25, 65:5
**permanency** [1] - 28:3
**permanent** [2] - 24:13, 27:23
**persistently** [1] - 33:25
**person** [16] - 9:13, 9:25, 10:20, 11:5, 11:13, 14:20, 26:2, 28:7, 35:22, 38:16, 38:17, 38:20, 38:22, 46:23, 47:3, 59:9
**personal** [1] - 23:4
**personally** [1] - 30:6
**personnel** [1] - 54:5
**persons** [3] - 7:24, 22:12, 54:1
**perspective** [5] - 9:1, 59:12, 59:22, 60:5, 61:6
**pertains** [1] - 42:23
**pertinent** [2] - 54:13, 54:22
**PHENELUS** [1] - 1:19
**phone** [11] - 16:25, 17:1, 17:2, 17:12, 17:23, 18:5, 18:6, 18:9, 20:20, 56:9
**photograph** [3] - 9:13, 10:14, 14:19
**photographs** [1] - 11:4
**phrase** [1] - 7:17
**physical** [1] - 21:15
**picture** [1] - 16:22
**pictures** [1] - 9:7
**piece** [1] - 46:23
**Pierre** [1] - 8:17
**Pines** [1] - 21:14
**place** [2] - 30:18, 31:5
**Plaintiff** [1] - 1:5
**plan** [3] - 5:21, 63:10, 63:12
**plane** [1] - 17:14
**planning** [5] - 17:23, 18:2, 23:9, 23:12, 63:4
**play** [2] - 5:12, 6:13
**plotting** [1] - 16:10
**plus** [2] - 28:16, 32:9
**point** [10] - 6:23, 17:20, 22:24, 28:2, 29:11, 33:13, 44:14, 45:21, 46:20
**political** [11] - 13:7, 13:10, 14:1, 14:5, 14:12, 16:6, 43:4, 43:20, 44:21, 59:16
**politicians** [3] - 42:22, 43:3, 55:15
**politics** [4] - 13:13, 13:18, 13:25, 43:17
**Ponce** [1] - 2:5
**popcorn** [2] - 4:9, 4:10
**port** [3] - 11:23, 11:25, 12:3
**position** [1] - 23:1
**POSNER** [1] - 2:11
**possibility** [1] - 22:15
**possible** [1] - 6:6
**possibly** [2] - 6:13, 6:22
**post** [1] - 59:12
**potential** [2] - 12:4, 14:13
**power** [1] - 17:23
**practice** [2] - 54:10, 54:18
**precisely** [2] - 13:5, 13:16
**predecessor** [1] - 25:25
**premise** [2] - 39:2, 39:13
**preparation** [1] - 26:1
**preparing** [1] - 62:19
**presence** [3] - 49:16, 50:2, 50:3
**present** [3] - 5:23, 41:15, 44:11
**president** [6] - 12:24, 16:11, 41:16, 41:20, 44:11
**President** [7] - 17:23, 18:2, 18:15, 18:22, 23:10, 23:13, 23:21
**presidential** [7] - 10:17, 41:5, 41:8, 41:19, 42:12, 44:10
**pretel** [1] - 25:25
**PRETEL** [1] - 1:7
**Pretel** [28] - 8:11, 20:12, 21:2, 22:25, 24:22, 25:11, 26:3, 28:4, 30:10, 30:21, 31:11, 32:11, 32:16, 34:21, 36:1, 36:4, 36:21, 37:7, 37:18, 37:23, 38:24, 39:6, 39:16, 40:19, 52:21, 56:12, 57:10, 57:11
**pretty** [1] - 17:19
**previous** [1] - 10:14
**previously** [1] - 4:17
**primarily** [8] - 12:8, 12:10, 12:18, 13:7, 13:20, 26:9, 30:6, 59:8
**primary** [5] - 25:21, 32:18, 32:25, 36:15, 50:17
**private** [3] - 40:13, 40:14, 40:19
**proactive** [1] - 52:23
**proceed** [1] - 62:25
**proceedings** [2] -

67:1, 68:4
**process** [2] - 24:10, 27:23
**program** [1] - 27:14
**promise** [1] - 14:3
**properly** [1] - 38:4
**prosecutor** [5] - 60:3, 60:16, 60:21, 60:23, 60:24
**provide** [12] - 7:23, 11:21, 29:1, 29:5, 29:7, 29:8, 29:15, 29:21, 29:22, 30:11, 36:21, 53:2
**provided** [4] - 6:12, 14:8, 27:24, 61:8
**provides** [1] - 38:21
**providing** [10] - 12:18, 12:20, 29:16, 29:18, 30:2, 38:22, 40:22, 59:9, 59:10, 59:22
**public** [6] - 27:12, 27:13, 27:17, 27:20, 28:8, 28:18
**publishing** [1] - 9:10
**pull** [1] - 66:14
**purchases** [1] - 5:6
**purported** [1] - 11:18
**purpose** [7] - 9:1, 9:3, 14:11, 14:12, 14:15, 22:1, 48:23
**purposes** [1] - 12:5
**put** [4] - 37:4, 42:2, 48:10, 60:5

## Q

**qualified** [1] - 28:8
**questioned** [1] - 48:2

## R

**Rahmer** [1] - 62:11
**ran** [4] - 52:8, 52:10, 52:11, 52:12
**rate** [1] - 4:13
**rather** [1] - 63:19
**reach** [1] - 56:7
**react** [1] - 19:19
**read** [2] - 22:5, 46:3
**reading** [1] - 19:11
**ready** [4] - 4:3, 4:13, 17:15, 64:1
**realize** [1] - 60:1
**realized** [1] - 53:12
**really** [1] - 13:13
**reason** [1] - 33:13
**reasons** [2] - 24:11, 42:1
**reassigned** [1] - 25:20
**rebuttal** [1] - 63:16
**receive** [3] - 46:22, 62:10, 62:14
**received** [5] - 16:25, 19:19, 45:14, 46:18, 51:3
**recess** [1] - 66:25
**recitation** [1] - 60:15
**recognize** [10] - 9:8, 9:13, 9:25, 10:6, 10:20, 11:5, 11:13, 14:20, 15:10, 21:22
**recommended** [1] - 24:13
**record** [4] - 14:1, 14:7, 32:8, 36:16
**recounted** [1] - 22:10
**recruiting** [1] - 18:18
**referencing** [1] - 46:16
**referred** [1] - 46:2
**referring** [1] - 42:15
**regard** [1] - 20:10
**regarding** [1] - 47:9
**register** [13] - 19:14, 48:20, 48:25, 49:3, 49:6, 49:17, 50:11, 50:12, 50:19, 50:25, 51:2, 51:8, 51:22
**registering** [1] - 51:6
**relations** [1] - 43:20
**relationship** [24] - 7:1, 8:2, 14:24, 19:8, 20:22, 20:23, 21:6, 21:12, 23:2, 23:3, 40:14, 40:20, 40:22, 48:4, 48:15, 48:17, 50:18, 50:23, 51:1, 51:11, 51:20, 54:6, 55:14
**relay** [1] - 7:24
**relayed** [1] - 7:12
**Relevance** [1] - 5:18
**relevance** [2] - 12:4, 46:25
**relying** [3] - 35:10, 38:25, 39:13
**remaining** [2] - 4:23, 5:1
**remember** [12] - 13:6, 13:16, 21:16, 24:2, 41:25, 44:2, 45:11, 45:13, 45:18, 56:10, 60:24, 60:25
**remembered** [1] - 42:1
**remove** [1] - 17:23
**removed** [2] - 35:25, 36:9
**renew** [1] - 27:19
**renewed** [1] - 28:2
**repeat** [2] - 49:25, 54:17
**repeated** [1] - 14:6
**rephrase** [1] - 22:19
**report** [19] - 14:8, 14:9, 15:8, 15:14, 15:17, 15:18, 15:22, 15:25, 17:18, 22:1, 26:7, 35:25, 42:2, 42:9, 42:16, 42:20, 58:23, 59:2, 61:4
**REPORTED** [1] - 2:21
**reported** [11] - 35:16, 35:17, 37:19, 37:23, 39:6, 47:16, 47:18, 48:19, 48:23, 49:1, 49:2
**Reporter** [2] - 2:23, 68:10
**reporting** [2] - 49:2, 49:5
**representations** [2] - 38:11, 40:7
**represented** [1] - 41:6
**Republic** [1] - 16:16
**requests** [1] - 62:11
**reservation** [1] - 41:24
**reside** [1] - 32:22
**resign** [1] - 18:23
**resistance** [1] - 58:4
**resolve** [1] - 14:4
**resources** [2] - 12:1, 39:11
**respect** [3] - 34:10, 64:7, 64:14
**respond** [2] - 13:9, 17:17
**responded** [2] - 19:24, 20:5
**response** [3] - 46:9, 62:2, 62:20
**responsibilities** [1] - 29:11
**responsible** [1] - 27:5
**rest** [1] - 63:13
**restaurant** [2] - 21:14, 21:16
**retrieved** [1] - 53:15
**return** [1] - 57:6
**review** [3] - 60:7, 60:8, 60:14
**reviewed** [4] - 37:16, 60:4, 60:7, 60:10
**reviewing** [1] - 37:3
**rise** [3] - 4:2, 4:4, 61:19
**risk** [4] - 21:12, 22:14, 48:10, 48:11
**role** [4] - 5:11, 5:13, 5:16, 22:16
**room** [1] - 61:6
**roughly** [1] - 24:2
**routes** [1] - 12:9
**RPR** [2] - 2:22, 68:9
**run** [1] - 16:17

## S

**safe** [2] - 33:16, 33:20
**Sanon** [27] - 10:3, 10:15, 10:17, 12:13, 12:14, 12:18, 12:23, 16:21, 17:3, 17:6, 17:12, 17:22, 18:2, 18:4, 18:13, 18:14, 18:21, 23:6, 23:15, 35:15, 37:9, 40:12, 40:20, 41:5, 42:15, 47:16
**Santo** [1] - 16:16
**sat** [3] - 11:19, 60:16, 60:20
**Saturday** [1] - 57:3
**saw** [18] - 23:25, 37:13, 45:21, 46:3, 46:5, 46:9, 46:19, 46:20, 46:22, 47:7, 56:7, 56:9, 59:6, 59:18, 60:4, 60:10, 65:17
**schedule** [2] - 63:1, 63:25
**screen** [3] - 4:16, 15:16, 21:21
**SE** [3] - 1:24, 2:2, 2:14
**se** [2] - 31:18, 52:23
**SEAN** [1] - 1:14
**seated** [1] - 61:25
**Second** [2] - 2:2, 2:14
**second** [4] - 6:13, 53:9, 59:11, 66:11
**secretive** [1] - 49:9
**Security** [1] - 35:5
**security** [25] - 9:4, 13:15, 14:2, 14:16, 16:18, 19:5, 19:8, 19:11, 19:22, 29:23, 30:8, 40:23, 40:25, 45:16, 47:14, 48:20, 48:25, 49:17, 50:6, 50:9, 50:11, 50:12, 50:15, 53:4, 55:15
**SECURITY** [2] - 4:4, 61:19
**see** [14] - 9:20, 32:13, 36:25, 38:10, 39:23, 39:24, 40:1, 40:4, 40:5, 42:16, 42:20, 61:23, 65:13, 65:16
**seeing** [3] - 59:25, 60:3, 60:19
**seek** [1] - 22:11
**seeking** [1] - 45:19
**senator** [3] - 10:13, 13:1, 43:12
**sending** [1] - 23:6
**sense** [2] - 22:25, 63:5
**sent** [1] - 19:5
**sentence** [2] - 33:7, 33:10
**September** [1] - 25:15
**SESSION** [1] - 1:5
**several** [2] - 26:16, 27:1
**shadow** [1] - 49:9
**shortly** [1] - 57:4
**show** [3] - 9:7, 15:9, 52:14
**showed** [5] - 10:14, 16:22, 47:3, 47:17, 52:13
**showing** [5] - 9:24, 10:19, 14:19, 21:21, 24:18
**shown** [3] - 46:20, 47:5, 47:19
**shuffle** [1] - 64:19
**shut** [9] - 43:14, 43:16, 44:4, 44:5, 44:7, 44:8, 44:15, 44:20, 44:25
**sign** [1] - 62:21
**signed** [2] - 28:15, 66:12
**significance** [1] - 40:7
**significant** [7] - 27:12, 27:13, 27:17, 27:20, 28:8, 28:18, 29:8
**simultaneously** [1] - 16:14
**sister's** [1] - 18:22
**sit** [1] - 57:17
**sitting** [1] - 31:11
**situation** [4] - 13:7,

13:10, 14:5, 30:18
**slight** [1] - 64:18
**Solages** [12] - 9:16, 9:20, 18:11, 35:16, 37:9, 37:19, 37:20, 37:22, 40:13, 40:20, 64:11, 66:23
**SOLAGES** [1] - 2:16
**soldiers** [1] - 23:7
**someone** [8] - 20:13, 24:8, 25:17, 31:24, 39:16, 47:18, 54:12, 54:21
**sometimes** [11] - 5:5, 6:3, 18:5, 24:11, 25:24, 30:15, 30:17, 30:21, 63:16
**somewhat** [1] - 30:12
**somewhere** [1] - 31:5
**soon** [1] - 63:19
**sore** [1] - 31:3
**sorry** [18] - 4:25, 26:24, 29:3, 30:4, 34:24, 38:6, 39:5, 40:18, 41:14, 48:22, 49:22, 54:17, 55:13, 60:9, 62:19, 66:1, 66:18, 66:21
**sort** [2] - 6:20, 63:4
**sorts** [1] - 15:5
**sounds** [3] - 32:9, 32:14, 32:15
**source** [51] - 5:11, 5:13, 5:16, 5:23, 5:25, 6:6, 6:10, 6:12, 6:13, 6:15, 6:18, 6:20, 6:22, 7:20, 7:21, 15:6, 15:14, 24:5, 24:9, 24:10, 24:12, 24:20, 24:21, 26:14, 26:25, 27:22, 28:15, 29:18, 31:5, 31:17, 31:18, 31:20, 33:19, 34:14, 36:3, 36:18, 38:4, 38:8, 38:12, 38:14, 48:5, 48:8, 51:14, 53:11, 54:12, 54:21, 55:21, 55:23, 58:8
**source's** [3] - 27:22, 54:11, 54:19
**sources** [13] - 5:5, 6:3, 7:5, 7:14, 7:17, 7:18, 7:21, 8:1, 15:12, 15:13, 25:21, 25:23, 50:24
**SOUTHERN** [1] - 1:1
**speaking** [1] - 46:13
**speaks** [1] - 13:12
**Special** [10] - 8:16, 13:11, 19:6, 19:7, 19:15, 47:10, 47:15, 51:4, 51:18, 62:11
**special** [2] - 27:11, 27:25
**Specialist** [1] - 8:17
**specialist** [2] - 8:19, 8:20
**specific** [3] - 8:22, 36:5, 36:17
**specifically** [3] - 20:11, 38:20, 61:5
**specifics** [1] - 36:8
**specify** [1] - 47:19
**speculation** [3] - 5:18, 23:17, 40:9
**spoken** [2] - 18:8, 57:8
**squad** [1] - 25:19
**stand** [2] - 31:24, 35:4
**standing** [1] - 64:17
**start** [5] - 59:25, 61:24, 63:4, 63:10, 63:18
**State** [2] - 43:14, 43:19
**States** [10] - 2:23, 5:15, 11:17, 12:11, 13:8, 27:5, 28:19, 32:22, 64:25, 68:10
**STATES** [5] - 1:1, 1:4, 1:11, 1:14, 1:20
**status** [4] - 27:20, 28:4, 54:11, 54:19
**stay** [2] - 30:12, 63:20
**STENOGRAPHICALLY** [1] - 2:21
**step** [1] - 36:9
**steps** [2] - 20:18, 20:25
**stick** [1] - 31:2
**still** [4] - 15:4, 62:2, 62:17, 64:14
**stipulate** [1] - 9:21
**stop** [4] - 12:2, 13:20, 24:8, 55:17
**straight** [1] - 49:9
**Street** [3] - 1:15, 1:20, 2:8
**strike** [4] - 29:4, 30:3, 32:8, 58:20
**stuff** [1] - 61:3
**sub** [7] - 7:14, 7:17, 7:18, 7:20, 7:21, 8:1, 50:24
**sub-source** [1] - 7:20
**sub-sources** [6] - 7:14, 7:17, 7:18, 7:21, 8:1, 50:24
**subject** [1] - 5:22
**subjected** [1] - 5:14
**submit** [1] - 14:8
**submitted** [2] - 17:20, 65:10
**substance** [1] - 42:5
**suggest** [1] - 14:3
**suggesting** [3] - 44:9, 44:12, 64:5
**Suite** [8] - 1:15, 1:24, 2:2, 2:5, 2:12, 2:14, 2:17, 2:20
**summarize** [1] - 15:25
**superiors** [1] - 45:9
**supervisor** [2] - 57:9
**supplemental** [1] - 61:4
**supplemented** [2] - 58:23, 59:2
**support** [2] - 13:8, 43:8
**supposed** [1] - 42:5
**surprise** [1] - 17:3
**surprised** [1] - 32:5
**suspect** [5] - 26:19, 26:22, 38:2, 38:7, 39:25
**suspected** [1] - 16:10
**suspicions** [1] - 16:6
**sustain** [1] - 65:12
**sustained** [9] - 20:1, 23:18, 40:10, 45:2, 49:12, 52:2, 65:15, 66:3, 66:18
**switch** [1] - 64:21
**sworn** [1] - 4:18
**Syrian** [1] - 12:20

## T

**TAMA** [1] - 2:11
**target** [2] - 5:10, 5:22
**Task** [8] - 7:12, 21:19, 35:21, 36:5, 52:10, 57:8, 57:23, 58:3
**task** [2] - 21:1, 58:1
**team** [2] - 62:21, 63:9
**ten** [7] - 28:4, 28:16, 28:17, 32:3, 33:25, 34:3, 58:12
**tenure** [1] - 32:11
**term** [1] - 41:21
**terms** [1] - 63:23
**testifying** [1] - 66:10
**testimony** [3] - 5:4, 20:3, 61:22
**TFO** [2] - 56:14, 57:10
**THE** [51] - 1:10, 1:14, 3:2, 4:3, 4:6, 5:19, 5:20, 9:22, 20:1, 20:4, 22:8, 22:19, 23:18, 25:4, 40:10, 44:17, 45:2, 47:1, 49:12, 49:24, 49:25, 52:2, 55:25, 57:22, 57:23, 61:9, 61:12, 61:15, 61:21, 62:9, 62:14, 62:18, 62:23, 63:9, 63:12, 64:4, 64:9, 64:11, 64:13, 64:17, 64:24, 65:2, 65:4, 65:6, 65:8, 65:16, 65:22, 66:4, 66:9, 66:22, 66:25
**thinking** [1] - 64:14
**Third** [1] - 2:8
**THOMAS** [1] - 1:14
**THORNTON** [1] - 1:23
**thoughts** [1] - 53:9
**three** [7] - 35:9, 35:13, 35:14, 56:10, 56:11, 56:17, 65:23
**throw** [1] - 16:11
**thumb** [1] - 31:3
**Tim** [1] - 19:6
**timing** [5] - 61:17, 62:25, 63:23, 64:7, 64:14
**today** [3] - 62:2, 62:6, 62:7
**together** [2] - 36:6, 36:11
**tomorrow** [5] - 61:10, 61:14, 61:17, 61:18, 64:5
**tone** [1] - 20:15
**took** [2] - 46:23, 47:3
**Touhy** [2] - 62:11, 62:14
**TRACHTEN** [1] - 2:11
**trafficking** [2] - 12:9, 12:22
**transcription** [1] - 68:4
**transition** [3] - 25:20, 25:22, 43:25
**transitional** [6] - 41:11, 41:15, 41:22, 42:18, 44:10
**translated** [4] - 8:24, 46:1, 46:12, 47:4
**translation** [2] - 13:5, 46:4
**translations** [2] - 8:21
**transpired** [1] - 57:20
**TRIAL** [1] - 1:10
**triggered** [1] - 4:11
**trouble** [1] - 45:7
**trust** [8] - 33:18, 33:20, 33:21, 33:23, 33:24, 34:1, 34:2, 58:12
**trusted** [1] - 33:17
**trustworthiness** [1] - 35:10
**try** [3] - 6:7, 6:11, 61:23
**trying** [15] - 22:16, 23:1, 23:3, 24:2, 30:12, 35:19, 39:21, 49:6, 49:9, 49:18, 50:18, 56:7, 56:15, 59:19, 61:2
**turmoil** [1] - 59:16
**turn** [2] - 6:25, 16:20
**turned** [1] - 52:18
**TV** [1] - 60:19
**twenty** [1] - 40:18
**two** [12] - 11:4, 19:11, 21:10, 21:13, 42:24, 50:22, 56:10, 56:11, 56:17, 62:10, 64:15, 64:21
**type** [6] - 7:22, 15:10, 24:16, 38:22, 45:21, 51:20

## U

**U.S** [18] - 1:17, 5:16, 11:9, 14:4, 27:4, 27:8, 32:10, 33:10, 43:8, 49:16, 49:19, 50:3, 50:18, 54:1, 54:5, 54:11, 54:20, 59:15
**ultimately** [1] - 7:14
**umbrella** [3] - 34:23, 34:25, 39:25
**unauthorized** [3] - 6:18, 16:7, 22:14
**under** [7] - 5:6, 34:23, 34:24, 34:25, 39:10, 39:25, 49:8
**unfortunate** [1] - 58:22
**united** [1] - 2:23
**UNITED** [5] - 1:1, 1:4, 1:11, 1:14, 1:20

**United** [9] - 5:15, 11:17, 12:11, 13:8, 27:5, 28:19, 32:22, 64:25, 68:10
**unless** [1] - 63:19
**up** [16] - 14:10, 25:17, 27:25, 28:2, 28:6, 28:15, 44:22, 47:17, 47:19, 52:13, 52:14, 56:6, 58:8, 61:10, 61:16, 66:14
**upheaval** [1] - 59:16
**uploaded** [1] - 37:1
**upset** [3] - 19:20, 20:17, 47:23
**urgently** [1] - 56:15
**useful** [12] - 7:2, 29:1, 29:5, 29:15, 29:16, 29:18, 29:20, 29:21, 29:23, 29:25, 30:2, 30:11

## V

**vacation** [8] - 23:22, 56:4, 56:6, 56:11, 56:13, 56:24, 57:2, 57:5
**vacay** [1] - 56:4
**valuable** [2] - 12:12, 53:16
**value** [5] - 26:19, 26:22, 27:2, 29:16, 29:24
**various** [1] - 42:21
**Veintemilla** [2] - 64:9, 65:6
**VEINTEMILLA** [1] - 2:10
**verbal** [1] - 21:11
**verbally** [1] - 13:22
**verified** [1] - 39:12
**verify** [3] - 6:15, 39:1, 39:21
**vernacular** [1] - 32:6
**versus** [1] - 61:6
**vest** [1] - 64:19
**vet** [2] - 6:11, 6:15
**violent** [2] - 6:18, 6:21
**visa** [3] - 27:11, 27:12, 27:25
**voicing** [1] - 42:22
**voluntarily** [2] - 57:12, 57:13
**vouch** [2] - 27:16, 58:12
**vouching** [1] - 28:7
**vs** [1] - 1:6

## W

**wait** [1] - 54:2
**waiting** [3] - 62:2, 62:3, 62:21
**warrant** [4] - 5:15, 5:17, 5:20, 66:11
**Washington** [1] - 1:18
**week** [9] - 63:6, 63:7, 63:11, 63:14, 63:16, 63:19, 63:20, 64:15
**week's** [1] - 63:7
**weeks** [4] - 63:18, 64:1, 64:15
**welcome** [1] - 4:6
**whole** [2] - 22:5, 66:19
**willy** [1] - 33:21
**willy-nilly** [1] - 33:21
**WITNESS** [5] - 5:20, 9:22, 20:4, 49:25, 57:23
**witness** [2] - 4:17, 25:3
**WITNESSES** [1] - 3:2
**witnesses** [3] - 64:19, 64:22
**woke** [1] - 56:6
**woman** [2] - 60:25, 61:2
**word** [3] - 7:17, 41:22, 42:12
**words** [2] - 31:17, 41:25
**world** [2] - 30:23, 31:1
**worlds** [1] - 30:12
**worry** [2] - 4:8, 4:13
**wow** [1] - 60:1
**wrapped** [1] - 14:10
**write** [4] - 14:8, 15:13, 15:15
**written** [4] - 17:18, 17:20, 45:25, 59:20
**wrote** [4] - 42:9, 42:17, 42:24, 59:7
**WU** [22] - 1:19, 3:4, 4:15, 4:20, 5:24, 9:10, 9:12, 9:23, 20:8, 22:9, 22:21, 23:19, 25:3, 40:9, 44:16, 45:1, 46:25, 49:11, 49:23, 52:1, 55:24, 57:21
**Wu** [3] - 4:14, 43:23, 44:22

## Y

**year** [4] - 6:25, 28:2, 28:5, 28:16
**yearly** [2] - 27:21, 27:25
**years** [10] - 28:1, 28:3, 28:4, 28:16, 28:17, 32:3, 33:22, 33:25, 34:3, 58:12
**York** [2] - 34:18, 34:19
**yourself** [2] - 55:18, 61:2