UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 22-cr-20104-JB

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Miami, Florida |
| | ) |
| vs. | ) April 22, 2026 |
| | ) Day 30 - Morning Session |
| ARCANGEL PRETEL ORTIZ, *et al.*, | ) |
| | ) 9:05 AM - 12:07 PM |
| Defendants. | ) |
| | ) Pages 1 to 139 |

TRANSCRIPT OF JURY TRIAL

HELD BEFORE THE HONORABLE JACQUELINE BECERRA

UNITED STATES DISTRICT JUDGE

LANCE W. STEINBEISSER, FCRR, RPR, FPR-C
Federal Certified Realtime Reporter
United States District Court
400 North Miami Avenue
Miami, Florida 33128
305.523.5633

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription.

APPEARANCES:

FOR THE GOVERNMENT:

SEAN T. MCLAUGHLIN, AUSA
JASON WU, AUSA
ANDREW J. BRIGGS, US DOJ trial attorney
ALTANESE P. PHENELUS, AUSA
United States Attorney's Office

ON BEHALF OF DEFENDANT PRETEL ORTIZ:

ORLANDO DO CAMPO, ESQ.
DANIELA JARAMILLO, ESQ.
Do Campo & Thornton, P.A.

DAVID A. HOWARD, ESQ.
Law Offices of David A. Howard

ON BEHALF OF DEFENDANT INTRIAGO:

EMMANUEL PEREZ, ESQ.
Emmanuel Perez & Associates

HECTOR L. FLORES, ESQ.
Barzee Flores

ON BEHALF OF DEFENDANT VEINTEMILLA:

MARISSEL DESCALZO, ESQ.
Descalzo Law

TAMA BETH KUDMAN, ESQ.
Kudman Trachten Aloe Posner LLP

ON BEHALF OF DEFENDANT SOLAGES:

JONATHAN S. FRIEDMAN, ESQ.
Jonathan S. Friedman, P.A.

S. PATRICK DRAY, ESQ.
S. Patrick Dray, P.A.

# TABLE OF CONTENTS

| | PAGE |
|---|---|
| GOVERNMENT'S WITNESSES: | |
| GEORGE NUNEZ | |
| Continued Cross-Examination by Mr. Howard......... | 6 |
| Cross-Examination by Mr. Perez.................... | 16 |
| Cross-Examination by Mr. Dray..................... | 30 |
| Redirect Examination by Mr. Wu.................... | 39 |
| DANIEL GONZALEZ | |
| Direct Examination by Mr. Wu...................... | 46 |
| Cross-Examination by Mr. Howard................... | 80 |
| Certificate of Reporter........................... | 122 |

(Call to the Order of the Court.)

THE COURTROOM DEPUTY: Calling the case of the United States versus Arcangel Pretel Ortiz, Antonio Intriago, Walter Veintemilla, James Solages, Case 22-CR-20104-Becerra.

Counsel, please announce your appearances for the record, starting with the Government.

MR. MCLAUGHLIN: Good morning, Your Honor. Sean McLaughlin on behalf of the United States. Also with me at counsel table is AUSA Jason Wu; DOJ trial attorney Andrew Briggs; AUSA Altanese Phenelus; and the case agent, FBI Special Agent Tom Pavletic.

MR. HOWARD: Good morning, Your Honor. David Howard, Daniela Jaramillo, and Orlando do Campo on behalf of Mr. Ortiz, who is present.

MR. PEREZ: Good morning, Your Honor. Emmanuel Perez and Mr. Flores with Mr. Antonio Intriago, who's standing next to us at counsel table.

MS. DESCALZO: Good morning, Your Honor. Marissel Descalzo and Tama Kudman on behalf of Walter Veintemilla, who is present in court.

MR. FRIEDMAN: Good morning, Your Honor. Jonathan Friedman and Patrick Dray on behalf of James Solages, who is present in court.

THE COURT: And just for the record, Mr. Ortiz is using the services of our interpreters, who are here today.

Mr. Howard, how much longer do you have on cross-examination?

MR. HOWARD: For this gentleman, Your Honor, I think it would be 15 minutes or less.

THE COURT: And I think, Mr. Intriago [sic], you said you had questions for him as well?

MR. PEREZ: No more than 30 minutes, Your Honor, if that.

THE COURT: Anything on behalf of Mr. Veintemilla --

MS. KUDMAN: No, Your Honor.

THE COURT: -- or Mr. Solages?

MR. DRAY: Judge, I am not sure. It just depends. But if I do, it will probably be ten minutes, if --

THE COURT: So the Government knows, its next witness needs to be -- that will probably take us maybe to the morning break, maybe not.

Are we ready with the next witness?

MR. MCLAUGHLIN: We are, Judge.

THE COURT: All right. Let's bring the jury in.

(Jury entered at 9:07 AM.)

THE COURT: Mr. Howard, you may continue with your cross-examination.

MR. HOWARD: Thank you, Your Honor. Good morning, ladies and gentlemen.

(Government witness, GEORGE NUNEZ, was previously

sworn.)

CONTINUED CROSS-EXAMINATION

BY MR. HOWARD:

Q. Good morning, sir.

A. Good morning.

Q. I just have a few more questions for you, and I want to start off by maybe correcting something that we discussed yesterday, and I had asked you if you had gotten into any kind of trouble because of the April 6 meeting with your superiors or colleagues and you said "no"; right?

A. Correct.

Q. It was the contact that Mr. Intriago made with the embassy in Haiti that you got in trouble for a little bit; right?

A. No, sir, I was never in trouble for the contact.

Q. When I say "trouble," I mean your colleagues, maybe supervisor, were a little perturbed by the fact that that had occurred?

A. Not that I'm aware.

Q. Okay. All right. Yesterday, we covered the fact that Mr. Ortiz has assisted DEA, FBI, and Homeland Security for about ten years; right?

A. Yes, sir.

Q. And one of the ways that he did that was by capturing communications; right?

A. Yes, sir.

Q. He would make control phone calls?
A. Yes.
Q. And explain what a control phone call is.
A. A control phone call is when a CHS has a recording device and will either receive a call or make a call to a subject target and capture that on some type of recording.
Q. Okay. And that's one of the things -- one of the -- probably one of the more useful ways that he would capture evidence that you found useful, you and the other agencies; correct?
A. Yes, sir.
Q. And I imagine that would also apply if he had WhatsApp or text communications as well. Those would be equally as valuable; right?
A. Yes, sir.
Q. All right. And so Mr. Ortiz was intimately familiar with the fact that written communications, audio communications, phone communications are potent evidence that's used by federal investigators to aid in their prosecutions; right?
A. He would be.
Q. He was?
A. Yes.
Q. And this conspiracy he supposedly did was on his two phones; right?
MR. WU: Objection. Argumentative. Lack of

knowledge.

THE COURT: Overruled.

BY MR. HOWARD:

Q. It was on his phones?

A. It would be on his phones.

Q. And not only would he have conspired on his phones but he voluntarily turned them in; right?

A. As far as I understand, I believe he turned his phones in, but I wasn't there to receive his phones.

Q. Okay. So what you're saying is you know he turned them in. You don't know if it was voluntary?

A. I wasn't there to receive his phones, so I couldn't answer that.

Q. Okay. But you know he turned them in?

A. I believe he turned them in, yes, sir.

Q. All right. Do you know Special Agent Nicholas Rahmer?

A. I do.

Q. He's FBI just like you; right?

A. Yes, sir.

Q. And he was one of the lead investigators in the investigation of the death of President Jovenel Moise?

A. Yes, sir.

Q. And I know you told us yesterday that you did not think to approach him or any other lead investigator to kind of download what you knew about this confidential source that you

were supervising; right?
A. I'm sorry. I don't -- say that again. I don't understand what you're asking.
Q. You didn't go to Special Agent Nicholas Rahmer or any other FBI agent who was investigating the matter to give them -- offer them the information that you knew about your confidential human source that you were investigating?
A. I was approached by the investigative team to include Agent Rahmer reference the investigation at one point.
Q. Yeah. I'm not asking if they approached you. I'm asking if you approached them. No?
A. I was approached. I was.
Q. All right. You're aware, are you not, that in 2023 Special Agent Nicholas Rahmer wanted to review the contents of the phone you were using back in 2021? You're aware of that?
A. Again, I was not part of the investigation.
Q. You're aware of that?
A. But I don't know what -- what exactly they were -- what investigation they were conducting or how they were conducting the investigation. I don't know if they were looking into the phones, but I would assume they would be. But I'm not aware of exactly what their investigation was.
Q. Okay. Well, that's not my question I asked.
You're aware that Special Agent Rahmer, in 2023, requested to review the phone that you were using in 2021?

You're aware of that, are you not, sir?
A. I'm not sure if I was aware of that at the time or not.
Q. I'm asking if you're aware of that.
A. I am aware now.
Q. Okay. And in 2023, he was told that the information might not exist, and nobody got back to him in that year at all. You know that?
MR. WU: Objection. Hearsay. "Told."
THE COURT: Sustained.
BY MR. HOWARD:
Q. Are you aware of that?
A. I'm sorry. Am I aware of if he had -- if he was looking into my phone or not?
Q. Are you aware that he did not get your phone in 2023?
A. I was made aware that he did not get my phone.
Q. And you're aware that he attempted -- are you aware whether anybody got back to him or not?
A. I am not.
Q. Okay. And you're aware that he attempted again in 2024?
A. I'm not aware of his attempts to gain access to my phone on -- specific access. I'm not aware of whether it was 2021 or 2024. But I know there was attempts to obtain information from my phone.
Q. And you're aware that in 2024 your phone from 2021 was wiped?

A. Yes, I am aware.
Q. Okay. And when did that get wiped?
A. I don't know when it got wiped, sir.
Q. It's your phone, isn't it?
A. It is my phone. So we get issued phones every 18 months. Once I turn my phone in to our IT department, I don't know how long they hold those phones for. I don't know when those phones are wiped. We turn those in and we are issued new phones every 18 months.
Q. Okay.
A. So I don't have control of the phones or the status of the phones.
Q. When did you turn it in, then?
A. I don't remember the exact date I turned it in, but it --
Q. Would you have any record of that anywhere that we could go and check?
A. There most likely is a record of when I turned that phone in.
Q. And where would that record be?
A. It would be with our IT department, I assume.
Q. Do you remember if you had turned it in already in 2023?
A. Yes.
Q. And in what part of 2023?
A. Again, I can't remember when exactly that phone was turned in.

Q. Okay. And the way that you're able to know that is because you have them in 18-month cycles. Therefore, if you had it in 2021, it would be gone by 2023 is essentially what you're extrapolating?

A. Yes, sir.

Q. Did it not occur to you before you turned it in -- strike that. Before we get to that...

Is it the practice of the FBI to have the information contained on the phones of their agents wiped clean every 18 months? Is that the practice?

A. So my understanding is those phones, once they're turned in, they are held for a certain period of time. I don't know how long that is. And then eventually they are wiped. I don't know how soon or how much later after they're turned in they're wiped, but I know eventually they are wiped.

Q. Okay. But when you turned yours in or before you turned yours in, it occurred to you that a confidential human source with whom you had contact, evidence of contact on your phone, was under investigation for an assassination -- it occurred to you that it might be prudent to preserve that information, did it not?

A. Well, again, so there was -- there's constant information that we communicate with, but when we communicate with sources, we try not to put anything on our phones that -- in other words, we try to communicate verbally, whether it's

through telephone calls, direct comms. So if there is anything on the phone, it's not too substantial, in my experience.

Q. Okay. Well, I don't know about your experience, but what did you do? Did you have text communications back and forth with Mr. Pretel Ortiz during your tenure of your supervision of him as a confidential source?

A. I did have text communications with Mr. Pretel.

Q. Okay. Nobody would have been able to review it, then, to determine its relevance after it was wiped? You realize that?

A. I do realize that.

Q. And you weren't conducting the investigation, so you didn't know what may or may not be pertinent; correct?

A. That is correct.

Q. And it did not occur to you that a confidential human source, under your supervision for a murder of a head of state, that it would be prudent for you to preserve those communications? That didn't occur to you at all?

MR. WU: Objection. Asked and answered.

THE COURT: It's asked and answered. Move on, Counsel.

MR. HOWARD: I don't think he answered it, Judge.

THE COURT: I think he did.

MR. HOWARD: Okay.

BY MR. HOWARD:

Q. Was there anything on your phone concerning your interfacing with Haitian politicians and whatnot on the 6th of April 2021, as best as you can recall?
A. As best as I can recall, just before the meeting, I had asked Mr. Pretel Ortiz to send me information about the gentleman we were going to meet with that day.
Q. So that information he sent to you would have been on that phone that was wiped as well?
A. Yes, sir.
Q. Okay. You were telling us that when you went and supplemented your report about that April 6, 2021, meeting, you did so after consulting with an Assistant United States Attorney; right?
A. Yes, sir.
Q. And you said it was a lady; it wasn't this one here.
A. That is correct.
Q. Okay. And did that Assistant United States Attorney ask you to preserve your phone?
A. I don't believe we had that discussion.
Q. Okay. Did you volunteer at all anything about the fact that communications were on your phone?
A. I did not. I didn't -- I did not.
Q. Okay. Now, you're telling us yesterday --
MR. HOWARD: I'm about to wrap up, Judge.
THE COURT: That's fine. You're good.

BY MR. HOWARD:

Q. You were telling us yesterday, sir, that over the course of ten years Mr. Pretel Ortiz had at least garnered some level of trust with FBI, DEA, and Homeland Security; right?

A. Yes, sir.

Q. And is it policy of the FBI to close out -- strike that.

You were saying that you used the term "close out confidential human source."

Did I recall correctly?

A. Something like that, yes, sir.

Q. And closing out a confidential human source refers to terminating the FBI's association and contracted engagement with him; right?

A. Yes, sir.

Q. And is it the FBI's policy to close out a confidential human source if any investigation of him -- criminal investigation ensues, do you close him out immediately? Is that what happens? Is that policy?

A. Well, not necessarily. If there's -- if there's a criminal investigation on a source, he's not automatically -- he or she may not automatically be closed out.

Q. Okay. But after ten years of garnered, earned trust, you closed out Mr. Pretel Ortiz on July the 27th, 2021; right?

A. I did.

Q. Not three weeks into the investigation. It had barely

gotten underway.
A. That's correct.
Q. Had you concluded at that point that he was guilty?
A. No, sir. So even if we close out a source, it doesn't mean that a source can permanently be closed out.
A source can be closed at one point and then at another point, later on, can be reopened.
Q. Okay. But as far as this defendant is concerned, Mr. Arcangel Pretel Ortiz, after ten years of earned trust, you cut him loose in three weeks flat?
A. That's correct.
Q. Before the investigation even got underway?
A. That is correct.
MR. HOWARD: Thank you, Your Honor. Nothing further.
THE COURT: All right. Mr. Perez.

CROSS-EXAMINATION

BY MR. PEREZ:
Q. Good morning, sir. How are you?
A. Good morning, sir.
Q. I represent Mr. Intriago, Antonio Intriago. I'm going to be asking you some questions about your testimony.
A. Yes, sir.
Q. Sir, before you attended that meeting on the 16th of -- I'm sorry -- on the 28th of April, did you conduct any kind of background investigation on Mr. Intriago, who was a business

partner or a partner of Mr. Ortiz?
A. You're talking about the meeting on April 6; correct?
Q. Yes, sir.
A. I never met him. I had not, no, sir.
Q. But you had learned from Mr. Ortiz that he had recently opened a corporation with a business partner?
A. I knew he had a company, yes, sir.
Q. What was your understanding of his relationship in the company before you got there?
A. Owner, part-owner.
Q. Okay. And when you got there, it was a security company; correct?
A. Yes, sir.
Q. And what I mean by security is that they sell security merchandise like tactical pants, hats, vests, things like that?
A. Yes, sir. When I arrived at the business, that's what it appeared.
Q. And did you also see that they sold firearms there?
A. I don't recall seeing firearms.
Q. All right.
A. It's been a while.
Q. Did you verify to see if Mr. Intriago had a federal firearms license?
A. I did not. I hadn't met him until that day.

Q. Right.
And you had never questioned him or interrogated him in any way?
A. I never met him until that day.
Q. All right. And you didn't share with Mr. Intriago that Mr. Ortiz was a confidential informant for the FBI because that would be a violation of your policies?
A. Correct.
Q. And you didn't share that with anyone else either?
A. Correct.
Q. Were you made aware that Mr. Intriago had traveled to Bolivia a couple months before with Mr. Ortiz? Did you learn that from Mr. Gonzalez -- Agent Gonzalez?
A. I knew there was some travel to that country, but I didn't know much of the details.
Q. All right. And I believe you testified that when the issue of politics and a transitional government came forward in the discussion that you sort of waived it away and you said, "You know, we don't want to get involved in politics"?
A. Well, I didn't know the specifics of the conversation. But correct, I did basically cut that conversation off when --
Q. About when in that meeting did that conversation come up? In the beginning? In the middle?
A. I would say somewhere in the middle. I believe Mr. Kessa was one of the first to speak and then Mr. Joseph Joel John

then spoke. So it was --
Q. And it was JJJ, Mr. -- Senator Joan Joseph Joel [sic] that said some negative things about the US; correct?
A. Well, he had spoken about the -- from my understanding of the translation, the lack of support -- he had mentioned the lack of support from the United States, is what I recall.
Q. And he also said that the United States had racist policies towards Haiti. Do you recall that?
A. I don't remember the specifics of what he was saying. Again, it was being translated to me.
Q. And there was another individual there that the Government showed you a picture of. Let me see if I can put a picture of him up. It's in evidence.
MR. FLORES: If we could have Defense Table 2.
BY MR. PEREZ:
Q. This gentleman -- he's up on your screen. He was reflected as a sergeant; correct?
A. Yes.
Q. And you seem to indicate from your testimony that you weren't sure that he was military or that perhaps he was feigning being someone connected to the military?
A. I never said he was fainting [sic]. I said he had represented himself as a prior sergeant in the US Army.
Q. All right. And it's fairly easy for you to verify just by looking at a DAVID whether or not person is a veteran or not;

correct?
A. Well, it could be because some veterans do put on their driver's license. They seek to put the veteran status on their driver's license, but many other veterans do not. So it may be a way of identifying if someone is a veteran, but it's not necessarily an indicator.
Q. Right.
But do you see his DAVID reflects that he -- right underneath "safe driver" indicates he's a veteran?
A. Yes, it says on his driver's license he is a veteran.
Q. All right. And you didn't verify whether or not he was a veteran at that time?
A. Well, I had just met him. I never met him before, so...
MR. PEREZ: Thank you. You can take that down.
BY MR. PEREZ:
Q. Now, when the issue of military support came or transitional change, you didn't, like, get up and say, "This is it, it's over," and walk out of the meeting? You just said, "We're not interested in it," but you continued to sit there and listen to whatever they had to say; correct?
A. Well, I -- I listened to what Mr. Kessa and Mr. Sanon had to say because it was relevant to what we were looking -- information we were looking for.
Q. Yes, sir.
But when they talked about the transition for the new

president, you didn't get up and leave the meeting and say, "It's over. We're out of here."

You stayed until the end of the meeting?

A. Well, I stayed until the end of the meeting because I was interested in hearing what information they had to offer.

Q. Right.

And that would be the prudent thing to do. The fact that in a meeting I may say something to you that you're unable to deliver, that doesn't mean you're going to walk out of the meeting and ignore whatever else is going to be said after that?

A. Correct. We're interested in information that comes in. Sometimes there's information that's not relevant to what we're looking for, but we want -- we never know if someone has additional information that might be of interest to us.

So I believe it was worth listening to what Mr. Sanon had to say.

Q. Right.

And I noticed in your original report that you carefully listed everyone that was there at that meeting, but Mr. Antonio Intriago was not listed in your original report at all as even being present at the meeting. Are you aware of that?

A. Yes, sir. So when I first got to the meeting, I did not recall seeing Mr. Intriago there. It wasn't until after the

meeting when I -- when we were getting ready to leave that Mr. Pretel Ortiz introduced Mr. Intriago as "Tony," and he mentioned he was either his employee or his business partner. So throughout the meeting -- I didn't know if he was actually at the meeting, if -- or he showed up toward the end of it.
Q. Right.
Because he wasn't sitting at that table where that discussion was taking place?
A. I don't remember him sitting at the table, but I don't remember if he showed up somewhere during the meeting and sat near the table, but I don't recall him being there during the meeting.
Q. All right. And that's the reason that in the report that you prepared on April 28 his name is not even mentioned in the report; correct?
A. Correct.
Q. In fact, it was after the assassination, approximately four months later, that you filed a supplemental report at the request of a prosecutor. Do you recall that?
A. Well, at the request and at the agreement with the prosecutor, we decided that it was important to document all present at that -- at that meeting.
Q. You said request an agreement?
A. Well, we -- we sat down. We spoke about it. I explained all the -- the information as to who else was there during the

meeting, after the meeting, some additional details, and we agreed that it was important to document that information.
Q. All right. So the prosecutor requested that you file a supplemental report that would refer back to the April meeting so that you would add some extra things?
A. So we could document additional observations, yes, sir.
Q. Yeah, that's what I'm saying.
A. Yes, sir.
Q. So it was in that report that -- after the fact that you included what you just relayed to us that you happened to meet Antonio at the end of the meeting?
A. Yes, sir.
Q. And you also wrote in that report about what occurred at the embassy?
A. I did.
Q. All right. So I want to talk a little bit about that embassy issue.
Are you aware that the person that showed up at the embassy with the letter of introduction and the names of all the Colombians was Mr. Antonio Intriago and not Mr. Ortiz?
A. I'm aware that Mr. Intriago was the one that showed up at the embassy in Haiti.
Q. So what restriction can you tell us did Mr. Intriago have with the federal government that somehow prohibited him from disclosing to the resident agent that you were the last

government agent that he had been in contact with?

A. Mr. Intriago was not a CHS for the FBI, so I had no control of what he would or would not say.

Q. So he was free to go to the embassy -- had no restriction -- and say, "Hey, we're here to do business, and this is the company, and these are the people that are going to be working with us"; correct?

A. That's correct.

Q. But you obviously got upset because it was information that leaked, you felt, from Ortiz somehow?

A. Yes, sir. I called Mr. Ortiz that day.

Q. You did.

Do you have any information that Ortiz told Mr. Intriago, "I'm a confidential informant. Don't go to the embassy because this could bring us some kind of an issue"? Are you aware of that?

A. I'm sorry. Can you say that again?

Q. Let me rephrase the question.

Are you aware of any of the other individuals, not only Mr. Intriago but Sanon, Marty [sic] Kessa, anybody else that was at the meeting that was somehow contractually prohibited because of an agreement with the federal government to go to the embassy and say, "The last person I met was FBI George Nunez. I met him at a meeting."

Did you announce that prohibition there somehow?

A. No, not at all.
Q. Okay. So why were you upset, I think was the word you used, that Intriago, a person that has no connection with the federal government, who is not obligated in any way, that he went and gave a letter and the person that received the letter said, "Hey, who is the last person you came in contact with? The Government uses your name."
What's wrong with that?
A. Why was I upset at Mr. Intriago or why was I upset at Mr. Ortiz?
Q. No.
Why were you upset -- why were you upset at both? Why were you upset at Ortiz?
A. Well, Mr. Ortiz, he is a CHS for the FBI. And Mr. Ortiz understands that he needs -- for his safety and for any of those he is working with or subsources, that the association between him and the FBI could put him and others at risk.
So when I called Mr. Ortiz, I asked him why was his employees in -- going to the embassy and basically claiming that I had directed them to do that, which I had not.
So I basically had re-admonished Mr. Ortiz over the phone that very day, explaining to him the risk, again, of his association with the FBI and any of his immediate contacts.
Q. I'm sorry. You said that Mr. Ortiz said what to you? What was his excuse to you?

A. When he responded -- I asked him what had happened. He said it was a miscommunication, that when he's -- my understanding, he had spoken to Mr. Intriago and that Mr. Intriago had told him that he was asked by the embassy if he was either working with or knew of any government agency that he was working with.

Q. So Mr. Intriago innocently said, "The last person I saw was Agent George Nunez" --

MR. WU: Objection. Argumentative.

THE COURT: Sustained.

BY MR. PEREZ:

Q. Now, this generated a number of emails between yourself and Agent -- I'm going to butcher his name -- Augustyniak?

A. Augustyniak, yes.

Q. And you received an email inquiring as to, you know, what happened here? Why did these guys show up? Do you recall that?

A. I do recall the email.

Q. And what was your response to that?

A. So my response is that I did not instruct Mr. Intriago to go to the embassy, that I did not really know him well.

Q. Did you also tell the FBI agent that both yourself and Agent Bent had debriefed Mr. Intriago here in Miami? Do you recall that?

A. No, we never debriefed Mr. Intriago in Miami.

Q. What is a debriefing, if you could explain?
A. Debriefing is basically when we sit down with someone and basically interview them and obtain any information that they have to offer.
Q. So if you told Tim that you had debriefed both of them in Miami, that would not be true; correct?
A. So when I say we did a debrief -- I don't know the specifics of the email, but I know we did do a debrief. I would be talking about either the source or the people we had interviewed that day during the meeting.
Q. Well, I thought you testified that that first day you didn't even meet Mr. Intriago. So obviously you couldn't debrief someone you never met.
A. No, sir. I met Mr. Intriago on the -- on April 6. I didn't say I debriefed him.
Q. Right.
Do you recall sending an email to Tim that said, "Bent met with them to debrief them here in Miami; however, we never told them to go to any embassy."
Do you recall that email to him?"
A. I do recall.
Q. So when you told Tim, the FBI agent, that you had debriefed them in Miami, you must be referring to Ortiz and Intriago? Who else?
A. I was not referring to Mr. Intriago because we never

debriefed him. I was referring to Mr. Pretel Ortiz and the Haitian group that we met with that day.
Q. Right.
But your email says, "I do know the guys you're referring to. Myself and SA Bent met with them to debrief them here in Miami."
You never debriefed Intriago?
A. I never debriefed Mr. Intriago.
Q. So is it fair to say that this email that you sent to Tim is a little bit inaccurate?
A. No, sir. When I was talking to Tim, Mr. -- I'm sorry, Special Agent Augustyniak, I was referring to the group we had met with. Now, again, I don't know if Mr. Intriago was present during the meeting, but I do know I had met Mr. Intriago after the meeting.
Q. Sir, but this entire email exchange with Tim involves Mr. Intriago's visit to the American Embassy. It doesn't involve anything having to do with the Haitians. It appears to be a singular person that the complaint is about.
A. According to the email, there were multiple people that showed up at the embassy. I didn't know who else was there, but upon talking to Mr. Pretel, my understanding is there were multiple people that had showed up that were -- that were related to Mr. Pretel Ortiz's company.
Q. Right.

And I believe you also told Tim, Agent Tim, that Mr. Intriago was an employee of the company?

A. That's what I was told by -- that I recall that I was told by Mr. Pretel Ortiz.

Q. The last question.

Were there any video cameras or recording equipment at CTU that you're aware of?

A. I'm not aware of.

Q. Would the FBI have told Mr. Ortiz to shut them off during your visit?

A. I -- I -- like I said, I was never aware of any cameras at CTU, so I --

Q. Right.

But let me ask you this. Is it your policy that, for instance, if you're coming to my office, for you to ask, "Are there any video recording cameras here that are going to record the meeting" -- any office? Did you ask Mr. Ortiz to shut down any video cameras --

A. I never asked Mr. Ortiz to shut down any video cameras.

MR. PEREZ: No further questions, Your Honor. Thank you.

THE COURT: Thank you.

On behalf of Mr. Veintemilla.

MS. KUDMAN: No questions, Your Honor.

THE COURT: On behalf of Mr. Solages?

MR. DRAY: Yes, Your Honor.

THE COURT: Mr. Dray.

MR. DRAY: Ladies and gentlemen of the jury. May it please the Court.

CROSS-EXAMINATION

BY MR. DRAY:

Q. Sir, my name is Patrick Dray. I represent James Solages.

You know James; correct?

A. I met him on one occasion, yes, sir.

Q. On April 6, 2021, in Doral?

A. That is correct.

Q. So you went there at that meeting and you met sort of, let's call them, the Haitian delegation?

A. Yes, sir.

Q. And they came obviously here to Miami because they wanted some assistance; correct?

A. Well --

Q. That's why they came?

A. -- my understanding is they came to provide information.

Q. Right.

But they could have sent you an email or a report or something to that effect, but the reason as a diplomatic mission, it's sort of an exchange, would you agree with me? They're going to give you something and they want something back; right? It's normal?

A. Well, sir, you're assuming, I -- it was a diplomatic mission. I wasn't -- we weren't looking at it as a diplomatic mission. We were looking at it as meeting -- having a meeting to obtain information -- criminal information and international security information.
Q. So that's the way you're looking at it; correct?
A. That's what we -- that's what we went into the meeting --
Q. Just one-sided. All these people are coming just to give you information. They don't want anything?
A. That's what we were there to meet for, sir.
Q. So that's what you're telling the jury?
A. That's what happened, sir.
Q. Now, national security. So you would be interested in things -- for example, any kind of intelligence, if there's people from Iraq that are coming and buying Haitian passports; correct?
A. That is correct.
Q. And that came up; right?
A. It did.
Q. Okay. And drug trafficking out of the port there where the mayor was from; correct?
A. That is correct.
Q. Human trafficking?
A. Yes, sir.
Q. Okay. But the passport issue, that's kind of an important

thing, especially for the FBI and for the security of our country here; correct?
A. It is important.
Q. Right.
Because if Iraqis are going there in droves and then getting Haitian passports for money, then they can easily infiltrate the United States; correct?
A. Well, Iranians, and --
Q. Iranians. I'm sorry.
A. Yes, sir.
Q. So the answer is "yes."
Now, when you met James, he wasn't hiding in the corner, on April 6, in the conference room there; was he?
A. He was not. He was present at the meeting.
Q. Yeah, he was.
He actually -- maybe you forgot because a lot of things and a lot of time, but he actually came over and introduced himself and shook your hand. Do you remember that?
A. I do remember.
Q. He's got a good handshake; right?
A. He did have a good handshake.
Q. A big guy. All right.
I know sometimes you didn't check your emails, you didn't check your phones, nor had the TFO.
By the way, what police agency is he actually from?

I know he's --
A. He's a task force officer with the Customs and Border Protection.
Q. And he's assigned with the FBI, but he's Custom and Border?
A. He is Custom and Border, but he is assigned to the FBI.
Q. Was he a municipal officer here in Miami-Dade County before? Do you know?
A. No. My understanding is he's been with that agency.
Q. Okay. All right. So now you were the handler for Mr. Ortiz; correct?
A. Yes, sir.
Q. Okay. But Mr. Ortiz was not primarily in Haiti at the time that you were receiving information from Mr. Ortiz about Iranian activity and all these other kinds of things that we just talked about that was interesting for your perspective for national security; correct?
A. Correct.
Q. So the information that was down there was provided by James Solages. Did you know that?
A. I -- I -- I received the information from Christian Sanon.
Q. Okay. But you testified earlier on direct that you get multiple sources. So some sources were direct from Mr. Sanon, but you also received information from Mr. Ortiz; correct?
A. In reference to the Iranians and the Syrians?

Q. About all the different topics that we talked about for national security. So drug trafficking, all those kinds of things we talked about.

Did you get any information in April -- I'll make it easy for you -- from Mr. Ortiz? Nothing?

A. Did I get any information in reference to the criminal activity and the national security activity in Haiti from --

Q. Yes.

A. -- from Mr. Pretel Ortiz? I did not. Not direct information, no.

Q. And are you sure about that? Are you sure he didn't send you texts with some attachments? Maybe you didn't open them?

A. I don't remember any.

Q. You don't remember. All right. That's a fair answer.

And how about in May? Do you recall anything in May -- any information from Mr. Ortiz?

A. I don't recall.

Q. No?

How about June?

A. I don't recall.

Q. No?

How about July?

A. I do not recall.

Q. Would there be anything that would refresh your recollection?

A. There may be. I don't know.
Q. Now, you had a phone, a Pixel 5; correct --
A. I did.
Q. -- at that time?
And so if we had that phone and we opened it up, that might refresh your recollection, would it not?
A. It might. But, again, I don't remember him sending any information reference national security or criminal activity --
Q. Yeah, I know.
But you testified that you got this letter, but because it was in French, you didn't think there was anything of value, so you never even looked at it?
A. I never received the letter, sir.
Q. Yeah, you looked at it and then it got taken away; right?
A. It was shown to me at one point.
Q. Yeah. Okay.
Now, let me ask you -- we all got phones. Everybody's got phones here. And it goes to the cloud; right? A lot of the information goes to the cloud? I mean, it's not physically going to keep everything on the phone. Would you agree with that?
A. I would agree.
Q. Okay. And did your phone work differently?
A. As far as how the Pixel 5 works, that's something you

would have to ask the IT department.
Q. You have no idea?
A. I don't know.
Q. You don't know.
Did you have another phone after this one? A 7?
A. So after I turned in my original phone, I received a new phone.
Q. Right.
Because they were looking for your phone that you had back in 2021, and it got wiped, as we now know. I don't know if they checked the cloud or not, but --
MR. WU: Objection. Counsel is arguing.
THE COURT: He is.
Ask a question, Counsel.
BY MR. DRAY:
Q. Now you got a new device, and it died and had to be replaced; is that correct? A 7?
A. I believe I had a total of four devices since.
Q. And you had four devices. They died. All of them?
A. Some did -- there was one that did -- that was damaged.
Q. Let me ask you this question right here. All right.
At the time in 2021, you had 15 years in as an FBI agent; right?
A. I did.
Q. Okay. How many 302s did you write in those 15 years?

Hundreds; right?
A. Hundreds.
Q. Now, on April 6, you went to the meeting in 2021. You wrote the report. You actually wrote it that day. Did you know that?
A. I did.
Q. You drafted it that same day?
A. Yes, sir.
Q. Did you meet with a prosecutor to write that report?
A. I did not.
Q. And the death of the president was when?
A. July 7th of 2021.
Q. And then you amended the report. Do you remember when you amended it?
A. It was a few months after.
Q. Yeah, August 10, actually, is when you wrote it; right?
A. That is correct.
Q. Okay. But then it got entered on the 16th of August, and for that report you testified that you met with a prosecutor; right?
A. I did.
Q. All right. Also, I noted that it was in a different file number. You guys used different file numbers; is that right?
A. That's correct.
Q. Let me ask you. Bring it back here. The US Embassy, that

was May 25, 2021. Now, when Americans travel abroad, especially in countries that there could be some hostile activities, let's put it, it's a good idea for them to check in with the embassy; is it not? You don't know?
A. I'm sorry. If an American is traveling overseas, it's a good idea to check in with the embassy?
Q. Yes, in case something happens. Right?
A. In case something happens, yes, sir.
Q. Absolutely. That's what it's for.
They are supposed to help citizens that are abroad; right?
A. Correct.
Q. Okay. Now, you know the other person that was there was James Solages with Mr. Intriago? Did you know that, at the embassy?
A. Initially I did not.
Q. But now your recollection is refreshed?
A. I believe at one point I may have been told that it may have been James Solages.
Q. Yeah, I mean, he wasn't hiding. He was there; right? He checked into the embassy. That's our property. That's where we can go for safety; right?
A. Yes, sir.
Q. Okay. So he's out in the open; is he not?
MR. WU: Argumentative.

BY MR. DRAY:
Q. He's not trying to hide himself?
THE COURT: I am sorry. What was the objection?
MR. WU: Argumentative.
THE COURT: It is argumentative. Sustained.
Ask your next question.
BY MR. DRAY:
Q. So did you learn later on that it was actually James Solages that was sending you information through Mr. Ortiz about what was going on? You didn't know that?
A. I didn't know.
Are you asking if James Solages was providing information to Christian Sanon? Because it was Christian Sanon that provided me the information about the national security --
Q. I was talking about Mr. Ortiz.
A. I never knew that Mr. Solages was providing information to Mr. Ortiz, no.
Q. It's too bad we don't have that phone.
MR. WU: Objection. Move to strike.
MR. DRAY: No further questions, Judge.
THE COURT: Any redirect?

REDIRECT EXAMINATION

BY MR. WU:
Q. Agent Nunez, I want to start with some questions you were

asked yesterday about Defendant Ortiz relying on you to verify information.

Do you recall that dialogue that you had with Mr. Howard?

A. I do.

Q. Which direction does information flow in a confidential source/handler relationship? Do you give the confidential source intelligence, or is the confidential source supposed to give you intelligence?

A. The confidential source is supposed to give us intelligence.

Q. And we talked a little bit about your training guides or policy manuals around sources. In those documents, what, if any, obligation do you have to help a confidential source verify information that that source is collecting as part of his private business relationships?

A. We don't have any.

Q. I also wanted to ask you a little bit about your phone, which has been talked about a little bit today. You mentioned you had texted briefly with Defendant Ortiz; is that right?

A. That's correct.

Q. I think you also testified you tried to avoid substantive communications. What were you texting with him?

A. Usually when we text, we'll set up meetings. We'll set up times, dates. Anytime there's substantive communications

where a CHS is providing information or intel, we'll set up a meeting and we'll either -- if we can't meet in person, we'll have a telephone call where the information is provided, but we don't document -- we don't text intel over the phone, or at least we try to avoid to.
Q. And you were also asked by Mr. Howard whether you had some awareness that Defendant Ortiz -- his phones had been turned over to the FBI. Do you recall those questions?
A. Yes.
Q. So whatever text messages that you had with Defendant Ortiz, would you expect those to also be on his phone?
A. I would.
Q. There was also a question briefly about certain phones being backed up to cloud services. Do you remember that?
A. Yes, sir.
Q. Can you think of the reason why the FBI would not want its official phones backed up to Apple iCloud or Google Drive?
A. Well, if there's any intel or any information that could compromise a CHS, it would be in an iCloud. So that's one of the reasons that that information may be limited, and if, for example, someone breaches that data, then the CHS can be exposed.
MR. WU: Ms. Hamm, could I have the monitors to the podium, please? Thank you so much.
BY MR. WU:

Q. While we're waiting on that to start, let me ask you a few questions about Defendant Intriago and what you just spoke about with his counsel.

Was Mr. Intriago, Defendant Intriago, a source for the FBI?

A. He was not.

Q. Did you ever meet with Defendant Intriago at the FBI's offices in Miramar?

A. I never did.

Q. Did you ever meet with him on a Saturday at those offices?

A. Never.

Q. Did you ever tell Defendant Intriago that the United States Government supported what he was doing in Haiti?

A. I never did.

Q. Did you direct him to go to the embassy and mention your name?

A. I did not.

MR. DRAY: Judge, outside the scope.

THE COURT: Overruled.

BY MR. WU:

Q. By the way, in your experience, have you gone to US embassies in foreign countries before?

A. I have.

Q. In your experience, do US Embassy employees randomly ask visitors about the last FBI agent that they met?

A. No.
Q. I'm now going to show you on your screen what's already in evidence as Government's Exhibit 1E4, directing your attention to page 15 of the exhibit.
Do you recognize this document here?
A. I do.
Q. What is it?
A. It's a field office annual source report. So it's kind of an annual assessment we do on CHSs.
Q. And whose assessment is this one?
A. Mine.
Q. For which confidential source?
A. For Pretel Ortiz.
Q. Okay. Do you recall speaking to Mr. Howard about Defendant Ortiz being of -- what value he was to the FBI?
A. I do.
Q. So this particular source report, what are the dates that it covers?
A. It covers from March 28, 2020, to March 27 of 2021.
Q. I'm now going to take you to page 5 of that report.
So during that period between March of 2020 and March of 2021, how much money was Defendant Ortiz paid by the FBI in that reporting period?
A. $500.
Q. So how much value had Ortiz provided the FBI in that

entire year, March 2020 to March 2021?
A. I would say $500's worth, so...
Q. Did you personally successfully build a criminal case with any of Defendant Ortiz's tips or intelligence the whole time that you were his primary handler, August 2020 to July 2021?
A. No, sir.
Q. Now, I want to conclude by asking you a few questions about -- going back to that embassy visit, and I think some of the defense counsel talked to you about whether there was anything hidden when Intriago and his band went to the US Embassy.
Do you recall those questions?
A. I believe so, yes, sir.
Q. Remind us, roughly what time of year was that in 2021?
A. The visit to the embassy?
Q. Yes.
A. That was -- I believe it was end of May.
Q. I'm now going to show you what's already in evidence as Government's Exhibit 147C, page 251.
At the end of May 2021, did Ortiz ever tell you about a plan to "give the rat the tickets"?
A. No, sir.
Q. Do you know what that means?
A. No, sir.
Q. Did he ever call President Moise of Haiti "the rat" while

he was speaking to you?
MR. DRAY: Objection. Leading.
THE COURT: Overruled.
THE WITNESS: Not to me.
BY MR. WU:
Q. And based on what you learned of that embassy visit by Intriago, Solages, did CTU try to register a plan to give the rat the tickets when they visited the embassy in late May of 2021?
MR. DRAY: Objection, Judge.
THE COURT: Overruled.
THE WITNESS: I'm sorry. Can you say that again?
BY MR. WU:
Q. Yeah.
So based on what you learned about that embassy visit by Intriago and Solages and others, did CTU try and register a plan to give "the rat" the tickets --
MR. DRAY: Objection, Judge.
THE COURT: Overruled.
BY MR. WU:
Q. -- when they visited in late May 2021?
A. I'm not sure what their intentions were that day.
MR. WU: All right. No further questions, Your Honor.
THE COURT: All right. Call your next witness.

MR. WU: The United States calls Task Force Officer Daniel Gonzalez.

THE COURTROOM DEPUTY: Please raise your right hand.

(Government witness, DANIEL GONZALEZ, duly sworn.)

THE COURTROOM DEPUTY: Please state your name for the record.

THE WITNESS: Daniel Gonzalez.

DIRECT EXAMINATION

BY MR. WU:

Q. Could you spell your full name for the record as well, please?

A. D-A-N-I-E-L. Gonzalez is G-O-N-Z-A-L-E-Z.

Q. Officer Gonzalez, where did you start your career in law enforcement?

A. I started with United States Customs and Border Protection, 2007, right here in Miami, Florida.

Q. What type of training did you undertake to become a CBP officer?

A. We attend training at the Federal Law Enforcement Training Center in Glynco, Georgia. After the academy, there's continued training with whatever specialized function you're going to be performing at your duty location.

Q. Did you start working with the FBI in some capacity during your career?

A. Yes, I did. In 2018, I began working as an FBI task force

officer on an organized crime squad.
Q. Can you explain for the jury what a task force officer is?
A. A task force is a combination of law enforcement with varying authorities and expertise, and they're usually gathered together to combat a specific threat. In this case, it's transnational organized crime.
Q. What FBI squad -- oh, could you describe the FBI squad that you're assigned to?
A. Yeah, it's transnational organized crime. And with FBI Miami, the area of responsibility, the AOR, is usually going to be South America, parts of Central America, and the Caribbean, which means that the work that we primarily focus on is combatting cartels.
Q. What are your job duties as part of that squad?
A. As a task force officer, I conduct investigations, long-term investigations as well as support FBI Miami with cross-border activity as CBP. Customs and Border Protection is charged with regulating and enforcing customs and immigration laws of the United States.
Q. And do you have any supervisory responsibilities as part of your job?
A. I do. Customs and Border Protection Miami field office has several CBP officers that are loaned out to federal law enforcement investigative agencies as task force officers themselves. So I have seven that report to me.

Q. Changing topics a bit.

Are you familiar with an individual named Arcangel Pretel Ortiz?

A. I am.

Q. Do you see him in the courtroom?

A. Yes.

Q. And could you describe him by a piece of clothing that he's wearing?

A. It's the gentleman standing with the gray suit and the blue shirt.

MR. WU: Let the record reflect that the witness has identified Defendant Ortiz.

BY MR. WU:

Q. How do you know Mr. Ortiz?

A. Mr. Ortiz was a confidential human source for FBI Miami, I believe, since 2010, though my -- my awareness of him began, I think, in June of 2020.

Q. And who was Defendant Ortiz's primary handler in 2020 and 2021 when you worked with him?

A. So it was an agent named Mario Monreal, who was departing our squad, and the responsibilities then get passed on to other squad mates, so Special Agent George Nunez became the handler, and I was a cohandler along with George Nunez.

Q. What was your impression of Ortiz's attitude when you first started overseeing him?

A. He was -- he was very amicable, very energetic, eager to help in any way, eager to provide information.
Q. And do confidential sources sometimes bring you potential leads if they hear about possible criminal activity?
A. Yes. We try to streamline it as best we can when we try to avoid things that are publically available in the news and so on and so forth, but they do try to provide information to us to see if there's an investigation or there's a violation there that needs to be investigated.
Q. And when Ortiz reported information to you, what countries was he reporting on?
A. Well, he's a Colombian national. He has a lot of knowledge base and experience with certain narco-terrorist groups in Colombia, which is primarily where my interest was, but I believe he did work for the New York field office and other areas in other parts of the world, but I wasn't privy to those investigations, so I can't say.
Q. Did you successfully build a case with Defendant Ortiz's tips or intelligence in 2020 or 2021 when you worked with him?
A. So successfully, no. There was -- there was a public corruption case that was initiated based on information that he was providing, which was -- it was worked to the best extent that it could be worked, but it didn't yield indictments or arrests, so -- that's what I would take as successful.

So we did initiate an investigation, but I wouldn't call it a successful one.

Q. Now, can confidential sources sometimes commit certain kinds of criminal activity under your supervision to help you catch other criminals?

A. Yeah, based on the nature of the arrangement, the confidential human source is given very specific guidelines and a time frame of what they can do and what they can't do, and it's always at the supervision of law enforcement.

Q. And do you provide them with written authorization when you're going to do something like that?

A. Yes, sir.

Q. Are there specific crimes that a confidential source could never be authorized to commit under FBI policy, and, if so, what are those?

A. Yes. There is -- we read it verbatim so that we never miss anything for that purpose. I don't have it in front of me. But off the top of my head, I can tell that you can't commit any crime of violence, spare that it's in your own self-defense. You can't be coerced into conducting any violation that's outside of the purview of what the agreement is. And whatever it is that you do do and whatever it is that you do say, it has to be truthful.

Those are the primary covenants aside other policy items. But those are the primary ones, acts of violence and

veracity, truthfulness.
Q. I'd like to focus your attention now on 2021 and your relationship with Defendant Ortiz. How did you communicate with him?
A. We communicated by text, by calls, also in person. He was local in the area, so -- that's the way we would communicate. WhatsApp is an application that we would utilize also.
Q. And how often would you use any of these forms to contact him?
A. He would actually communicate pretty frequently. A lot of times it wasn't pertinent communications. But as I said before, he was just very eager, very energetic, and a lot of times it was just non-pertinent communications.
Q. I'm now going to show you what's already in evidence as a component of Government's Exhibit 106C, a file titled, "Chat Ortiz 0040, Gonzalez 0719."
Do you recognize this file, Officer Gonzalez?
A. I do. I do, sir.
Q. What is it?
A. This appears to be a Cellebrite extraction of the WhatsApp communications between myself and Mr. Ortiz.
Q. And I'm going to turn your attention to page 199.
Do you see both your original messages and an English translation of the messages in this file?
A. Yes, sir.

Q. By the way, are you bilingual? Do you speak both English and Spanish?
A. Yes, sir.
Q. So focusing your attention on the message in the center of the screen, could you read the English language translation of that message there?
A. It says, "I already spoke to George, and we renewed the agreement and the rules of the game."
Q. What date and time did you receive that information from Defendant Ortiz?
A. It shows March 18, 2021, at 2:12 PM.
Q. I'm now going to show you what's already in evidence as Government's Exhibit 1E1, page 3. Do you recognize this type of document?
A. Yes, sir.
Q. What is it?
A. These are the admonishments that are given to a confidential human source.
Q. And what was the date that these admonishments were administered?
A. On 3/18/2021.
Q. How did that date compare to the date of the message that we just saw where Defendant Ortiz said to you that he had just spoken to George, renewed the agreement and the rules of the game?

A. It looks like the same date.
Q. Could you read this rule of the game that was delivered on March 18, 2021, to Defendant Ortiz?
A. No. 2, it says, "The CHS is not authorized to engage in any criminal activity and has no immunity from prosecution for any unauthorized criminal activity. This instruction is not necessary for CHSs who have such authorization" --
THE COURT: You have to slow down. I know that you're just reading it, but the court reporter still has to take the record.
THE WITNESS: My apologies, Your Honor. I'll begin again.
"No. 2, the CHS is not authorized to engage in any criminal activity and has no immunity from prosecution for any unauthorized criminal activity."
BY MR. WU:
Q. And you can stop there, before the parentheses. Thank you.
A. Thank you.
Q. Now, around this time in March and April of 2021, did Mr. Ortiz mention the country of Haiti to you?
A. He did in, I believe it was, April. He mentioned he had some clients that were having training at his place of business. They were going to purchase some security-related equipment and that they could potentially have information.

And I believe he sought -- he sought us to meet with them, yeah.
Q. What, if anything, did Ortiz ask you or the FBI to do to help these people from Haiti with their political projects?
A. Well, he had mentioned to me that there was political -- information regarding, like, political misuse with the issuance or appropriation of Haitian passports in relation to Iran and terroristic groups wanting to exploit Haiti and Haitian passports.
He mentioned also that they could potentially have information related to drug activity, but he -- he sought -- he sought for us to meet with them, and I didn't feel like it was appropriate. The timeline wasn't right. There wasn't enough time available for research for us to see who these people were or if any of the information was warranted.
So I believe I negated him. I told him I wasn't going. I wasn't going to meet with them.
Q. What, if anything, did Ortiz tell you in the run-up to that potential meeting about changing or installing a new president of Haiti?
A. Nothing.
Q. Now, although you turned down that meeting, did someone else from the FBI meet with Defendant Ortiz's Haitian contacts?
A. Yeah, I believe Special Agent George Nunez and Special

Agent Bent -- I'm sure about George. John, I'm 99 percent sure, but yeah.
Q. Do you recall when they met, when that meeting occurred?
A. I believe it was in April.
Q. Okay. When did you next see Ortiz in person after that April meeting?
A. We saw him at a Lime very shortly after that meeting. It might have even been the next day.
Q. I'm going to go to page 230 of the Government's Exhibit 106C, chat file. I'm going to direct your attention to the two messages here in blue.
Do you see those?
A. Yes, sir.
Q. What were you sending to Ortiz there?
A. That was the address to the Lime restaurant that's in Pembroke Pines.
Q. And was that for your meeting the next day on April 8?
A. Yes, sir.
Q. Did you, in fact, meet with Ortiz at Lime on April 8?
A. We did.
Q. Now, before we talk about that meeting, I'd like to show you Government's Exhibit 147B, page 26.
Let me ask you. Did you schedule that meeting with Ortiz to occur at the FBI's offices?
A. No. We -- we usually don't like having confidential human

sources go to a big government building. It's bad -- it's bad operational security and it's frowned upon.
Q. So I'm now going to show you page 28 of the same exhibit from April 8, 2021.
Did you meet with Ortiz on April 8, 2021, at the FBI?
A. No.
Q. Do you have any idea why he was taking these photographs and sending them around?
A. I don't.
Q. So now let's talk about the meeting that you did have at Lime.
What did you say to Ortiz about his Haitian connections at that Lime meeting?
A. Well, Special Agent Nunez had informed me that that meeting had really nothing to do with actionable information that could be shared, that they were talking about problems with Haiti and Haitian politics, something that is not our purview, something that we don't work or we can't help with. We're not the State Department, and it was a complete and utter waste of time.
And we were -- myself -- speaking for myself alone in this, I was upset with him because the security business that he has lends for him to be able to deal with local law enforcement or law enforcement in general. I believe he had sold equipment and had some sort of certificate of

appreciation from the City of Miami Police, something along those lines. So it would be normal for somebody like him to know law enforcement people.

So if he introduced us to somebody because they could potentially have information, there's a little bit of leniency in the fact that they may know that he knows law enforcement but perhaps not federal law enforcement and perhaps not know that he's a confidential human source.

So when he introduces George and Special Agent Bent -- I'm almost positive it was Special Agent Bent -- to these individuals, he runs the risk of exposing his status as a confidential human source, which could lead to his file closure because it would be a safety risk for him, and it would probably also lead to the cancellation of his immigration benefits that were in the pipeline.

Q. So what did you say to Ortiz about his activities in Haiti at that Lime meeting?

A. That he -- that he can't -- he can't be introducing people that way to us. That he has to take information, give it to us, let us assess it. There's things that he's not aware of in the background that has to happen. And me, personally, with no disrespect at all to Haiti, it's very difficult for us at that time to work in Haiti.

We didn't have a vetted team. There's rampant corruption in the government, unfortunately. I'm very

empathetic to them, of course; however, unless there were narcotics on a container ship leaving, you know, Port-au-Prince and heading to the United States where we can have some sort of viable investigation lead to a US, you know, extradition of somebody, then we don't want the information.

In fact, not to be crude, and my apologies to Your Honor, but I believe I told him "Stay the F out of Haiti," for me, because I just can't work it.

So that was the sort of informal admonishment to him. It was the first time he had done it with us. So we left it as a sort of verbal -- a verbal conversation.

Q. Now, you just mentioned that Defendant Ortiz's regular line of work, as you understood it, was selling security equipment. I'm directing your attention to page 236 of the chat at 106C.

What is the date of this message?

A. April 8, 2021.

Q. Do you recall Defendant Ortiz would sometimes send you videos?

A. Yes. This is part of the non-pertinent communications I mentioned earlier.

MR. WU: So I'm now going to publish side-by-side that video, which is named VID 2021-0224-WA0050, already in evidence as part of Government's Exhibit 106B2.

(Played video.)

BY MR. WU:
Q. Pausing briefly there, do you recognize the type of gun that's in that video?
A. It looks like an AK from this vantage right here, and he mentions 762, so that would make sense.
Q. What is 762?
A. That's the cartridge size.
Q. Is that rifle ammunition?
A. Yeah.
Q. And is the AK-47 an assault rifle?
A. Yes, sir.
(Played video.)
BY MR. WU:
Q. Actually, before we go further in the video, let me ask you, have you met Defendant Ortiz's business partner in this business, the security business?
A. I did meet him one time, yes.
Q. Do you know his name?
A. Tony.
Q. Do you see Tony in the courtroom?
A. The gentleman on the far right of the gentleman standing up.
MR. PEREZ: We'll stipulate, Your Honor.
(Played video.)
BY MR. WU:

Q. Pausing there right around the 1:20 mark, do you recognize the person that's in that video?
A. That's Tony.
(Played video.)
BY MR. WU:
Q. I'm going to pause there around the 1:44 mark.
Officer Gonzalez, looking at the ballistic plate on the left compared to the ballistic plate on the right, which is Government's Exhibit 103B9, page 6, how do those compare?
A. They appear to be the same, or at least have the same -- the same label.
(Played video.)
BY MR. WU:
Q. And pausing there at 1:46, I'm now going to show you Government's Exhibit 103B9, page 4.
How do the larger plates at the bottom of that image compare to what you see in the video right there?
A. Yeah, they appear to be the same type of ballistic plate.
Q. Now let's turn back to events in Haiti.
After April of 2021, did Ortiz continue updating you about events in Haiti or speaking about his work in Haiti from time to time?
A. Yes, he did. He was providing information related to a mosque which had -- there was a counterterrorism concern there, and that reporting was taken and provided to the group

that works those type of violations or threats. There was a few communications about that, yes.

Q. Did you formally direct or order him, though, to do anything in Haiti?

A. No.

Q. So what was your understanding of when Mr. Ortiz had some activities or interests in Haiti? Did you understand him to be working for himself or for the FBI?

A. No. His -- his interaction with the people that he had originally wanted me to meet with was because they had business dealings with the company. They were buying equipment from them. They had a professional relationship. It had nothing to do with us.

MR. WU: I'm now jumping forward to page 326 of Government's Exhibit 106C, the chat file.

BY MR. WU:

Q. Directing your attention to the chat at the top there, what's the date of that chat?

A. May 11, 2021.

Q. What did Ortiz report to you on May 11?

A. He reported that alias Barbecue, a very dangerous fugitive, wanted to negotiate.

Q. And then in the second message, how did he describe that person?

A. A Haitian criminal.

Q. How did Ortiz tell you he was in contact with Barbecue?
A. So it didn't appear that he was in direct communication with Barbecue. He had an intermediary -- there were two, actually. One was named Torchon. Another was named St. Clair.
Q. And what did you ultimately instruct Ortiz to do about Barbecue?
A. As was normal for him, he was very energetic about wanting to provide information or potentially help the United States bag a fugitive, so he wanted to meet with them, and it was very important for us that he did not. It wasn't safe. So I instructed him, "Don't meet with him."
Q. And directing your attention to the top chat here, what's the date of that chat?
A. May 12, 2021.
Q. And what's the first thing that you say in that chat to Ortiz?
A. "Don't meet with him."
Q. What, if anything, did Ortiz say to you that he was asking Barbecue to help him do in exchange for negotiating his surrender?
A. Nothing.
Q. I'm now going to show you what's already in evidence as Government's Exhibit 147C, page 98.
What, if anything, did Ortiz tell you about seeking

Barbecue's participation against Jovenel?
A. Nothing.
Q. What, if anything, did he tell you about a supposed amnesty agreement for Barbecue?
A. Nothing.
Q. Did you assign Arcangel Pretel Ortiz to reach an agreement with the US?
A. No.
Q. By the way, how many days passed between when you told Ortiz not to meet with Barbecue and the messages that I'm showing you on the screen?
A. May I see the previous date once more, please?
About four days, sir.
Q. What would you have done if Ortiz had sent you those messages that I just showed you in Government's Exhibit 147C about Barbecue participating in an effort against Jovenel?
A. He would have -- he would have faced probably harsh consequences, to begin with, the closure of his file, his source file, which would also ultimately revoke his immigration status in the United States.
Q. Now I want to move you ahead a few weeks. Let's get into late May 2021. In late May 2021, did you learn about a visit at the US Embassy?
A. Yes, we did.
Q. Okay. And what was your understanding of what happened at

the US Embassy?

A. My understanding was that Special Agent Nunez was notified that there were a group of people who appeared at the US Embassy in Haiti and wanted to register or wanted to touch base with somebody at the US Embassy. It's all not very clear what the purpose was.

However, the group that was there had mentioned Special Agent Nunez's name, which prompted the regional security officer at the embassy to contact FBI Miami to get some clarification from Special Agent Nunez.

Q. And how did you link that meeting, if at all, to Defendant Ortiz?

A. Because I believe his business partner was present at the embassy, and so they mentioned that they were there on Special Agent Nunez's behalf or they name-dropped him in some way.

And so that's how we came to find out that it was linked to Mr. Ortiz.

Q. And you just mentioned that his business partner visited the embassy. Who was that, in your understanding?

A. Mr. Intriago.

Q. What was your reaction when you learned that Defendant Intriago had gone to the embassy and was, as you put it, name-dropping Agent Nunez?

A. Yeah. So we knew that the meeting had taken place previously in April. And so after the conversation that we

had in April, we included a written admonishment in his file after that meeting where we documented that he's been informed that he can't try to broker contracts anymore between his law enforcement handlers and people on the outside. He's only to report information to us, and then we'll decide what steps we're going to take forward and whether or not we would want to even have a conversation with somebody.

But he's not a broker anymore, contacts between us and anybody else, specifically those in Haiti.

MR. WU: Your Honor, do you want the jury to have the break now or should we go to 10:45?

THE COURT: Will you be finished with him at 10:45?

MR. WU: No, no. We'll be about halfway through the exam.

THE COURT: That's fine. Let's take the break now.

(Jury exited at 10:35 AM.)

THE COURT: All right. I'll talk to them about the full days before lunch.

Anything on behalf of the Government before the break?

MR. MCLAUGHLIN: Not right now.

THE COURT: Mr. Ortiz?

MR. DO CAMPO: No.

THE COURT: Intriago?

MR. PEREZ: No, Your Honor.

THE COURT: Veintemilla?

MS. DESCALZO: No, Your Honor.

THE COURT: Solages?

MR. DRAY: No, Your Honor.

THE COURT: All right. 15 minutes.

(Recess from 10:36 AM TO 10:49 AM.)

THE COURT: Bring the jury back.

(Jury entered at 10:49 AM.)

THE COURT: Mr. Wu, you can continue.

MR. WU: Thank you, Your Honor.

BY MR. WU:

Q. Officer Gonzalez, when we left off, I think you had mentioned that you ended up giving Ortiz some written admonishments about the time of the embassy visit; is that right?

A. Yes, sir.

Q. I'm now going to show you page 360 of Government's Exhibit 106C, your chat with Ortiz. Who wrote that long message in the blue box at the top of this page?

A. I did, sir.

Q. Do you typically write such long text messages?

A. No.

Q. Why did you feel the need to write such a long text message here?

A. I felt like it was better put in writing. My -- the

thought that I had that I wanted to convey to him as opposed to having it on the phone so he could look back at it, he could read it again, and he could understand where we're coming from, to which he replied. So he acknowledged that he understood.

Q. Could you turn to the second paragraph of your message and read that section?

A. Yes, sir.

It says, "Regarding Haiti, don't bring me anything regarding the people in George's meeting. That situation went super bad with a lot of people. I'm not going to talk about that any longer, but I'll tell you something as a friend. If there's ever the appearance that you or Tony are trying to use our relationship to benefit your company, everything will be over quickly. It's possible that requests/applications will be canceled.

"My fight for you only goes to a certain point, and I won't be able to defend you. I think it's best if you no longer try to introduce us to others."

Q. And let's pause there.

When you said "the people in George's meeting," who were you referring to?

A. The Haitian group that he met during that meeting.

Q. And what is the concern that you're identifying here where you talk about the appearance of Ortiz or Intriago trying to

use our relationship to benefit your company?
A. Yeah, it was part of the conversation at length. Because he had mentioned in April that the group that he was meeting with is actually doing business with the company that he's working for. Right?
So if there's a professional relationship and there's profits to be gained, utilizing governmental contacts to investigate one person or another or to perform any sort of official act that would then benefit him and his private business is -- is not permissible in any way.
So if there was any sort of help that he was trying to obtain for any of the people that he's trying to introduce us to, that would further benefit his business, we would go ahead and close his file and close his immigration status.
Q. Could you please read the paragraph that starts with "you are someone" and then ends with the words "you are aware"?
A. Yes.
"You are someone who the US has allowed, under the control of this agency, to commit federal violations in order to bring bad guys to justice. A lot of trust has been placed in you. Don't let a few Haitians take that away."
Q. When you referred to Ortiz as someone who "the US has allowed to commit federal violations in order to bring bad guys to justice," what did you mean? What role of his were you referring to?

A. Specifically the authorized OIA, the criminal activity that was authorized for him to commit under the supervision of the United States Government as a confidential human source.
Q. Had you authorized him to commit any otherwise illegal activity in Haiti?
A. No, none.
Q. Yet, was he even working for you in Haiti?
A. No.
Q. I want you to read just the next sentence after "change of topic." What does it say there?
A. It says, "The only thing we have pending with Haiti is the mosques. I'll let you know more about that this week."
Q. And what did you mean by that?
A. It was the information that he had previously provided about the mosques, which obviously we're not going to -- we're not going to tell the confidential human source all of the -- they don't have access to the law enforcement information that we have access to. So he's not going to specifically know what's being done with that information, but I can communicate to him that that information is being reviewed and that's what that means, that that information that he gave, the intelligence that he gave is being reviewed by a separate group that looks into those sort of violations.
Q. All right. What time of day did you send this message?
A. It was May 28, 2021, at 10:21 in the morning.

Q. Turning to the next message, who does that come from?
A. It comes from Mr. Ortiz.
Q. What's the date and time associated with that message?
A. May 28, 2021, at 10:47 in the morning.
Q. So, roughly, how much time passed between these two messages?
A. About 20-or-so minutes.
Q. Now, I don't want to go through this whole message with you line by line, but can you first -- read the first paragraph here of Defendant Ortiz's response to you.
A. It says, "Brother, neither Tony nor I will talk about what we do, and it will never be necessary to use the agency for our own benefit. I know the law and the consequences of that."
Q. All right. And then the next paragraph, what was Ortiz's excuse, essentially, for what had happened at the embassy?
A. What I got from it was that it was a misunderstanding that somehow, someway they -- "they" being the group that was in Haiti -- believed they needed to check in or register with the embassy, but he -- he basically said that his business partner misunderstood what the situation was, and he chalked it up to a misunderstanding.
Q. Could you read this sentence that starts with "I introduced" and ends with "nothing more"?
A. Yes, sir.

It says, "I introduced these people from Haiti given the intelligence they represent for the needs of the country, nothing more."

Q. And when Ortiz said "nothing more" there, had he ever asked you for anything more for these Haitian contacts of his?

A. No.

Q. Had he ever asked you for some help in making their political goals in Haiti come true?

A. No. And even if he did, that's not -- that's not what we do.

Q. And no need to read the rest of this message word for word, but in essence, is it fair to characterize this as an extended apology?

A. Yeah, he says as much at the very bottom.

Q. And do you recall how you responded to this message from Ortiz?

A. I hoped that he finally got the message, and I told him for us to move past it and to move on.

Q. After May 28, 2021, when you had this heated exchange with Ortiz, how often did Ortiz bring up Haiti with you?

A. Not very much at all after this.

Q. I'm now going to show you what's already in evidence as Government's Exhibit 147D, page 42.

What, if anything, did Ortiz tell you about an attack on President Moise of Haiti planned for 1:00 AM on June 3,

2021?

A. Nothing.

Q. I'm now going to show you page 229 of the same exhibit.

What, if anything, did Ortiz tell you about a plan to capture Moise at the Port-au-Prince airport on June 19, 2021?

A. Nothing at all.

Q. Moving on to Government's Exhibit 147E, page 16.

What, if anything, did Ortiz tell you about a plan to go to Moise's house in early July 2021?

A. Nothing.

Q. During this entire time, June-July 2021, what, if anything, did Ortiz tell you about his CTU team planning to execute a supposed Haitian arrest warrant for President Moise?

A. Nothing.

Q. What would you have done if he had told you any of these things?

A. We probably would have arrested him.

MR. HOWARD: Objection. It calls for speculation.

THE COURT: Overruled. It's untimely.

You need to put those microphones closer to you, sir.

THE WITNESS: Referring to your question --

THE COURT: There's no question pending now.

BY MR. WU:

Q. I'll ask it again.

What would you have done if he had told you any of

those things that I just showed you?

THE COURT: He actually answered that question.

MR. WU: I apologize. I didn't hear him.

BY MR. WU:

Q. So fast-forward to July 7 of 2021, how did you learn that President Moise of Haiti was assassinated?

A. On July 7, he sent me a text message asking him [sic] to call him. I eventually got in contact with him later in the day, and then began this very long, very confusing communication as to his security team assisting a judge prosecutor figure, "fiscalia," he said in Spanish, with some sort of arrest warrant. He was kind of ecstatic. He was very concerned. He was forwarding me audio messages of gunshots and -- it was just a very chaotic notification.

And so we began collecting as much as we could. I told him to preserve any and all messages that he has or any information that he has, and that we would do a -- eventually we will do a debrief.

Q. Now I'm turning to page 388 of Government's Exhibit 106C, the chat file between you and Ortiz.

Directing your attention to the final message on the page. What was the purpose of you sending this message to Ortiz?

A. So because there was a lot of communications and phone calls and text messages, I wanted to make sure that I

understood what the summary of his communication was, so I sent this back to him if there was anything wrong, that way he would be able to correct me.

Q. So, to be clear, who told you that his company was contracted to provide security services to Christian Sanon, presidential candidate, and a female judge?

A. Mr. Ortiz.

Q. Who told you that CTU's personnel was with the prosecutor's office while she was en route to serve an arrest warrant on the president? Who told you that?

A. Mr. Ortiz.

Q. Who claimed that they found the president had been assassinated?

A. Mr. Ortiz.

Q. Who told you that the CTU personnel took away a judge and retreated?

A. Mr. Ortiz.

Q. Who told you that they hid in a home where they eventually secreted the judge out?

A. Mr. Ortiz.

Q. Okay. And to be clear, when he was describing this judge that they were escorting, was he speaking in English or in Spanish?

A. Spanish.

Q. Okay. So when he was speaking to you in Spanish, what

gender did he describe the judge to be?
A. A female.
Q. I'm now going to show you page 411 of your same conversation.
What is the date of this message at the bottom of the screen there?
A. It's July 7, 2021.
Q. Who sent it to who?
A. In blue is my question to Mr. Ortiz.
Q. All right. What did you ask him?
A. "What was the name of the judge?"
Q. And why did you use "la juez" there, in the question, female judge?
A. He had originally stated on the phone that it was a female judge.
Q. And when we're talking about a female judge, a female judge that was accompanying his personnel? Was that his claim?
A. Or rather, his personnel was accompanying the female judge.
Q. Now, scrolling down to the next page, 412, there's an empty file here, but do you recall Ortiz sending you an image in response to your question?
A. Yes, I do.
Q. What was the image, as best as you can recall it?

A. So it was a Haitian document. It appeared to be some sort of an arrest warrant. And what I understood from it, because I do not speak Creole, was that there was a name on it, and there was also a date, and the date was 2019, which I found odd.

And the name was Noelcius. I apologize if I mispronounce that.

Q. So I'm going to open up a document that's part of Government's Exhibit 108B5 with a file name starting in 59E3D. I'd like you to take a look at that. This is already in evidence.

Do you recognize this document?

A. Yes, sir.

Q. How do you recognize this document? Where have you seen it before?

A. That's the document that Mr. Ortiz forwarded to me.

Q. And then going to page 413, why do you ask after receiving that warrant, "2019?"

A. Beginning with the premise that there's no authority, that I'm aware of, for foreigners to go into another country and arrest a Haitian national on a Haitian arrest warrant, escaping -- escaping the confusion of that premise. It's also dated in 2019 and allegedly this warrant is being served in 2021. It just -- it bears another question.

Q. And then I want to go to the first green message on

page 413. What does it say there?
A. Jean Roger Noelcius.
Q. And so I just want to make sure we have the sequence right. What was the question that you asked Ortiz on page 411?
A. "What was the name of the judge, the female judge?"
Q. And he sends you an arrest warrant, a supposed arrest warrant, and then how does he respond here?
A. "Jean Roger Noelcius."
Q. Do you happen to know, is Jean Roger Noelcius a man or a woman?
A. The name appears to be male. I'm not familiar with who the person is, though.
Q. I now want to go to the next message on page 413.
When did you send this message in blue, the top one in the current display?
A. July 7, 2021, at 10:19 PM.
Q. And why did you tell Defendant Ortiz, "We have several questions"?
A. It was -- it was a pretty chaotic phone call. There was also a sort of what I would believe as a lack of urgency in providing me this information. He was always very quick to message me, to call me. He would send me messages unrelated to any work that we were doing. He would send me messages about things that were occurring in the news in the year that

I knew him.

And so for something like this -- this tragic event where there's a loss of life, he messaged me in the morning just asking if I could give him a call. There didn't appear to be any sense of urgency in that. And when we finally began talking hours later, hearing all of these things happen, how people from his company are wounded, some of them are dead, there was some sort of a home invasion that occurred. It was all pretty confusing. It was shocking. That arrest warrant is odd. What they were doing, accompanying a prosecutor to serve, that is odd.

There were just so many gaps there that -- that he needed to be brought in. We needed to have a conversation with him.

Q. You just alluded to a lack of urgency, so I would like to go through the timeline in a little more detail with you.

Going back to page 387, what's the date and time of this message?

A. It's July 7, 2021, at 10:07 in the morning.

MR. WU: Just to briefly scroll up.

BY MR. WU:

Q. What was the previous message in this chat? What day did it come from?

A. July 5.

Q. So we've seen the first message on July 7.

What did Ortiz ask you to do around 10:07 AM in the morning?
A. To call him whenever I could.
Q. When you responded, "Give me 1.5 hours," did Ortiz immediately respond back that it was an emergency?
A. No, I don't exactly recall. He just says, "Okay. Yeah."
Q. And by the way, he asked you for a call at 10:07 AM. When were you able to reply to that text?
A. At 2:28 PM.
Q. Is this what you were talking about when you referred to a lack of urgency, an odd lack of urgency on his part?
A. Yes.
Q. Did you continue using Defendant Ortiz as a confidential source after July 7, 2021?
A. No.
Q. What happened to his relationship with the FBI?
A. So he was brought in for a debrief over the next few days. And after the debriefs had occurred, there's a group that's separate from ours that would have been responsible or are responsible for investigating Neutrality Act violations, and that group began investigating this situation.
And so after the debriefs, it was clear that Mr. Ortiz would then most likely become a subject of that investigation.
Q. And so in terms of his confidential source relationship,

did you terminate that relationship with him, or did the FBI terminate that relationship with him?
A. Well, yeah, the FBI, yeah.
Q. Quickly publish for you Government's Exhibit 1E6, already in evidence. What does that show?
A. This is a source closing document.
Q. And have you had any contact with Defendant Ortiz since he was closed as a source in July of 2021?
A. The last contact I had with him was on July 23 when I informed him that any and all communication needs to go to Special Agent Nunez and not myself.
MR. WU: We pass the witness, Your Honor.
THE COURT: All right. Cross-examination.

CROSS-EXAMINATION

BY MR. HOWARD:
Q. Good morning, sir.
A. Good morning.
Q. You're a TRO. What does TRO mean?
A. A TFO, sir. It means task force officer.
Q. Late night.
TFO, what is it?
A. It means task force officer.
Q. So you don't work with the FBI; right?
A. I do.
Q. You're not an FBI agent?

A. I'm not an FBI agent, sir.
Q. You are employed with what law enforcement agency?
A. With United States Customs and Border Protection.
Q. Okay. And a task force officer is somebody who works interagency, works with another agency?
A. Correct, sir, yes.
Q. Okay. And you were one of Mr. Ortiz's handlers?
A. Yes, sir.
Q. And was that assignment given to you by George Nunez, or was it given to you by the agency you work for?
A. No, it was -- it was assigned by the FBI squad supervisor, the squad that I support. When there's a transition of one agent leaving, that agent's cases and likely their confidential human sources get disbursed among the remaining agents on the team, to include task force officers.
So Mr. Ortiz went from having Special Agent Monreal as his primary file control officer to Special Agent Nunez of which I would be assisting.
Q. Okay. And Special Agent Monreal, did he kind of give you a debriefing describing his experiences that he had had with Mr. Pretel Ortiz and breaking it down a little bit?
A. Yes, to some degree. Mr. Monreal wasn't with him for all too long either. But the first time I met Mr. Ortiz, it was together with Special Agent Monreal.
Q. But you told us that you had developed an impression that

he was earnest; right?
A. Yes, sir.
Q. He really wanted to get at it?
A. Yes.
Q. And he -- probably almost too much so; right?
A. He was enthusiastic, yes, sir.
Q. He was enthusiastic. And enthusiastic in giving you information concerning criminal activity?
A. Correct.
Q. You did not get the impression that he himself was a criminal or had a criminal disposition; right?
A. No, sir, not at that time, no.
Q. And would it be fair to say that between you and George Nunez, you had a lot more contact with Mr. Pretel Ortiz than George Nunez did?
A. I don't know to the extent of the contact that Nunez had with Mr. Ortiz, but I did have frequent contact with him in the time that I knew him that year, so yes.
Q. Okay. But if you were a cohandler, is it that you and George Nunez are on par, or he is the supervisor of all handlers? How did that work?
A. So as explained to me and as I understand in the trainings that we get with the FBI, the task force officer can be a cohandler in equal standing in the investigation; however, there are several limitations. I can't add another cohandler

onto his file.

There's certain things in his file that I won't be able to do as a task force officer. There is a yearly review that's done. That's done by the case agent or by the supervisor, not by -- who's an FBI employee, not the task force officer.

So an investigation, we can run hand in hand; however, the FBI agent that's the primary handler on file will have additional responsibilities and abilities that a task force officer, whether it's me or a local law enforcement officer or whoever else is part of this task force, will be able to do it, if that makes sense.

Q. Okay. You hadn't been with Mr. Pretel Ortiz for a full year before this all unfolded; right?

A. It was just about a full year. I met him, I believe, in June of 2020, and this incident that we're discussing here happened in July. So it was just about over a year.

Q. And before the incident in 2021 occurred on July the 7th, had you had the opportunity to write a review on his behalf?

A. Well, the reviews on his file weren't written by me, I don't believe. I can contribute to them. But there were reviews done, yes.

Q. And reviews done during the time you handled him before this incident occurred on July 7, 2021, reviews that you contributed to?

A. I believe there might have been. I would have to look at the reports, but I believe there might have been, yes, sir.
Q. But had you contributed to any during this time, you would have given a good review, I take it?
A. Yes. Part of the reviews are the statistical accomplishments that the CHS has done, meaning successes.
Q. Sure.
A. Unfortunately, we didn't have too much of those. But he did get a satisfactory review, yes, sir.
Q. But when he was giving you information, even though it never materialized into anything, was he giving you false information at all?
A. Up to that point that I'm aware of, no, sir.
Q. Okay. So that means at no point, then, until this incident, in your impression?
A. As far as I'm aware, yes, sir.
Q. Okay. So notwithstanding the inability to turn it into an actual prosecution or conviction, he was giving you truthful information concerning criminal activity about which he was aware; right?
A. As far as I knew, yes, sir.
Q. You deemed him to have a good attitude --
A. Yes.
Q. -- be productive and be reliable; right?
A. Yes, sir.

Q. And trustworthy?
A. As -- as -- as --
Q. Up to that point?
A. Yeah, as one can expect up to that point. Yes, sir.
Q. Okay. Would you say you had a good working relationship with him?
A. I did. He was --
Q. He was affable?
A. Yes. Very amicable, nice guy.
Q. And you were affable, too. I mean, your communications with him were as a friend. As a matter of fact, you refer to him as a friend on occasion or at least on one?
A. Yeah. I mean, I could clarify that the relationship between a handler and a source is -- is a dynamic one where the source is usually obtaining some sort of monetary benefit from the handler or some sort of immigration benefit.
So they'll typically view the handler in one way where the handler, essentially, for lack of a better expression, handles the person. If that means being cordial, being nice, using colloquialisms, using any kind of nickname or nicety, calling them friends --
Q. That's part of the job?
A. -- it's part of the job.
Q. Okay.
A. But if you ask me if I thought he was a nice guy and

amicable, yes, absolutely.
Q. Okay, but you weren't telling us that you really didn't think of him as a friend. I mean, he's a confidential human source.
A. Right. There's a --
Q. But part of that was you kind of endearing yourself to him; right?
A. Yes, yes. And in the Latin culture, we're very friendly and very -- I'll say "bro" and "friend" and all that.
Q. So part genuine, part job; right?
A. Yes, sir.
Q. Okay. Now, as early as December of 2020, you were aware that he was a partner in a security company; right?
A. Yes.
Q. And you're aware that he would travel in relation to the security company's private business. You're aware of that?
A. Yes.
Q. And you're aware that he actually traveled internationally in furtherance of private security business with CTU? You're aware of that?
A. Yes, sir. I believe he traveled to Bolivia.
Q. Yes, you knew he had a security-related contract with the Bolivian military?
A. Yeah, he conducted a training of some sort down there, yes.

Q. And as a matter of fact, you were of the impression that his company may also be contracted to participate in security contracting for Bolivian military leadership convoys?
A. Convoys, no, I wouldn't go so far as to say that. He did send me a picture -- he texted me a picture of him with somebody who he said was one of the ministers in Bolivia, and he had a certificate of appreciation from them to CTU.
Q. Okay. If I show you a report of yours, may it refresh your recollection as to what your impression was as early as December of 2020?
A. Please, yes.
MR. HOWARD: May I, Your Honor?
THE COURT: You may.
MR. HOWARD: Thank you.
THE WITNESS: Would you like me to read this?
BY MR. HOWARD:
Q. No, I want you to refresh your recollection starting with that sentence right there, this one.
A. Okay. Yes, it does say "convoys."
Q. Okay. So as early as December of 2020, you had the impression that not only had he had a training assignment with the Bolivian military but he also may have been contracted to participate in security contracting for Bolivian military leadership convoys; right?
A. Yeah, as per my report, yes, sir.

Q. Okay. And we can trust your report; right? You wrote it?
A. Yes.
Q. You would agree that your best recollection of events would have been then, not now?
A. Correct.
Q. You agree with that?
A. Correct.
Q. And in connection with Mr. Ortiz's travel about which you were aware in Bolivia to provide security in Bolivia, either you or somebody else provided Mr. Ortiz with an address and phone number of the US Embassy in Bolivia?
A. Yes. This might have been me, yeah.
Q. So providing embassy contact information, even though he was heading to Bolivia on private security business, was something you thought appropriate; right?
A. Yes. I would provide that to any -- any one of my family members or friends that are going to a foreign country. It's important to know where the US Embassy is in case you have any issues, yes.
Q. All right. He also -- beyond traveling internationally for private security business about which you were aware, he also traveled internationally when tasked by the FBI and DEA; right?
A. Yes, but that was outside of my -- my purview with him.
Q. I know.

A. I haven't asked him to do that, but I would assume, yes, he has before in the past.
Q. But you know about that. Does about 15 times traveling on behalf of the DEA or FBI sound about right?
A. Sure. Yes.
Q. All right. And you were also aware that Mr. Pretel Ortiz's company CTU was contracted to do security-related tactical training? You're aware of that as well?
A. He did mention that they do do that as well, yes.
Q. So he didn't hide that from you. You knew that, sir?
A. No, he didn't, sir.
Q. On May the 31st of 2021, Mr. Ortiz reached out to you via a WhatsApp message at about 11:09 PM. Does that sound familiar?
A. The date once more, please.
Q. May the 31st of 2021, the night before April 1.
A. Okay.
Q. Does that sound familiar?
A. I would have to look back at the --
Q. I want to help you refresh your recollection, and I'm going to be referring to a chat that you and he had. Would it aid you if you had it in front of you to refresh your recollection as we go?
A. Yes, or -- I mean, if you gave the context of the message, maybe it would also refresh my memory.

Q. Okay. Well, let's do that first.
On May the 31st, 2021, Mr. Ortiz reached out to you at 11:09 PM. You responded that you were out with your wife. "Can this wait until tomorrow?"
And he said, "Okay, but it's important."
Right?
A. Okay.
Q. That sounds familiar, like something you recall?
A. It sounds like something I would do at 11:09 PM, yes, sir.
Q. Fair enough. Fair enough. Me too.
And you spoke to him the next day on a call, and that was April the 1st of 2021, and he told you about having met Christian Sanon, James Solages, and Marky Kessa --
A. Yes.
Q. -- right?
A. Yes.
Q. So he had tried to reach you the night before. You guys actually spoke on April 1 -- talking, and he first introduced you to the names Christian Sanon, Marky Kessa, James Solages; right?
A. Yes, sir. Yep.
Q. And he told you these were, for the most part, political actors in Haiti that he had met; right?
A. Clients of his, yes.
Q. Yeah, well, they were political actors. He let you know

that Marky Kessa was the mayor of Jacmel, which is a city in Haiti. He told you that?
A. He did. And that Mr. Sanon was a political hopeful.
Q. Political hopeful.
A. Yes.
Q. Right?
A. Yes, yes.
Q. And he told you that Mr. Solages was ex-military?
A. Yes. I think he said army, if I remember.
Q. Ex-army?
A. Something like that.
Q. One branch of the military or the other.
You had had a phone conversation. This was relayed to you in a conversation as opposed to texts back and forth; right?
A. It was, yeah, maybe most likely a combination of the two.
Q. And in that conversation, he invited you to a meeting that he was about to have with these gentlemen; right?
A. Yes.
Q. And he told you that his company had been approached seeking private defense tactical training by these men?
A. Yes.
Q. Because running for office in Haiti was dangerous?
A. Yes.
Q. So you were aware that at that time -- or it had been

conveyed to you by Mr. Ortiz that the nature of his relationship with the people that he had just introduced to you, or at least their names, was that he had been approached about providing security in Haiti as Mr. Sanon campaigned.

You're aware of that?

A. Yes, yes, yeah.

Q. So just like you were saying that -- when you said on direct that when Mr. Ortiz has both a private relationship -- contractual business relationship and is also trying to introduce you to the people concerned for things that might advance your interest, you said that would alert some suspicion that he's leveraging you, but it seemed like he did it in Bolivia and it was okay; right?

A. No, I wouldn't say that, sir.

Q. Okay. Well, he invited you to a meeting in Haiti; right? And you were admittedly a little hesitant?

A. Well, the meeting was to be in --

Q. I'm sorry. In Miami.

A. Yeah, at his place of business.

Q. But with respect to Haitian people who he had candidly told you he had a business relationship with; right?

A. Correct.

Q. And you were candidly hesitant; right?

A. Yes, sir.

Q. He told you that these people spoke openly about Haitian

politicians being heavily engaged in corruption and money laundering. He told you that?
A. Correct.
Q. And that these people who he was referencing were interested in establishing a working relationship with US law enforcement. That's Sanon, Solages, and Kessa, and whoever else he mentioned at the time; right?
A. Yes.
Q. Okay. And he invited you to this meeting. You were a bit reticent. And the first thing you asked him to do was verify the phone numbers that he had provided you for these people; right?
A. I may have, yeah.
Q. Okay. So that means he provided you phone numbers?
A. Mm-hmm.
Q. And it seems like you told him you needed to do your homework on your end; right?
A. Yes, sir.
Q. And you told him that you needed to check this out because not only for his safety but for his business.
Do you remember telling him that?
A. For his safety, yeah, I do recall that.
Q. And his business?
A. Yeah. We're in the ballpark, yeah.
Q. And so when he told you that it was ex-military and you

told him, "I've got to check it out," I suspect you went to check to see if that person that he said referenced himself as ex-army or ex-military -- I suspect you went and checked that out; right?

A. Well, there's a limitation as to what we can see with military records. That request has to be made. That request wasn't made. But there's law enforcement database queries that we will do on the phone numbers and on the names that he provided. And more so important than those database queries was the information that he communicated to me.

Based on what he communicated to me about what they wanted to present in conjunction with the information from the database queries, it wasn't anything viable that I could work, and so I declined.

Q. I understand that.

A. Yeah.

Q. But you told him that you had to check it out --

A. Yes, sir.

Q. -- for his security and for his business. "I need to check out who these people are you're trying to introduce me to"; right?

A. Right.

Q. And are you telling me that the FBI doesn't have the resources to check and see if somebody is ex-military? You're not telling me that?

A. I'm not saying that, sir.

Q. Okay. But you're just saying, for whatever reason, you did not check it out? That's not something you chose to check out?

A. Correct.

Q. You just ran the phone numbers and to see if the phone numbers were matching up to the names that he had provided.

Was that the limit of your vetting process?

A. There's several database queries. I actually -- I can't recall all of the database queries that I did, but yeah, research was conducted, it's fair to say --

Q. Okay.

A. -- and an assessment of the information that he gave.

Q. So if Mr. Ortiz was relying upon your representation that you're verifying and he was thinking that you're verifying this representation about ex-military, his reliance would have been misplaced; right? Because you didn't do that; right?

A. Correct.

Q. Okay. And you declined to go to this meeting; right?

A. Yes, sir.

Q. And you said it was because you never thought it was a good idea; right?

A. Essentially, yes, sir.

Q. The reason you gave Mr. Ortiz was that you were out with a family emergency and you can't make it. That's what you told

him?
A. Yes, sir.
Q. Okay. You didn't tell him, "I'm not going because it's a bad idea." You told him, "I'm not going because I have something else to do"; right?
A. Right.
Q. So you weren't particularly transparent. You did not convey the extent of your concern, if you had it, in fact, to Mr. Ortiz, did you?
A. He won't be privy to any law enforcement database results that we get. We won't tell him that.
Q. No, no, I'm not asking whether or not you told him, "Hey, I checked this out," and what you have --
A. Right.
Q. -- but you told him the reason that you weren't going to the April 6 meeting was because you had competing family obligations; right? That's what you told him?
A. Yes, I did. I believe I told him I wasn't going to go, and I believe he pressed and wanted to keep pushing the issue. And then I told him I was out with family as part of handling the person, yeah.
Q. As part of handling, because you wouldn't have seen the value in telling him, "I don't think this is a good idea." Instead, you made him go along and do it and told him you had family obligations?

A. I wouldn't say that, sir. I didn't make him go along and do anything.
Q. Well, I mean --
A. He was already meeting with them because they were doing some sort of training. It had nothing to do with information.
Q. So you were just saying you didn't think it was advisable that you be included in that meeting?
A. Correct. And he was never tasked to collect anything from them, likewise.
Q. Sure. But there was then, therefore, nothing that you had observed that gave you the impression that it was a bad idea for him to meet with them on the 6th?
A. At that moment in time, he has a private business. If he has a private business deal going on with these individuals, we're nobody to tell him not to engage in a private business deal or not, unless there's something absolutely in your face about the situation -- somebody has a warrant, something like that.
Q. And there was nothing in your face?
A. No, sir.
Q. So you didn't say, "Don't do that. That's a bad idea"? You did not say that?
A. I did not say that, sir.
Q. And for whatever reason, you thought it was a bad idea, but George Nunez, he jumped at the opportunity. He went;

right?
A. Yes, he did.
Q. And he took FBI Special Agent Bent with him?
A. Yes, sir.
Q. Who else did he take with him? Do you know? I think they went four deep. Do you remember?
A. I wasn't there, sir. I don't know who he took with him.
Q. Okay. So even though, in your better judgment, you said, "Let me give him an excuse," Special Agent Nunez thought it was fine; right?
A. Correct.
Q. Now, there was a point at which you told us on direct that you admonished him about introducing law enforcement to anyone, essentially; right?
A. Right.
Q. Because you were concerned it would blow his cover; right?
A. Among other things, yes.
Q. That was the primary one that you were concerned about. If you go around introducing your handler to civilians, it may leak that we're FBI and blow your cover --
A. I would -- I would say --
Q. -- or his cover?
A. -- safety. Yes, that parallels into -- safety is the primary concern.
Q. A safety concern.

So you were concerned for his safety and you said --
A. And the agent's safety, sir.
Q. Right.
But the funny thing is that you were admonishing him about it. All he did was extend an invitation. Agent Nunez made the decision, in his judgment --
A. Right.
Q. -- to attend?
A. Correct.
MR. WU: Objection. Argumentative.
THE COURT: Overruled.
THE WITNESS: Well, keep in mind, I don't know the communications that he had -- that Mr. Ortiz had with Special Agent Nunez, so I'm not aware if Special Agent Nunez had had the same opportunity to hear what they had to offer or not. Maybe -- and this is speculation, of course, because I don't know what Special Agent Nunez --
BY MR. HOWARD:
Q. Don't speculate. Don't speculate.
A. Yeah, yeah.
Q. What I want to know is, it would be fair to say that if a confidential human source extends an invitation to law enforcement, it's upon them to exercise their judgment whether to accept or decline; right?
A. Correct.

Q. And you exercised your best judgment to decline?
A. Yes, sir.
Q. And it wasn't Mr. Ortiz. It was Special Agent Nunez, Special Agent Bent, and whoever accompanied them, exercised their judgment to attend? It's not on him. It's on them?
MR. WU: Objection. Argumentative.
THE COURT: Sustained.
BY MR. HOWARD:
Q. Well, when you decided, that was a judgment you made; right? Not him?
A. Yes, sir.
Q. When they decided to go, that was the judgment they made, not him?
MR. WU: Objection. Asked and answered.
THE COURT: I'll let him answer this question and then we'll move on.
THE WITNESS: May I have the question once more, please?
BY MR. HOWARD:
Q. Okay. When you decided not to go --
A. Yes.
Q. -- that was a judgment you made; right?
A. Correct.
Q. Not a judgment he made, Mr. Pretel Ortiz. That's a judgment you made not to attend; right?

A. He can't compel me to attend.
Q. Right.
A. Right.
Q. And can he compel Agent Nunez to attend?
A. No, sir.
Q. Agent Bent?
A. No, sir.
Q. So when they decided to go, that was the judgment they made, not Mr. Pretel Ortiz?
A. Yes, sir.
Q. Okay. All right. So when you admonished Mr. Pretel Ortiz about doing it, did you suggest to Agent Nunez, hey, maybe you shouldn't be doing that? Did you admonish him or at least give him a friendly nudge?
A. No, sir. There's -- there's a little bit more to it there, based on what Special Agent Nunez was telling me were the topics of discussion in that meeting.
Q. He didn't know him until he went, though?
A. Correct.
Q. And you didn't know him until you went; right?
A. Correct.
Q. You decided not to go. He decided to go.
A. But Mr. Ortiz knew, and that's where the admonishment comes in, because Mr. Ortiz is aware of the type of work that we're looking for --

Q. Right.
A. -- and what ended up happening was some political tirade, and that's why he was verbally admonished.
Q. Okay. That's fair.
There was also mention of targets in Haiti, money laundering; right?
A. Correct.
Q. That would be within the scope of the things you would be interested in him bringing to your attention, I take it?
A. Not unless there's a US bank involved, sir. As stated before, it's very difficult to work in Haiti. There's a lot of corruption. We don't have teams down there. We don't have the ability to subpoena a bank in Haiti. It's very, very difficult.
So, no, that wouldn't be something that was interesting. And that also lends to my decision as to why I didn't find it interesting to work with whoever it is he was trying to present.
Q. Okay. But if he was working with the DEA and FBI and he learns about corruption, possible mosques, and ISIS down in Haiti -- that was mentioned as well; right?
A. Correct, correct.
Q. That's not stuff you would want your confidential human source to bring to your attention?
A. Yes, anything and everything they should bring, and then

we'll assess whether -- their viability in investigating or not.

In fact, the mosques was something that was forwarded on to a team that looks at that, so that --

Q. Right.

A. -- yeah.

Q. So some of the topics that were addressed at that meeting were out-of-pocket because they're political. Some were right down the middle; right?

A. Keep in mind, I don't know what was discussed at the meeting because I wasn't there.

Q. Okay. So --

A. But he had previously reported the mosques to me outside of that meeting. So, yeah, that was something that we documented and we pushed forward.

Q. Okay. So there was actually some legitimate purpose and because you say, "Look, Haiti's too much of a pain in the neck. I'm not even going to go there. Let somebody else handle that" was pretty much your reason for saying, "I'll pass on this one"; right?

A. Not necessarily let somebody else handle that, just that we -- our group wouldn't be able to support what they were trying to bring.

MR. HOWARD: Okay. One second, Your Honor. I got ahead of myself.

BY MR. HOWARD:
Q. After Mr. Ortiz's meeting on April 1, before the April 6 meeting, he came back to you and he clarified, "Look, Mr. Sanon is not a member of the Haitian Government yet. He's a presidential hopeful." He did clarify that for you?
A. Yes.
Q. Okay. So he didn't misrepresent that; right?
A. No, sir.
Q. And when the prospect of you going to the meeting was still alive, he offered to meet with you ahead of time and kind of give you a debrief, bring you up to speed before the meeting; right?
A. I recalled he mentioned they were flying in and at what time they were flying in, and if we could meet, but it wasn't feasible.
Q. Right.
But he offered to meet with you ahead of time and bring you up to speed before you walk into it?
A. Yeah, I believe he did. Yes.
Q. He did, okay.
And when Ortiz said that, notwithstanding your attending or not, he would vet the situation and provide you a report of what was what; right?
A. That would have been normal, yes.
Q. That would have been normal.

And he said but for now, then, he will just deal with them as a private security advisor?
A. Yes.
Q. So he didn't say -- there was nothing you told him that made him say, "Oh, I better stop dealing with them." He told you, "I'll just continue my private business with them"?
A. It's a private business relationship, yes, sir.
Q. And you didn't interfere or seek to interfere?
A. No, sir.
Q. And you didn't admonish him not to pursue that?
A. No.
Q. Okay. And as you said earlier -- I think you got ahead of me there, but he was giving you updates before the April 6 meeting, saying, "Sanon's arriving. He's at the airport. The mayor's arriving. We're going to this restaurant for lunch, and then we're going to have a meeting."
He was updating you. He was giving you information?
A. And I believe I told him, "We need more time to assess. We don't just meet with people in that way" -- something along those lines.
Q. And when you said "we," you didn't mean the FBI. You meant you because Nunez was getting ready to go; right?
A. Is that a question?
Q. Now, after that meeting, the morning of April 7, Mr. -- strike that.

Were you the one that passed the information on about this potential meeting or prospective meeting to George Nunez? Are you the one that passed that on?
A. I believe I had a conversation with George about it, yeah.
Q. Okay. Because on April 7, Mr. Ortiz sends you a WhatsApp saying, "Thank you very much. The meeting yesterday was a complete success."
Do you remember that?
A. Yeah.
Q. He did, okay.
A. I mean, he was incorrect about it, but yeah, he did say that.
Q. Was that the impression that he had?
A. That was the impression he had, yes, sir.
Q. Okay. And you didn't disabuse him of that at all?
A. Well, I spoke to George about it and found out it was not a success.
Q. So he's the only one that got left in the dark as to the successful nature of that meeting or not? You and George had one understanding. You didn't communicate it to him?
A. It was brought to his attention when we met in person.
Q. Later on?
A. Yes, sir.
Q. Okay. On April 22, about two weeks later, he requests permission to go to Haiti, permission to travel. He said,

"Could you get me some permission to travel"; right --
A. Yeah.
Q. -- "to Haiti"?
A. I denied that, I believe.
Q. You didn't deny it. You just didn't respond. You asked him, "Oh, by the way, have you gotten your money?" was your response?
A. I believe we did circle back to that because he wanted to travel on the bequest of his private business, and I told him that we don't provide permission for him to travel for his private business. I believe that happened a little bit later on, but yeah, I did address that.
Q. Only to Bolivia?
A. No, sir, that was when he was talking about Haiti.
Q. No, but you said you don't allow him to travel for his private business. You allowed him to travel for his private business to Bolivia, did you not?
A. I did not allow him to travel. So essentially what happens is when somebody is on deferred action, essentially they don't have a lawful status in the United States, and the Government is providing a deferred action on their behalf because there's some application pending, to not get too complicated with it.
They can get an authorization for what is called an advanced parole, and that advanced parole will allow the

person to depart the United States and to enter back in, even though technically they don't have a lawful status.

So what he was asking me was for me to make that request, and I told him -- I don't remember the day, but I know it was a little bit later on -- that for his own -- that he is incorrect in that assumption, that if he's going to travel for a private business, I can't obtain that for him. If he were to travel for us, it would be something different.

Q. Okay. But you were aware that he had been permitted -- I think you just told us at the beginning of my examination that he has traveled internationally for his private business --

A. Yeah.

Q. -- right?

So you were conservative in the amount of leash that you give your confidential human sources, but apparently this is not FBI policy because he had been previously allowed to go for private business. True?

A. I believe he was also working for DEA, not to just stick it onto FBI, for example, but he had a previous authorization, and that authorization is usually good for a year.

So when he went to Bolivia, I believe he used a previously existing authorization to do that. And whether that was DEA or FBI, I can't say. It was before. I didn't request it, so I don't know.

Q. Okay. So there are --

A. It wasn't on my -- it wasn't something I solicited.
Q. Not on your watch?
A. Yes, sir.
Q. Right.
So there are three judgments we're talking about here. There's a conservative judgment of Special Agent Daniel Gonzalez, there is the judgment of the FBI, and the judgment of the DEA.
We know that you didn't allow him to travel internationally for private business, but somebody else did. Fair?
A. Fair, sir.
Q. So when he asked that, because you were now his handler, he recognizes there was a more tighter parameter around what he could do, but it wouldn't be unusual for him to ask since it had been granted to him before; right?
A. Correct.
Q. Okay. And round about this time -- but you denied it -- I think you just changed the subject, but maybe you denied it explicitly in a verbal communication. I'll take your word at that. 512 -- strike that.
You recognize that if he is in the United States and his company, some of whom don't require this parole that you have to authorize, is down in Haiti doing business, you realize he has less of a control and less of an ability to

know the granular details of what's occurring there.

You realize that?

A. Because he's not present, yes, that would make sense.

Q. Okay. So anything he gets is likely secondhand news. Some of it may be lost in translation, in communication. You recognize that he now, because you prohibited him from going to Haiti -- and I'm not saying you were wrong in doing that -- that he had less control over what was occurring there; right?

MR. WU: Objection. Speculation.

THE COURT: Overruled.

THE WITNESS: I would agree, yeah.

BY MR. HOWARD:

Q. Okay. All right. And around this time of May 12, 2021, as a matter of fact he was trying to pass on information to you about Barbecue; right? We heard about that?

A. Yes, sir.

Q. And Barbecue is a gang leader down in Haiti; right?

A. Yes, sir.

Q. Probably the biggest one; right?

A. As far as we know, yes.

Q. And he was telling you that Barbecue wants to surrender, and you guys might be interested in this; right?

A. Yes, sir.

Q. And you told him, "Don't meet with Barbecue"; right?

A. Yes, sir.

Q. And you know he didn't because he never went to Haiti; right? He did not go to Haiti?
A. Correct, he didn't go to Haiti, but...
Q. Did Barbecue come here?
A. He was in contact with the intermediary, sir. He mentioned the gentlemen by the name of Torchon and St. Clair.
Q. Well, the intermediary that he was in touch with was the intermediary that he said would facilitate Barbecue's surrender; right?
A. Yeah, but I understood that to mean to meet with those intermediaries, not with Barbecue himself. Barbecue would not come to the United States.
Q. Fair enough, but what I'm saying was before you said, "Don't meet with Barbecue," he had already interfaced with this intermediary or he couldn't have told you that this intermediary wants to broker a deal?
A. Correct.
Q. So you know that he met with this person. Do you know that he met with this person, telephonically or otherwise, after you told him not to, or no?
A. If we can just go back. I don't know if he met with them in person. My understanding was he was in communications telephonically, like it wasn't an in-person meeting.
Q. Right. Okay.
A. I certainly wasn't aware of the communications that the

prosecution showed me in reference to his communications about Barbecue.
Q. You weren't aware of a lot of things; right? Fair to say?
A. Fair to say.
Q. And you wouldn't have been expected to because he wasn't sharing everything about the private business -- end of his business with you; right?
A. Correct.
Q. But before a person like Mr. Ortiz, a confidential human source, can ever be in a position to say, "Hey, you might want to check out this or you might want to check out that," he has to first be in the world and engaged; right?
A. Correct.
Q. Right.
He doesn't say, "Hey, I see a guy over there that looks suspicious. Can I go talk to him?" He goes and talks to him, he tries to engender some trust, and then he comes back to you and he reports; right?
A. Correct.
Q. So it wouldn't have been unusual, then, for him to talk to -- what's the name of this intermediary?
A. It was two gentlemen, Torchon and St. Clair.
Q. Right.
It wouldn't have been unusual for him to have been interfacing or coming across this man in the course of this

private business enterprise that he was handling remotely and then say, "Hey, you might want to talk to this guy"; right? Nothing unusual about that?
A. It wouldn't have been unusual, no.
Q. You just weren't interested?
A. That's -- that's not true. We --
Q. You were?
A. Yes, sir. I didn't want him to meet anybody, but we did collect that information, and we passed it on to --
Q. DEA maybe?
A. Well, there's an FBI investigation into Barbecue as well. I believe -- I believe there are several, and we passed the information along to individuals that are working that investigation.
Q. So this was, at least in your estimation, at the time that you were presented with it -- it seemed to be a useful piece of intel in any event; right? Kind of --
A. Not useful for me. It wasn't my investigation. But it might have been useful for somebody else. And part of our responsibility is to take it and to give it to whoever might have some use for it.
Q. When you say "somebody else," you mean US law enforcement?
A. Correct.
Q. The people who he is enthusiastic about helping; right?
A. Yes, yes.

Q. All right. 5/28, then, a few weeks later, is when you have this admonishment, "Don't introduce us to anybody else, Bro," I think you said; right?
A. Correct.
Q. "You might blow your cover"; right?
A. Yes.
Q. All right. Cool.
And that was a safety concern you had for him because you didn't want him going off getting himself killed?
A. Yes.
Q. And the Government introduced it and did not read it in its entirety, but tell me if this is what it said. I'm going to read the pertinent parts regarding Haiti and your admonishment and his response.
You said, "Regarding Haiti, do not bring me anything from the people involved in the meeting with George" -- George who?
A. That would be Special Agent Nunez, sir.
Q. You didn't say, "Don't take any of that to George." You said, "Don't bring none of that to me"; right? Right? That's what you said?
A. Yes, that's what I said. Yeah.
Q. "That situation went very badly with many." What were you talking about there?
A. Well, the US Embassy, they were upset about that. The FBI

Miami supervisors were upset about that.

Q. Okay. George got in trouble a little bit? He got rapped on the knuckles?

A. Well, I believe they had some questions as to why that group was showing up that they had met with George. I wasn't in that, so I can't speak to --

Q. Well, George told us there was no fallout. I'm asking you when you --

MR. WU: Objection. Spoke about another witness's testimony.

THE COURT: Sustained.

MR. HOWARD: I'll withdraw that, Your Honor. I'm sorry.

BY MR. HOWARD:

Q. When you say that "that situation" -- let me read more.

"That situation went very badly with many. I will not talk more about that, but I'll tell you one thing as a friend." Okay? So let me interrupt there.

It went badly; right? This whole Intriago showing up at the embassy in Haiti, it went badly; right?

A. Yes.

Q. People at the embassy down there were put out; right? They were --

A. Confused.

Q. -- unimpressed?

A. Yes.
Q. And the FBI supervisory contingent in Miami was also a tad annoyed; right? As a matter of fact, it went very badly for many; right? That's what you said?
A. Yes.
Q. And the only person whose name was dropped was Special Agent George Nunez; right?
A. Well, I'd have to read -- I don't remember the conversation verbatim.
Q. Okay.
A. I think the longest text I ever wrote him -- if I could have it on the screen, I would be able to read it along with you.
Q. It does mention, you say, "I will not talk more about that."
A. Right.
Q. But I would assume if it went very badly for many, it would go badly for the people whose names were implicated; right?
A. Well, yeah, I mean, it's a breakdown of procedure to have a confidential human source in any way having his business partner in this case --
Q. Essentially blow his cover?
A. Essentially, yeah. And based on his -- based on Mr. Ortiz's response --

Q. We're going to get to that. We're going to get to that.
A. Okay.
Q. All right. So you said that situation went very badly --
MR. WU: Can he finish the answer?
MR. HOWARD: I'm sorry.
THE COURT: I thought he was finished with the answer, so I'm going to let the agent finish with his answer and then we're going to take our break for lunch.
THE WITNESS: Based on the conversation with Mr. Ortiz, it seemed as if it was a misunderstanding attributed largely to his overeagerness, his pride in trying to help the United States Government that he apparently had expressed that he cared about so much, and we gave him an admonishment. I wrote it in text. We wrote it down and we -- I believe in future conversations as well, we also brought it up again, but yeah.
BY MR. HOWARD:
Q. So to summarize --
THE COURT: Yeah, can we summarize after the break? It's noon.
MR. HOWARD: I've got to remember, Judge. Thank you. I will.
THE COURT: That's all right. I wanted to break now because there's something I want to tell the jury before we break, okay, in terms of scheduling.

The Government's on track to -- if it doesn't rest by the end of the week by Friday, it would rest Monday. Right? That's kind of where we are in terms of timing.

As you know, because I mentioned this, if you remember, back at jury selection, or during the opening instructions, the defense obviously has no obligation to put on any case. Right? Only the Government has the burden in a criminal case.

If any of the defendants put on a case, my assessment of it, in speaking with the lawyers and just my experience, is that it would be a few days. It wouldn't be more than a week. Okay?

If a defendant puts on a case, the Government could put on a rebuttal case. That would be very -- again, if they do, because they don't have to put on a rebuttal case even if the defendant puts on a case. We're not talking about that being very lengthy.

I tell you all of that because I think we're on track, but we're sort of at the tail end of this. Okay? Once everybody rests, there will be closing arguments. Right? All the lawyers have will have the opportunity to address you. The Government will address you. The defense lawyers will address you. The Government, since it bears the burden, will address you last, and then I address you with the jury instructions. Right? It's at that point that you would begin

your deliberations.

We've been on schedule, which I have enjoyed, but we'll see when it's all over whether everybody agrees with me -- but I think it's made a long trial manageable, right, having two short days and three long days. I think I asked you last week whether you were willing to stay an extra hour or so, and, of course, everybody already has plans and all of that.

So what I want you all to think about is if you want to go to either five regular days like we do Monday, Wednesday, Friday -- do you just want to go to five full days starting next week or four days starting next week. And then I want you to think about for deliberations. Typically, juries deliberate the entire day. They wouldn't have a short day.

Once you start deliberating, though, the schedule is yours. So if you want to stay late, you can. If you want to leave early, you can. You're going to let us know how long you're going to deliberate.

So I tell you that because it's impossible for me to exactly time when closing arguments would be or exactly time when you would start deliberating, and those are time periods where I would want there to be full days. I don't want the closings to be broken up.

So, again, I don't think closing arguments are going

to be next week, but you might want to start having longer days so that you can get to your deliberations sooner and think about whether or not for deliberations you're prepared to stay for the full day.

I know you've all made plans, and it might be that this is our schedule to the end, which, of course, we're all comfortable with. But if you can and would like to make them longer days, talk about it during lunch, or talk about it with your family -- not with your family, talk about the timing, not the case. Right?

For those of you who have to make arrangements for children or parents or things like that, whenever you have an answer for me, if it's today or tomorrow, that would be great. It helps us plan. It helps me plan. I have hearings before and after this case, so I'm happy to move anything if you want to start staying for those longer days next week.

All right. Don't talk about the case with anyone, don't look anything up, and we'll see you in an hour.

(Jury exited at 12:05 PM.)

THE COURT: Anything on behalf of the United States before the lunch break?

MR. MCLAUGHLIN: This morning, Your Honor, we filed a motion to compel regarding the two additional law enforcement witnesses. The defense has filed sort of an omnibus response to that. So I don't know if the Court wants to take that up

later -- we can file a reply -- or if you just want to hear it orally. But just letting the Court know where we are.

THE COURT: I saw it. I haven't been able to read it, but I did see it come through.

I have a funeral to attend this evening. So at 4:30, whenever we break today, I do have to go, so I can't do it at the end of the day.

We can address it tomorrow morning. I have a civil hearing that won't take very long, so we can address sort of things like that in the morning, if that's fine.

MR. MCLAUGHLIN: Very well.

MR. HOWARD: On behalf of Ortiz, nothing other than your clock is throwing me off.

THE COURT: It's throwing us all off.

Okay. Nothing on behalf of Intriago?

Mr. Veintemilla?

MS. KUDMAN: Nothing, Your Honor.

THE COURT: Mr. Solages? Enjoy your lunch.

(Lunch recess at 12:07 PM.)

(See Afternoon Session for continuation.)

CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcription of the record of proceedings in the above-entitled matter prepared from my stenotype notes.

DATE: 30th of June, 2026

/s/*Lance W. Steinbeisser*
LANCE W. STEINBEISSER, FCRR, RPR, FPR-C
Official Court Reporter
United States District Court
Southern District of Florida
Miami, Florida

**$**

**$500** [1] - 43:24

**/**

**/s/Lance** [1] - 122:5

**0**

**0040** [1] - 51:16
**0719** [1] - 51:16

**1**

**1** [4] - 1:7, 89:16, 90:18, 104:2
**1.5** [1] - 79:4
**10** [1] - 37:16
**103B9** [2] - 60:9, 60:15
**106B2** [1] - 58:24
**106C** [6] - 51:15, 55:10, 58:15, 61:15, 66:18, 73:19
**108B5** [1] - 76:9
**10:07** [3] - 78:19, 79:1, 79:7
**10:19** [1] - 77:17
**10:21** [1] - 69:25
**10:35** [1] - 65:16
**10:36** [1] - 66:6
**10:45** [2] - 65:11, 65:12
**10:47** [1] - 70:4
**10:49** [2] - 66:6, 66:8
**11** [2] - 61:19, 61:20
**11:09** [3] - 89:13, 90:3, 90:9
**12** [2] - 62:15, 110:13
**122** [2] - 1:7, 3:8
**12:05** [1] - 120:19
**12:07** [2] - 1:6, 121:19
**147B** [1] - 55:22
**147C** [3] - 44:19, 62:24, 63:15
**147D** [1] - 71:23
**147E** [1] - 72:7
**15** [6] - 5:4, 36:22, 36:25, 43:4, 66:5, 89:3
**16** [2] - 3:4, 72:7
**16th** [2] - 16:23, 37:18
**18** [5] - 11:5, 11:9, 12:9, 52:11, 53:3
**18-month** [1] - 12:2
**19** [1] - 72:5
**199** [1] - 51:22
**1:00** [1] - 71:25
**1:20** [1] - 60:1
**1:44** [1] - 60:6
**1:46** [1] - 60:14
**1E1** [1] - 52:13
**1E4** [1] - 43:3
**1E6** [1] - 80:4
**1st** [1] - 90:12

**2**

**2** [3] - 19:14, 53:4, 53:13
**20-or-so** [1] - 70:7
**2007** [1] - 46:16
**2010** [1] - 48:16
**2018** [1] - 46:25
**2019** [3] - 76:4, 76:18, 76:23
**2020** [11] - 43:19, 43:21, 44:1, 44:5, 48:17, 48:18, 49:19, 83:16, 86:12, 87:10, 87:20
**2021** [57] - 9:15, 9:25, 10:21, 10:24, 12:3, 14:3, 14:11, 15:23, 30:10, 36:10, 36:22, 37:3, 37:12, 38:1, 43:19, 43:22, 44:1, 44:5, 44:14, 44:20, 45:9, 45:21, 48:19, 49:19, 51:2, 52:11, 53:3, 53:20, 56:4, 56:5, 58:17, 60:20, 61:19, 62:15, 63:22, 69:25, 70:4, 71:19, 72:1, 72:5, 72:9, 72:11, 73:5, 75:7, 76:24, 77:17, 78:19, 79:14, 80:8, 83:18, 83:24, 89:12, 89:16, 90:2, 90:12, 110:13
**2021-0224-WA0050** [1] - 58:23
**2023** [7] - 9:13, 9:24, 10:5, 10:14, 11:21, 11:23, 12:3
**2024** [3] - 10:19, 10:22, 10:24
**2026** [2] - 1:5, 122:4
**22** [2] - 1:5, 106:24
**22-CR-20104-Becerra** [1] - 4:4
**22-cr-20104-JB** [1] - 1:2
**229** [1] - 72:3
**23** [1] - 80:9
**230** [1] - 55:9
**236** [1] - 58:14
**25** [1] - 38:1
**251** [1] - 44:19
**26** [1] - 55:22
**27** [1] - 43:19
**27th** [1] - 15:23
**28** [6] - 22:14, 43:19, 56:3, 69:25, 70:4, 71:19
**28th** [1] - 16:24
**2:12** [1] - 52:11
**2:28** [1] - 79:9

**3**

**3** [2] - 52:13, 71:25
**3/18/2021** [1] - 52:21
**30** [3] - 1:5, 3:5, 5:7
**302s** [1] - 36:25
**305.523.5633** [1] - 1:19
**30th** [1] - 122:4
**31st** [3] - 89:12, 89:16, 90:2
**326** [1] - 61:14
**33128** [1] - 1:19
**360** [1] - 66:17
**387** [1] - 78:17
**388** [1] - 73:19
**39** [1] - 3:5

**4**

**4** [1] - 60:15
**400** [1] - 1:18
**411** [2] - 75:3, 77:5
**412** [1] - 75:21
**413** [3] - 76:17, 77:1, 77:14
**42** [1] - 71:23
**46** [1] - 3:7
**4:30** [1] - 121:5

**5**

**5** [4] - 35:2, 35:25, 43:20, 78:24
**5/28** [1] - 114:1
**500's** [1] - 44:2
**512** [1] - 109:21
**59E3D** [1] - 76:9

**6**

**6** [12] - 3:4, 6:9, 14:11, 17:2, 27:14, 30:10, 32:13, 37:3, 60:9, 96:16, 104:2, 105:13
**6th** [2] - 14:2, 97:12

**7**

**7** [12] - 36:5, 36:17, 73:5, 73:7, 75:7, 77:17, 78:19, 78:25, 79:14, 83:24, 105:24, 106:5
**762** [2] - 59:5, 59:6
**7th** [2] - 37:12, 83:18

**8**

**8** [5] - 55:17, 55:19, 56:4, 56:5, 58:17
**80** [1] - 3:7

**9**

**98** [1] - 62:24
**99** [1] - 55:1
**9:05** [1] - 1:6
**9:07** [1] - 5:20

**A**

**abilities** [1] - 83:9
**ability** [2] - 102:13, 109:25
**able** [11] - 12:1, 13:9, 56:23, 67:18, 74:3, 79:8, 83:3, 83:12, 103:22, 116:12, 121:3
**above-entitled** [1] - 122:3
**abroad** [2] - 38:1, 38:10
**absolutely** [3] - 38:9, 86:1, 97:16
**academy** [1] - 46:20
**accept** [1] - 99:24
**access** [4] - 10:20, 10:21, 69:17, 69:18
**accompanied** [1] - 100:4
**accompanying** [3] - 75:17, 75:19, 78:10
**accomplishments** [1] - 84:6
**according** [1] - 28:20
**acknowledged** [1] - 67:4
**Act** [1] - 79:20
**act** [1] - 68:9
**action** [2] - 107:19, 107:21
**actionable** [1] - 56:15
**activities** [3] - 38:3, 57:16, 61:7
**activity** [16] - 33:15, 34:7, 35:9, 47:17, 49:4, 50:4, 53:5, 53:6, 53:14, 53:15, 54:11, 69:1, 69:5, 82:8, 84:19
**actors** [2] - 90:23, 90:25
**acts** [1] - 50:25
**actual** [1] - 84:18
**add** [2] - 23:5, 82:25
**additional** [5] - 21:15, 23:1, 23:6, 83:9, 120:23
**address** [10] - 55:15, 88:10, 107:12, 118:21, 118:22, 118:23, 118:24, 121:8, 121:9
**addressed** [1] - 103:7
**administered** [1] - 52:20
**admittedly** [1] - 92:16
**admonish** [2] - 101:13, 105:10
**admonished** [4] - 25:21, 98:13, 101:11, 102:3
**admonishing** [1] - 99:4
**admonishment** [6] - 58:9, 65:1, 101:23, 114:2, 114:14, 117:14
**admonishments** [3] - 52:17, 52:19, 66:14
**advance** [1] - 92:11
**advanced** [2] - 107:25
**advisable** [1] - 97:6
**advisor** [1] - 105:2
**affable** [2] - 85:8, 85:10
**Afternoon** [1] - 121:20
**agencies** [2] - 7:9,

47:24
**agency** [8] - 26:5, 32:25, 33:9, 68:19, 70:12, 81:2, 81:5, 81:10
**agent** [15] - 4:10, 9:5, 23:25, 24:1, 26:22, 27:22, 36:23, 42:25, 48:20, 80:25, 81:1, 81:13, 83:4, 83:8, 117:7
**Agent** [44] - 4:11, 8:16, 9:4, 9:9, 9:14, 9:24, 18:13, 26:8, 26:13, 26:23, 28:12, 29:1, 39:25, 48:22, 54:25, 55:1, 56:14, 57:9, 57:10, 64:2, 64:8, 64:10, 64:15, 64:23, 80:11, 81:16, 81:17, 81:19, 81:24, 98:3, 98:9, 99:5, 99:14, 99:17, 100:3, 100:4, 101:4, 101:6, 101:12, 101:16, 109:6, 114:18, 116:7
**agent's** [2] - 81:13, 99:2
**agents** [2] - 12:9, 81:15
**agree** [6] - 30:23, 35:22, 35:23, 88:3, 88:6, 110:11
**agreed** [1] - 23:2
**agreement** [8] - 22:20, 22:23, 24:22, 50:21, 52:8, 52:24, 63:4, 63:6
**agrees** [1] - 119:3
**ahead** [6] - 63:21, 68:14, 103:25, 104:10, 104:17, 105:12
**aid** [2] - 7:19, 89:22
**aided** [1] - 1:22
**airport** [2] - 72:5, 105:14
**AK** [1] - 59:4
**AK-47** [1] - 59:10
**al** [1] - 1:6
**alert** [1] - 92:11
**alias** [1] - 61:21
**alive** [1] - 104:10
**allegedly** [1] - 76:23
**allow** [4] - 107:15, 107:18, 107:25, 109:9
**allowed** [4] - 68:18, 68:23, 107:16, 108:16
**alluded** [1] - 78:15
**almost** [2] - 57:10, 82:5
**Aloe** [1] - 2:19
**alone** [1] - 56:21
**Altanese** [1] - 4:10
**ALTANESE** [1] - 2:5
**AM** [9] - 1:6, 5:20, 65:16, 66:6, 66:8, 71:25, 79:1, 79:7
**amended** [2] - 37:13, 37:14
**America** [2] - 47:11
**AMERICA** [1] - 1:4
**American** [2] - 28:17, 38:5
**Americans** [1] - 38:1
**amicable** [3] - 49:1, 85:9, 86:1
**ammunition** [1] - 59:8
**amnesty** [1] - 63:4
**amount** [1] - 108:14
**ANDREW** [1] - 2:4
**Andrew** [1] - 4:9
**announce** [2] - 4:5, 24:25
**annoyed** [1] - 116:3
**annual** [2] - 43:8, 43:9
**answer** [8] - 8:12, 32:11, 34:14, 100:15, 117:4, 117:7, 120:13
**answered** [5] - 13:19, 13:20, 13:22, 73:2, 100:14
**Antonio** [6] - 4:3, 4:16, 16:20, 21:21, 23:11, 23:20
**anytime** [1] - 40:25
**AOR** [1] - 47:10
**apologies** [2] - 53:11, 58:6
**apologize** [2] - 73:3, 76:6
**apology** [1] - 71:13
**appear** [4] - 60:10, 60:18, 62:2, 78:4
**appearance** [2] - 67:13, 67:25
**appearances** [1] - 4:5
**APPEARANCES** [1] - 2:1
**appeared** [3] - 17:18, 64:3, 76:1
**Apple** [1] - 41:17
**application** [2] - 51:7, 107:22
**apply** [1] - 7:12
**appreciation** [2] - 57:1, 87:7
**approach** [1] - 8:24
**approached** [6] - 9:8, 9:10, 9:11, 9:12, 91:20, 92:3
**appropriate** [2] - 54:13, 88:15
**appropriation** [1] - 54:7
**April** [36] - 1:5, 6:9, 14:3, 14:11, 16:24, 17:2, 22:14, 23:4, 27:14, 30:10, 32:13, 34:4, 37:3, 53:20, 53:22, 55:4, 55:6, 55:17, 55:19, 56:4, 56:5, 58:17, 60:20, 64:25, 65:1, 68:3, 89:16, 90:12, 90:18, 96:16, 104:2, 105:13, 105:24, 106:5, 106:24
**Arcangel** [4] - 4:3, 16:9, 48:2, 63:6
**ARCANGEL** [1] - 1:6
**area** [2] - 47:10, 51:6
**areas** [1] - 49:16
**arguing** [1] - 36:12
**argumentative** [7] - 7:25, 26:9, 38:25, 39:4, 39:5, 99:10, 100:6
**arguments** [3] - 118:20, 119:21, 119:25
**army** [3] - 91:9, 91:10, 94:3
**Army** [1] - 19:23
**arrangement** [1] - 50:6
**arrangements** [1] - 120:11
**arrest** [9] - 72:13, 73:12, 74:9, 76:2, 76:21, 77:7, 78:9
**arrested** [1] - 72:17
**arrests** [1] - 49:24
**arrived** [1] - 17:17
**arriving** [2] - 105:14, 105:15
**aside** [1] - 50:24
**assassinated** [2] - 73:6, 74:13
**assassination** [2] - 12:19, 22:17
**assault** [1] - 59:10
**assess** [3] - 57:20, 103:1, 105:18
**assessment** [4] - 43:9, 43:10, 95:13, 118:9
**assign** [1] - 63:6
**assigned** [4] - 33:4, 33:6, 47:8, 81:11
**assignment** [2] - 81:9, 87:21
**assistance** [1] - 30:16
**Assistant** [2] - 14:12, 14:17
**assisted** [1] - 6:20
**assisting** [2] - 73:10, 81:18
**associated** [1] - 70:3
**Associates** [1] - 2:13
**association** [3] - 15:12, 25:16, 25:23
**assume** [4] - 9:21, 11:20, 89:1, 116:17
**assuming** [1] - 31:1
**assumption** [1] - 108:6
**attachments** [1] - 34:12
**attack** [1] - 71:24
**attempted** [2] - 10:16, 10:19
**attempts** [2] - 10:20, 10:22
**attend** [7] - 46:19, 99:8, 100:5, 100:25, 101:1, 101:4, 121:5
**attended** [1] - 16:23
**attending** [1] - 104:22
**attention** [12] - 43:3, 51:2, 51:22, 52:4, 55:10, 58:14, 61:17, 62:13, 73:21, 102:9, 102:24, 106:21
**attitude** [2] - 48:24, 84:22
**Attorney** [2] - 14:13, 14:17
**attorney** [2] - 2:4, 4:9
**Attorney's** [1] - 2:5
**attributed** [1] - 117:11
**au** [2] - 58:3, 72:5
**audio** [2] - 7:17, 73:13
**August** [3] - 37:16, 37:18, 44:5
**Augustyniak** [3] - 26:13, 26:14, 28:12
**AUSA** [5] - 2:3, 2:4, 2:5, 4:9, 4:10
**authorities** [1] - 47:4
**authority** [1] - 76:19
**authorization** [6] - 50:10, 53:7, 107:24, 108:19, 108:20, 108:22
**authorize** [1] - 109:24
**authorized** [6] - 50:14, 53:4, 53:13, 69:1, 69:2, 69:4
**automatically** [2] - 15:20, 15:21
**available** [2] - 49:6, 54:14
**Avenue** [1] - 1:18
**avoid** [3] - 40:22, 41:5, 49:6
**aware** [52] - 6:18, 9:13, 9:15, 9:17, 9:21, 9:24, 10:1, 10:2, 10:3, 10:4, 10:11, 10:12, 10:14, 10:15, 10:16, 10:19, 10:20, 10:21, 10:24, 11:1, 18:11, 21:22, 23:18, 23:21, 24:16, 24:19, 29:7, 29:8, 29:11, 57:20, 68:16, 76:20, 84:13, 84:16, 84:20, 86:12, 86:15, 86:16, 86:18, 86:20, 88:9, 88:21, 89:6, 89:8, 91:25, 92:5, 99:14, 101:24, 108:9, 111:25, 112:3
**awareness** [2] - 41:7, 48:16

## B

**backed** [2] - 41:14, 41:17
**background** [2] - 16:25, 57:21
**bad** [10] - 39:19, 56:1, 67:11, 68:20, 68:23, 96:4, 97:11, 97:21, 97:24
**badly** [8] - 114:23,

115:16, 115:19, 115:20, 116:3, 116:17, 116:18, 117:3
**bag** [1] - 62:10
**ballistic** [3] - 60:7, 60:8, 60:18
**ballpark** [1] - 93:24
**band** [1] - 44:10
**bank** [2] - 102:10, 102:13
**Barbecue** [18] - 61:21, 62:1, 62:3, 62:7, 62:20, 63:4, 63:10, 63:16, 110:15, 110:17, 110:21, 110:24, 111:4, 111:11, 111:14, 112:2, 113:11
**Barbecue's** [2] - 63:1, 111:8
**barely** [1] - 15:25
**Barzee** [1] - 2:15
**base** [2] - 49:13, 64:5
**based** [9] - 45:6, 45:15, 49:21, 50:6, 94:11, 101:16, 116:24, 117:9
**bears** [2] - 76:24, 118:23
**became** [1] - 48:22
**BECERRA** [1] - 1:11
**become** [2] - 46:17, 79:23
**BEFORE** [1] - 1:11
**began** [6] - 46:25, 48:16, 73:9, 73:15, 78:5, 79:21
**begin** [3] - 53:11, 63:18, 118:25
**beginning** [3] - 18:23, 76:19, 108:10
**BEHALF** [4] - 2:7, 2:12, 2:16, 2:21
**behalf** [15] - 4:8, 4:13, 4:19, 4:22, 5:9, 29:23, 29:25, 64:15, 65:19, 83:19, 89:4, 107:21, 120:20, 121:12, 121:15
**benefit** [7] - 67:14, 68:1, 68:9, 68:13, 70:13, 85:15, 85:16
**benefits** [1] - 57:15
**Bent** [9] - 26:23, 27:18, 28:5, 55:1, 57:10, 98:3, 100:4, 101:6
**bequest** [1] - 107:9
**best** [8] - 14:3, 14:4, 49:5, 49:22, 67:18, 75:25, 88:3, 100:1
**BETH** [1] - 2:19
**better** [4] - 66:25, 85:18, 98:8, 105:5
**between** [11] - 25:17, 26:12, 43:21, 51:21, 63:9, 65:3, 65:8, 70:5, 73:20, 82:13, 85:14
**beyond** [1] - 88:20
**big** [2] - 32:22, 56:1
**biggest** [1] - 110:19
**bilingual** [1] - 52:1
**bit** [14] - 6:13, 23:16, 28:10, 40:12, 40:18, 40:19, 48:1, 57:5, 81:21, 93:9, 101:15, 107:11, 108:5, 115:2
**blow** [4] - 98:16, 98:20, 114:5, 116:23
**blue** [5] - 48:10, 55:11, 66:19, 75:9, 77:15
**Bolivia** [11] - 18:12, 86:21, 87:6, 88:9, 88:11, 88:14, 92:13, 107:13, 107:17, 108:21
**Bolivian** [4] - 86:23, 87:3, 87:22, 87:23
**border** [1] - 47:17
**Border** [7] - 33:2, 33:5, 33:6, 46:15, 47:17, 47:22, 81:3
**bottom** [3] - 60:16, 71:14, 75:5
**box** [1] - 66:19
**branch** [1] - 91:12
**breaches** [1] - 41:21
**break** [10] - 5:16, 65:11, 65:15, 65:20, 117:8, 117:19, 117:23, 117:25, 120:21, 121:6
**breakdown** [1] - 116:20
**breaking** [1] - 81:21
**briefly** [4] - 40:20, 41:13, 59:2, 78:20
**Briggs** [1] - 4:10
**BRIGGS** [1] - 2:4
**bring** [16] - 5:19, 24:15, 37:25, 49:3, 66:7, 67:9, 68:20, 68:23, 71:20, 102:24, 102:25, 103:23, 104:11, 104:18, 114:15, 114:20
**bringing** [1] - 102:9
**bro** [1] - 86:9
**Bro** [1] - 114:3
**broken** [1] - 119:24
**broker** [3] - 65:3, 65:8, 111:16
**Brother** [1] - 70:11
**brought** [4] - 78:13, 79:17, 106:21, 117:15
**build** [2] - 44:3, 49:18
**building** [1] - 56:1
**burden** [2] - 118:7, 118:23
**business** [46] - 16:25, 17:6, 17:17, 22:3, 24:5, 40:16, 53:24, 56:22, 59:15, 59:16, 61:11, 64:13, 64:18, 68:4, 68:10, 68:13, 70:20, 86:16, 86:19, 88:14, 88:21, 92:9, 92:19, 92:21, 93:20, 93:23, 94:19, 97:13, 97:14, 97:15, 105:6, 105:7, 107:9, 107:11, 107:16, 107:17, 108:7, 108:11, 108:17, 109:10, 109:24, 112:6, 112:7, 113:1, 116:21
**but..** [1] - 111:3
**butcher** [1] - 26:13
**buying** [2] - 31:15, 61:11
**BY** [41] - 6:3, 8:3, 10:10, 13:25, 15:1, 16:17, 19:15, 20:15, 26:11, 30:6, 36:15, 39:1, 39:7, 39:24, 41:25, 42:20, 45:5, 45:13, 45:20, 46:9, 48:13, 53:16, 59:1, 59:13, 59:25, 60:5, 60:13, 61:16, 66:11, 72:23, 73:4, 78:21, 80:15, 87:16, 99:18, 100:8, 100:19, 104:1, 110:12, 115:14, 117:17

## C

**cameras** [5] - 29:6, 29:11, 29:16, 29:18, 29:19
**campaigned** [1] - 92:4
**CAMPO** [2] - 2:8, 65:23
**Campo** [2] - 2:9, 4:13
**canceled** [1] - 67:16
**cancellation** [1] - 57:14
**candidate** [1] - 74:6
**candidly** [2] - 92:20, 92:23
**capacity** [1] - 46:23
**capture** [3] - 7:6, 7:8, 72:5
**capturing** [1] - 6:23
**cared** [1] - 117:13
**career** [2] - 46:13, 46:24
**carefully** [1] - 21:20
**Caribbean** [1] - 47:12
**cartels** [1] - 47:13
**cartridge** [1] - 59:7
**CASE** [1] - 1:2
**case** [21] - 4:2, 4:10, 38:7, 38:8, 44:3, 47:5, 49:18, 49:21, 83:4, 88:18, 116:22, 118:7, 118:8, 118:9, 118:13, 118:14, 118:15, 118:16, 120:10, 120:15, 120:17
**Case** [1] - 4:4
**cases** [1] - 81:13
**catch** [1] - 50:5
**CBP** [3] - 46:17, 47:17, 47:23
**Cellebrite** [1] - 51:20
**Center** [1] - 46:20
**center** [1] - 52:4
**Central** [1] - 47:11
**certain** [6] - 12:12, 41:13, 49:13, 50:3, 67:17, 83:2
**certainly** [1] - 111:25
**CERTIFICATE** [1] - 122:1
**certificate** [2] - 56:25, 87:7
**Certificate** [1] - 3:8
**Certified** [1] - 1:17
**certify** [1] - 122:2
**chalked** [1] - 70:21
**change** [2] - 20:17, 69:9
**changed** [1] - 109:19
**changing** [2] - 48:1, 54:19
**chaotic** [2] - 73:14, 77:20
**characterize** [1] - 71:12
**charged** [1] - 47:18
**chat** [13] - 51:15, 55:10, 58:15, 61:15, 61:17, 61:18, 62:13, 62:14, 62:16, 66:18, 73:20, 78:22, 89:21
**check** [16] - 11:16, 32:23, 32:24, 38:3, 38:6, 70:19, 93:19, 94:1, 94:2, 94:17, 94:20, 94:24, 95:3, 112:11
**checked** [4] - 36:11, 38:21, 94:3, 96:13
**children** [1] - 120:12
**chose** [1] - 95:3
**Christian** [6] - 33:21, 39:13, 74:5, 90:13, 90:19
**CHS** [9] - 7:4, 24:2, 25:14, 41:1, 41:19, 41:21, 53:4, 53:13, 84:6
**CHSs** [2] - 43:9, 53:7
**circle** [1] - 107:8
**citizens** [1] - 38:10
**City** [1] - 57:1
**city** [1] - 91:1
**civil** [1] - 121:8
**civilians** [1] - 98:19
**claim** [1] - 75:18
**claimed** [1] - 74:12
**claiming** [1] - 25:19
**Clair** [3] - 62:5, 111:6, 112:22
**clarification** [1] - 64:10
**clarified** [1] - 104:3
**clarify** [2] - 85:13, 104:5
**clean** [1] - 12:9
**clear** [4] - 64:5, 74:4, 74:21, 79:22
**clients** [2] - 53:23, 90:24

**clock** [1] - 121:13
**close** [7] - 15:6, 15:7, 15:15, 15:17, 16:4, 68:14
**closed** [5] - 15:21, 15:23, 16:5, 16:6, 80:8
**closer** [1] - 72:20
**closing** [5] - 15:11, 80:6, 118:20, 119:21, 119:25
**closings** [1] - 119:24
**closure** [2] - 57:13, 63:18
**clothing** [1] - 48:7
**cloud** [4] - 35:19, 35:20, 36:11, 41:14
**coerced** [1] - 50:20
**cohandler** [4] - 48:23, 82:19, 82:24, 82:25
**colleagues** [2] - 6:10, 6:15
**collect** [2] - 97:8, 113:9
**collecting** [2] - 40:15, 73:15
**colloquialisms** [1] - 85:20
**Colombia** [1] - 49:14
**Colombian** [1] - 49:12
**Colombians** [1] - 23:20
**combat** [1] - 47:5
**combatting** [1] - 47:13
**combination** [2] - 47:3, 91:16
**comfortable** [1] - 120:7
**coming** [5] - 29:15, 31:8, 31:15, 67:4, 112:25
**commit** [7] - 50:3, 50:14, 50:19, 68:19, 68:23, 69:2, 69:4
**comms** [1] - 13:1
**communicate** [8] - 12:23, 12:25, 51:3, 51:6, 51:10, 69:19, 106:20
**communicated** [3] - 51:5, 94:10, 94:11
**communication** [6] - 62:2, 73:10, 74:1, 80:10, 109:20, 110:5
**communications** [22] - 6:24, 7:13, 7:17, 7:18, 13:5, 13:8, 13:18, 14:21, 40:23, 40:25, 51:11, 51:13, 51:21, 58:20, 61:2, 73:24, 85:10, 99:13, 111:22, 111:25, 112:1
**company** [17] - 17:7, 17:9, 17:11, 24:6, 28:24, 29:2, 61:11, 67:14, 68:1, 68:4, 74:4, 78:7, 86:13, 87:2, 89:7, 91:20, 109:23
**company's** [1] - 86:16
**compare** [3] - 52:22, 60:9, 60:17
**compared** [1] - 60:8
**compel** [3] - 101:1, 101:4, 120:23
**competing** [1] - 96:16
**complaint** [1] - 28:19
**complete** [2] - 56:19, 106:7
**complicated** [1] - 107:23
**component** [1] - 51:15
**compromise** [1] - 41:19
**computer** [1] - 1:22
**computer-aided** [1] - 1:22
**concern** [6] - 60:24, 67:24, 96:8, 98:24, 98:25, 114:8
**concerned** [6] - 16:8, 73:13, 92:10, 98:16, 98:18, 99:1
**concerning** [3] - 14:1, 82:8, 84:19
**conclude** [1] - 44:7
**concluded** [1] - 16:3
**conduct** [2] - 16:24, 47:15
**conducted** [2] - 86:24, 95:11
**conducting** [4] - 9:19, 13:12, 50:20
**conference** [1] - 32:13
**confidential** [36] - 8:25, 9:7, 12:17, 13:7, 13:15, 15:8, 15:11, 15:15, 18:6, 24:14, 40:6, 40:7, 40:8, 40:10, 40:14, 43:12, 48:15, 49:3, 50:3, 50:7, 50:13, 52:18, 55:25, 57:8, 57:12, 69:3, 69:16, 79:13, 79:25, 81:14, 86:3, 99:22, 102:23, 108:15, 112:9, 116:21
**confused** [1] - 115:24
**confusing** [2] - 73:9, 78:9
**confusion** [1] - 76:22
**conjunction** [1] - 94:12
**connected** [1] - 19:21
**connection** [2] - 25:3, 88:8
**connections** [1] - 56:13
**consequences** [2] - 63:18, 70:13
**conservative** [2] - 108:14, 109:6
**conspiracy** [1] - 7:23
**conspired** [1] - 8:6
**constant** [1] - 12:22
**consulting** [1] - 14:12
**contact** [17] - 6:12, 6:14, 12:18, 24:1, 25:6, 51:8, 62:1, 64:9, 73:8, 80:7, 80:9, 82:14, 82:16, 82:17, 88:13, 111:5
**contacts** [5] - 25:23, 54:24, 65:8, 68:7, 71:5
**contained** [1] - 12:9
**container** [1] - 58:2
**contents** [1] - 9:14
**context** [1] - 89:24
**contingent** [1] - 116:2
**continuation** [1] - 121:20
**continue** [5] - 5:21, 60:20, 66:9, 79:13, 105:6
**continued** [2] - 20:19, 46:21
**Continued** [1] - 3:4
**CONTINUED** [1] - 6:2
**contract** [1] - 86:22
**contracted** [5] - 15:12, 74:5, 87:2, 87:22, 89:7
**contracting** [2] - 87:3, 87:23
**contracts** [1] - 65:3
**contractual** [1] - 92:9
**contractually** [1] - 24:21
**contribute** [1] - 83:21
**contributed** [2] - 83:25, 84:3
**control** [9] - 7:1, 7:3, 7:4, 11:11, 24:3, 68:19, 81:17, 109:25, 110:8
**conversation** [15] - 18:20, 18:21, 18:22, 58:11, 64:25, 65:7, 68:2, 75:4, 78:13, 91:13, 91:14, 91:17, 106:4, 116:9, 117:9
**conversations** [1] - 117:15
**convey** [2] - 67:1, 96:8
**conveyed** [1] - 92:1
**conviction** [1] - 84:18
**convoys** [4] - 87:3, 87:4, 87:19, 87:24
**cool** [1] - 114:7
**cordial** [1] - 85:19
**corner** [1] - 32:13
**corporation** [1] - 17:6
**correct** [71] - 6:11, 7:10, 13:13, 13:14, 14:16, 16:2, 16:11, 16:13, 17:2, 17:12, 18:8, 18:10, 18:21, 19:3, 19:17, 20:1, 20:20, 21:12, 22:15, 22:16, 24:7, 24:8, 27:6, 30:8, 30:11, 30:16, 31:6, 31:16, 31:17, 31:21, 31:22, 32:2, 32:7, 33:11, 33:17, 33:18, 33:24, 35:2, 36:17, 37:17, 37:24, 38:12, 40:21, 74:3, 81:6, 82:9, 88:5, 88:7, 92:22, 93:3, 95:5, 95:18, 97:8, 98:11, 99:9, 99:25, 100:23, 101:19, 101:21, 102:7, 102:22, 109:17, 111:3, 111:17, 112:8, 112:13, 112:19, 113:23, 114:4, 122:2
**correcting** [1] - 6:7
**correctly** [1] - 15:9
**corruption** [5] - 49:21, 57:25, 93:1, 102:12, 102:20
**Counsel** [2] - 13:21, 36:14
**counsel** [6] - 4:5, 4:9, 4:17, 36:12, 42:3, 44:9
**counterterrorism** [1] - 60:24
**countries** [3] - 38:2, 42:22, 49:10
**country** [6] - 18:14, 32:2, 53:21, 71:2, 76:20, 88:17
**County** [1] - 33:7
**couple** [1] - 18:12
**course** [6] - 15:2, 58:1, 99:16, 112:25, 119:7, 120:6
**court** [3] - 4:20, 4:23, 53:9
**COURT** [55] - 1:1, 4:24, 5:5, 5:9, 5:11, 5:14, 5:19, 5:21, 8:2, 10:9, 13:20, 13:23, 14:25, 16:15, 26:10, 29:22, 29:25, 30:2, 36:13, 39:3, 39:5, 39:22, 42:19, 45:3, 45:11, 45:19, 45:25, 53:8, 65:12, 65:15, 65:17, 65:22, 65:24, 66:1, 66:3, 66:5, 66:7, 66:9, 72:19, 72:22, 73:2, 80:13, 87:13, 99:11, 100:7, 100:15, 110:10, 115:11, 117:6, 117:19, 117:23, 120:20, 121:3, 121:14, 121:18
**Court** [7] - 1:18, 4:1, 30:4, 120:25, 121:2, 122:6, 122:6
**COURTROOM** [3] - 4:2, 46:3, 46:5
**courtroom** [2] - 48:5, 59:20
**covenants** [1] - 50:24
**cover** [5] - 98:16, 98:20, 98:22, 114:5, 116:23
**covered** [1] - 6:19

**covers** [2] - 43:18, 43:19
**Creole** [1] - 76:3
**crime** [4] - 47:1, 47:6, 47:9, 50:19
**crimes** [1] - 50:13
**criminal** [19] - 15:16, 15:20, 31:4, 34:6, 35:8, 44:3, 49:4, 50:4, 53:5, 53:6, 53:14, 53:15, 61:25, 69:1, 82:8, 82:11, 84:19, 118:8
**criminals** [1] - 50:5
**cross** [4] - 5:2, 5:22, 47:17, 80:13
**Cross** [4] - 3:4, 3:4, 3:5, 3:7
**CROSS** [4] - 6:2, 16:16, 30:5, 80:14
**cross-border** [1] - 47:17
**cross-examination** [3] - 5:2, 5:22, 80:13
**Cross-Examination** [4] - 3:4, 3:4, 3:5, 3:7
**CROSS-EXAMINATION** [4] - 6:2, 16:16, 30:5, 80:14
**crude** [1] - 58:6
**CTU** [9] - 29:7, 29:12, 45:7, 45:16, 72:12, 74:15, 86:19, 87:7, 89:7
**CTU's** [1] - 74:8
**culture** [1] - 86:8
**current** [1] - 77:16
**Custom** [2] - 33:4, 33:6
**customs** [2] - 47:18, 47:22
**Customs** [4] - 33:2, 46:15, 47:17, 81:3
**cut** [2] - 16:10, 18:21
**cycles** [1] - 12:2

## D

**D-A-N-I-E-L** [1] - 46:12
**Dade** [1] - 33:7
**damaged** [1] - 36:20
**dangerous** [2] - 61:21, 91:23
**Daniel** [3] - 46:2, 46:7, 109:6
**DANIEL** [2] - 3:6, 46:4
**DANIELA** [1] - 2:8
**Daniela** [1] - 4:13
**dark** [1] - 106:18
**data** [1] - 41:21
**database** [6] - 94:7, 94:9, 94:13, 95:9, 95:10, 96:10
**DATE** [1] - 122:4
**date** [16] - 11:14, 52:9, 52:19, 52:22, 53:1, 58:16, 61:18, 62:14, 63:12, 70:3, 75:5, 76:4, 78:17, 89:15
**dated** [1] - 76:23
**dates** [2] - 40:25, 43:17
**DAVID** [3] - 2:10, 19:25, 20:8
**David** [2] - 2:10, 4:12
**days** [14] - 63:9, 63:13, 65:18, 79:17, 118:11, 119:5, 119:10, 119:11, 119:12, 119:23, 120:2, 120:8, 120:16
**DEA** [9] - 6:20, 15:4, 88:22, 89:4, 102:19, 108:18, 108:23, 109:8, 113:10
**dead** [1] - 78:7
**deal** [5] - 56:23, 97:14, 97:16, 105:1, 111:16
**dealing** [1] - 105:5
**dealings** [1] - 61:11
**death** [2] - 8:21, 37:11
**debrief** [8] - 27:7, 27:8, 27:13, 27:18, 28:5, 73:18, 79:17, 104:11
**debriefed** [8] - 26:23, 26:25, 27:5, 27:15, 27:23, 28:1, 28:7, 28:8
**debriefing** [3] - 27:1, 27:2, 81:20
**debriefs** [2] - 79:18, 79:22
**December** [3] - 86:12, 87:10, 87:20
**decide** [1] - 65:5
**decided** [7] - 22:21, 100:9, 100:12, 100:20, 101:8, 101:22
**decision** [2] - 99:6, 102:16
**decline** [2] - 99:24, 100:1
**declined** [2] - 94:14, 95:19
**deemed** [1] - 84:22
**deep** [1] - 98:6
**defend** [1] - 67:18
**Defendant** [28] - 40:1, 40:20, 41:7, 41:10, 42:2, 42:4, 42:7, 42:12, 43:15, 43:22, 44:4, 48:12, 48:18, 49:18, 51:3, 52:10, 52:23, 53:3, 54:23, 58:12, 58:18, 59:15, 64:11, 64:21, 70:10, 77:18, 79:13, 80:7
**DEFENDANT** [4] - 2:7, 2:12, 2:16, 2:21
**defendant** [3] - 16:8, 118:13, 118:16
**Defendants** [1] - 1:7
**defendants** [1] - 118:9
**defense** [6] - 44:9, 50:20, 91:21, 118:6, 118:22, 120:24
**Defense** [1] - 19:14
**deferred** [2] - 107:19, 107:21
**degree** [1] - 81:22
**delegation** [1] - 30:13
**deliberate** [2] - 119:14, 119:19
**deliberating** [2] - 119:16, 119:22
**deliberations** [4] - 119:1, 119:13, 120:2, 120:3
**deliver** [1] - 21:9
**delivered** [1] - 53:2
**denied** [3] - 107:4, 109:18, 109:19
**deny** [1] - 107:5
**depart** [1] - 108:1
**departing** [1] - 48:20
**department** [3] - 11:6, 11:20, 36:1
**Department** [1] - 56:19
**DEPUTY** [3] - 4:2, 46:3, 46:5
**DESCALZO** [3] - 2:17, 4:18, 66:2
**Descalzo** [2] - 2:18, 4:19
**describe** [4] - 47:7, 48:7, 61:23, 75:1
**describing** [2] - 74:21, 81:20
**detail** [1] - 78:16
**details** [3] - 18:15, 23:1, 110:1
**determine** [1] - 13:10
**developed** [1] - 81:25
**device** [2] - 7:4, 36:16
**devices** [2] - 36:18, 36:19
**dialogue** [1] - 40:3
**died** [2] - 36:16, 36:19
**different** [4] - 34:1, 37:22, 37:23, 108:8
**differently** [1] - 35:24
**difficult** [3] - 57:22, 102:11, 102:14
**diplomatic** [3] - 30:22, 31:1, 31:2
**direct** [10] - 13:1, 33:22, 33:23, 34:9, 42:15, 55:10, 61:3, 62:2, 92:8, 98:12
**DIRECT** [1] - 46:8
**Direct** [1] - 3:7
**directed** [1] - 25:20
**directing** [5] - 43:3, 58:14, 61:17, 62:13, 73:21
**direction** [1] - 40:6
**disabuse** [1] - 106:15
**disbursed** [1] - 81:14
**disclosing** [1] - 23:25
**discussed** [2] - 6:7, 103:10
**discussing** [1] - 83:16
**discussion** [4] - 14:19, 18:18, 22:8, 101:17
**display** [1] - 77:16
**disposition** [1] - 82:11
**disrespect** [1] - 57:22
**DISTRICT** [3] - 1:1, 1:1, 1:12
**District** [3] - 1:18, 122:6, 122:7
**DIVISION** [1] - 1:2
**DO** [2] - 2:8, 65:23
**document** [12] - 22:21, 23:2, 23:6, 41:4, 43:5, 52:14, 76:1, 76:8, 76:12, 76:14, 76:16, 80:6
**documented** [2] - 65:2, 103:15
**documents** [1] - 40:13
**DOJ** [2] - 2:4, 4:9
**done** [10] - 58:10, 63:14, 69:19, 72:15, 72:25, 83:4, 83:22, 83:23, 84:6
**Doral** [1] - 30:10
**down** [18] - 20:14, 22:24, 27:2, 29:18, 29:19, 33:19, 53:8, 54:22, 75:21, 81:21, 86:24, 102:12, 102:20, 103:9, 109:24, 110:17, 115:22, 117:14
**download** [1] - 8:25
**drafted** [1] - 37:7
**DRAY** [14] - 2:23, 5:12, 30:1, 30:3, 30:6, 36:15, 39:1, 39:7, 39:21, 42:18, 45:2, 45:10, 45:18, 66:4
**Dray** [4] - 2:24, 4:22, 30:2, 30:7
**Dray....................** [1] - 3:5
**Drive** [1] - 41:17
**driver** [1] - 20:9
**driver's** [3] - 20:3, 20:4, 20:10
**dropped** [2] - 64:15, 116:6
**dropping** [1] - 64:23
**droves** [1] - 32:5
**drug** [3] - 31:20, 34:2, 54:11
**duly** [1] - 46:4
**during** [15] - 13:6, 22:10, 22:11, 22:25, 27:10, 28:14, 29:9, 43:21, 46:23, 67:23, 72:11, 83:23, 84:3, 118:5, 120:8
**duties** [1] - 47:14
**duty** [1] - 46:22
**dynamic** [1] - 85:14

## E

**eager** [3] - 49:1, 49:2,

51:12
**early** [5] - 72:9, 86:12, 87:9, 87:20, 119:18
**earned** [2] - 15:22, 16:9
**earnest** [1] - 82:1
**easily** [1] - 32:6
**easy** [2] - 19:24, 34:5
**ecstatic** [1] - 73:12
**effect** [1] - 30:22
**effort** [1] - 63:16
**either** [9] - 7:5, 18:9, 22:3, 26:5, 27:9, 41:2, 81:23, 88:9, 119:10
**email** [10] - 26:15, 26:18, 27:8, 27:17, 27:20, 28:4, 28:9, 28:16, 28:20, 30:21
**emails** [2] - 26:12, 32:23
**embassies** [1] - 42:22
**embassy** [33] - 6:12, 23:14, 23:17, 23:19, 23:22, 24:4, 24:15, 24:23, 25:19, 26:4, 26:21, 27:19, 28:21, 38:4, 38:6, 38:15, 38:21, 42:15, 44:8, 44:15, 45:6, 45:8, 45:15, 64:9, 64:14, 64:19, 64:22, 66:14, 70:16, 70:20, 88:13, 115:20, 115:22
**Embassy** [11] - 28:17, 37:25, 42:24, 44:11, 63:23, 64:1, 64:4, 64:5, 88:11, 88:18, 114:25
**emergency** [2] - 79:5, 95:25
**EMMANUEL** [1] - 2:13
**Emmanuel** [2] - 2:13, 4:15
**empathetic** [1] - 58:1
**employed** [1] - 81:2
**employee** [3] - 22:3, 29:2, 83:5
**employees** [2] - 25:19, 42:24
**empty** [1] - 75:22
**en** [1] - 74:9
**end** [12] - 21:3, 21:4, 22:5, 23:11, 44:17, 44:20, 93:17, 112:6, 118:2, 118:19, 120:6, 121:7
**endearing** [1] - 86:6
**ended** [2] - 66:13, 102:2
**ends** [2] - 68:16, 70:24
**energetic** [3] - 49:1, 51:12, 62:8
**enforcement** [20] - 46:14, 47:3, 47:24, 50:9, 56:24, 57:3, 57:6, 57:7, 65:4, 69:17, 81:2, 83:10, 93:6, 94:7, 96:10, 98:13, 99:23, 113:22, 120:23
**Enforcement** [1] - 46:19
**enforcing** [1] - 47:18
**engage** [3] - 53:4, 53:13, 97:15
**engaged** [2] - 93:1, 112:12
**engagement** [1] - 15:12
**engender** [1] - 112:17
**English** [4] - 51:23, 52:1, 52:5, 74:22
**enjoy** [1] - 121:18
**enjoyed** [1] - 119:2
**ensues** [1] - 15:17
**enter** [1] - 108:1
**entered** [3] - 5:20, 37:18, 66:8
**enterprise** [1] - 113:1
**enthusiastic** [4] - 82:6, 82:7, 113:24
**entire** [4] - 28:16, 44:1, 72:11, 119:14
**entirety** [1] - 114:12
**entitled** [1] - 122:3
**equal** [1] - 82:24
**equally** [1] - 7:13
**equipment** [5] - 29:6, 53:25, 56:25, 58:14, 61:12
**escaping** [2] - 76:22
**escorting** [1] - 74:22
**especially** [2] - 32:1, 38:2
**ESQ** [9] - 2:8, 2:8, 2:10, 2:13, 2:14, 2:17, 2:19, 2:22, 2:23
**essence** [1] - 71:12
**essentially** [9] - 12:3, 70:16, 85:18, 95:23, 98:14, 107:18, 107:19, 116:23, 116:24
**establishing** [1] - 93:5
**estimation** [1] - 113:15
**et** [1] - 1:6
**evening** [1] - 121:5
**event** [2] - 78:2, 113:17
**events** [3] - 60:19, 60:21, 88:3
**eventually** [5] - 12:13, 12:15, 73:8, 73:17, 74:18
**evidence** [13] - 7:9, 7:18, 12:18, 19:13, 43:3, 44:18, 51:14, 52:12, 58:24, 62:23, 71:22, 76:11, 80:5
**ex** [7] - 91:8, 91:10, 93:25, 94:3, 94:24, 95:16
**ex-army** [2] - 91:10, 94:3
**ex-military** [5] - 91:8, 93:25, 94:3, 94:24, 95:16
**exact** [1] - 11:14
**exactly** [6] - 9:18, 9:22, 11:24, 79:6, 119:21
**exam** [1] - 65:14
**Examination** [6] - 3:4, 3:4, 3:5, 3:5, 3:7, 3:7
**examination** [4] - 5:2, 5:22, 80:13, 108:10
**EXAMINATION** [6] - 6:2, 16:16, 30:5, 39:23, 46:8, 80:14
**example** [3] - 31:14, 41:21, 108:19
**exchange** [4] - 28:16, 30:23, 62:20, 71:19
**excuse** [3] - 25:25, 70:16, 98:9
**execute** [1] - 72:13
**exercise** [1] - 99:23
**exercised** [2] - 100:1, 100:4
**Exhibit** [18] - 43:3, 44:19, 51:15, 52:13, 55:10, 55:22, 58:24, 60:9, 60:15, 61:15, 62:24, 63:15, 66:17, 71:23, 72:7, 73:19, 76:9, 80:4
**exhibit** [3] - 43:4, 56:3, 72:3
**exist** [1] - 10:6
**existing** [1] - 108:22
**exited** [2] - 65:16, 120:19
**expect** [2] - 41:11, 85:4
**expected** [1] - 112:5
**experience** [6] - 13:3, 13:4, 42:21, 42:24, 49:13, 118:10
**experiences** [1] - 81:20
**expertise** [1] - 47:4
**explain** [3] - 7:3, 27:1, 47:2
**explained** [2] - 22:24, 82:22
**explaining** [1] - 25:22
**explicitly** [1] - 109:20
**exploit** [1] - 54:8
**exposed** [1] - 41:22
**exposing** [1] - 57:11
**expressed** [1] - 117:13
**expression** [1] - 85:19
**extend** [1] - 99:5
**extended** [1] - 71:13
**extends** [1] - 99:22
**extent** [3] - 49:23, 82:16, 96:8
**extra** [2] - 23:5, 119:6
**extraction** [1] - 51:20
**extradition** [1] - 58:5
**extrapolating** [1] - 12:4

**F**

**face** [2] - 97:16, 97:19
**faced** [1] - 63:17
**facilitate** [1] - 111:8
**fact** [16] - 6:16, 6:19, 7:17, 14:20, 21:7, 22:17, 23:9, 55:19, 57:6, 58:6, 85:11, 87:1, 96:8, 103:3, 110:14, 116:3
**fainting** [1] - 19:22
**fair** [14] - 28:9, 34:14, 71:12, 82:13, 90:10, 95:11, 99:21, 102:4, 109:11, 109:12, 111:13, 112:3, 112:4
**fairly** [1] - 19:24
**fallout** [1] - 115:7
**false** [1] - 84:11
**familiar** [6] - 7:16, 48:2, 77:12, 89:14, 89:18, 90:8
**family** [7] - 88:16, 95:25, 96:16, 96:20, 96:25, 120:9
**far** [8] - 8:8, 16:8, 35:25, 59:21, 84:16, 84:21, 87:4, 110:20
**fast** [1] - 73:5
**fast-forward** [1] - 73:5
**FBI** [64] - 4:10, 6:20, 8:18, 9:5, 12:8, 15:4, 15:6, 18:6, 24:2, 24:23, 25:14, 25:17, 25:23, 26:22, 27:22, 29:9, 32:1, 33:4, 33:6, 36:22, 41:8, 41:16, 42:5, 42:25, 43:15, 43:22, 43:25, 46:23, 46:25, 47:7, 47:9, 47:16, 48:15, 50:14, 54:3, 54:23, 56:5, 61:8, 64:9, 79:16, 80:1, 80:3, 80:23, 80:25, 81:1, 81:11, 82:23, 83:5, 83:8, 88:22, 89:4, 94:23, 98:3, 98:20, 102:19, 105:21, 108:16, 108:19, 108:23, 109:7, 113:11, 114:25, 116:2
**FBI's** [4] - 15:12, 15:15, 42:7, 55:24
**FCRR** [2] - 1:17, 122:5
**feasible** [1] - 104:15
**Federal** [2] - 1:17, 46:19
**federal** [9] - 7:19, 17:23, 23:24, 24:22, 25:4, 47:23, 57:7, 68:19, 68:23
**feigning** [1] - 19:21
**felt** [2] - 24:10, 66:25
**female** [8] - 74:6, 75:2, 75:13, 75:14, 75:16, 75:19, 77:6
**few** [10] - 6:6, 37:15,

42:1, 44:7, 61:2, 63:21, 68:21, 79:17, 114:1, 118:11
**field** [3] - 43:8, 47:22, 49:15
**fight** [1] - 67:17
**figure** [1] - 73:11
**file** [22] - 23:3, 37:22, 37:23, 51:15, 51:17, 51:24, 55:10, 57:12, 61:15, 63:18, 63:19, 65:1, 68:14, 73:20, 75:22, 76:9, 81:17, 83:1, 83:2, 83:8, 83:20, 121:1
**filed** [3] - 22:18, 120:22, 120:24
**final** [1] - 73:21
**finally** [2] - 71:17, 78:5
**fine** [4] - 14:25, 65:15, 98:10, 121:10
**finish** [2] - 117:4, 117:7
**finished** [2] - 65:12, 117:6
**firearms** [3] - 17:19, 17:20, 17:24
**first** [15] - 18:25, 21:24, 27:11, 48:25, 58:10, 62:16, 70:9, 76:25, 78:25, 81:23, 90:1, 90:18, 93:10, 112:12
**fiscalia** [1] - 73:11
**five** [2] - 119:10, 119:11
**flat** [1] - 16:10
**FLORES** [2] - 2:14, 19:14
**Flores** [2] - 2:15, 4:16
**FLORIDA** [1] - 1:1
**Florida** [5] - 1:4, 1:19, 46:16, 122:7, 122:7
**flow** [1] - 40:6
**flying** [2] - 104:13, 104:14
**focus** [2] - 47:12, 51:2
**focusing** [1] - 52:4
**FOR** [1] - 2:2
**force** [15] - 33:2, 46:25, 47:2, 47:3, 47:15, 47:24, 80:19, 80:22, 81:4, 81:15, 82:23, 83:3, 83:6, 83:10, 83:11
**Force** [1] - 46:1
**foregoing** [1] - 122:2
**foreign** [2] - 42:22, 88:17
**foreigners** [1] - 76:20
**forgot** [1] - 32:16
**formally** [1] - 61:3
**forms** [1] - 51:8
**forth** [3] - 13:5, 49:7, 91:14
**forward** [5] - 18:17, 61:14, 65:6, 73:5, 103:15
**forwarded** [2] - 76:16, 103:3
**forwarding** [1] - 73:13
**four** [6] - 22:18, 36:18, 36:19, 63:13, 98:6, 119:12
**FPR** [2] - 1:17, 122:5
**FPR-C** [2] - 1:17, 122:5
**frame** [1] - 50:8
**free** [1] - 24:4
**French** [1] - 35:12
**frequent** [1] - 82:17
**frequently** [1] - 51:10
**Friday** [2] - 118:2, 119:11
**FRIEDMAN** [2] - 2:22, 4:21
**Friedman** [2] - 2:22, 4:22
**friend** [6] - 67:12, 85:11, 85:12, 86:3, 86:9, 115:18
**friendly** [2] - 86:8, 101:14
**friends** [2] - 85:21, 88:17
**front** [2] - 50:17, 89:22
**frowned** [1] - 56:2
**fugitive** [2] - 61:22, 62:10
**full** [7] - 46:10, 65:18, 83:13, 83:15, 119:11, 119:23, 120:4
**function** [1] - 46:21
**funeral** [1] - 121:5
**funny** [1] - 99:4
**furtherance** [1] - 86:19
**future** [1] - 117:15

**G**

**G-O-N-Z-A-L-E-Z** [1] - 46:12
**gain** [1] - 10:20
**gained** [1] - 68:7
**game** [3] - 52:8, 52:25, 53:2
**gang** [1] - 110:17
**gaps** [1] - 78:12
**garnered** [2] - 15:3, 15:22
**gathered** [1] - 47:5
**gender** [1] - 75:1
**general** [1] - 56:24
**generated** [1] - 26:12
**gentleman** [6] - 5:3, 14:6, 19:16, 48:9, 59:21
**gentlemen** [5] - 5:24, 30:3, 91:18, 111:6, 112:22
**genuine** [1] - 86:10
**GEORGE** [2] - 3:3, 5:25
**George** [25] - 24:24, 26:8, 48:22, 48:23, 52:7, 52:24, 54:25, 55:1, 57:9, 81:9, 82:13, 82:15, 82:20, 97:25, 106:2, 106:4, 106:16, 106:19, 114:16, 114:19, 115:2, 115:5, 115:7, 116:7
**George's** [2] - 67:10, 67:21
**Georgia** [1] - 46:20
**given** [6] - 50:7, 52:17, 71:1, 81:9, 81:10, 84:4
**Glynco** [1] - 46:20
**goals** [1] - 71:8
**Gonzalez** [11] - 18:13, 46:2, 46:7, 46:12, 46:13, 51:16, 51:17, 60:7, 66:12, 109:7
**GONZALEZ** [2] - 3:6, 46:4
**Google** [1] - 41:17
**GOVERNMENT** [1] - 2:2
**Government** [17] - 4:6, 5:14, 5:25, 19:11, 25:7, 42:13, 46:4, 65:19, 69:3, 104:4, 107:21, 114:11, 117:12, 118:7, 118:13, 118:22, 118:23
**government** [8] - 18:17, 23:24, 24:1, 24:22, 25:4, 26:5, 56:1, 57:25
**Government's** [19] - 43:3, 44:19, 51:15, 52:13, 55:9, 55:22, 58:24, 60:9, 60:15, 61:15, 62:24, 63:15, 66:17, 71:23, 72:7, 73:19, 76:9, 80:4, 118:1
**GOVERNMENT'S** [1] - 3:2
**governmental** [1] - 68:7
**granted** [1] - 109:16
**granular** [1] - 110:1
**gray** [1] - 48:9
**great** [1] - 120:13
**green** [1] - 76:25
**group** [13] - 28:2, 28:12, 60:25, 64:3, 64:7, 67:23, 68:3, 69:23, 70:18, 79:18, 79:21, 103:22, 115:5
**groups** [2] - 49:14, 54:8
**guidelines** [1] - 50:7
**guides** [1] - 40:12
**guilty** [1] - 16:3
**gun** [1] - 59:2
**gunshots** [1] - 73:13
**guy** [5] - 32:22, 85:9, 85:25, 112:15, 113:2
**guys** [7] - 26:16, 28:4, 37:23, 68:20, 68:24, 90:17, 110:22

**H**

**Haiti** [54] - 6:13, 19:8, 23:22, 33:13, 34:7, 42:13, 44:25, 53:21, 54:4, 54:8, 54:20, 56:17, 57:16, 57:22, 57:23, 58:7, 60:19, 60:21, 61:4, 61:7, 64:4, 65:9, 67:9, 69:5, 69:7, 69:11, 70:19, 71:1, 71:8, 71:20, 71:25, 73:6, 90:23, 91:2, 91:23, 92:4, 92:15, 102:5, 102:11, 102:13, 102:21, 106:25, 107:3, 107:14, 109:24, 110:7, 110:17, 111:1, 111:2, 111:3, 114:13, 114:15, 115:20
**Haiti's** [1] - 103:17
**Haitian** [20] - 14:2, 28:2, 30:13, 31:15, 32:6, 54:7, 54:9, 54:23, 56:12, 56:17, 61:25, 67:23, 71:5, 72:13, 76:1, 76:21, 92:20, 92:25, 104:4
**Haitians** [2] - 28:18, 68:21
**halfway** [1] - 65:13
**hamm** [1] - 41:23
**hand** [4] - 32:18, 46:3, 83:7
**handle** [2] - 103:19, 103:21
**handled** [1] - 83:23
**handler** [11] - 33:10, 44:5, 48:18, 48:23, 83:8, 85:14, 85:16, 85:17, 85:18, 98:19, 109:13
**handlers** [3] - 65:4, 81:7, 82:21
**handles** [1] - 85:19
**handling** [3] - 96:20, 96:22, 113:1
**handshake** [2] - 32:20, 32:21
**happy** [1] - 120:15
**harsh** [1] - 63:17
**hats** [1] - 17:15
**head** [2] - 13:16, 50:18
**heading** [2] - 58:3, 88:14
**hear** [4] - 49:4, 73:3, 99:15, 121:1
**heard** [1] - 110:15
**hearing** [3] - 21:5, 78:6, 121:9
**hearings** [1] - 120:14
**hearsay** [1] - 10:8
**heated** [1] - 71:19
**heavily** [1] - 93:1
**HECTOR** [1] - 2:14
**HELD** [1] - 1:11
**held** [1] - 12:12
**help** [12] - 38:10,

40:14, 49:2, 50:4, 54:4, 56:18, 62:9, 62:20, 68:11, 71:7, 89:20, 117:12
**helping** [1] - 113:24
**helps** [2] - 120:14
**hesitant** [2] - 92:16, 92:23
**hid** [1] - 74:18
**hidden** [1] - 44:10
**hide** [2] - 39:2, 89:10
**hiding** [2] - 32:12, 38:20
**himself** [8] - 19:23, 32:18, 39:2, 61:8, 82:10, 94:2, 111:11, 114:9
**hmm** [1] - 93:15
**hold** [1] - 11:7
**home** [2] - 74:18, 78:8
**Homeland** [2] - 6:20, 15:4
**homework** [1] - 93:17
**Honor** [28] - 4:7, 4:12, 4:15, 4:18, 4:21, 5:3, 5:7, 5:10, 5:23, 16:14, 29:20, 29:24, 30:1, 45:24, 53:11, 58:7, 59:23, 65:10, 65:25, 66:2, 66:4, 66:10, 80:12, 87:12, 103:24, 115:12, 120:22, 121:17
**HONORABLE** [1] - 1:11
**hoped** [1] - 71:17
**hopeful** [3] - 91:3, 91:4, 104:5
**hostile** [1] - 38:2
**hour** [2] - 119:6, 120:18
**hours** [2] - 78:6, 79:4
**house** [1] - 72:9
**HOWARD** [30] - 2:10, 4:12, 5:3, 5:23, 6:3, 8:3, 10:10, 13:22, 13:24, 13:25, 14:24, 15:1, 16:14, 72:18, 80:15, 87:12, 87:14, 87:16, 99:18, 100:8, 100:19, 103:24, 104:1, 110:12, 115:12, 115:14, 117:5, 117:17, 117:21, 121:12
**Howard** [7] - 2:10, 4:12, 5:1, 5:21, 40:4, 41:6, 43:14
**Howard........** [1] - 3:4
**Howard.................** [1] - 3:7
**human** [22] - 9:7, 12:17, 13:15, 15:8, 15:11, 15:16, 31:23, 48:15, 50:7, 52:18, 55:25, 57:8, 57:12, 69:3, 69:16, 81:14, 86:3, 99:22, 102:23, 108:15, 112:9, 116:21
**hundreds** [2] - 37:1, 37:2

**I**

**iCloud** [2] - 41:17, 41:19
**idea** [10] - 36:2, 38:3, 38:6, 56:7, 95:22, 96:4, 96:23, 97:11, 97:21, 97:24
**identified** [1] - 48:12
**identifying** [2] - 20:5, 67:24
**ignore** [1] - 21:10
**illegal** [1] - 69:4
**image** [3] - 60:16, 75:22, 75:25
**imagine** [1] - 7:12
**immediate** [1] - 25:23
**immediately** [2] - 15:17, 79:5
**immigration** [5] - 47:19, 57:15, 63:20, 68:14, 85:16
**immunity** [2] - 53:5, 53:14
**implicated** [1] - 116:18
**important** [8] - 22:21, 23:2, 31:25, 32:3, 62:11, 88:18, 90:5, 94:9
**impossible** [1] - 119:20
**impression** [10] - 48:24, 81:25, 82:10, 84:15, 87:1, 87:9, 87:21, 97:11, 106:13, 106:14
**in-person** [1] - 111:23
**inability** [1] - 84:17
**inaccurate** [1] - 28:10
**incident** [4] - 83:16, 83:18, 83:24, 84:15
**include** [2] - 9:8, 81:15
**included** [3] - 23:10, 65:1, 97:7
**incorrect** [2] - 106:11, 108:6
**indicate** [1] - 19:19
**indicates** [1] - 20:9
**indicator** [1] - 20:6
**indictments** [1] - 49:24
**individual** [2] - 19:11, 48:2
**individuals** [4] - 24:19, 57:11, 97:14, 113:13
**infiltrate** [1] - 32:7
**informal** [1] - 58:9
**informant** [2] - 18:6, 24:14
**information** [81] - 9:6, 10:5, 10:22, 12:8, 12:20, 12:22, 14:5, 14:7, 20:23, 21:5, 21:12, 21:13, 21:15, 22:25, 23:2, 24:9, 24:13, 27:3, 30:19, 31:4, 31:5, 31:9, 33:14, 33:19, 33:21, 33:24, 34:4, 34:6, 34:10, 34:16, 35:8, 35:20, 39:9, 39:13, 39:14, 39:17, 40:2, 40:6, 40:15, 41:1, 41:3, 41:18, 41:20, 49:2, 49:7, 49:10, 49:21, 52:9, 53:25, 54:6, 54:11, 54:15, 56:15, 57:5, 57:19, 58:5, 60:23, 62:9, 65:5, 69:14, 69:17, 69:19, 69:20, 69:21, 73:17, 77:22, 82:8, 84:10, 84:12, 84:19, 88:13, 94:10, 94:12, 95:13, 97:5, 105:17, 106:1, 110:14, 113:9, 113:13
**informed** [3] - 56:14, 65:2, 80:10
**initiate** [1] - 50:1
**initiated** [1] - 49:21
**innocently** [1] - 26:7
**inquiring** [1] - 26:15
**installing** [1] - 54:19
**instance** [1] - 29:15
**instead** [1] - 96:24
**instruct** [2] - 26:20, 62:6
**instructed** [1] - 62:12
**instruction** [1] - 53:6
**instructions** [2] - 118:6, 118:25
**intel** [4] - 41:1, 41:4, 41:18, 113:17
**intelligence** [8] - 31:14, 40:8, 40:9, 40:11, 44:4, 49:19, 69:22, 71:2
**intentions** [1] - 45:22
**interaction** [1] - 61:9
**interagency** [1] - 81:5
**interest** [3] - 21:15, 49:14, 92:11
**interested** [8] - 20:19, 21:5, 21:12, 31:13, 93:5, 102:9, 110:22, 113:5
**interesting** [3] - 33:16, 102:16, 102:17
**interests** [1] - 61:7
**interfaced** [1] - 111:14
**interfacing** [2] - 14:2, 112:25
**interfere** [2] - 105:8
**intermediaries** [1] - 111:11
**intermediary** [7] - 62:3, 111:5, 111:7, 111:8, 111:15, 111:16, 112:21
**international** [1] - 31:5
**internationally** [5] - 86:18, 88:20, 88:22, 108:11, 109:10
**interpreters** [1] - 4:25
**interrogated** [1] - 18:2
**interrupt** [1] - 115:18
**interview** [1] - 27:3
**interviewed** [1] - 27:10
**intimately** [1] - 7:16
**INTRIAGO** [1] - 2:12
**Intriago** [51] - 4:3, 4:16, 5:5, 6:12, 16:20, 16:25, 17:23, 18:5, 18:11, 21:21, 21:25, 22:2, 23:20, 23:21, 23:23, 24:2, 24:14, 24:20, 25:3, 25:9, 26:3, 26:4, 26:7, 26:20, 26:23, 26:25, 27:12, 27:14, 27:24, 27:25, 28:7, 28:8, 28:13, 28:15, 29:2, 38:14, 42:2, 42:4, 42:7, 42:12, 44:10, 45:7, 45:16, 64:20, 64:22, 65:24, 67:25, 115:19, 121:15
**Intriago's** [1] - 28:17
**introduce** [5] - 67:19, 68:12, 92:10, 94:20, 114:2
**introduced** [8] - 22:2, 32:18, 57:4, 70:24, 71:1, 90:18, 92:2, 114:11
**introduces** [1] - 57:9
**introducing** [3] - 57:18, 98:13, 98:19
**introduction** [1] - 23:19
**invasion** [1] - 78:8
**investigate** [1] - 68:8
**investigated** [1] - 49:9
**investigating** [5] - 9:5, 9:7, 79:20, 79:21, 103:1
**investigation** [23] - 8:21, 9:9, 9:16, 9:19, 9:20, 9:22, 12:19, 13:12, 15:16, 15:17, 15:20, 15:25, 16:12, 16:25, 49:8, 50:1, 58:4, 79:24, 82:24, 83:7, 113:11, 113:14, 113:18
**investigations** [3] - 47:15, 47:16, 49:17
**investigative** [2] - 9:8, 47:24
**investigator** [1] - 8:24
**investigators** [2] - 7:19, 8:20
**invitation** [2] - 99:5, 99:22
**invited** [3] - 91:17, 92:15, 93:9
**involve** [1] - 28:18
**involved** [3] - 18:19,

102:10, 114:16
**involves** [1] - 28:16
**Iran** [1] - 54:8
**Iranian** [1] - 33:15
**Iranians** [3] - 32:8, 32:9, 33:25
**Iraq** [1] - 31:15
**Iraqis** [1] - 32:5
**ISIS** [1] - 102:20
**issuance** [1] - 54:7
**issue** [6] - 18:17, 20:16, 23:17, 24:15, 31:25, 96:19
**issued** [2] - 11:5, 11:8
**issues** [1] - 88:19
**IT** [3] - 11:6, 11:20, 36:1
**items** [1] - 50:25

## J

**Jacmel** [1] - 91:1
**JACQUELINE** [1] - 1:11
**James** [12] - 4:4, 4:22, 30:7, 30:8, 32:12, 33:20, 38:14, 38:19, 39:8, 39:12, 90:13, 90:19
**Jaramillo** [1] - 4:13
**JARAMILLO** [1] - 2:8
**Jason** [1] - 4:9
**JASON** [1] - 2:4
**Jean** [3] - 77:2, 77:9, 77:10
**JJJ** [1] - 19:2
**Joan** [1] - 19:2
**job** [5] - 47:14, 47:21, 85:22, 85:23, 86:10
**Joel** [2] - 18:25, 19:2
**John** [2] - 18:25, 55:1
**JONATHAN** [1] - 2:22
**Jonathan** [2] - 2:22, 4:21
**Joseph** [2] - 18:25, 19:2
**Jovenel** [3] - 8:21, 63:1, 63:16
**JUDGE** [1] - 1:12
**judge** [15] - 5:12, 73:10, 74:6, 74:15, 74:19, 74:21, 75:1, 75:11, 75:13, 75:15, 75:16, 75:17, 75:20, 77:6
**Judge** [8] - 5:18, 13:22, 14:24, 39:21, 42:18, 45:10, 45:18, 117:21
**judgment** [14] - 98:8, 99:6, 99:23, 100:1, 100:5, 100:9, 100:12, 100:22, 100:24, 100:25, 101:8, 109:6, 109:7
**judgments** [1] - 109:5
**juez** [1] - 75:12
**July** [19] - 15:23, 34:22, 37:12, 44:5, 72:9, 72:11, 73:5, 73:7, 75:7, 77:17, 78:19, 78:24, 78:25, 79:14, 80:8, 80:9, 83:17, 83:18, 83:24
**jumped** [1] - 97:25
**jumping** [1] - 61:14
**June** [7] - 34:19, 48:17, 71:25, 72:5, 72:11, 83:16, 122:4
**June-July** [1] - 72:11
**juries** [1] - 119:14
**jury** [9] - 5:19, 30:3, 31:11, 47:2, 65:10, 66:7, 117:24, 118:5, 118:24
**JURY** [1] - 1:10
**Jury** [4] - 5:20, 65:16, 66:8, 120:19
**justice** [2] - 68:20, 68:24

## K

**keep** [4] - 35:21, 96:19, 99:12, 103:10
**Kessa** [7] - 18:24, 20:21, 24:20, 90:13, 90:19, 91:1, 93:6
**killed** [1] - 114:9
**kind** [14] - 6:8, 8:24, 16:24, 24:15, 31:14, 31:25, 43:8, 73:12, 81:19, 85:20, 86:6, 104:11, 113:17, 118:3
**kinds** [3] - 33:15, 34:2, 50:4
**knowledge** [2] - 8:1, 49:13
**knows** [2] - 5:14, 57:6
**knuckles** [1] - 115:3
**KUDMAN** [4] - 2:19, 5:10, 29:24, 121:17
**Kudman** [2] - 2:19, 4:19

## L

**label** [1] - 60:11
**lack** [8] - 7:25, 19:5, 19:6, 77:21, 78:15, 79:11, 85:18
**ladies** [2] - 5:24, 30:3
**lady** [1] - 14:15
**LANCE** [2] - 1:17, 122:5
**language** [1] - 52:5
**largely** [1] - 117:11
**larger** [1] - 60:16
**last** [9] - 23:25, 24:23, 25:6, 26:7, 29:5, 42:25, 80:9, 118:24, 119:6
**late** [6] - 45:8, 45:21, 63:22, 80:20, 119:17
**Latin** [1] - 86:8
**laundering** [2] - 93:2, 102:6
**Law** [3] - 2:10, 2:18, 46:19
**law** [21] - 46:13, 47:3, 47:23, 50:9, 56:23, 56:24, 57:3, 57:6, 57:7, 65:3, 69:17, 70:13, 81:2, 83:10, 93:5, 94:7, 96:10, 98:13, 99:22, 113:22, 120:23
**lawful** [2] - 107:20, 108:2
**laws** [1] - 47:19
**lawyers** [3] - 118:10, 118:21, 118:22
**lead** [5] - 8:20, 8:24, 57:12, 57:14, 58:4
**leader** [1] - 110:17
**leadership** [2] - 87:3, 87:24
**leading** [1] - 45:2
**leads** [1] - 49:4
**leak** [1] - 98:20
**leaked** [1] - 24:10
**learn** [4] - 18:12, 39:8, 63:22, 73:5
**learned** [4] - 17:5, 45:6, 45:15, 64:21
**learns** [1] - 102:20
**leash** [1] - 108:14
**least** [7] - 15:3, 41:5, 60:10, 85:12, 92:3, 101:13, 113:15
**leave** [3] - 21:1, 22:1, 119:18
**leaving** [2] - 58:2, 81:13
**left** [4] - 58:10, 60:8, 66:12, 106:18
**legitimate** [1] - 103:16
**lends** [2] - 56:23, 102:16
**length** [1] - 68:2
**lengthy** [1] - 118:17
**leniency** [1] - 57:5
**less** [4] - 5:4, 109:25, 110:8
**letter** [5] - 23:19, 25:5, 35:11, 35:14, 35:15
**letting** [1] - 121:2
**level** [1] - 15:3
**leveraging** [1] - 92:12
**license** [4] - 17:24, 20:3, 20:4, 20:10
**life** [1] - 78:3
**likely** [5] - 11:17, 79:23, 81:13, 91:16, 110:4
**likewise** [1] - 97:9
**Lime** [6] - 55:7, 55:15, 55:19, 56:11, 56:13, 57:17
**limit** [1] - 95:8
**limitation** [1] - 94:5
**limitations** [1] - 82:25
**limited** [1] - 41:20
**line** [3] - 58:13, 70:9
**lines** [2] - 57:2, 105:20
**link** [1] - 64:11
**linked** [1] - 64:17
**listed** [2] - 21:20, 21:21
**listen** [1] - 20:20
**listened** [1] - 20:21
**listening** [1] - 21:16
**LLP** [1] - 2:19
**loaned** [1] - 47:23
**local** [3] - 51:6, 56:23, 83:10
**location** [1] - 46:22
**longest** [1] - 116:11
**Look** [2] - 103:17, 104:3
**look** [5] - 67:2, 76:10, 84:1, 89:19, 120:18
**looked** [2] - 35:13,
**looking** [12] - 9:20, 10:12, 19:25, 20:22, 20:23, 21:14, 31:2, 31:3, 31:6, 36:9, 60:7, 101:25
**looks** [5] - 53:1, 59:4, 69:23, 103:4, 112:16
**loose** [1] - 16:10
**loss** [1] - 78:3
**lost** [1] - 110:5
**Lunch** [1] - 121:19
**lunch** [6] - 65:18, 105:15, 117:8, 120:8, 120:21, 121:18

## M

**male** [1] - 77:12
**man** [2] - 77:10, 112:25
**manageable** [1] - 119:4
**manuals** [1] - 40:13
**March** [9] - 43:19, 43:21, 44:1, 52:11, 53:3, 53:20
**Mario** [1] - 48:20
**MARISSEL** [1] - 2:17
**Marissel** [1] - 4:18
**mark** [2] - 60:1, 60:6
**Marky** [3] - 90:13, 90:19, 91:1
**Marty** [1] - 24:20
**matching** [1] - 95:7
**materialized** [1] - 84:11
**mates** [1] - 48:22
**matter** [6] - 9:5, 85:11, 87:1, 110:14, 116:3, 122:3
**mayor** [2] - 31:21, 91:1
**mayor's** [1] - 105:15
**MCLAUGHLIN** [6] - 2:3, 4:7, 5:18, 65:21, 120:22, 121:11
**McLaughlin** [1] - 4:8
**mean** [19] - 6:15, 16:5, 17:14, 21:9, 35:20, 38:20, 68:24, 69:13, 80:18, 85:10, 85:13, 86:3, 89:24,

97:3, 105:21, 106:11, 111:10, 113:22, 116:20
**meaning** [1] - 84:6
**means** [8] - 44:23, 47:12, 69:21, 80:19, 80:22, 84:14, 85:19, 93:14
**meant** [1] - 105:22
**mechanical** [1] - 1:21
**meet** [29] - 14:6, 23:10, 27:12, 31:10, 37:9, 41:2, 42:7, 42:10, 54:1, 54:12, 54:17, 54:23, 55:19, 56:5, 59:17, 61:10, 62:10, 62:12, 62:18, 63:10, 97:12, 104:10, 104:14, 104:17, 105:19, 110:24, 111:10, 111:14, 113:8
**meeting** [82] - 6:9, 14:4, 14:11, 16:23, 17:2, 18:22, 20:18, 21:1, 21:3, 21:4, 21:8, 21:10, 21:20, 21:22, 21:24, 22:1, 22:4, 22:5, 22:10, 22:12, 22:22, 23:1, 23:4, 23:11, 24:21, 24:24, 27:10, 28:14, 28:15, 29:17, 30:12, 31:3, 31:7, 32:14, 37:3, 41:2, 54:19, 54:22, 55:3, 55:6, 55:7, 55:17, 55:21, 55:23, 56:10, 56:13, 56:15, 57:17, 64:11, 64:24, 65:2, 67:10, 67:21, 67:23, 68:3, 91:17, 92:15, 92:17, 93:9, 95:19, 96:16, 97:4, 97:7, 101:17, 103:7, 103:11, 103:14, 104:2, 104:3, 104:9, 104:12, 105:14, 105:16, 105:24, 106:2, 106:6, 106:19, 111:23, 114:16
**meetings** [1] - 40:24
**member** [1] - 104:4
**members** [1] - 88:17
**memory** [1] - 89:25
**men** [1] - 91:21
**mention** [5] - 42:15, 53:21, 89:9, 102:5, 116:14
**mentioned** [19] - 19:5, 22:3, 22:14, 40:19, 53:22, 54:5, 54:10, 58:12, 58:21, 64:7, 64:14, 64:18, 66:13, 68:3, 93:7, 102:21, 104:13, 111:6, 118:4
**mentions** [1] - 59:5
**merchandise** [1] - 17:15
**message** [28] - 52:4, 52:6, 52:22, 58:16, 61:23, 66:18, 66:24, 67:6, 69:24, 70:1, 70:3, 70:8, 71:11, 71:15, 71:17, 73:7, 73:21, 73:22, 75:5, 76:25, 77:14, 77:15, 77:23, 78:18, 78:22, 78:25, 89:13, 89:24
**messaged** [1] - 78:3
**messages** [13] - 41:10, 51:23, 51:24, 55:11, 63:10, 63:15, 66:21, 70:6, 73:13, 73:16, 73:25, 77:23, 77:24
**met** [31] - 17:4, 17:25, 18:4, 20:13, 24:23, 24:24, 27:13, 27:14, 27:18, 28:2, 28:5, 28:13, 28:14, 30:9, 30:12, 32:12, 37:19, 42:25, 55:3, 59:15, 67:23, 81:23, 83:15, 90:12, 90:23, 106:21, 111:18, 111:19, 111:21, 115:5
**MIAMI** [1] - 1:2
**Miami** [22] - 1:4, 1:18, 1:19, 26:23, 26:25, 27:6, 27:18, 27:23, 28:6, 30:15, 33:7, 46:16, 47:10, 47:16, 47:22, 48:15, 57:1, 64:9, 92:18, 115:1, 116:2, 122:7
**Miami-Dade** [1] - 33:7
**microphones** [1] - 72:20
**middle** [3] - 18:23, 18:24, 103:9
**might** [19] - 10:5, 12:20, 21:15, 35:6, 35:7, 55:8, 84:1, 84:2, 88:12, 92:10, 110:22, 112:10, 112:11, 113:2, 113:19, 113:20, 114:5, 120:1, 120:5
**military** [14] - 19:20, 19:21, 20:16, 86:23, 87:3, 87:22, 87:23, 91:8, 91:12, 93:25, 94:3, 94:6, 94:24, 95:16
**mind** [2] - 99:12, 103:10
**mine** [1] - 43:11
**ministers** [1] - 87:6
**minutes** [5] - 5:4, 5:7, 5:13, 66:5, 70:7
**Miramar** [1] - 42:8
**miscommunication** [1] - 26:2
**misplaced** [1] - 95:17
**mispronounce** [1] - 76:7
**misrepresent** [1] - 104:7
**miss** [1] - 50:17
**mission** [3] - 30:23, 31:2, 31:3
**misunderstanding** [3] - 70:17, 70:22, 117:10
**misunderstood** [1] - 70:21
**misuse** [1] - 54:6
**Moise** [6] - 8:21, 44:25, 71:25, 72:5, 72:13, 73:6
**Moise's** [1] - 72:9
**moment** [1] - 97:13
**Monday** [2] - 118:2, 119:10
**monetary** [1] - 85:15
**money** [5] - 32:6, 43:22, 93:1, 102:5, 107:6
**monitors** [1] - 41:23
**Monreal** [5] - 48:20, 81:16, 81:19, 81:22, 81:24
**months** [6] - 11:5, 11:9, 12:10, 18:12, 22:18, 37:15
**morning** [22] - 4:7, 4:12, 4:15, 4:18, 4:21, 5:15, 5:23, 6:4, 6:5, 16:18, 16:19, 69:25, 70:4, 78:3, 78:19, 79:2, 80:16, 80:17, 105:24, 120:22, 121:8, 121:10
**Morning** [1] - 1:5
**mosque** [1] - 60:24
**mosques** [5] - 69:12, 69:15, 102:20, 103:3, 103:13
**most** [4] - 11:17, 79:23, 90:22, 91:16
**motion** [1] - 120:23
**move** [7] - 13:20, 39:20, 63:21, 71:18, 100:16, 120:15
**moving** [1] - 72:7
**MR** [105] - 4:7, 4:12, 4:15, 4:21, 5:3, 5:7, 5:12, 5:18, 5:23, 6:3, 7:25, 8:3, 10:8, 10:10, 13:19, 13:22, 13:24, 13:25, 14:24, 15:1, 16:14, 16:17, 19:14, 19:15, 20:14, 20:15, 26:9, 26:11, 29:20, 30:1, 30:3, 30:6, 36:12, 36:15, 38:25, 39:1, 39:4, 39:7, 39:20, 39:21, 39:24, 41:23, 41:25, 42:18, 42:20, 45:2, 45:5, 45:10, 45:13, 45:18, 45:20, 45:23, 46:1, 46:9, 48:11, 48:13, 53:16, 58:22, 59:1, 59:13, 59:23, 59:25, 60:5, 60:13, 61:14, 61:16, 65:10, 65:13, 65:21, 65:23, 65:25, 66:4, 66:10, 66:11, 72:18, 72:23, 73:3, 73:4, 78:20, 78:21, 80:12, 80:15, 87:12, 87:14, 87:16, 99:10, 99:18, 100:6, 100:8, 100:14, 100:19, 103:24, 104:1, 110:9, 110:12, 115:9, 115:12, 115:14, 117:4, 117:5, 117:17, 117:21, 120:22, 121:11, 121:12
**MS** [5] - 4:18, 5:10, 29:24, 66:2, 121:17
**multiple** [3] - 28:20, 28:23, 33:23
**municipal** [1] - 33:7
**murder** [1] - 13:16
**must** [1] - 27:23

**N**

**name** [20] - 22:14, 25:7, 26:13, 30:7, 42:16, 46:5, 46:10, 59:18, 64:8, 64:15, 64:22, 75:11, 76:3, 76:6, 76:9, 77:6, 77:12, 111:6, 112:21, 116:6
**name-dropped** [1] - 64:15
**named** [5] - 48:2, 48:20, 58:23, 62:4
**names** [6] - 23:19, 90:19, 92:3, 94:8, 95:7, 116:18
**narco** [1] - 49:13
**narco-terrorist** [1] - 49:13
**narcotics** [1] - 58:2
**national** [8] - 31:13, 33:17, 34:2, 34:7, 35:8, 39:14, 49:12, 76:21
**nature** [3] - 50:6, 92:1, 106:19
**near** [1] - 22:11
**necessarily** [3] - 15:19, 20:6, 103:21
**necessary** [2] - 53:7, 70:12
**neck** [1] - 103:18
**need** [5] - 66:23, 71:11, 72:20, 94:19, 105:18
**needed** [5] - 70:19, 78:13, 93:16, 93:19
**needs** [5] - 5:15, 25:15, 49:9, 71:2, 80:10
**negated** [1] - 54:16
**negative** [1] - 19:3
**negotiate** [1] - 61:22
**negotiating** [1] -

62:20
**Neutrality** [1] - 79:20
**never** [28] - 6:14, 17:4, 18:2, 18:4, 19:22, 20:13, 21:14, 26:25, 27:13, 27:19, 27:25, 28:7, 28:8, 29:11, 29:19, 35:13, 35:14, 39:17, 42:9, 42:11, 42:14, 50:14, 50:16, 70:12, 84:11, 95:21, 97:8, 111:1
**new** [5] - 11:8, 20:25, 36:6, 36:16, 54:19
**New** [1] - 49:15
**news** [3] - 49:6, 77:25, 110:4
**next** [19] - 4:16, 5:14, 5:17, 39:6, 45:25, 55:5, 55:8, 55:17, 69:9, 70:1, 70:15, 75:21, 77:14, 79:17, 90:11, 119:12, 120:1, 120:16
**nice** [3] - 85:9, 85:20, 85:25
**nicety** [1] - 85:21
**Nicholas** [3] - 8:16, 9:4, 9:14
**nickname** [1] - 85:20
**night** [3] - 80:20, 89:16, 90:17
**NO** [1] - 1:2
**nobody** [3] - 10:6, 13:9, 97:15
**Noelcius** [4] - 76:6, 77:2, 77:9, 77:10
**non** [2] - 51:13, 58:20
**non-pertinent** [2] - 51:13, 58:20
**none** [2] - 69:6, 114:20
**noon** [1] - 117:20
**normal** [5] - 30:25, 57:2, 62:8, 104:24, 104:25
**North** [1] - 1:18
**noted** [1] - 37:22
**notes** [1] - 122:3
**nothing** [23] - 16:14, 34:5, 54:21, 56:15, 61:13, 62:22, 63:2, 63:5, 70:24, 71:3, 71:4, 72:2, 72:6, 72:10, 72:14, 97:5, 97:10, 97:19, 105:4, 113:3, 121:12, 121:15, 121:17
**noticed** [1] - 21:19
**notification** [1] - 73:14
**notified** [1] - 64:2
**notwithstanding** [2] - 84:17, 104:21
**nudge** [1] - 101:14
**number** [3] - 26:12, 37:23, 88:11
**numbers** [6] - 37:23, 93:11, 93:14, 94:8, 95:6, 95:7
**NUNEZ** [2] - 3:3, 5:25
**Nunez** [31] - 24:24, 26:8, 39:25, 48:22, 48:23, 54:25, 56:14, 64:2, 64:10, 64:23, 80:11, 81:9, 81:17, 82:14, 82:15, 82:16, 82:20, 97:25, 98:9, 99:5, 99:14, 99:17, 100:3, 101:4, 101:12, 101:16, 105:22, 106:2, 114:18, 116:7
**Nunez's** [2] - 64:8, 64:15

## O

**objection** [16] - 7:25, 10:8, 13:19, 26:9, 36:12, 39:3, 39:20, 45:2, 45:10, 45:18, 72:18, 99:10, 100:6, 100:14, 110:9, 115:9
**obligated** [1] - 25:4
**obligation** [2] - 40:14, 118:6
**obligations** [2] - 96:17, 96:25
**observations** [1] - 23:6
**observed** [1] - 97:11
**obtain** [5] - 10:22, 27:3, 31:4, 68:12, 108:7
**obtaining** [1] - 85:15
**obviously** [5] - 24:9, 27:12, 30:15, 69:15, 118:6
**occasion** [2] - 30:9, 85:12
**occur** [4] - 12:6, 13:15, 13:18, 55:24
**occurred** [9] - 6:17, 12:17, 12:19, 23:13, 55:3, 78:8, 79:18, 83:18, 83:24
**occurring** [3] - 77:25, 110:1, 110:8
**odd** [4] - 76:5, 78:10, 78:11, 79:11
**OF** [8] - 1:1, 1:4, 1:10, 2:7, 2:12, 2:16, 2:21, 122:1
**offer** [4] - 9:6, 21:5, 27:4, 99:15
**offered** [2] - 104:10, 104:17
**Office** [1] - 2:5
**office** [7] - 29:15, 29:17, 43:8, 47:22, 49:15, 74:9, 91:23
**Officer** [2] - 46:1, 51:17
**officer** [19] - 33:2, 33:7, 46:13, 46:18, 47:1, 47:2, 47:15, 60:7, 64:9, 66:12, 80:19, 80:22, 81:4, 81:17, 82:23, 83:3, 83:6, 83:10, 83:11
**officers** [3] - 47:23, 47:24, 81:15
**offices** [3] - 42:8, 42:10, 55:24
**Offices** [1] - 2:10
**Official** [1] - 122:6
**official** [2] - 41:17, 68:9
**often** [2] - 51:8, 71:20
**OIA** [1] - 69:1
**omnibus** [1] - 120:24
**ON** [4] - 2:7, 2:12, 2:16, 2:21
**once** [7] - 11:6, 12:11, 63:12, 89:15, 100:17, 118:19, 119:16
**one** [42] - 6:23, 7:7, 7:8, 8:20, 9:9, 14:15, 16:6, 18:25, 23:21, 30:9, 31:8, 35:16, 36:5, 36:20, 38:18, 41:19, 43:10, 50:2, 59:17, 62:4, 68:8, 77:15, 81:7, 81:12, 85:4, 85:12, 85:14, 85:17, 87:6, 87:18, 88:16, 91:12, 98:18, 103:20, 103:24, 106:1, 106:3, 106:18, 106:20, 110:19, 115:17
**one-sided** [1] - 31:8
**ones** [1] - 50:25
**open** [3] - 34:12, 38:24, 76:8
**opened** [2] - 17:6, 35:5
**opening** [1] - 118:5
**openly** [1] - 92:25
**operational** [1] - 56:2
**opportunity** [4] - 83:19, 97:25, 99:15, 118:21
**opposed** [2] - 67:1, 91:14
**orally** [1] - 121:2
**Order** [1] - 4:1
**order** [3] - 61:3, 68:19, 68:23
**organized** [3] - 47:1, 47:6, 47:9
**original** [4] - 21:19, 21:21, 36:6, 51:23
**originally** [2] - 61:10, 75:14
**Orlando** [1] - 4:13
**ORLANDO** [1] - 2:8
**ORTIZ** [2] - 1:6, 2:7
**Ortiz** [143] - 4:3, 4:14, 4:24, 6:20, 7:16, 13:6, 14:5, 15:3, 15:23, 16:9, 17:1, 17:5, 18:6, 18:12, 22:2, 23:20, 24:10, 24:11, 24:13, 25:10, 25:13, 25:14, 25:18, 25:21, 25:24, 27:23, 28:1, 29:4, 29:9, 29:17, 29:19, 33:11, 33:13, 33:14, 33:24, 34:5, 34:9, 34:16, 39:9, 39:16, 39:18, 40:1, 40:20, 41:7, 41:11, 43:13, 43:15, 43:22, 43:25, 44:20, 48:3, 48:12, 48:14, 48:15, 49:10, 51:3, 51:16, 51:21, 52:10, 52:23, 53:3, 53:21, 54:3, 54:18, 55:5, 55:14, 55:19, 55:24, 56:5, 56:12, 57:16, 58:18, 60:20, 61:6, 61:20, 62:1, 62:6, 62:17, 62:19, 62:25, 63:6, 63:10, 63:14, 64:12, 64:17, 65:22, 66:13, 66:18, 67:25, 68:22, 70:2, 71:4, 71:16, 71:20, 71:24, 72:4, 72:8, 72:12, 73:20, 73:23, 74:7, 74:11, 74:14, 74:17, 74:20, 75:9, 75:22, 76:16, 77:4, 77:18, 79:1, 79:4, 79:13, 79:23, 80:7, 81:16, 81:21, 81:23, 82:14, 82:17, 83:13, 88:10, 89:12, 90:2, 92:1, 92:8, 95:14, 95:24, 96:9, 99:13, 100:3, 100:24, 101:9, 101:11, 101:23, 101:24, 104:21, 106:5, 112:9, 117:10, 121:12
**Ortiz's** [15] - 28:24, 44:4, 48:18, 48:24, 49:18, 54:23, 58:12, 59:15, 70:10, 70:15, 81:7, 88:8, 89:7, 104:2, 116:25
**otherwise** [2] - 69:4, 111:19
**out-of-pocket** [1] - 103:8
**outside** [5] - 42:18, 50:21, 65:4, 88:24, 103:13
**overeagerness** [1] - 117:11
**Overruled** [1] - 45:19
**overruled** [7] - 8:2, 42:19, 45:3, 45:11, 72:19, 99:11, 110:10
**overseas** [1] - 38:5
**overseeing** [1] - 48:25
**own** [3] - 50:19, 70:13, 108:5
**owner** [2] - 17:10

## P

**P.A** [3] - 2:9, 2:22, 2:24
**PAGE** [1] - 3:2
**page** [27] - 43:4,

43:20, 44:19, 51:22, 52:13, 55:9, 55:22, 56:3, 58:14, 60:9, 60:15, 61:14, 62:24, 66:17, 66:19, 71:23, 72:3, 72:7, 73:19, 73:22, 75:3, 75:21, 76:17, 77:1, 77:5, 77:14, 78:17
**pages** [1] - 1:7
**paid** [1] - 43:22
**pain** [1] - 103:17
**pants** [1] - 17:15
**par** [1] - 82:20
**paragraph** [4] - 67:6, 68:15, 70:10, 70:15
**parallels** [1] - 98:23
**parameter** [1] - 109:14
**parentheses** [1] - 53:17
**parents** [1] - 120:12
**parole** [3] - 107:25, 109:23
**part** [22] - 9:16, 11:23, 17:10, 40:15, 47:14, 47:20, 58:20, 58:24, 68:2, 76:8, 79:11, 83:11, 84:5, 85:22, 85:23, 86:6, 86:10, 90:22, 96:20, 96:22, 113:19
**part-owner** [1] - 17:10
**participate** [2] - 87:2, 87:23
**participating** [1] - 63:16
**participation** [1] - 63:1
**particular** [1] - 43:17
**particularly** [1] - 96:7
**partner** [10] - 17:1, 17:6, 22:3, 59:15, 64:13, 64:18, 70:20, 86:13, 116:22
**parts** [3] - 47:11, 49:16, 114:13
**pass** [3] - 80:12, 103:20, 110:14
**passed** [7] - 48:21, 63:9, 70:5, 106:1, 106:3, 113:9, 113:12
**passport** [1] - 31:25
**passports** [4] - 31:15, 32:6, 54:7, 54:9
**past** [2] - 71:18, 89:2
**PATRICK** [1] - 2:23
**Patrick** [3] - 2:24, 4:22, 30:7
**pause** [2] - 60:6, 67:20
**pausing** [3] - 59:2, 60:1, 60:14
**Pavletic** [1] - 4:11
**Pembroke** [1] - 55:16
**pending** [3] - 69:11, 72:22, 107:22
**people** [31] - 24:6, 27:9, 28:20, 28:23, 31:8, 31:15, 54:4, 54:15, 57:3, 57:18, 61:9, 64:3, 65:4, 67:10, 67:11, 67:21, 68:12, 71:1, 78:7, 92:2, 92:10, 92:20, 92:25, 93:4, 93:11, 94:20, 105:19, 113:24, 114:16, 115:22, 116:18
**per** [1] - 87:25
**percent** [1] - 55:1
**PEREZ** [11] - 2:13, 4:15, 5:7, 16:17, 19:15, 20:14, 20:15, 26:11, 29:20, 59:23, 65:25
**Perez** [3] - 2:13, 4:15, 16:15
**Perez..................** [1] - 3:4
**perform** [1] - 68:8
**performing** [1] - 46:22
**perhaps** [3] - 19:20, 57:7
**period** [3] - 12:12, 43:21, 43:23
**periods** [1] - 119:22
**permanently** [1] - 16:5
**permissible** [1] - 68:10
**permission** [4] - 106:25, 107:1, 107:10
**permitted** [1] - 108:9
**person** [27] - 19:25, 23:18, 24:23, 25:3, 25:5, 25:6, 26:7, 28:19, 38:13, 41:2, 51:5, 55:5, 60:2, 61:24, 68:8, 77:13, 85:19, 94:2, 96:21, 106:21, 108:1, 111:18, 111:19, 111:22, 111:23, 112:9, 116:6
**personally** [2] - 44:3, 57:21
**personnel** [4] - 74:8, 74:15, 75:17, 75:19
**perspective** [1] - 33:16
**pertinent** [5] - 13:13, 51:11, 51:13, 58:20, 114:13
**perturbed** [1] - 6:16
**Phenelus** [1] - 4:10
**PHENELUS** [1] - 2:5
**phone** [47] - 7:1, 7:3, 7:4, 7:18, 9:15, 9:25, 10:13, 10:14, 10:15, 10:20, 10:23, 10:24, 11:4, 11:5, 11:6, 11:17, 11:24, 12:18, 13:2, 14:1, 14:8, 14:18, 14:21, 25:22, 35:2, 35:5, 35:21, 35:24, 36:5, 36:6, 36:7, 36:9, 39:19, 40:18, 41:4, 41:11, 67:2, 73:24, 75:14, 77:20, 88:11, 91:13, 93:11, 93:14, 94:8, 95:6
**phones** [23] - 7:24, 8:4, 8:5, 8:6, 8:8, 8:9, 8:12, 9:21, 11:5, 11:7, 11:8, 11:9, 11:11, 11:12, 12:9, 12:11, 12:24, 32:24, 35:18, 35:19, 41:7, 41:13, 41:17
**photographs** [1] - 56:7
**physically** [1] - 35:21
**picture** [4] - 19:12, 87:5
**piece** [2] - 48:7, 113:16
**Pines** [1] - 55:16
**pipeline** [1] - 57:15
**Pixel** [2] - 35:2, 35:25
**place** [4] - 22:8, 53:23, 64:24, 92:19
**placed** [1] - 68:20
**plan** [7] - 44:21, 45:7, 45:17, 72:4, 72:8, 120:14
**planned** [1] - 71:25
**planning** [1] - 72:12
**plans** [2] - 119:7, 120:5
**plate** [3] - 60:7, 60:8, 60:18
**plates** [1] - 60:16
**Played** [5] - 58:25, 59:12, 59:24, 60:4, 60:12
**PM** [9] - 1:6, 52:11, 77:17, 79:9, 89:13, 90:3, 90:9, 120:19, 121:19
**pocket** [1] - 103:8
**podium** [1] - 41:24
**point** [13] - 9:9, 16:3, 16:6, 16:7, 35:16, 38:18, 67:17, 84:13, 84:14, 85:3, 85:4, 98:12, 118:25
**Police** [1] - 57:1
**police** [1] - 32:25
**policies** [2] - 18:7, 19:8
**policy** [8] - 15:6, 15:15, 15:18, 29:14, 40:13, 50:14, 50:24, 108:16
**political** [10] - 54:4, 54:5, 54:6, 71:8, 90:22, 90:25, 91:3, 91:4, 102:2, 103:8
**politicians** [2] - 14:2, 93:1
**politics** [3] - 18:17, 18:19, 56:17
**port** [1] - 31:20
**Port** [2] - 58:3, 72:5
**Port-au-Prince** [2] - 58:3, 72:5
**position** [1] - 112:10
**positive** [1] - 57:10
**Posner** [1] - 2:19
**possible** [3] - 49:4, 67:15, 102:20
**potent** [1] - 7:18
**potential** [3] - 49:3, 54:19, 106:2
**potentially** [4] - 53:25, 54:10, 57:5, 62:9
**practice** [2] - 12:8, 12:10
**premise** [2] - 76:19, 76:22
**prepared** [3] - 22:14, 120:3, 122:3
**present** [11] - 4:14, 4:20, 4:23, 21:22, 22:22, 28:14, 32:14, 64:13, 94:12, 102:18, 110:3
**presented** [1] - 113:16
**preserve** [4] - 12:20, 13:17, 14:18, 73:16
**President** [5] - 8:21, 44:25, 71:25, 72:13, 73:6
**president** [5] - 21:1, 37:11, 54:20, 74:10, 74:12
**presidential** [2] - 74:6, 104:5
**pressed** [1] - 96:19
**Pretel** [23] - 4:3, 13:6, 13:8, 14:5, 15:3, 15:23, 16:9, 22:2, 28:1, 28:22, 28:24, 29:4, 34:9, 43:13, 48:3, 63:6, 81:21, 82:14, 83:13, 89:6, 100:24, 101:9, 101:11
**PRETEL** [2] - 1:6, 2:7
**pretty** [4] - 51:10, 77:20, 78:9, 103:19
**previous** [3] - 63:12, 78:22, 108:19
**previously** [6] - 5:25, 64:25, 69:14, 103:13, 108:16, 108:22
**pride** [1] - 117:11
**primarily** [3] - 33:13, 47:12, 49:14
**primary** [8] - 44:5, 48:18, 50:24, 50:25, 81:17, 83:8, 98:18, 98:24
**Prince** [2] - 58:3, 72:5
**private** [24] - 40:16, 68:9, 86:16, 86:19, 88:14, 88:21, 91:21, 92:8, 97:13, 97:14, 97:15, 105:2, 105:6, 105:7, 107:9, 107:11, 107:16, 108:7, 108:11, 108:17, 109:10, 112:6, 113:1
**privy** [2] - 49:16, 96:10
**problems** [1] - 56:16
**procedure** [1] - 116:20

**Proceedings** [1] - 1:21
**proceedings** [1] - 122:2
**process** [1] - 95:8
**produced** [1] - 1:22
**productive** [1] - 84:24
**professional** [2] - 61:12, 68:6
**profits** [1] - 68:7
**prohibited** [3] - 23:24, 24:22, 110:6
**prohibition** [1] - 24:25
**projects** [1] - 54:4
**prompted** [1] - 64:8
**property** [1] - 38:21
**prosecution** [4] - 53:5, 53:14, 84:18, 112:1
**prosecutions** [1] - 7:19
**prosecutor** [7] - 22:19, 22:21, 23:3, 37:9, 37:19, 73:11, 78:10
**prosecutor's** [1] - 74:9
**prospect** [1] - 104:9
**prospective** [1] - 106:2
**Protection** [5] - 33:3, 46:16, 47:17, 47:22, 81:3
**provide** [10] - 30:19, 49:2, 49:7, 50:10, 62:9, 74:5, 88:9, 88:16, 104:22, 107:10
**provided** [11] - 33:19, 39:14, 41:3, 43:25, 60:25, 69:14, 88:10, 93:11, 93:14, 94:9, 95:7
**providing** [9] - 39:12, 39:17, 41:1, 49:22, 60:23, 77:22, 88:13, 92:4, 107:21
**prudent** [3] - 12:20, 13:17, 21:7
**public** [1] - 49:20
**publicly** [1] - 49:6
**publish** [2] - 58:22, 80:4
**purchase** [1] - 53:24
**purpose** [4] - 50:17, 64:6, 73:22, 103:16
**pursue** [1] - 105:10
**purview** [3] - 50:21, 56:18, 88:24
**pushed** [1] - 103:15
**pushing** [1] - 96:19
**put** [14] - 12:24, 19:12, 20:2, 20:3, 25:17, 38:3, 64:22, 66:25, 72:20, 115:22, 118:6, 118:9, 118:14, 118:15
**puts** [2] - 118:13, 118:16

**Q**

**queries** [5] - 94:7, 94:9, 94:13, 95:9, 95:10
**questioned** [1] - 18:2
**questions** [14] - 5:6, 6:6, 16:21, 29:20, 29:24, 39:21, 39:25, 41:8, 42:2, 44:7, 44:12, 45:23, 77:19, 115:4
**quick** [1] - 77:22
**quickly** [2] - 67:15, 80:4

**R**

**racist** [1] - 19:7
**Rahmer** [5] - 8:16, 9:4, 9:9, 9:14, 9:24
**raise** [1] - 46:3
**rampant** [1] - 57:24
**ran** [1] - 95:6
**randomly** [1] - 42:24
**rapped** [1] - 115:2
**rat** [4] - 44:21, 44:25, 45:8, 45:17
**rather** [1] - 75:19
**re** [1] - 25:21
**re-admonished** [1] - 25:21
**reach** [2] - 63:6, 90:17
**reached** [2] - 89:12, 90:2
**reaction** [1] - 64:21
**read** [17] - 50:16, 52:5, 53:2, 67:3, 67:7, 68:15, 69:9, 70:9, 70:23, 71:11, 87:15, 114:11, 114:13, 115:15, 116:8, 116:12, 121:3
**reading** [1] - 53:9
**ready** [3] - 5:17, 22:1, 105:22
**realize** [4] - 13:10, 13:11, 109:25, 110:2
**really** [4] - 26:21, 56:15, 82:3, 86:2
**Realtime** [1] - 1:17
**reason** [8] - 22:13, 30:22, 41:16, 95:2, 95:24, 96:15, 97:24, 103:19
**reasons** [1] - 41:20
**rebuttal** [2] - 118:14, 118:15
**recalled** [1] - 104:13
**receive** [4] - 7:5, 8:9, 8:12, 52:9
**received** [6] - 25:5, 26:15, 33:21, 33:24, 35:14, 36:6
**receiving** [2] - 33:14, 76:17
**recently** [1] - 17:5
**Recess** [1] - 66:6
**recess** [1] - 121:19
**recognize** [9] - 43:5, 51:17, 52:13, 59:2, 60:1, 76:12, 76:14, 109:22, 110:6
**recognizes** [1] - 109:14
**recollection** [8] - 34:25, 35:6, 38:17, 87:9, 87:17, 88:3, 89:20, 89:23
**record** [11] - 4:6, 4:24, 11:15, 11:17, 11:19, 29:17, 46:6, 46:10, 48:11, 53:10, 122:2
**recorded** [1] - 1:21
**recording** [4] - 7:4, 7:6, 29:6, 29:16
**records** [1] - 94:6
**redirect** [1] - 39:22
**Redirect** [1] - 3:5
**REDIRECT** [1] - 39:23
**refer** [2] - 23:4, 85:11
**reference** [5] - 9:9, 33:25, 34:6, 35:8, 112:1
**referenced** [1] - 94:2
**referencing** [1] - 93:4
**referred** [2] - 68:22, 79:10
**referring** [9] - 27:23, 27:25, 28:1, 28:5, 28:12, 67:22, 68:25, 72:21, 89:21
**refers** [1] - 15:11
**reflect** [1] - 48:11
**reflected** [1] - 19:17
**reflects** [1] - 20:8
**refresh** [7] - 34:24, 35:6, 87:8, 87:17, 89:20, 89:22, 89:25
**refreshed** [1] - 38:17
**regarding** [6] - 54:6, 67:9, 67:10, 114:13, 114:15, 120:23
**regional** [1] - 64:8
**register** [4] - 45:7, 45:16, 64:4, 70:19
**regular** [2] - 58:12, 119:10
**regulating** [1] - 47:18
**related** [6] - 28:24, 53:24, 54:11, 60:23, 86:22, 89:7
**relation** [2] - 54:7, 86:15
**relationship** [19] - 17:8, 40:7, 51:3, 61:12, 67:14, 68:1, 68:6, 79:16, 79:25, 80:1, 80:2, 85:5, 85:13, 92:2, 92:8, 92:9, 92:21, 93:5, 105:7
**relationships** [1] - 40:16
**relayed** [2] - 23:10, 91:13
**relevance** [1] - 13:10
**relevant** [2] - 20:22, 21:13
**reliable** [1] - 84:24
**reliance** [1] - 95:16
**relying** [2] - 40:1, 95:14
**remaining** [1] - 81:14
**remember** [21] - 11:14, 11:21, 11:24, 19:9, 22:9, 22:10, 32:18, 32:19, 34:13, 34:14, 35:7, 37:13, 41:14, 91:9, 93:21, 98:6, 106:8, 108:4, 116:8, 117:21, 118:5
**remind** [1] - 44:14
**remotely** [1] - 113:1
**renewed** [2] - 52:7, 52:24
**reopened** [1] - 16:7
**rephrase** [1] - 24:18
**replaced** [1] - 36:17
**replied** [1] - 67:4
**reply** [2] - 79:8, 121:1
**report** [24] - 14:11, 21:19, 21:21, 22:13, 22:15, 22:18, 23:4, 23:9, 23:13, 30:21, 37:4, 37:9, 37:13, 37:19, 43:8, 43:17, 43:20, 47:25, 61:20, 65:5, 87:8, 87:25, 88:1, 104:23
**reported** [3] - 49:10, 61:21, 103:13
**REPORTER** [1] - 122:1
**reporter** [1] - 53:9
**Reporter** [2] - 1:17, 122:6
**Reporter..........................** [1] - 3:8
**reporting** [3] - 43:23, 49:11, 60:25
**reports** [2] - 84:2, 112:18
**represent** [3] - 16:20, 30:7, 71:2
**representation** [2] - 95:14, 95:16
**represented** [1] - 19:23
**request** [7] - 22:19, 22:20, 22:23, 94:6, 108:4, 108:24
**requested** [2] - 9:25, 23:3
**requests** [1] - 106:24
**requests/ applications** [1] - 67:15
**require** [1] - 109:23
**research** [2] - 54:14, 95:11
**resident** [1] - 23:25
**resources** [1] - 94:24
**respect** [1] - 92:20
**respond** [3] - 77:8, 79:5, 107:5
**responded** [4] - 26:1, 71:15, 79:4, 90:3
**response** [8] - 26:19, 26:20, 70:10, 75:23, 107:7, 114:14, 116:25, 120:24
**responsibilities** [3] - 47:20, 48:21, 83:9
**responsibility** [2] - 47:10, 113:20

**responsible** [2] - 79:19, 79:20
**rest** [3] - 71:11, 118:1, 118:2
**restaurant** [2] - 55:15, 105:15
**restriction** [2] - 23:23, 24:5
**rests** [1] - 118:20
**results** [1] - 96:10
**reticent** [1] - 93:10
**retreated** [1] - 74:16
**review** [7] - 9:14, 9:25, 13:9, 83:3, 83:19, 84:4, 84:9
**reviewed** [2] - 69:20, 69:22
**reviews** [5] - 83:20, 83:22, 83:23, 83:24, 84:5
**revoke** [1] - 63:19
**rifle** [2] - 59:8, 59:10
**risk** [4] - 25:17, 25:22, 57:11, 57:13
**Roger** [3] - 77:2, 77:9, 77:10
**role** [1] - 68:24
**room** [1] - 32:13
**roughly** [2] - 44:14, 70:5
**round** [1] - 109:18
**route** [1] - 74:9
**RPR** [2] - 1:17, 122:5
**rule** [1] - 53:2
**rules** [2] - 52:8, 52:24
**run** [2] - 54:18, 83:7
**run-up** [1] - 54:18
**running** [1] - 91:23
**runs** [1] - 57:11

## S

**SA** [1] - 28:5
**safe** [2] - 20:9, 62:11
**safety** [11] - 25:15, 38:22, 57:13, 93:20, 93:22, 98:23, 98:25, 99:1, 99:2, 114:8
**Sanon** [14] - 20:21, 21:16, 24:20, 33:21, 33:23, 39:13, 39:14, 74:5, 90:13, 90:19, 91:3, 92:4, 93:6, 104:4
**Sanon's** [1] - 105:14
**sat** [2] - 22:10, 22:24
**satisfactory** [1] - 84:9
**Saturday** [1] - 42:10
**saw** [4] - 26:7, 52:23, 55:7, 121:3
**schedule** [4] - 55:23, 119:2, 119:16, 120:6
**scheduling** [1] - 117:25
**scope** [2] - 42:18, 102:8
**screen** [6] - 19:16, 43:2, 52:5, 63:11, 75:6, 116:12
**scroll** [1] - 78:20
**scrolling** [1] - 75:21
**SEAN** [1] - 2:3
**Sean** [1] - 4:7
**second** [3] - 61:23, 67:6, 103:24
**secondhand** [1] - 110:4
**secreted** [1] - 74:19
**section** [1] - 67:7
**Security** [2] - 6:20, 15:4
**security** [32] - 17:11, 17:14, 31:5, 31:13, 32:1, 33:17, 34:2, 34:7, 35:8, 39:15, 53:24, 56:2, 56:22, 58:13, 59:16, 64:9, 73:10, 74:5, 86:13, 86:16, 86:19, 86:22, 87:2, 87:23, 88:9, 88:14, 88:21, 89:7, 92:4, 94:19, 105:2
**security-related** [3] - 53:24, 86:22, 89:7
**See** [1] - 121:20
**see** [21] - 17:19, 17:23, 19:12, 20:8, 48:5, 49:8, 51:23, 54:14, 55:5, 55:12, 59:20, 60:17, 63:12, 94:2, 94:5, 94:24, 95:6, 112:15, 119:3, 120:18, 121:4
**seeing** [2] - 17:20, 21:25
**seek** [2] - 20:3, 105:8
**seeking** [2] - 62:25, 91:21
**seem** [1] - 19:19
**selection** [1] - 118:5
**self** [1] - 50:20
**self-defense** [1] - 50:20
**sell** [1] - 17:14
**selling** [1] - 58:13
**Senator** [1] - 19:2
**send** [8] - 14:5, 34:11, 58:18, 69:24, 77:15, 77:23, 77:24, 87:5
**sending** [7] - 27:17, 35:7, 39:9, 55:14, 56:8, 73:22, 75:22
**sends** [2] - 77:7, 106:5
**sense** [4] - 59:5, 78:5, 83:12, 110:3
**sent** [7] - 14:7, 28:9, 30:21, 63:14, 73:7, 74:2, 75:8
**sentence** [3] - 69:9, 70:23, 87:18
**separate** [2] - 69:22, 79:19
**sequence** [1] - 77:3
**sergeant** [2] - 19:17, 19:23
**serve** [2] - 74:9, 78:11
**served** [1] - 76:23
**services** [3] - 4:25, 41:14, 74:5
**Session** [2] - 1:5, 121:20
**set** [3] - 40:24, 41:1
**seven** [1] - 47:25
**several** [5] - 47:23, 77:18, 82:25, 95:9, 113:12
**share** [2] - 18:5, 18:9
**shared** [1] - 56:16
**sharing** [1] - 112:6
**ship** [1] - 58:2
**shirt** [1] - 48:10
**shocking** [1] - 78:9
**shook** [1] - 32:18
**short** [2] - 119:5, 119:14
**shortly** [1] - 55:7
**show** [15] - 26:16, 43:2, 44:18, 51:14, 52:12, 55:21, 56:3, 60:14, 62:23, 66:17, 71:22, 72:3, 75:3, 80:5, 87:8
**showed** [10] - 19:12, 22:5, 22:10, 23:18, 23:21, 28:21, 28:23, 63:15, 73:1, 112:1
**showing** [3] - 63:11, 115:5, 115:19
**shown** [1] - 35:16
**shows** [1] - 52:11
**shut** [3] - 29:9, 29:18, 29:19
**sic** [4] - 5:5, 19:2, 24:20, 73:7
**sic]** [1] - 19:22
**side** [2] - 58:22
**side-by-side** [1] - 58:22
**sided** [1] - 31:8
**singular** [1] - 28:19
**sit** [2] - 20:19, 27:2
**sitting** [2] - 22:7, 22:9
**situation** [9] - 67:10, 70:21, 79:21, 97:17, 104:22, 114:23, 115:15, 115:16, 117:3
**size** [1] - 59:7
**slow** [1] - 53:8
**so..** [2] - 20:13, 44:2
**SOLAGES** [1] - 2:21
**Solages** [19] - 4:4, 4:22, 5:11, 29:25, 30:7, 33:20, 38:14, 38:19, 39:9, 39:12, 39:17, 45:7, 45:16, 66:3, 90:13, 90:19, 91:8, 93:6, 121:18
**sold** [2] - 17:19, 56:25
**solicited** [1] - 109:1
**someone** [10] - 19:21, 20:5, 21:14, 27:2, 27:13, 41:21, 54:22, 68:16, 68:18, 68:22
**sometimes** [5] - 21:13, 32:23, 49:3, 50:3, 58:18
**someway** [1] - 70:18
**somewhere** [2] - 18:24, 22:10
**soon** [1] - 12:14
**sooner** [1] - 120:2
**sorry** [13] - 9:2, 10:12, 16:24, 24:17, 25:24, 28:11, 32:9, 38:5, 39:3, 45:12, 92:18, 115:13, 117:5
**sort** [21] - 18:18, 30:12, 30:23, 56:25, 58:4, 58:9, 58:11, 68:8, 68:11, 69:23, 73:12, 76:1, 77:21, 78:8, 85:15, 85:16, 86:24, 97:5, 118:19, 120:24, 121:9
**sought** [4] - 54:1, 54:11, 54:12
**sound** [3] - 89:4, 89:13, 89:18
**sounds** [2] - 90:8, 90:9
**source** [42] - 8:25, 9:7, 12:17, 13:7, 13:16, 15:8, 15:11, 15:16, 15:20, 16:4, 16:5, 16:6, 27:9, 40:8, 40:10, 40:14, 40:15, 42:4, 43:8, 43:12, 43:17, 48:15, 50:7, 50:13, 52:18, 57:8, 57:12, 63:19, 69:3, 69:16, 79:14, 79:25, 80:6, 80:8, 85:14, 85:15, 86:4, 99:22, 102:24, 112:10, 116:21
**source/handler** [1] - 40:7
**sources** [9] - 12:24, 33:23, 40:13, 49:3, 50:3, 56:1, 81:14, 108:15
**South** [1] - 47:11
**SOUTHERN** [1] - 1:1
**Southern** [1] - 122:7
**Spanish** [5] - 52:2, 73:11, 74:23, 74:24, 74:25
**spare** [1] - 50:19
**speaking** [7] - 43:14, 45:1, 56:21, 60:21, 74:22, 74:25, 118:10
**Special** [32] - 4:11, 8:16, 9:4, 9:14, 9:24, 28:12, 48:22, 54:25, 56:14, 57:9, 57:10, 64:2, 64:8, 64:10, 64:14, 80:11, 81:16, 81:17, 81:19, 81:24, 98:3, 98:9, 99:13, 99:14, 99:17, 100:3, 100:4, 101:16, 109:6, 114:18, 116:6
**specialized** [1] - 46:21
**specific** [4] - 10:21, 47:5, 50:7, 50:13
**specifically** [3] - 65:9, 69:1, 69:18
**specifics** [3] - 18:20, 19:9, 27:8

**speculate** [2] - 99:19
**speculation** [3] - 72:18, 99:16, 110:9
**speed** [2] - 104:11, 104:18
**spell** [1] - 46:10
**spoken** [3] - 19:4, 26:3, 52:24
**squad** [8] - 47:1, 47:7, 47:14, 48:21, 48:22, 81:11, 81:12
**St** [3] - 62:5, 111:6, 112:22
**standing** [4] - 4:16, 48:9, 59:21, 82:24
**start** [9] - 6:7, 39:25, 42:1, 46:13, 46:23, 119:16, 119:22, 120:1, 120:16
**started** [2] - 46:15, 48:25
**starting** [5] - 4:6, 76:9, 87:17, 119:12
**starts** [2] - 68:15, 70:23
**State** [1] - 56:19
**state** [2] - 13:17, 46:5
**STATES** [3] - 1:1, 1:4, 1:12
**States** [25] - 1:18, 2:5, 4:3, 4:8, 14:12, 14:17, 19:6, 19:7, 32:7, 42:13, 46:1, 46:15, 47:19, 58:3, 62:9, 63:20, 69:3, 81:3, 107:20, 108:1, 109:22, 111:12, 117:12, 120:20, 122:6
**statistical** [1] - 84:5
**status** [7] - 11:11, 20:3, 57:11, 63:20, 68:14, 107:20, 108:2
**stay** [3] - 119:6, 119:17, 120:4
**Stay** [1] - 58:7
**stayed** [2] - 21:3, 21:4
**staying** [1] - 120:16
**STEINBEISSER** [2] - 1:17, 122:5
**Steinbeisser** [1] - 122:5
**stenography** [1] - 1:21
**stenotype** [1] - 122:3
**steps** [1] - 65:5
**stick** [1] - 108:18
**still** [2] - 53:9, 104:10
**stipulate** [1] - 59:23
**stop** [2] - 53:17, 105:5
**streamline** [1] - 49:5
**strike** [5] - 12:6, 15:6, 39:20, 105:25, 109:21
**stuff** [1] - 102:23
**subject** [3] - 7:5, 79:23, 109:19
**subpoena** [1] - 102:13
**subsources** [1] - 25:16
**substantial** [1] - 13:2
**substantive** [2] - 40:22, 40:25
**success** [2] - 106:7, 106:17
**successes** [1] - 84:6
**successful** [3] - 49:25, 50:2, 106:19
**successfully** [3] - 44:3, 49:18, 49:20
**suggest** [1] - 101:12
**suit** [1] - 48:9
**summarize** [2] - 117:18, 117:19
**summary** [1] - 74:1
**super** [1] - 67:11
**superiors** [1] - 6:9
**supervising** [1] - 9:1
**supervision** [5] - 13:6, 13:16, 50:4, 50:9, 69:2
**supervisor** [4] - 6:16, 81:11, 82:20, 83:5
**supervisors** [1] - 115:1
**supervisory** [2] - 47:20, 116:2
**supplemental** [2] - 22:18, 23:4
**supplemented** [1] - 14:11
**support** [6] - 19:5, 19:6, 20:16, 47:16, 81:12, 103:22
**supported** [1] - 42:13
**supposed** [6] - 38:10, 40:8, 40:10, 63:3, 72:13, 77:7
**supposedly** [1] - 7:23
**surrender** [3] - 62:21, 110:21, 111:9
**suspect** [2] - 94:1, 94:3
**suspicion** [1] - 92:12
**suspicious** [1] - 112:16
**sustained** [5] - 10:9, 26:10, 39:5, 100:7, 115:11
**sworn** [2] - 6:1, 46:4
**Syrians** [1] - 33:25

## T

**Table** [1] - 19:14
**table** [5] - 4:9, 4:17, 22:7, 22:9, 22:11
**tactical** [3] - 17:15, 89:8, 91:21
**tad** [1] - 116:2
**tail** [1] - 118:19
**talks** [1] - 112:16
**TAMA** [1] - 2:19
**Tama** [1] - 4:19
**target** [1] - 7:6
**targets** [1] - 102:5
**Task** [1] - 46:1
**task** [15] - 33:2, 46:25, 47:2, 47:3, 47:15, 47:24, 80:19, 80:22, 81:4, 81:15, 82:23, 83:3, 83:5, 83:9, 83:11
**tasked** [2] - 88:22, 97:8
**team** [6] - 9:8, 57:24, 72:12, 73:10, 81:15, 103:4
**teams** [1] - 102:12
**technically** [1] - 108:2
**telephone** [2] - 13:1, 41:3
**telephonically** [2] - 111:19, 111:23
**ten** [5] - 5:13, 6:21, 15:3, 15:22, 16:9
**tenure** [1] - 13:6
**term** [2] - 15:7, 47:16
**terminate** [2] - 80:1, 80:2
**terminating** [1] - 15:12
**terms** [3] - 79:25, 117:25, 118:3
**terrorist** [1] - 49:13
**terroristic** [1] - 54:8
**testified** [6] - 18:16, 27:11, 33:22, 35:11, 37:19, 40:22
**testimony** [3] - 16:21, 19:19, 115:10
**text** [14] - 7:13, 13:5, 13:8, 40:24, 41:4, 41:10, 51:5, 66:21, 66:23, 73:7, 73:25, 79:8, 116:11, 117:14
**texted** [2] - 40:20, 87:5
**texting** [1] - 40:23
**texts** [2] - 34:12, 91:14
**TFO** [3] - 32:24, 80:19, 80:21
**that..** [1] - 12:7
**THE** [69] - 1:11, 2:2, 4:2, 4:24, 5:5, 5:9, 5:11, 5:14, 5:19, 5:21, 8:2, 10:9, 13:20, 13:23, 14:25, 16:15, 26:10, 29:22, 29:25, 30:2, 36:13, 39:3, 39:5, 39:22, 42:19, 45:3, 45:4, 45:11, 45:12, 45:19, 45:25, 46:3, 46:5, 46:7, 53:8, 53:11, 65:12, 65:15, 65:17, 65:22, 65:24, 66:1, 66:3, 66:5, 66:7, 66:9, 72:19, 72:21, 72:22, 73:2, 80:13, 87:13, 87:15, 99:11, 99:12, 100:7, 100:15, 100:17, 110:10, 110:11, 115:11, 117:6, 117:9, 117:19, 117:23, 120:20, 121:3, 121:14, 121:18
**themselves** [1] - 47:25
**therefore** [2] - 12:2, 97:10
**thinking** [1] - 95:15
**Thornton** [1] - 2:9
**threat** [1] - 47:5
**threats** [1] - 61:1
**three** [4] - 15:25, 16:10, 109:5, 119:5
**throughout** [1] - 22:4
**throwing** [2] - 121:13, 121:14
**tickets** [3] - 44:21, 45:8, 45:17
**tighter** [1] - 109:14
**Tim** [8] - 27:5, 27:17, 27:22, 28:9, 28:11, 28:16, 29:1
**timeline** [2] - 54:13, 78:16
**timing** [2] - 118:3, 120:9
**tips** [2] - 44:4, 49:19
**tirade** [1] - 102:2
**titled** [1] - 51:15
**TO** [1] - 66:6
**today** [4] - 4:25, 40:19, 120:13, 121:6
**together** [2] - 47:5, 81:24
**Tom** [1] - 4:11
**tomorrow** [3] - 90:4, 120:13, 121:8
**Tony** [6] - 22:2, 59:19, 59:20, 60:3, 67:13, 70:11
**took** [3] - 74:15, 98:3, 98:7
**top** [5] - 50:18, 61:17, 62:13, 66:19, 77:15
**topic** [1] - 69:10
**topics** [4] - 34:1, 48:1, 101:17, 103:7
**Torchon** [3] - 62:4, 111:6, 112:22
**total** [1] - 36:18
**touch** [2] - 64:4, 111:7
**toward** [1] - 22:5
**towards** [1] - 19:8
**Trachten** [1] - 2:19
**track** [2] - 118:1, 118:19
**trafficking** [3] - 31:20, 31:23, 34:2
**tragic** [1] - 78:2
**training** [10] - 40:12, 46:17, 46:19, 46:21, 53:23, 86:24, 87:21, 89:8, 91:21, 97:5
**Training** [1] - 46:19
**trainings** [1] - 82:22
**TRANSCRIPT** [1] - 1:10
**transcript** [1] - 1:21
**transcription** [2] - 1:22, 122:2
**transition** [2] - 20:25, 81:12
**transitional** [2] - 18:17, 20:17
**translated** [1] - 19:10
**translation** [4] - 19:5, 51:24, 52:5, 110:5
**transnational** [2] - 47:6, 47:9
**transparent** [1] - 96:7

**travel** [14] - 18:14, 38:1, 86:15, 88:8, 106:25, 107:1, 107:9, 107:10, 107:15, 107:16, 107:18, 108:7, 108:8, 109:9
**traveled** [5] - 18:11, 86:18, 86:21, 88:22, 108:11
**traveling** [3] - 38:5, 88:20, 89:3
**trial** [3] - 2:4, 4:9, 119:4
**TRIAL** [1] - 1:10
**tried** [2] - 40:22, 90:17
**tries** [1] - 112:17
**TRO** [2] - 80:18
**trouble** [5] - 6:9, 6:13, 6:14, 6:15, 115:2
**true** [4] - 27:6, 71:8, 108:17, 113:6
**trust** [6] - 15:4, 15:22, 16:9, 68:20, 88:1, 112:17
**trustworthy** [1] - 85:1
**truthful** [2] - 50:23, 84:18
**truthfulness** [1] - 51:1
**try** [10] - 12:24, 12:25, 41:5, 45:7, 45:16, 49:5, 49:7, 65:3, 67:19
**trying** [11] - 39:2, 67:13, 67:25, 68:11, 68:12, 92:9, 94:20, 102:18, 103:23, 110:14, 117:11
**turn** [7] - 11:6, 11:8, 11:13, 51:22, 60:19, 67:6, 84:17
**turned** [17] - 8:7, 8:8, 8:10, 8:14, 8:15, 11:14, 11:17, 11:21, 11:24, 12:6, 12:11, 12:14, 12:16, 36:6, 41:7, 54:22
**turning** [2] - 70:1, 73:19
**two** [9] - 7:23, 55:11, 62:3, 70:5, 91:16, 106:24, 112:22, 119:5, 120:23
**type** [7] - 7:6, 46:17, 52:13, 59:2, 60:18, 61:1, 101:24
**typically** [3] - 66:21, 85:17, 119:13

**U**

**ultimately** [2] - 62:6, 63:19
**unable** [1] - 21:9
**unauthorized** [2] - 53:6, 53:15
**under** [6] - 12:19, 13:16, 50:4, 50:14, 68:18, 69:2
**underneath** [1] - 20:9
**understood** [5] - 58:13, 67:5, 74:1, 76:2, 111:10
**undertake** [1] - 46:17
**underway** [2] - 16:1, 16:12
**unfolded** [1] - 83:14
**unfortunately** [2] - 57:25, 84:8
**unimpressed** [1] - 115:25
**UNITED** [3] - 1:1, 1:4, 1:12
**United** [25] - 1:18, 2:5, 4:2, 4:8, 14:12, 14:17, 19:6, 19:7, 32:7, 42:12, 46:1, 46:15, 47:19, 58:3, 62:9, 63:20, 69:3, 81:3, 107:20, 108:1, 109:22, 111:12, 117:12, 120:20, 122:6
**unless** [3] - 58:1, 97:16, 102:10
**unrelated** [1] - 77:23
**untimely** [1] - 72:19
**unusual** [5] - 109:15, 112:20, 112:24, 113:3, 113:4
**up** [40] - 14:24, 18:22, 19:13, 19:16, 20:17, 21:1, 22:5, 22:10, 23:18, 23:21, 26:16, 28:21, 28:23, 31:18, 35:5, 40:24, 41:1, 41:14, 41:17, 54:18, 59:22, 66:13, 70:21, 71:20, 76:8, 78:20, 84:13, 85:3, 85:4, 95:7, 102:2, 104:11, 104:18, 115:5, 115:19, 117:16, 119:24, 120:18, 120:25
**updates** [1] - 105:13
**updating** [2] - 60:20, 105:17
**upset** [10] - 24:9, 25:2, 25:9, 25:12, 25:13, 56:22, 114:25, 115:1
**urgency** [5] - 77:21, 78:5, 78:15, 79:11
**US** [21] - 2:4, 19:3, 19:23, 37:25, 42:21, 42:24, 44:11, 58:4, 63:7, 63:23, 64:1, 64:3, 64:5, 68:18, 68:22, 88:11, 88:18, 93:5, 102:10, 113:22, 114:25
**useful** [5] - 7:8, 7:9, 113:16, 113:18, 113:19
**uses** [1] - 25:7
**utilize** [1] - 51:7
**utilizing** [1] - 68:7
**utter** [1] - 56:20

**V**

**valuable** [1] - 7:14
**value** [4] - 35:13, 43:15, 43:25, 96:23
**vantage** [1] - 59:4
**varying** [1] - 47:4
**Veintemilla** [6] - 4:4, 4:19, 5:9, 29:23, 66:1, 121:16
**VEINTEMILLA** [1] - 2:16
**veracity** [1] - 51:1
**verbal** [3] - 58:11, 109:20
**verbally** [2] - 12:25, 102:3
**verbatim** [2] - 50:16, 116:9
**verify** [6] - 17:23, 19:24, 20:11, 40:1, 40:15, 93:10
**verifying** [2] - 95:15
**versus** [1] - 4:3
**vests** [1] - 17:15
**vet** [1] - 104:22
**veteran** [6] - 19:25, 20:3, 20:5, 20:9, 20:10, 20:12
**veterans** [2] - 20:2, 20:4
**vetted** [1] - 57:24
**vetting** [1] - 95:8
**via** [1] - 89:12
**viability** [1] - 103:1
**viable** [2] - 58:4, 94:13
**VID** [1] - 58:23
**video** [14] - 29:6, 29:16, 29:18, 29:19, 58:23, 58:25, 59:3, 59:12, 59:14, 59:24, 60:2, 60:4, 60:12, 60:17
**videos** [1] - 58:19
**view** [1] - 85:17
**violation** [3] - 18:7, 49:8, 50:21
**violations** [5] - 61:1, 68:19, 68:23, 69:23, 79:20
**violence** [2] - 50:19, 50:25
**visit** [8] - 28:17, 29:10, 44:8, 44:15, 45:6, 45:15, 63:22, 66:14
**visited** [3] - 45:8, 45:21, 64:18
**visitors** [1] - 42:25
**voluntarily** [1] - 8:7
**voluntary** [1] - 8:11
**volunteer** [1] - 14:20
**vs** [1] - 1:5

**W**

**wait** [1] - 90:4
**waiting** [1] - 42:1
**waived** [1] - 18:18
**walk** [3] - 20:18, 21:9, 104:18
**Walter** [2] - 4:3, 4:19
**wants** [3] - 110:21, 111:16, 120:25
**warrant** [11] - 72:13, 73:12, 74:10, 76:2, 76:18, 76:21, 76:23, 77:7, 77:8, 78:9, 97:17
**warranted** [1] - 54:15
**waste** [1] - 56:20
**watch** [1] - 109:2
**ways** [2] - 6:23, 7:8
**wearing** [1] - 48:8
**Wednesday** [1] - 119:11
**week** [8] - 69:12, 118:2, 118:11, 119:6, 119:12, 120:1, 120:16
**weeks** [5] - 15:25, 16:10, 63:21, 106:24, 114:1
**whatnot** [1] - 14:2
**WhatsApp** [5] - 7:12, 51:7, 51:20, 89:13, 106:5
**whole** [3] - 44:4, 70:8, 115:19
**wife** [1] - 90:3
**willing** [1] - 119:6
**wiped** [11] - 10:25, 11:2, 11:3, 11:8, 12:9, 12:13, 12:15, 13:10, 14:8, 36:10
**withdraw** [1] - 115:12
**WITNESS** [10] - 45:4, 45:12, 46:7, 53:11, 72:21, 87:15, 99:12, 100:17, 110:11, 117:9
**witness** [7] - 5:14, 5:17, 5:25, 45:25, 46:4, 48:11, 80:12
**witness's** [1] - 115:9
**WITNESSES** [1] - 3:2
**witnesses** [1] - 120:24
**woman** [1] - 77:11
**word** [4] - 25:2, 71:11, 71:12, 109:20
**words** [2] - 12:25, 68:16
**works** [4] - 35:25, 61:1, 81:4, 81:5
**world** [2] - 49:16, 112:12
**worth** [2] - 21:16, 44:2
**wounded** [1] - 78:7
**wrap** [1] - 14:24
**write** [5] - 36:25, 37:9, 66:21, 66:23, 83:19
**writing** [1] - 66:25
**written** [5] - 7:17, 50:10, 65:1, 66:13, 83:20
**wrote** [9] - 23:13, 37:4, 37:16, 66:18, 88:1, 116:11, 117:14
**Wu** [2] - 4:9, 66:9
**WU** [46] - 2:4, 7:25, 10:8, 13:19, 26:9, 36:12, 38:25, 39:4, 39:20, 39:24,

41:23, 41:25, 42:20, 45:5, 45:13, 45:20, 45:23, 46:1, 46:9, 48:11, 48:13, 53:16, 58:22, 59:1, 59:13, 59:25, 60:5, 60:13, 61:14, 61:16, 65:10, 65:13, 66:10, 66:11, 72:23, 73:3, 73:4, 78:20, 78:21, 80:12, 99:10, 100:6, 100:14, 110:9, 115:9, 117:4
**Wu..................** [1] - 3:5
**Wu....................** [1] - 3:7

Y

**year** [9] - 10:6, 44:1, 44:14, 77:25, 82:18, 83:14, 83:15, 83:17, 108:20
**yearly** [1] - 83:3
**years** [6] - 6:21, 15:3, 15:22, 16:9, 36:22, 36:25
**yesterday** [7] - 6:8, 6:19, 8:23, 14:23, 15:2, 40:1, 106:6
**yield** [1] - 49:23
**York** [1] - 49:15
**yourself** [3] - 26:12, 26:22, 86:6