UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 22-CR-20104-JB

UNITED STATES OF AMERICA, Miami, Florida

Plaintiff, April 22, 2026
DAY 30 - AFTERNOON SESSION
vs. 1:08 p.m. to 4:34 p.m.

ARCANGEL PRETEL ORTIZ, et al., Pages 1 to 154

Defendants.

---

JURY TRIAL
BEFORE THE HONORABLE JACQUELINE BECERRA
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT: SEAN THOMAS MCLAUGHLIN, ESQ.
DOJ - UNITED STATES ATTORNEY'S OFFICE
11200 NW 20th Street, Suite 101
Miami, Florida 33132
-and-
ANDREW BRIGGS, ESQ.
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue Northwest
Washington, DC 20530
-and-
JASON WU, ESQ.
ALTANESE PHENELUS, ESQ.
UNITED STATES ATTORNEY'S OFFICE
99 Northeast 4th Street
Miami, Florida 33132

FOR DEFENDANT ORTIZ: ORLANDO DO CAMPO, ESQ.
DANIELA JARAMILLO, ESQ.
DO CAMPO & THORNTON, P.A.
150 SE 2nd Avenue, Suite 602
Miami, Florida 33131
-and-

FOR DEFENDANT ORTIZ: DAVID A. HOWARD, ESQ.
DAVID A. HOWARD, P.A.
25 SE Second Avenue, Suite 1100
Miami, Florida 33131

FOR DEFENDANT INTRIAGO:
EMMANUEL PEREZ, ESQ.
EMMANUEL PEREZ & ASSOCIATES, P.A.
901 Ponce de Leon Boulevard, Suite 101
Coral Gables, Florida 33134
-and-
HECTOR L. FLORES, ESQ.
BARZEE FLORES, P.A.
Courthouse Center, Penthouse 1
40 Northwest Third Street
Miami, Florida 33128

FOR DEFENDANT VEINTEMILLA:
TAMA BETH KUDMAN, ESQ.
KUDMAN TRACHTEN ALOE POSNER, LLP
7108 Fairway Drive, Suite 130
Palm Beach Gardens, Florida 33418
-and-
MARISSEL DESCALZO, ESQ.
DESCALZO LAW, P.A.
150 SE Second Avenue, Suite 600
Miami, Florida 33131

FOR DEFENDANT SOLAGES: JONATHAN S. FRIEDMAN, ESQ.
JONATHAN S. FRIEDMAN, P.A.
101 NE 3rd Avenue, Suite 1500
Fort Lauderdale, Florida 33301
-and-
S. PATRICK DRAY, ESQ.
S. PATRICK DRAY, P.A.
1900 Biscayne Blvd., Suite 459
North Miami, Florida 33181

STENOGRAPHICALLY REPORTED BY:

PATRICIA DIAZ, FCRR, RPR, FPR
Official Court Reporter
United States District Court
400 North Miami Avenue, 11th Floor
Miami, Florida 33128
(305) 523-5178

# I N D E X


| WITNESSES FOR THE GOVERNMENT: | PAGE |
|---|---|
| DANIEL GONZALEZ | |
| CONTINUED CROSS-EXAMINATION BY MR. HOWARD | 4 |
| CROSS-EXAMINATION BY MR. PEREZ | 31 |
| CROSS-EXAMINATION BY MS. KUDMAN | 46 |
| CROSS-EXAMINATION BY MS. KUDMAN | 54 |
| REDIRECT EXAMINATION BY MR. WU | 65 |
| REINIEL GONZALEZ | |
| DIRECT EXAMINATION BY MR. BRIGGS | 79 |
| CROSS-EXAMINATION BY MR. PEREZ | 92 |
| MANUEL GARCIA | |
| DIRECT EXAMINATION BY MR. BRIGGS | 96 |
| DIMITRI SMITH | |
| DIRECT EXAMINATION BY MR. BRIGGS | 100 |
| CROSS-EXAMINATION BY MR. PEREZ | 122 |


## GOVERNMENT'S EXHIBITS


| NO. | ADMITTED |
|---|---|
| 148, 149, 150 and 154 | 100 |

(Call to the Order of the Court.)

COURT SECURITY OFFICER: All rise.

THE COURT: Okay. The jury is back and ready. Everybody is here.

Let's bring the jury in.

(Jury in at 1:08 p.m.)

(Government witness, DANIEL GONZALEZ, was previously sworn.)

THE COURT: Mr. Howard, please continue.

CONTINUED CROSS-EXAMINATION

BY MR. HOWARD:

Q. All right. We are going to try and summarize.

You were saying that you had deduced that Mr. Ortiz or Mr. Intriago, an affiliate of Mr. Ortiz, went down to the embassy and you deduced that he was a little bit too enthusiastic, the same person you knew, kind of out over his skis.

Right?

A. Yes.

Q. All well intended, but a little beyond his --

A. Yes, that's fair.

Q. -- proper space?

A. Correct.

Q. All right. But we are going to -- I am going to go through exactly what you said in his response.

"Regarding Haiti, do not bring me anything from the people involved in the meeting with George. That situation went very badly with many. I will not talk more about that but I will let you -- I will tell you one thing, as a friend, if one day it gives the appearance, not that you're actually doing it, but it gives the appearance that you or Tony are trying to use our relationship for the benefit of your personal company, everything will end quickly. It is possible that requests and applications will be cancelled."

I take it that was immigration requests?

A. Yes, sir.

Q. "My support for you only goes so far and I will not be able to defend you.

"I think it is better that you no longer try to establish introductions with us or others."

Right?

A. Yes.

Q. So, at the end of all of that, hey, dude, you need to slow down. But at the end it's, "don't try and introduce us to other people," not, "stop messing with the people in Haiti."

Right, at least that point. Okay?

A. Yeah.

Q. You go on, I'm not speaking to you as punishment, obviously. I'm not speaking to you as a punishment, obviously.

I am speaking to you -- I'm speaking to you to reason with

you. You are someone whom the United States has allowed under role of this agency to commit federal violations in order to bring bad people to justice, a lot of trust, not just a mere level, but a lot of trust has been placed on you.

MR. WU: Objection. Argumentative.

THE COURT: Overruled.

BY MR. HOWARD:

Q. "A lot of trust has been placed on you. Do not let some Haitians take that away from you."

In other words, stay in pocket. Right?

A. Right. I'd also like to point out that this is a translation from Spanish to English that you are reading.

Q. Right.

Would it be more accurate if I put it up and you read it and translate what you just said?

A. No, just in reference specifically to the word you mentioned, "punish," it can also --

Q. This is not an admonishment. I am not trying to chide you.

A. It was more meant to capture the word chastise as opposed to like punish.

Q. Right, right, right.

A. He's not going to be put in a corner or anything.

It's chastising him.

Q. Right. I'm not trying to -- right. Okay. Chastise you.

Okay. Then you change subjects and you talk about the fact

that you are only interested in the mosques in Haiti and then you talk about another investigation and then you end by saying, "Thank you, Angelo, for your help, as always, and enjoy your weekend." Right?

His response which may have been somewhat bastardized by the translation, "Brother, neither Tony nor I will ever talk about what we do." In other words, I am not going to say we are informants. Right?

MR. WU: Objection. Argumentative.

BY MR. HOWARD:

Q. Agreed?

THE COURT: Overruled.

BY MR. HOWARD:

Q. "And there will never be a need for us to use the agency for personal benefit. I know the law and the consequences of that, and I explained to George, which being the man Scott had," so, he had already spoken to George apparently. Right? Nunez had already balled him out?

A. Yes, I think so.

Q. Because Nunez got balled out. Right?

A. I can't say if he did or he didn't, sir.

Q. "As I explained to George, the man, Scott," I guess at the embassy, "asked whether anyone from an agency had been contacted, and Tony responded, but nothing was ever said that goes against the rules. I presented these people from Haiti

only for the intelligence they represent for the needs of the country. You know that I have been supporting transnational investigations with the agency for many years and I am always absolutely transparent and respectful.

"I have never acted for any other reason than to bring justice to the most difficult places, and this caused me having to leave the life I had and start over from zero here, which I will call my homeland. Bro, my service through my dedication to this sacred work and my commitment, I never asked for anything in return. I have even remained silent and without changing my commitment despite the difficulties that have arisen during my service because I fully trust every member of the team.

"I continue because I know that if we do not do it, no one else will, not even the American forces. We are the only ones who work in crime prevention. I am very proud of this."

And then he ends with, "I am very sorry for the misunderstanding."

Sounds about right?

A. Translated, yes, sir.

Q. And your answer, "I know, brother. I have everything clear but the people at the embassy had a different understanding based on how the" --

MR. WU: Objection. Is there going to be a question?

THE COURT: I am not sure why we are not showing the

witness what you are reading.

MR. HOWARD: I am almost done. I have half a sentence left.

THE COURT: All right.

BY MR. HOWARD:

Q. "But the people at the embassy had a different understanding based on how the Haitians presented themselves.

"Don't worry, the issue is dead, already buried, we move forward."

Right?

A. Correct.

Q. So, you said, look, watch yourself. He said, misunderstanding, my bad. And you say, it's buried, let's move on. Right?

A. Correct.

Q. Essentially.

Okay. All right. So, we move now to July 7th. You were saying there was no urgency. Do you know whether Mr. Ortiz attempted to call George Nunez, Special Agent George Nunez before he tried to call you or how many times he may have done so?

A. Afterwards, yeah, and I believe when I spoke to him on the phone on the 7th, he did mention that he tried to call George, yeah.

Q. So the urgency might have been in that direction. Right?

A. It's possible.
Q. And you understood that given the dynamic, what was transpiring at that time was he was getting accounts of a chaotic situation in Haiti. Right?
A. Yes. I still feel there should have been a more sense of urgency to try to get ahold of me if he knew that I was around.
Q. I understand.
A. Yeah.
Q. You are a conservative guy but you think you were the person he should have tried to get to, not George Nunez, not anybody else, it should have been Daniel Gonzalez?
A. No, that's not what I am saying. I am saying if he tried to get ahold of George and couldn't get ahold of George, he should have tried a little harder to get ahold of me or otherwise.
If he would have sent me a text and said, "This is an emergency" or, "Hey, I really need you to get ahold of me, it's urgent," then I wouldn't have said, "I will call you in an hour and a half when I am available," or something along those lines.
Q. Right. But you also realize that he was trying to put out fires down there and try to getting accounts of what is transpiring as this chaos was unfolding. Right?
A. I mean, all I can convey is my opinion.
Q. Is your opinion. Okay.

But he did try to call you at 10:08 a.m., twice, and you didn't respond. Right?
A. Right.
Q. You responded about two and a half hours later and said, "Give me an hour and a half," and he said, "Okay."
A. Right.
Q. And you think he should have said, "No, no, no, no, now, now, now." Right?
A. Yes.
Q. And you don't know whether or not he was engaged in other things and trying to juggle other balls at the time?
A. I don't.
Q. Then when two and a half hours passes, in other words, an hour past when you said you'd call him back, he tries to reach you again. Right?
Did you guys speak at that time?
A. We did eventually land on a call, yeah.
Q. You did?
A. Around 5:00. It was around 5:00 p.m. or something like that.
I don't have the transcript of the conversation in front of me but, yeah, we got on the phone and that's when he started trying to catch me up.
Q. Okay. So, he was giving you whatever, whether or not you think it was deliberately misleading or not, he was purporting

to give you an update of what was transpiring. Right?
A. Yes.
Q. And you realize whatever he heard, he must have heard secondhand because he wasn't there. Right?
A. And forwarding messages and so on and so forth.
Q. So he was forwarding stuff that he was getting directly. Right?
A. Correct.
Q. At least as to what he was receiving was being passed on to you directly in some respect. Right?
A. Yes. In other words, it wasn't -- the only firsthand was what he -- the conversations that he was having with those people and he was telling me he was having those conversation, that's firsthand.
Q. That's secondhand.
A. But an audio -- well, with him --
Q. Seeing it is firsthand.
A. Seeing it in person, but hearing it, they are actually having a conversation with him. He is not reporting on a conversation that happened with two other people.
Q. Right?
A. He had comms with one of the individuals that was over there that was trying to keep him up to date.
Q. But the thing is this: It didn't become apparent to you at some stage that there was a miscommunication going on between

you, at some level, with respect to the judge?
A. Yeah, that was -- the priority at that moment was to identify any U.S. citizens that might be in danger in Haiti at that moment in time. It was very clear to me the judge was a female but the name was a male. The warrant was '19, why are they doing a warrant, all of that.
He was going to be brought in for a debrief, right, but priority at that moment is who is there, where are they from, what are their names.
Q. Right. But let's assume there are two judges who had some nexus to this, whatever it may have been, one, a woman; one, a man. He first referenced to you the woman, right, within the context of the activity in which they are engaged. Right?
A. Correct.
Q. And then you asked him for the name of the judge and he gave you like, I don't know in the U.S., Jean could be a woman or a man, but Ronald [sic], I think was the middle name, Noelcius?
A. Jean Roger Noelcius.
Q. Roger. So he gave you the name of a man even though he mentioned the name, a woman, so you guys realized you guys were like two ships passing in the night, at least as to that point. Right?
A. Yes.
Q. You didn't take that as him trying to deceive you?

A. At that moment, as stated, it was a very chaotic call and I understood that there was a certain level of confusion there which is obviously why we wanted him to have him come in and give us a full debriefing.
Q. Of course.
Now, he was asking you for help. Right? For whatever assistance you could provide for the people down there who were in danger?
A. Yes, his contact was that people that he has down there working for his business had been involved in some incident and they are in danger.
Q. Right, and you asked, "Has anybody contacted the U.S. Embassy?"
A. Yes.
Q. And he said, "But not successfully," right, is what he told you anyway?
A. Yes, I do believe at some point in time he did mention that there were two that were -- I guess they had two believed to be U.S. citizens were in contact with the embassy, but that was much later in the communication.
Q. Okay. As a matter of fact, he kept updating you periodically, frequently throughout the day up until 10:13 p.m. that night?
A. Yes.
Q. You were in constant contact with him at least by text or

WhatsApp post. Right?
A. It was a long day.
Q. And there were a few calls as well.
So, he wasn't -- he didn't ghost you. He wasn't absenting himself. He was trying to get your help, communicating, trying to update you, that's what was happening all throughout the day and throughout the night?
A. He was responsive, yes.
Q. As a matter of fact, there are 14 written communications back and forth up and through 10 o'clock. That sounds about right?
A. Yes, sir.
Q. At 10:19 p.m., you tell him that you are in communication and he should get all the details. Who were you telling him you were in communication with?
A. Well, I didn't tell him, I don't think I did tell him who I was in communication with, but essentially, I was in communication with our personnel that covers the area of responsibility of Haiti, which is in Santo Domingo, Dominican Republic.
Q. Okay.
A. As well as members of the FBI team.
Q. Okay. So, you were in communication, you were trying to get your arms around this crisis on behalf of your confidential human source, whatever he had gotten himself into. Right?

A. Right.
Q. And you were concerned about American citizens who may be in danger. That was your primary concern at least. Right?
A. Yes, sir.
Q. And you were in contact with FBI in Santo Domingo and FBI here?
A. Yes.
Q. What about FBI down in Haiti?
A. I believe at that moment in time we didn't really have personnel stationed that were able to participate, but we do know that our personnel in Santo Domingo had direct communications with Port-au-Prince to be able to be deal with anything that might come up over there.
Q. Okay. So you wouldn't --
A. But as far as an investigative team, we didn't have anyone in Haiti at the time.
Q. But you were making a concerted effort. Right?
A. Right.
Q. You had Homeland Security agents down there. Did you think to call them or no?
A. Well, because the information was coming from an FBI confidential human source, usually those channels of communication should go through the home agency of that confidential human source at the time.
From my understanding, they were -- within days, they were

also part of the investigation.
Q. Would it be fair to say that the federal law enforcement agencies, as they go about their business, are kind of siloed, you know, you don't really -- even in a crisis like this, you would rather call FBI in Santo Domingo than call HSI on the ground where it's happening?
A. No, I wouldn't say that's accurate. It's not a matter of rathering to call one or another. It's the fact that there is a crime in Haiti and Haiti is a sovereign nation. Whether or not it's a U.S. jurisdictional event remains to be seen.
So, if a crime happens in another country, it's the purview of that other country to deal with it. But, however, we have the possibility of American citizens involved. There is a confidential human source that is signed up with the FBI that's reporting it.
Q. You got to get to work?
A. Yeah, we have to try to help the U.S. citizens and document the reporting as it comes.
Q. Among the items of information that he provided you throughout these 13 or 14 calls or text exchanges throughout the day, was the names of 26 different people affiliated with the operation, Colombians?
A. I wouldn't be able to recite the names, but, yes, he provided various names.
Q. A whole list of names?

A. Yeah.
Q. Okay. So he wasn't trying to hide names from you. He gave you the list of everybody that's down there, at least 26 people anyway. Right?
A. He provided names, yes.
Q. And 26 sounds about right?
A. It sounds about right.
Q. Okay. And he continues to update you into 2:00 a.m. on 7/8, like 2:00 a.m. in the morning, he is still coming at you.
You are communicating with him. Right?
A. Yeah, sounds about right.
Q. Then you, actually, on the 9th -- on the 8th, we were on 7/8 until 2:00 in the morning.
Now we are on the 9th. You sat down, you brought him in to be debriefed.
It was you. Right?
Special Agent Timothy Augustyniak and Special Agent Ryan Bonura. Right?
A. Yes, sir.
Q. And you brought him in.
Did he try to allude you or did he come in voluntarily?
A. No, he came in voluntarily.
Q. He came in voluntarily. And he sat with you for about, how long would you say?
A. It must have been maybe two hours, something like that.

Q. Who was the lawyer that he showed up with?
A. No, he was still reporting as a debrief, confidential human source, so he did not come with an attorney.
Q. He didn't lawyer up?
A. No.
Q. Did you admonish him that he had a right to remain silent or no?
A. Not at that time.
I'd have to look at a report. I know we did that.
Q. In a later meeting?
A. We needed to take an initial debrief of the situation, yeah.
Q. And in that meeting on July the 9th, he voluntarily comes in, he voluntarily speaks to you. Right? Right?
A. Correct.
Q. And he voluntarily gives up his text messages and communications that he had had?
A. Yeah. He --
Q. Offered them to you?
A. Yeah, we were able to review some of -- there was a discussion about that.
Q. A discussion that resulted in him voluntarily giving you the communication on his phone, notwithstanding what the discussion may have been?
A. I mean, there is a heavy emphasis on the level of

communication he had on the 7th. However, during that same debrief that you are talking about now, we found out that he knew that his team was surveilling the president on July 3rd and not one single phone call did I get about that.

So, he was overly communicative on the 7th. However, where were the communications on the 3rd when he knew about that?

Q. Right.

A. So there's --

Q. You have subsequently determined that he might not have been completely -- not have been complete with you --

A. Correct.

Q. -- in the information he was conveying. You have subsequently determined that?

A. Right.

Q. And this, of course, wouldn't be one of those oversights like the other stuff, you think this one was on purpose for some reason.

Right?

A. It would be incredibly unbelievable to me for him to have that knowledge and not have passed it my way.

Q. Okay. And he gave you Sanon's phone number?

A. He did give phone numbers, yes, sir.

Q. He gave phone numbers for two of Sanon's U.S. phones and one of Sanon's Haitian phones and Gerard Latortue's phone as well.

He gave that to you?
A. I believe he did, sir.
Q. Okay. Whatever communications on his phone, you would have deduced that he was not trying to hide it, he is giving you that information, not only for his phones, but other people that were involved?
A. Yes. Yeah.
Q. Actually, it was at this very meeting before all of that, you told Mr. Ortiz that he was not under obligation to provide you information. Right?
A. Yeah. So it was a voluntary debrief, yeah.
Q. He was not under obligation to give you his text messages or his phone?
A. Correct.
Q. And he was not under any information to talk to you?
A. Correct.
Q. And he decided to do all of that?
A. Yes.
Q. Okay. Now, on 7/11, two days later, you create a WhatsApp chat between yourself, Mr. Ortiz and Special Agent Augustyniak. It's just the three of you. Right?
A. I believe so.
Q. And you tell Mr. Ortiz to send all his Haiti communications, any information he is providing there so that you and Special Agent Augustyniak can get it simultaneously.

Right? Right?
A. I believe so, sir.
Q. And you contacted Mr. Ortiz at 4:37:09 p.m. on 7/11/21 and he was with -- sitting down with Homeland Security, ATF, and ICE. Right?
A. Yes, I remember that.
Q. And you respond by telling, on that same chat, Special Agent Augustyniak that you didn't receive any request for coordination.
That was your instinctive response, at the time, anyway. Right?
A. Well, that was --
Q. That was your observation, and it was a fact?
A. Yes, that was, yes.
Q. And you were a bit put out by the fact that ATF and HSI is trying to talk to your confidential source of information and they don't even give you a shout?
A. I mean, it's a little more complex than that but, yeah.
Q. And Mr. Ortiz gives you the number of the person who had summoned him to that meeting. Right?
A. Yes.
Q. And you tell Mr. Ortiz to please give you a call after he leaves. Right?
A. Yes.
Q. And Mr. Ortiz responds by asking you for permission to give

them his phone. He is asking you, "Can I give them my phone, too?" Right?
A. Yes.
Q. Because you had already downloaded it, I take it, you had already --
A. He was to present that the next day on the 12th at the main office, yeah, at the FBI main office.
Q. So that gives a little context to it. He is asking you, his handler, "Can I give this to ATF and HSI because I know I'm supposed to give you that tomorrow, or later today?"
A. Right, to add to the context, he was aware that we were requesting his devices and he was calling in reference to that and I believe in the conversation I told Mr. Ortiz that he can inform the HSI agents that are there that he is scheduled to appear at the FBI office and if they would like, they can join in on the meeting and it can all be reviewed together.
Q. I understand.
But the point is that he didn't say, "Hey, man, tell these guys they can't get my phone." He asked you for permission to give it to them. Right?
A. Right. And I can't advise him one way or another in that instance.
Q. Right.
Then we move to the next day, July the 11th, because this is happening every day now. Right?

A. Yes.
Q. And you met with -- Mr. Ortiz met with you and the Special Agent Eduardo Urtiaga. Is it Urtiaga?
A. Urtiaga, yes.
Q. Urtiaga, sorry about that.
And at that time, he provided you with a bunch of physical documents, several physical documents, related to his dealings with these people?
A. Yeah, I believe it was a business contract between CTU and Mr. Sanon, Sanon, Sanon, however you say it.
Q. He gave you Mr. Sanon's contract with CTU. Right?
A. Yes, sir.
Q. And Mr. Sanon's funds asset guarantee document. Right?
A. I believe that was part of the documents, yeah.
Q. He gave you his loan application and his loan agreement. Right?
A. Yes.
Q. And this is all stuff you asked for?
A. Right.
Q. And this is all stuff he provided --
A. Yes.
Q. -- on the very next day?
A. Yeah.
Q. Again, voluntarily?
A. Yes, voluntarily, sir.

Q. Still no lawyer, no nothing?
A. No.
Q. There were -- there is an extensive report that Special Agent Nicholas Rahmer got of your communications with Mr. Ortiz.
Do you remember that?
A. I believe I provided the export of the chat to them, yeah.
Q. Okay. How come your phone didn't get wiped?
I mean, did they ask for your phone early in the process or did it occur to you that your phone might contain valuable information so you made sure that you preserved it?
A. Yes, I -- so, at the time the -- essentially, our government phones are managed by the agency, so once you change phones, the phone is completely wiped and destroyed.
Q. So you made sure you kept yours?
A. I made sure to keep WhatsApp because WhatsApp wasn't automatically backed up, so I maintained his communications for that reason.
Q. You thought that to be a duty of yours as a law enforcement officer because one of your confidential sources was under investigation for the murder of a head of state, according to you?
A. It was my responsibility to try to maintain all of the WhatsApp communications, regardless of whether it's his or somebody else's, yeah.

Q. You would expect that of any FBI agent, wouldn't you, to be that prudent, to be responsible?
A. I would, yes.
Q. Okay. So, your chats with Mr. Pretel Ortiz, as reflected in this 93-page document, extensive, and I would love to go over it all but I know I can't. I'd like to highlight --
THE COURT: You can try.
MR. HOWARD: I will try. I am going to try.
THE COURT: If it's relevant and not objectionable, then maybe I will allow it.
BY MR. HOWARD:
Q. All right. I am going to try and be fast with this so work with me.
A. Do you have a copy of that, sir, may I ask, just so I can follow along with you?
MR. HOWARD: I could probably put it on screen, but it might facilitate this and it might take me a moment, Your Honor, because I did not intend to put it on screen with him.
Could I have a quick second, please?
THE COURT: Okay.
BY MR. HOWARD:
Q. While he tries to look at it, let's try to work our way through it.
If he doesn't find it, we will work around it. Okay?
A. Yes. No problem. Thank you.

Q. Thank you.

Now, starting your conversations on 3/31/21 -- you know what, you are going to move down to April 1st.

MR. HOWARD: Sorry, Judge, this might be useful. I am going to cut out a lot of this.

BY MR. HOWARD:

Q. I am going to start around 7/7/21. We just spoke about the confidentials you had earlier. We don't need to go back to that and that he is giving you all this information.

I want to go after that.

You know what I want to do? I want to go to the back.

There was something you said that was kind of curious to me. This is 92 pages of exchanges between you and Mr. Pretel Ortiz. Right?

And on page 92 of 93, the date is 7/10/2021.

You say to him, "Remember that your communications with us, up until now, is as a source. It is a different conversation if another agency takes you as a witness. I can't -- I won't recommend that you don't cooperate with another agency but you are a source for the FBI, not HSI. You are under no obligation, like I said yesterday" -- so this is the second time you tell him this -- "to talk to or -- to talk to anyone else. When we make arrangements, Miguel needs to do that with me or George."

A. If -- just a small correction on what you just said.

Q. It's on your screen.
A. No, not yet.
Q. It is there now.
THE COURT: It's not on his screen.
MR. HOWARD: I'm sorry, would you, please.
BY MR. HOWARD:
Q. Okay. Tell me where I am getting it wrong.
"Remember that your communication with us, up until now, is as a source. It is a different conversation if another agency takes you as a witness. I can't, and I won't recommend that you don't cooperate with another agency, but you are a source for the FBI, not Homeland Security. You are under no obligation, like I said yesterday, to talk to us or to talk to anyone else."
A. Oh, that's the part you left out, to talk to us.
Q. That was under the watermark. I was trying to figure out what it is, but it is clearing.
"To talk to us or to talk to anyone else. When we make arrangements, Miguel needs to do that with me or with George."
A. That's correct, sir.
Q. So you are telling him, "Hey, you don't even have to talk to HSI now, you don't have to talk to us either, but you darn sure don't have to talk to them because you are our source." Right?
What were you trying to accomplish there?

A. The layperson may not really fully understand the way that law enforcement works or the laws. What I didn't want is for an individual that is not knowledgeable, that is not engaged in or haven't been employed as a law enforcement officer in the United States. He was military over there in Colombia but he needed to be aware that another law enforcement agency, who already knows that he is a source for the FBI, to try to leverage the fact that he is a source to try to manipulate him in any way or anything like that.

Everything we wanted to do with him, we wanted to be above board, which is why I made it clear in person, over the phone and again, the next day, you are not under any obligation to do these debriefs.

Q. This was an admonishment. You were trying to help him out and let them know he had the right to remain silent, like the stuff we see on TV, Miranda rights and to a lawyer and everything like that. Right?

A. I think he actually mentions that he was eventually -- I think towards the end of the communications after his last -- his debrief was cancelled on the 12th, and when we informed him that it would be cancelled he did mention to me that he was thinking about getting an attorney, which I communicated to the investigatory team.

Q. Right. He was thinking about getting a -- it was about time. Right?

A. Yeah.
Q. And this was in December now. Right?
A. No, this was still July.
Q. No, I am wrong.
This is still July. But he didn't get a lawyer until -- you know when he got arrested, like two and a half years later, no lawyer, no --
A. I wasn't involved in the investigation, so I don't know. That was pretty much the end of my involvement.
So, the investigation itself, I have no dog in that fight.
Q. Okay. Did you participate in the decision to cut him loose three weeks after the incident, this guy that you had trusted for so long. That wasn't your call, was it?
A. No, so shortly after -- he had no phones. He reached out to me on a second phone. I communicated to, I believe it was Augustyniak that he had a new phone number and then on the 23rd of July, he reached out and said, "Hey, this is my new phone number," and I told him, "Hey, you are not supposed to contact me anymore. If you are going to contact anybody, contact George," because it was around the 12th where they said hey, I'm, me, myself, that I am off his file. I am not going to deal with him anymore.
Q. Right. And his -- the reason he had a new phone number is because he had given his phones to law enforcement. Right?
A. Yes.

Q. It's not that he smashed them or tried to change them. He'd given them up?
A. Yes, from what I understood, yeah, he gave up his phone and his laptop, I believe.
Q. And even so, he called and gave you his new number?
A. Yes.
Q. And you advised him -- and you thought his life was melting down, it was very sad from all angles. Right?
You weren't even allowed to communicate with him anymore?
A. Yes, it was pretty much done.
MR. HOWARD: Thank you, sir.
Nothing further.
THE COURT: All right. On behalf of Mr. Intriago.

CROSS-EXAMINATION

BY MR. PEREZ:
Q. Good afternoon, Agent Nunez. How are you?
A. I am good, sir. Good afternoon.
Q. Good. I'm sorry. I represent Mr. Intriago and I am just going to be asking you some questions about your interactions with Mr. Intriago.
A. Yes, sir.
Q. When did you first physically meet Mr. Intriago?
A. I believe I only met him once in passing. We met Mr. Ortiz at his place of business in Doral and Mr. Intriago was there, we said hello. I had heard about him already from Mr. Ortiz.

Q. Okay.
A. But it was brief.
Q. All right. Before you went to the business and saw Mr. Intriago, had you been there prior to that to meet with Mr. Ortiz to take a look at the setup there?
A. I think that was that time. I think that was that time. I only recall going there once myself. I think others had gone but --
Q. Did you go there accompanied by other agents?
A. Yes, sir.
Q. And how were you introduced to Mr. Intriago by Mr. Pretel?
A. Usually when we say hello, it's "*el amigo*. Hey, it's my friend," something along those lines.
Q. So you were not introduced as an FBI agent to my client?
A. No. No, not that I am aware of. Maybe amongst themselves, I am not sure, but I wouldn't be able to say.
Q. Now, there came a time where you went there with another agent in order to fill out paperwork so that Mr. Ortiz could travel to Bolivia?
A. I'd have to take a look at the report. If it was one or two times, I think that would have been it, but I'd have to take a look at the report.
Q. Do you recall going to the office at CTU to fill out paperwork in order for Mr. Ortiz to be able to travel to Bolivia?

A. So, I do recall the Bolivia, the Bolivia travel, but it's not permission for him to travel immigration-wise like what the other defense counsel was saying. It was -- it's a -- it's called an extraterritorial admonishment where you let a person know, you can't do this over there. You can't do that over there.

You are subject to the sovereignty of that country if they arrest him, so on and so forth. But I wanted to make that distinction, that's it's not an immigration authorization or anything like that. It's documentary. It's policy.

Q. Thank you. I understand.

But you did actually go there to provide Mr. Ortiz with certain information concerning what the procedures were in a foreign country?

A. It sounds correct, sir.

I would say, yes.

Q. And you saw Mr. Intriago while you were there?

A. Yes.

Q. And do you have any idea what type of impression Mr. Intriago had about who you were?

A. I would assume, and as I mentioned earlier with the prosecutor, I would assume that he might have thought that we were, in some way, law enforcement only because it's very normal for his business.

They deal with law enforcement all the time. As long as

the specifics of the law enforcement group is not mentioned, then as far as Mr. Ortiz's status as a confidential human source isn't discussed. It's not really that big a deal if he thought I was law enforcement or not.
Q. So what you are telling the jury is Mr. Intriago might have confused you with an ordinary law enforcement officer as opposed to an agent that was going to provide Mr. Ortiz with paperwork for his foreign travel.
Is that what you are saying?
A. It might have been -- I would say it's plausible that he believed us to be some sort of law enforcement entity, yeah.
And keep in mind, I didn't believe he was aware because we were with Mr. Ortiz. So, whether or not Mr. Ortiz discussed with him why it was that we were there, that's something else entirely.
Q. Understand.
But you went there. You met with Mr. Ortiz in the side office, and you filled out certain paperwork. Correct?
A. Yes.
Q. And while you were there, you provided Mr. Ortiz with contact information in the event that he should have any issues in Bolivia at all?
A. Yes, I believe I did.
Q. And it's not only the embassy, but I think you also provided the name of the FBI agent that would have been

assigned to the Bolivia Embassy?
A. I'd have to verify the report, but I did provide him information about the -- as I would for any traveller going to a foreign country, it's important for everybody who travels foreign to know where the embassy is and how to reach it.
Q. Well, I am not referring to anybody. I am referring to somebody that you are handling.
A. Yes.
Q. CHS handling.
So, you are not aware of anything Mr. Ortiz may have told my client regarding who you were?
A. No, sir.
Q. Did you show any credentials there while you were there?
A. No, sir.
Q. And who did you go there with?
A. If I went twice, it might have been with different agent. One of the times I might have been there with Special Agent Matt Suhr, who is working with the.
THE COURT STENOGRAPHER: What was the name?
THE WITNESS: Matt Suhr. Suhr, is S-U-H-R. He was the agent that was working the public corruption information that Mr. Pretel was providing.
BY MR. PEREZ:
Q. And from what you saw in plain view, it would appear to be a security company that sold helmets and tactical gear and that

sort of thing?
A. Yes, sir.
Q. Did you see any firearms there?
A. No, sir.
Q. Did you conduct any kind of an independent investigation on Mr. Intriago just to see who your confidential informant was doing business with?
A. No, sir.
Q. Do you ever do that at all?
A. If there is a need to do it, sir, yes, but the need hadn't arised for us to investigate our own confidential human source.
Q. You were shown a video of some bulletproof vest.
A. Yes, sir, the testing of the ballistic vest, yes.
Q. Are you familiar with any of the regulatory matters concerning bulletproof vests or plates or anything else like that?
A. Can you be more specific, sir?
Q. Yeah. What is your familiarity with the regulations concerning bulletproof vests and the regulations involving the exportation of bulletproof vests?
A. So, with specific regards to exportation, there are certain products and commodities that are covered under the Armed Export Act to where there would need to be a security filing if you were to export some of those items, commercial quantities, the value, the description of the item, all that comes into

play.

But, yes, that's -- those might be regulated materials, yes, sir.

Q. Assuming they are regulated, but you are not familiar with the specific regulations in terms of the types of plates that are used, the thickness, what countries they can and cannot be transported to?

A. I don't have direct experience with export cargo. I have a general awareness of that just because working in the agency that I work for. Yeah.

Q. And you were not involved in any portion of the investigation having to do with the bulletproof vest?

A. No, sir.

Q. There was a text message that you were asked by Mr. Ortiz about Barbecue, Cherizier, one of the gang leaders in Haiti, and you said you didn't have an interest in talking to him. Do you recall that?

A. I didn't say that, sir, no. I didn't want him to talk to him. I didn't want Ortiz to talk to him.

Q. And the reason for that, just to understand why?

A. So, I mean, we can go through the list of atrocities that that gang member has done, murder, rape, kidnapping, setting people on fire, might be where he got the name from but, yeah, I didn't want this gentleman to interact with those individuals.

The information he provided was already passed on to groups that were looking into capturing that fugitive, and that was well enough, well enough in setting down.

Q. As far as you know, Barbecue is not an asset of U.S. intelligence, is he?

A. I would have no awareness of that, sir.

Q. So he might be but you don't know?

MR. WU: Objection.

THE COURT: Sustained.

BY MR. PEREZ:

Q. Now, I want to talk about the visit to the American Embassy.

A. Okay.

Q. It was Mr. Intriago that went to the American Embassy with the letter?

A. This is what I heard, yes.

Q. It was him. Mr. Intriago had no prohibition, no agreement with the Government, no instruction from you or any other agent that he was not allowed to go to the American Embassy to register his company. Correct?

A. I provided -- I don't have direct communications with Mr. Intriago at any point in time. Speaking from myself, there was no instruction given to Mr. Ortiz to that effect.

As a U.S. citizen, you can present yourself to any U.S. Embassy anywhere.

Q. Right. So, if Mr. Ortiz is not allowed to tell Mr. Intriago that he is a confidential informant because he is not supposed to, how is Mr. Intriago supposed to know that he can't go to the U.S. Embassy to register a company that he has an partnership interest with Mr. Ortiz?
A. Well, you see, that's part of the reason why people got upset because what ended up happening, whether it was Mr. Intriago or any of the people that were with him, I don't know who mentioned it, but they provide the name of George Nunez and they mentioned that he was an FBI agent, which is why it came back to FBI Miami. So, the fact that they were aware of that and that they were providing names of agents is a slight break in protocol of how things like that happen and there were questions about it.
Keep in mind, I didn't get any of those messages. I wasn't in those e-mails or meetings, so there is very little I can even speak to that.
Q. So, Mr. Intriago could have used your name and said, "Hey, the last person I saw was this particular agent," only because he saw you and didn't know that he wasn't supposed to say anything.
Do you understand that it could just be an completely innocent disclosure at the American Embassy?
MR. WU: Objection. Argumentative.
THE COURT: Sustained.

BY MR. PEREZ:
Q. Is there -- do you have any reason to believe that Mr. Intriago had any kind of prohibition or restriction on telling the U.S. Embassy in Haiti that his company was there to do business?
A. No.
Q. Now, during the trip to Bolivia, what was your understanding of what the purpose of the trip to Bolivia was?
A. Mr. Ortiz told me that they were going to be conducting a training down there and it was personal business.
Because it was foreign travel, there is a policy in place that we have to just document that the person is going and that it's personal business, which we did, and it very clearly says in the document that it's personal. And it was in line with what the business is. It was in line with what they do.
Q. I assume what you saw there in the business in terms of what the business did was, at least in the United States, completely legal?
A. From my understanding, the time that I went there, potentially two times that I went there, it was a business in Doral, just like any other.
Q. Right. There has been -- let me go back to the bulletproof vest question, if you know.
If I produce a bulletproof vest in the United States, is there any prohibition, regardless of the level of protection,

for me to give it to you or sell it to you here in the United States, or is the restriction only regarding the exportation of the vest?
A. I am not an expert in this field, particularly any state regulations that might exist in that. I don't believe there is but I just want to carry out that I am not a commerce expert to be able to tell you that, sir.
Q. You have been to places like Lou's Gun Shop. They sell bulletproof vests there. Correct?
A. Yes.
Q. And to sell it to an individual, do they need any kind of special permit or anything?
A. To sell it domestically to an individual, no. Like I said, if you tell me if you tell me that you are selling a truckful, maybe there is something but, I just -- yeah, I don't want to answer being slightly uninformed about the scope of all of the regulations that might apply.
Q. Do you know if a person travels to a foreign country, whichever country it may be, if they can take a personal protection vest and if that's exempt under the regulations, regardless of the level of protection?
A. So, are you asking the regulations of all the other countries?
Q. Yes. No. No. I am referring to U.S. regulation.
Let me give you an example.

A. Okay.
Q. Let's say I am traveling to Haiti and I decide to take a bulletproof vest for my protection, the highest level possible. Do you know if there is an exception under the Arms Export Act that would allow me to carry a vest for personal protection?
MR. WU: Objection.
Calls for a legal conclusion.
THE COURT: Sustained.
He already said he is unfamiliar with it as well.
BY MR. PEREZ:
Q. You heard of two different judges, Judge Noelcius and another judge, a female judge by the name of Windelle Coq, C-O-Q. Correct?
A. I remember the name C-O-Q from the debrief, yeah.
Q. Do you know enough about the Haiti case to know what the interrelationship is of these two judges and what role they played in this Haiti case at all?
A. No, sir.
Q. When Mr. Ortiz traveled to Bolivia, did he assist the Government in any confidential form, with what he usually does as confidential informant in addition to perhaps working in terms of his private matter?
A. He did provide information that he said he obtained while he was down there of some sort of money laundering activity. I believe we documented that.

Q. Okay. You are not familiar with that, though?
A. I remember we weren't able to do anything. We weren't able to do anything with it. It didn't materialize. There was information about a fugitive later on that had ties to Bolivia that was part of an HSI case and we provided that to HSI, but as far as us beginning, initiating an investigation into the material that he was given, it never materialized.
Q. So, in addition to requesting permission for his private travel, he incidentally provided some information to the Government?
A. Yes.
Q. That did materialize?
A. Yes.
Q. So he was partially working for the Government when he was in Bolivia?
A. No. I mean, he wasn't tasked to do anything. If he was tasked to collect, then I would have said yes to that answer, but incidental collection without tasking is a byproduct of his just living his normal, everyday life, and any information provided to us, we are going to check for viability and do our due diligence with it but, no, he wasn't working for the Government at the time.
Q. You were shown a picture of the FBI building on Saturday.
Do you remember that?
A. You mean in April?

Q. I believe the prosecutor showed you a particular picture.
A. Yes, previous to the Lime meeting?
Q. Yes.
A. Yes, sir.
Q. How far is the Lime restaurant from the FBI?
A. It's close, sir, within minutes, a couple minutes. Yeah.
Q. You don't meet with anyone at the building. You usually meet outside the building?
A. Yes, sir.
Q. So, it's very easy to pass in front of the FBI building on my way to the Lime restaurant.
Correct?
A. Yeah, but I believe he pulled into the restaurant based on the photograph, sir. But, yes, you can be on the way to the restaurant and pass by the FBI building.
Q. After the assassination of the president, when you met with Mr. Ortiz did you discuss Mr. Intriago?
A. His name might have come up at some point but the discussions were primarily with Ortiz about what he knew and we asked him to preserve any communications that he might have had with anybody down there, yeah.
Q. At any point, did you tell Mr. Ortiz that Mr. Intriago should come in and speak with a federal agent?
A. No, in fact, I said when Mr. Ortiz was to come in that he was not to bring Tony and that maybe sometime in the future we

may end up speaking to Tony. I never did, though.
Q. Let me ask you, Agent, why not bring both them in together?
A. Because it was a debrief of a confidential human source. Just by the very nature of it, we need to get -- we need to try to make sense of everything that happened over the phone the night before. Yeah.
Q. Fair enough.
Is it a policy or practice in your field to interview a confidential human source alone, not with anyone else?
A. Ideally, yes, sir.
Q. And why is that? Could you explain that to us?
A. I don't want to sound in any particular way, but it's to maintain the confidentiality of the person and of the information that they are giving.
Q. Isn't another reason so that you can -- what about targets of an investigation?
Should you interview those type of people separately as well?
A. Well, Mr. Ortiz wasn't a target of investigation at that time and neither was Tony. There was no investigation at that time. So, the information was beginning to be collected. It was being reviewed. It was being digested, so to speak, for lack of a better word, and once the investigation began, I was apart from it.
Q. But my question to you is, let's fast forward and say they

both become targets.

Would you consider it to be kosher to interview both of the targets together?

A. I wouldn't do that, sir, no. I have arrested multiple people at once and they all go into separate interview rooms.

Q. Why is that? Why is that a prudent thing to do?

A. It's prudent because you maintain the correct version of the story line without interference from the other person and you prohibit the possibility of either coercion or cohesion within their two stories, sir.

MR. PEREZ: Thank you very much, sir. I have no further questions.

THE WITNESS: Thank you, sir.

THE COURT: On behalf of Mr. Veintemilla?

MS. KUDMAN: I do have some questions, Your Honor.

CROSS-EXAMINATION

BY MS. KUDMAN:

Q. Good afternoon, Agent.

A. Good afternoon, ma'am.

Q. My name is Tama Kudman, and I represent Walter Veintemilla along with Marissel Descalzo.

Agent, you have been telling the jury that it's important for a confidential human source to remain discreet and not reveal his work with the Government. Correct?

A. Yes, ma'am.

Q. Now, you worked with Mr. Ortiz for some time. Correct?
A. About a year.
Q. And you were aware, of course, that he had a company called CTU Federal Security. Correct?
A. Yes, ma'am.
Q. And you know CTU stands for Counter Terrorism Unit. Correct?
A. I believe so.
Q. Well, just to make sure that we are on the same page, I am going to show you what's been previously admitted into evidence as Government Exhibit 2B2.
MS. KUDMAN: Can we publish this?
COURTROOM DEPUTY: Yes.
BY MS. KUDMAN:
Q. And, of course, you have seen this. This is the articles of incorporation for CTU?
THE COURT: Nothing is up for anybody.
MS. KUDMAN: Oh, I'm sorry.
I did the wrong cord. I apologize.
THE WITNESS: This might have been -- this might have been provided after my departure from the contact of this event. So, I didn't get to review this, I don't believe, but --
BY MS. KUDMAN:
Q. Don't you look into the work that your confidential human

sources are doing?
A. So, the confidential human sources will provide us an update with where their employment is. There is a yearly review that happens. So the answer to that question is yes. It's not necessarily the handlers, and that's done to maintain a sort of check and balance with the fact that you don't have the same people handling them that know them, that might be friendly with them reviewing their personal lives, where they live or their business.
So, I'm sure this type of work was done because he had reviews in his source file, but what I am saying is I wouldn't be familiar with this document, per se.
Q. Okay. But certainly, this is a filing with the Florida Department of State. Correct? With the Secretary of State. Right? It's on Sunbiz?
A. It appears so, yes.
Q. And you did know that the name of this company was Counter Terrorist Unit Federal Academy, LLC. Right?
A. He may have mentioned what it stood for at one point in time. Yes. I will say yes.
Q. And if you look at Article III, the description of the company is, "We provide protection, defensive training and services for civilians and government agencies and everything related to protection field including gear, equipment and technology."

Right?
A. Yes, I see that.
Q. Now, again, you've indicated that the idea with the confidential human source is that they remain discreet. Right?
A. Yes.
Q. And had you looked at this document, this might have concerned you about what this name and what this description might be sort of suggesting to the public about what the company does and who they do it with?
A. No, not at all. I mean, I see why you would ask that question, but there are thousands and thousands of private security firms all throughout the country and all over the world, and that's the type of work that they do.
In this article here, in this State of Florida document, they could put everything that they want in there. It doesn't necessarily mean that some of it would be legal in certain circumstances.
But to your point, private security companies exist. You can hire bodyguards. They can protect you in and out of the country. They can travel with you.
So this, in and of itself, is what he does as a business.
Q. And, sir, I am not suggesting that there is anything wrong with private protection services. Right?
That's a perfectly lawful business.
A. Right.

Q. What I am asking you is does the name Counter Terrorist Unit Federal Academy suggest a relationship to the Government that raises any flags for you as you look at it today?
A. No. No, I am just exposed to this world so much that it just doesn't.
Q. Well, what about for laypeople who aren't exposed to that word on a daily basis, do you think that this might suggest, Federal Academy might suggest a relationship to our government or governmental agencies?
MR. WU: Objection. Speculation.
THE COURT: Sustained.
BY MS. KUDMAN:
Q. Sir, you have been out to the CTU office. Correct?
A. Yes.
Q. I am going to show you Government Exhibit 95A, page 1 that's already in evidence and, sir, you have been there so you see this is the front entrance to CTU?
A. Yes, I see.
Q. And it's a professional looking office. Correct?
A. Yes.
Q. And as you walk in, there is a big, giant American flag in the entranceway. Correct?
A. Yes, ma'am.
Q. And, of course, as you walk through the lobby you see all of the mannequins with all of the tactical gear on. Correct?

A. Yes.
Q. Now, sir, you've also, I'm sure, since you were up at CTU, you have also seen their badges that they have on items of clothing.
Correct?
A. Yes.
Q. So, here, particularly, you see Counter Terrorist Unit Federal Academy. Right?
A. Yes, ma'am.
Q. And right next to it above the eagle's head, it says "USA"?
A. Yes, ma'am.
Q. And with sort of those military stars and the American eagle in the patch?
A. Yes, ma'am.
Q. Quite official looking. Correct?
A. Yes.
Q. And the American flag is next to it?
A. Yes, ma'am.
Q. And walking through the office at CTU, there is quite a bit about war indicating relationship with the military and, of course, there is tactical weaponry throughout the business.
Correct?
A. I didn't look at any of this stuff that was on the wall. I see the photos that you have here. I have no reason to doubt that those aren't photos taken of his office.

Q. Okay. Now, sir, when we talk about the tactical gear that's all around the office, you see the body armor and the rifles. Correct?
A. Yes, ma'am.
Q. And there is reference to the fact that they provide shooting lessons and training?
A. Training, yes.
Q. This is the training area within CTU, correct, where they give lessons?
A. Yes.
Q. And you have seen that they have their logo all over their facility.
A. Yes, ma'am.
Q. Counter Terrorism Unit with the American eagle. It's sort of all over the place. Right?
A. Yeah, I can see that, ma'am.
Q. I know you said that one of the reasons that you want you confidential human sources to be discreet is, of course, for their safety and for the safety of the agents, but aren't you also concerned about people getting the wrong impression that might be doing business with your confidential human sources that they might be misled into believing that they are working with the Government if they work with a confidential human source who is letting people know that they work with the Government?

MR. WU: Objection. Argumentative.

THE COURT: Sustained.

BY MS. KUDMAN:

Q. Let me rephrase that.

Is it not one of your concerns that people may be misled by one of your confidential human sources if they indicate that they are, in fact, working with you and your agency?

MR. WU: Same objection.

THE COURT: I will allow that question. He can answer that.

THE WITNESS: I don't think that that's what is happening here.

BY MS. KUDMAN:

Q. That's not my question.

I am asking you is that a concern?

A. You are asking me if it's a concern that my confidential source --

Q. Might be misusing their relationship with your agency or with you and misleading people that they are dealing with about their relationship with the Government?

A. It's a very tricky question because I don't think anybody is misleading here. I think your assumption is that this material and the eagle holding the arrows and the oak leaf and all that stuff, that that's unique. It's not. If you go to any gun show, in South Florida or beyond, you are going to see

patches, American flags, you are going to see eagles, you are going to see everything everywhere, and it's going to look just like the material that you are showing me now.

He works for a security company. They sell security-related material and fatigues and vests. All of that is in line. He has worked with law enforcement before. City of Miami, at least is the one document that he showed me, so I can say that I have seen that, but I don't think that this material here is misleading. I just don't.

Q. What about for a person who doesn't go to gun shows and who hasn't done any other business with security companies and isn't in your world, sir? Do you not --

MR. WU: Objection. Speculation and argumentative.

THE COURT: Sustained.

MS. KUDMAN: I have no further questions.

THE COURT: For Mr. Solages?

MR. FRIEDMAN: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. FRIEDMAN:

Q. Good afternoon.

A. Good afternoon, sir.

Q. My name is Jonathan Friedman and I, along with Patrick Dray, represent James Solages.

You know who Mr. Solages is, don't you?

A. I know of him through the reporting. I never interacted

with him and I haven't met him.
Q. You are aware Mr. Ortiz owns CTU. We have gone through this several times. Right?
A. Yes, sir.
Q. And you are aware that CTU had employees, did you not?
A. Yes. Yes, sir.
Q. And you are aware that Mr. Solages was one of those employees. Correct?
A. Yes, around the time of the event, he had mentioned Solages previously as being part of the meeting that would happen before, but I wasn't aware that he was an employees up until the event started unfolding.
Q. So Mr. Solages, it was your understanding, attended the meeting on April 6, 2021. Correct?
A. I believe he was one of the ones named, yes, sir.
Q. And it's your testimony that you don't know what, in essence, he was doing at CTU up until the events closer to July 7th. Is that correct?
A. Well, when I speak to that, I speak to the Haitian group that was there and what I know of that Haitian group is that, aside from trying to pass along information to Mr. Ortiz, they met with other agents that I wasn't there to speak about political concerns in Haiti.
Q. Did you know whether or not Mr. Ortiz had some sort of training program at CTU where he would then certify somebody to

be a CTU sort of agent or personnel there?
A. No, sir.
Q. You were not aware of any of that?
A. No.
Q. Okay. You testified initially, although you made it very clear and obvious that there is corruption in Haiti and you kind of used the expletive, stay the F out of Haiti, you still had an interest because you wanted to still investigate transnational organized crime. Correct?
A. Not entirely, sir.
What I wanted was for the information that he was providing on the mosques, to make its way through. It was important at the time. I felt that transnational organized crime could not really effectively be investigated within Haiti itself.
Q. But the mosques, you had an interest, a desire to learn that information. Correct?
A. Yes, sir.
Q. That's because that could eventually benefit and help our country. Right?
A. Yes, sir.
Q. Against things that may infiltrate our country. Right?
A. National security concerns. Yes, sir.
Q. Were you aware that Ms. Solages was sort of the ears and eyes on the ground when he went to Haiti?
A. No, I was not aware, sir.

Q. Okay. You are aware that -- well, Mr. Ortiz was not allowed to travel to Haiti. Correct?
A. Right.
Q. You were aware that Mr. Ortiz was receiving information on mosques, on this criminal activity that was taking place in Haiti. Correct?
A. Right. Right.
Q. How was it that you were aware of that?
A. Well, the presumption is the source has a subsource, somebody else that might be present that is feeding him information and then, thus, he transfers it along to us.
Q. Isn't it true Mr. Solages was that subsource in Haiti that was providing information to Mr. Ortiz?
A. I was never told that that was the case, sir.
Q. You were never told?
A. No.
Q. But you were receiving information on facts and events that were very helpful to your agency. Correct?
A. Right.
Q. And, in fact, that stuff was put into reports. Correct?
A. I just want to reemphasize that because I wasn't part of the investigation, if it was later found that Mr. Solages was the one finding that information, it could be so, but as far as I know, it could be any of the Haitian contacts that he had originally met with.

Q. Have you had a chance to review Mr. Ortiz's phone to see the communications that would be coming across from Mr. Solages that was in Haiti back here to Mr. Ortiz?
A. No, sir. The investigative team did. I was never given the entire -- I was not part of the investigation. I didn't have a need to know, so the extraction of the phone, I never got hands on it.
Q. You would agree, though, George Nunez, Agent George Nunez knew that Mr. Solages was behind all of the information that was coming back from Haiti. Correct?
MR. WU: Objection.
THE COURT: Sustained.
BY MR. FRIEDMAN:
Q. Did you communicate with Agent Nunez?
A. Yes, I have.
Q. Did you ever communicate about the information that you were receiving from Haiti, about the mosques and the problem and the criminal aspect down there?
A. Yeah, Agent Nunez would be able to see the reports that go into the file.
Q. Did he ever indicate to you who was providing that firsthand knowledge, that information, and sending it back to Mr. Ortiz?
A. No, sir.
Q. We talked about Barbecue.

You spoke about Barbecue with the other lawyers and you said that at some point, Mr. Ortiz was in communication with some affiliates of Barbecue. Correct?
A. Yes, sir.
Q. Were you aware that it was Mr. Solages who had set up that meeting, that Facetime call that Mr. Ortiz was able to speak with these people?
A. I was not aware of that, sir.
Q. You are not aware of that.
The information that was provided on Barbecue, has that been useful to the United States?
A. That information, what I can say, was passed along to investigative units that have an interest in Barbecue. They requested the information from me. I can assume it was useful to them but I wasn't part of those investigations so I can't -- I can't say how far it got.
Q. I think you testified that Barbecue is a fugitive.
Is that correct?
A. Yes, sir, that's open source. I am not letting anything out of the bag there.
Q. Absolutely. There is a current pending indictment out of the Southern District of New York for Barbecue?
A. If you Google it, there might be more than that.
Q. You are aware that information from Mr. Solages passed on through Mr. Ortiz was used in that investigation and ultimately

in indicting Barbecue?

A. Well, I wouldn't -- like I say, I don't have an insight into those investigations. A lot of times the information is funneled to the people that need it and then they work it and then I focus on what I focus on. It's the way all these units work.

Q. Do you categorize the mosques -- I know you have an interest in that. There was some discussion about Iranians getting passports. They were paying for passports illegally and then, somehow, being able to access our country.

Is that related to the mosques?

A. Yes, sir.

Q. There was information passed from Haiti, I know you don't want to say who it was or you are saying you don't know who it was, but there was information passed with regard to that as well with these illegal passports. Correct?

A. I just want to make it clear that the subsource of information for the Haiti was never specified to me by Ortiz. So, if it became part of the investigation herein afterwards, then that's where you might have more knowledge of it than I do.

So, I just want to make clear that it's not that I don't want to say. I can't say where that information came from, just that it was absorbed, it was processed, and it was pushed through to the pertinent units.

Q. Do you know if Mr. Ortiz had any other employees down in Haiti during the period of time that you were receiving this information?
A. At the time that I was receiving this information, I didn't know that Solages was an employee for him. I knew of Solages being an employee when he called me saying that the president was dead, and we were talking about who is there, and we brought him in for a debrief afterwards, and then that's where he said that Solages was an employee along with, apparently, several other individuals that hadn't been previously mentioned.
Q. So was it at that time that you realized it was Mr. Solages who was providing and passing on this important, critical information to the Government?
A. It might have been, but he also provided 23 additional names.
Q. Okay.
A. I will give you that it might be, sir.
Q. Okay. I appreciate that.
You testified that when you were texting back and forth with Mr. Ortiz on July 7th, that things were maybe confusing, the texts back and forth.
Do you remember that line of questioning?
A. Yes, sir.
Q. In fact, you've -- with regard to the judge, Jean, you

didn't know if that was a man or a woman. Right?
A. Yes, sir.
Q. And you testified that there is a certain level of confusion -- there was a certain level of an confusion going on because there was this incident that just took place. Right?
Pretty hectic for Mr. Ortiz?
A. Tragic.
Q. Tragic.
A. Tragic incident.
Q. And sometimes the information, you know, it's like two ships passing. He may be saying one thing and you may be thinking another.
Is that right?
A. It was -- yeah, there was a lot of confusion, we can say that, yeah.
Q. Anybody in Haiti, notwithstanding that Mr. Ortiz was here, but somebody in Haiti, would you agree, would be under the same excitement in the same type of situation where maybe their communications would not be necessarily understood correctly by somebody who they were texting with.
Is that correct?
MR. WU: Objection. Speculation. Argumentative.
THE COURT: Sustained.
BY MR. FRIEDMAN:
Q. Were there any other miscommunications that you could

recall with Mr. Ortiz on this July 7th, the date of this incident happening?

A. The entire collection of data surmised the key point that the president of Haiti was dead, that there was some sort of a home invasion, and that Haitian police are tracking down a group of people, some of which are known, some of which aren't, that are affiliated or in some way affiliated to CTU.

And beyond that, it's all confusion until he came in the next day and we started going through it.

Q. Okay.

Mr. Solages, you would agree, would not be purview to the conversations that you had with Mr. Ortiz. Correct?

A. Yeah, at least as far as I know.

Q. And you indicated Mr. Ortiz was eager. He was energetic.

Is that correct?

A. Yes, sir.

Q. And he was constantly communicating with people or communicating with you?

A. Yes, sir.

Q. Did he communicate and was he that eager with his employees the same way that he was communicating with you. Do you know?

MR. WU: Objection. Lack of knowledge.

THE COURT: Sustained.

BY MR. FRIEDMAN:

Q. You testified that at the time this happened that there was

not an FBI office, let's say, call it an office, in Haiti. Is that correct?
A. A vetted team, sir.
Q. A vetted team?
A. Yeah.
Q. Isn't it true that about three months after the death of the president in Haiti, the FBI opened a permanent office. Do you know?
A. It might be so. I do recall hearing something along those lines.
Q. Are you aware that they opened that office because they were provided information on fake passports, human trafficking, and all the things that were being reported to the FBI prior to July 7th?
A. I am not aware of the reasons why they decided to open the office, sir. It's above my pay grade, unfortunately.
Q. Is that office still open today?
A. I haven't worked in Haiti previously. Up until this point, I do believe we do have bodies there now and certainly during the course of this investigation there have been several of my colleagues that have gone down there to help out with it.
MR. FRIEDMAN: I have nothing further, Your Honor. Thank you.
THE COURT: All right. Any redirect?
MR. WU: Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. WU:

Q. Officer Gonzalez, let's start by briefly talking about Lime.

Do you recall talking about the proximity of Lime and the FBI's offices when you were being questioned by Mr. Perez?

A. Yes, sir.

Q. I want to talk in a little more detail. These photographs that we saw here in Government Exhibit 147B, page 28, is this the street outside the FBI or what are we looking at right there?

A. I'm sorry, the image isn't up on the screen.

Oh, here it goes.

Q. That paved area that I see, is that the outside public street or what is that?

A. Yeah, so the image on top is showing a photo taken of a vehicle that has already turned into the road that goes into the entry gate. So, if one were driving by it, the vehicle would not have that orientation which is why I said what I said to counsel.

Q. Do you need to drive through the FBI's driveway to get to Lime?

A. No, sir.

Q. Now, let's talk a little bit about the idea, I think this is something you discussed with Mr. Howard, that you viewed

Defendant Ortiz as trustworthy or at least gave him a modicum of trust before July 7, 2021.

Do you recall that discussion?

A. Yes, sir.

Q. And I believe you said that you had not caught him in a specific lie before July 7th. Correct?

A. Correct. He was trustworthy, I believe I said, up until that point.

Q. How would your evaluation have changed if you learned that he was omitting certain information or not telling you everything?

A. It would have been detrimental to my stance. As the debriefs continued and the information was collected and processed, particularly the knowledge that on July 3rd he had knowledge -- he reported to me that he had knowledge of a surveillance on the president when we debriefed him where he never communicated that on July 3rd.

It's something that he is overly communicative with so many other things, things that have nothing to do with us, current events in Colombia. There was an attack in Colombia and he is sending me news reels. I mean, he is very enthusiastic, very energetic and certainly the surveillance of a foreign head of state would have been something that he would have communicated to me, and I come to find out about all of these events, you know, post situation on July 7th.

And that was the first indication where I feel like he was omitting, and that ultimately lead to his file closure.
Q. And is it possible an omission of information could actually be as serious as an explicit lie, depending on what information is being omitted?
MR. DO CAMPO: Objection, Your Honor. Speculative.
THE COURT: It is speculative.
Ask another question.
BY MR. WU:
Q. Let me show you. We are going to go through a few slides now.
I am showing you part of Government Exhibit 147B, page 77 from April 19, 2021. In April 2021, do you ever recall Defendant Ortiz telling you that he had nicknamed President Moise of Haiti "the thief"?
A. No, sir.
MR. DO CAMPO: Your Honor, this is beyond the scope of direct -- of cross, rather.
THE COURT: It's not. Overruled.
BY MR. WU:
Q. Going to page 101, April 23, 2021, around this time do you recall Defendant Ortiz, did he ever tell you that he was tasking someone with looking with their own eyes about the security of the thief, who would be President Moise, in the palace and in his house?

A. No, he did not.
Q. You mentioned Ortiz would send you news reels. Could you briefly describe that.
He would send you news briefs about what?
MR. DO CAMPO: Your Honor, asked and answered.
THE COURT: Overruled.
THE WITNESS: The attack in Cucuta in Colombia. I believe there were maybe some Haitian news articles that he sent after the incident, a lot of open source stuff which in person and conversation we always advised not, because I can't collect information on anything that's open source.
BY MR. WU:
Q. I am going to show you another message, Government Exhibit 147B, page 145.
At the end of April -- by the way, so during this period in April, was Ortiz sending you news articles, open source information, that kind of stuff?
A. Yeah, but I don't believe it had to do with Haiti.
Q. Got it. At the end of April, April 30, 2021, do you recall Ortiz telling you about a plan to take over the National Palace of Haiti?
A. No.
Q. Is that some information that you would have been interested to learn?
A. Yes.

Q. I am going to show you page 241 of Government's Exhibit 147C. Now, in your direct examination I showed you some videos or one video of Ortiz sending you a video of a ballistics test. Correct?

A. Yes.

Q. In May 2021, did Ortiz ever inform you that people in his control or employ were gathering guns in Haiti?

A. No, sir.

Q. In May 2021, did he ever tell you about a decision to "give the rat the tickets"?

A. No, sir.

Q. Did he ever refer to President Moise of Haiti as "the rat" when he was speaking to you?

A. No, sir, he never discussed the president of Haiti.

Q. I am now going to show you Government's Exhibit 147D, page 41. Did Ortiz ever say anything like "see you in the shadows" when he was speaking to you, his FBI handler?

A. No.

MR. PEREZ: Your Honor, I am objecting. This is entirely outside the scope of direct.

THE COURT: It's not. If you would like to come sidebar, I will tell you.

Otherwise, I can tell you during the break.

Mr. Wu, please continue.

BY MR. WU:

Q. You were asked a number of questions during the cross-examinations about how much Ortiz had shared with you about Barbecue, the gang leader.
Do you recall those questions?
A. Yes, sir.
Q. What gang alliance does Barbecue lead, if you recall?
A. Well, as far as I know, and I wasn't part of those investigations, it's taken different forms and it's been called different names over the past few years, but I wouldn't be able to give you an accurate name now.
I don't know where it's gotten or where it's merged into.
Q. Sure. So a few weeks after the conversations we have already looked at regarding Barbecue, did Ortiz ever tell you he was meeting with another gang leader in Haiti?
A. No.
Q. Did he ever tell you, "This man has already made an official alliance with us, more than 500 men, one of the strongest groups around"?
A. No, sir.
Q. Again, we were talking about Ortiz's trustworthiness and what he either told you or what he omitted. Is this information you would have wanted to know about his activities in Haiti?
A. Yes, sir.
Q. I am going to show you page 349 of Government's

Exhibit 147D.

You and Ortiz were in pretty frequent communication in June 2021?

A. Yeah.

Q. Did he ever tell you about a plan involving the gangs doing a main thrust?

A. No, sir.

Q. Now, we also -- there was extensive questioning in your cross-examination regarding what Ortiz told you both in the days leading up to July 7th and on July 7th.

Do you recall those questions?

A. Yes, sir.

Q. We looked at this previously, but what was the date of the last communication from Ortiz before July 7th?

A. July 5th.

Q. And then what's the date of the first time he communicated with you on July 7th?

A. July 7th at 10:00 in the morning.

Q. By the way, I want to look at this.

On July 5th, can you briefly summarize, what is he talking about here in this message?

A. He was providing information about potential Nevada driver's licenses being issued to illegal immigrants in Las Vegas.

Q. Okay. So, Ortiz had time to raise concerns with you about

the scourge of immigrants getting driver's licenses in his text messages with you?
A. Yes.
Q. I am now going to show you Government's Exhibit 147E, page 63, messages from July 6, 2021.
Did you ever receive any messages from Ortiz on July 6, 2021?
A. No, sir.
Q. So at 10:37 at night, did he tell you anything about a crew getting ready to go to President Moise's house?
A. No, sir.
Q. I want to finally end by talking about, there were a few questions you were asked about possible confusion in your communications with Ortiz about this judge on July 7th.
Do you recall those questions?
A. Yes, sir.
Q. I want to show you, again, a message. This is from page 388 of 106C, a chat between you and Mr. Ortiz.
When you provided this contact summary, who gave you this information about the female judge?
A. Mr. Ortiz.
Q. Was this a very short conversation or it seems like there is a lot of information here?
How long did it take for him to describe all that to you?
A. We spoke for several minutes initially, and then it was

repeated contact throughout the night, until the late hours of the night.

Q. Could you help me out?

Could you count with me how many sometimes "a judge" is mentioned in this summary of yours?

A. There is one. There is two.

You skipped one.

There is three.

Q. That is why I needed your help counting.

Thank you, sir.

When Ortiz spoke to you about this judge, did he consistently refer to her as a female judge or did he sometimes use the male pronoun in Spanish?

A. No, it sounded like it was a female judge, which is why I wanted to make sure and I asked him.

Q. And was there any ambiguity or confusion when he was giving you this contact summary that that judge was present on the scene with his CTU security contractors?

A. Yeah, and then he mentioned that eventually in the home that they were held up with, she was secreted out by some of the police officers that were there.

Q. So he claimed the female judge was physically present with his people?

A. Yes.

Q. Now I want to go through again, very briefly, page 411.

What question did you ask Ortiz about the judge?
A. I asked what the name of the judge was.
Q. What did Ortiz respond?
A. Jean Roger Noelcius.
Q. And I want to focus on this question. We didn't look at this on direct. The last question you asked on page 413, what did you ask him?
A. I asked, "female," because he provided the name. The name appeared to be male so I was just trying to figure that out.
Q. What time did you send that message?
A. That was at 10:19 p.m., the same night.
Q. Scrolling to page 414, did Ortiz ever clarify or say that he had miscommunicated with you? We will look through some of his messages but we will start there.
Does he clarify in these messages?
A. In this evening, no, and in the debrief we went into further detail but this evening, no, we never really got an answer.
MR. WU: Okay. No further questions.
(Witness excused.)
THE COURT: All right. Why don't we go ahead and just take the afternoon break.
Take 20 minutes.
We will be back in 20 minutes.
COURT SECURITY OFFICER: All rise for the jury.

(Jury out at 2:47 p.m.)

THE COURT: All right. Everyone take a seat.

Just for the record, during -- the witness can be excused. Thank you very much, sir.

Just for the record, during direct examination there was extensive questioning as to what this agent had been told by Mr. Ortiz and what had been communicated and not communicated to him.

So, it was definitely within the scope of the direct but with respect to cross-examination, there was lengthy cross-examination in an attempt to establish that Mr. Ortiz was trusted, that he had been communicative, that he did not withhold information from them.

There was also cross-examination to suggest that the verbiage or the language that Mr. Ortiz or others who were informants would use would be of a certain nature and that that was sort of kind of the playing along with it.

So, I mean, those are just off the top of my head some of the topics that were covered on direct and cross, which is why I overruled the objections to the redirect.

In the meantime, I cleared my civil hearing for tomorrow and Friday, so what I'd like to do tomorrow morning is deal with the Government's motions with respect to more specificity on both the law enforcement witnesses and the lay witnesses. So just for everybody's references, those would be

Docket Entry numbers 1571, 1593 and 1600.

Let's try to knock those out tomorrow morning, if we can.

And then on Friday morning, I'd like to hear the motions with respect to Experts Goudreau, Phillips, and Lafontant, the one for Lafontant was filed today, that's 1589, 1598 and 1603.

With respect to --

MR. DO CAMPO: Your Honor, Mr. Goudreau, we are likely not calling him as a witness.

THE COURT: Okay.

MR. DO CAMPO: I will confirm tomorrow morning but I just don't want anyone working on his matter, spending time on that because, at this point, I don't believe he is coming.

THE COURT: Either way, if he is coming, we will deal with it on Friday.

Then with Expert Lew, I expect if she is going to have a report, that the report will be available by noon on Friday, give the Government the weekend to digest it, and I will hear final arguments on Lew Monday morning. In the event we need a Daubert or any kind of hearing outside the presence of the jury, which I think we might, we might be able to do that either Monday after court or Tuesday. Assuming they are not ready to do full days on Tuesdays, we could do that Tuesday.

I assume there is enough of a defense case that you

could put on the defense case Monday and Tuesday without her.

It doesn't look like the Government will rest on Friday but I think it's likely, unless something really changes, that it could be Monday. Right?

MR. MCLAUGHLIN: It should be Monday, Judge.

THE COURT: In terms of your Rule 29s, I will give you each about ten minutes.

Mr. Do Campo wants more.

How much would you like for your Rule 29?

MR. DO CAMPO: No, I don't want more.

THE COURT: You want less?

MR. DO CAMPO: No, I think ten minutes is perfect.

THE COURT: Ten for each of you.

Mr. Perez, do you need more than ten?

MR. PEREZ: Fifteen seconds.

THE COURT: Fifteen seconds.

MR. PEREZ: About five minutes.

THE COURT: Listen, don't tempt me. I've taken out the timer before.

How much time do you need?

MS. DESCALZO: We reserve the right to take anyone's unused ten minutes.

THE COURT: And then on behalf of Mr. Solages?

MR. FRIEDMAN: Ten or 15.

THE COURT: So we are talking about 10 or 15 minutes

each, which is why I thought that the Rule 29s are going to take us an hour, because the Government, obviously, has to respond to them and I have to rule.

So, we will either do those at the end of the day or, you know, pack granola bars, maybe it's lunch on Monday or Tuesday.

I am not going to give the jury like a big hour break in the middle of anything, I guess is my point.

At this point, I think you have 15 minutes so take your 15.

(Brief recess.)

COURT SECURITY OFFICER: All rise.

THE COURT: Everyone can be seated. I don't know if the jury is ready. I just came back out.

Mr. Briggs, is this your witness?

MR. BRIGGS: Yes, Your Honor.

THE COURT: Are there any exhibits that you intend to introduce with him that might be stipulated into?

MR. BRIGGS: No, Your Honor, but there are some that will come up that I may move to admit with stipulation with Mr. Perez. If you want to handle those now we can.

THE COURT: No, I just want to make sure that you talked about it so that we can -- are they ready?

COURTROOM DEPUTY: Yes.

THE COURT: Okay. Let's bring them in.

COURT SECURITY OFFICER: All rise for the jury.

(Jury in at 3:09 p.m.)

THE COURT: All right. Everyone be seated.

Government, call your next witness for the record, please.

MR. BRIGGS: Thank you, Your Honor. The Government calls Reiniel Gonzalez.

THE COURT: You can swear in the witness.

COURTROOM DEPUTY: Please raise your right hand.

(The witness, Reiniel Gonzalez, was duly sworn.)

COURTROOM DEPUTY: Please state your name for the record.

THE WITNESS: Reiniel Gonzalez.

DIRECT EXAMINATION

BY MR. BRIGGS:

Q. Good afternoon, sir.

A. Good afternoon.

Q. Are you employed?

A. I'm sorry?

Q. Are you employed?

A. Yes.

Q. By who?

A. IBC Airways.

Q. What's your position there?

A. Director of cargo operations.

Q. How long have you been with IBC Airways?
A. 12 years.
Q. Generally speaking, what does IBC Airways do?
A. Mainly we are a cargo airline. We export to many countries in the Caribbean.
Q. What are your job duties?
A. My job is supervising from the receiving of the cargo, processing of the cargo, manifesting and exporting the cargo in one of our flights.
Q. Where is your office?
A. Our office is in Miami.
Q. Near the airport?
A. At the airport.
Q. In your time with IBC Airways, have you become familiar with the automated export system?
A. I do.
Q. Can you please generally describe what that system is for the jury?
A. Basically states the explanation of the cargo that you are exporting prior to departure.
Q. Is it a system that's run by the U.S. Government?
A. I believe so.
Q. Are you also familiar with electronic export information and how it relates to the automated export system?
A. I do.

Q. When would someone be required to make a disclosure in the automated export system?
A. Any restricted items or any items or shipments that are valued $2,500 or more.
Q. Let's talk about restricted items. Are those also referred to as controlled items?
A. Correct.
Q. Can you please just generally describe what those are, like what are some general categories of a controlled item?
A. It could be from pharmacy to firearms.
Q. If those things are being shipped through your company, would a disclosure need to be made in the automated export system?
A. Yes.
Q. Whose responsibility is it to make that disclosure?
A. The supplier or shipper.
Q. By "supplier," do you mean also the customer?
A. Correct.
Q. Mr. Gonzalez --
MR. BRIGGS: Ms. Hamm, can we please publish.
BY MR. BRIGGS:
Q. Mr. Gonzalez, I am showing you what's already in evidence as Government Exhibit 137. Do you recognize what is there on the screen?
A. Yes, sir.

Q. What is it?
A. This is an air waybill.
Q. Can you please generally describe for the jury what an air waybill is?
A. An air waybill is a legal document that is required to be in place when you are exporting anything by air.
Q. Did you review this particular air waybill in preparation of your testimony today?
A. Not that I recall.
Q. Did you review -- well, actually, strike that.
Let's take a look now at this air waybill. Let's start here on the top left.
What are we looking at here in the top left?
A. This is the information of the shipper.
Q. Okay. And now over here on the top right, what are we seeing there?
A. This is our airline information indicating that it's an air waybill that belongs to IBC Airways.
Q. Returning here, who does the shipper appear to be?
A. The name?
Q. Yes, sir.
A. GCP Clinical Research, LLC.
Q. And what are -- pointing your attention here to this information, what's that information there?
A. That is the air waybill number or tracking number.

Q. Okay. Let's move now to this box.
What's the information that's contained here in this box?
A. This would be the recipient information or the consignee.
Q. So this is the recipient of the shipment?
A. Correct.
Q. Who appears to be listed here as the recipient?
A. International Medical Village.
Q. To what country does this shipment appear to be headed?
A. Haiti.
Q. All right. Let's move now to the information that we see here. Let's start in this box.
What's depicted there?
A. This is indicating the airport of departure.
Q. What's that depicted there that I circled?
A. That's the three letter code for the airport of destination.
Q. What is that airport code?
A. This is Port-au-Prince.
Q. Is Port-au-Prince in Haiti?
A. Yes.
Q. What about the flight date and there is a number below that. What does that mean?
A. That is the flight number and date indicating the destination.
Q. Okay. Let's move now over to the right-hand side of this.

What information is depicted here in these boxes?
A. This is the accounting information or part of the accounting information here. We can dictate, according to the shipper or the supplier if the item or the shipment will be prepaid or collected.
Q. And what does it appear here, like what do these boxes mean in terms of the accounting?
A. It shows that it's been prepaid.
Q. Let's move to this box here. It says "declared value for carriage." What does that mean?
A. The shipper or supplier would disclose the value of the shipment.
Q. What then does NVD stand for there?
A. No value declared.
Q. Where would that information come from?
A. From the shipper.
Q. From the customer?
A. Correct.
Q. So if there had been a value declared, would you expect to see that value in that box?
A. Yes, that's correct.
Q. How about there in that next box I pointed to?
A. This would be the same thing but for Customs, the value declared to Customs.
Q. Was there any value declared here?

A. No.
Q. And, again, is IBC Airways relying on information it receives from the customer to fill in this?
A. Yes.
Q. Okay. We are now in this box. Could you please read what that says there?
A. "These commodities, technology or software were exported from the United States in accordance with the Export Administration Regulation Division" -- I can barely see that, but it says "contrary to U.S. law is prohibited."
Q. What does that mean? Why is that here in this airbill?
A. This is a common statement in air waybills, indicating that they are nonrestricted items. There is no special instructions as to the shipment.
Q. How does IBC Airways know whether a particular shipment does or does not contain a controlled item?
A. We rely on the shipper.
Q. So you'd rely on information provided to you by the customer?
A. Correct.
Q. And why is Haiti there in that box?
A. It's showing, once again, that this shipment is being exported to Haiti.
Q. All right. Looking now at these boxes, what's depicted here in these boxes?

A. This is showing the amount of pieces and weight.
Q. Could amount of pieces refer to boxes?
A. Correct.
Q. Okay. And what's the weight that's depicted here?
A. It's showing 550 pounds or 249.48 kilograms.
Q. Is that the total weight of the 11 pieces?
A. Correct.
Q. Let's go now here to these boxes. What's depicted here?
A. Here it's showing the chargeable weight, meaning the volume of these pieces if it's greater than the actual weight of the freight. And on the right side, it's indicating the rate per pound.
Q. So this number that's depicted here, is that a dollar amount?
A. Correct.
Q. What's depicted here in this box?
A. Here is the description of the freight.
Q. Where does this description come from?
A. The shipper, customer.
Q. From the customer. So here, for this particular air waybill the description is medical X-ray vests and school supplies?
A. Yes.
Q. Does IBC Airways do anything independent of the information that's provided by the customer to verify what is or isn't in

the shipment?
A. We do. We -- after receiving the freight and before being exported or loaded into our aircraft, we do screening. Now, the screening is done by a K-9 and the K-9 is searching for drugs and explosives.
Q. Would this particular K-9 be able to sniff out a ballistic vest?
A. No.
Q. Okay. What do we see here in this box?
A. This is also an accounting box. This is showing the fees for the air waybill, for IBC Airways is creating this air waybill. The handling fee which is, usually when it's paid with a credit card, there is a 4 percent handling fee that is added to the total.
And the turnover fee. The turnover fee is a fee that is paid to the agent at destination.
Q. Do you recognize this name here?
A. Yes.
Q. Who is that?
A. He is an ex-employee.
Q. He used to work at IBC Airways?
A. Yes.
Q. And what's the date here of this air waybill?
A. June 10, 2021.
Q. I am showing you now what's already in evidence at

Government's 137. This is page 3.

Do you recognize this form here, Mr. Gonzalez?

A. Yes.

Q. Is this an IBC Airways form?

A. Yes.

Q. Is this a form used by IBC Airways for customers that want to pay for their shipment without being present?

A. That is correct.

Q. Mr. Gonzalez, I am showing you now what is already in evidence as Government's 147D, page 142. Pointing your attention to those two boxes there, do commercial invoice and shipper letter, are those terms that you are familiar with in your work at IBC Airways?

A. Yes.

Q. I am now showing you page 143. On the left, what do we see there on the left?

A. That's the commercial invoice.

Q. Okay. Then on the right?

A. The shipper's letter of instructions.

Q. Looking now at this, which is already in evidence at Government's 114BC, file ending in 33CC. Do you see that, Mr. Gonzalez?

A. I do.

Q. Is this a commercial invoice from IBC Airways?

A. No, that's a commercial invoice provided by the customer.

Q. Is the information contained in this form, is this the information that later goes into the air waybill?
A. Not necessarily from the commercial invoice.
Q. Where would the information that's in the air waybill come from?
A. The shipper's letter of instruction.
Q. Okay. Let's go now then to the shipper's letter of instruction. This is Government 114B6, file ending BF9E.
Do you recognize this document here, Mr. Gonzalez?
A. I do.
Q. This is the shipper's letter of instruction?
A. Yes.
Q. Now, the information that's populated here in this form, this is populated by the customer?
A. It is.
Q. And then IBC Airways then takes the information in this form to complete the transaction to fill out the air waybill?
A. Yes.
Q. What's depicted here in this shipper's letter of instruction as the nature and quantity of goods?
A. Medical X-ray vests and school supplies.
Q. Now I want to draw your attention to the bottom of this document. Do you see that there it says "copy of OFAC license"?
A. Yes.

Q. If this shipment had contained controlled goods and if there was a license that were required for its shipment, would that have been provided by the shipper?
A. Yes.
Q. Was there such a license provided here for this shipment?
A. No.
Q. All right. Mr. Gonzalez, I wanted to turn your attention now to this particular message here and I want to ask you about some information that's contained here.
Do you see the address that's listed here?
A. Yes.
Q. Do you recognize that address?
A. Yes.
Q. What address is it?
A. That is IBC Airways' address.
Q. All right. Now, let's turn to this phone number here.
Do you see that phone number?
A. Yes.
Q. Do you recognize that phone number?
A. Yes.
Q. What is it?
A. Our main number.
Q. How about this name here, Lude Senatus? Do you recognize that name?
A. Yes.

Q. Who is it?
A. It's one of our sales associates.
Q. I am showing you now what's already in evidence as Government's Exhibit 147D, page 161.
Do you see that photo there on the right?
A. Yes.
Q. Do you recognize where that photo was taken?
A. Yes.
Q. Where was it taken?
A. That's our receiving area, our warehouse.
Q. Now, zooming in on one of those boxes on the photo, it appears as though one of the stickers has been scraped off.
Do you see that?
A. Yes, I do.
Q. Is that something that IBC Airways would do?
A. Not at all.
Q. All right. Turning back now to Government's 137, page 1. Based on what is reported here as the contents of this shipment, would IBC Airways have made any declarations in the automated export system?
A. We would not have to.
Q. Why not?
A. First, there is no value declared. It's indicating that it's not an item that is valued over $2,500 or a restricted item.

Q. And did IBC Airways make any declarations in the automated export system for this shipment?
A. No.
MR. BRIGGS: Pass the witness, Your Honor.
THE COURT: All right. Cross-examination on behalf of Mr. Ortiz?
MR. DO CAMPO: No questions, Your Honor.
THE COURT: On behalf of Mr. Intriago?

CROSS-EXAMINATION

BY MR. PEREZ:
Q. Good afternoon, sir. How are you?
A. Good afternoon.
Q. I just have a few questions for you.
Is the shipper in this case, the GCP Clinical Research, a regular customer of yours?
A. If it's in the air waybill it is, yes.
Q. All right. They seem to know this lady by the name of Lude Senatus?
A. I believe so. She is a sales associate so she helps all the customers.
Q. So, as far as you remember, you have had this customer in the past. Correct?
A. Not that I recall.
Q. Okay. And the customer would generally provide payment information and ID. Correct?

A. They would.
Q. All right. And you would ask for that ID. Correct?
A. Yes.
MR. PEREZ: All right. Could you put 137 up, please?
Thank you.
BY MR. PEREZ:
Q. All right. Who is this gentleman, Edel Abad?
A. He was an operations agent.
Q. All right. And that was someone that used to work for you before?
A. Yes.
MR. PEREZ: Could you just scroll up a little bit?
BY MR. PEREZ:
Q. This is, apparently, the customer that paid, you have a receipt there for $1,037.40?
A. Yes.
MR. PEREZ: Go to the next page, please.
BY MR. PEREZ:
Q. What is the name of the person who is apparently the individual behind the shipper?
A. I'm sorry, I am seeing a credit card authorization form, not a shipper.
Q. I'm sorry, who paid for this?
A. The person that paid for it is the name descriptive there.
Q. Frederick Bergmann?

A. Yes.
Q. And he put his credit card down, Visa.
Would he have appeared in person or can this be done remotely by someone else?
A. The reason we have a credit card authorization form is only when the customer is not in person.
Q. Okay. So this customer would not have gone in person?
A. Not if he -- if he filled this out, he wouldn't.
Q. Do you provide -- do you request of the customer some kind of a driver's license or passport?
A. When they are filling out a credit card authorization form, yes.
MR. PEREZ: Could you shift it up, please? Keep going.
There you go.
BY MR. PEREZ:
Q. And that would be the passport of the individual that is Frederick Bergmann.
It's actually backwards but do you see that?
A. I can barely see it, but yes.
Q. Now, when the package is received by the person that is supposed to receive it, do you get some kind of a receipt back or some evidence or proof that they received it?
A. When it's received by our warehouse or at destination?
Q. At the destination.
A. No, we do not.

Q. You do not.
A. Our airline is limited to provide the service from airport to airport.
MR. PEREZ: Could you slide back down again, Mr. Flores?
One more.
BY MR. PEREZ:
Q. So, this receipt would be the receipt from Haiti. Correct?
A. I wouldn't know.
MR. PEREZ: Could you slide it up one, please.
BY MR. PEREZ:
Q. Could you read the name that is written there underneath that number?
A. Pierre Ashkard.
Q. Ashkard Pierre?
A. Ashkard.
Q. Is that correct?
A. That seems like it, yes, that's correct.
MR. PEREZ: I have no further questions, Your Honor.
THE COURT: All right. Anything on behalf of Mr. Veintemilla?
MS. KUDMAN: No, Your Honor.
THE COURT: On behalf of Mr. Solages?
MR. DRAY: No, Your Honor.
THE COURT: Any redirect on behalf of the United

States?

MR. BRIGGS: No, Your Honor.

(Witness excused.)

THE COURT: All right. Call your next witness.

MR. BRIGGS: The Government calls CBP Chief Manuel Garcia.

COURTROOM DEPUTY: Please raise your right hand.

(The witness, Manuel Garcia, was duly sworn.)

COURTROOM DEPUTY: Please state your name for the record.

THE WITNESS: Manuel Garcia.

MR. BRIGGS: May I proceed?

THE COURT: Yes, you may.

DIRECT EXAMINATION

BY MR. BRIGGS:

Q. Good afternoon, sir.

A. Good afternoon.

Q. Are you employed?

A. Yes, I am.

Q. By whom?

A. Customs & Border Protection.

Q. And if you'd be sure to speak into the mic, that way we can get you and the court reporter can get you, too.

What's your position at Customs & Border Protection?

A. I am a chief CBP officer.

Q. How long have you been a chief CBP officer?
A. Approximately 14 years, going on 15 years this year.
Q. Where is your office?
A. Miami International Airport.
Q. Generally speaking, what are your job duties?
A. I oversee cargo operations at the airport.
Q. In your time with CBP, have you become familiar with the automated export system?
A. Yes, I have.
Q. Can you please generally describe that for the jury?
A. It's a system that we use to track filings of exports exiting the United States.
Q. Why would it be important for CBP to track exports that are leaving the United States?
A. There is items that are being exported out of the United States that need to be controlled, such as weapons, such as dual-use commodities, radioactive material, things that, you know, have to do with the security of our nation.
Q. Are there certain things -- let's talk about controlled goods.
Are controlled goods -- is there a requirement that an exporter make a disclosure in the automated export system if they are exporting controlled goods?
A. Yes.
Q. Is there also -- aside from that, is there another piece of

when you would or wouldn't have to declare something in the automated export system?
A. Yes.
Q. What's that?
A. Certain shipments, depending on the commodity, require an exportation license.
Licenses are normally granted by the Bureau of Industry Security, BIS, which is under the Department of Commerce or under Department of State, specifically under an office called the Directorate of Defense Trade Controls.
MR. BRIGGS: Ms. Hamm, can we have the screens?
BY MR. BRIGGS:
Q. Chief Garcia, what's on your screen now is Government's 137. What is this that we are looking at there?
A. An air waybill.
Q. Did you review this air waybill in preparation of your testimony today?
A. Yes, I did.
Q. Were you able to review the automated export system to see whether any disclosures were made in that system with respect to the shipment that is depicted here?
A. Yes, I did. I did review the AES system.
Q. Were there any such disclosures?
A. No.
MR. BRIGGS: Pass the witness, Your Honor.

THE COURT: All right. On behalf of Mr. Ortiz?
MR. DO CAMPO: No questions, Your Honor.
THE COURT: On behalf of Mr. Intriago?
MR. PEREZ: No questions, Your Honor.
THE COURT: Mr. Veintemilla?
MS. DESCALZO: No questions, Your Honor.
THE COURT: Mr. Solages?
MR. DRAY: No questions, Your Honor.
(Witness excused.)
THE COURT: All right. Call your next witness.
MR. BRIGGS: At this time, the Government calls Dimitri Smith.
COURTROOM DEPUTY: Please raise your right hand.
(The witness, Dimitri Smith, was duly sworn.)
COURTROOM DEPUTY: Please state your name for the record, and spell it.
THE WITNESS: Dimitri, D-I-M-I-T-R-I, last name Smith, S-M-I-T-H.
Thank you.
MR. BRIGGS: Your Honor, before I proceed with this witness, upon stipulation of the defense, we are going to be using Government 148, 149, 150, and 154. I believe there is no objection.
THE COURT: Any objection to those exhibits?
Hearing none, 148, 149, 150 and 154 are admitted.

(Government Exhibits 148, 149, 150 and 154 were received in evidence.)

THE COURT: You may proceed.

MR. BRIGGS: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. BRIGGS:

Q. Good afternoon, Mr. Smith.

A. Good afternoon.

Q. I would ask that you speak into the microphone so we can get you.

Are you employed?

A. Yes.

Q. By whom?

A. The Department of Commerce.

Q. Do you work in a particular section of the Department of Commerce?

A. Yes.

Q. And what's that?

A. The Bureau of Industry and Security.

Q. If I refer to the Bureau of Industry and Security as BIS, will we understand each other?

A. Yes.

Q. What is your title at BIS?

A. I am a senior engineer.

Q. Do you work for any specific division within BIS?

A. Yes.
Q. What's that?
A. Currently I work for the marine, missiles and aerospace division. Previously, I worked for the munitions control division.
Q. Let's talk about the time with the munitions control division. What does, generally speaking, the munitions control division do?
A. Sure. We control less sensitive military items for export.
Q. I'm sorry, for export?
A. Yes, sir, outside the United States.
Q. Can you give some general examples of what these less sensitive military items are?
A. Sure. Stuff like parts of a fighter jet that may not be controlled by another regulation that fall under our purview that would be controlled by my office. Weapons systems, components and parts that are used by the military or law enforcement personnel.
Q. How about ballistic vests?
A. That falls under there, yes, sir.
Q. Where is your office?
A. My office is located in Washington, DC.
Q. How long have you been with the Department of Commerce?
A. Over ten years.
Q. For all that time, have you been a senior engineer?

A. A majority of the time.
Q. Before that, were you just a regular engineer?
A. Yes.
Q. What's your educational background?
A. I have an undergraduate degree in electrical engineering.
Q. Can you please describe for your job -- excuse me, can you please describe for the jury what your job duties are?
A. Sure. My job duties are to review export license applications and also to provide classification, commodity classifications.
Q. Let's talk about export license applications. Can you please describe what that is for the jury?
A. Sure.
So, certain dual-use items and less sensitive military items require authorization from the Government before you can send it outside the United States.
Q. And then you also said you do commodity classifications. What does that mean?
A. So, if an industry or an individual would like to know the classification where an item falls within our regulations, then they come into the Department of Commerce and request what is called a commodity classification so I can tell them exactly where, within our regulations, that item falls.
Q. Are you familiar with the Export Control Reform Act?
A. Yes, sir.

Q. Is that also known as ECRA?
A. Yes.
Q. Can you please describe for the jury what ECRA is?
A. Yes. ECRA give the Department of Commerce, more specifically BIS, the authority to control dual-use or less sensitive military goods for export.
Q. So that's like -- that's the law that your office follows?
A. Yes.
Q. All right. Are you familiar with the Export Administration Regulations?
A. Yes.
Q. Also known as EAR?
A. Yes.
Q. Can you generally describe what the EAR is for the jury?
A. Yes. The EAR are the regulations that give us the guidance to control the items that are under ECRA or are controlled by ECRA.
Q. Within this EAR, within these regulations, is there a list of controlled items?
A. Yes.
Q. What's that list called?
A. It's called a commerce control list.
Q. Are you familiar with a commerce control list?
A. Yes.
Q. Are there different general categories of items controlled

on that commerce control list?
A. Yes.
Q. What are some of those broad categories?
A. Broadly controls electronics, computers, vessels, aircraft.
Q. How about ballistic vests?
A. Ballistic vests do fall under one or two ECCNs, our export control classification numbers.
Q. What does it mean when a good or item is on the commerce control list?
A. It means that the item is captured, it's enumerated on the list so that item is controlled for export.
Q. Okay. Now, you made reference to an ECCN. What is an ECCN?
A. Sure. An ECCN is an export control classification number. That is what we use to identify the particular categories or the items that are on the list. It's a five digit alphanumeric number.
Q. So, within the commercial control list there are a number of different goods that are controlled. Is that right?
A. Yes.
Q. And if an item is on the commerce control list, does it then have an ECCN?
A. Yes.
Q. And in your job, why is it important to determine whether an item is or is not on the commerce control list?

A. Within our regulation that -- the item that's on the list, it tells you whether or not you need a license. So, it is important to determine whether or not an item is captured so you know what your responsibilities are as far as exporting.
Q. Have you briefly previously handled export license applications for ballistic vests?
A. Yes.
Q. Have you done commodity classification for ballistic vests?
A. Yes.
Q. Have you done license determinations for ballistic vests?
A. Yes.
Q. How did you learn how to do all this?
A. On-the-job training, going to seminars, time and grade.
Q. Have you given trainings on export controls and licensing requirements?
A. Yes.
Q. To whom?
A. I've been to universities. I've done it for companies, for trade shows, international partners.
Q. How many licensing determinations have you done over your career?
A. Over 200.
Q. Generally speaking, what are the steps to determine if a license is required to export a particular item to a particular country?

A. Sure. You want to identify what the item is, where the item falls on the list, then look at the reasons for control of that item, and then determine what the reasons for control are for the destination that the item is going to.
Q. And you said that the item is going to. Is that the country of destination?
A. Yes, the end -- yes, the destination.
Q. Now, with respect to the first step, which is just determining what the item is, where do you get that information to determine what the item is?
A. It comes from whoever submits the information to the Department of Commerce.
Q. And why is it important to get information concerning what the item is?
A. So we can identify where the item falls within the list, the regulations.
Q. So you use those descriptors as to what the item is to determine if it's controlled or not?
A. Correct.
MR. BRIGGS: Your Honor, at this time, the Government offers the Dimitri Smith as an exert in export licensing requirements as for ballistic vests.
THE COURT: Mr. Ortiz?
MR. DO CAMPO: Your Honor --
THE COURT: Hold on, I'm going to go down the list.

Is there any objection on behalf of Mr. Ortiz?
MR. DO CAMPO: Accept --
THE COURT: On behalf of Mr. Intriago?
MR. PEREZ: Your Honor, acceptable to the extent that it is in document -- Docket Entry 1277.
THE COURT: So noted for the record.
Anything on behalf of Mr. Veintemilla?
MS. DESCALZO: No, Your Honor.
THE COURT: Mr. Solages.
MR. FRIEDMAN: No, Your Honor.
THE COURT: All right. You may proceed.
MR. BRIGGS: Thank you, Your Honor.
BY MR. BRIGGS:
Q. All right. Mr. Smith, on your screen now is Government's 103A, page 48 on the left, and on the right is Government's 103A, page 50.
Have you seen these before?
A. Yes.
Q. What do they appear to depict?
A. They appear to be ballistic plates.
Q. Is the front on the left and the back on the right?
A. That appears to be the case, yes.
MR. BRIGGS: Your Honor, may I approach the witness?
THE COURT: You may.
BY MR. BRIGGS:

Q. Mr. Smith, you have what's been identified and admitted into evidence as Government's Exhibit 95C. Does one of those plates that's there at Government's 95C appear similar to the plate that's shown in the photograph we are seeing?
A. Yes.
Q. Now, turning to what's on the screen, and let's look at the right side, is there information depicted there on that photo that would allow you to determine whether this plate would require a license?
A. Yes.
Q. Can you please circle on your screen that information?
A. (Indicating.)
MR. BRIGGS: May the record reflect that the within circled the words, "According to NIJ 0101.06 (2008) Level III." And then below that, the witness circled, "This plate is certified Level III, according to NIJ 0101.06 (2008)."
BY MR. BRIGGS:
Q. Can you please describe for the jury what that is that you just circled?
A. Sure. That's the strength level of the plate, what the plate is able to withstand, the amount of force.
Q. So we see there what I think is an acronym, NIJ. What is NIJ?
A. Sure, NIJ stands for the National Institute of Justice.
Q. And what does the NIJ do with respect to ballistic vests?

A. The NIJ, it tells you what level the ballistic plates are rated at.
Q. And is there an industry standard rating with respect to these ballistic vests?
A. Yes, that is NIJ levels.
Q. Okay. So, is it like Levels I, II, III, IV?
A. Correct.
Q. And what's the level that we see circled there?
A. What appears to be Level III.
Q. Now, is the NIJ level of a ballistic vest, is that important for you as you do your analysis?
A. Yes.
Q. Based on what we see here in Government's 103A, page 50, would you have the information you need to determine whether this plate was controlled under the commerce control list?
A. Yes.
Q. Mr. Smith, I am showing you what's now in evidence as Government's 148. What is this that we are looking at here?
A. This is a section of the commerce control list, more specifically, this is 1A613.
Q. Let's start with that number. What is that number 1A613?
A. 1A613 is the alphanumeric number that we talked about earlier, the ECCN.
Q. So is this section of the commerce control list for that particular ECCN?

A. That is correct.
Q. What's the information right below that heading there? We see license requirements and reason for control. What do those mean?
A. So, each item is controlled for particular reasons. In this case it's controlled for NS, RS, AT, UN and those stand for National Security, Regional Stability, Anti Terrorism and United Nations Controls.
Q. Going to the second page of Government's 148 -- this is the second page of that section -- where would we look here if we were trying to determine whether that plate that we were just looking at, whether it fell under this ECCN?
A. Sure. You can go through the list and then you see under D, it tells you there is a body armor section, so I look at D, start there.
Q. All right. So, we were just here in D, and now the continuation of that page is over on the right-hand side.
Do you see that?
A. Yes.
Q. Okay. So on the left-hand side, we have the label for this particular plate. On the right-hand side, we have the commerce control list.
Can you please go through with the jury how you would determine whether this particular plate falls under this particular ECCN?

A. Sure.

So, basically, based off the information we have we know that this is a hard plate.

So, I would go to D2, Section D2, and I will look at what the description says and it tells me that it controls hard body armor plates that provide ballistic protection equal to NIJ Level III or equivalent standards.

Q. What I've circled there in green, are those the same?

A. Yes.

Q. So does that mean that this particular plate will fall under this ECCN in the commerce control list?

A. Yes.

Q. What would be the next step in your analysis to determine whether this particular plate could be exported?

A. Yes. So, we go back to the last page and look at the title, and the reasons for control and we would need to know where the plate is going, but you see in the control section it says it's control for NS, RS, AT and UN reasons. So, you have to pull up the country chart.

Q. Okay. Let's slow down a little bit.

So, we've determined that the plate that we were looking at falls under this particular ECCN, which is 1A613. Is that right?

A. Yes.

Q. And then we were talking about the reasons for control. Is

that what I just circled there?
A. Yes.
Q. Now, you mentioned country chart. Can you please describe for the jury what a country chart is?
A. Sure. So the country chart lists the countries that you will be exporting to and it tells you the reasons for control for that destination.
Q. Okay. So, do you see the country of Haiti depicted there?
A. Yes.
Q. All right. Can you please describe for the jury now how you would take the reasons for control and compare them against the country chart here for Haiti?
A. Yeah. So, what this list is telling you is basically if there is an X in the column, then there will be a license requirement and all you need is one X in order to identify a license requirement.
So, we look at Haiti on the left and then we follow that line across, I want to look for the columns that have NS, RS and AT. And for the ECCN, we know it's controlled for NS-1 and RS-1. It's also controlled for AT and UN. However, Haiti is not controlled for AT and UN. So, we will go find NS-1 on the chart and then you look down national security, NS-1, and then you find Haiti and then you see if there is an X in the box and if there is, then there is a license requirement, and there is also one for RS-1 in this case.

I believe that's the right one.
Q. So after your review of the commerce control list, your determination of the applicable ECCN and weighing that against this country chart, does the plate require a license for export to Haiti?
A. Yes.
Q. All right. Mr. Smith, I am showing you what's already in evidence as 103A, page 52 on the left, and Government's 103A, page 54, on the right.
What appears to be depicted here in these photos?
A. It appears to be another ballistic plate.
Q. Does it appear to be the front on the left and the back on the right?
A. Yes.
Q. Now, in what you've been shown there in the physical exhibits, in Government's 95C, do you see a side plate that is similar to what we see in the photos here?
A. Yes.
Q. Can you please pick that up?
A. (Complies.)
Q. Does that physical exhibit appear similar to what we see here in the photos?
A. Yes.
Q. Looking now at the right side, is there information depicted there in that label that would allow you to determine

whether this plate would require an export license?
A. Yes.
Q. And what's that?
A. The same as before. So, we are going to look for the NIJ level -- I think I missed the mark.
Q. Do you want to try it again?
A. Yes, sure.
Q. You circled NIJ 0101.06 (2008) Level III.
Is that right?
A. Yes.
Q. And based on the information included here in this manufacturing label, would you have the information that you would need to determine if this side plate was controlled?
A. Yes.
Q. And would the ECCN for this side plate be the same as the ECCN for the front plate that we were just looking at?
A. Yes.
Q. And would it be the same analysis with respect to looking at the reasons for control and the country chart?
A. Yes.
Q. And so, would this side plate require a license for export to Haiti?
A. Yes.
Q. There in Government's 95C, there also is what appears to be a vest.

Do you see that there?
A. Yes.
Q. Can you please pick it up and look inside to see if you see a label?
A. Yes.
Q. Do you see a label within there?
A. Yes.
Q. I am showing you Government's 103B5, page 24.
Does the label that's depicted there on the screen appear similar to the label that's there on that vest?
A. Yes.
Q. Is there information depicted here on -- let's look at the screen, is there information depicted there on the screen that would allow you to determine whether this vest would require an export license?
A. Yes.
Q. And what's that? Can you please circle it?
A. Sure.
(Indicating.)
MR. BRIGGS: The witness has circled USA NIJ 0101.06 Level IIIA.
BY MR. BRIGGS:
Q. Now, is Level IIIA different than Level III?
A. Yes.
Q. How so?

A. Level IIIA is a lesser -- it doesn't have a higher level control or is not as strong. Does not offer the same amount of protection.
Q. All right. Mr. Smith, I am showing you Government's 149.
Do you recognize this?
A. Yes.
Q. What is it that we are looking at here?
A. This is going back -- it's another entry on the commerce control list.
Q. Okay. Pointing your attention to that bold header there, what is that that we are looking at?
A. That is the ECCN and the title.
Q. And this is a different ECCN we are looking at. This is ECCN A1005?
A. Yes.
Q. And what follows, is that the section for this particular ECCN?
A. Yes.
Q. This is now page 2 of that particular ECCN?
A. Yes.
MR. BRIGGS: And we will put up page 3, too.
BY MR. BRIGGS:
Q. Where would you go here in this section of the commerce control list to determine whether that vest that we were just looking at, whether it was controlled under this section?

A. So, I look at the entries and I would look at the soft body armor for this example.
Q. So with respect to the vest that we were looking at in Government's 103B, page 24, you would classify that as soft body armor?
A. Yes.
Q. And it would then fall under this particular ECCN?
A. Yes.
Q. And just like before, what then would you do after you determine that that vest would fall under this ECCN?
A. So, we would look at the reasons for control and go back to the country chart.
Q. On the right, we have Government's 149. Are those the reasons for control for those particular ECCN?
A. Yes.
Q. And now going to the country chart, what would you do now knowing those reasons for control?
A. Sure. So, we would look at the ECCN and then it's control for NS-2 reasons, and then you look for, again, the country that -- the destination you are trying to ship it to.
In this case, I am going to say it's Haiti and we are going to look for NS-2 and see if there is a license requirement.
Q. So after your review of this ECCN for this particular vest that we have been looking at, does that vest require a license for export to Haiti?

A. Yes.
Q. Now, generally speaking, are there exceptions to these licensing requirements we have been talking about?
A. Yes.
Q. And what are those?
A. So, a license exception is in lieu of a license you can get what is called an exception, so basically if a license, you think of like a physical document you receive from us, and an exception is saying that you do not have to come to the Department of Commerce to get a license, essentially.
Q. And generally speaking, what are some examples of exceptions that are available to controlled goods?
A. Sure, there is like a bag or something that you can take with you on an aircraft that's for your personal use and that is like temporary, something that you are also going to use for your person for temporary purposes, and then return it back to the United States after you are done using it.
Q. Did you find any of those exceptions to be applicable here?
A. In 1A005 there may be an exception that's applicable.
Q. And what is that?
A. That is Group B. So you would have to look at another chart and it will tell you that since Haiti is in Group B, then you may be able to export the item to Haiti without a license.
Q. And that would be for that vest that we are looking at?
A. Correct, unless --

Q. Not the plates?
A. Correct.
Q. So how would that exception work then with that vest?
A. You would have to, I guess, notify. You have to list it on your shipping documents that you are using a license exception.
I would go to rely on CBP or something for that information more so.
Q. Can you generally describe to the jury how a person would go applying for an export license?
A. Sure. Yes.
So, we have a system them called SNAP-R within the Department of Commerce and it's free to use. All of our services are free. So, you just apply for a license by providing your name, your information, what you are trying to export, where you are trying to export it to, the information we kind of went over earlier.
Q. Are there people available within your office or resources, like if folks have questions regarding these requirements, is there someone they can talk to?
A. Yes, we have an outreach group.
Q. Are those resources free?
A. Yes.
Q. Now, is there a system at BIS that you can use to search for prior export license applications?
A. No. But I can search for prior application.

Q. Okay. That's what I am asking. Can you?
A. Yes, I can.
Q. Did you run certain names through that system in preparation for your testimony today?
A. Yes.
Q. In your search of that system, did you find any license applications to export ballistic vests or plates to Haiti on the part of Antonio Intriago in 2021?
A. No.
Q. How about Frederick Bergmann?
A. No.
Q. How about Christian Sanon?
A. No.
Q. How about GCP Clinical Research, LLC?
A. No.
Q. How about CTU Security, LLC?
A. No.
Q. How about Counter Terrorist Unit Federal Academy, LLC?
A. No.
Q. Did you find any prior applications for Defendant Antonio Intriago at all in your system?
A. Yes.
Q. When was that?
A. 2019.
Q. I am showing you Government's 154. Do you see that on your

screen, Mr. Smith?
A. Yes.
Q. What is this that we are looking at?
A. This is an approved license application.
Q. Let's go through it. Who appears to be the applicant?
A. CTU Security.
Q. And the contact information provided?
A. It says Tony Intriago.
Q. Going now to the second page of Government's 154, what appears to be the good or the item that is the subject of this license?
A. It says, let's see, bulletproof vest.
Q. And can you tell from this license where the vest is headed, like what's the ultimate destination?
A. Yes. It says it's going to Brazil.
Q. Does Brazil have different controls than Haiti?
A. They may but in this instance I believe they may be the same.
Q. Now, just because somebody received a license in 2019 to export something to Brazil, does that mean they could use this license to export something to Haiti?
A. No, a license is specific to the end use that's listed or the end users that are listed.
MR. BRIGGS: May I have a moment, Your Honor.
Pass the witness.

THE COURT: Any cross-examination on behalf of Mr. Ortiz?

MR. DO CAMPO: No, Your Honor.

THE COURT: On behalf of Mr. Intriago?

MR. PEREZ: Yes, Your Honor.

THE COURT: You may proceed.

CROSS-EXAMINATION

BY MR. PEREZ:

Q. Good afternoon, Mr. Smith. How are you?

A. Doing well, good afternoon.

Q. Good, thank you.

I am going to ask you some questions on behalf of Mr. Intriago. The photographs that you were shown, do you know where those photographs were taken?

A. No.

Q. Did you have an opportunity to inspect the cover and see if there were any plates inside those?

A. Physically?

Q. Yes, sir, physically.

A. No.

Q. So you are looking at the label of a photograph and you are assuming that there is a plate inside that's equivalent to that label. Correct?

A. I'm looking at the information that's provided.

Q. Right, sir, the label. That's where you are getting your

information from?
A. Correct.
Q. And the ones that you were shown here obviously have plates in them and the labels are similar to the -- according to the prosecutor, to the ones you saw in the photographs?
A. Yes.
Q. All right. Have you been shown any actual plates that were seized or obtained from the country of Haiti, as far as you know?
A. I'm not sure as far as I know. I would say I don't know.
Q. Okay. I want to -- I am a little confused so I want to understand the process by which one applies for license, but first I'd like to ask you some questions.
You are employed by the Bureau of Industry and Security and that's within the United States Department of Commerce. Correct?
A. Yes.
Q. And you basically work in an office that handles export classifications.
Correct?
A. Amongst other things, yes.
Q. And -- but you are not like a ballistics engineer or anything like that. Right?
A. No.
Q. I think you said you are an electrical engineer?

A. Correct.
Q. You, yourself, you have never personally body armor or been involved in the manufacturing of body armor?
A. No.
Q. And you don't fire and test rifles at ballistic ranges or anything like that?
A. Not for the purposes of my job, no.
Q. That's what I am saying, as part of your job.
A. Okay. No.
Q. And you -- you are not -- you don't have legal training as a lawyer?
A. I am not a lawyer, no.
Q. I'm sorry?
A. I am not a lawyer, no.
Q. Right. Now, basically what these regulations are is that they are an interpretation of the statutes for the Department of Commerce. Correct?
A. An interpretation?
Q. Yes, sir.
A. What do you mean by that?
Q. The regulations interpret what is essentially the Export Control Reform Act.
A. Yes, sir.
Q. And are you familiar with the language of the Export Reform Act itself?

A. Not as much as the EAR but, yes, I just know the EAR portion.
Q. And you have never testified as an expert on the Export Control Reform Act?
A. No.
Q. Now, is it fair to say that the training that you've had regarding these ballistic vests are just on-the-job training that you've received, seminars within your department?
A. Yes.
Q. Okay. And there is no such thing as like a national certification or anything from the National Institute of Justice, the NIJ for the information that you are providing?
MR. BRIGGS: Objection. Vague.
MR. PEREZ: I can rephrase it, Your Honor.
THE COURT: Go ahead and rephrase it.
BY MR. PEREZ:
Q. You have no formal certification from the National Institute of Justice. Correct?
A. No.
Q. You have no formal certifications about ballistic testing in a laboratory?
A. No.
Q. Now, this is the way that I understand your explanation regarding how a civilian figures out if they need to get an export license.

A. Go ahead.
Q. The first thing you told us was, if you carry a personal vest you don't need a license. Correct?
A. That's not exactly true.
Q. Okay. Tell me exactly how it is then.
A. Yes, sir. So, you have to determine where the item falls within the list before you can determine whether or not a license exception is available, and if you want to know whether you can use a license exception, I think you need to have familiarity -- be familiar with our list.
Q. Okay. So, what you are saying is that there are certain countries that I can't even take a personal vest for myself on the plane in my bag. Correct?
A. It depends.
Q. Depend on what?
A. It depends on what the classification of the vest is.
Q. Okay. Let's say it's a Classification III?
A. Yes, sir. Is it hard or soft?
Q. Could I take a Classification III to Haiti? I believe you said that that's an exception.
A. Is it hard or soft?
Q. Soft.
A. Soft. It guess it depends. Does it have fragmentation protection?
Q. It does not have fragmentation protection.

MR. BRIGGS: I am going to object to this line of questioning, Your Honor.

THE COURT: I will allow it. He is answering.

BY MR. PEREZ:

Q. Go ahead.

A. If it is not fragmentation protected and it is less than Level III, then it is possible that a license exception may be available, yes, sir.

Q. Okay. Now, the way that I understand this is that it is a four-step process, am I correct, before you can determine if you need a license?

The way I see it is, Step 1 is you look at the product description that's provided to you. Correct?

A. Correct.

Q. And that product description comes from the label on the cover of the soft armor?

A. Yes, or it can come from the manufacturer or -- yes.

Q. Yes, sir.

Now, Step 2 is to compare that description against the commerce control list.

Correct?

A. Yes, sir.

Q. Okay. So I got that. I'm doing good, though.

And then the control list is part of a set of regulations called the Export Administration Regulations or you guys refer

to it as the EAR. Correct?
A. Yes.
Q. All right. So then Step 3 is to identify an ECCN, which is an export control classification number, that you believe matches. Correct?
A. Yes.
Q. And then Step 4 is you need to consult the country chart to see if that vest with that classification can be exported to that particular country?
A. Yes.
Q. Now, your view of this vest or, rather, your view of the picture that you saw is based entirely on that four-step process. There is nothing else that comes into play?
A. Yeah, I think you brought all the information we need in order to make a classification, yes.
Q. All right. But other than that four-step process, you don't have any independent judgment on that?
A. No, you don't need to be certified by another division or anything. Anybody can do it like you just did, sir.
Q. Right, it's not based on an opinion. It's just based on looking at the chart?
A. Yes.
Q. Okay. As I understand, everything is in the regulations then?
A. Yes.

Q. Now, what happens if the regulation is ambiguous and you can't resolve that ambiguity?

Like, let's say that two ECCNs could fit the same product for you, what comes from the written words and the regulations and nothing else, if you have an ambiguity with regard to the ECCN?

A. Do you have an example?

Q. No, I don't.

A. I can't provide an answer if you don't have an example. I don't follow.

Q. Okay. Are there instances when the ECCN fit the same product and there is an ambiguity?

A. Not to my knowledge.

Q. Okay. Now, you told the jury that any citizen for free can access this information on a web page or a website?

A. You said anybody -- repeat that, sorry.

Q. Any one of us can go on this website and just access this information as to what the regulations are?

A. Yes.

Q. And this is maintained by BIS in the Department of Commerce's website. Correct?

A. I believe you can find the regulations. They are like a Code of Federal Regulations, I don't -- but, yes, we maintain the regulations.

Q. Okay. And that's organized into parts and I think the

control, commerce control list is Part 774. Correct?
A. That is correct.
Q. Okay. Now, is it fair to say that Part 774 alone is probably over 1,100 pages?
A. I do not recall the amount of pages. I don't think it's that many. I think the whole EAR is less than a thousand pages, but don't quote me on that. I don't know exactly.
Q. There is about, in the Part 774, there is about ten categories, 0 through 9, I believe?
A. Yes.
Q. It's labeled, say, Category 1, special materials, related equipment, chemicals, microorganisms, toxins, and ballistic vests fall within that first category?
A. Yes, Category 1, yes, sir.
Q. Then within that category there are five product groups, A through E. Correct?
A. Yes.
Q. And Product Group A is end items, equipment, accessories, attachments, parts, components and systems?
A. Yes, physical stuff, yes.
Q. And within Category 1, Product A there are multiple ECCNs that relate in some way to body armor?
A. You can say there is at least two.
Q. At least two. Okay.
So, ECCN 1A55 [sic] covers certain body armor?

A. Yes.

MR. PEREZ: Now, could you -- 149, please.

MR. FLORES: If I could have the screen.

BY MR. PEREZ:

Q. Government Exhibit 149. So, we are looking now at the full text of ECCN 1A005. Is that correct?

A. It's not a full text.

I think there is another few --

MR. PEREZ: There is a second page to it. Go to the second page so he can look at it.

MR. FLORES: That's the only page I have, I'm sorry.

BY MR. PEREZ:

Q. Now, the category that you've applied in this case is ECCN 1A613, which is what you've -- and it covers body armor and related items.

Is that correct?

A. Yes.

MR. PEREZ: Would you go to 148, please?

BY MR. PEREZ:

Q. So, to an ordinary person, you have to figure out which one applies. You have to look at what's called the license requirement section to the list of items that are controlled and the related controls and related definitions in each of the ECCNs.

Is that correct?

A. That's correct.
Q. And Section 1A613 has Subsections A through Z. Correct?
A. Is it A through Z or A through X? I have to look through the ECCN all the way. It might be Y, actually.
Q. 1A613.
That may be a two-page document, Mr. Flores.
A. Keep scrolling down.
Q. There we go. Sorry about that.
A. It's Y.
Q. Do you see it's A through Z?
You got X, Y and then at the bottom, I guess.
A. Y.
Q. Okay. A through Y. Correct?
A. Yes.
Q. All right. Now, my understanding is that you have told the jury that the labels that you saw and the plates that you were shown here fall under the category of 1A613D. Correct?
A. Yes.
Q. And that 1A613D is divided into subparts, soft body armor, and D2 for hard body armor?
A. Yes.
Q. Oof, that's a lot.
MR. BRIGGS: Objection.
THE COURT: Maybe it's time to take a breath and reconvene tomorrow morning.

It's 4:30. Don't talk about the case. Don't look anything up. We will see you tomorrow morning at 9 o'clock.

COURT SECURITY OFFICER: All rise for the jury.

(Jury out at 4:32 p.m.)

THE COURT: All right. So, we will reconvene tomorrow morning at 8:30 in the morning.

MR. MCLAUGHLIN: Very well.

THE COURT: I have a question for the Government. I have Ms. Descalzo's recent filing of the jury instructions which are color-coded, but what I am not sure is whether the Government has had time to review it because some of the objections appear to be, you know, they are bringing back the pattern, things like that.

Have you had a chance to look at that yet, or no?

MR. MCLAUGHLIN: We are in the process of and we anticipate filing something in writing regarding our position on what the jury instructions actually should be, so the Court can use that during the charge conference.

THE COURT: Let me ask you for a favor. When you do that, are you filing a separate memorandum or are you giving me another set of jury instructions that are, you know, have blue taken out, or more red in or something like that?

MR. MCLAUGHLIN: It will be more like a memorandum. It will be styled a memorandum, Judge.

THE COURT: The only thing I am going to ask you to do

then, and if it is what it is, that's fine, is to take a look at what Ms. Descalzo provided to see if you, in fact, have an objection because it doesn't seem to me that the Government has had an opportunity to respond to some of what the defense has proposed.

MR. MCLAUGHLIN: Correct, we will.

THE COURT: Because they just gave it to us now.

When do you think you will have that by? Because I just want to make sure of when should I start looking at the jury instructions.

MR. MCLAUGHLIN: Sometime early next week, hopefully Monday.

THE COURT: No, that's fine. I was going to do it over the weekend, but it doesn't look like that makes a lot of sense for me to do over the weekend.

MR. MCLAUGHLIN: I don't think we are going to get something filed by the weekend. Maybe --

THE COURT: That's fine.

And I am not sure that the Government will have time, after I looked at them today, to really look at them and say, okay, this is what's left in terms of us arguing about it. I mean, there is plenty to argue about on jury instructions, of course.

Anything on behalf of Mr. Ortiz?

MS. JARAMILLO: No, Your Honor.

THE COURT: Mr. Intriago?

MR. PEREZ: No, Your Honor.

THE COURT: Mr. Perez, how much longer on the cross-examination of this witness?

MR. PEREZ: 15 minutes, 20 at most.

THE COURT: Anything on behalf of Mr. Veintemilla?

MS. DESCALZO: Nothing, Your Honor.

THE COURT: Mr. Solages?

MR. DRAY: No, Your Honor.

THE COURT: It looks like we are only a couple of hours behind in terms of what the Government was proposing, so we are getting there. We will see what the jury says tomorrow about full days.

All right. Enjoy your evening. I'll see you at 8:30.

MR. MCLAUGHLIN: Thank you, Judge.

(Proceedings were adjourned at 4:34 p.m.)

C E R T I F I C A T E

I hereby certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

June 30, 2026
DATE

/s/Patricia Diaz

PATRICIA DIAZ, FCRR, RPR, FPR
Official Court Reporter
United States District Court
400 North Miami Avenue, 11th Floor
Miami, Florida 33128
(305) 523-5178

## $

**$1,037.40** [1] - 93:15
**$2,500** [2] - 81:4, 91:24

## '

**'19** [1] - 13:5

## /

**/s/Patricia** [1] - 136:8

## 0

**0** [1] - 130:9
**0101.06** [4] - 108:14, 108:16, 114:8, 115:20

## 1

**1** [8] - 1:7, 2:8, 50:15, 91:17, 127:12, 130:11, 130:14, 130:21
**1,100** [1] - 130:4
**10** [3] - 15:10, 77:25, 87:24
**100** [2] - 3:13, 3:18
**101** [4] - 1:15, 2:5, 2:17, 67:21
**103A** [5] - 107:15, 107:16, 109:13, 113:8
**103B** [1] - 117:4
**103B5** [1] - 115:8
**106C** [1] - 72:18
**10:00** [1] - 71:18
**10:08** [1] - 11:1
**10:13** [1] - 14:22
**10:19** [2] - 15:13, 74:11
**10:37** [1] - 72:9
**11** [1] - 86:6
**1100** [1] - 2:2
**11200** [1] - 1:15
**114B6** [1] - 89:8
**114BC** [1] - 88:21
**11th** [3] - 2:24, 23:24, 136:10
**12** [1] - 80:2
**122** [1] - 3:13
**1277** [1] - 107:5
**12th** [3] - 23:6, 29:20, 30:20
**13** [1] - 17:20
**130** [1] - 2:12
**137** [5] - 81:23, 88:1, 91:17, 93:4, 98:14
**14** [3] - 15:9, 17:20, 97:2
**142** [1] - 88:10
**143** [1] - 88:15
**145** [1] - 68:14
**147B** [3] - 65:9, 67:12, 68:14
**147C** [1] - 69:2
**147D** [4] - 69:15, 71:1, 88:10, 91:4
**147E** [1] - 72:4
**148** [7] - 3:18, 99:22, 99:25, 100:1, 109:18, 110:9, 131:18
**149** [8] - 3:18, 99:22, 99:25, 100:1, 116:4, 117:13, 131:2, 131:5
**15** [6] - 77:24, 77:25, 78:9, 78:10, 97:2, 135:5
**150** [6] - 1:24, 2:14, 3:18, 99:22, 99:25, 100:1
**1500** [1] - 2:17
**154** [6] - 3:18, 99:22, 99:25, 100:1, 120:25, 121:9
**1571** [1] - 76:1
**1589** [1] - 76:6
**1593** [1] - 76:1
**1598** [1] - 76:7
**1600** [1] - 76:1
**1603** [1] - 76:7
**161** [1] - 91:4
**19** [1] - 67:13
**1900** [1] - 2:20
**1:08** [2] - 1:6, 4:6
**1A005** [2] - 118:19, 131:6
**1A55** [1] - 130:25
**1A613** [7] - 109:20, 109:21, 109:22, 111:22, 131:14, 132:2, 132:5
**1A613D** [2] - 132:17, 132:19
**1st** [1] - 27:3

## 2

**2** [2] - 116:19, 127:19
**20** [3] - 74:23, 74:24, 135:5
**200** [1] - 105:22
**2008** [2] - 108:14, 114:8
**2008)** [1] - 108:16
**2019** [2] - 120:24, 121:19
**2021** [13] - 55:14, 66:2, 67:13, 67:21, 68:19, 69:6, 69:9, 71:3, 72:5, 72:7, 87:24, 120:8
**2026** [2] - 1:5, 136:8
**20530** [1] - 1:18
**20th** [1] - 1:15
**22** [1] - 1:5
**22-CR-20104-JB** [1] - 1:2
**23** [2] - 61:15, 67:21
**23rd** [1] - 30:16
**24** [2] - 115:8, 117:4
**241** [1] - 69:1
**249.48** [1] - 86:5
**25** [1] - 2:2
**26** [3] - 17:21, 18:3, 18:6
**28** [1] - 65:9
**29** [1] - 77:9
**29s** [2] - 77:6, 78:1
**2:00** [3] - 18:8, 18:9, 18:13
**2:47** [1] - 75:1
**2B2** [1] - 47:11
**2nd** [1] - 1:24

## 3

**3** [3] - 88:1, 116:21, 128:3
**3/31/21** [1] - 27:2
**30** [3] - 1:5, 68:19, 136:8
**305** [2] - 2:25, 136:11
**31** [1] - 3:4
**33128** [3] - 2:9, 2:24, 136:10
**33131** [3] - 1:24, 2:2, 2:15
**33132** [2] - 1:15, 1:21
**33134** [1] - 2:6
**33181** [1] - 2:20
**33301** [1] - 2:18
**33418** [1] - 2:12
**33CC** [1] - 88:21
**349** [1] - 70:25
**388** [1] - 72:18
**3:09** [1] - 79:2
**3rd** [5] - 2:17, 20:3, 20:6, 66:14, 66:17

## 4

**4** [3] - 3:4, 87:13, 128:7
**40** [1] - 2:8
**400** [2] - 2:24, 136:10
**41** [1] - 69:16
**411** [1] - 73:25
**413** [1] - 74:6
**414** [1] - 74:12
**459** [1] - 2:20
**46** [1] - 3:5
**48** [1] - 107:15
**4:30** [1] - 133:1
**4:32** [1] - 133:4
**4:34** [2] - 1:6, 135:16
**4:37:09** [1] - 22:3
**4th** [1] - 1:20

## 5

**50** [2] - 107:16, 109:13
**500** [1] - 70:17
**52** [1] - 113:8
**523-5178** [2] - 2:25, 136:11
**54** [2] - 3:5, 113:9
**550** [1] - 86:5
**5:00** [2] - 11:19
**5th** [2] - 71:15, 71:20

## 6

**6** [3] - 55:14, 72:5, 72:6
**600** [1] - 2:14
**602** [1] - 1:24
**63** [1] - 72:5
**65** [1] - 3:6

## 7

**7** [1] - 66:2
**7/10/2021** [1] - 27:15
**7/11** [1] - 21:19
**7/11/21** [1] - 22:3
**7/7/21** [1] - 27:7
**7/8** [2] - 18:9, 18:13
**7108** [1] - 2:12
**77** [1] - 67:12
**774** [3] - 130:1, 130:3, 130:8
**79** [1] - 3:8
**7th** [16] - 9:17, 9:23, 20:1, 20:5, 55:18, 61:21, 63:1, 64:14, 66:6, 66:25, 71:10, 71:14, 71:17, 71:18, 72:14

## 8

**8:30** [2] - 133:6, 135:14
**8th** [1] - 18:12

## 9

**9** [2] - 130:9, 133:2
**901** [1] - 2:5
**92** [3] - 3:9, 27:13, 27:15
**93** [1] - 27:15
**93-page** [1] - 26:5
**950** [1] - 1:17
**95A** [1] - 50:15
**95C** [4] - 108:2, 108:3, 113:16, 114:24
**96** [1] - 3:11
**99** [1] - 1:20
**9th** [3] - 18:12, 18:14, 19:13

## A

**a.m** [3] - 11:1, 18:8, 18:9
**A1005** [1] - 116:14
**Abad** [1] - 93:7
**able** [19] - 5:12, 16:10, 16:12, 17:23, 19:20, 32:16, 32:24, 41:7, 43:2, 58:19, 59:6, 60:10, 70:9, 76:22, 87:6, 98:19, 108:21, 118:23
**above-entitled** [1] - 136:5
**absenting** [1] - 15:4
**absolutely** [2] - 8:4, 59:21
**absorbed** [1] - 60:24
**Academy** [5] - 48:18, 50:2, 50:8, 51:8, 120:18
**accept** [1] - 107:2
**acceptable** [1] - 107:4
**access** [3] - 60:10, 129:15, 129:17
**accessories** [1] - 130:18
**accompanied** [1] - 32:9
**accomplish** [1] - 28:25
**accordance** [1] - 85:8
**according** [5] - 25:21, 84:3, 108:14, 108:16, 123:4
**accounting** [4] - 84:2, 84:3, 84:7, 87:10
**accounts** [2] - 10:3, 10:22

**accurate** [4] - 6:14, 17:7, 70:10, 136:4
**acronym** [1] - 108:22
**Act** [6] - 36:23, 42:4, 102:24, 124:22, 124:25, 125:4
**acted** [1] - 8:5
**activities** [1] - 70:22
**activity** [3] - 13:13, 42:24, 57:5
**actual** [2] - 86:10, 123:7
**add** [1] - 23:11
**added** [1] - 87:14
**addition** [2] - 42:21, 43:8
**additional** [1] - 61:15
**address** [4] - 90:10, 90:12, 90:14, 90:15
**adjourned** [1] - 135:16
**Administration** [3] - 85:9, 103:9, 127:25
**admit** [1] - 78:20
**admitted** [3] - 47:10, 99:25, 108:1
**ADMITTED** [1] - 3:17
**admonish** [1] - 19:6
**admonishment** [3] - 6:18, 29:14, 33:4
**advise** [1] - 23:21
**advised** [2] - 31:7, 68:10
**aerospace** [1] - 101:3
**AES** [1] - 98:22
**affiliate** [1] - 4:14
**affiliated** [3] - 17:21, 63:7
**affiliates** [1] - 59:3
**AFTERNOON** [1] - 1:5
**afternoon** [17] - 31:16, 31:17, 46:18, 46:19, 54:20, 54:21, 74:22, 79:16, 79:17, 92:11, 92:12, 96:16, 96:17, 100:7, 100:8, 122:9, 122:10
**afterwards** [3] - 9:22, 60:19, 61:8
**agencies** [3] - 17:3, 48:23, 50:9
**agency** [15] - 6:2, 7:14, 7:23, 8:3, 16:23, 25:13, 27:18, 27:19, 28:9, 28:11, 29:6, 37:9, 53:7, 53:18, 57:18
**agent** [16] - 26:1, 32:14, 32:18, 34:7, 34:25, 35:16, 35:21, 38:18, 39:10, 39:19, 44:23, 46:22, 56:1, 75:6, 87:16, 93:8
**Agent** [15] - 9:19, 18:17, 21:20, 21:25, 22:8, 24:3, 25:4, 31:16, 35:17, 45:2, 46:18, 58:8, 58:14, 58:19
**agents** [6] - 16:19, 23:14, 32:9, 39:12, 52:19, 55:22
**agree** [3] - 58:8, 62:17, 63:11
**agreed** [1] - 7:11
**agreement** [2] - 24:15, 38:17
**ahead** [4] - 74:21, 125:15, 126:1, 127:5
**ahold** [5] - 10:6, 10:13, 10:14, 10:17
**air** [19] - 82:2, 82:3, 82:5, 82:6, 82:7, 82:11, 82:17, 82:25, 85:12, 86:20, 87:11, 87:23, 89:2, 89:4, 89:17, 92:16, 98:15, 98:16
**airbill** [1] - 85:11
**aircraft** [3] - 87:3, 104:4, 118:14
**airline** [3] - 80:4, 82:17, 95:2
**Airport** [1] - 97:4
**airport** [8] - 80:12, 80:13, 83:13, 83:15, 83:17, 95:2, 95:3, 97:6
**Airways** [18] - 79:23, 80:1, 80:3, 80:14, 82:18, 85:2, 85:15, 86:24, 87:11, 87:21, 88:4, 88:6, 88:13, 88:24, 89:16, 91:15, 91:19, 92:1
**Airways'** [1] - 90:15
**al** [1] - 1:7
**alliance** [2] - 70:6, 70:17
**allow** [7] - 26:10, 42:5, 53:9, 108:8, 113:25, 115:14, 127:3
**allowed** [5] - 6:1, 31:9, 38:19, 39:1, 57:2
**allude** [1] - 18:21
**almost** [1] - 9:2
**ALOE** [1] - 2:11
**alone** [2] - 45:9, 130:3
**alphanumeric** [2] - 104:16, 109:22
**ALTANESE** [1] - 1:19
**ambiguity** [4] - 73:16, 129:2, 129:5, 129:12
**ambiguous** [1] - 129:1
**AMERICA** [1] - 1:4
**American** [12] - 8:15, 16:2, 17:13, 38:11, 38:14, 38:19, 39:23, 50:21, 51:12, 51:17, 52:14, 54:1
**amigo** [1] - 32:12
**amount** [6] - 86:1, 86:2, 86:14, 108:21, 116:2, 130:5
**analysis** [3] - 109:11, 111:13, 114:18
**ANDREW** [1] - 1:16
**Angelo** [1] - 7:3
**angles** [1] - 31:8
**answer** [7] - 8:21, 41:16, 43:17, 48:4, 53:9, 74:18, 129:9
**answered** [1] - 68:5
**answering** [1] - 127:3
**Anti** [1] - 110:7
**anticipate** [1] - 133:16
**Antonio** [2] - 120:8, 120:20
**anyway** [3] - 14:16, 18:4, 22:10
**apart** [1] - 45:24
**apologize** [1] - 47:19
**apparent** [1] - 12:24
**appear** [12] - 23:15, 35:24, 82:19, 83:8, 84:6, 107:19, 107:20, 108:3, 113:12, 113:21, 115:9, 133:12
**appearance** [2] - 5:5, 5:6
**APPEARANCES** [1] - 1:12
**appeared** [2] - 74:9, 94:3
**applicable** [3] - 113:3, 118:18, 118:19
**applicant** [1] - 121:5
**application** [3] - 24:15, 119:25, 121:4
**applications** [7] - 5:9, 102:9, 102:11, 105:6, 119:24, 120:7, 120:20
**applied** [1] - 131:13
**applies** [2] - 123:12, 131:21
**apply** [2] - 41:17, 119:13
**applying** [1] - 119:9
**appreciate** [1] - 61:19
**approach** [1] - 107:23
**approved** [1] - 121:4
**April** [11] - 1:5, 27:3, 43:25, 55:14, 67:13, 67:21, 68:15, 68:16, 68:19
**ARCANGEL** [1] - 1:7
**area** [4] - 15:18, 52:8, 65:14, 91:10
**argue** [1] - 134:22
**arguing** [1] - 134:21
**argumentative** [6] - 6:5, 7:9, 39:24, 53:1, 54:13, 62:22
**arguments** [1] - 76:20
**arised** [1] - 36:11
**arisen** [1] - 8:12
**Armed** [1] - 36:22
**armor** [13] - 52:2, 110:14, 111:6, 117:2, 117:5, 124:2, 124:3, 127:16, 130:22, 130:25, 131:14, 132:19, 132:20
**arms** [1] - 15:24
**Arms** [1] - 42:4
**arrangements** [2] - 27:23, 28:19
**arrest** [1] - 33:8
**arrested** [2] - 30:6, 46:4
**arrows** [1] - 53:23
**Article** [1] - 48:21
**article** [1] - 49:14
**articles** [3] - 47:15, 68:8, 68:16
**Ashkard** [3] - 95:14, 95:15, 95:16
**aside** [2] - 55:21, 97:25
**aspect** [1] - 58:18
**assassination** [1] - 44:16
**asset** [2] - 24:13, 38:4
**assigned** [1] - 35:1
**assist** [1] - 42:19
**assistance** [1] - 14:7
**associate** [1] - 92:19
**ASSOCIATES** [1] - 2:5
**associates** [1] - 91:2
**assume** [6] - 13:10, 33:21, 33:22, 40:16, 59:14, 76:25
**assuming** [3] - 37:4, 76:23, 122:22
**assumption** [1] - 53:22
**AT** [5] - 110:6, 111:18, 112:19, 112:20, 112:21
**ATF** [3] - 22:4, 22:15, 23:9
**atrocities** [1] - 37:21
**attachments** [1] - 130:19
**attack** [2] - 66:20, 68:7
**attempt** [1] - 75:11
**attempted** [1] - 9:19
**attended** [1] - 55:13
**attention** [5] - 82:23, 88:11, 89:22, 90:7, 116:10
**attorney** [2] - 19:3, 29:22
**ATTORNEY'S** [2] - 1:14, 1:20
**au** [3] - 16:12, 83:18, 83:19
**audio** [1] - 12:16
**Augustyniak** [5] - 18:17, 21:20, 21:25, 22:8, 30:16
**authority** [1] - 103:5
**authorization** [5] - 33:9, 93:21, 94:5, 94:11, 102:15
**automated** [10] - 80:15, 80:24, 81:2, 81:12, 91:20, 92:1, 97:8, 97:22, 98:2, 98:19
**automatically** [1] - 25:17
**available** [6] - 10:19, 76:18, 118:12, 119:17, 126:8, 127:8
**Avenue** [7] - 1:17, 1:24, 2:2, 2:14, 2:17, 2:24, 136:10
**aware** [23] - 23:11, 29:6, 32:15, 34:12, 35:10, 39:11, 47:3, 55:2, 55:5, 55:7, 55:11, 56:3, 56:23, 56:25, 57:1, 57:4, 57:8, 59:5, 59:8, 59:9,

59:24, 64:11, 64:15
**awareness** [2] - 37:9, 38:6

## B

**backed** [1] - 25:17
**background** [1] - 102:4
**backwards** [1] - 94:18
**bad** [2] - 6:3, 9:13
**badges** [1] - 51:3
**badly** [1] - 5:3
**bag** [3] - 59:20, 118:13, 126:13
**balance** [1] - 48:6
**balled** [2] - 7:18, 7:20
**ballistic** [21] - 36:13, 87:6, 101:19, 104:5, 104:6, 105:6, 105:8, 105:10, 106:22, 107:20, 108:25, 109:1, 109:4, 109:10, 111:6, 113:11, 120:7, 124:5, 125:7, 125:20, 130:12
**ballistics** [2] - 69:4, 123:22
**balls** [1] - 11:11
**Barbecue** [13] - 37:15, 38:4, 58:25, 59:1, 59:3, 59:10, 59:13, 59:17, 59:22, 60:1, 70:3, 70:6, 70:13
**barely** [2] - 85:9, 94:19
**bars** [1] - 78:5
**BARZEE** [1] - 2:7
**based** [10] - 8:23, 9:7, 44:13, 91:18, 109:13, 111:2, 114:11, 128:12, 128:20
**basis** [1] - 50:7
**bastardized** [1] - 7:5
**Beach** [1] - 2:12
**became** [1] - 60:19
**BECERRA** [1] - 1:10
**become** [4] - 12:24, 46:1, 80:14, 97:7
**BEFORE** [1] - 1:10
**began** [1] - 45:23
**beginning** [2] - 43:6, 45:21
**behalf** [19] - 15:24, 31:13, 46:14, 77:23, 92:5, 92:8, 95:20, 95:23, 95:25, 99:1, 99:3, 107:1, 107:3, 107:7, 122:1, 122:4, 122:12, 134:24, 135:6
**behind** [3] - 58:9, 93:20, 135:11
**belongs** [1] - 82:18
**below** [3] - 83:21, 108:15, 110:2
**benefit** [3] - 5:7, 7:15, 56:18
**Bergmann** [3] - 93:25, 94:17, 120:10
**BETH** [1] - 2:11
**better** [2] - 5:14, 45:23
**between** [5] - 12:25, 21:20, 24:9, 27:13, 72:18
**beyond** [4] - 4:20, 53:25, 63:8, 67:17
**BF9E** [1] - 89:8
**big** [3] - 34:3, 50:21, 78:7
**BIS** [7] - 98:8, 100:20, 100:23, 100:25, 103:5, 119:23, 129:20
**Biscayne** [1] - 2:20
**bit** [6] - 4:15, 22:15, 51:19, 65:24, 93:12, 111:20
**blue** [1] - 133:21
**Blvd** [1] - 2:20
**board** [1] - 29:11
**bodies** [1] - 64:19
**body** [12] - 52:2, 110:14, 111:5, 117:1, 117:5, 124:2, 124:3, 130:22, 130:25, 131:14, 132:19, 132:20
**bodyguards** [1] - 49:19
**bold** [1] - 116:10
**Bolivia** [11] - 32:19, 32:25, 33:1, 34:22, 35:1, 40:7, 40:8, 42:19, 43:4, 43:15
**Bonura** [1] - 18:18
**Border** [2] - 96:21, 96:24
**bottom** [2] - 89:22, 132:11
**Boulevard** [1] - 2:5
**box** [12] - 83:1, 83:2, 83:11, 84:9, 84:20, 84:22, 85:5, 85:21, 86:16, 87:9, 87:10, 112:23
**boxes** [8] - 84:1, 84:6, 85:24, 85:25, 86:2, 86:8, 88:11, 91:11
**Brazil** [3] - 121:15, 121:16, 121:20
**break** [4] - 39:13, 69:23, 74:22, 78:7
**breath** [1] - 132:24
**brief** [1] - 32:2
**Brief** [1] - 78:11
**briefly** [5] - 65:3, 68:3, 71:20, 73:25, 105:5
**briefs** [1] - 68:4
**BRIGGS** [37] - 1:16, 3:8, 3:11, 3:13, 78:16, 78:19, 79:6, 79:15, 81:20, 81:21, 92:4, 96:2, 96:5, 96:12, 96:15, 98:11, 98:12, 98:25, 99:11, 99:20, 100:4, 100:6, 106:20, 107:12, 107:13, 107:23, 107:25, 108:13, 108:17, 115:20, 115:22, 116:21, 116:22, 121:24, 125:13, 127:1, 132:23
**Briggs** [1] - 78:15
**bring** [7] - 4:5, 5:1, 6:3, 8:5, 44:25, 45:2, 78:25
**bringing** [1] - 133:12
**bro** [1] - 8:8
**broad** [1] - 104:3
**broadly** [1] - 104:4
**brother** [1] - 8:21
**Brother** [1] - 7:6
**brought** [5] - 13:7, 18:14, 18:20, 61:8, 128:14
**building** [5] - 43:23, 44:7, 44:8, 44:10, 44:15
**bulletproof** [10] - 36:12, 36:15, 36:19, 36:20, 37:12, 40:22, 40:24, 41:9, 42:3, 121:12
**bunch** [1] - 24:6
**Bureau** [4] - 98:7, 100:19, 100:20, 123:14
**buried** [2] - 9:8, 9:13
**business** [20] - 14:10, 17:3, 24:9, 31:24, 32:3, 33:24, 36:7, 40:5, 40:10, 40:13, 40:15, 40:16, 40:17, 40:20, 48:9, 49:21, 49:24, 51:21, 52:21, 54:11
**BY** [63] - 2:21, 3:4, 3:4, 3:5, 3:5, 3:6, 3:8, 3:9, 3:11, 3:13, 3:13, 4:11, 6:7, 7:10, 7:13, 9:5, 26:11, 26:21, 27:6, 28:6, 31:15, 35:23, 38:10, 40:1, 42:10, 46:17, 47:14, 47:24, 50:12, 53:3, 53:13, 54:19, 58:13, 62:24, 63:24, 65:2, 67:9, 67:20, 68:12, 69:25, 79:15, 81:21, 92:10, 93:6, 93:13, 93:18, 94:15, 95:7, 95:11, 96:15, 98:12, 100:6, 107:13, 107:25, 108:17, 115:22, 116:22, 122:8, 125:16, 127:4, 131:4, 131:12, 131:19
**byproduct** [1] - 43:18

## C

**C-O-Q** [1] - 42:13
**Campo** [1] - 77:8
**CAMPO** [14] - 1:22, 1:23, 67:6, 67:17, 68:5, 76:9, 76:12, 77:10, 77:12, 92:7, 99:2, 106:24, 107:2, 122:3
**cancelled** [3] - 5:9, 29:20, 29:21
**cannot** [1] - 37:6
**capture** [1] - 6:19
**captured** [2] - 104:10, 105:3
**capturing** [1] - 38:2
**card** [5] - 87:13, 93:21, 94:2, 94:5, 94:11
**career** [1] - 105:21
**cargo** [8] - 37:8, 79:25, 80:4, 80:7, 80:8, 80:19, 97:6
**Caribbean** [1] - 80:5
**carriage** [1] - 84:10
**carry** [3] - 41:6, 42:5, 126:2
**CASE** [1] - 1:2
**case** [13] - 42:15, 42:17, 43:5, 57:14, 76:25, 77:1, 92:14, 107:22, 110:6, 112:25, 117:21, 131:13, 133:1
**catch** [1] - 11:23
**categories** [5] - 81:9, 103:25, 104:3, 104:15, 130:9
**categorize** [1] - 60:7
**Category** [3] - 130:11, 130:14, 130:21
**category** [4] - 130:13, 130:15, 131:13, 132:17
**caught** [1] - 66:5
**caused** [1] - 8:6
**CBP** [6] - 96:5, 96:25, 97:1, 97:7, 97:13, 119:6
**Center** [1] - 2:8
**certain** [15] - 14:2, 33:13, 34:18, 36:21, 49:16, 62:3, 62:4, 66:10, 75:16, 97:19, 98:5, 102:14, 120:3, 126:11, 130:25
**certainly** [3] - 48:13, 64:19, 66:22
**certification** [2] - 125:11, 125:17
**certifications** [1] - 125:20
**certified** [2] - 108:16, 128:18
**certify** [2] - 55:25, 136:3
**chance** [2] - 58:1, 133:14
**change** [3] - 6:25, 25:13, 31:1
**changed** [1] - 66:9
**changes** [1] - 77:3
**changing** [1] - 8:11
**channels** [1] - 16:22
**chaos** [1] - 10:23
**chaotic** [2] - 10:4, 14:1
**charge** [1] - 133:18
**chargeable** [1] - 86:9
**chart** [13] - 111:19, 112:3, 112:4, 112:5, 112:12, 112:22, 113:4, 114:19, 117:12, 117:16, 118:22, 128:7, 128:21
**chastise** [2] - 6:19, 6:24
**chastising** [1] - 6:23
**chat** [4] - 21:20, 22:7, 25:7, 72:18

**chats** [1] - 26:4
**check** [2] - 43:20, 48:6
**chemicals** [1] - 130:12
**Cherizier** [1] - 37:15
**chide** [1] - 6:18
**Chief** [1] - 96:5
**chief** [3] - 96:25, 97:1, 98:13
**Christian** [1] - 120:12
**CHS** [1] - 35:9
**circle** [2] - 108:11, 115:17
**circled** [9] - 83:14, 108:14, 108:15, 108:19, 109:8, 111:8, 112:1, 114:8, 115:20
**circumstances** [1] - 49:17
**citizen** [2] - 38:24, 129:14
**citizens** [5] - 13:3, 14:19, 16:2, 17:13, 17:17
**City** [1] - 54:6
**civil** [1] - 75:21
**civilian** [1] - 125:24
**civilians** [1] - 48:23
**claimed** [1] - 73:22
**clarify** [2] - 74:12, 74:15
**classification** [10] - 102:9, 102:20, 102:22, 104:7, 104:14, 105:8, 126:16, 128:4, 128:8, 128:15
**Classification** [2] - 126:17, 126:19
**classifications** [3] - 102:10, 102:17, 123:19
**classify** [1] - 117:4
**clear** [6] - 8:21, 13:4, 29:11, 56:6, 60:17, 60:22
**cleared** [1] - 75:21
**clearing** [1] - 28:17
**clearly** [1] - 40:13
**client** [2] - 32:14, 35:11
**Clinical** [3] - 82:22, 92:14, 120:14
**close** [1] - 44:6
**closer** [1] - 55:17
**closure** [1] - 67:2
**clothing** [1] - 51:4
**code** [2] - 83:15, 83:17
**Code** [1] - 129:23
**coded** [1] - 133:10
**coercion** [1] - 46:9
**cohesion** [1] - 46:9
**colleagues** [1] - 64:21
**collect** [2] - 43:17, 68:11
**collected** [3] - 45:21, 66:13, 84:5
**collection** [2] - 43:18, 63:3
**Colombia** [4] - 29:5, 66:20, 68:7
**Colombians** [1] - 17:22
**color** [1] - 133:10
**color-coded** [1] - 133:10
**column** [1] - 112:14
**columns** [1] - 112:18
**coming** [6] - 16:21, 18:9, 58:2, 58:10, 76:14, 76:15
**commerce** [17] - 41:6, 103:22, 103:23, 104:1, 104:8, 104:21, 104:25, 109:15, 109:19, 109:24, 110:21, 111:11, 113:2, 116:8, 116:23, 127:20, 130:1
**Commerce** [11] - 98:8, 100:14, 100:16, 101:23, 102:21, 103:4, 106:12, 118:10, 119:12, 123:15, 124:17
**Commerce's** [1] - 129:21
**commercial** [7] - 36:24, 88:11, 88:17, 88:24, 88:25, 89:3, 104:18
**commit** [1] - 6:2
**commitment** [2] - 8:9, 8:11
**commodities** [3] - 36:22, 85:7, 97:17
**commodity** [5] - 98:5, 102:9, 102:17, 102:22, 105:8
**common** [1] - 85:12
**comms** [1] - 12:22
**communicate** [4] - 31:9, 58:14, 58:16, 63:20
**communicated** [7] - 29:22, 30:15, 66:17, 66:23, 71:16, 75:7, 75:8
**communicating** [5] - 15:5, 18:10, 63:17, 63:18, 63:21
**communication** [13] - 14:20, 15:13, 15:15, 15:17, 15:18, 15:23, 16:23, 19:23, 20:1, 28:8, 59:2, 71:2, 71:14
**communications** [16] - 15:9, 16:12, 19:17, 20:6, 21:3, 21:24, 25:4, 25:17, 25:24, 27:16, 29:19, 38:21, 44:20, 58:2, 62:19, 72:14
**communicative** [3] - 20:5, 66:18, 75:12
**companies** [3] - 49:18, 54:11, 105:18
**company** [11] - 5:7, 35:25, 38:20, 39:4, 40:4, 47:3, 48:17, 48:22, 49:9, 54:4, 81:11
**compare** [2] - 112:11, 127:19
**complete** [2] - 20:10, 89:17
**completely** [4] - 20:10, 25:14, 39:22, 40:18
**complex** [1] - 22:18
**Complies** [1] - 113:20
**components** [2] - 101:17, 130:19
**computers** [1] - 104:4
**concern** [3] - 16:3, 53:15, 53:16
**concerned** [3] - 16:2, 49:7, 52:20
**concerning** [4] - 33:13, 36:15, 36:19, 106:13
**concerns** [4] - 53:5, 55:23, 56:22, 71:25
**concerted** [1] - 16:17
**conclusion** [1] - 42:7
**conduct** [1] - 36:5
**conducting** [1] - 40:9
**conference** [1] - 133:18
**confidential** [24] - 15:24, 16:22, 16:24, 17:14, 19:2, 22:16, 25:20, 34:2, 36:6, 36:11, 39:2, 42:20, 42:21, 45:3, 45:9, 46:23, 47:25, 48:2, 49:4, 52:18, 52:21, 52:23, 53:6, 53:16
**confidentiality** [1] - 45:13
**confidentials** [1] - 27:8
**confirm** [1] - 76:12
**confused** [2] - 34:6, 123:11
**confusing** [1] - 61:21
**confusion** [7] - 14:2, 62:4, 62:14, 63:8, 72:13, 73:16
**consequences** [1] - 7:15
**conservative** [1] - 10:9
**consider** [1] - 46:2
**consignee** [1] - 83:3
**consistently** [1] - 73:12
**constant** [1] - 14:25
**constantly** [1] - 63:17
**consult** [1] - 128:7
**contact** [13] - 14:9, 14:19, 14:25, 16:5, 30:18, 30:19, 34:21, 47:21, 72:19, 73:1, 73:17, 121:7
**contacted** [3] - 7:24, 14:12, 22:3
**contacts** [1] - 57:24
**contain** [2] - 25:10, 85:16
**contained** [4] - 83:2, 89:1, 90:1, 90:9
**contents** [1] - 91:18
**context** [3] - 13:13, 23:8, 23:11
**continuation** [1] - 110:17
**continue** [3] - 4:9, 8:14, 69:24
**continued** [1] - 66:13
**CONTINUED** [2] - 3:4, 4:10
**continues** [1] - 18:8
**contract** [2] - 24:9, 24:11
**contractors** [1] - 73:18
**contrary** [1] - 85:10
**Control** [3] - 102:24, 124:22, 125:4
**control** [44] - 69:7, 101:4, 101:6, 101:7, 101:9, 103:5, 103:16, 103:22, 103:23, 104:1, 104:7, 104:9, 104:14, 104:18, 104:21, 104:25, 106:2, 106:3, 109:15, 109:19, 109:24, 110:3, 110:22, 111:11, 111:16, 111:17, 111:18, 111:25, 112:6, 112:11, 113:2, 114:19, 116:2, 116:9, 116:24, 117:11, 117:14, 117:17, 117:18, 127:20, 127:24, 128:4, 130:1
**controlled** [26] - 81:6, 81:9, 85:16, 90:1, 97:16, 97:19, 97:21, 97:23, 101:15, 101:16, 103:16, 103:19, 103:25, 104:11, 104:19, 106:18, 109:15, 110:5, 110:6, 112:19, 112:20, 112:21, 114:13, 116:25, 118:12, 131:22
**Controls** [2] - 98:10, 110:8
**controls** [5] - 104:4, 105:14, 111:5, 121:16, 131:23
**conversation** [9] - 11:21, 12:13, 12:19, 12:20, 23:13, 27:17, 28:9, 68:10, 72:22
**conversations** [4] - 12:12, 27:2, 63:12, 70:12
**convey** [1] - 10:24
**conveying** [1] - 20:12
**cooperate** [2] - 27:19, 28:11
**coordination** [1] - 22:9
**copy** [2] - 26:14, 89:23
**Coq** [1] - 42:12
**COQ** [1] - 42:14
**Coral** [1] - 2:6
**cord** [1] - 47:19
**corner** [1] - 6:22
**correct** [99] - 4:23, 9:11, 9:15, 12:8, 13:14, 19:15, 20:11, 21:14, 21:16, 28:20,

33:15, 34:18, 38:20, 41:9, 42:13, 44:12, 46:7, 46:24, 47:1, 47:4, 47:7, 48:14, 50:13, 50:19, 50:22, 50:25, 51:5, 51:15, 51:22, 52:3, 52:8, 55:8, 55:14, 55:18, 56:9, 56:16, 57:2, 57:6, 57:18, 57:20, 58:10, 59:3, 59:18, 60:16, 62:21, 63:12, 63:15, 64:2, 66:6, 66:7, 69:4, 81:7, 81:18, 83:5, 84:18, 84:21, 85:20, 86:3, 86:7, 86:15, 88:8, 92:22, 92:25, 93:2, 95:8, 95:17, 95:18, 106:19, 109:7, 110:1, 118:25, 119:2, 122:23, 123:2, 123:16, 123:20, 124:1, 124:17, 125:18, 126:3, 126:13, 127:10, 127:13, 127:14, 127:21, 128:1, 128:5, 129:21, 130:1, 130:2, 130:16, 131:6, 131:16, 131:25, 132:1, 132:2, 132:13, 132:17, 134:6
**correction** [1] - 27:25
**correctly** [1] - 62:19
**corruption** [2] - 35:21, 56:6
**counsel** [2] - 33:3, 65:20
**count** [1] - 73:4
**Counter** [5] - 47:6, 48:17, 50:1, 51:7, 120:18
**counter** [1] - 52:14
**counting** [1] - 73:9
**countries** [5] - 37:6, 41:23, 80:4, 112:5, 126:12
**country** [30] - 8:2, 17:11, 17:12, 33:7, 33:14, 35:4, 41:18, 41:19, 49:12, 49:20, 56:19, 56:21, 60:10, 83:8, 105:25, 106:6, 111:19, 112:3, 112:4, 112:5, 112:8, 112:12, 113:4, 114:19, 117:12, 117:16, 117:19, 123:8, 128:7, 128:9
**couple** [2] - 44:6, 135:10
**course** [9] - 14:5, 20:15, 47:3, 47:15, 50:24, 51:21, 52:18, 64:20, 134:23
**COURT** [92] - 1:1, 4:2, 4:3, 4:9, 6:6, 7:12, 8:25, 9:4, 26:7, 26:9, 26:20, 28:4, 31:13, 35:19, 38:9, 39:25, 42:8, 46:14, 47:17, 50:11, 53:2, 53:9, 54:14, 54:16, 58:12, 62:23, 63:23, 64:24, 67:7, 67:19, 68:6, 69:21, 74:21, 74:25, 75:2, 76:11, 76:15, 77:6, 77:11, 77:13, 77:16, 77:18, 77:23, 77:25, 78:12, 78:13, 78:17, 78:22, 78:25, 79:1, 79:3, 79:8, 92:5, 92:8, 95:20, 95:23, 95:25, 96:4, 96:13, 99:1, 99:3, 99:5, 99:7, 99:10, 99:24, 100:3, 106:23, 106:25, 107:3, 107:6, 107:9, 107:11, 107:24, 122:1, 122:4, 122:6, 125:15, 127:3, 132:24, 133:3, 133:5, 133:8, 133:19, 133:25, 134:7, 134:13, 134:18, 135:1, 135:3, 135:6, 135:8, 135:10
**court** [2] - 76:23, 96:23
**Court** [6] - 2:23, 2:23, 4:1, 133:17, 136:9, 136:9
**Courthouse** [1] - 2:8
**COURTROOM** [8] - 47:13, 78:24, 79:9, 79:11, 96:7, 96:9, 99:13, 99:15
**cover** [2] - 122:16, 127:16
**covered** [2] - 36:22, 75:19
**covers** [3] - 15:18, 130:25, 131:14
**create** [1] - 21:19
**creating** [1] - 87:11
**credentials** [1] - 35:13
**credit** [5] - 87:13, 93:21, 94:2, 94:5, 94:11
**crew** [1] - 72:9
**crime** [5] - 8:16, 17:9, 17:11, 56:9, 56:13
**criminal** [2] - 57:5, 58:18
**crisis** [2] - 15:24, 17:4
**critical** [1] - 61:13
**CROSS** [12] - 3:4, 3:4, 3:5, 3:5, 3:9, 3:13, 4:10, 31:14, 46:16, 54:18, 92:9, 122:7
**cross** [10] - 67:18, 70:2, 71:9, 75:10, 75:11, 75:14, 75:19, 92:5, 122:1, 135:4
**cross-examination** [7] - 71:9, 75:10, 75:11, 75:14, 92:5, 122:1, 135:4
**CROSS-EXAMINATION** [12] - 3:4, 3:4, 3:5, 3:5, 3:9, 3:13, 4:10, 31:14, 46:16, 54:18, 92:9, 122:7
**cross-examinations** [1] - 70:2
**CTU** [20] - 24:9, 24:11, 32:23, 47:4, 47:6, 47:16, 50:13, 50:17, 51:2, 51:19, 52:8, 55:2, 55:5, 55:17, 55:25, 56:1, 63:7, 73:18, 120:16, 121:6
**Cucuta** [1] - 68:7
**curious** [1] - 27:12
**current** [2] - 59:21, 66:19
**customer** [16] - 81:17, 84:17, 85:3, 85:19, 86:19, 86:20, 86:25, 88:25, 89:14, 92:15, 92:21, 92:24, 93:14, 94:6, 94:7, 94:9
**customers** [2] - 88:6, 92:20
**Customs** [4] - 84:23, 84:24, 96:21, 96:24
**cut** [2] - 27:5, 30:11

## D

**D2** [3] - 111:4, 132:20
**daily** [1] - 50:7
**danger** [4] - 13:3, 14:8, 14:11, 16:3
**Daniel** [1] - 10:11
**DANIEL** [2] - 3:3, 4:7
**DANIELA** [1] - 1:23
**darn** [1] - 28:22
**data** [1] - 63:3
**date** [8] - 12:23, 27:15, 63:1, 71:13, 71:16, 83:21, 83:23, 87:23
**DATE** [1] - 136:8
**Daubert** [1] - 76:21
**DAVID** [2] - 2:1, 2:1
**DAY** [1] - 1:5
**days** [5] - 16:25, 21:19, 71:10, 76:24, 135:13
**DC** [2] - 1:18, 101:22
**de** [1] - 2:5
**dead** [3] - 9:8, 61:7, 63:4
**deal** [7] - 16:12, 17:12, 30:22, 33:25, 34:3, 75:23, 76:15
**dealing** [1] - 53:19
**dealings** [1] - 24:7
**death** [1] - 64:6
**debrief** [10] - 13:7, 19:2, 19:11, 20:2, 21:11, 29:20, 42:14, 45:3, 61:8, 74:16
**debriefed** [2] - 18:15, 66:16
**debriefing** [1] - 14:4
**debriefs** [2] - 29:13, 66:13
**deceive** [1] - 13:25
**December** [1] - 30:2
**decide** [1] - 42:2
**decided** [2] - 21:17, 64:15
**decision** [2] - 30:11, 69:9
**declarations** [2] - 91:19, 92:1
**declare** [1] - 98:1
**declared** [6] - 84:9, 84:14, 84:19, 84:24, 84:25, 91:23
**dedication** [1] - 8:8
**deduced** [3] - 4:13, 4:15, 21:4
**defend** [1] - 5:13
**Defendant** [4] - 66:1, 67:14, 67:22, 120:20
**DEFENDANT** [5] - 1:22, 2:1, 2:4, 2:10, 2:16
**defendants** [1] - 1:8
**defense** [5] - 33:3, 76:25, 77:1, 99:21, 134:4
**Defense** [1] - 98:10
**defensive** [1] - 48:22
**definitely** [1] - 75:9
**definitions** [1] - 131:23
**degree** [1] - 102:5
**deliberately** [1] - 11:25
**DEPARTMENT** [1] - 1:17
**Department** [14] - 48:14, 98:8, 98:9, 100:14, 100:15, 101:23, 102:21, 103:4, 106:12, 118:10, 119:12, 123:15, 124:16, 129:20
**department** [1] - 125:8
**departure** [3] - 47:21, 80:20, 83:13
**depict** [1] - 107:19
**depicted** [17] - 83:12, 83:14, 84:1, 85:24, 86:4, 86:8, 86:13, 86:16, 89:19, 98:21, 108:7, 112:8, 113:10, 113:25, 115:9, 115:12, 115:13
**DEPUTY** [8] - 47:13, 78:24, 79:9, 79:11, 96:7, 96:9, 99:13, 99:15
**Descalzo** [2] - 46:21, 134:2
**DESCALZO** [6] - 2:13, 2:14, 77:21, 99:6, 107:8, 135:7
**Descalzo's** [1] - 133:9
**describe** [15] - 68:3, 72:24, 80:17, 81:8, 82:3, 97:10, 102:6, 102:7, 102:12, 103:3, 103:14, 108:18, 112:3, 112:10, 119:8
**description** [10] - 36:25, 48:21, 49:7, 86:17, 86:18, 86:21, 111:5, 127:13, 127:15, 127:19

**descriptive** [1] - 93:24
**descriptors** [1] - 106:17
**desire** [1] - 56:15
**despite** [1] - 8:11
**destination** [11] - 83:16, 83:24, 87:16, 94:23, 94:24, 106:4, 106:6, 106:7, 112:7, 117:20, 121:14
**destroyed** [1] - 25:14
**detail** [2] - 65:8, 74:17
**details** [1] - 15:14
**determination** [1] - 113:3
**determinations** [2] - 105:10, 105:20
**determine** [19] - 104:24, 105:3, 105:23, 106:3, 106:10, 106:18, 108:8, 109:14, 110:11, 110:24, 111:13, 113:25, 114:13, 115:14, 116:24, 117:10, 126:6, 126:7, 127:10
**determined** [3] - 20:9, 20:13, 111:21
**determining** [1] - 106:9
**detrimental** [1] - 66:12
**devices** [1] - 23:12
**DIAZ** [2] - 2:22, 136:8
**Diaz** [1] - 136:8
**dictate** [1] - 84:3
**different** [14] - 8:22, 9:6, 17:21, 27:17, 28:9, 35:16, 42:11, 70:8, 70:9, 103:25, 104:19, 115:23, 116:13, 121:16
**difficult** [1] - 8:6
**difficulties** [1] - 8:11
**digest** [1] - 76:19
**digested** [1] - 45:22
**digit** [1] - 104:16
**diligence** [1] - 43:21
**DIMITRI** [2] - 3:12, 99:17
**Dimitri** [4] - 99:11, 99:14, 99:17, 106:21
**direct** [10] - 16:11, 37:8, 38:21, 67:18, 69:2, 69:20, 74:6, 75:5, 75:9, 75:19
**DIRECT** [6] - 3:8, 3:11, 3:13, 79:14, 96:14, 100:5
**direction** [1] - 9:25
**directly** [2] - 12:6, 12:10
**director** [1] - 79:25
**Directorate** [1] - 98:10
**disclose** [1] - 84:11
**disclosure** [5] - 39:23, 81:1, 81:12, 81:15, 97:22
**disclosures** [2] - 98:20, 98:23
**discreet** [3] - 46:23, 49:4, 52:18
**discuss** [1] - 44:17
**discussed** [4] - 34:3, 34:13, 65:25, 69:14
**discussion** [5] - 19:21, 19:22, 19:24, 60:8, 66:3
**discussions** [1] - 44:19
**distinction** [1] - 33:9
**District** [3] - 2:23, 59:22, 136:9
**DISTRICT** [3] - 1:1, 1:1, 1:11
**divided** [1] - 132:19
**division** [6] - 100:25, 101:4, 101:5, 101:7, 101:8, 128:18
**DIVISION** [1] - 1:2
**Division** [1] - 85:9
**DO** [14] - 1:22, 1:23, 67:6, 67:17, 68:5, 76:9, 76:12, 77:10, 77:12, 92:7, 99:2, 106:24, 107:2, 122:3
**Docket** [2] - 76:1, 107:5
**document** [15] - 17:17, 24:13, 26:5, 40:12, 40:14, 48:12, 49:6, 49:14, 54:7, 82:5, 89:9, 89:23, 107:5, 118:8, 132:6
**documentary** [1] - 33:10
**documented** [1] - 42:25
**documents** [4] - 24:7, 24:14, 119:5
**dog** [1] - 30:10
**DOJ** [1] - 1:14
**dollar** [1] - 86:13
**domestically** [1] - 41:13
**Domingo** [4] - 15:19, 16:5, 16:11, 17:5
**Dominican** [1] - 15:19
**done** [14] - 9:2, 9:20, 31:10, 37:22, 48:5, 48:10, 54:11, 87:4, 94:3, 105:8, 105:10, 105:18, 105:20, 118:17
**Doral** [2] - 31:24, 40:21
**doubt** [1] - 51:24
**down** [26] - 4:14, 5:19, 10:22, 14:7, 14:9, 16:8, 16:19, 18:3, 18:14, 22:4, 27:3, 31:8, 38:3, 40:10, 42:24, 44:21, 58:18, 61:1, 63:5, 64:21, 94:2, 95:4, 106:25, 111:20, 112:22, 132:7
**downloaded** [1] - 23:4
**draw** [1] - 89:22
**DRAY** [5] - 2:19, 2:19, 95:24, 99:8, 135:9
**Dray** [1] - 54:23
**drive** [1] - 65:21
**Drive** [1] - 2:12
**driver's** [3] - 71:23, 72:1, 94:10
**driveway** [1] - 65:21
**driving** [1] - 65:18
**drugs** [1] - 87:5
**dual** [3] - 97:17, 102:14, 103:5
**dual-use** [3] - 97:17, 102:14, 103:5
**dude** [1] - 5:18
**due** [1] - 43:21
**duly** [3] - 79:10, 96:8, 99:14
**during** [11] - 8:12, 20:1, 40:7, 61:2, 64:19, 68:15, 69:23, 70:1, 75:3, 75:5, 133:18
**duties** [4] - 80:6, 97:5, 102:7, 102:8
**duty** [1] - 25:19
**dynamic** [1] - 10:2

## E

**e-mails** [1] - 39:16
**eager** [2] - 63:14, 63:20
**eagle** [3] - 51:13, 52:14, 53:23
**eagle's** [1] - 51:10
**eagles** [1] - 54:1
**EAR** [8] - 103:12, 103:14, 103:15, 103:18, 125:1, 128:1, 130:6
**early** [2] - 25:9, 134:11
**ears** [1] - 56:23
**easy** [1] - 44:10
**ECCN** [31] - 104:12, 104:13, 104:14, 104:22, 109:23, 109:25, 110:12, 110:25, 111:11, 111:22, 112:19, 113:3, 114:15, 114:16, 116:12, 116:13, 116:14, 116:17, 116:19, 117:7, 117:10, 117:14, 117:18, 117:23, 128:3, 129:6, 129:11, 130:25, 131:6, 131:13, 132:4
**ECCNs** [4] - 104:6, 129:3, 130:21, 131:24
**ECRA** [5] - 103:1, 103:3, 103:4, 103:16, 103:17
**Edel** [1] - 93:7
**Eduardo** [1] - 24:3
**educational** [1] - 102:4
**effect** [1] - 38:23
**effectively** [1] - 56:14
**effort** [1] - 16:17
**either** [6] - 28:22, 46:9, 70:21, 76:15, 76:23, 78:4
**el** [1] - 32:12
**electrical** [2] - 102:5, 123:25
**electronic** [1] - 80:23
**electronics** [1] - 104:4
**embassy** [7] - 4:15, 7:23, 8:22, 9:6, 14:19, 34:24, 35:5
**Embassy** [9] - 14:13, 35:1, 38:12, 38:14, 38:19, 38:25, 39:4, 39:23, 40:4
**emergency** [1] - 10:17
**EMMANUEL** [2] - 2:4, 2:5
**emphasis** [1] - 19:25
**employ** [1] - 69:7
**employed** [6] - 29:4, 79:18, 79:20, 96:18, 100:11, 123:14
**employee** [4] - 61:5, 61:6, 61:9, 87:20
**employees** [5] - 55:5, 55:8, 55:11, 61:1, 63:20
**employment** [1] - 48:3
**end** [15] - 5:8, 5:18, 5:19, 7:2, 29:19, 30:9, 45:1, 68:15, 68:19, 72:12, 78:4, 106:7, 121:22, 121:23, 130:18
**ended** [1] - 39:7
**ending** [2] - 88:21, 89:8
**ends** [1] - 8:17
**energetic** [2] - 63:14, 66:22
**enforcement** [15] - 17:2, 25:19, 29:2, 29:4, 29:6, 30:24, 33:23, 33:25, 34:1, 34:4, 34:6, 34:11, 54:6, 75:24, 101:18
**engaged** [3] - 11:10, 13:13, 29:3
**engineer** [5] - 100:24, 101:25, 102:2, 123:22, 123:25
**engineering** [1] - 102:5
**English** [1] - 6:12
**enjoy** [2] - 7:3, 135:14
**enthusiastic** [2] - 4:16, 66:21
**entire** [2] - 58:5, 63:3
**entirely** [4] - 34:15, 56:10, 69:20, 128:12
**entitled** [1] - 136:5
**entity** [1] - 34:11
**entrance** [1] - 50:17
**entranceway** [1] - 50:22
**entries** [1] - 117:1
**Entry** [2] - 76:1, 107:5
**entry** [2] - 65:18, 116:8
**enumerated** [1] - 104:10
**equal** [1] - 111:6
**equipment** [3] - 48:24, 130:12, 130:18

**equivalent** [2] - 111:7, 122:22
**ESQ** [13] - 1:14, 1:16, 1:19, 1:19, 1:22, 1:23, 2:1, 2:4, 2:7, 2:11, 2:13, 2:16, 2:19
**essence** [1] - 55:17
**essentially** [5] - 9:16, 15:17, 25:12, 118:10, 124:21
**establish** [2] - 5:14, 75:11
**et** [1] - 1:7
**evaluation** [1] - 66:9
**evening** [3] - 74:16, 74:17, 135:14
**event** [6] - 17:10, 34:21, 47:22, 55:9, 55:12, 76:20
**events** [4] - 55:17, 57:17, 66:20, 66:24
**eventually** [4] - 11:17, 29:18, 56:18, 73:19
**everyday** [1] - 43:19
**everywhere** [1] - 54:2
**evidence** [12] - 47:10, 50:16, 81:22, 87:25, 88:10, 88:20, 91:3, 94:22, 100:2, 108:2, 109:17, 113:8
**ex** [1] - 87:20
**ex-employee** [1] - 87:20
**exactly** [5] - 4:25, 102:22, 126:4, 126:5, 130:7
**examination** [9] - 69:2, 71:9, 75:5, 75:10, 75:11, 75:14, 92:5, 122:1, 135:4
**EXAMINATION** [20] - 3:4, 3:4, 3:5, 3:5, 3:6, 3:8, 3:9, 3:11, 3:13, 3:13, 4:10, 31:14, 46:16, 54:18, 65:1, 79:14, 92:9, 96:14, 100:5, 122:7
**examinations** [1] - 70:2
**example** [4] - 41:25, 117:2, 129:7, 129:9
**examples** [2] - 101:12, 118:11
**exception** [11] - 42:4, 118:6, 118:7, 118:9, 118:19, 119:3, 119:5, 126:8, 126:9, 126:20, 127:7
**exceptions** [3] - 118:2, 118:12, 118:18
**exchanges** [2] - 17:20, 27:13
**excitement** [1] - 62:18
**excuse** [1] - 102:6
**excused** [4] - 74:20, 75:4, 96:3, 99:9
**exempt** [1] - 41:20
**exert** [1] - 106:21
**Exhibit** [13] - 47:11, 50:15, 65:9, 67:12, 68:14, 69:2, 69:15, 71:1, 72:4, 81:23, 91:4, 108:2, 131:5
**exhibit** [1] - 113:21
**EXHIBITS** [1] - 3:16
**Exhibits** [1] - 100:1
**exhibits** [3] - 78:17, 99:24, 113:16
**exist** [2] - 41:5, 49:18
**exiting** [1] - 97:12
**expect** [3] - 26:1, 76:17, 84:19
**experience** [1] - 37:8
**Expert** [1] - 76:17
**expert** [3] - 41:4, 41:6, 125:3
**Experts** [1] - 76:5
**explain** [1] - 45:11
**explained** [2] - 7:16, 7:22
**explanation** [2] - 80:19, 125:23
**expletive** [1] - 56:7
**explicit** [1] - 67:4
**explosives** [1] - 87:5
**Export** [9] - 36:23, 42:4, 85:8, 102:24, 103:9, 124:21, 124:24, 125:3, 127:25
**export** [43] - 25:7, 36:24, 37:8, 80:4, 80:15, 80:23, 80:24, 81:2, 81:12, 91:20, 92:2, 97:8, 97:22, 98:2, 98:19, 101:9, 101:10, 102:8, 102:11, 103:6, 104:6, 104:11, 104:14, 105:5, 105:14, 105:24, 106:21, 113:4, 114:1, 114:21, 115:15, 117:25, 118:23, 119:9, 119:15, 119:24, 120:7, 121:20, 121:21, 123:18, 125:25, 128:4
**exportation** [4] - 36:20, 36:21, 41:2, 98:6
**exported** [6] - 85:7, 85:23, 87:3, 97:15, 111:14, 128:8
**exporter** [1] - 97:22
**exporting** [6] - 80:8, 80:20, 82:6, 97:23, 105:4, 112:6
**exports** [2] - 97:11, 97:13
**exposed** [2] - 50:4, 50:6
**extensive** [4] - 25:3, 26:5, 71:8, 75:6
**extent** [1] - 107:4
**extraction** [1] - 58:6
**extraterritorial** [1] - 33:4
**eyes** [2] - 56:24, 67:23

## F

**Facetime** [1] - 59:6
**facilitate** [1] - 26:17
**facility** [1] - 52:12
**fact** [15] - 6:25, 14:21, 15:9, 17:8, 22:13, 22:15, 29:8, 39:11, 44:24, 48:6, 52:5, 53:7, 57:20, 61:25, 134:2
**facts** [1] - 57:17
**fair** [5] - 4:21, 17:2, 45:7, 125:6, 130:3
**Fairway** [1] - 2:12
**fake** [1] - 64:12
**fall** [7] - 101:15, 104:6, 111:10, 117:7, 117:10, 130:13, 132:17
**falls** [8] - 101:20, 102:20, 102:23, 106:2, 106:15, 110:24, 111:22, 126:6
**familiar** [13] - 36:14, 37:4, 43:1, 48:12, 80:14, 80:23, 88:12, 97:7, 102:24, 103:9, 103:23, 124:24, 126:10
**familiarity** [2] - 36:18, 126:10
**far** [14] - 5:12, 16:15, 34:2, 38:4, 43:6, 44:5, 57:23, 59:16, 63:13, 70:7, 92:21, 105:4, 123:8, 123:10
**fast** [2] - 26:12, 45:25
**fatigues** [1] - 54:5
**favor** [1] - 133:19
**FBI** [26] - 15:22, 16:5, 16:8, 16:21, 17:5, 17:14, 23:7, 23:15, 26:1, 27:20, 28:12, 29:7, 32:14, 34:25, 39:10, 39:11, 43:23, 44:5, 44:10, 44:15, 64:1, 64:7, 64:13, 65:10, 69:17
**FBI's** [2] - 65:6, 65:21
**FCRR** [2] - 2:22, 136:8
**federal** [3] - 6:2, 17:2, 44:23
**Federal** [7] - 47:4, 48:18, 50:2, 50:8, 51:8, 120:18, 129:23
**fee** [5] - 87:12, 87:13, 87:15
**feeding** [1] - 57:10
**fees** [1] - 87:10
**fell** [1] - 110:12
**felt** [1] - 56:13
**female** [7] - 13:5, 42:12, 72:20, 73:12, 73:14, 73:22, 74:8
**few** [7] - 15:3, 67:10, 70:9, 70:12, 72:12, 92:13, 131:8
**field** [3] - 41:4, 45:8, 48:24
**fifteen** [2] - 77:15, 77:16
**fight** [1] - 30:10
**fighter** [1] - 101:14
**figure** [3] - 28:16, 74:9, 131:20
**figures** [1] - 125:24
**file** [6] - 30:21, 48:11, 58:20, 67:2, 88:21, 89:8
**filed** [2] - 76:6, 134:17
**filing** [5] - 36:23, 48:13, 133:9, 133:16, 133:20
**filings** [1] - 97:11
**fill** [4] - 32:18, 32:23, 85:3, 89:17
**filled** [2] - 34:18, 94:8
**filling** [1] - 94:11
**final** [1] - 76:20
**finally** [1] - 72:12
**fine** [3] - 134:1, 134:13, 134:18
**fire** [2] - 37:23, 124:5
**firearms** [2] - 36:3, 81:10
**fires** [1] - 10:22
**firms** [1] - 49:12
**first** [9] - 13:12, 31:22, 67:1, 71:16, 91:23, 106:8, 123:13, 126:2, 130:13
**firsthand** [4] - 12:11, 12:14, 12:17, 58:22
**fit** [2] - 129:3, 129:11
**five** [3] - 77:17, 104:16, 130:15
**flag** [2] - 50:21, 51:17
**flags** [2] - 50:3, 54:1
**flight** [2] - 83:21, 83:23
**flights** [1] - 80:9
**Floor** [2] - 2:24, 136:10
**FLORES** [4] - 2:7, 2:7, 131:3, 131:11
**Flores** [2] - 95:5, 132:6
**FLORIDA** [1] - 1:1
**Florida** [16] - 1:4, 1:15, 1:21, 1:24, 2:2, 2:6, 2:9, 2:12, 2:15, 2:18, 2:20, 2:24, 48:13, 49:14, 53:25, 136:10
**focus** [3] - 60:5, 74:5
**folks** [1] - 119:18
**follow** [3] - 26:15, 112:17, 129:10
**follows** [2] - 103:7, 116:16
**FOR** [7] - 1:14, 1:22, 2:1, 2:4, 2:10, 2:16, 3:2
**force** [1] - 108:21
**forces** [1] - 8:15
**foregoing** [1] - 136:3
**foreign** [7] - 33:14, 34:8, 35:4, 35:5, 40:11, 41:18, 66:22
**form** [10] - 42:20, 88:2, 88:4, 88:6, 89:1, 89:13, 89:17, 93:21, 94:5, 94:11
**formal** [2] - 125:17, 125:20
**forms** [1] - 70:8
**Fort** [1] - 2:18
**forth** [5] - 12:5, 15:10, 33:8, 61:20, 61:22

**forward** [2] - 9:9, 45:25
**forwarding** [2] - 12:5, 12:6
**four** [3] - 127:10, 128:12, 128:16
**four-step** [3] - 127:10, 128:12, 128:16
**FPR** [2] - 2:22, 136:8
**fragmentation** [3] - 126:23, 126:25, 127:6
**Frederick** [3] - 93:25, 94:17, 120:10
**free** [4] - 119:12, 119:13, 119:21, 129:14
**freight** [3] - 86:11, 86:17, 87:2
**frequent** [1] - 71:2
**frequently** [1] - 14:22
**Friday** [5] - 75:22, 76:4, 76:16, 76:18, 77:2
**Friedman** [1] - 54:22
**FRIEDMAN** [10] - 2:16, 2:17, 54:17, 54:19, 58:13, 62:24, 63:24, 64:22, 77:24, 107:10
**friend** [2] - 5:4, 32:13
**friendly** [1] - 48:8
**front** [6] - 11:21, 44:10, 50:17, 107:21, 113:12, 114:16
**fugitive** [3] - 38:2, 43:4, 59:17
**full** [5] - 14:4, 76:24, 131:5, 131:7, 135:13
**fully** [2] - 8:12, 29:1
**funds** [1] - 24:13
**funneled** [1] - 60:4
**future** [1] - 44:25

## G

**Gables** [1] - 2:6
**gang** [5] - 37:15, 37:22, 70:3, 70:6, 70:14
**gangs** [1] - 71:5
**Garcia** [4] - 96:6, 96:8, 96:11, 98:13
**GARCIA** [1] - 3:10
**Gardens** [1] - 2:12
**gate** [1] - 65:18
**gathering** [1] - 69:7
**GCP** [3] - 82:22, 92:14, 120:14
**gear** [4] - 35:25, 48:24, 50:25, 52:1
**general** [4] - 37:9, 81:9, 101:12, 103:25
**generally** [13] - 80:3, 80:17, 81:8, 82:3, 92:24, 97:5, 97:10, 101:7, 103:14, 105:23, 118:2, 118:11, 119:8
**gentleman** [2] - 37:24, 93:7
**George** [16] - 5:2, 7:16, 7:17, 7:22, 9:19, 9:23, 10:10, 10:13, 27:24, 28:19, 30:20, 39:9, 58:8
**Gerard** [1] - 20:24
**ghost** [1] - 15:4
**giant** [1] - 50:21
**given** [7] - 10:2, 30:24, 31:2, 38:23, 43:7, 58:4, 105:14
**GONZALEZ** [3] - 3:3, 3:7, 4:7
**Gonzalez** [12] - 10:11, 65:3, 79:7, 79:10, 79:13, 81:19, 81:22, 88:2, 88:9, 88:22, 89:9, 90:7
**goods** [8] - 89:20, 90:1, 97:20, 97:21, 97:23, 103:6, 104:19, 118:12
**Google** [1] - 59:23
**Goudreau** [2] - 76:5, 76:9
**government** [4] - 25:13, 48:23, 50:8, 79:4
**GOVERNMENT** [2] - 1:14, 3:2
**Government** [36] - 4:7, 38:18, 42:20, 43:10, 43:14, 43:22, 46:24, 47:11, 50:2, 50:15, 52:23, 52:25, 53:20, 61:14, 65:9, 67:12, 68:13, 76:19, 77:2, 78:2, 79:6, 80:21, 81:23, 89:8, 96:5, 99:11, 99:22, 100:1, 102:15, 106:20, 131:5, 133:8, 133:11, 134:3, 134:19, 135:11
**Government's** [27] - 69:1, 69:15, 70:25, 72:4, 75:23, 88:1, 88:10, 88:21, 91:4, 91:17, 98:14, 107:15, 107:16, 108:2, 108:3, 109:13, 109:18, 110:9, 113:8, 113:16, 114:24, 115:8, 116:4, 117:4, 117:13, 120:25, 121:9
**GOVERNMENT'S** [1] - 3:16
**governmental** [1] - 50:9
**grade** [2] - 64:16, 105:13
**granola** [1] - 78:5
**granted** [1] - 98:7
**greater** [1] - 86:10
**green** [1] - 111:8
**ground** [2] - 17:6, 56:24
**Group** [3] - 118:21, 118:22, 130:18
**group** [5] - 34:1, 55:19, 55:20, 63:6, 119:20
**groups** [3] - 38:1, 70:18, 130:15
**guarantee** [1] - 24:13
**guess** [6] - 7:22, 14:18, 78:8, 119:4, 126:23, 132:11
**guidance** [1] - 103:15
**Gun** [1] - 41:8
**gun** [2] - 53:25, 54:10
**guns** [1] - 69:7
**guy** [2] - 10:9, 30:12
**guys** [5] - 11:16, 13:21, 23:19, 127:25

## H

**Haiti** [66] - 5:1, 5:20, 7:1, 7:25, 10:4, 13:3, 15:19, 16:8, 16:16, 17:9, 21:23, 37:15, 40:4, 42:2, 42:15, 42:17, 55:23, 56:6, 56:7, 56:14, 56:24, 57:2, 57:6, 57:12, 58:3, 58:10, 58:17, 60:13, 60:18, 61:2, 62:16, 62:17, 63:4, 64:1, 64:7, 64:18, 67:15, 68:18, 68:21, 69:7, 69:12, 69:14, 70:14, 70:23, 83:9, 83:19, 85:21, 85:23, 95:8, 112:8, 112:12, 112:17, 112:20, 112:23, 113:5, 114:22, 117:21, 117:25, 118:22, 118:23, 120:7, 121:16, 121:21, 123:8, 126:19
**Haitian** [6] - 20:24, 55:19, 55:20, 57:24, 63:5, 68:8
**Haitians** [2] - 6:9, 9:7
**half** [6] - 9:2, 10:19, 11:4, 11:5, 11:13, 30:6
**Hamm** [2] - 81:20, 98:11
**hand** [7] - 79:9, 83:25, 96:7, 99:13, 110:17, 110:20, 110:21
**handle** [1] - 78:21
**handled** [1] - 105:5
**handler** [2] - 23:9, 69:17
**handlers** [1] - 48:5
**handles** [1] - 123:18
**handling** [5] - 35:7, 35:9, 48:7, 87:12, 87:13
**hands** [1] - 58:7
**hard** [5] - 111:3, 111:5, 126:18, 126:21, 132:20
**harder** [1] - 10:14
**head** [4] - 25:21, 51:10, 66:22, 75:18
**headed** [2] - 83:8, 121:14
**header** [1] - 116:10
**heading** [1] - 110:2
**hear** [2] - 76:4, 76:19
**heard** [5] - 12:3, 31:25, 38:16, 42:11
**hearing** [5] - 12:18, 64:9, 75:21, 76:21, 99:25
**heavy** [1] - 19:25
**hectic** [1] - 62:6
**HECTOR** [1] - 2:7
**held** [1] - 73:20
**hello** [2] - 31:25, 32:12
**helmets** [1] - 35:25
**help** [9] - 7:3, 14:6, 15:5, 17:17, 29:14, 56:18, 64:21, 73:3, 73:9
**helpful** [1] - 57:18
**helps** [1] - 92:19
**hereby** [1] - 136:3
**herein** [1] - 60:19
**hide** [2] - 18:2, 21:4
**higher** [1] - 116:1
**highest** [1] - 42:3
**highlight** [1] - 26:6
**himself** [2] - 15:5, 15:25
**hire** [1] - 49:19
**hold** [1] - 106:25
**holding** [1] - 53:23
**home** [3] - 16:23, 63:5, 73:19
**homeland** [1] - 8:8
**Homeland** [3] - 16:19, 22:4, 28:12
**Honor** [42] - 26:18, 46:15, 54:17, 64:22, 64:25, 67:6, 67:17, 68:5, 69:19, 76:9, 78:16, 78:19, 79:6, 92:4, 92:7, 95:19, 95:22, 95:24, 96:2, 98:25, 99:2, 99:4, 99:6, 99:8, 99:20, 100:4, 106:20, 106:24, 107:4, 107:8, 107:10, 107:12, 107:23, 121:24, 122:3, 122:5, 125:14, 127:2, 134:25, 135:2, 135:7, 135:9
**HONORABLE** [1] - 1:10
**hopefully** [1] - 134:11
**hour** [5] - 10:18, 11:5, 11:14, 78:2, 78:7
**hours** [5] - 11:4, 11:13, 18:25, 73:1, 135:10
**house** [2] - 67:25, 72:10
**Howard** [2] - 4:9, 65:25
**HOWARD** [18] - 2:1, 2:1, 3:4, 4:11, 6:7, 7:10, 7:13, 9:2, 9:5, 26:8, 26:11, 26:16, 26:21, 27:4, 27:6, 28:5, 28:6, 31:11
**HSI** [8] - 17:5, 22:15, 23:9, 23:14, 27:20, 28:22, 43:5
**human** [18] - 15:25, 16:22, 16:24, 17:14, 19:2, 34:2, 36:11, 45:3, 45:9, 46:23, 47:25, 48:2, 49:4, 52:18, 52:21, 52:23, 53:6, 64:12

## I

**IBC** [19] - 79:23, 80:1, 80:3, 80:14, 82:18, 85:2, 85:15, 86:24, 87:11, 87:21, 88:4, 88:6, 88:13, 88:24, 89:16, 90:15, 91:15, 91:19, 92:1
**ICE** [1] - 22:5
**ID** [2] - 92:25, 93:2
**idea** [3] - 33:19, 49:3, 65:24
**ideally** [1] - 45:10
**identified** [1] - 108:1
**identify** [6] - 13:3, 104:15, 106:1, 106:15, 112:15, 128:3
**II** [1] - 109:6
**III** [11] - 48:21, 108:14, 108:16, 109:6, 109:9, 111:7, 114:8, 115:23, 126:17, 126:19, 127:7
**IIIA** [3] - 115:21, 115:23, 116:1
**illegal** [2] - 60:16, 71:23
**illegally** [1] - 60:9
**image** [2] - 65:12, 65:16
**immigrants** [2] - 71:23, 72:1
**immigration** [3] - 5:10, 33:2, 33:9
**immigration-wise** [1] - 33:2
**important** [9] - 35:4, 46:22, 56:12, 61:13, 97:13, 104:24, 105:3, 106:13, 109:11
**impression** [2] - 33:19, 52:20
**incident** [6] - 14:10, 30:12, 62:5, 62:9, 63:2, 68:9
**incidental** [1] - 43:18
**incidentally** [1] - 43:9
**included** [1] - 114:11
**including** [1] - 48:24
**incorporation** [1] - 47:16
**incredibly** [1] - 20:19
**independent** [3] - 36:5, 86:24, 128:17
**indicate** [2] - 53:6, 58:21
**indicated** [2] - 49:3, 63:14
**Indicating** [1] - 115:19
**indicating** [8] - 51:20, 82:17, 83:13, 83:23, 85:12, 86:11, 91:23, 108:12
**indication** [1] - 67:1
**indicting** [1] - 60:1
**indictment** [1] - 59:21
**individual** [6] - 29:3, 41:11, 41:13, 93:20, 94:16, 102:19
**individuals** [3] - 12:22, 37:25, 61:10
**Industry** [4] - 98:7, 100:19, 100:20, 123:14
**industry** [2] - 102:19, 109:3
**infiltrate** [1] - 56:21
**inform** [2] - 23:14, 69:6
**informant** [3] - 36:6, 39:2, 42:21
**informants** [2] - 7:8, 75:16
**information** [103] - 16:21, 17:19, 20:12, 21:5, 21:10, 21:15, 21:24, 22:16, 25:11, 27:9, 33:13, 34:21, 35:3, 35:21, 38:1, 42:23, 43:4, 43:9, 43:19, 45:14, 45:21, 55:21, 56:11, 56:16, 57:4, 57:11, 57:13, 57:17, 57:23, 58:9, 58:16, 58:22, 59:10, 59:12, 59:14, 59:24, 60:3, 60:13, 60:15, 60:18, 60:23, 61:3, 61:4, 61:14, 62:10, 64:12, 66:10, 66:13, 67:3, 67:5, 68:11, 68:17, 68:23, 70:22, 71:22, 72:20, 72:23, 75:13, 80:23, 82:14, 82:17, 82:24, 83:2, 83:3, 83:10, 84:1, 84:2, 84:3, 84:15, 85:2, 85:18, 86:24, 89:1, 89:2, 89:4, 89:13, 89:16, 90:9, 92:25, 106:9, 106:11, 106:13, 108:7, 108:11, 109:14, 110:2, 111:2, 113:24, 114:11, 114:12, 115:12, 115:13, 119:6, 119:14, 119:15, 121:7, 122:24, 123:1, 125:12, 128:14, 129:15, 129:18
**informed** [1] - 29:20
**initial** [1] - 19:11
**initiating** [1] - 43:6
**innocent** [1] - 39:23
**inside** [3] - 115:3, 122:17, 122:22
**insight** [1] - 60:2
**inspect** [1] - 122:16
**instance** [2] - 23:22, 121:17
**instances** [1] - 129:11
**instinctive** [1] - 22:10
**Institute** [3] - 108:24, 125:11, 125:18
**instruction** [6] - 38:18, 38:23, 89:6, 89:8, 89:11, 89:20
**instructions** [7] - 85:13, 88:19, 133:9, 133:17, 133:21, 134:10, 134:22
**intelligence** [2] - 8:1, 38:5
**intend** [2] - 26:18, 78:17
**intended** [1] - 4:20
**interact** [1] - 37:24
**interacted** [1] - 54:25
**interactions** [1] - 31:19
**interest** [6] - 37:16, 39:5, 56:8, 56:15, 59:13, 60:8
**interested** [2] - 7:1, 68:24
**interference** [1] - 46:8
**international** [2] - 83:7, 105:19
**International** [1] - 97:4
**interpret** [1] - 124:21
**interpretation** [2] - 124:16, 124:18
**interrelationship** [1] - 42:16
**interview** [4] - 45:8, 45:17, 46:2, 46:5
**Intriago** [31] - 4:14, 31:13, 31:18, 31:20, 31:22, 31:24, 32:4, 32:11, 33:17, 33:20, 34:5, 36:6, 38:14, 38:17, 38:22, 39:2, 39:3, 39:8, 39:18, 40:3, 44:17, 44:22, 92:8, 99:3, 107:3, 120:8, 120:21, 121:8, 122:4, 122:13, 135:1
**INTRIAGO** [1] - 2:4
**introduce** [2] - 5:19, 78:18
**introduced** [2] - 32:11, 32:14
**introductions** [1] - 5:15
**invasion** [1] - 63:5
**investigate** [2] - 36:11, 56:8
**investigated** [1] - 56:14
**investigation** [17] - 7:2, 17:1, 25:21, 30:8, 30:10, 36:5, 37:12, 43:6, 45:16, 45:19, 45:20, 45:23, 57:22, 58:5, 59:25, 60:19, 64:20
**investigations** [4] - 8:3, 59:15, 60:3, 70:8
**investigative** [3] - 16:15, 58:4, 59:13
**investigatory** [1] - 29:23
**invoice** [5] - 88:11, 88:17, 88:24, 88:25, 89:3
**involved** [7] - 5:2, 14:10, 17:13, 21:6, 30:8, 37:11, 124:3
**involvement** [1] - 30:9
**involving** [2] - 36:19, 71:5
**Iranians** [1] - 60:8
**issue** [1] - 9:8
**issued** [1] - 71:23
**issues** [1] - 34:21
**item** [30] - 36:25, 81:9, 84:4, 85:16, 91:24, 91:25, 102:20, 102:23, 104:8, 104:10, 104:11, 104:21, 104:25, 105:1, 105:3, 105:24, 106:1, 106:2, 106:3, 106:4, 106:5, 106:9, 106:10, 106:14, 106:15, 106:17, 110:5, 118:23, 121:10, 126:6
**items** [20] - 17:19, 36:24, 51:3, 81:3, 81:5, 81:6, 85:13, 97:15, 101:9, 101:13, 102:14, 102:15, 103:16, 103:19, 103:25, 104:16, 130:18, 131:15, 131:22
**itself** [4] - 30:10, 49:21, 56:14, 124:25
**IV** [1] - 109:6

## J

**JACQUELINE** [1] - 1:10
**James** [1] - 54:23
**JARAMILLO** [2] - 1:23, 134:25
**JASON** [1] - 1:19
**Jean** [4] - 13:16, 13:19, 61:25, 74:4
**jet** [1] - 101:14
**job** [11] - 80:6, 80:7, 97:5, 102:6, 102:7, 102:8, 104:24, 105:13, 124:7, 124:8, 125:7
**join** [1] - 23:15
**Jonathan** [1] - 54:22
**JONATHAN** [2] - 2:16, 2:17
**Judge** [5] - 27:4, 42:11, 77:5, 133:24, 135:15
**JUDGE** [1] - 1:11
**judge** [16] - 13:1, 13:4, 13:15, 42:12, 61:25, 72:14, 72:20, 73:4, 73:11, 73:12, 73:14, 73:17, 73:22, 74:1, 74:2
**judges** [3] - 13:10, 42:11, 42:16
**judgment** [1] - 128:17
**juggle** [1] - 11:11
**July** [26] - 9:17, 19:13, 20:3, 23:24, 30:3, 30:5, 30:17, 55:18, 61:21, 63:1, 64:14, 66:2, 66:6, 66:14, 66:17, 66:25, 71:10, 71:14, 71:15, 71:17, 71:18, 71:20, 72:5, 72:6, 72:14
**June** [3] - 71:3, 87:24, 136:8
**jurisdictional** [1] - 17:10
**JURY** [1] - 1:10

**jury** [30] - 4:3, 4:5, 34:5, 46:22, 74:25, 76:22, 78:7, 78:14, 79:1, 80:18, 82:3, 97:10, 102:7, 102:12, 103:3, 103:14, 108:18, 110:23, 112:4, 112:10, 119:8, 129:14, 132:16, 133:3, 133:9, 133:17, 133:21, 134:10, 134:22, 135:12
**Jury** [4] - 4:6, 75:1, 79:2, 133:4
**JUSTICE** [1] - 1:17
**justice** [2] - 6:3, 8:6
**Justice** [3] - 108:24, 125:12, 125:18

## K

**K-9** [3] - 87:4, 87:6
**keep** [6] - 12:23, 25:16, 34:12, 39:15, 94:13, 132:7
**kept** [2] - 14:21, 25:15
**key** [1] - 63:3
**kidnapping** [1] - 37:22
**kilograms** [1] - 86:5
**kind** [13] - 4:16, 17:3, 27:12, 36:5, 40:3, 41:11, 56:7, 68:17, 75:17, 76:21, 94:9, 94:21, 119:16
**knock** [1] - 76:2
**knowing** [1] - 117:17
**knowledge** [8] - 20:20, 58:22, 60:20, 63:22, 66:14, 66:15, 129:13
**knowledgeable** [1] - 29:3
**known** [3] - 63:6, 103:1, 103:12
**knows** [1] - 29:7
**kosher** [1] - 46:2
**KUDMAN** [15] - 2:11, 2:11, 3:5, 3:5, 46:15, 46:17, 47:12, 47:14, 47:18, 47:24, 50:12, 53:3, 53:13, 54:15, 95:22
**Kudman** [1] - 46:20

## L

**label** [11] - 110:20, 113:25, 114:12, 115:4, 115:6, 115:9, 115:10, 122:21, 122:23, 122:25, 127:15
**labeled** [1] - 130:11
**labels** [2] - 123:4, 132:16
**laboratory** [1] - 125:21
**lack** [2] - 45:23, 63:22
**lady** [1] - 92:17
**Lafontant** [2] - 76:6
**land** [1] - 11:17
**language** [2] - 75:15, 124:24
**laptop** [1] - 31:4
**Las** [1] - 71:23
**last** [6] - 29:19, 39:19, 71:14, 74:6, 99:17, 111:15
**late** [1] - 73:1
**Latortue's** [1] - 20:24
**Lauderdale** [1] - 2:18
**laundering** [1] - 42:24
**law** [18] - 7:15, 17:2, 25:19, 29:2, 29:4, 29:6, 30:24, 33:23, 33:25, 34:1, 34:4, 34:6, 34:11, 54:6, 75:24, 85:10, 101:17, 103:7
**LAW** [1] - 2:14
**lawful** [1] - 49:24
**laws** [1] - 29:2
**lawyer** [9] - 19:1, 19:4, 25:1, 29:16, 30:5, 30:7, 124:11, 124:12, 124:14
**lawyers** [1] - 59:1
**lay** [1] - 75:24
**laypeople** [1] - 50:6
**layperson** [1] - 29:1
**lead** [2] - 67:2, 70:6
**leader** [2] - 70:3, 70:14
**leaders** [1] - 37:15
**leading** [1] - 71:10
**leaf** [1] - 53:23
**learn** [3] - 56:15, 68:24, 105:12
**learned** [1] - 66:9
**least** [12] - 5:21, 12:9, 13:22, 14:25, 16:3, 18:3, 40:17, 54:7, 63:13, 66:1, 130:23, 130:24
**leave** [1] - 8:7
**leaves** [1] - 22:23
**leaving** [1] - 97:14
**left** [13] - 9:3, 28:15, 82:12, 82:13, 88:15, 88:16, 107:15, 107:21, 110:20, 112:17, 113:8, 113:12, 134:21
**left-hand** [1] - 110:20
**legal** [5] - 40:18, 42:7, 49:16, 82:5, 124:10
**lengthy** [1] - 75:10
**Leon** [1] - 2:5
**less** [7] - 77:11, 101:9, 101:12, 102:14, 103:5, 127:6, 130:6
**lesser** [1] - 116:1
**lessons** [2] - 52:6, 52:9
**letter** [8] - 38:15, 83:15, 88:12, 88:19, 89:6, 89:7, 89:11, 89:19
**letting** [2] - 52:24, 59:19
**Level** [10] - 108:14, 108:16, 109:9, 111:7, 114:8, 115:21, 115:23, 116:1, 127:7
**level** [15] - 6:4, 13:1, 14:2, 19:25, 40:25, 41:21, 42:3, 62:3, 62:4, 108:20, 109:1, 109:8, 109:10, 114:5, 116:1
**levels** [1] - 109:5
**Levels** [1] - 109:6
**leverage** [1] - 29:8
**Lew** [2] - 76:17, 76:20
**license** [46] - 89:24, 90:2, 90:5, 94:10, 98:6, 102:8, 102:11, 105:2, 105:5, 105:10, 105:24, 108:9, 110:3, 112:14, 112:16, 112:24, 113:4, 114:1, 114:21, 115:15, 117:22, 117:24, 118:6, 118:7, 118:10, 118:23, 119:5, 119:9, 119:13, 119:24, 120:6, 121:4, 121:11, 121:13, 121:19, 121:21, 121:22, 123:12, 125:25, 126:3, 126:8, 126:9, 127:7, 127:11, 131:21
**licenses** [3] - 71:23, 72:1, 98:7
**licensing** [4] - 105:14, 105:20, 106:21, 118:3
**lie** [2] - 66:6, 67:4
**lieu** [1] - 118:6
**life** [3] - 8:7, 31:7, 43:19
**likely** [2] - 76:9, 77:3
**Lime** [6] - 44:2, 44:5, 44:11, 65:4, 65:5, 65:22
**limited** [1] - 95:2
**line** [7] - 40:14, 40:15, 46:8, 54:6, 61:23, 112:18, 127:1
**lines** [3] - 10:20, 32:13, 64:10
**list** [35] - 17:25, 18:3, 37:21, 103:18, 103:21, 103:22, 103:23, 104:1, 104:9, 104:11, 104:16, 104:18, 104:21, 104:25, 105:1, 106:2, 106:15, 106:25, 109:15, 109:19, 109:24, 110:13, 110:22, 111:11, 112:13, 113:2, 116:9, 116:24, 119:4, 126:7, 126:10, 127:20, 127:24, 130:1, 131:22
**listed** [4] - 83:6, 90:10, 121:22, 121:23
**listen** [1] - 77:18
**lists** [1] - 112:5
**live** [1] - 48:9
**lives** [1] - 48:8
**living** [1] - 43:19
**LLC** [5] - 48:18, 82:22, 120:14, 120:16, 120:18
**LLP** [1] - 2:11
**loaded** [1] - 87:3
**loan** [2] - 24:15
**lobby** [1] - 50:24
**located** [1] - 101:22
**logo** [1] - 52:11
**look** [44] - 9:12, 19:9, 26:22, 32:5, 32:20, 32:22, 47:25, 48:21, 50:3, 51:23, 54:2, 71:19, 74:5, 74:13, 77:2, 82:11, 106:2, 108:6, 110:10, 110:14, 111:4, 111:15, 112:17, 112:18, 112:22, 114:4, 115:3, 115:12, 117:1, 117:11, 117:18, 117:19, 117:22, 118:21, 127:12, 131:10, 131:21, 132:3, 133:1, 133:14, 134:1, 134:14, 134:20
**looked** [4] - 49:6, 70:13, 71:13, 134:20
**looking** [28] - 38:2, 50:19, 51:15, 65:10, 67:23, 82:13, 85:24, 88:20, 98:14, 109:18, 110:12, 111:21, 113:24, 114:16, 114:18, 116:7, 116:11, 116:13, 116:25, 117:3, 117:24, 118:24, 121:3, 122:21, 122:24, 128:21, 131:5, 134:9
**looks** [1] - 135:10
**loose** [1] - 30:11
**Lou's** [1] - 41:8
**love** [1] - 26:5
**Lude** [2] - 90:23, 92:17
**lunch** [1] - 78:5

## M

**ma'am** [11] - 46:19, 46:25, 47:5, 50:23, 51:9, 51:11, 51:14, 51:18, 52:4, 52:13, 52:16
**mails** [1] - 39:16
**main** [4] - 23:6, 23:7, 71:6, 90:22
**maintain** [5] - 25:23, 45:13, 46:7, 48:5, 129:23
**maintained** [2] - 25:17, 129:20
**majority** [1] - 102:1
**male** [3] - 13:5, 73:13, 74:9
**man** [8] - 7:16, 7:22, 13:12, 13:17, 13:20, 23:18, 62:1, 70:16
**managed** [1] - 25:13
**manifesting** [1] - 80:8
**manipulate** [1] - 29:8
**mannequins** [1] - 50:25
**MANUEL** [1] - 3:10
**Manuel** [3] - 96:5, 96:8, 96:11

**manufacturer** [1] - 127:17
**manufacturing** [2] - 114:12, 124:3
**marine** [1] - 101:3
**MARISSEL** [1] - 2:13
**Marissel** [1] - 46:21
**mark** [1] - 114:5
**matches** [1] - 128:5
**material** [6] - 43:7, 53:23, 54:3, 54:5, 54:9, 97:17
**materialize** [2] - 43:3, 43:12
**materialized** [1] - 43:7
**materials** [2] - 37:2, 130:11
**Matt** [2] - 35:18, 35:20
**matter** [6] - 14:21, 15:9, 17:7, 42:22, 76:13, 136:5
**matters** [1] - 36:14
**MCLAUGHLIN** [9] - 1:14, 77:5, 133:7, 133:15, 133:23, 134:6, 134:11, 134:16, 135:15
**mean** [23] - 10:24, 19:25, 22:18, 25:9, 37:21, 43:16, 43:25, 49:10, 49:16, 66:21, 75:18, 81:17, 83:22, 84:6, 84:10, 85:11, 102:18, 104:8, 110:4, 111:10, 121:20, 124:20, 134:22
**meaning** [1] - 86:9
**means** [1] - 104:10
**meant** [1] - 6:19
**meantime** [1] - 75:21
**Medical** [1] - 83:7
**medical** [2] - 86:21, 89:21
**meet** [4] - 31:22, 32:4, 44:7, 44:8
**meeting** [11] - 5:2, 19:10, 19:13, 21:8, 22:20, 23:16, 44:2, 55:10, 55:14, 59:6, 70:14
**meetings** [1] - 39:16
**melting** [1] - 31:7
**member** [2] - 8:12, 37:22
**members** [1] - 15:22
**memorandum** [3] - 133:20, 133:23, 133:24
**men** [1] - 70:17
**mention** [3] - 9:23, 14:17, 29:21
**mentioned** [13] - 6:17, 13:21, 33:21, 34:1, 39:9, 39:10, 48:19, 55:9, 61:11, 68:2, 73:5, 73:19, 112:3
**mentions** [1] - 29:18
**mere** [1] - 6:3
**merged** [1] - 70:11
**message** [6] - 37:14, 68:13, 71:21, 72:17, 74:10, 90:8
**messages** [9] - 12:5, 19:16, 21:12, 39:15, 72:2, 72:5, 72:6, 74:14, 74:15
**messing** [1] - 5:20
**met** [9] - 24:2, 31:23, 34:17, 44:16, 55:1, 55:22, 57:25
**MIAMI** [1] - 1:2
**Miami** [16] - 1:4, 1:15, 1:21, 1:24, 2:2, 2:9, 2:15, 2:20, 2:24, 2:24, 39:11, 54:7, 80:11, 97:4, 136:10, 136:10
**mic** [1] - 96:22
**microorganisms** [1] - 130:12
**microphone** [1] - 100:9
**middle** [2] - 13:17, 78:8
**might** [40] - 9:25, 13:3, 16:13, 20:9, 25:10, 26:17, 27:4, 33:22, 34:5, 34:10, 35:16, 35:17, 37:2, 37:23, 38:7, 41:5, 41:17, 44:18, 44:20, 47:20, 48:7, 49:6, 49:8, 50:7, 50:8, 52:21, 52:22, 53:18, 57:10, 59:23, 60:20, 61:15, 61:18, 64:9, 76:22, 78:18, 132:4
**Miguel** [2] - 27:23, 28:19
**military** [8] - 29:5, 51:12, 51:20, 101:9, 101:13, 101:17, 102:14, 103:6
**mind** [2] - 34:12, 39:15
**minutes** [12] - 44:6, 72:25, 74:23, 74:24, 77:7, 77:12, 77:17, 77:22, 77:25, 78:9, 135:5
**Miranda** [1] - 29:16
**miscommunicated** [1] - 74:13
**miscommunication** [1] - 12:25
**miscommunications** [1] - 62:25
**misleading** [4] - 11:25, 53:19, 53:22, 54:9
**misled** [2] - 52:22, 53:5
**missed** [1] - 114:5
**missiles** [1] - 101:3
**misunderstanding** [2] - 8:18, 9:13
**misusing** [1] - 53:18
**modicum** [1] - 66:1
**Moise** [3] - 67:15, 67:24, 69:12
**Moise's** [1] - 72:10
**moment** [7] - 13:2, 13:4, 13:8, 14:1, 16:9, 26:17, 121:24
**Monday** [7] - 76:20, 76:23, 77:1, 77:4, 77:5, 78:5, 134:12
**money** [1] - 42:24
**months** [1] - 64:6
**morning** [12] - 18:9, 18:13, 71:18, 75:22, 76:2, 76:4, 76:12, 76:20, 132:25, 133:2, 133:6
**mosques** [7] - 7:1, 56:12, 56:15, 57:5, 58:17, 60:7, 60:11
**most** [2] - 8:6, 135:5
**motions** [2] - 75:23, 76:5
**move** [10] - 9:8, 9:13, 9:17, 23:24, 27:3, 78:20, 83:1, 83:10, 83:25, 84:9
**MR** [147] - 3:4, 3:4, 3:6, 3:8, 3:9, 3:11, 3:13, 3:13, 4:11, 6:5, 6:7, 7:9, 7:10, 7:13, 8:24, 9:2, 9:5, 26:8, 26:11, 26:16, 26:21, 27:4, 27:6, 28:5, 28:6, 31:11, 31:15, 35:23, 38:8, 38:10, 39:24, 40:1, 42:6, 42:10, 46:11, 50:10, 53:1, 53:8, 54:13, 54:17, 54:19, 58:11, 58:13, 62:22, 62:24, 63:22, 63:24, 64:22, 64:25, 65:2, 67:6, 67:9, 67:17, 67:20, 68:5, 68:12, 69:19, 69:25, 74:19, 76:9, 76:12, 77:5, 77:10, 77:12, 77:15, 77:17, 77:24, 78:16, 78:19, 79:6, 79:15, 81:20, 81:21, 92:4, 92:7, 92:10, 93:4, 93:6, 93:12, 93:13, 93:17, 93:18, 94:13, 94:15, 95:4, 95:7, 95:10, 95:11, 95:19, 95:24, 96:2, 96:5, 96:12, 96:15, 98:11, 98:12, 98:25, 99:2, 99:4, 99:8, 99:11, 99:20, 100:4, 100:6, 106:20, 106:24, 107:2, 107:4, 107:10, 107:12, 107:13, 107:23, 107:25, 108:13, 108:17, 115:20, 115:22, 116:21, 116:22, 121:24, 122:3, 122:5, 122:8, 125:13, 125:14, 125:16, 127:1, 127:4, 131:2, 131:3, 131:4, 131:9, 131:11, 131:12, 131:18, 131:19, 132:23, 133:7, 133:15, 133:23, 134:6, 134:11, 134:16, 135:2, 135:5, 135:9, 135:15
**MS** [18] - 3:5, 3:5, 46:15, 46:17, 47:12, 47:14, 47:18, 47:24, 50:12, 53:3, 53:13, 54:15, 77:21, 95:22, 99:6, 107:8, 134:25, 135:7
**multiple** [2] - 46:4, 130:21
**munitions** [3] - 101:4, 101:6, 101:7
**murder** [2] - 25:21, 37:22
**must** [2] - 12:3, 18:25

## N

**name** [35] - 13:5, 13:15, 13:17, 13:20, 13:21, 34:25, 35:19, 37:23, 39:9, 39:18, 42:12, 42:14, 44:18, 46:20, 48:17, 49:7, 50:1, 54:22, 70:10, 74:2, 74:8, 79:11, 82:20, 87:17, 90:23, 90:24, 92:17, 93:19, 93:24, 95:12, 96:9, 99:15, 99:17, 119:14
**named** [1] - 55:15
**names** [11] - 13:9, 17:21, 17:23, 17:24, 17:25, 18:2, 18:5, 39:12, 61:16, 70:9, 120:3
**nation** [2] - 17:9, 97:18
**national** [3] - 56:22, 112:22, 125:10
**National** [5] - 68:20, 108:24, 110:7, 125:11, 125:17
**Nations** [1] - 110:8
**nature** [3] - 45:4, 75:16, 89:20
**NE** [1] - 2:17
**near** [1] - 80:12
**necessarily** [4] - 48:5, 49:16, 62:19, 89:3
**need** [30] - 5:18, 7:14, 10:17, 27:8, 36:10, 36:23, 41:11, 45:4, 58:6, 60:4, 65:21, 76:20, 77:14, 77:20, 81:12, 97:16, 105:2, 109:14, 111:16, 112:15, 114:13, 125:24, 126:3, 126:9, 127:11, 128:7, 128:14, 128:18
**needed** [3] - 19:11, 29:6, 73:9
**needs** [3] - 8:1, 27:23, 28:19
**Nevada** [1] - 71:22
**never** [16] - 7:14, 8:5, 8:9, 43:7, 45:1, 54:25, 57:14, 57:15, 58:4, 58:6, 60:18, 66:17, 69:14, 74:17, 124:2, 125:3
**new** [4] - 30:16, 30:17, 30:23, 31:5
**New** [1] - 59:22
**news** [5] - 66:21, 68:2, 68:4, 68:8, 68:16
**next** [14] - 23:6, 23:24, 24:22, 29:12,

51:10, 51:17, 63:9, 79:4, 84:22, 93:17, 96:4, 99:10, 111:13, 134:11
**nexus** [1] - 13:11
**Nicholas** [1] - 25:4
**nicknamed** [1] - 67:14
**night** [8] - 13:22, 14:23, 15:7, 45:6, 72:9, 73:1, 73:2, 74:11
**NIJ** [14] - 108:14, 108:16, 108:22, 108:23, 108:24, 108:25, 109:1, 109:5, 109:10, 111:6, 114:4, 114:8, 115:20, 125:12
**NO** [1] - 1:2
**Noelcius** [4] - 13:18, 13:19, 42:11, 74:4
**none** [1] - 99:25
**nonrestricted** [1] - 85:13
**noon** [1] - 76:18
**normal** [2] - 33:24, 43:19
**normally** [1] - 98:7
**North** [3] - 2:20, 2:24, 136:10
**Northeast** [1] - 1:20
**Northwest** [2] - 1:17, 2:8
**noted** [1] - 107:6
**nothing** [9] - 7:24, 25:1, 31:12, 47:17, 64:22, 66:19, 128:13, 129:5, 135:7
**notify** [1] - 119:4
**notwithstanding** [2] - 19:23, 62:16
**NS** [3] - 110:6, 111:18, 112:18
**NS-1** [3] - 112:19, 112:21, 112:22
**NS-2** [2] - 117:19, 117:22
**number** [24] - 20:21, 22:19, 30:16, 30:18, 30:23, 31:5, 70:1, 82:25, 83:21, 83:23, 86:13, 90:16, 90:17, 90:19, 90:22, 95:13, 104:14, 104:17, 104:18, 109:21, 109:22, 128:4
**numbers** [4] - 20:22, 20:23, 76:1, 104:7
**Nunez** [11] - 7:18, 7:20, 9:19, 10:10, 31:16, 39:10, 58:8, 58:14, 58:19
**NVD** [1] - 84:13
**NW** [1] - 1:15

## O

**o'clock** [2] - 15:10, 133:2
**oak** [1] - 53:23
**object** [1] - 127:1
**objecting** [1] - 69:19
**objection** [20] - 6:5, 7:9, 8:24, 38:8, 39:24, 42:6, 50:10, 53:1, 53:8, 54:13, 58:11, 62:22, 63:22, 67:6, 99:23, 99:24, 107:1, 125:13, 132:23, 134:3
**objectionable** [1] - 26:9
**objections** [2] - 75:20, 133:12
**obligation** [5] - 21:9, 21:12, 27:21, 28:13, 29:12
**observation** [1] - 22:13
**obtained** [2] - 42:23, 123:8
**obvious** [1] - 56:6
**obviously** [5] - 5:24, 14:3, 78:2, 123:3
**occur** [1] - 25:10
**OF** [3] - 1:1, 1:4, 1:17
**OFAC** [1] - 89:23
**offer** [1] - 116:2
**offered** [1] - 19:19
**offers** [1] - 106:21
**OFFICE** [2] - 1:14, 1:20
**office** [26] - 23:7, 23:15, 32:23, 34:18, 50:13, 50:19, 51:19, 51:25, 52:2, 64:1, 64:7, 64:11, 64:16, 64:17, 80:10, 80:11, 97:3, 98:9, 101:16, 101:21, 101:22, 103:7, 119:17, 123:18
**officer** [6] - 25:20, 29:4, 34:6, 65:3, 96:25, 97:1
**OFFICER** [5] - 4:2, 74:25, 78:12, 79:1, 133:3
**officers** [1] - 73:21
**offices** [1] - 65:6
**official** [3] - 2:23, 51:15, 70:17
**Official** [1] - 136:9
**omission** [1] - 67:3
**omitted** [2] - 67:5, 70:21
**omitting** [2] - 66:10, 67:2
**on-the-job** [2] - 105:13, 125:7
**once** [6] - 25:13, 31:23, 32:7, 45:23, 46:5, 85:22
**one** [45] - 5:4, 8:14, 12:22, 13:11, 17:8, 20:4, 20:15, 20:16, 20:24, 23:21, 25:20, 32:20, 35:17, 37:15, 48:19, 52:17, 53:5, 53:6, 54:7, 55:7, 55:15, 57:23, 62:11, 65:18, 69:3, 70:17, 73:6, 73:7, 76:6, 80:9, 91:2, 91:11, 91:12, 95:6, 95:10, 104:6, 108:2, 112:15, 112:25, 113:1, 123:12, 129:17, 131:20
**ones** [4] - 8:15, 55:15, 123:3, 123:5
**oof** [1] - 132:22
**open** [6] - 59:19, 64:15, 64:17, 68:9, 68:11, 68:16
**opened** [2] - 64:7, 64:11
**operation** [1] - 17:22
**operations** [3] - 79:25, 93:8, 97:6
**opinion** [3] - 10:24, 10:25, 128:20
**opportunity** [2] - 122:16, 134:4
**opposed** [2] - 6:19, 34:7
**order** [5] - 6:2, 32:18, 32:24, 112:15, 128:15
**Order** [1] - 4:1
**ordinary** [2] - 34:6, 131:20
**organized** [3] - 56:9, 56:13, 129:25
**orientation** [1] - 65:19
**originally** [1] - 57:25
**ORLANDO** [1] - 1:22
**ORTIZ** [3] - 1:7, 1:22, 2:1
**Ortiz** [91] - 4:13, 4:14, 9:18, 21:9, 21:20, 21:23, 22:3, 22:19, 22:22, 22:25, 23:13, 24:2, 25:5, 26:4, 27:14, 31:23, 31:25, 32:5, 32:18, 32:24, 33:12, 34:7, 34:13, 34:17, 34:20, 35:10, 37:14, 37:19, 38:23, 39:1, 39:5, 40:9, 42:19, 44:17, 44:19, 44:22, 44:24, 45:19, 47:1, 55:2, 55:21, 55:24, 57:1, 57:4, 57:13, 58:3, 58:23, 59:2, 59:6, 59:25, 60:18, 61:1, 61:21, 62:6, 62:16, 63:1, 63:12, 63:14, 66:1, 67:14, 67:22, 68:2, 68:16, 68:20, 69:3, 69:6, 69:16, 70:2, 70:13, 71:2, 71:9, 71:14, 71:25, 72:6, 72:14, 72:18, 72:21, 73:11, 74:1, 74:3, 74:12, 75:7, 75:11, 75:15, 92:6, 99:1, 106:23, 107:1, 122:2, 134:24
**Ortiz's** [3] - 34:2, 58:1, 70:20
**otherwise** [2] - 10:15, 69:23
**outreach** [1] - 119:20
**outside** [7] - 44:8, 65:10, 65:14, 69:20, 76:21, 101:11, 102:16
**overly** [2] - 20:5, 66:18
**overruled** [5] - 6:6, 7:12, 67:19, 68:6, 75:20
**oversee** [1] - 97:6
**oversights** [1] - 20:15
**own** [2] - 36:11, 67:23
**owns** [1] - 55:2

## P

**P.A** [7] - 1:23, 2:1, 2:5, 2:7, 2:14, 2:17, 2:19
**p.m** [12] - 1:6, 4:6, 11:19, 14:22, 15:13, 22:3, 74:11, 75:1, 79:2, 133:4, 135:16
**pack** [1] - 78:5
**package** [1] - 94:20
**page** [40] - 27:15, 47:9, 50:15, 65:9, 67:12, 67:21, 68:14, 69:1, 69:15, 70:25, 72:4, 72:17, 73:25, 74:6, 74:12, 88:1, 88:10, 88:15, 91:4, 91:17, 93:17, 107:15, 107:16, 109:13, 110:9, 110:10, 110:17, 111:15, 113:8, 113:9, 115:8, 116:19, 116:21, 117:4, 121:9, 129:15, 131:9, 131:10, 131:11, 132:6
**PAGE** [1] - 3:2
**Pages** [1] - 1:7
**pages** [4] - 27:13, 130:4, 130:5, 130:7
**paid** [5] - 87:12, 87:16, 93:14, 93:23, 93:24
**palace** [1] - 67:25
**Palace** [1] - 68:20
**Palm** [1] - 2:12
**paperwork** [4] - 32:18, 32:24, 34:8, 34:18
**Part** [3] - 130:1, 130:3, 130:8
**part** [16] - 17:1, 24:14, 28:15, 39:6, 43:5, 55:10, 57:21, 58:5, 59:15, 60:19, 67:12, 70:7, 84:2, 120:8, 124:8, 127:24
**partially** [1] - 43:14
**participate** [2] - 16:10, 30:11
**particular** [26] - 39:19, 44:1, 45:12, 82:7, 85:15, 86:20, 87:6, 90:8, 100:15, 104:15, 105:24, 109:25, 110:5, 110:21, 110:24, 110:25, 111:10, 111:14, 111:22, 116:16, 116:19, 117:7, 117:14, 117:23, 128:9
**particularly** [3] - 41:4, 51:7, 66:14
**partners** [1] - 105:19
**partnership** [1] - 39:5
**parts** [4] - 101:14, 101:17, 129:25, 130:19
**pass** [6] - 44:10,

44:15, 55:21, 92:4, 98:25, 121:25
**passed** [7] - 12:9, 20:20, 38:1, 59:12, 59:24, 60:13, 60:15
**passes** [1] - 11:13
**passing** [4] - 13:22, 31:23, 61:13, 62:11
**passport** [2] - 94:10, 94:16
**passports** [4] - 60:9, 60:16, 64:12
**past** [3] - 11:14, 70:9, 92:22
**patch** [1] - 51:13
**patches** [1] - 54:1
**PATRICIA** [2] - 2:22, 136:8
**Patrick** [1] - 54:22
**PATRICK** [2] - 2:19, 2:19
**pattern** [1] - 133:13
**paved** [1] - 65:14
**pay** [2] - 64:16, 88:7
**paying** [1] - 60:9
**payment** [1] - 92:24
**pending** [1] - 59:21
**Pennsylvania** [1] - 1:17
**Penthouse** [1] - 2:8
**people** [32] - 5:1, 5:20, 6:3, 7:25, 8:22, 9:6, 12:13, 12:20, 14:7, 14:9, 17:21, 18:3, 21:5, 24:8, 37:23, 39:6, 39:8, 45:17, 46:5, 48:7, 52:20, 52:24, 53:5, 53:19, 59:7, 60:4, 63:6, 63:17, 69:6, 73:23, 119:17
**per** [2] - 48:12, 86:11
**percent** [1] - 87:13
**Perez** [4] - 65:6, 77:14, 78:21, 135:3
**PEREZ** [43] - 2:4, 2:5, 3:4, 3:9, 3:13, 31:15, 35:23, 38:10, 40:1, 42:10, 46:11, 69:19, 77:15, 77:17, 92:10, 93:4, 93:6, 93:12, 93:13, 93:17, 93:18, 94:13, 94:15, 95:4, 95:7, 95:10, 95:11, 95:19, 99:4, 107:4, 122:5, 122:8, 125:14, 125:16, 127:4, 131:2, 131:4, 131:9, 131:12, 131:18, 131:19, 135:2, 135:5
**perfect** [1] - 77:12
**perfectly** [1] - 49:24
**perhaps** [1] - 42:21
**period** [2] - 61:2, 68:15
**periodically** [1] - 14:22
**permanent** [1] - 64:7
**permission** [4] - 22:25, 23:19, 33:2, 43:8
**permit** [1] - 41:12
**person** [22] - 4:16, 10:10, 12:18, 22:19, 29:11, 33:4, 39:19, 40:12, 41:18, 45:13, 46:8, 54:10, 68:10, 93:19, 93:24, 94:3, 94:6, 94:7, 94:20, 118:16, 119:8, 131:20
**personal** [11] - 5:7, 7:15, 40:10, 40:13, 40:14, 41:19, 42:5, 48:8, 118:14, 126:2, 126:12
**personally** [1] - 124:2
**personnel** [5] - 15:18, 16:10, 16:11, 56:1, 101:18
**pertinent** [1] - 60:25
**pharmacy** [1] - 81:10
**PHENELUS** [1] - 1:19
**Phillips** [1] - 76:5
**phone** [29] - 9:23, 11:22, 19:23, 20:4, 20:21, 20:22, 20:23, 20:24, 21:3, 21:13, 23:1, 23:19, 25:8, 25:9, 25:10, 25:14, 29:11, 30:15, 30:16, 30:17, 30:23, 31:3, 45:5, 58:1, 58:6, 90:16, 90:17, 90:19
**phones** [7] - 20:23, 20:24, 21:5, 25:13, 25:14, 30:14, 30:24
**photo** [5] - 65:16, 91:5, 91:7, 91:11, 108:7
**photograph** [3] - 44:14, 108:4, 122:21
**photographs** [4] - 65:8, 122:13, 122:14, 123:5
**photos** [5] - 51:24, 51:25, 113:10, 113:17, 113:22
**physical** [6] - 24:6, 24:7, 113:15, 113:21, 118:8, 130:20
**physically** [4] - 31:22, 73:22, 122:18, 122:19
**pick** [2] - 113:19, 115:3
**picture** [3] - 43:23, 44:1, 128:12
**piece** [1] - 97:25
**pieces** [4] - 86:1, 86:2, 86:6, 86:10
**Pierre** [2] - 95:14, 95:15
**place** [6] - 31:24, 40:11, 52:15, 57:5, 62:5, 82:6
**placed** [2] - 6:4, 6:8
**places** [2] - 8:6, 41:8
**plain** [1] - 35:24
**Plaintiff** [1] - 1:5
**plan** [2] - 68:20, 71:5
**plane** [1] - 126:13
**plate** [23] - 108:4, 108:8, 108:15, 108:20, 108:21, 109:15, 110:11, 110:21, 110:24, 111:3, 111:10, 111:14, 111:17, 111:21, 113:4, 113:11, 113:16, 114:1, 114:13, 114:15, 114:16, 114:21, 122:22
**plates** [12] - 36:15, 37:5, 107:20, 108:3, 109:1, 111:6, 119:1, 120:7, 122:17, 123:3, 123:7, 132:16
**plausible** [1] - 34:10
**play** [2] - 37:1, 128:13
**played** [1] - 42:17
**playing** [1] - 75:17
**plenty** [1] - 134:22
**pocket** [1] - 6:10
**point** [17] - 5:21, 6:11, 13:22, 14:17, 23:18, 38:22, 44:18, 44:22, 48:19, 49:18, 59:2, 63:3, 64:18, 66:8, 76:14, 78:8, 78:9
**pointed** [1] - 84:22
**pointing** [3] - 82:23, 88:10, 116:10
**police** [2] - 63:5, 73:21
**policy** [3] - 33:10, 40:11, 45:8
**political** [1] - 55:23
**Ponce** [1] - 2:5
**populated** [2] - 89:13, 89:14
**Port** [3] - 16:12, 83:18, 83:19
**Port-au-Prince** [3] - 16:12, 83:18, 83:19
**portion** [2] - 37:11, 125:2
**position** [3] - 79:24, 96:24, 133:16
**POSNER** [1] - 2:11
**possibility** [2] - 17:13, 46:9
**possible** [6] - 5:8, 10:1, 42:3, 67:3, 72:13, 127:7
**post** [2] - 15:1, 66:25
**potential** [1] - 71:22
**potentially** [1] - 40:20
**pound** [1] - 86:12
**pounds** [1] - 86:5
**practice** [1] - 45:8
**prepaid** [2] - 84:5, 84:8
**preparation** [3] - 82:7, 98:16, 120:4
**presence** [1] - 76:21
**present** [6] - 23:6, 38:24, 57:10, 73:17, 73:22, 88:7
**presented** [2] - 7:25, 9:7
**preserve** [1] - 44:20
**preserved** [1] - 25:11
**President** [4] - 67:14, 67:24, 69:12, 72:10
**president** [7] - 20:3, 44:16, 61:6, 63:4, 64:7, 66:16, 69:14
**presumption** [1] - 57:9
**PRETEL** [1] - 1:7
**Pretel** [4] - 26:4, 27:13, 32:11, 35:22
**pretty** [4] - 30:9, 31:10, 62:6, 71:2
**prevention** [1] - 8:16
**previous** [1] - 44:2
**previously** [8] - 4:7, 47:10, 55:10, 61:10, 64:18, 71:13, 101:4, 105:5
**primarily** [1] - 44:19
**primary** [1] - 16:3
**Prince** [3] - 16:12, 83:18, 83:19
**priority** [2] - 13:2, 13:8
**private** [5] - 42:22, 43:8, 49:11, 49:18, 49:23
**problem** [2] - 26:25, 58:17
**procedures** [1] - 33:13
**proceed** [5] - 96:12, 99:20, 100:3, 107:11, 122:6
**Proceedings** [1] - 135:16
**proceedings** [1] - 136:4
**process** [6] - 25:9, 123:12, 127:10, 128:13, 128:16, 133:15
**processed** [2] - 60:24, 66:14
**processing** [1] - 80:8
**produce** [1] - 40:24
**product** [5] - 127:12, 127:15, 129:3, 129:12, 130:15
**Product** [2] - 130:18, 130:21
**products** [1] - 36:22
**professional** [1] - 50:19
**program** [1] - 55:25
**prohibit** [1] - 46:9
**prohibited** [1] - 85:10
**prohibition** [3] - 38:17, 40:3, 40:25
**pronoun** [1] - 73:13
**proof** [1] - 94:22
**proper** [1] - 4:22
**proposed** [1] - 134:5
**proposing** [1] - 135:11
**prosecutor** [3] - 33:22, 44:1, 123:5
**protect** [1] - 49:19
**protected** [1] - 127:6
**protection** [12] - 40:25, 41:20, 41:21, 42:3, 42:5, 48:22, 48:24, 49:23, 111:6, 116:3, 126:24, 126:25
**Protection** [2] - 96:21, 96:24
**protocol** [1] - 39:13
**proud** [1] - 8:16
**provide** [16] - 14:7,

21:9, 33:12, 34:7, 35:2, 39:9, 42:23, 48:2, 48:22, 52:5, 92:24, 94:9, 95:2, 102:9, 111:6, 129:9
**provided** [28] - 17:19, 17:24, 18:5, 24:6, 24:20, 25:7, 34:20, 34:25, 38:1, 38:21, 43:5, 43:9, 43:20, 47:21, 59:10, 61:15, 64:12, 72:19, 74:8, 85:18, 86:25, 88:25, 90:3, 90:5, 121:7, 122:24, 127:13, 134:2
**providing** [10] - 21:24, 35:22, 39:12, 56:11, 57:13, 58:21, 61:13, 71:22, 119:14, 125:12
**proximity** [1] - 65:5
**prudent** [3] - 26:2, 46:6, 46:7
**public** [3] - 35:21, 49:8, 65:14
**publish** [2] - 47:12, 81:20
**pull** [1] - 111:19
**pulled** [1] - 44:13
**punish** [2] - 6:17, 6:20
**punishment** [2] - 5:23, 5:24
**purporting** [1] - 11:25
**purpose** [2] - 20:16, 40:8
**purposes** [2] - 118:16, 124:7
**purview** [3] - 17:11, 63:11, 101:15
**pushed** [1] - 60:24
**put** [12] - 6:14, 6:22, 10:21, 22:15, 26:16, 26:18, 49:15, 57:20, 77:1, 93:4, 94:2, 116:21

## Q

**quantities** [1] - 36:24
**quantity** [1] - 89:20
**questioned** [1] - 65:6
**questioning** [4] - 61:23, 71:8, 75:6, 127:2
**questions** [21] - 31:19, 39:14, 46:12, 46:15, 54:15, 70:1, 70:4, 71:11, 72:13, 72:15, 74:19, 92:7, 92:13, 95:19, 99:2, 99:4, 99:6, 99:8, 119:18, 122:12, 123:13
**quick** [1] - 26:19
**quickly** [1] - 5:8
**quite** [2] - 51:15, 51:19
**quote** [1] - 130:7

## R

**radioactive** [1] - 97:17
**Rahmer** [1] - 25:4
**raise** [4] - 71:25, 79:9, 96:7, 99:13
**raises** [1] - 50:3
**ranges** [1] - 124:5
**rape** [1] - 37:22
**rat** [2] - 69:10, 69:12
**rate** [1] - 86:11
**rated** [1] - 109:2
**rather** [3] - 17:5, 67:18, 128:11
**rathering** [1] - 17:8
**rating** [1] - 109:3
**ray** [2] - 86:21, 89:21
**reach** [2] - 11:14, 35:5
**reached** [2] - 30:14, 30:17
**read** [3] - 6:14, 85:5, 95:12
**reading** [2] - 6:12, 9:1
**ready** [5] - 4:3, 72:10, 76:24, 78:14, 78:23
**realize** [2] - 10:21, 12:3
**realized** [2] - 13:21, 61:12
**really** [9] - 10:17, 16:9, 17:4, 29:1, 34:3, 56:14, 74:17, 77:3, 134:20
**reason** [12] - 5:25, 8:5, 20:17, 25:18, 30:23, 37:20, 39:6, 40:2, 45:15, 51:24, 94:5, 110:3
**reasons** [15] - 52:17, 64:15, 106:2, 106:3, 110:5, 111:16, 111:18, 111:25, 112:6, 112:11, 114:19, 117:11, 117:14, 117:17, 117:19
**receipt** [4] - 93:15, 94:21, 95:8
**receive** [4] - 22:8, 72:6, 94:21, 118:8
**received** [6] - 94:20, 94:22, 94:23, 100:1, 121:19, 125:8
**receives** [1] - 85:3
**receiving** [9] - 12:9, 57:4, 57:17, 58:17, 61:2, 61:4, 80:7, 87:2, 91:10
**recent** [1] - 133:9
**recess** [1] - 78:11
**recipient** [3] - 83:3, 83:4, 83:6
**recite** [1] - 17:23
**recognize** [9] - 81:23, 87:17, 88:2, 89:9, 90:12, 90:19, 90:23, 91:7, 116:5
**recommend** [2] - 27:19, 28:10
**reconvene** [2] - 132:25, 133:5
**record** [8] - 75:3, 75:5, 79:4, 79:12, 96:10, 99:16, 107:6, 108:13
**red** [1] - 133:22
**redirect** [3] - 64:24, 75:20, 95:25
**REDIRECT** [2] - 3:6, 65:1
**reels** [2] - 66:21, 68:2
**reemphasize** [1] - 57:21
**refer** [5] - 69:12, 73:12, 86:2, 100:20, 127:25
**reference** [4] - 6:16, 23:12, 52:5, 104:12
**referenced** [1] - 13:12
**references** [1] - 75:25
**referred** [1] - 81:5
**referring** [3] - 35:6, 41:24
**reflect** [1] - 108:13
**reflected** [1] - 26:4
**Reform** [4] - 102:24, 124:22, 124:24, 125:4
**regard** [3] - 60:15, 61:25, 129:5
**regarding** [9] - 5:1, 35:11, 41:2, 70:13, 71:9, 119:18, 125:7, 125:24, 133:16
**regardless** [3] - 25:24, 40:25, 41:21
**regards** [1] - 36:21
**Regional** [1] - 110:7
**register** [2] - 38:20, 39:4
**regular** [2] - 92:15, 102:2
**regulated** [2] - 37:2, 37:4
**regulation** [4] - 41:24, 101:15, 105:1, 129:1
**Regulation** [1] - 85:9
**regulations** [20] - 36:18, 36:19, 37:5, 41:5, 41:17, 41:20, 41:22, 102:20, 102:23, 103:15, 103:18, 106:16, 124:15, 124:21, 127:24, 128:23, 129:4, 129:18, 129:22, 129:24
**Regulations** [3] - 103:10, 127:25, 129:23
**regulatory** [1] - 36:14
**Reiniel** [3] - 79:7, 79:10, 79:13
**REINIEL** [1] - 3:7
**relate** [1] - 130:22
**related** [8] - 24:7, 48:24, 54:5, 60:11, 130:11, 131:15, 131:23
**relates** [1] - 80:24
**relationship** [6] - 5:7, 50:2, 50:8, 51:20, 53:18, 53:20
**relevant** [1] - 26:9
**rely** [3] - 85:17, 85:18, 119:6
**relying** [1] - 85:2
**remain** [4] - 19:6, 29:15, 46:23, 49:4
**remained** [1] - 8:10
**remains** [1] - 17:10
**remember** [9] - 22:6, 25:6, 27:16, 28:8, 42:14, 43:2, 43:24, 61:23, 92:21
**remotely** [1] - 94:4
**repeat** [1] - 129:16
**repeated** [1] - 73:1
**rephrase** [3] - 53:4, 125:14, 125:15
**report** [7] - 19:9, 25:3, 32:20, 32:22, 35:2, 76:18
**REPORTED** [1] - 2:21
**reported** [3] - 64:13, 66:15, 91:18
**reporter** [1] - 96:23
**Reporter** [2] - 2:23, 136:9
**reporting** [5] - 12:19, 17:15, 17:18, 19:2, 54:25
**reports** [2] - 57:20, 58:19
**represent** [4] - 8:1, 31:18, 46:20, 54:23
**Republic** [1] - 15:20
**request** [3] - 22:8, 94:9, 102:21
**requested** [1] - 59:14
**requesting** [2] - 23:12, 43:8
**requests** [2] - 5:8, 5:10
**require** [8] - 98:5, 102:15, 108:9, 113:4, 114:1, 114:21, 115:14, 117:24
**required** [4] - 81:1, 82:5, 90:2, 105:24
**requirement** [6] - 97:21, 112:15, 112:16, 112:24, 117:22, 131:22
**requirements** [5] - 105:15, 106:22, 110:3, 118:3, 119:18
**Research** [3] - 82:22, 92:14, 120:14
**reserve** [1] - 77:21
**resolve** [1] - 129:2
**resources** [2] - 119:17, 119:21
**respect** [12] - 12:10, 13:1, 75:10, 75:23, 76:5, 76:8, 98:20, 106:8, 108:25, 109:3, 114:18, 117:3
**respectful** [1] - 8:4
**respond** [5] - 11:2, 22:7, 74:3, 78:3, 134:4
**responded** [2] - 7:24, 11:4
**responds** [1] - 22:25
**response** [3] - 4:25, 7:5, 22:10
**responsibilities** [1] - 105:4

**responsibility** [3] - 15:19, 25:23, 81:15
**responsible** [1] - 26:2
**responsive** [1] - 15:8
**rest** [1] - 77:2
**restaurant** [4] - 44:5, 44:11, 44:13, 44:15
**restricted** [3] - 81:3, 81:5, 91:24
**restriction** [2] - 40:3, 41:2
**resulted** [1] - 19:22
**return** [2] - 8:10, 118:16
**returning** [1] - 82:19
**reveal** [1] - 46:24
**review** [13] - 19:20, 47:22, 48:4, 58:1, 82:7, 82:10, 98:16, 98:19, 98:22, 102:8, 113:2, 117:23, 133:11
**reviewed** [2] - 23:16, 45:22
**reviewing** [1] - 48:8
**reviews** [1] - 48:11
**rifles** [2] - 52:3, 124:5
**right-hand** [3] - 83:25, 110:17, 110:21
**rights** [1] - 29:16
**rise** [5] - 4:2, 74:25, 78:12, 79:1, 133:3
**road** [1] - 65:17
**Roger** [2] - 13:19, 74:4
**roger** [1] - 13:20
**role** [2] - 6:2, 42:16
**Ronald** [1] - 13:17
**rooms** [1] - 46:5
**RPR** [2] - 2:22, 136:8
**RS** [3] - 110:6, 111:18, 112:18
**RS-1** [2] - 112:20, 112:25
**Rule** [3] - 77:6, 77:9, 78:1
**rule** [1] - 78:3
**rules** [1] - 7:25
**run** [2] - 80:21, 120:3
**Ryan** [1] - 18:17

## S

**S-M-I-T-H** [1] - 99:18
**S-U-H-R** [1] - 35:20
**sacred** [1] - 8:9
**sad** [1] - 31:8
**safety** [2] - 52:19
**sales** [2] - 91:2, 92:19
**Sanon** [4] - 24:10, 120:12
**Sanon's** [5] - 20:21, 20:23, 20:24, 24:11, 24:13
**Santo** [4] - 15:19, 16:5, 16:11, 17:5
**sat** [2] - 18:14, 18:23
**Saturday** [1] - 43:23
**saw** [10] - 32:3, 33:17, 35:24, 39:19, 39:20, 40:16, 65:9, 123:5, 128:12, 132:16
**scene** [1] - 73:18
**scheduled** [1] - 23:14
**school** [2] - 86:21, 89:21
**scope** [4] - 41:16, 67:17, 69:20, 75:9
**Scott** [2] - 7:17, 7:22
**scourge** [1] - 72:1
**scraped** [1] - 91:12
**screen** [15] - 26:16, 26:18, 28:1, 28:4, 65:12, 81:24, 98:13, 107:14, 108:6, 108:11, 115:9, 115:13, 121:1, 131:3
**screening** [2] - 87:3, 87:4
**screens** [1] - 98:11
**scroll** [1] - 93:12
**scrolling** [2] - 74:12, 132:7
**se** [1] - 48:12
**SE** [3] - 1:24, 2:2, 2:14
**SEAN** [1] - 1:14
**search** [3] - 119:23, 119:25, 120:6
**searching** [1] - 87:4
**seat** [1] - 75:2
**seated** [2] - 78:13, 79:3
**Second** [2] - 2:2, 2:14
**second** [8] - 26:19, 27:21, 30:15, 110:9, 110:10, 121:9, 131:9, 131:10
**secondhand** [2] - 12:4, 12:15
**seconds** [2] - 77:15, 77:16
**Secretary** [1] - 48:14
**secreted** [1] - 73:20
**section** [10] - 100:15, 109:19, 109:24, 110:10, 110:14, 111:17, 116:16, 116:23, 116:25, 131:22
**Section** [2] - 111:4, 132:2
**SECURITY** [5] - 4:2, 74:25, 78:12, 79:1, 133:3
**security** [12] - 35:25, 36:23, 49:12, 49:18, 54:4, 54:5, 54:11, 56:22, 67:24, 73:18, 97:18, 112:22
**Security** [11] - 16:19, 22:4, 28:12, 47:4, 98:8, 100:19, 100:20, 110:7, 120:16, 121:6, 123:14
**security-related** [1] - 54:5
**see** [61] - 29:16, 36:3, 36:6, 39:6, 49:2, 49:10, 50:17, 50:18, 50:24, 51:7, 51:24, 52:2, 52:16, 53:25, 54:1, 54:2, 58:1, 58:19, 65:14, 69:16, 83:10, 84:20, 85:9, 87:9, 88:15, 88:21, 89:23, 90:10, 90:17, 91:5, 91:13, 94:18, 94:19, 98:19, 108:22, 109:8, 109:13, 110:3, 110:13, 110:18, 111:17, 112:8, 112:23, 113:16, 113:17, 113:21, 115:1, 115:3, 115:6, 117:22, 120:25, 121:12, 122:16, 127:12, 128:8, 132:10, 133:2, 134:2, 135:12, 135:14
**seeing** [5] - 12:17, 12:18, 82:16, 93:21, 108:4
**seem** [2] - 92:17, 134:3
**seized** [1] - 123:8
**sell** [5] - 41:1, 41:8, 41:11, 41:13, 54:4
**selling** [1] - 41:14
**seminars** [2] - 105:13, 125:8
**Senatus** [2] - 90:23, 92:18
**send** [5] - 21:23, 68:2, 68:4, 74:10, 102:16
**sending** [4] - 58:22, 66:21, 68:16, 69:3
**senior** [2] - 100:24, 101:25
**sense** [3] - 10:5, 45:5, 134:14
**sensitive** [4] - 101:9, 101:13, 102:14, 103:6
**sent** [2] - 10:16, 68:9
**sentence** [1] - 9:2
**separate** [2] - 46:5, 133:20
**separately** [1] - 45:17
**serious** [1] - 67:4
**service** [3] - 8:8, 8:12, 95:2
**services** [3] - 48:23, 49:23, 119:13
**SESSION** [1] - 1:5
**set** [3] - 59:5, 127:24, 133:21
**setting** [2] - 37:22, 38:3
**setup** [1] - 32:5
**several** [5] - 24:7, 55:3, 61:10, 64:20, 72:25
**shadows** [1] - 69:16
**shared** [1] - 70:2
**shift** [1] - 94:13
**ship** [1] - 117:20
**shipment** [15] - 83:4, 83:8, 84:4, 84:12, 85:14, 85:15, 85:22, 87:1, 88:7, 90:1, 90:2, 90:5, 91:19, 92:2, 98:21
**shipments** [2] - 81:3, 98:5
**shipped** [1] - 81:11
**shipper** [13] - 81:16, 82:14, 82:19, 84:4, 84:11, 84:16, 85:17, 86:19, 88:12, 90:3, 92:14, 93:20, 93:22
**shipper's** [5] - 88:19, 89:6, 89:7, 89:11, 89:19
**shipping** [1] - 119:5
**ships** [2] - 13:22, 62:11
**shooting** [1] - 52:6
**Shop** [1] - 41:8
**short** [1] - 72:22
**shortly** [1] - 30:14
**shout** [1] - 22:17
**show** [11] - 35:13, 47:10, 50:15, 53:25, 67:10, 68:13, 69:1, 69:15, 70:25, 72:4, 72:17
**showed** [4] - 19:1, 44:1, 54:7, 69:2
**showing** [19] - 8:25, 54:3, 65:16, 67:12, 81:22, 85:22, 86:1, 86:5, 86:9, 87:10, 87:25, 88:9, 88:15, 91:3, 109:17, 113:7, 115:8, 116:4, 120:25
**shown** [8] - 36:12, 43:23, 108:4, 113:15, 122:13, 123:3, 123:7, 132:17
**shows** [3] - 54:10, 84:8, 105:19
**sic** [2] - 13:17, 130:25
**side** [12] - 34:17, 83:25, 86:11, 108:7, 110:17, 110:20, 110:21, 113:16, 113:24, 114:13, 114:15, 114:21
**sidebar** [1] - 69:22
**signed** [1] - 17:14
**silent** [3] - 8:10, 19:6, 29:15
**siloed** [1] - 17:3
**similar** [5] - 108:3, 113:17, 113:21, 115:10, 123:4
**simultaneously** [1] - 21:25
**single** [1] - 20:4
**sitting** [1] - 22:4
**situation** [5] - 5:2, 10:4, 19:11, 62:18, 66:25
**skipped** [1] - 73:7
**skis** [1] - 4:17
**slide** [2] - 95:4, 95:10
**slides** [1] - 67:10
**slight** [1] - 39:13
**slightly** [1] - 41:16
**slow** [2] - 5:18, 111:20
**small** [1] - 27:25
**smashed** [1] - 31:1
**Smith** [12] - 99:12, 99:14, 99:17, 100:7, 106:21, 107:14, 108:1, 109:17, 113:7, 116:4, 121:1, 122:9
**SMITH** [1] - 3:12
**SNAP** [1] - 119:11
**SNAP-R** [1] - 119:11
**sniff** [1] - 87:6
**soft** [8] - 117:1,

117:4, 126:18, 126:21, 126:22, 126:23, 127:16, 132:19
**software** [1] - 85:7
**SOLAGES** [1] - 2:16
**Solages** [23] - 54:16, 54:23, 54:24, 55:7, 55:9, 55:13, 56:23, 57:12, 57:22, 58:2, 58:9, 59:5, 59:24, 61:5, 61:9, 61:12, 63:11, 77:23, 95:23, 99:7, 107:9, 135:8
**sold** [1] - 35:25
**someone** [6] - 6:1, 67:23, 81:1, 93:9, 94:4, 119:19
**sometime** [2] - 44:25, 134:11
**sometimes** [3] - 62:10, 73:4, 73:12
**somewhat** [1] - 7:5
**sorry** [15] - 8:17, 24:5, 27:4, 28:5, 31:18, 47:18, 65:12, 79:19, 93:21, 93:23, 101:10, 124:13, 129:16, 131:11, 132:8
**sort** [12] - 34:11, 36:1, 42:24, 48:6, 49:8, 51:12, 52:14, 55:24, 56:1, 56:23, 63:4, 75:17
**sound** [1] - 45:12
**sounded** [1] - 73:14
**sounds** [6] - 8:19, 15:10, 18:6, 18:7, 18:11, 33:15
**source** [27] - 15:25, 16:22, 16:24, 17:14, 19:3, 22:16, 27:17, 27:20, 28:9, 28:11, 28:23, 29:7, 29:8, 34:3, 36:11, 45:3, 45:9, 46:23, 48:11, 49:4, 52:24, 53:17, 57:9, 59:19, 68:9, 68:11, 68:16
**sources** [6] - 25:20, 48:1, 48:2, 52:18, 52:21, 53:6
**South** [1] - 53:25
**Southern** [1] - 59:22
**SOUTHERN** [1] - 1:1
**sovereign** [1] - 17:9
**sovereignty** [1] - 33:7
**space** [1] - 4:22
**Spanish** [2] - 6:12, 73:13
**speaking** [14] - 5:23, 5:24, 5:25, 38:22, 45:1, 69:13, 69:17, 80:3, 97:5, 101:7, 105:23, 118:2, 118:11
**speaks** [1] - 19:14
**Special** [8] - 9:19, 18:17, 21:20, 21:25, 22:7, 24:2, 25:3, 35:17
**special** [4] - 18:17, 41:12, 85:13, 130:11
**specific** [6] - 36:17, 36:21, 37:5, 66:6, 100:25, 121:22
**specifically** [4] - 6:16, 98:9, 103:5, 109:20
**specificity** [1] - 75:24
**specifics** [1] - 34:1
**specified** [1] - 60:18
**speculation** [3] - 50:10, 54:13, 62:22
**speculative** [2] - 67:6, 67:7
**spell** [1] - 99:16
**spending** [1] - 76:13
**spoken** [1] - 7:17
**Stability** [1] - 110:7
**stage** [1] - 12:25
**stance** [1] - 66:12
**stand** [2] - 84:13, 110:6
**standard** [1] - 109:3
**standards** [1] - 111:7
**stands** [2] - 47:6, 108:24
**stars** [1] - 51:12
**start** [9] - 8:7, 27:7, 65:3, 74:14, 82:11, 83:11, 109:21, 110:15, 134:9
**started** [3] - 11:22, 55:12, 63:9
**starting** [1] - 27:2
**State** [4] - 48:14, 49:14, 98:9
**state** [6] - 25:21, 41:4, 66:23, 79:11, 96:9, 99:15
**statement** [1] - 85:12
**States** [17] - 2:23, 6:1, 29:5, 40:17, 40:24, 41:2, 59:11, 85:8, 96:1, 97:12, 97:14, 97:16, 101:11, 102:16, 118:17, 123:15, 136:9
**STATES** [5] - 1:1, 1:4, 1:11, 1:14, 1:20
**states** [1] - 80:19
**stationed** [1] - 16:10
**status** [1] - 34:2
**statutes** [1] - 124:16
**stay** [2] - 6:10, 56:7
**STENOGRAPHER** [1] - 35:19
**STENOGRAPHICALLY** [1] - 2:21
**step** [5] - 106:8, 111:13, 127:10, 128:12, 128:16
**Step** [4] - 127:12, 127:19, 128:3, 128:7
**steps** [1] - 105:23
**stickers** [1] - 91:12
**still** [9] - 10:5, 18:9, 19:2, 25:1, 30:3, 30:5, 56:7, 56:8, 64:17
**stipulated** [1] - 78:18
**stipulation** [2] - 78:20, 99:21
**stood** [1] - 48:19
**stop** [1] - 5:20
**stories** [1] - 46:10
**story** [1] - 46:8
**street** [2] - 65:10, 65:15
**Street** [3] - 1:15, 1:20, 2:8
**strength** [1] - 108:20
**strike** [1] - 82:10
**strong** [1] - 116:2
**strongest** [1] - 70:18
**stuff** [12] - 12:6, 20:16, 24:18, 24:20, 29:16, 51:23, 53:24, 57:20, 68:9, 68:17, 101:14, 130:20
**styled** [1] - 133:24
**subject** [2] - 33:7, 121:10
**subjects** [1] - 6:25
**submits** [1] - 106:11
**subparts** [1] - 132:19
**Subsections** [1] - 132:2
**subsequently** [2] - 20:9, 20:13
**subsource** [3] - 57:9, 57:12, 60:17
**successfully** [1] - 14:15
**suggest** [4] - 50:2, 50:7, 50:8, 75:14
**suggesting** [2] - 49:8, 49:22
**Suhr** [3] - 35:18, 35:20
**Suite** [8] - 1:15, 1:24, 2:2, 2:5, 2:12, 2:14, 2:17, 2:20
**summarize** [2] - 4:12, 71:20
**summary** [3] - 72:19, 73:5, 73:17
**summoned** [1] - 22:20
**Sunbiz** [1] - 48:15
**supervising** [1] - 80:7
**supplier** [4] - 81:16, 81:17, 84:4, 84:11
**supplies** [2] - 86:22, 89:21
**support** [1] - 5:12
**supporting** [1] - 8:2
**supposed** [6] - 23:10, 30:18, 39:3, 39:20, 94:21
**surmised** [1] - 63:3
**surveillance** [2] - 66:16, 66:22
**surveilling** [1] - 20:3
**sustained** [9] - 38:9, 39:25, 42:8, 50:11, 53:2, 54:14, 58:12, 62:23, 63:23
**swear** [1] - 79:8
**sworn** [4] - 4:8, 79:10, 96:8, 99:14
**system** [20] - 80:15, 80:17, 80:21, 80:24, 81:2, 81:13, 91:20, 92:2, 97:8, 97:11, 97:22, 98:2, 98:19, 98:20, 98:22, 119:11, 119:23, 120:3, 120:6, 120:21
**systems** [2] - 101:16, 130:19

## T

**tactical** [4] - 35:25, 50:25, 51:21, 52:1
**TAMA** [1] - 2:11
**Tama** [1] - 46:20
**target** [1] - 45:19
**targets** [3] - 45:15, 46:1, 46:3
**tasked** [2] - 43:16, 43:17
**tasking** [2] - 43:18, 67:23
**team** [8] - 8:13, 15:22, 16:15, 20:3, 29:23, 58:4, 64:3, 64:4
**technology** [2] - 48:25, 85:7
**temporary** [2] - 118:15, 118:16
**tempt** [1] - 77:18
**ten** [8] - 77:7, 77:12, 77:13, 77:14, 77:22, 77:24, 101:24, 130:8
**terms** [8] - 37:5, 40:16, 42:22, 77:6, 84:7, 88:12, 134:21, 135:11
**Terrorism** [3] - 47:6, 52:14, 110:7
**Terrorist** [4] - 48:18, 50:1, 51:7, 120:18
**test** [2] - 69:4, 124:5
**testified** [6] - 56:5, 59:17, 61:20, 62:3, 63:25, 125:3
**testimony** [4] - 55:16, 82:8, 98:17, 120:4
**testing** [2] - 36:13, 125:20
**text** [9] - 10:16, 14:25, 17:20, 19:16, 21:12, 37:14, 72:1, 131:6, 131:7
**texting** [2] - 61:20, 62:20
**texts** [1] - 61:22
**THE** [97] - 1:10, 1:14, 3:2, 4:3, 4:9, 6:6, 7:12, 8:25, 9:4, 26:7, 26:9, 26:20, 28:4, 31:13, 35:19, 35:20, 38:9, 39:25, 42:8, 46:13, 46:14, 47:17, 47:20, 50:11, 53:2, 53:9, 53:11, 54:14, 54:16, 58:12, 62:23, 63:23, 64:24, 67:7, 67:19, 68:6, 68:7, 69:21, 74:21, 75:2, 76:11, 76:15, 77:6, 77:11, 77:13, 77:16, 77:18, 77:23, 77:25, 78:13, 78:17, 78:22, 78:25, 79:3, 79:8, 79:13, 92:5, 92:8, 95:20, 95:23, 95:25, 96:4, 96:11, 96:13, 99:1, 99:3, 99:5, 99:7, 99:10, 99:17, 99:24, 100:3, 106:23, 106:25, 107:3, 107:6, 107:9, 107:11, 107:24, 122:1, 122:4,

122:6, 125:15, 127:3, 132:24, 133:5, 133:8, 133:19, 133:25, 134:7, 134:13, 134:18, 135:1, 135:3, 135:6, 135:8, 135:10
**themselves** [2] - 9:7, 32:15
**thickness** [1] - 37:6
**thief** [2] - 67:15, 67:24
**thinking** [3] - 29:22, 29:24, 62:12
**Third** [1] - 2:8
**THOMAS** [1] - 1:14
**THORNTON** [1] - 1:23
**thousand** [1] - 130:6
**thousands** [2] - 49:11
**three** [5] - 21:21, 30:12, 64:6, 73:8, 83:15
**throughout** [8] - 14:22, 15:6, 15:7, 17:20, 49:12, 51:21, 73:1
**thrust** [1] - 71:6
**tickets** [1] - 69:10
**ties** [1] - 43:4
**timer** [1] - 77:19
**Timothy** [1] - 18:17
**title** [3] - 100:23, 111:16, 116:12
**today** [8] - 23:10, 50:3, 64:17, 76:6, 82:8, 98:17, 120:4, 134:20
**together** [3] - 23:16, 45:2, 46:3
**tomorrow** [9] - 23:10, 75:22, 76:2, 76:12, 132:25, 133:2, 133:5, 135:12
**Tony** [7] - 5:6, 7:6, 7:24, 44:25, 45:1, 45:20, 121:8
**took** [1] - 62:5
**top** [5] - 65:16, 75:18, 82:12, 82:13, 82:15
**topics** [1] - 75:19
**total** [2] - 86:6, 87:14
**towards** [1] - 29:19
**toxins** [1] - 130:12
**TRACHTEN** [1] - 2:11
**track** [2] - 97:11, 97:13
**tracking** [2] - 63:5, 82:25
**trade** [1] - 105:19
**Trade** [1] - 98:10
**trafficking** [1] - 64:12
**tragic** [3] - 62:7, 62:8, 62:9
**training** [10] - 40:10, 48:22, 52:6, 52:7, 52:8, 55:25, 105:13, 124:10, 125:6, 125:7
**trainings** [1] - 105:14
**transaction** [1] - 89:17
**transcript** [1] - 11:21
**transcription** [1] - 136:4
**transfers** [1] - 57:11
**translate** [1] - 6:15
**translated** [1] - 8:20
**translation** [2] - 6:12, 7:6
**transnational** [3] - 8:2, 56:9, 56:13
**transparent** [1] - 8:4
**transpiring** [3] - 10:3, 10:23, 12:1
**transported** [1] - 37:7
**travel** [9] - 32:19, 32:24, 33:1, 33:2, 34:8, 40:11, 43:9, 49:20, 57:2
**traveled** [1] - 42:19
**traveling** [1] - 42:2
**traveller** [1] - 35:3
**travels** [2] - 35:4, 41:18
**TRIAL** [1] - 1:10
**tricky** [1] - 53:21
**tried** [6] - 9:20, 9:23, 10:10, 10:12, 10:14, 31:1
**tries** [2] - 11:14, 26:22
**trip** [2] - 40:7, 40:8
**truckful** [1] - 41:14
**true** [3] - 57:12, 64:6, 126:4
**trust** [5] - 6:3, 6:4, 6:8, 8:12, 66:2
**trusted** [2] - 30:12, 75:12
**trustworthiness** [1] - 70:20
**trustworthy** [2] - 66:1, 66:7
**try** [19] - 4:12, 5:14, 5:19, 10:6, 10:22, 11:1, 17:17, 18:21, 25:23, 26:7, 26:8, 26:12, 26:22, 29:7, 29:8, 45:4, 76:2, 114:6
**trying** [23] - 5:6, 6:18, 6:24, 10:21, 11:11, 11:23, 12:23, 13:25, 15:5, 15:23, 18:2, 21:4, 22:16, 28:16, 28:25, 29:14, 55:21, 74:9, 110:11, 117:20, 119:14, 119:15
**Tuesday** [4] - 76:23, 76:24, 77:1, 78:6
**Tuesdays** [1] - 76:24
**turn** [2] - 90:7, 90:16
**turned** [1] - 65:17
**turning** [2] - 91:17, 108:6
**turnover** [2] - 87:15
**TV** [1] - 29:16
**twice** [2] - 11:1, 35:16
**two** [24] - 11:4, 11:13, 12:20, 13:10, 13:22, 14:18, 18:25, 20:23, 21:19, 30:6, 32:21, 40:20, 42:11, 42:16, 46:10, 62:10, 73:6, 88:11, 104:6, 129:3, 130:23, 130:24, 132:6
**two-page** [1] - 132:6
**type** [5] - 33:19, 45:17, 48:10, 49:13, 62:18
**types** [1] - 37:5

## U

**U.S** [16] - 1:17, 13:3, 13:16, 14:12, 14:19, 17:10, 17:17, 20:23, 38:4, 38:24, 39:4, 40:4, 41:24, 80:21, 85:10
**ultimate** [1] - 121:14
**ultimately** [2] - 59:25, 67:2
**UN** [4] - 110:6, 111:18, 112:20, 112:21
**unbelievable** [1] - 20:19
**under** [30] - 6:1, 21:9, 21:12, 21:15, 25:20, 27:20, 28:12, 28:16, 29:12, 36:22, 41:20, 42:4, 62:17, 98:8, 98:9, 101:15, 101:20, 103:16, 104:6, 109:15, 110:12, 110:13, 110:24, 111:11, 111:22, 116:25, 117:7, 117:10, 132:17
**undergraduate** [1] - 102:5
**underneath** [1] - 95:12
**understood** [4] - 10:2, 14:2, 31:3, 62:19
**unfamiliar** [1] - 42:9
**unfolding** [2] - 10:23, 55:12
**unfortunately** [1] - 64:16
**uninformed** [1] - 41:16
**unique** [1] - 53:24
**Unit** [6] - 47:6, 48:18, 50:2, 51:7, 52:14, 120:18
**United** [17] - 6:1, 29:5, 40:17, 40:24, 41:1, 59:11, 85:8, 95:25, 97:12, 97:14, 97:15, 101:11, 102:16, 110:8, 118:17, 123:15, 136:9
**united** [1] - 2:23
**UNITED** [5] - 1:1, 1:4, 1:11, 1:14, 1:20
**units** [3] - 59:13, 60:5, 60:25
**universities** [1] - 105:18
**unless** [2] - 77:3, 118:25
**unused** [1] - 77:22
**up** [38] - 6:14, 11:23, 12:23, 14:22, 15:10, 16:13, 17:14, 19:1, 19:4, 19:16, 25:17, 27:17, 28:8, 31:2, 31:3, 39:7, 44:18, 45:1, 47:17, 51:2, 55:11, 55:17, 59:5, 64:18, 65:12, 66:7, 71:10, 73:20, 78:20, 93:4, 93:12, 94:13, 95:10, 111:19, 113:19, 115:3, 116:21, 133:2
**update** [4] - 12:1, 15:6, 18:8, 48:3
**updating** [1] - 14:21
**upset** [1] - 39:7
**urgency** [3] - 9:18, 9:25, 10:6
**urgent** [1] - 10:18
**Urtiaga** [4] - 24:3, 24:4, 24:5
**USA** [2] - 51:10, 115:20
**useful** [3] - 27:4, 59:11, 59:14
**users** [1] - 121:23

## V

**vague** [1] - 125:13
**valuable** [1] - 25:10
**value** [9] - 36:25, 84:9, 84:11, 84:14, 84:19, 84:20, 84:23, 84:25, 91:23
**valued** [2] - 81:4, 91:24
**various** [1] - 17:24
**Vegas** [1] - 71:24
**vehicle** [2] - 65:17, 65:18
**Veintemilla** [6] - 46:14, 46:20, 95:21, 99:5, 107:7, 135:6
**VEINTEMILLA** [1] - 2:10
**verbiage** [1] - 75:15
**verify** [2] - 35:2, 86:25
**version** [1] - 46:7
**vessels** [1] - 104:4
**vest** [28] - 36:12, 36:13, 37:12, 40:23, 40:24, 41:3, 41:20, 42:3, 42:5, 87:7, 109:10, 114:25, 115:10, 115:14, 116:24, 117:3, 117:10, 117:23, 117:24, 118:24, 119:3, 121:12, 121:13, 126:3, 126:12, 126:16, 128:8, 128:11
**vests** [19] - 36:15, 36:19, 36:20, 41:9, 54:5, 86:21, 89:21, 101:19, 104:5, 104:6, 105:6, 105:8, 105:10, 106:22, 108:25, 109:4, 120:7, 125:7, 130:13
**vetted** [2] - 64:3, 64:4
**viability** [1] - 43:20
**video** [3] - 36:12,

69:3
**videos** [1] - 69:3
**view** [3] - 35:24, 128:11
**viewed** [1] - 65:25
**Village** [1] - 83:7
**violations** [1] - 6:2
**Visa** [1] - 94:2
**visit** [1] - 38:11
**volume** [1] - 86:9
**voluntarily** [9] - 18:21, 18:22, 18:23, 19:13, 19:14, 19:16, 19:22, 24:24, 24:25
**voluntary** [1] - 21:11
**vs** [1] - 1:6

## W

**walk** [2] - 50:21, 50:24
**walking** [1] - 51:19
**wall** [1] - 51:23
**Walter** [1] - 46:20
**wants** [1] - 77:8
**war** [1] - 51:20
**warehouse** [2] - 91:10, 94:23
**warrant** [2] - 13:5, 13:6
**Washington** [2] - 1:18, 101:22
**watch** [1] - 9:12
**watermark** [1] - 28:16
**waybill** [17] - 82:2, 82:4, 82:5, 82:7, 82:11, 82:18, 82:25, 86:21, 87:11, 87:12, 87:23, 89:2, 89:4, 89:17, 92:16, 98:15, 98:16
**waybills** [1] - 85:12
**weaponry** [1] - 51:21
**weapons** [2] - 97:16, 101:16
**web** [1] - 129:15
**website** [3] - 129:15, 129:17, 129:21
**week** [1] - 134:11
**weekend** [5] - 7:4, 76:19, 134:14, 134:15, 134:17
**weeks** [2] - 30:12, 70:12
**weighing** [1] - 113:3
**weight** [5] - 86:1, 86:4, 86:6, 86:9, 86:10
**WhatsApp** [5] - 15:1, 21:19, 25:16, 25:24
**whichever** [1] - 41:19
**whole** [2] - 17:25, 130:6
**Windelle** [1] - 42:12
**wiped** [2] - 25:8, 25:14
**wise** [1] - 33:2
**withhold** [1] - 75:13
**withstand** [1] - 108:21
**WITNESS** [8] - 35:20, 46:13, 47:20, 53:11, 68:7, 79:13, 96:11, 99:17
**witness** [22] - 4:7, 9:1, 27:18, 28:10, 75:3, 76:10, 78:15, 79:4, 79:8, 79:10, 92:4, 96:4, 96:8, 98:25, 99:10, 99:14, 99:21, 107:23, 108:15, 115:20, 121:25, 135:4
**Witness** [3] - 74:20, 96:3, 99:9
**WITNESSES** [1] - 3:2
**witnesses** [2] - 75:24, 75:25
**woman** [5] - 13:11, 13:12, 13:16, 13:21, 62:1
**word** [4] - 6:16, 6:19, 45:23, 50:7
**words** [6] - 6:10, 7:7, 11:13, 12:11, 108:14, 129:4
**works** [2] - 29:2, 54:4
**world** [3] - 49:13, 50:4, 54:12
**worry** [1] - 9:8
**writing** [1] - 133:16
**written** [3] - 15:9, 95:12, 129:4
**WU** [22] - 1:19, 3:6, 6:5, 7:9, 8:24, 38:8, 39:24, 42:6, 50:10, 53:1, 53:8, 54:13, 58:11, 62:22, 63:22, 64:25, 65:2, 67:9, 67:20, 68:12, 69:25, 74:19
**Wu** [1] - 69:24

## X

**X-ray** [2] - 86:21, 89:21

## Y

**year** [2] - 47:2, 97:2
**yearly** [1] - 48:3
**years** [7] - 8:3, 30:6, 70:9, 80:2, 97:2, 101:24
**yesterday** [2] - 27:21, 28:13
**York** [1] - 59:22
**yourself** [4] - 9:12, 21:20, 38:24, 124:2

## Z

**zero** [1] - 8:7
**zooming** [1] - 91:11