**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 22-CR-20104-BECERRA**

**UNITED STATES OF AMERICA**

**v.**

**CHRISTIAN SANON,**

**Defendant.**
**__________________________________/**

**GOVERNMENT'S RESPONSE IN OPPOSITION TO**
**DEFENDANT SANON'S MOTION FOR CONTINUANCE (DE 1891)**

Defendant Christian Sanon asks the Court to either force the Government to try him on the previous, Fifth Superseding Indictment (DE 552), or to continue his trial for 30 days to allow him to prepare for trial on the Sixth Superseding Indictment (DE 1850). Yet Sanon is facing the same charges, the same evidence, and the same core theory of the case that the Government has always advanced: that Sanon and a group of confederates hatched a plan to kidnap or kill Haitian President Jovenel Moise, and that they provided a wide variety of illicit services in support of their plot. The Court should not require the Government to elect trial on the Fifth Superseding Indictment—which is an exercise of prosecutorial discretion, not subject to court review. And the Court should allow this case—which is, at its heart, the same case that it always has been—to proceed to trial on September 28, 2026.

## ARGUMENT

### I. The Government Alone May Elect Which Indictment To Take to Trial.

Sanon insists that the Court, if it maintains the September 28, 2026, trial date, should compel the Government to try him on the Fifth Superseding Indictment rather than the Sixth Superseding Indictment. *See* (DE 1891:9). But the power to elect an indictment rests solely within

the Government's prosecutorial discretion, and neither a defendant nor a district court can compel the Government to try a defendant on a particular indictment.

As an initial matter, when a grand jury returns a superseding indictment, the prior indictment remains viable. "Two indictments for the same offense may be outstanding at the same time if jeopardy has not attached." *United States v. Del Vecchio*, 707 F.2d 1214, 1216 (11th Cir. 1983); *see also United States v. Flores-Perez*, 646 F.3d 667, 671 (9th Cir. 2011) ("[A] superseding indictment does not nullify an original indictment."); *United States v. Vavlitis*, 9 F.3d 206, 209 (1st Cir. 1993) ("It is clear that the grand jury's return of a superseding indictment does not void the original indictment."). In that scenario, the government, and the government alone, "may elect to proceed on any pending indictment, whether it is the most recently returned superseding indictment or a prior indictment." *United States v. Hickey*, 580 F.3d 922, 930 (9th Cir. 2009) (citing additional authorities). Thus, the Government may choose to try Sanon on either the Fifth or Sixth Superseding Indictments.

That decision represents an exercise of prosecutorial discretion, vested exclusively in the Executive Branch. *Cf. Wayte v. United States*, 470 U.S. 598, 607 (1985) (explaining that discretionary prosecutorial judgments are unreviewable by courts because "the decision to prosecute is particularly ill-suited to judicial review"). Notably, Sanon does not cite a single authority or example—and the Government cannot find one—in which a district court compelled the prosecution to try a defendant on a particular indictment among two viable options.[1]

---

[1] Note that this is distinct from a motion to compel election. *See, e.g.*, *United States v. Jones*, 601 F.3d 1247, 1258 (11th Cir. 2010). When confronted with a multiplicitous indictment (not the situation here), a court may compel the prosecution to elect which charge(s) to bring to trial. In other words, a court may, in very narrow and specific circumstances, compel the government to *make* an election; it cannot, however, tell the government *which charge* or indictment to elect.

Sanon's chief authority, *United State v. Rojas-Contreras*, 474 U.S. 231 (1985), does not help him on this front. *Rojas-Contreras* explained that the defendant's only potential remedy from a late-breaking superseding indictment is a continuance of his trial. *See id.* at 236. As the Court noted, "[t]he authority of the District Court to grant an 'ends of justice' continuance should take care of *any* case in which the Government seeks a superseding indictment which operates to prejudice a defendant." *Id.* (emphasis added). In short, the Court should deny Sanon's initial request to force the Government to try him on the earlier indictment. And, for the reasons explained in Part II below, the Court should also deny Sanon's request for a continuance.

## II. The Court Should Not Continue the Trial Because the Sixth Superseding Indictment Does Not Fundamentally Alter the Charges or the Prosecution's Factual Theory.

Sanon requests, in the alternative, a 30-day continuance of his trial (DE 1891:5-8). Yet the Sixth and Fifth Superseding Indictments charge Sanon with the same crimes. His trial on the newest indictment will not differ, in any material way, from the trial that he would receive on the previous one. Nor does Sanon identify any specific, additional preparation work—beyond vague and general claims that he must rework his exam outlines, file new motions, or rethink his trial strategy—that the Sixth Superseding Indictment would require him to perform.

A district court has discretion to grant a continuance to a defendant, faced with a new superseding indictment, "when necessary to allow further preparation." *United States v. Petit*, 841 F.2d 1546, 1554 (11th Cir. 1988) (quotation marks omitted). But such continuances are often unnecessary. In *Petit*, for instance, the prosecution team "returned a superseding indictment two working days before trial was scheduled," and defense counsel did not receive the indictment until "the day trial was scheduled to begin and the jury was selected." *Id.* at 1554. Even so, the district court denied the defense a continuance, and the Eleventh Circuit affirmed. As the *Petit* Court

explained, the superseding indictment made relatively minor changes to the charges, adding "an additional purpose" to the conspiracy (alleging that the defendants "conspired to *receive* and *possess* stolen property, rather than merely to take the property unlawfully") and by "changing the ending date of the conspiracy to the date of [their] arrest." *Id.* These changes did not substantially alter the government's factual theory, however, and the defendants failed to "point[] to any important preparatory work which their attorneys were compelled to leave undone because of the change in the indictment." *Id.* at 1555 (citation modified). For other examples of similar decisions, see *United States v. Brantley*, 68 F.3d 1283, 1288-89 (11th Cir. 1995) (affirming denial of a continuance even though the defendant learned of a superseding indictment, which changed the charging statute but not the Government's core factual theory, on the fifth day of trial), and *United States v. Hawkins*, 765 F.2d 1482, 1488 (11th Cir. 1985) (observing that the key question is whether the defendant can show "any important preparatory work which his attorney was compelled to leave undone because of the change in the indictment"). "When a superseding indictment is returned at some time close to trial, it is impossible for the court to know if the defendant's trial preparation is negatively affected unless the court is told of the problem. Therefore, it is incumbent on the *defendant* to bring that prejudice to the attention of the trial court," *United States v. Watkins*, 811 F.2d 1408, 1411 (11th Cir. 1987)—and to be as specific as possible.

The Government will address each distinction between the Sixth and Fifth Superseding Indictments identified by Sanon, *see* (DE 1891:3-7), and explain why none of them works a material or substantial change in the Government's evidence or theory of the case. At the outset, however, it is critical to correct Sanon's statement that "[t]he Government itself told the jury in the Ortiz trial that the principals abandoned Mr. Sanon in June 2021" (DE 1891:4). That was not the case that the Government presented against Sanon's former co-defendants, nor the one it will

present next week. As the evidence in the prior trial showed, and as the evidence in his own trial will show, Sanon recruited and gathered the group of conspirators who ultimately arranged President Moise's assassination. Sanon enlisted those individuals to provide material support to the conspiracy to kidnap or kill President Moise, and Sanon himself provided material support, including services as varied as (among other things) (a) their own participation as personnel in the scheme; (b) financial fundraising, mostly from recipients of pandemic-era government loans; (c) arranging travel to Haiti and lodging for Sanon, Sanon's supporters (like Antonio Intriago and James Solages), and two dozen Colombian mercenaries, (d) searching for and obtaining an arsenal of weapons, ammunition, and ballistic vests, and (e) training and tactical planning, culminating in the dead-of-night operation coordinated by Sanon's allies to storm President Moise's home and kill him on July 7, 2021.

In mid-June 2021, when certain members of the group realized that Sanon could not become President under the Haitian Constitution, they recruited more conspirators, including another person who could serve as the group's puppet President, former Haitian judge Wendelle Coq Thelot ("Madame Coq"). While the group relinquished the idea of Sanon immediately becoming President, Sanon and his underlings—including Solages and Ashkard Pierre—remained active, eager members of the conspiracy. The Government's evidence has always shown—and will again show—that these co-conspirators ensured Sanon was placated with a position in Madame Coq's future Haitian government, such as delegate to the United Nations or a cabinet-level role in a Coq administration, and that he accepted this lesser role. Sanon never once sought to fly home to South Florida or return to the United States. Long after the conspiracy added Coq and her Haitian supporters, key conspirators like Solages and Vincent still visited and updated Sanon on a regular, sometimes daily basis. During late June 2021, Sanon sent Solages to meet

with former U.S. Marine Jimmy Thompson in Texas to get guidance and advice on the planned assassination. During early July 2021, Sanon was fully aware that the Colombian mercenaries had been transported from their hotel to a staging area to conduct the operation with Solages. And on July 7-8, 2021, Sanon eagerly parroted his conspirators' attempts to cover up their crimes and seize power. Sanon's own text messages also reveal that he was eagerly waiting to capitalize on events and for Madame Coq or himself to be sworn in. Shortly before this arrest on July 9, 2021, Sanon lamented to conspirator Frederick Bergmann that he (Sanon) should never have "given" Solages and the Colombian mercenaries to Madame Coq and that he "had made a deal with the devil."

In sum, this evidence refutes the notion that the conspirators "abandoned" Sanon in any legally meaningful sense. He remained an important conspirator and accomplice from the genesis through the execution of the kidnap-or-kill plot, never withdrew, and expected to reap significant benefits from President Moise's death until the bitter end. In fact, it was not until July 8, 2021, the day after the assassination, when Sanon began to realize that his group's coup had failed and reported to Bergmann, "I have not been hired," and "No salary for me."

This factual theory, and all the pre-existing evidence to prove it, would have been the same in the world in which the Government tried Sanon on the Fifth Superseding Indictment. Now, as the Government elects to proceed on the Sixth Superseding Indictment, it will still present the same theory and evidence.

Bearing this essential feature in mind, each of the differences that Sanon identifies between the Fifth and Sixth Superseding Indictments is immaterial, from the perspective of the upcoming trial. Nothing needs to change in Sanon's preparation for trial because nothing of significance has shifted in the Government's case against Sanon.

**Change to the Conspiracy Period**. Sanon first complains that Counts 1 through 3 expand the conspiracy period, starting in June 2020 rather than February 2021, and ending on July 31, 2021, rather than July 7, 2021 (DE 1891:3). In his view, the use of "communications on and after July 8, 2021" may "require[] new investigation of the post-assassination period, new evidentiary objections, and new proposed instructions" (DE 1891:6).

In practical terms, however, the case against Sanon remains identical. Sanon has long known (or should have known) that the Government intends to present limited evidence of Sanon's 2020 and early 2021 activities on the one hand—the prelude to him finding the allies who actually accomplished the assassination—and Sanon's post-July 7, 2021, activities on the other. Indeed, in the prior trial, which involved the other defendants charged in the Fifth Superseding Indictment, there already was limited evidence about the conspirators'—including Sanon's—July 8, 2021, communications. In the Government's digital evidence summary exhibit, for example, 11 slides covered the group's July 8 efforts to conceal their guilt and excuse their actions, while also continuing to try to seize power in Haiti. In the Government's revised digital evidence summary exhibit for Sanon's trial, the Government once again intends to present 11 slides of July 8 communications—something Sanon has long known through receiving and presumably reviewing prior versions of the summary.

All the same evidence remains admissible under either the Fifth or Sixth Superseding Indictments. Under the Fifth Superseding Indictment, evidence pre-dating February 2021 or post-dating July 8, 2021, is inextricably intertwined with the charges in Counts 1 through 3. Events outside a charged conspiracy period remain admissible when they are "necessary to complete the story of the crime" or are "inextricably intertwined with the evidence regarding the charged offense." *United States v. Nerey*, 877 F.3d 956, 974 (11th Cir. 2017). In this case, events or

communications that show the beginnings of Sanon's desire for political power in Haiti or antipathy toward President Moise would both be necessary to complete the story of the crime, by establishing Sanon's motivation and his earliest forays in planning a violent coup, and also would be inextricably intertwined because his relationships with many of his co-conspirators, like Bergmann or Solages, began well before February 2021. By the same token, events immediately following July 7, 2021, would also be admissible and inextricably intertwined. After all, "efforts to conceal a conspiracy" often "support the inference that a defendant knew of the conspiracy and joined it while it was in operation." *United States v. Reeves*, 742 F.3d 487, 500 (11th Cir. 2014). And in any event, allegations that a conspiracy ended "on or about" a certain date are inherently flexible. "[W]hen the terminology 'on or about' is used" in an indictment, "the court may permit proof of occurrences within as much as several weeks of the date stated," *United States v. Milisci*, 465 F.2d 700, 703 (5th Cir. 1972), so Sanon should never have turned a blind eye to evidence post-dating July 7, 2021, even when facing the Fifth Superseding Indictment. Put simply, the expanded conspiracy period in the Sixth Superseding Indictment does not require Sanon to confront or prepare for any new evidence.

**The Types of Material Support Alleged**. For the sake of clarity, the Sixth Superseding Indictment elaborates with more specificity as to the types of material support that Sanon and his co-conspirators provided to their efforts to kidnap or kill President Moise: "property, services, financial services, lodging, training, expert advice and assistance, safehouses, false documentation and identification, communications equipment, facilities, weapons, lethal substances, personnel including themselves, and transportation" (DE 1850:26). The Fifth Superseding Indictment described the material support in broader terms as "personnel, including themselves, and services" (DE 552:2).

Even so, the Government is presenting the same case as to material support. Sanon appears to suggest that the Fifth Superseding Indictment is somehow narrower than the Sixth, but the opposite is true. The Sixth Superseding Indictment, by providing a more detailed list of the types of material support at issue, has given more definite form to the expansive category of "services" and "personnel" identified in the prior indictment. The evidence disclosed to Sanon, and presented at the prior trial, has always been that Sanon and his supporters provided a panoply of services to their complex scheme to assassinate President Moise, including (a) fundraising and financial services by associates such as Walter Veintemilla, Byron Rainer, Jacob Israel, Keegan Harricharan, and others; (b) tactical planning and training, or expert advice and assistance, provided by Ortiz, Intriago, and former Colombian Special Forces officers and soldiers such as Rivera; (c) coordinating and arranging travel, including both transportation and lodging or safehouses, performed by Sanon himself, Veintemilla, Intriago, and Ashkard Pierre, among others; and (d) obtaining, shipping, buying, or borrowing heavy-duty weaponry, ammunition, and ballistic vests, also performed by Sanon himself, Intriago, Bergmann, Solages, and others. The fact that the Sixth Superseding Indictment more specifically identifies the categories or types of services provided by the conspirators does not change either the Government's evidence or factual theory—and, by extension, does not change the preparation Sanon should do to ready himself for trial. Indeed, as Sanon himself concedes, he already knew that evidence and testimony about "the ballistic vests, the travel, the lodging, and the funds" were relevant to other charges in the Fifth Superseding Indictment (DE 1891:3-4). Since he has pleaded not guilty to those charges, he presumably has prepared to defend himself from those factual allegations already.

In a similar vein, Sanon protests that the Sixth Superseding Indictment now includes explicit language noting that the conspirators sought to conceal or disguise the source or nature of

their material support, and that their material support was, in part, intended to conceal an escape from the assassination (DE 1891:3). But these allegations do not involve any new evidence beyond that already disclosed to Sanon and admitted without objection at the prior trial of his former co-defendants. Cooperating witnesses Israel and Harricharan will explain that they concealed or disguised the source or nature of funds raised for Sanon as part of their work for the financing arm of the conspiracy, led by Veintemilla. Other evidence and testimony will reveal that Sanon, Bergmann, and Intriago conspired to ship, and did ship, ballistic vests to Haiti under the guise of sending X-ray vests to Sanon's supposed medical charity—the subject matter of Counts 8-10 of the Sixth Superseding Indictment, which are unchanged from Counts 6, 8, and 9 of the Fifth Superseding Indictment. Finally, just as in the prior trial, the Government will elicit brief testimony about how Sanon's underlings, such as Pierre, helped Mario Antonio Palacios and Joseph Joel John (among others) conceal themselves and later escape Haiti.

**New Named Defendants**. Sanon implies that he has never prepared to face allegations that the charged conspiracies included Joseph Felix Badio, Vitel'Homme Innocent, Byron Sherrod Rainer, the seventeen formerly uncharged Colombian mercenaries, Samir Handal, and Pierre (DE 1891:4). He even argues that this "single enlarged conspiracy" may demand "new briefing on multiple conspiracies, variance and Rule 801(d)(2)(E)" (DE 1891:6-7). But the discovery Sanon has been receiving for years; the Government's digital evidence summary exhibit; the record of the previous trial; and the Government's prior filings, including its motion to admit co-conspirator statements, have long put Sanon on notice of these allegations. The Sixth Superseding Indictment does not change the picture or scope of the conspiracy. The Fifth Superseding Indictment always charged Sanon with conspiring with "other persons known and unknown to the Grand Jury" (DE 552:2). Thus, the only change that has occurred is that some unidentified or uncharged co-

conspirators (like Badio, Rainer, or the other Colombian mercenaries) have now become charged co-conspirators.

**New Fraud Charges Against Other Defendants**. Sanon also notes that the Sixth Superseding Indictment contains new fraud charges, not against Sanon himself (DE 1891:4, 6). But the jury will receive a redacted version of the indictment, reflecting only the charges against Sanon. Thus, those additional charges do not demand new preparation on Sanon's part. The Government will hew to the same limits on presenting financial evidence that the Court established at the prior trial. The Government will not argue or present financial analyst testimony that Sanon's co-conspirators like Rainer or Israel procured funds for the coup through fraud, although the Government will note, as a factual matter, that much of the funding originated from pandemic-era government loans. Israel and Harricharan will testify that their role in the scheme including laundering funds, but they will not (and cannot) assert that Sanon personally participated in those activities. In sum, the fraud charges against certain new defendants have no bearing on Sanon's trial and will not change the limitations already in place or the financial tracing testimony.

**New General Allegations and Aliases**. Sanon complains that the Sixth Superseding Indictment accuses him of "working directly with the CTU and Worldwide companies, Colombian mercenaries, and other individuals" to carry out "a planned coup d'etat in Haiti, including the planned killing or kidnapping of President Moise" (DE 1891:4). He also criticizes that indictment for identifying two of his other aliases, "Mr. President" and "P" (*id.*). In his view, those allegations "are prejudicial on their face" and "require motions to strike surplusage" (DE 1891:7). But none of those additions require more or new preparation from Sanon. The quoted general allegation is, in a nutshell, what the case against Sanon is—and always has been—about: his work with Ortiz, Intriago, or Solages (i.e., CTU), Veintemilla (Worldwide), the Colombian mercenaries, and other

individuals to violently depose President Moise and seize power in Haiti. As for the identified nicknames, the Government's digital device summary exhibit—first disclosed to the defense in March 2025—has always contained communications in which co-conspirators such as John, Intriago, Bergmann, and others refer to Sanon by those titles or nicknames. Thus, those should be no surprise to Sanon; and, in any event, he has not explained how or why he needs 30 days to prepare to address the incontrovertible, repeatedly documented fact that people called him Mr. President or P. Nor is it clear why Sanon thinks those honorifics are inherently prejudicial.

At bottom, Sanon is facing the same charges, the same factual theories, and the same evidence at trial that he should always have been preparing to oppose. This case is no different than *Petit*, in which an indictment returned shortly before trial altered the conspiracy period and expanded the list of alternative means of violating the charged statute but did not actually transform the Government's theory of the case. *See* 841 F.2d at 1554-55. Nor can Sanon claim that "time consumed" preparing "additional motions after the return of the superseding indictment" requires a continuance unless he can show that his counsel had to forego "important preparatory work" for trial. *Hawkins*, 765 F.2d at 1488. Because the Sixth Superseding Indictment does not prejudice Sanon, the Court should not continue his trial for 30 days—which would force this trial, which is anticipated to take six to eight weeks, to run into the holiday time period when many jurors will be unable to sit and will require lengthy recesses and disruptions.

## III. The Court Should Not Compel the Government To Disclose the Limited Redactions in the Unsealed Sixth Superseding Indictment to Sanon.

The Court unsealed the Sixth Superseding Indictment but preserved limited redactions in light of the ongoing investigation of this matter. Those allegations do not materially affect Sanon, and they all concern matters that would be redacted from the copy of the indictment provided to the jury during deliberations. Thus, they have no bearing on Sanon's preparation.

## CONCLUSION

For these reasons, the Court should deny Sanon's motion to continue (DE 1891).

Respectfully submitted,

JASON REDING QUIÑONES
United States Attorney

By: *<u>/s Sean T. McLaughlin</u>*
Sean T. McLaughlin
Assistant United States Attorney
Court ID No. A5501121
11200 NW 20th Street, Suite 101
Miami, FL 33172
(305) 715-7642/7654
Sean.McLaughlin@usdoj.gov

<u>/s *Jason Wu*</u>
Jason Wu
Assistant United States Attorney
Court ID No. A5502299
99 N.E. 4th Street
Miami, FL 33132
(305) 961-9226
Jason.Wu@usdoj.gov

*<u>/s Altanese Phenelus</u>*
Altanese Phenelus
Assistant United States Attorney
FL Bar No. 112693
99 N.E. 4th Street
Miami, FL 33132
(305) 961-9375
Altanese.Phenelus@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on September 23, 2026, I filed the foregoing document through CM/ECF and thus served all counsel of record.

<u>/s *Jason Wu*</u>
Jason Wu
Assistant United States Attorney