**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 22-CR-20104-BECERRA(s)(s)(s)(s)(s)(s)**

**UNITED STATES OF AMERICA**

**v.**

**CHRISTIAN SANON,**

**Defendant.**
______________________________/

**GOVERNMENT'S MOTION TO EXCLUDE OR LIMIT**
**<u>DEFENDANT SANON'S PROFFERED EXPERT WITNESS TESTIMONY</u>**

Defendant Christian Sanon has notified the Government of its intent to call three purported expert witnesses: Jean Daniel Lafontant, Nicole Phillips, and Thomas Pullen. As it did at the trial of Sanon's former co-defendants Arcangel Pretel Ortiz, Antonio Intriago, Walter Veintemilla, and James Solages, the Court should exclude Mr. Lafontant's testimony in its entirety (DE 1625). The Court also should impose similar or more stringent limits on Ms. Phillips's testimony in light of its more limited relevance to Sanon's trial (DE 1618). Finally, the Court should either exclude Mr. Pullen's testimony or impose a deadline for the defense to disclose his expert report.

As to Mr. Lafontant, his proffered testimony remains the same: that practitioners of Vodou likely assassinated President Moise because of the supposedly distinctive manner in which he was shot or wounded. But as the Court pointed out before, "there is no such thing as a voodoo assassination" (DE 1783:150), and thus no witness can testify as an expert about any supposedly distinctive, Vodou way of killing another person.

As to Ms. Phillips, certain parts of her prior trial testimony are not relevant—at least based on the evidence elicited to date in this trial—or are prejudicial. The Government asks that the Court limit Ms. Phillips to the opinions to which she testified at the previous trial and also preclude

Ms. Phillips from offering testimony concerning the Haitian Prime Minister position that, at least as of now, appears to have no bearing on the issues raised in Sanon's trial.

Finally, as to Mr. Pullen, the Government has not yet received any expert report or disclosure concerning his testimony, besides a sweeping and vague statement that he will testify "relating to the phones and electronic items in this case." He should be excluded as an expert given the vagueness of this disclosure, particularly because Mr. Pullen has had years to examine the phones in question and formulate an opinion. Alternatively, the Government requests that the Court impose an October 28, 2026, deadline for disclosure of Mr. Pullen's expert report.

**BACKGROUND**

On October 14, 2026, Defendant Christian Sanon provided notice of his intent to present testimony from three purported experts. As to Mr. Lafontant, the disclosure stated only that:

> Mr. Jean Daniel Lafontant is an expert in the Vodou religion generally and will provide testimony on the Vodou religion and its role in Haitian society and politics. He will also provide testimony that the injuries sustained by President Moïse, more likely than not, had a ritualistic aspect indicating that the assassins were familiar with the principles of Vodou.

(Ex. A) (Oct. 14, 2026 email disclosure).

As for Ms. Phillips, Sanon disclosed that:

> Ms. Nicole Phillips is an expert on Haitian law, politics and society. She will testify to events that occurred before during and after the assassination of President Moïse that put the role of Haitian legal, political and social life in the proper context of the events leading to his death. She will also testify to the arrest warrant in this case executed by Judge Jean Roger Noelcius.

(*id.*).

Finally, Sanon described Mr. Pullen as:

> an expert in the forensic examination of electronic items, including cell phones, tablets, media storage, laptops and desktop computers. He is familiar with the software used by the government to perform extractions and parsing of electronic devices. He can testify relating to the phones and electronic items in this case.

(*id.*).

This initial disclosure included the supposed experts' resumes but did not include any expert reports from Mr. Lafontant, Ms. Phillips, or Mr. Pullen.

The Government asked Sanon to provide adequate disclosures concerning the purported experts' opinions, along with the data or bases for those opinions and the methodologies used in arriving at their conclusions. The Government also sent Sanon the similar disclosures made by former co-defendant Ortiz at the prior trial. After conferral, Sanon's defense counsel has stated that they adopt the other defendants' disclosures as to Mr. Lafontant and Ms. Phillips, and that they intend to present the same testimony from those witnesses. The defense has stated that Mr. Pullen is still working on his analysis of the phones in this case (phones disclosed to the defense years earlier), but that they anticipate him preparing an expert report or summary of his opinions.

**Mr. Lafontant's Proffered Testimony**

Mr. Lafontant's proffered testimony remains the same as the testimony that the Court excluded in the prior trial. Exhibit B to this motion contains that defense disclosure. Stated briefly, that disclosure claims that Mr. Lafontant "is an expert in the Vodou religion generally and will provide testimony regarding Vodou cosmology and its role in Haitian society, politics, and culture" (Ex. B, at 1). In particular, he will testify that the gunshot wound to President Moies's head may have some significance in Vodou cosmology or practice, suggesting that a Vodou practitioner inflicted that wound: "In Vodou-inflected interpretations, destruction of the face prevents recognition, perception, and testimony in the post-mortem state. To injure the eye is to prevent the dead from seeing who is summoning them to speak" (Ex. B, at 3). Among other similar opinions, Mr. Lafontant will assert that "[t]he symmetric injuries to the decedent's upper and lower limbs are also consistent with mutilations predicated on Vodou principles" (*id.*). Finally, the

gunshot sounds in both of President Moise's arms, according to Mr. Lafontant, "correspond to the symmetrical pattern of mutilation in the practice of Vodou" (*id.*).

During the prior trial, the Court excluded Mr. Lafontant's testimony as unreliable and improper under *Daubert v. Merrell Pharms., Inc.*, 509 U.S. 579 (1993). As the Court observed, eliciting that testimony would be tantamount to qualifying Mr. Lafontant as "an expert in voodoo assassination" (DE 1783:156), but "there is no such thing as a voodoo assassination" (DE 1783:150). The Court ultimately concluded that Mr. Lafontant did not, and could not, have "expertise to say this is the work of someone who believed in the voodoo religion as opposed to just another assassination" (DE 1785:44).

**<u>Ms. Phillips's Proffered Testimony</u>**

Exhibit C is the defense disclosure related to Ms. Phillips. Ms. Phillips will offer five opinions (numbered in the same fashion as in the Government's prior motion to exclude, DE 1598):

- Opinion #1 (Haitian governance issues): In 2021, "Haiti was operating amid significant institutional dysfunction, . . . resulting in diminished rule of law and a vacuum of effective state authority" (Ex. C, at 1).
- Opinion #2 (Haitian transitional government): "[W]ithin Haiti's political history—particularly in the post-Duvalier era—periods of transitional or de facto governance are not anomalous, but have repeatedly emerged in response to political crises" (*id.*).
- Opinion #3 (role of gangs in Haitian politics and society): "[A]rmed groups in Haiti operate as both criminal and political actors, exercising territorial control, influencing political processes, and functioning as de facto authorities in many areas. . . . in this context, interactions with armed groups are common among political actors, security personnel, and

others operating in Haiti, and may be necessary to facilitate movement or ensure safety within gang-controlled areas" (*id.*).

- Opinion #4 (political unrest under President Moise): "[T]hese events occurred in a broader environment of political violence, including documented instances in which armed groups, at times in coordination with state actors, were used to repress dissent and target perceived opponents" (*id.*).
- Opinion #5 (role of the President and Prime Minister): "Finally, Ms. Phillips will testify regarding the constitutional structure of executive authority in Haiti, including the respective roles of the President and Prime Minister" (Ex. C, at 2).

Defendant Sanon's email also states that Ms. Phillips "may testify to the arrest warrant in this case executed by Judge Jean Roger Noelcius," although the full disclosure does not say anything about the arrest warrant.[1]

At the prior trial, the Court precluded Ms. Phillips from offering Opinion #1 because it "bait[ed] the nullification issue" and lacked reliable sourcing or methodology (DE 1782:18). It would be "improper" to "lead[] the jury to believe that [President] Moise was improperly there, a bad president, violating human rights" (*id.*). Based on that ruling, the defense withdrew Opinion #4, which related to substantially similar subject matter (DE 1782:20).

The Court limited Opinion #2 to testimony that "post-Duvalier in Haiti, there have been periods where we've got transitional Governments," meaning "that Sanon's view that he was going to be a transitional leader [was] not a foreign thing in Haiti" (DE 1782:19).

---

[1] To the extent that Sanon does intend to elicit testimony about the arrest warrant, the Government objects to lack of notice because the existing disclosure does not describe any of Ms. Phillips's actual opinions about the warrant, much less the bases or methodology for arriving at those opinions. Ms. Phillips is not a Haitian lawyer, much less a Haitian criminal practitioner.

The Government agreed that the defense could offer Opinion #3, concerning the role of gangs in Haitian society (DE 1782:10).

Finally, Opinion #5 was relevant in the prior trial only because those defendants intended to argue "that Ariel Henry was behind this plot to kill President Jovenel Moise, and Mr. Ariel Henry had been announced as the new prime minister approximately three to four days before Mr. Moise was assassinated" (DE 1782:10-11). Thus, that opinion was potentially relevant (at least under the defense's theory) to Mr. Henry's motive. The Court ruled that, "on those very limited points," Ms. Phillips had sufficient expertise to testify (DE 1782:20).

## LEGAL STANDARD

Under the Federal Rules of Evidence, a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that" four conditions hold true:

(a) "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;"

(b) "the testimony is based on sufficient facts or data;"

(c) "the testimony is the product of reliable principles and methods;" and

(d) "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."

Fed. R. Evid. 702.

Expert testimony must help the jury "determine a fact in issue." Fed. R. Evid. 702(a). Put another way, the testimony must be relevant. *See* Fed. R. Evid. 401, 402. The testimony must also be the product of a reliable methodology. District courts should "admit expert testimony only if it is both reliable and relevant." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005).

## ANALYSIS

### I. The Court Should Exclude Mr. Lafontant's Testimony.

The Court should adhere to its prior ruling excluding Mr. Lafontant's testimony (DE 1625). Because the Court has already reviewed and considered the same disclosure during the previous trial, the Government rests on the arguments made in its motion to exclude and during argument on that motion (DE 1603). The defense has not disclosed any additional opinion, nor has it revealed any heretofore unknown data, methodology, or bases for the opinions already rejected by this Court. Thus, there is no reason for the Court to deviate from its previous, well-reasoned decision.

For convenience, the Government reproduces the arguments made in its prior motion (DE 1603) below, with minor changes updated to the circumstances of this trial. Arguments concerning the next witness begin at page 13, *infra*.

***

#### 1. Mr. Lafontant's Testimony Is Not Reliable.

Mr. Lafontant is not trained to determine cause of death. Such testimony should be reserved for experts with medical or scientific specialization and experience. *See Mann v. Taser Int'l, Inc.*, 2007 WL 9712075, at *8 (N.D. Ga. Dec. 27, 2007) (finding that the purported expert "is not a nurse, physician, or pathologist, and her paramedic training and experience do not qualify her to testify as to [cause of death]"); *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1245 (11th Cir. 2005) ("The underlying predicates of any cause-and-effect medical testimony are that medical science understands the physiological process by which a particular disease or syndrome develops and knows what factors cause the process to occur.").

Mr. Lafontant's training appears to derive from faith-based or theological interpretations. It is not shaped by any scientific framework concerning the examination of a corpse. Unlike a medical examiner, pathologist, or other medical doctor, who is trained to evaluate physiological trauma and determine cause of death through established forensic methodologies, a religious expert has no comparable foundation to assess forensic issues. Courts, as gatekeepers, have an obligation to "keep junk science away from the jury." *United States v. Ware*, 69 F.4th 830, 847 (11th Cir. 2023). "Subjective speculation that masquerades as scientific knowledge does not provide good grounds for the admissibility of expert opinions." *McClain*, 401 F.3d at 1245 (citing *Glastetter v. Novartis Pharm. Corp.*, 252 F.3d 986, 989 (8th Cir. 2001) (internal citations omitted)).

The use of a Vodou expert (or any religious expert) in a criminal investigation to determine cause of death is unheard of. The Government has not found, nor has the defense provided, a single federal case permitting a religious expert to testify for such a purpose, especially in a case involving violations of Title 18, United States Code, Sections 956 and 2339A (DE 1850). *C.f. United States v. Hayat*, 710 F.3d 875, 900-02 (9th Cir. 2013) (allowing defendant's religious expert to testify about the "cultural practice and meaning of carrying Arabic scriptures," and government's religious expert to testify that the note in defendant's wallet meant that he was ready to commit warfare, in prosecution for providing material support to terrorists).

The facts of this case and the evidence adduced at trial do not compare to *Hayat.* The trial testimony, text message, ballistic, medical, and phone evidence have unequivocally established the following: 1) the Defendant and his co-conspirators planned and agreed to kidnap or kill President Moise for months prior to July 7, 2021 (GX 147A-E); 2) shortly after 1:00 a.m. on July 7, 2021, the Defendant's Colombian mercenaries traveled to President Moise's residence, riddled

the residence with gunfire, and the Colombian Delta Team members killed President Moise and gravely wounded First Lady Martine Moise inside the bedroom (GXs 102B, 103C-1, 104B-1-2, 104C-1-2, 105A-B, 161A-D); 3) the same weapon utilized by, and seized from, the Colombian Delta Team members fired multiple bullets and bullet fragments extracted from President Moise and First Lady Martine Moise (GXs 103C-1, 103D, 103E, 104C-3, 105A); 4) at approximately 1:58 a.m., a burner phone belonging to one of the Colombian mercenaries repeatedly photographed the now-deceased President Moise inside his bedroom (GX 136B-1-7); and 5) hours later on July 7, 2021, Solages texted "the contractor[s] did it", and Colombian mercenary Duberney Capador texted "we already did the hard part"—confirming that the Defendant's Colombian mercenaries, in fact, killed President Moise (GX 147E at 63, 69). Based on this record, a Vodou expert's testimony has no proper basis.

Even if this Court wishes to consider Mr. Lafontant's non-scientific opinion about President Moise's cause of death, the purported methodology he seeks to employ is completely unreliable. To determine reliability, courts may consider the following when evaluating an experience-based expert: whether the methodology is testable, subject to peer review, governed by known error rates, and generally accepted (among other reasonable factors). *Daubert v. Merrell Pharms., Inc.*, 509 U.S. 579, 593-94 (1993). *See also* Fed. R. Evid. 702 committee's notes (2023) ("If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.").

Defendant Sanon's disclosure appears to base Mr. Lafontant's proffered conclusions on four observations: 1) the gunshot wound to President Moise's head (stating that "[t]o injure the eye is to prevent the dead from seeing who is summoning them to speak"); 2) injuries to President

Moise's upper limbs ("support[ing] the inference of an intentional effort to make both arms unusable in the other-life"); 3) injuries to President Moise's lower limbs (opining that the injuries are "consistent with the practice of breaking the legs for the cadaver not to walk"); and 4) the positioning of President Moise's body (concluding that because "Mr. Moise's legs appear to have been staged so as to form a triangle [and] … his left arm pointing upwards" Vodou was involved). *See* Ex. B.

This is nothing more than junk opinion masquerading as scientific knowledge. *Ware*, 69 F.4th at 847*; McClain*, 401 F.3d at 1245. Mr. Lafontant's purported expert testimony is like that of the engineering expert in *Kumho Tire Co v. Carmichael*, who used visual inspection to conclude that the tire on a vehicle was defective. 526 U.S. 137 (1999). The Supreme Court upheld the trial court's decision to exclude the expert. *Id.* at 158. The Court reasoned that it had no evidence that other experts in the industry used the engineer's methodology, including his observation about the symmetry of tread wear on the tire, and had no articles or papers supporting the engineer's conclusions. *Id.* at 157. Like in *Kumho*, there is no evidence that Mr. Lafontant's opinion can be tested or that it is generally accepted by other Vodou priests or religious experts, let alone any other peer-reviewed scientific or expert community. *Id.* at 151 (further noting that courts should analyze whether the opinion of a witness whose expertise is based purely on experience "is of a kind that others in the field would recognize as acceptable."). Neither Defendant Sanon nor Mr. Lafontant have directed the Government to any legitimate, peer-reviewed article or publication supporting these alleged conclusions.

Importantly, nothing in Mr. Lafontant's disclosure explains how he can—given the trial evidence and testimony in this case—possibly distinguish wounds or injuries caused by someone with a background in Vodou from wounds caused by non-Vodou-practicing killers. For instance,

how does one distinguish between President Moise's wounds and First Lady Martine Moise's wounds in this context? How does one distinguish an execution-style headshot that damages the victim's eye socket from one intended to "prevent the dead from seeing" in the afterlife? How does one distinguish a wound in a victim's dominant hand (a common defensive wound for a person attacked at close range) from a wound that "silenc[es] him in the world of the dead?" Mr. Lafontant purportedly places great significance on wounds to President Moise's extremities, but President Moise also had numerous gunshot wounds to his torso. Were those shots not the handiwork of a Vodou practitioner? Or did his Vodou-practicing assassins mix in non-ritual shots with their religiously significant ones? "The more subjective and controversial the expert's inquiry, the more likely the testimony should be excluded as unreliable." Fed. R. Evid. 702 committee's notes.

Beyond its inherent and obvious unreliability, Mr. Lafontant's testimony also runs the risk of opening the flood gates. Religious experts, like those who practice Vodou or Santeria, could now opine on cause of death based on speculative and subjective observations any time a corpse has wounds in certain areas of the body—wounds which could exist in nearly every instance involving a victim with multiple gunshot wounds.

**2. Mr. Lafontant's Testimony Is Not Relevant and Unduly Prejudicial.**

For the same reasons stated above, Mr. Lafontant's testimony is also irrelevant and unduly prejudicial. "*Daubert* describes the question of relevance as one of 'fit,' requiring a 'valid scientific connection' between the expert's testimony and the relevant inquiry." *Russell v. Pallito*, 2019 U.S. Dist. LEXIS 204300, at *7 (D. Vt. Nov. 25, 2019) (citing *Daubert*, 509 U.S. at 591, 592). There is no "fit" or "scientific connection" to anything here with Mr. Lafontant.

The Defendant's clear goal is to inject tasteless, internet-based gossip into this trial and present uncorroborated, sensationalized opinion about President Moise's death to the jury. The charges in this case do not rest on what allegedly may or may not have happened to President Moise's body postmortem.

The Defendant has been charged with conspiracy (an agreement) to kill or kidnap the president and to provide material support (among other charges) (DE 552). This is not a whodunit murder mystery. Mr. Lafontant's proffered testimony, including about the gunshot wounds to President Moise's upper limbs suggesting an "intentional effort to make both arms unusable in the other-life" and "to impede the decedent's post-mortem agency and his capacity to act or intervene after death," is wholly irrelevant. *See United States v. Nichols*, 416 F.3d 811, 825 (8th Cir. 2005) (finding that the expert's testimony was not relevant because the case was "not about religious convictions in general or [the defendant's] specific religious beliefs; rather, the critical issues pertained to the elements of fraud and money laundering.").

Mr. Lafontant's proffered testimony should also be excluded under Rule 403. "Because of the powerful and potentially misleading effect of expert evidence, sometimes expert opinions that otherwise meet the admissibility requirements may still be excluded by applying Rule 403." *United States v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004). Relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R. Evid. 403. Any probative value the testimony may offer is substantially outweighed by the danger of unfair prejudice, misleading the jury, and confusing the issues. *Frazier*, 387 F.3d at 1244. Allowing a religious expert to weigh in on forensic issues would risk masking personal and unsubstantiated beliefs as expert opinions, which could distract the jury from the actual evidence.

## II. The Court Should Limit Ms. Phillips's Testimony to Matter Relevant to This Trial.

At the prior trial, the Court allowed Ms. Phillips to testify to (in our numbering system) Opinions #2, #3, and #5. The Court should adhere to those rulings but, in this trial, should also preclude Opinion #5. Unlike in the prior trial, Defendant Sanon has not—at least, not clearly—stated that he believes Ariel Henry is responsible for President Moise's assassination. Unless Sanon clarifies that he is pursuing that defense theory, the Court should limit Ms. Phillips to testifying that, in her view, (a) "transitional" governments were not unusual or unprecedented in Haitian political history, particularly post-Duvalier (Opinion #2); and (b) "interactions with armed groups are common among political actors, security personnel, and others operating in Haiti, and may be necessary to facilitate movement or ensure safety within gang-controlled areas" (Opinion #3) (Ex. C, at 1). As things stand now, Opinion #5, which relates to the roles and powers of the President and Prime Minister in Haiti, is irrelevant under Rule 401.

The Government reproduces the relevant portion of its previous motion to exclude Opinions #1 and #4 (DE 1598) below, with minor conforming changes.

***

### A. Ms. Phillips's Opinions #1 and #4 Are Improper and Irrelevant Justification or Nullification Testimony and Likely Depend Heavily on Hearsay.

To be admissible, an expert's opinion must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Put another way, it must be relevant. Fed. R. Evid. 401, 402. Evidence "based upon an invalid defense should be excluded because [it is] irrelevant as a matter of law to the charges of the indictment." *United States v. Anderson*, 872 F.2d 1508, 1516 n.12 (11th Cir. 1989). Sanon has not stated expressly that he is mounting a justification defense, and that affirmative defense has several strict elements, which he cannot meet:

(1) That there was an unlawful and present, immediate, and impending threat of

death or serious bodily harm to the Defendant or another;

(2) That the Defendant's own negligent or reckless conduct did not create a situation where the Defendant would be forced to engage in a crime;

(3) That the Defendant had no reasonable legal alternative to violating the law; and

(4) That avoiding the threatened harm caused the criminal action.

Eleventh Circuit Pattern Jury Instructions, Sept. 2025, S16; *see also United States v. Deleveaux*, 205 F.3d 1291 (11th Cir 2000).

Viewed through this lens, Ms. Phillips's first and fourth opinions are irrelevant. In essence, Ms. Phillips intends to testify about problems with President Moise's administration, including purportedly unlawful or unjust actions taken during his presidency. This evidence effectively goes to jury nullification: to the lawless notion that kidnapping or assassinating President Moise was an acceptable response to his alleged unlawful conduct or suppression of "dissent" within his country. The Government anticipated this exact improper evidence during in limine practice. *See* (DE 1306).

This evidence is distinct from evidence of the defendant's discussions with his conspirators, during the February to July 2021 timeframe, about President Moise and his purported wrongdoing. Those contemporaneous statements all go to his state of mind, including his political motives (or excuses) for committing the charged crimes. In that context, the items are not being admitted for the truth of the matters asserted; what matters is that Sanon knew about and discussed those claims while planning President Moise's kidnapping or assassination.

The validity of the underlying claims, however, such as whether President Moise was engaged in "unconstitutional governance by decree," is irrelevant. Even if true, they could not justify kidnapping or killing him. And they threaten to create a prejudicial and time-consuming

mini-trial on President Moise's legitimacy. To permit evidence or argument about President Moise's supposed unlawful conduct would be nothing more than victim blaming—a tactic regularly condemned in other prosecutions. *Cf.* Fed. R. Evid. 412; *United States v. Svete*, 556 F.3d 1157, 1665 (11th Cir. 2009) ("[t]he negligence of the victim in failing to discover a fraudulent scheme is not a defense.").

In addition, this supposed "expert" will offer "[s]ubjective speculation that masquerades as scientific knowledge." *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1245 (11th Cir. 2005). Ms. Phillips's personal opinions about Haitian politics or the legitimacy of President Moise's actions during his presidency—or any opinions of other authors that she may have read—are irrelevant. The defense has also already covered this ground with various witnesses, including by publishing public critiques of President Moise found on certain phones admitted into evidence. To the extent that Ms. Phillips is repeating the opinions of others, this supposed "expert" may be little more than an improper "conduit[] for hearsay." *Williams v. Illinois*, 567 U.S. 50, 80 (2012). "Although the Rules permit experts some leeway with respect to hearsay evidence, a party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) (citation modified).

Ms. Phillips's existing disclosures imply that she may regurgitate information from various reports published by the United Nations, human rights NGOs, or possibly the news media. Ms. Phillips's notice does not identify a single primary-source document that she reviewed to formulate these opinions, nor any methodology that she applied to determine whether statements in a particular NGO report or third-party report were true. And the Government cannot fathom how a

witness, who has lived in San Francisco, California, at least since 2018, could possibly have any relevant knowledge about events in Haiti during the final years of President Moise's presidency.

### III. The Court Should Exclude Mr. Pullen's Testimony or Impose a Reasonable Deadline for Disclosure of Mr. Pullen's Expert Report.

Finally, the Court should exclude any proffered expert testimony from Mr. Pullen. The defense's disclosure concerning Mr. Pullen—that he will testify "relating to the phones and electronic items in this case"—effectively is no disclosure at all. It does not identify any opinion he will offer, much less the bases or methodologies that he used to arrive at his unknown opinions. Moreover, Mr. Pullen is not responding to some new issue arising for the first time from this trial; he has worked for the defense for quite some time, examining device extractions produced in discovery years earlier (in the case of the Defendant's three phones, over three years ago).[2]

Alternatively, the Court should impose a deadline of Wednesday, October 28, 2026, for disclosure of Mr. Pullen's expert report. Mr. Pullen's work relates to digital forensics, a complex subject that will potentially require either a motion to preclude testimony or time to prepare rebuttal expert testimony. An October 28, 2026, disclosure deadline would avoid the need to recess the trial to enable the Government to complete those essential tasks.

## CONCLUSION

For the reasons above, this Court should exclude Mr. Lafontant's testimony and should substantially limit Ms. Phillips's testimony. The Government also asks the Court to order the Defendant to disclose—or to permit him to reveal—both experts' prior expert testimony from the past four years, *see* Fed. R. Crim. P. 16(a)(1)(G)(iii), (b)(1)(C)(iii), and the amount of their fees,

---

[2] If the defense intends to call Mr. Pullen simply to admit other items from those phone extractions, not included in the Government's exhibits, that ministerial task would not require calling him as an expert. And assuming those items are relevant and not barred by any other rule of evidence, the Government would not object to such items.

which presumably have increased since the prior trial. Finally, the Government asks that the Court either exclude Mr. Pullen as an expert or impose a Wednesday, October 28, 2026, deadline for disclosure of Mr. Pullen's expert report.

Respectfully submitted,

JASON REDING QUIÑONES
United States Attorney

By: */s Sean T. McLaughlin*
Sean T. McLaughlin
Assistant United States Attorney
Court ID No. A5501121
11200 NW 20th Street, Suite 101
Miami, FL 33172
(305) 715-7642/7654
Sean.McLaughlin@usdoj.gov

/s *Jason Wu*
Jason Wu
Assistant United States Attorney
Court ID No. A5502299
99 N.E. 4th Street
Miami, FL 33132
(305) 961-9226
Jason.Wu@usdoj.gov

*/s Altanese Phenelus*
Altanese Phenelus
Assistant United States Attorney
FL Bar No. 112693
99 N.E. 4th Street
Miami, FL 33132
(305) 961-9375
Altanese.Phenelus@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on October 24, 2026, I filed the foregoing document through CM/ECF and thus served all counsel of record.

/s *Jason Wu*
Jason Wu
Assistant United States Attorney