# Exhibit B

New Perspectives in Policing

AUGUST 2014

HARVARD Kennedy School
Program in Criminal Justice Policy and Management

NIJ
National Institute of Justice

# Policing and Wrongful Convictions

Anthony W. Batts, Maddy deLone and Darrel W. Stephens

### Executive Session on Policing and Public Safety

This is one in a series of papers that will be published as a result of the Executive Session on Policing and Public Safety.

Harvard's Executive Sessions are a convening of individuals of independent standing who take joint responsibility for rethinking and improving society's responses to an issue. Members are selected based on their experiences, their reputation for thoughtfulness and their potential for helping to disseminate the work of the Session.

In the early 1980s, an Executive Session on Policing helped resolve many law enforcement issues of the day. It produced a number of papers and concepts that revolutionized policing. Thirty years later, law enforcement has changed and NIJ and the Harvard Kennedy School are again collaborating to help resolve law enforcement issues of the day.

Learn more about the Executive Session on Policing and Public Safety at:

www.NIJ.gov, keywords "Executive Session Policing"

www.hks.harvard.edu, keywords "Executive Session Policing"

## Introduction

Few events subject the criminal justice system to as intense scrutiny from policymakers, elected officials, the media and the general public as the exoneration of a wrongfully convicted defendant. The multimillion-dollar settlement recently announced by New York City in the notorious case of the Central Park Five has once again brought the injustice of wrongful convictions and the corollary injustice of failing to convict the real assailant to the forefront of the national consciousness. (In that case, five black and Latino teenagers were convicted on the basis of false confessions of the brutal — and widely publicized — rape of a young woman jogging in Central Park. All were tried as adults and sentenced to lengthy prison terms, then exonerated years later when the real perpetrator confessed to the crime — a confession corroborated by DNA evidence.) As this and other high-profile wrongful convictions continue to spark controversy, a dispassionate, thoughtful examination of the systemic causes of wrongful convictions and their potential solutions can benefit all components of the criminal justice system and the community at large.

Given their function as gatekeepers to the criminal justice system and as the initial point of contact with offenders, accused offenders, victims and ordinary citizens, police agencies are in the most advantageous position to conduct such an examination. This paper calls for strong leadership from police agencies to lead reviews of wrongful convictions that can be learning experiences for all components of the criminal justice system. The lessons learned from these reviews can lead to the implementation of changes in practice across criminal justice agencies that will improve justice without compromising safety.

Section I reviews what has been learned from studying exonerations over the past 20 years, including who the exonerees are, the factors that contribute to wrongful convictions, and the best practices that address these factors. Section II looks at the role cognitive biases play in wrongful convictions. Section III presents several recommendations that research shows will minimize the likelihood of wrongful convictions and that are important for police departments to adopt. These recommendations include best practices that address known contributing factors, including eyewitness identification, false confessions, informant testimony and evidence preservation. This section also suggests an approach for learning from error and viewing mistakes as systemwide weaknesses. Section IV provides suggestions for how police can cooperate and assist with post-conviction investigations and work with other stakeholders to uncover past errors. The conclusion explains why adopting these recommendations will provide both justice and public safety advantages: (1) they will minimize the number of innocent individuals who are wrongly convicted and (2) they will prevent police from overlooking the actual perpetrator early in an investigation because of misleading evidence that points to the wrong person, thereby increasing the number of perpetrators correctly identified in the initial stage.

The recommendations are comprehensive, far-reaching, and necessitate strong leadership from police agencies, both to implement and to provide the guidance required for the entire criminal justice community to adopt a more systemwide approach to learning from wrongful convictions and to improve the system as a whole.

Cite this paper as: Batts, Anthony, Maddy deLone and Darrel Stephens, *Policing and Wrongful Convictions.* New Perspectives in Policing Bulletin. Washington, D.C.: U.S. Department of Justice, National Institute of Justice, 2014. NCJ 246328.

## I. What Have We Learned From Exonerations?

*After getting into a car accident with his neighbor on November 21, 1981, Henry James, then 20 years old, went to inform his neighbor's wife that her husband had been arrested. The next morning at 6 a.m., the neighbor's wife was awakened by an intruder who raped her at knifepoint and then left the home. She immediately called the police and told them that the perpetrator was a black male whom she did not know.*

*During a search of the community the following day, an officer saw James and thought he fit the description of the perpetrator. The investigator on the case placed James' picture in a photo book with 75 other*

*black males, and the victim identified James from his photo. James was later placed in a live lineup with individuals who failed to match the description provided by the victim and was again identified by the victim. Biological evidence was taken from both the victim and James, and no matches were confirmed. At trial, James' stepfather testified that James was sleeping in the bed beside him on the morning of the attack and woke up for work at 6:30 a.m. Another witness testified that he saw James at a gas station near the time the crime occurred and gave him a ride to work. Despite the overwhelming evidence pointing to his innocence, James was convicted of rape and sentenced to life in prison. He spent almost 30 years in prison before DNA evidence excluded James as the perpetrator and he was exonerated.*

Henry James' case is not an isolated event in the criminal justice system, and the hundreds of wrongly convicted individuals released from prison over the past 20 years provide indisputable proof that wrongful convictions can and do occur. Since 1989, there have been over 1,300 exonerations in the United States — more than 300 through newly discovered DNA evidence (Innocence Project, 2014a) and about 1,000 additional exonerations through other types of evidence (National Registry of Exonerations, 2014). This number is not insignificant; however, what is even more important is that these are only the number of wrongly convicted persons that we know about. Because of limited available evidence, a large backlog of actual innocence cases, and a restricted number of individuals who can allocate sufficient time to look into these claims, we are discovering and examining only some of the wrongful convictions. As work progresses, it is inevitable that many more wrongful convictions will be uncovered.

Some ask how many innocent people have been convicted. The truth is that we will never know, but academics have looked at the question in discrete crime categories. In a study that reviewed defendants sentenced to death for murders involving rape between 1982 and 1989, Risinger (2008) estimated that between 3 and 5 percent were innocent. Gross (2008) also found that 2.5 percent of all prisoners sentenced to death between 1973 and 1989 were eventually exonerated. According to the Bureau of Justice Statistics (Carson and Golinelli, 2013), approximately 1.57 million prisoners were under the jurisdiction of state and federal correctional authorities at year-end 2012. If as few as 1 percent are innocent (a low estimate in light of the aforementioned studies), that would mean 15,700 innocent men and women are being kept behind bars. Regardless of how many there are, preventing additional cases should be a public safety and justice priority.

The wrongly convicted are not a homogeneous group. A 2012 study at Michigan Law School and Northwestern Law School (Gross and Shaffer, 2012) reviewed 873 exonerations and found that a majority of the exonerees were men, 50 percent were black, 38 percent were white, 11 percent were Hispanic and 2 percent were Native American or Asian. The exonerations studied span the United States, with large concentrations in Illinois, New York, Texas and California. This distribution is likely shaped by the uneven level of effort across states to examine wrongful convictions as well as differences in underlying rates of crime and convictions that

might distinguish more urban states. The types of crimes that individuals are falsely accused of committing also vary. Most of the exonerations involve rape and murder cases, although about 20 percent involve robberies or other crimes (Gross and Shaffer, 2012).

Although exonerees are diverse in many respects and their individual stories need to be highlighted, we have learned much from studying the collection of cases as a whole. Misidentification by eyewitnesses, false confessions, erroneous scientific evidence, untrue informant testimony, overzealous prosecution, inadequate defense and sometimes intentional misconduct contribute to the conviction of the innocent. We believe that most actors in the criminal justice system do their jobs with integrity and have every interest in protecting the innocent. However, it is clear that inadvertent errors committed by any (and all) individuals in the system eventually and directly contribute to wrongful convictions.

In recent years, research has led to several recommendations that can serve as checks on the system to prevent unnecessary miscues before an individual is falsely accused and to correct wrongs in the event they do occur. This paper focuses on the following questions: What policies should police departments adopt to help prevent wrongful convictions, and how can police best assist in post-conviction investigations? Specifically, we identify recommended procedures for eyewitness identification, recording of interrogations, informant testimony, and evidence storage and preservation. We then look at the importance of learning from error through an organizational accident model and testing initial assumptions in an investigation. Finally, we provide suggestions on how police can assist in post-conviction investigations.

Adopting these recommendations and developing a more rigorous process for investigations will provide several benefits. First, they will minimize the number of innocent individuals who are wrongly convicted. Second, as many wrongful conviction cases illustrate, when an individual is erroneously convicted of a crime, the true perpetrator often goes unpunished and commits future crimes (Acker, 2013). Out of the 132 actual perpetrators who were identified in the first 300 DNA exoneration cases, 65 had committed 137 additional violent crimes — 74 rapes, 33 murders and 30 other violent crimes (Innocence Project, 2013).

Moreover, it is well known that the length of time it takes to conduct an investigation and the probability of finding the perpetrator are inversely correlated: the longer the actual perpetrator goes undetected, the less likely it becomes he or she will ever be identified and apprehended. Thus, police will derive a public safety advantage from adopting these recommendations, as they will reduce the likelihood of being distracted from pursuing the real perpetrator because of misleading evidence and instead will help identify the actual perpetrator more quickly during the initial investigation.

We acknowledge that some of these recommendations will be challenging to implement and will need the entire community's support to be fully effective. We also acknowledge that wrongful

convictions occur as a result of systemwide errors, not simply mistakes by police officers. However, to stand by and do nothing at any level of the criminal justice system is a dereliction of responsibility and leadership.

We firmly believe that police departments are the best advocates to catalyze this kind of change, and our reasoning is twofold. First, because they are at the front end of the criminal justice process, police officers are the initial point of contact in an investigation, and their work affects the entire outcome of the case. If one piece of evidence is contaminated, it can often prejudice and contaminate other evidence (this is known as the "snowball biasing effect," which is discussed in more detail in section II). Second, years of study and research have produced highly specific, scientifically based reforms to implement at the police level. Best practices for other stages in the criminal justice system have not yet been empirically tested and determined. Thus, it is logical for these reforms and recommendations to be introduced to the criminal justice system at the police level.

## II. The Psychology Behind Cognitive Biases and Their Relationship to Wrongful Convictions

Cognitive scientists have greatly helped us understand wrongful convictions. It is now universal knowledge that human perception is not objective. Our perceptions are heavily influenced by previous experiences and events, and humans tend to remember the factors that fit with their constructed mindset more clearly than those that do not (a concept psychologists call "confirmatory bias"). Furthermore, scholars have shown that people are likely to hold fast to their own theories, even in the face of contradictory evidence (Simon, 2012).

It is common for people to experience this kind of "belief perseverance," and it is often difficult for them to realize their beliefs may be in error (Dror and Fraser-Mackenzie, 2009). This can happen at any stage of the criminal justice process — from forensic scientists interpreting data in a manner consistent with law enforcement theories of guilt to prosecutors being so convinced of a defendant's guilt that they neglect to focus on factors that contradict their theories — and it is clear that every individual, regardless of his or her level of responsibility or experience, is susceptible to this phenomenon. The likelihood of a wrongful conviction is further heightened by the volume of arrests and the burden placed on the criminal justice system as a whole. As it is currently constructed, the criminal justice system does not favor preventing or identifying wrongful convictions.

Humans are constantly flooded with sensory information — we hear, read and see information from a variety of sources — and must process everything quickly and efficiently (Findley and Scott, 2006). To handle this overwhelming amount of information, a host of shortcuts (heuristics) have been developed that allow people to make decisions rapidly without being overwhelmed by unnecessary or redundant input.[1] Although these shortcuts are generally helpful and effective strategies for synthesizing and

processing complex information, they sometimes lead to faulty conclusions (Snook and Cullen, 2009). This system of categorization and selective attention makes humans subject to error.

Tunnel vision, a heuristic-like model, is "the product of a variety of cognitive distortions that can impede accuracy in what we perceive and in how we interpret what we perceive" (Findley and Scott, 2006, p. 307). Although a confluence of cognitive biases is involved in tunnel vision, confirmatory and hindsight biases play the most prominent roles.[2] Confirmatory bias is the tendency to seek information and evidence that bolster existing expectations and hypotheses (Findley and Scott, 2006). It is usually not driven by conscious or explicit errors, occurs almost automatically, and is most likely to appear when evidence is ambiguous. In fact, research has shown that people easily hold onto weak ideas and that providing hypothetical explanations for an idea will bolster one's belief in its likelihood (Simon, 2012). Once a belief is in place, people tend to distort new information to validate their expectations, increasing the value of confirming evidence and labeling disconfirming evidence as insignificant or irrelevant.

Hindsight bias refers to the tendency to think that an eventual outcome was much more likely to occur than one originally expected (Findley and Scott, 2006). Memory is malleable and is greatly affected by subsequent perceptions and experiences. As a belief becomes more articulated and comprehensive (and thus more persuasive), it affects an individual's recollection of events (Stubbins and Stubbins, 2009). Moreover, humans do not (and cannot) process information on a blank slate. Individuals interpret information as a product of their beliefs, experiences, expertise and understanding, a concept known as top-down processing. It is a critical function because humans have limited processing capacities, and top-down processing helps manage the huge amount of input received by the brain; however, it can also cause error because people often do not realize they are combining new and old information (Dror, 2014). This lack of awareness, along with a propensity to be overconfident about one's beliefs, can reinforce a premature conclusion (Arkes et al., 1988; Findley and Scott, 2006).

These cognitive biases are not limited to novices and have been widely observed in experts in a variety of professions, including medicine,[3] journalism,[4] negotiating[5] and psychotherapy.[6] Dror explains that there is a "paradoxical nature of expertise, showing that with extraordinary abilities come vulnerabilities and pitfalls" (Dror, 2011, p. 184). Experts perform tasks and solve problems differently, which leads to high performance in most situations. To achieve such high performance, experts need to have well-organized knowledge; make sense of complex, often ambiguous, signals and patterns; quickly apply automaticity (reflexive skills that experts can perform effortlessly); and perform challenging tasks that perplex novices (Dror, 2011). Experts also have highly trained information processing mechanisms, with an acute ability to select the most pertinent information, group steps together into a single entity, and apply automaticity.

Ironically, these linchpins of expertise can lead to a lack of flexibility and to error. "Chunking" information makes the components less available, if not inaccessible altogether, and fine-tuned selective attention also leads to the filtering of potentially important information. For example, "chess experts are indeed better than novices in encoding and remembering board positions, but this is limited only to realistic board positions. Experts are no better, and are even worse than novices, in board positions in which constituting individual pieces are placed at random" (Dror, 2011, p. 181).

Thus, we can expect that experts in the criminal justice system are as susceptible as experts in other fields to these cognitive biases. For example, Dror and Hampikian (2011) found that a forensic scientist's interpretation of DNA mixtures can be biased by knowledge of specific circumstances of a criminal case. Indeed, the seminal report on forensic sciences in the United States by the Committee on Identifying the Needs of Forensic Sciences Community et al. (2009) explicitly acknowledges the susceptibility of bias in the forensic evidence discipline. This fallibility plagues all the actors in the justice system: defense attorneys, for instance, who only litigate certain types of cases are prone to form generalizations based on previous experiences that hamper their ability to envision alternate possibilities (Rand, 2003).

Tunnel vision is problematic in the criminal justice system especially because of what Dror (2014) refers to as the "biasing snowball effect," where knowing one piece of evidence can often prejudice and contaminate another line of evidence. This is particularly relevant to police work because it is usually the first point of contact in the criminal justice system and all later stages feed off the information gathered in a police investigation (Findley and Scott, 2006). Although these cognitive biases, to a certain degree, are inevitable in any case investigation, research has shown that several best practices can help prevent wrongful convictions and correct wrongs.

## III. What Police Can Do To Help Minimize the Likelihood of a Wrongful Conviction

Twenty years of study have helped identify the leading factors that contribute to wrongful convictions — eyewitness misidentification, false confessions, untruthful informants, unvalidated or improper forensic science, government misconduct and ineffective legal representation. Research has revealed changes in practice that can decrease the likelihood of any one of these errors recurring or at least increase the likelihood that the error will be discovered before conviction (Committee on Identifying the Needs of Forensic Sciences Community et al., 2009; Drizin and Leo, 2004; Kassin, Bogart, and Kerner, 2012; Natapoff, 2006; Steblay et al., 2001; Wells et al., 1998; Wogalter, Marwitz, and Leonard, 1992).

We call on police leaders to (1) adopt best practices that can reduce wrongful convictions and lead to the correct perpetrator, (2) embrace a culture of learning from error that works to understand when errors or near misses occur, and (3) develop investigative practices that continuously

challenge the unwarranted assumption — shared by witnesses, investigators and attorneys — that we are always right.

### A. Adopt Best Practices Known To Reduce the Likelihood of Wrongful Convictions

In the sections below, we review specific steps in the justice process and present several best practices in the following areas: eyewitness identification, interrogation, informant procedures, and evidence preservation and storage. These recommendations will reduce errors and improve the administration of justice.

#### 1. Eyewitness Identification

Eyewitness misidentification played a role in almost 40 percent of the 1,281 overturned convictions reported by the National Registry of Exonerations (2014) and close to 75 percent of the first 250 DNA exonerations (Garrett, 2011). Research illustrates that it continues to be a major factor, contributing to 73 percent of the current 312 DNA exonerations (Innocence Project, 2014b). Since the landmark National Institute of Justice study on eyewitness identification was published almost 15 years ago (Technical Working Group for Eyewitness Evidence, 1999), scholars have conducted extensive additional research showing that eyewitnesses are prone to error. Two main categories of factors interfere with eyewitness accuracy — estimator variables (e.g., lighting, presence of a weapon, degree of stress) and system variables (the ways that police retrieve and record witness memory). Although police officers have no control over estimator variables, several best practices have been developed to manage system variables (Innocence Project, 2014b).

First, numerous studies show that when lineup administrators know who the suspect is, they can have a strong biasing effect on eyewitnesses. In a study comparing the effects of blind and non-blind administration, Canter, Hammond, and Youngs (2013) found that the target photo was selected more than twice as often with an "informed administrator" than with a "blind administrator." Thus, implementing blind administration — when the officer administering the lineup is unaware of who the suspect is — can significantly reduce the likelihood of misidentification (Haw and Fisher, 2004; Phillips et al., 1999; Wells et al., 1998).

Second, eyewitnesses tend to use relative judgments in making identifications, where they compare lineup members to each other to decide which one most resembles their memory of the perpetrator. The major issue with relative judgments in eyewitness lineups is that one lineup member will always look more like the perpetrator than other members. This is of particular concern when the actual perpetrator is not included in the lineup, making the innocent suspect who most looks like the perpetrator more susceptible to selection (Wells, Steblay, and Dysart, 2011). Sequential rather than simultaneous presentation of lineups decreases the rate at which innocent people are selected by limiting the comparison of photos that eyewitnesses are prone to make in a simultaneous presentation (Cutler and Penrod, 1988; Lindsay and Wells, 1985; Steblay et al., 2001). Organizations such as the Innocence

Project (2014d) and the International Association of Chiefs of Police (IACP) (2010) also support the use of blind-sequential lineup presentations.

Bradfield, Wells, and Olson (2002) show that eyewitnesses who were given confirmatory feedback on their identification inflated their recollections of the confidence they felt in their selections. This study and others support the best practice that eyewitnesses provide a statement on their level of confidence in the identification at the time the identification is made, when the possibility of feedback and memory alterations is minimal. Furthermore, research indicates that having witnesses instantly answer questions about certainty has a partially prophylactic effect against future feedback effects (Quinlivan et al., 2009), and in the event that feedback does occur, the statements can be used to temper jurors' evaluations of the eyewitness identification (Bradfield and McQuiston, 2004).

Lineup composition is crucial for a fair lineup, as a biased lineup can cause an innocent suspect to stand out and thus increase the likelihood of a false identification (Wogalter, Marwitz, and Leonard, 1992). In a fair lineup, mock witnesses' selections should be evenly distributed over all of the lineup members, which is consistent with random chance. If mock witnesses focus on or choose one lineup member above others, this demonstrates a biased lineup. In one study that used archival records to examine the fairness of live lineups conducted in actual cases, researchers found that mock witnesses, who had never seen the suspect before and had only heard a description, identified the suspect 2.2 times more often than expected by chance. If lineups were fair, the mock witnesses would have identified the suspect 11 percent of the time (evenly distributed among the nine individuals in the lineup), yet the suspect was identified 25 percent of the time (Valentine and Heaton, 1999).

To minimize biased lineups, fillers should be selected based on a two-part procedure. First, filler picks should match critical details of the witness's description of the perpetrator. This will lessen the chance that an innocent suspect looks most like the perpetrator. Second, filler picks should not look too different from the suspect to ensure that the suspect does not stand out (Koehnken, Malpass, and Wogalter, 1996). Finally, all lineups should be properly recorded and documented to allow for review of the lineup in the event that it was improperly conducted (International Association of Chiefs of Police, 2010; Innocence Project, 2014b).

According to public information requests in nine states conducted by the Innocence Project and affiliated entities, many jurisdictions have implemented blind-sequential procedures voluntarily through the adoption of an official policy. These jurisdictions include but are not limited to Santa Clara, California; Monterey, California; Denver, Colorado; Palm Beach County, Florida; Baltimore, Maryland; Hyattsville, Maryland; Norwood, Massachusetts; Hennepin County, Minnesota; Colstrip, Montana; North Charleston, South Carolina; and Virginia Beach, Virginia. Six states have also adopted both blind and sequential administration, and five other states have recommended the double-blind reform package and

incorporated it into police training (Innocence Project, 2014d). Yet many departments are reluctant to adopt these procedures. That reluctance seems to stem largely from three concerns. First, many investigators question the research that indicates there are fewer misidentifications using a sequential lineup presentation. They argue that the research has been conducted in a laboratory environment and may not apply in the field. Second, they contend that blind administration is an operational problem because it is difficult to find someone who can act as a blind administrator. Third, investigators feel that turning over a victim or witness to someone he or she is not familiar with would hinder the lineup process.

The first of these concerns has been addressed both in the laboratory and in a recent randomized trial field study in four sites that showed sequential lineups with blind administration produced significantly fewer filler picks than the blind simultaneous procedure (11 and 18 percent, respectively). This reduction in filler picks was not associated with a reduction in suspect picks, with approximately one-quarter of witnesses choosing a suspect using both procedures (Wells, Steblay, and Dysart, in press). This peer-reviewed study, the only one of its kind, reinforced in the field what has been known in the laboratory for 30 years and has contributed to the increase in police agencies adopting the recommended policies. The experiences of departments that have implemented these practices also illustrate that the perceived obstacles are not serious areas of concern (Police Executive Research Forum, 2013). The IACP developed a model policy, along

### Folder Shuffle Method

Many police departments do not have enough independent administrators available to perform the number of blind lineups that are needed. This problem can be remedied by following folder shuffle procedures:

1. Place the suspect's and five filler photos in individual folders.
2. Shuffle the folders before giving them to the witness and place four empty folders at the bottom of the pile (you do not want the witness to know when he/she is viewing the last photo, because witnesses may feel an increased need to make an identification if they believe they are viewing the last photo).
3. The officer administrating the array should position himself or herself so he or she cannot see inside the folders as the witness is reviewing them.

This method will achieve the same effect as having an independent blind administrator (International Association of Chiefs of Police, 2010; Office of the Attorney General, State of Wisconsin, 2010).

with a training key, to guide police departments in implementing these practices (International Association of Chiefs of Police, 2010).[7] Many departments have adopted policies to address the concerns about staffing and witness/victim comfort. Despite initial resistance, experience has proved that implementation is simpler than expected, and the jurisdictions that adopt them prefer the new procedures.

**2. Interrogation Procedures**

Another major contributing cause of wrongful convictions is false confessions — innocent defendants made outright confessions or pled guilty in almost 16 percent of exoneration cases,

and innocent individuals incriminated themselves in some way in more than 25 percent of DNA exonerations (Gross and Shaffer, 2012; Innocence Project, 2014c). Innocent people confess for myriad reasons, among them duress, ignorance of the law, and intoxication. Juveniles and people with mental disabilities are considered vulnerable populations at an increased risk for falsely confessing. Drizin and Leo (2004) analyzed 125 cases of proven false confessions and found that 63 percent were younger than age 25 and 32 percent were younger than age 18. They also found that 22 percent were mentally challenged and 10 percent had a diagnosed mental illness. Although these populations may be the most vulnerable, the exonerations include many fully competent adults who confessed to crimes they did not commit.

Several core principles of psychology play a role in false confessions (Kassin, Bogart, and Kerner, 2012; Meissner and Russano, 2003). First, "people make choices that they think will maximize their well-being given the constraints they face, making the best of the situation they are in," (Kassin et al., 2010, p. 15). Second, people tend to view immediate outcomes more favorably than delayed outcomes and are impulsive in their decision-making (Kassin et al., 2010). Malleability of memory and the ability to manipulate an individual's perception of the past, which were discussed in section II, are also heightened during stressful situations (Drizin and Leo, 2004; Kassin and Kiechel, 1996; Leo and Ofshe, 1998).

Ironically, innocence itself may put innocent individuals at risk of falsely confessing. Research suggests that people who are falsely accused tend to believe that justice will prevail and that their innocence will become transparent to investigators. As a result, they often cooperate fully with police, waiving their rights to silence and lawyers and speaking freely to defend themselves. In a study of mock criminals and innocent individuals, the mock criminals varied the amount they disclosed, but the innocent individuals were uniformly forthcoming (Kassin, 2005). Another study compared the willingness of innocent individuals to waive their rights and submit to questioning to that of guilty individuals; the rates were 81 percent and 36 percent, respectively (Kassin and Norwick, 2004).

Finally, because the decision to interrogate a suspect is based on a preliminary suspicion of that individual, there can be an inherent bias during interrogations (known as "investigator bias"). This can lead to a propensity to view suspects as guilty and can inflate officers' confidence in their ability to detect deceit (Simon, 2012). For example, research shows that people who were led to believe that a truthful individual was being untruthful overestimated the amount of gaze aversion (an action typically associated with lying) the individual had displayed during the interrogation (Levine, Asad, and Park, 2006). Kassin and colleagues (2007) surveyed 631 police investigators, who estimated they were accurate at truth and lie detection 77 percent of the time although the average accuracy rate is actually about 54 percent, which is essentially no better than a random guess.

Recording custodial interrogations, from the reading of Miranda rights through the conclusion of the interrogation, is one way to reduce the likelihood that a false confession will go undetected through a criminal prosecution (Drizin and Leo, 2004; Kassin, Bogart, and Kerner, 2012). If there is an accurate record of exactly who said what first, a review of the interrogation will confirm whether the suspect provided details that "only the true perpetrator could know" or whether the interrogator inadvertently introduced those facts. It creates a record of all the inconsistent statements made that support the claim that the confession was not reliable. A recording also has the benefit of preventing false claims of torture or undue coercion. Seventeen states, including Arkansas, Connecticut, Indiana, Maryland, North Carolina, and Oregon; the District of Columbia; and almost 1,000 law enforcement agencies, many in large cities such as Atlanta, Boston, Dallas, Denver, Philadelphia, San Francisco, and St. Petersburg, now record the entire custodial interrogation in at least some categories of felonies (Sullivan, 2014). National organizations, including the IACP and the American Bar Association Criminal Justice Section, have endorsed the practice.

Police agencies face challenges in implementing video recording of interrogations. They must find the money in tight budgets to purchase and install the equipment needed to implement this best practice and must modify interview rooms to obtain clear images and sound. Policies and procedures must be developed, and officers must be trained. The greatest challenge is introducing a change that some will resist; however, with

## Interview With William Brooks

William G. Brooks III, Chief of the Norwood, Massachusetts, Police Department, is a staunch advocate for eyewitness identification best practices and recording of interrogations. He says about both policies: "As resistant as I was to them at first, it was really a breeze. It just works. It's one of the best things we've done."

The Norwood Police Department began recording interrogations in 2004. Although there was initial concern about individuals being unwilling to talk, the department has seen no additional resistance from individuals now that they are being recorded. Chief Brooks advises discreetly setting up a camera with a hidden microphone so there is not a constant reminder of the recording. He believes the benefits of recording interrogations are significant, including a reduction in the time detectives spend testifying about the interview procedures and no longer needing to explain to the jury why police did not record the interrogation.

The Norwood Police Department implemented the recommended eyewitness identification practices after Chief Brooks attended a training hosted by the District Attorney's office that promoted the practices. The adoption of the practices was seamless and the advantages were immense, especially at trial. Chief Brooks has noticed that because the lineup procedures now have a scientific basis, detectives are more professional on the witness stand, and there has been little cross-examination about the procedures.

According to Chief Brooks, the key to successfully adopting these best practices is the training. "From the police end, there's so much to know and if you don't tell the police the reason behind it, they won't get it and they resist it. In the departments that have the policy and have done the training, there is really no resistance. . . . Everywhere I go, they are always on board."

proper training and policies, experience has shown that police departments willingly comply with and benefit from the adoption of interrogation recordings. Sullivan (2004) spoke with 238 police agencies in 38 states and found that "virtually every officer with whom we spoke, having given custodial recordings a try, was enthusiastically in favor of the practice" (Sullivan, 2004, p. 6). Officers noted several benefits to recording, including a major decrease in the number of defense motions to suppress statements and confessions and increased capacity to focus on the suspect rather than taking copious notes during the interview, and they encountered no issues affecting their ability to obtain confessions (Sullivan, 2004). The IACP also has beneficial training keys to help police agencies institute electronic recording of custodial interrogations (International Association of Chiefs of Police, 2004).

### 3. Informant Practices

Informants, or those who provide evidence in expectation of some benefit from police or prosecutors (e.g., monetary reward, release from prison, or leniency in their own cases), have a significant impact in many police investigations and are particularly prominent in drug investigations. The overwhelming majority of drug cases are made through the use of informants who are involved in or on the fringes of the drug trade. According to federal statistics, 60 percent of drug defendants cooperate with prosecutors in some way in exchange for a reduction in their sentence or a dismissal of charges (Natapoff, 2006). In these situations, informants identify the dealer or make the drug purchases that provide the evidence to support an arrest and prosecution. Police and prosecutors also use jailhouse informants to obtain information from suspects in custody to strengthen their case.

The use of jailhouse informants also plays an important role in wrongful convictions. A study by the Center on Wrongful Convictions (2004) found that incentivized testimony was a leading factor in 45.9 percent of 111 capital wrongful convictions since the 1970s. In more than 15 percent of convictions overturned by DNA testing, an informant testified against the defendant at the original trial (Innocence Project, 2014e). Statements made by informants can often be the main piece of evidence against a defendant, and in some cases it is the only evidence. Although we understand the value to police in using informants to obtain evidence, it is apparent that measures should be taken to reduce the risk that incentivized statements may not be truthful and may contribute to more wrongful convictions.

To ensure informants are managed properly, the IACP recommends requiring that officers complete an Initial Suitability Report for the potential informant. The report includes information about the individual's relationship with the suspect, the potential informant's possible motivations, his or her criminal history and the individual's ability to gain information (International Association of Chiefs of Police, 2008). Understanding and monitoring the motivations of informants is vital to reducing the likelihood of a wrongful conviction.

In Washington, D.C., changes were recently made so that the defense is now given information that might impeach informant testimony at least two weeks before trial; previously the information was provided only hours or days before trial (Hsu and Alexander, 2013). California passed legislation in 2011 requiring prosecutors to corroborate information and incriminating statements provided by jailhouse informants by presenting forensic evidence or uncompromised testimony (Williams, 2011).

All case-relevant discussions with informants should be electronically recorded, and copies of the recordings should be given to the defense. Because most of these conversations occur in a custodial setting, this would not be a major burden for police departments, especially in light of the increased use of recording interrogations (Center on Wrongful Convictions, 2004). Finally, departments should create informant files and maintain detailed records of all interactions with their informants in a central database, and they should have a process for objectively evaluating the investigations. Keeping track of informants who are later determined to have offered inaccurate information can minimize the likelihood that law enforcement will use them again. For example, the FBI maintains records on informants' value to investigations by aggregating their "statistical accomplishments" and assessing their credibility (Natapoff, 2009). Not only will this decrease the number of wrongful convictions due to unreliable informants, it will also benefit police to have an educated, data-driven understanding of how useful and trustworthy potential informants are when they are considering using one for a case.

#### 4. Evidence Storage and Preservation

In recent decades, it has become clear that evidence gathered at crime scenes can have a substantial impact on the determination of innocence. In a preliminary review of closed cases with claims of innocence over a 10-year period, the Innocence Project (2013) found that 32 percent were closed because evidence had been lost or destroyed. For example, evidence handling played a key role in the 1986 murder conviction of Paul House. Blood on House's jeans was found to have matched the victim's, but testing in 2008 determined that the blood had actually come from a post-autopsy sample. House's jeans and a test tube of blood had been shipped in the same container to the FBI for analysis, and most of the blood was missing from the tube when it arrived, suggesting it had been spilled (Balko, 2011).

With increasingly advanced evidence-testing methods, the selection of items that can be used in the conviction or exoneration of an individual is growing exponentially. Thus, correct and careful evidence handling, tracking and storage are crucial for establishing innocence both before and after conviction; preservation is also key to post-conviction investigations.[8] Individuals involved in the intake, storage or disposition of biological evidence should consider taking online, in-person or other forms of guided instruction on evidence management.

The National Institute of Standards and Technology Technical Working Group on

Biological Evidence Preservation (2013) recognizes the importance of biological evidence for all parties and at all stages in the criminal justice system, and it advocates for the long-term retention of evidence in several crime categories. Specifically, it recommends the following:

> Biological evidence should be preserved through, at a minimum, the period of incarceration in the following crime categories, as defined in NIBRS [National Incident-Based Reporting System Resource Guide], regardless of whether or not a plea was obtained: homicides, sexual assault offenses, assaults, kidnapping/abductions, and robberies (Technical Working Group on Biological Evidence Preservation, 2013, p. 5).

Police departments in jurisdictions such as Dallas County, Texas, which have had significantly more exonerations than others, have been systematically saving evidence from rapes, murders and other major crimes since the 1970s. It stores "tiny lab slides on at least a portion of biological evidence collected from all major cases over the years. As a result, the department has flushed out culprits in decades-old crimes" (Moffeit and Greene, 2007, p. 4).

It is further recommended that police agencies develop written protocols for standardizing evidence packaging and tracking in property rooms. These policies should include packaging directions with digital photos and brief narrative descriptions that highlight the approved methods and a discussion on how various categories of evidence are best stored (Technical Working Group on Biological Evidence Preservation, 2013). Although there are several ways to improve the efficiency of tracking and retrieving evidence, the Charlotte-Mecklenburg (North Carolina) Police Department has developed a well-organized cataloging system that barcodes evidence dating back to 1978 (Moffeit and Greene, 2007).

Finally, departments should have clear guidelines on chain-of-custody documentation that identify "all persons who have had custody of evidence and the places where that evidence has been kept in chronological order from collection to destruction" (Technical Working Group on Biological Evidence Preservation, 2013, p. 25). This is especially important because failure to maintain proper documentation of evidence handling may result in evidence being inadmissible.

### B. Learn From Error Using an Organizational Accident Model

Implementing an organizational accident model allows police departments to review errors as systemwide weaknesses instead of single-cause mistakes.

As noted earlier, research has identified a number of factors that contribute to wrongful convictions and the best practices that can be implemented to address these contributing factors. Although these policies are certain to help reduce wrongful convictions that might have involved eyewitnesses, false confessions, poor evidence preservation or jailhouse informants, they will not address the systemwide failures that contribute to wrongful convictions.

Currently, many police departments review wrongful convictions through a single-cause, one-component review, where the focus of the search is to pinpoint the one mistake or "bad apple" that caused the wrongful conviction. The underlying assumption in these assessments is that once the lying informant, eyewitness misidentification or unethical prosecutor is uncovered and remedied, the system will once again be efficient. However, this type of review is flawed because it overlooks the multitude of less obvious errors that should be corrected to enhance the accuracy of the system as a whole (Doyle, 2012; Shane, 2013). What is needed is an approach to reviewing wrongful convictions (and near misses) that not only focuses on the major factors but also looks at the fundamental etiology of wrongful convictions.

We recommend that police agencies develop a review system that avoids simply blaming individuals and concentrates on understanding the organizational factors that contribute to errors. This type of organizational accident model does not ask why the individual erred but asks what structural issues played a role in the individual's actions that triggered the error. Accidents are assumed to take place because of one or more levels of organizational failure: organizational influences, unsafe supervision, preconditions for unsafe acts and the unsafe acts themselves. The model accepts that mistakes are inevitable in a human-dominated system and that no single error independently is sufficient to cause a significant accident. It shifts the focus to how inherent system weaknesses converge with these individual mistakes to lead to tragedies (Doyle, 2012; Shane, 2013). This type of review is a forward-looking tool that considers these accidents as a culmination of errors at several stages and treats mistakes as learning opportunities.

There are obstacles to creating and implementing an organizational accident model for the review of wrongful convictions and near misses. One formidable obstacle is that the criminal justice system is not a true system — it is an interconnected group of individual entities that come together to play specific roles in holding individuals accountable for violations of the law. Winning, rather than a search for truth and justice, has become a leading objective. Bringing police, prosecutors, defenders and the courts together to determine what went wrong is a challenge. One must overcome the tendency to assign blame even though it is clear that the responsibility for wrongful convictions cuts across all parts of the system. Civil liability is also a significant obstacle — how can all of the stakeholders come together in a culture where accountability for errors often comes in the form of institutional or individual financial judgments?

Review mechanisms have been established that may help answer that question and serve as a guide to developing a process for wrongful conviction and near-miss assessment. Child fatality review teams exist in all 50 states and the District of Columbia (Langstaff and Sleeper, 2001), and elder abuse and domestic violence fatality review teams have also been established in many communities across America (National Domestic

Violence Fatality Review Initiative, 2013; Stigal, 2005). These teams bring together police (leadership and labor), prosecutors, social services, mental health workers, coroners, public health officials and others to examine fatalities. They search for the causes of these deaths and aim to implement policies or procedures that will help prevent similar deaths in the future. Their success depends on creating an environment where there can be honest dialogue about system flaws and approaches for fixing them. The discussions are confidential, and members are prohibited from disclosing them outside the team (Stigal, 2005). Some states, such as California, have laws that support this confidentiality and protect oral and written communications from discovery (Stigal, 2005).

The field of health care also illustrates opportunities for learning from error and has developed a comprehensive approach to reviewing mistakes. In one examination of a wrong-patient surgery, the review team found at least 17 errors, ranging from the patient's face being draped so physicians could not see it to poor communication between doctors and nurses. Most critically, the review team concluded that no single error could have caused the wrong-patient surgery. Instead, the combination of all of these mistakes resulted in this major error (Chassin and Becher, 2002). Medical practitioners realized that viewing error as a failure of character was unproductive and left latent system weaknesses uninvestigated. Instead, focusing on the error review in a non-blaming, systems-oriented way would lead to much more useful information.

We believe that this model does not need to be implemented immediately at all levels of the criminal justice system and that police departments are in the best position to be the forerunners for this kind of change. Through police leadership, all stakeholders (e.g., defenders, prosecutors, forensic scientists) will eventually become involved, and a new element of professionalism within the criminal justice system will be created.

Although hurdles must be overcome to establish a systematic process for wrongful conviction review, it is essential that it be done. As Shane (2013, p. 3) states:

> In reality, even the best decisions are constrained by organizational policies, personal preparedness and situational circumstances beyond the individual's control. So, punishing the individual has limited impact; there is symbolic value, but that does little to correct the underlying problem, shape a culture of safety and develop organizational learning and personal mastery.

Thus, while we implore police leaders to adopt the best practices described in section III.A of this paper, we also call on these leaders to help move the system toward one that continuously learns from error and seeks truth, better outcomes and continual system improvement.

### C. Test Initial Assumptions

Using the knowledge acquired from wrongful conviction and near-miss reviews, police can

also develop new ways to test initial assumptions about a case or a suspect. As we have explained, belief perseverance is difficult to overcome. It is exacerbated by the immense institutional pressures police experience to close cases. Thus, creating checklists from scientifically based research, previous experiences, and investigations that serve as opportunities to question initial reactions can help direct police away from an innocent individual and toward the real perpetrator. Moreover, they provide a concrete record of how an officer handled a case and can be used as an example of good practice or to uncover errors as the case progresses.

Dating back to the 1930s, the use of checklists has proven helpful in avoiding pitfalls for business and industry in general. As technology improved, the amount of data and information available to practitioners in all areas grew, and managing and digesting it became more difficult. Checklists were developed to help practitioners perform a long list of steps reproducibly and to manage complex tasks. It is human nature to overlook some steps in the multitude of things we do daily. Gawande (2009) explains that in some of the most complex professions, such as medicine and aviation, checklists are essential, helping in memory recall and defining, at a minimum, the necessary steps needed to understand an overall process.

Departments and offices within the criminal justice arena are already using checklists to reinforce best practices because they are low cost, do not require a lot of time and serve very important purposes. Checklists are very useful in prosecutors' offices: they remind prosecutors of the steps they should take to avoid error, they provide supervisors with a record of how an employee has handled a case to date, and they increase the likelihood that prosecutors are basing their charging decisions on all available evidence. For example:

> The Manhattan District Attorney's Office has assembled a number of checklists designed to assist its prosecutors in investigating and prosecuting their cases. These checklists did not, for the most part, create new practices. Instead, they represented the formalization of existing office policies and practices. However, even though the checklists did not contain new policies, the Manhattan DA's Office wanted to emphasize the importance of distilling existing office policies into checklists (Center on the Administration of Criminal Law's Conviction Integrity Project, 2011, p. 18).

Checklists can be tailored to promote compliance in a variety of areas. The Manhattan District Attorney's Conviction Integrity Unit has developed a questionnaire to help prosecutors identify potential areas in cases where exculpatory material might exist that needs to be disclosed. The questionnaire is not a formal checklist — a prosecutor does not need to literally check a box for each type of evidence that does or does not exist.

Instead, the questionnaire provides flexibility to prosecutors in assessing their cases while still serving the purpose of a standard checklist (Center on the Administration of Criminal Law's Conviction Integrity Project, 2011).

The police have a long history of using checklists in a number of areas. Officer field training programs designed in the early 1960s used a daily checklist to evaluate performance and to ensure trainees practiced skills important to their success (Kaminsky, 2000). Police have also used checklists in domestic violence, homicide, assault and property crime investigations (Gerberth, 2013; Governor's Commission on Domestic and Sexual Violence, 2012; Greenberg, 2010; Sadusky,

## Case Example: Douglas Warney

On January 3, 1996, the police discovered William Beason's body in his bedroom. Beason had been stabbed to death in the neck and chest. They also found a bloodstained knife, towel and tissues in the bathroom hamper.

On the same day the media publicized the details of the murder, Douglas Warney called the police to discuss information he claimed to have about the homicide. Warney is cognitively impaired and has a recorded IQ of 68. He knew the victim casually, having done housework for him several times in prior years. Warney was taken in for an interrogation, where police obtained a signed confession stating that he had killed Beason alone.

Before the trial, biological evidence from the crime scene was analyzed. Testing on the towel and tissue found blood that did not come from either Warney or the victim. Nevertheless, in February 1997, Warney was convicted of second-degree murder and sentenced to 25 years to life in prison. In 2004, the Innocence Project accepted Warney's case, and DNA testing of evidence was issued. The results were entered into the New York State DNA databank of convicted felons, and the profile from the evidence matched an inmate who was already serving a life sentence for murder. Warney's conviction was vacated in 2006, and he was released from prison.

Mistakes occurred at all levels of the criminal justice process, but we will limit our review to police errors. First, police became focused on Warney as a primary suspect too quickly because of his suggestion that he had information about the murder. Warney had made similar calls to the police before that had not been credible, and he had recently been admitted to a psychiatric ward. Investigators should have asked questions that would have shed light on all possibilities as to why Warney called the police. These questions might have revolved around whether police had exhausted all other possible explanations for Warney's behavior and whether Warney had any other motives for calling about the crime.

Second, Warney's account of the crime changed several times, and his alleged confession was full of inconsistencies. Furthermore, it is important that the mental state and capabilities of an individual be considered when deciding if and how to interrogate someone, and research indicates that an interrogation that lasts more than four hours can increase the risk of an individual falsely confessing (Kassin et al., 2010). Warney was interrogated for 12 hours. Detectives would have benefitted from considering whether there were any factors that put Warney at an increased risk of falsely confessing.

Finally, when testing on the towel and tissue showed that the blood could not have come from either Warney or the victim, little was done to look into alternative explanations. After Warney was arrested, police did not explore any other possible suspects even though there were individuals who could have been questioned. If detectives had investigated other potential leads, this may have helped offset the effects of tunnel vision and the police's sole focus on Warney after his alleged confession (Innocence Project, 2007).

2010). Sidebottom, Tilley, and Eck (2012) believe checklists can play an important role in problem-oriented policing:

> We see checklists as supplementing the numerous strategies already in place to help manage the complexity involved in doing problem-oriented policing, not to be worked through slavishly but to act as an aide-memoir to ensure that actions that research evidence suggests is important are considered and not forgotten.

Police departments could also profit greatly from the use of checklists in areas such as eyewitness identification, interrogations, evidence collection and laboratory controls. Although police agencies are encouraged to improve these checklists, the objective is not to come up with an exhaustive list of questions. Doyle (2012) notes that as environments change and science advances, checklists will need to be continuously maintained, evaluated, monitored and perhaps replaced, and an overreliance on checklists can provide a false sense of security that everything in an investigation has been covered.

Each case, no matter how similar it may seem to a previous case, is unique in some way, and boiling investigations down to a checklist-type system may engender tunnel vision. Checklists are not a panacea, but when properly used they minimize the potential for overlooking important steps in the investigative process.

Thus, it is critical that police officers use checklists not only as a framework for investigation but also as a catalyst to test their initial assumptions about the direction of a case or a specific suspect during the initial investigation. The sidebar on page 19 presents a case example that uses this strategy and offers sample questions that could have been asked and that may have helped law enforcement identify the correct perpetrator instead of the innocent individual.

## IV. Facilitating and Assisting Investigations of Post-Conviction Claims of Innocence

Adopting these recommendations will greatly reduce the likelihood of wrongful convictions and decrease the number of perpetrators who are free to commit additional crimes. Yet some wrongful convictions are bound to continue — the burden on every individual in the criminal justice process is great, and human error is unavoidable. It is essential that police and prosecutors be able to question prior beliefs and be amenable to the possibility of error when they are approached by innocence organizations, convicted defendants or members of their departments who harbor lingering or newfound doubts about cases or convictions.

Research indicates that this type of openness is increasing — in 2012, police or prosecutors initiated or cooperated in 54 percent of the 63 exonerations, whereas in the previous 24 years they cooperated in only 30 percent of the cases on average (National Registry of Exonerations, 2014). Dallas County, Texas, District Attorney Craig Watkins established the first conviction integrity unit in 2007 to review and reinvestigate claims

of innocence in collaboration with innocence organizations and defense attorneys. Other prosecutorial offices are creating similar units. Texas leads the nation with 114 exonerations between 1989 and 2012, with police or prosecutors playing a major role in 53 of them (National Registry of Exonerations, 2014).

It is clear that police and prosecutors are becoming more engaged in these investigations, but exactly how they should become involved is not clear. What is the appropriate role for police in investigating claims of innocence? Should they establish something similar to the conviction integrity unit or cold case squads that focus on unsolved homicides and sexual assaults? Should they create policies to guide their actions in responding to information requests or when officers discover someone might have been wrongfully convicted?

We believe that at a minimum, police agencies should have written policies on how to react to claims of innocence. Although practice varies from one jurisdiction to another, police are frequently the custodians of evidence or investigative files that may contain important information — in most states and many large cities, the crime laboratories where biological evidence is stored and analyzed are under police control. In the course of their investigations, police also come across information that may raise questions about the guilt of someone convicted of a crime. Most often, however, the police will become involved after receiving requests for information from the prosecutor or innocence advocates conducting the investigation. Policies that spell out how officers are to investigate claims of innocence ensure that these cases are handled consistently and appropriately.

Developing post-conviction units is a more ambitious undertaking, but they lead to enormous benefits. They not only help safeguard the public, but they can also improve the accuracy of the cases a department brings and can augment public confidence in the criminal justice system. Similar to cold case units where police focus exclusively on unsolved crimes, post-conviction units specialize in investigating cases where officers determine that the convicted individual may be innocent. Although these judgments can be difficult to assess, police may bring cases to light for a variety of reasons, including the emergence of new evidence, a witness coming forward, or an officer believing something went wrong during an investigation after he or she reviews a case. Once police have identified possible cases, it is important to involve advocates and counsel for the potentially innocent individual and to work with the relevant members of the community to ensure that the case is handled properly.

The following sidebar includes three case examples in which individual police officers and entire police departments were indispensable in the post-conviction review process. These cases demonstrate the immense benefit of police support.

### Case Examples: Post-Conviction Review

**Exoneration of LaMonte Armstrong, with assistance from Detective Michael Matthews and the Greensboro Police Department.** LaMonte Armstrong was convicted of a 1988 murder in Greensboro, North Carolina, and was sentenced to life in prison. His conviction was based entirely on the testimony of an informant who then recanted. After looking at the case, Duke Law School's Wrongful Conviction Clinic reached out to the Greensboro Police Department, which was open to listening to the concerns and revisiting the case. Greensboro Detective Michael Matthews and two law students reviewed the entire case file, which contained documentation that strongly suggested Armstrong's innocence. Duke's Wrongful Conviction Clinic filed a motion for a new trial, and Armstrong was soon exonerated when DNA evidence at the crime scene was retested and excluded him. The clinic, Assistant District Attorney Howard Neumann and the Greensboro Police Department were all instrumental in Armstrong's exoneration (*Duke Law News,* 2012).

**Exoneration of Glenn Tinney, with assistance from the Mansfield, Ohio, Police Department.** Glenn Tinney confessed several times to a 1992 murder in Mansfield, Ohio; however, the multiple confessions were riddled with inconsistencies (he had also been diagnosed with several mental disorders, including schizophrenia, paranoia and depression) and the Mansfield Police Department was not convinced of his guilt. Nevertheless, he was still charged and convicted. In 2006, the Mansfield police brought the case to the Ohio Innocence Project. The Ohio Innocence Project was able to get Tinney's guilty plea withdrawn through court hearings in which Mansfield police officers testified about their belief that Tinney was innocent. He was exonerated in 2013 after serving 21 years in prison (10TV.com, 2012).

**Exoneration of Jonathan Moore, with assistance from the Aurora, Illinois, Police Department.** Jonathan Moore was convicted of a 2000 murder in Aurora, Illinois, and was sentenced to more than 50 years in prison. In April 2011, a confidential informant met with two Aurora detectives and said that someone other than Moore had committed the murder. Based on that information, police detectives pursued the new lead. Soon after, the Illinois Innocence Project (2012) became involved in the case; through collaboration with the police and state prosecutors, Moore's conviction was vacated and he was exonerated in 2012 (Hanley, 2012).

## Conclusion

Police will derive numerous benefits from adopting the recommendations that we have presented in this paper. First, as we have noted, the costs of wrongful conviction are substantial from both a justice and a public safety viewpoint. Every criminal justice official would argue that any rate of wrongful convictions is unacceptable, and that all reasonable measures must be taken to ensure that no innocent individuals are wrongly convicted. By the same token, public safety demands accuracy. When an innocent person is falsely convicted, the real perpetrator remains at large and can (and often does) commit future crimes. Reducing the likelihood of these events will inevitably bolster the public's perception of law enforcement's legitimacy.

Second, a department that has scientifically founded procedures in place promotes a systems-oriented approach to learning from error. Instead of searching for the one "bad apple," it focuses on understanding the structural factors that contribute to errors. This strategy will improve investigations and encourage police departments to move beyond an unproductive culture of blame and toward a culture of continual improvement. Health care reformers realized a deep reservoir of useful information by focusing on the mistakes instead of the successes (Sparrow,

2008), and we believe this opportunity transfers to the criminal justice system.

Finally, we believe that these recommendations are exemplary opportunities for police to build partnerships within the criminal justice system. Although the criminal justice system is not a "system" in the traditional sense, it is clear that all stakeholders are connected and that a decision or action by one player will affect the others. Thus, it is vital for this community, including police, prosecutors, defenders, forensic scientists, judges and the numerous other actors, to work together and strive for the best quality of work.

We have proposed that the following will greatly aid in preventing future harms: adoption of best practices and procedures, knowledge of existing or past problems in the system, and guidelines on how to be most effective in post-conviction investigations. These are continuously evolving improvements that require the support of the entire criminal justice system along with continued research.

We fully acknowledge that police are only one part of the criminal justice system; however, we remain steadfast in the belief that they play a critical role because they are at the front end of the system and have a major impact on the rest of the process. Furthermore, police departments are the most visible segment of the criminal justice community and often bear the brunt of social criticism for system errors. Police not only have the most to gain from adopting best practices and a comprehensive system of recognizing error and working to minimize it, but they can also be the best catalysts for this change throughout the system.

## Endnotes

1. Heuristics are problem-solving strategies that often, but not always, result in correct solutions. For example, when someone is about to cross a street, he or she most likely does not use complex mathematical or physics equations to calculate the distance or the speed of an oncoming car. Instead, when the person looks both ways and sees a car approaching, he or she will quickly form a sense of whether or not there is time to cross the street while the car is still a distance away. This use of visual cues and past experiences, which allows humans to make rapid judgments, is an example of a heuristic (Weinstein, 2002).

2. Simon (2012, pp. 36-39) describes five mechanisms of biased reasoning that are most applicable to law enforcement: (1) selective framing is the tendency to look for information that should be present if the hypothesis is true, (2) selective exposure is the tendency to selectively expose oneself to evidence that confirms one's hypothesis while ignoring discordant evidence, (3) selective scrutiny is the tendency to apply strict standards of scrutiny to information that is incompatible with one's hypothesis and lax standards to compatible information, (4) biased evaluation is the tendency to distort the evaluation of evidence based on one's hypothesis, and (5) selective stopping is the tendency to cease inquiries after finding a sufficient amount of evidence to bolster one's hypothesis.

3. A study on the influence of expertise on X-ray image processing demonstrated that although expert radiologists were better at detecting abnormal X-ray films, "recognition memory for normal X-ray films actually decreased with radiological experience to a chance level" (Myles-Worsley, Johnston, and Simons, 1988, p. 556).

4. Donsbach (2004) studied the cognitive processes at work during journalists' news decision-making and found they are based in part on the need for social validation of perceptions and the need to confirm existing beliefs.

5. An experiment conducted with expert (those with more than 10 years of experience) and amateur negotiators showed that while the abilities of experts to make mutually beneficial trade-offs were better than those of amateurs, their abilities to recognize when they had compatible interests with the other party were relatively similar to those of amateurs (Thompson, 1990).

6. In a study examining the use of confirmatory strategies in therapy, psychotherapists interviewed students to assess introversion and extroversion. The results showed that psychotherapists tended to sample behavioral evidence that would confirm their initial hypotheses when they chose questions from a list (Dallas and Baron, 1985).

7. This includes a procedure for presenting a photo array blindly through a folder shuffle method even if an independent administrator is not available.

8. The National Institute of Standards and Technology Technical Working Group on Biological Evidence Preservation recently published a manual that includes best practices in the handling, tracking and retention of evidence. The recommendations in this paper are derived in large part from this publication. For more information, refer to Technical Working Group on Biological Evidence Preservation (2013). The International Association for Property and Evidence also offers a wide range of materials, including professional standards and manuals, to assist law enforcement agencies in the proper handling of evidence. For example, *Property and Evidence by the Book,* 2nd ed., extensively addresses questions about property and evidence preservation and storage related to law enforcement (Latta and Bowers, 2011).

## References

10TV.com. 2012. "Police, Victim's Family Both Trying to Free Convicted Killer," http://www.10tv.com/content/stories/2012/09/28/mansfield-innocense-project-tries-to-free-man.html.

Acker, James. 2013. "The Flipside Injustice of Wrongful Convictions: When the Guilty Go Free." *Albany Law Review* 76: 1629-1712.

Arkes, Hal, David Faust, Thomas Guilmette, and Kathleen Hart. 1988. "Eliminating the Hindsight Bias." *Journal of Applied Psychology* 73: 305-307.

Balko, Radley. 2011. "Wrongful Convictions: How Many Innocent Americans Are Behind Bars?" *Reason* (July 7).

Bradfield, Amy, Gary Wells, and Elizabeth Olson. 2002. "The Damaging Effect of Confirming Feedback on the Relation Between Eyewitness Certainty and Identification Accuracy." *Journal of Applied Psychology* 87: 112-120.

Bradfield, Amy, and Dawn McQuiston. 2004. "When Does Evidence of Eyewitness Confidence Inflation Affect Judgments in a Criminal Trial?" *Law and Human Behavior* 28: 369-387.

Canter, David, Laura Hammond, and Donna Youngs. 2013. "Cognitive Bias in Line-Up Identifications: The Impact of Administrator Knowledge." *Science and Justice* 53: 83-88.

Carson, E. Ann, and Daniela Golinelli. 2013. *Prisoners in the United States, 2012: Trends in Admissions and Releases, 1991-2012.* Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics.

Center on the Administration of Criminal Law's Conviction Integrity Project. 2011. "Establishing Conviction Integrity Programs in Prosecutors' Offices." New York, New York: New York University School of Law, Center on the Administration of Criminal Law's Conviction Integrity Project.

Center on Wrongful Convictions. 2004. "The Snitch System: How Snitch Testimony Sent Randy Steidl and Other Innocent Americans to Death Row." Chicago, Illinois: Northwestern University School of Law, Bluhm Legal Clinic, Center on Wrongful Convictions.

Chassin, Mark, and Elise Becher. 2002. "The Wrong Patient." *Annals of Internal Medicine* 136(11): 826-833.

Committee on Identifying the Needs of Forensic Sciences Community; Committee on Science, Technology, and Law Policy and Global Affairs; Committee on Applied and Theoretical Statistics; and Division on Engineering and Physical Sciences, National Research Council of the National Academies. 2009. *Strengthening Forensic Science in the United States: A Path Forward.* Washington, D.C.: National Academies Press.

Cutler, Brian, and Steven Penrod. 1988. "Improving the Reliability of Eyewitness Identification: Lineup Construction and Presentation." *Journal of Applied Psychology* 73: 281-290.

Dallas, Mercedes, and Robert Baron. 1985. "Do Psychotherapists Use a Confirmatory Strategy During Interviewing?" *Journal of Social and Clinical Psychology* 3: 106-122.

Donsbach, Wolfgang. 2004. "Psychology of News Decisions: Factors Behind Journalists' Professional Behavior." *Journalism* 5: 131-157.

Doyle, James. 2012. "Learning About Learning From Error." *Ideas in American Policing* 14 (May).

Drizin, Steven, and Richard Leo. 2004. "The Problem of False Confessions in the Post-DNA World." *North Carolina Law Review* 82: 891-1007.

Dror, Itiel. 2011. "The Paradox of Human Expertise: Why Experts Get It Wrong." In *The Paradoxical Brain,* ed. Narinder Kapur. New York, New York.: Cambridge University Press, pp. 177-198.

Dror, Itiel. 2014. "Cognitive Forensics: Human Cognition, Contextual Information, and Bias." In *Encyclopedia of Criminology and Criminal Justice,* ed. G.J.N. Bruinsma and D.L. Weisburd. New York, New York: Springer Science+Business Media.

Dror, Itiel, and Peter Fraser-Mackenzie. 2009. "Cognitive Biases in Human Perception, Judgment, and Decision Making: Bridging Theory and the Real World." In *Criminal Investigative Failures,* ed. D. Kim Rossmo. Boca Raton, Florida: CRC Press, pp. 53-67.

Dror, Itiel, and Greg Hampikian. 2011. "Subjectivity and Bias in Forensic DNA Mixture Interpretation." *Science & Justice* 51(4): 204-208.

*Duke Law News*. 2012. "Duke Law Faculty, Alumni, and Students Secure Release, New Trial, for LaMonte Armstrong," http://law.duke.edu/news/duke-law-faculty-alumni-and-students-secure-release-new-trial-lamonte-armstrong/.

Findley, Keith, and Michael Scott. 2006. "The Multiple Dimensions of Tunnel Vision in Criminal Cases." *Wisconsin Law Review* 2006: 291-307.

Garrett, Brandon. 2011. *Convicting the Innocent: Where Criminal Prosecutions Go Wrong.* Cambridge, Massachusetts: Harvard University Press.

Gawande, Atul. 2009. *The Checklist Manifesto: How to Get Things Right.* New York, New York: Metropolitan Books.

Gerberth, Vernon. 2013. *Practical Homicide Investigation Checklist and Field Guide,* 2nd ed. Boca Raton, Florida: CRC Press.

Governor's Commission on Domestic and Sexual Violence. 2012. "A Model Protocol for Response to Adult Sexual Assault Cases." Concord, New Hampshire: State of New Hampshire, Office of the Attorney General.

Greenberg, Morris. 2010. "Investigating Property Crimes: A Checklist for Success." *Investigations eNews* (July 20), http://www.policeone.com/police-products/investigation/articles/2142763-Investigating-property-crimes-A-checklist-for-success/.

Gross, Samuel. 2008. "Convicting the Innocent." *Annual Review of Law and Social Science* 4: 173-192.

Gross, Samuel, and Michael Shaffer. 2012. "Exonerations in the United States, 1989-2012: Report by the National Registry of Exonerations." Ann Arbor, Michigan: University of Michigan School of Law.

Hanley, Matt. 2012. "Prosecutors Drop Murder Case Against Aurora Man Imprisoned Ten Years." *Chicago Sun Times* (March 6).

Haw, Ryan, and Ronald Fisher. 2004. "Effects of Administrator-Witness Contact on Eyewitness

Identification Accuracy." *Journal of Applied Psychology* 89: 1106-1112.

Hsu, Spencer, and Keith Alexander. 2013. "D.C. Plans Changes in Police Lineups, Informants to Stop Error." *The Washington Post* (February 13), http://www.washingtonpost.com/local/crime/dc-plans-changes-in-police-lineups-informants-to-stop-errors/2013/02/13/315673d4-7617-11e2-8f84-3e4b513b1a13_story.html.

Illinois Innocence Project. 2012. "The Jonathan Moore Case." Springfield, Illinois: University of Illinois-Springfield, Illinois Innocence Project, http://www.uis.edu/innocenceproject/cases/exonorees/TheJonathanMooreCase.html.

Innocence Project. 2007. "Douglas Warney." New York, New York: Yeshiva University, Benjamin N. Cardozo School of Law, Innocence Project, http://www.innocenceproject.org/Content/Douglas_Warney.php.

Innocence Project. 2013. "DNA Exoneration Cases Where Evidence Was Believed Lost or Destroyed." New York, New York: Yeshiva University, Benjamin N. Cardozo School of Law, Innocence Project, http://www.innocenceproject.org/Content/DNA_Exoneration_Cases_Where_Evidence_Was_Believed_Lost_or_Destroyed.php.

Innocence Project. 2014a. "DNA Exoneree Case Profiles." New York, New York: Yeshiva University, Benjamin N. Cardozo School of Law, Innocence Project, http://www.innocenceproject.org/know/.

Innocence Project. 2014b. "Eyewitness Misidentification." New York, New York: Yeshiva University, Benjamin N. Cardozo School of Law, Innocence Project, http://www.innocenceproject.org/understand/Eyewitness-Misidentification.php.

Innocence Project. 2014c. "False Confessions." New York, New York: Yeshiva University, Benjamin N. Cardozo School of Law, Innocence Project, http://www.innocenceproject.org/understand/False-Confessions.php.

Innocence Project. 2014d. "The Implementation of Double Blind-Sequential Presentation of Lineups." New York, New York: Yeshiva University, Benjamin N. Cardozo School of Law, Innocence Project.

Innocence Project. 2014e. "Informants." New York, New York: Yeshiva University, Benjamin N. Cardozo School of Law, Innocence Project, http://www.innocenceproject.org/understand/Snitches-Informants.php.

International Association of Chiefs of Police. 2004. "Interrogations and Confessions Model Policy." Alexandria, Virginia: International Association of Chiefs of Police.

International Association of Chiefs of Police. 2008. "Confidential Informants Model Policy." Alexandria, Virginia: International Association of Chiefs of Police.

International Association of Chiefs of Police. 2010. "Eyewitness Identification Model Policy." Alexandria, Virginia: International Association of Chiefs of Police, http://www.theiacp.org/about/whatsnew/tabid/459/default.aspx?id=1336&v=1.

Kaminsky, Glenn. 2000. *The Field Training Concept in Criminal Justice Agencies*. Upper Saddle River, New Jersey: Prentice Hall.

Kassin, Saul. 2005. "On the Psychology of Confessions: Does Innocence Put Innocents at Risk?" *American Psychologist* 60: 215-228.

Kassin, Saul, Daniel Bogart, and Jacqueline Kerner. 2012. "Confessions That Corrupt: Evidence from the DNA Exoneration Case Files." *Psychological Science* 23: 41-45.

Kassin, Saul, Steven Drizin, Thomas Grisso, Gisli Gudjonsson, Richard Leo, and Allison Redlich. 2010. "Police-Induced Confessions: Risk Factors and Recommendations." *Law and Human Behavior* 34: 3-38.

Kassin, Saul, and Katherine Kiechel. 1996. "The Social Psychology of False Confessions: Compliance, Internalization and Confabulation." *Psychological Science* 7: 125-128.

Kassin, Saul, Richard Leo, Christian Meissner, Kimberly Richman, Lori Colwell, Amy-May Leach, and Dana La Fon. 2007. "Police Interviewing and Interrogation: A Self-Report Survey of Police Practices and Beliefs." *Law and Human Behavior* 31: 381-400.

Kassin, Saul, and Rebecca Norwick. 2004. "Why People Waive Their Miranda Rights: The Power of Innocence." *Law and Human Behavior* 28: 211-221.

Koehnken, Gunter, Roy Malpass, and Michael Wogalter. 1996. "Forensic Applications of Line-Up Research." In *Psychological Issues in Eyewitness Identification,* ed. S. Sporer, R.S. Malpass, and G. Koehnken. Mahwah, New Jersey: Lawrence Erlbaum Associates, Inc., pp. 205-231.

Langstaff, John, and Tish Sleeper. 2001. *The National Center on Child Fatality Review.* Fact Sheet. Washington, D.C.: U.S. Department of Justice, Office of Juvenile Justice and Delinquency Prevention.

Latta, Joseph, and Gordon Bowers. 2011. P*roperty and Evidence by the Book,* 2nd ed. Burbank, California: International Association for Property and Evidence.

Leo, Richard, and Richard Ofshe. 1998. "The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation." *Journal of Criminal Law & Criminology* 88: 429-496.

Levine, Timothy, Kelli Jean Asad, and Hee Sun Park. 2006. "The Lying Chicken and the Gaze Avoidant Egg: Eye Contact, Deception and Causal Order." *Southern Communication Journal* 71: 401-411.

Lindsay, R.C., and Gary L. Wells. 1985. "Improving Eyewitness Identification from Lineups: Simultaneous versus Sequential Lineup Presentations." *Journal of Applied Psychology* 70: 556-564.

Meissner, C.A., and Melissa Russano. 2003. "The Psychology of Interrogations and False Confessions: Research and Recommendations."

*Canadian Journal of Police & Security Services* 1: 53-64.

Moffeit, Miles, and Susan Greene. 2007. "Room for Error in Evidence Vaults." *The Denver Post* (July 23).

Myles-Worsley, Marina, William Johnston, and Margaret Simons. 1988. "The Influence of Expertise on X-Ray Image Processing." *Journal of Experimental Psychology: Learning, Memory, and Cognition* 14: 553-557.

Natapoff, Alexandra. 2006. "Beyond Unreliable: How Snitches Contribute to Wrongful Convictions." *Golden Gate University Law Review* 37: 106-130.

Natapoff, Alexandra. 2009. *Snitching: Criminal Informants and the Erosion of American Justice.* New York, New York: New York University Press.

National Domestic Violence Fatality Review Initiative. 2013. "Frequently Asked Questions — What Is a Domestic Violence Fatality Review?" Flagstaff, Arizona: Northern Arizona University, National Domestic Violence Fatality Review Initiative, http://www.ndvfri.org/faqs.php.

National Registry of Exonerations. 2014. "Exonerations in 2013." Ann Arbor, Michigan: University of Michigan School of Law.

Office of the Attorney General, State of Wisconsin. 2010. "Model Policy and Procedure for Eyewitness Identification." Madison, Wisconsin: Wisconsin Department of Justice.

Phillips, Mark, Bradley McAuliff, Margaret Bull Kovera, and Brian Cutler. 1999. "Double-Blind Photoarray Administration as a Safeguard Against Investigator Bias." *Journal of Applied Psychology* 84: 940-951.

Police Executive Research Forum. 2013. "A National Survey of Eyewitness Identification Procedures in Law Enforcement Agencies." Final report for National Institute of Justice, grant number 2010-IJ-CX-0032, NCJ 242617, http://www.policeforum.org/assets/docs/Free_Online_Documents/Eyewitness_Identification/a%20national%20survey%20of%20eyewitness%20identification%20procedures%20in%20law%20enforcement%20agencies%202013.pdf.

Quinlivan, Deah, Jeffrey Neuschatz, Angelina Jimenez, Andrew Cling, Amy Bradfield Douglass, and Charles Goodsell. 2009. "Do Prophylactics Prevent Inflation? Post-Identification Feedback and the Effectiveness of Procedures to Protect Against Confidence-Inflation in Earwitnesses." *Law and Human Behavior* 33: 111-121.

Rand, Joseph. 2003. "Understanding Why Good Lawyers Go Bad: Using Case Studies in Teaching Cognitive Bias in Legal Decision-Making." *Clinical Law Review* 9: 731-782.

Risinger, Michael. 2008. "Innocents Convicted: An Empirically Justified Factual Wrongful Conviction Rate." *Journal of Criminal Law & Criminology* 97: 761-806.

Sadusky, Jane. 2010. "Best Practice Checklist for Improving Community Response to

Domestic Violence: Police Investigations." Duluth, Minnesota: Praxis International. Report submitted to the Office on Violence Against Women, grant number 2004-WT-AX-K052, http://www.praxisinternational.org/files/praxis/files/Safety%20Audits/TTABestPracticeChecklistPoliceInvestMar2012.pdf.

Shane, Jon. 2013. *Learning from Error in Policing: A Case Study in Organizational Accident Theory*. New York, New York: Springer.

Sidebottom, Aiden, Nick Tilley, and John Eck. 2012. "What of Checklists for Problem-Oriented Policing?" *Community Policing Dispatch* 5(5). Washington, D.C.: U.S. Department of Justice, Office of Community Oriented Policing Services, http://cops.usdoj.gov/html/dispatch/05-2012/POPChecklists.asp.

Simon, Dan. 2012. *In Doubt: The Psychology of the Criminal Justice Process*. Cambridge, Massachusetts: Harvard University Press.

Snook, Brent, and Richard Cullen. 2009. "Bounded Rationality and Criminal Investigations: Has Tunnel Vision Been Wrongfully Convicted?" In *Criminal Investigative Failures,* ed. D. Kim Rossmo. Boca Raton, Florida: CRC Press, pp. 71-98.

Sparrow, Malcolm. 2008. *The Character of Harms: Operational Challenges in Control*. New York, New York: Cambridge University Press.

Steblay, Nancy, Jennifer Dysart, Solomon Fulero, and R.C.L. Lindsay. 2001. "Eyewitness Accuracy Rates in Sequential and Simultaneous Lineup Presentations: A Meta-Analytic Comparison." *Law and Human Behavior* 25: 459-474.

Stigal, Lori. 2005. *Elder Abuse Fatality Review Teams: A Replication Manual*. Washington, D.C.: American Bar Association.

Stubbins, David, and Nelson Stubbins. 2009. "On the Horns of a Narrative: Judgment, Heuristics, and Biases in Criminal Investigation." In *Criminal Investigative Failures,* ed. D. Kim Rossmo. Boca Raton, Florida: CRC Press, pp. 99-142.

Sullivan, Thomas. 2004. "Police Experiences with Recording Custodial Interrogations." Chicago, Ilinois: Northwestern University School of Law, Bluhm Legal Clinic, Center on Wrongful Convictions.

Sullivan, Thomas. 2014. "Departments that Currently Record a Majority of Custodial Interrogations." Chicago, Illinois: Jenner & Block LLP.

Technical Working Group for Eyewitness Evidence. 1999. *Eyewitness Evidence: A Guide for Law Enforcement*. Washington, D.C.: U.S. Department of Justice, National Institute of Justice.

Technical Working Group on Biological Evidence Preservation. 2013. *The Biological Evidence Preservation Handbook: Best Practices for Evidence Handlers*. Gaithersburg, Maryland: U.S. Department of Commerce, National Institute of Standards and Technology.

Thompson, Leigh. 1990. "An Examination of Naive and Experienced Negotiators." *Journal of Personality and Social Psychology* 59: 82-90.

Valentine, Tim, and Pamela Heaton. 1999. "An Evaluation of the Fairness of Police Line-ups and Video Identifications." *Applied Cognitive Psychology* 13(S1): S59-S72.

Weinstein, Ian. 2002. "Don't Believe Everything You Think: Cognitive Bias in Legal Decision Making." *Clinical Law Review* 9: 783-834.

Wells, Gary L., Mark Small, Steven Penrod, Roy Malpass, Solomon Fulero, and C.A.E. Brimacombe. 1998. "Eyewitness Identification Procedures: Recommendations for Lineups and Photospreads." *Law and Human Behavior* 22: 603-647.

Wells, Gary L., Nancy K. Steblay, and Jennifer E. Dysart. 2011. *A Test of the Simultaneous vs. Sequential Lineup Methods: An Initial Report of the AJS National Eyewitness Identification Field Studies.* Des Moines, Iowa: American Judicature Society.

Wells, Gary L., Nancy K. Steblay, and Jennifer E. Dysart. In press. Double-Blind Photo-Lineups Using Actual Eyewitnesses: An Experimental Test of a Sequential Versus Simultaneous Lineup Procedure. *Law and Human Behavior.*

Williams, Carol. 2011. "California May Curb Use of Unsupported Jailhouse Testimony." *Los Angeles Times* (July 31), http://articles.latimes.com/2011/jul/31/local/la-me-jailhouse-informants-20110731.

Wogalter, Michael, Bradley Marwitz, and David Leonard. 1992. "Suggestiveness in Photospread Line-ups: Similarity Induces Distinctiveness." *Applied Cognitive Psychology* 6: 443-453.

## Author Note

Anthony W. Batts, D.P.A., is the Police Commissioner in Baltimore, Maryland, and former Chief of Police, Long Beach and Oakland, California.

Maddy deLone is Executive Director of the Innocence Project, a nonprofit legal organization committed to exonerating the wrongfully convicted through the use of DNA testing and criminal justice system reform.

Darrel W. Stephens is the retired Chief of the Charlotte-Mecklenburg Police Department. He is the Executive Director of the Major Cities Chiefs Association.

Special thanks to Elizabeth Janszky, who provided invaluable research and drafting assistance with this bulletin. Without her hard work, this bulletin would not have been possible.

Findings and conclusions in this publication are those of the authors and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

U.S. Department of Justice
Office of Justice Programs
*National Institute of Justice*

*Washington, DC 20531*
Official Business
Penalty for Private Use $300

N C J 2 4 6 3 2 8

PRESORTED STANDARD
POSTAGE & FEES PAID
DOJ/NIJ
PERMIT NO. G–91

MAILING LABEL AREA
(5" x 2") DO NOT PRINT THIS
AREA (INK NOR VARNISH)

## Members of the Executive Session on Policing and Public Safety

**Commissioner Anthony Batts,** Baltimore Police Department

**Professor David Bayley,** Distinguished Professor (Emeritus), School of Criminal Justice, State University of New York at Albany

**Professor Anthony Braga,** Senior Research Fellow, Program in Criminal Justice Policy and Management, John F. Kennedy School of Government, Harvard University; and Don M. Gottfredson Professor of Evidence-Based Criminology, School of Criminal Justice, Rutgers University

**Chief Jane Castor,** Tampa Police Department

**Ms. Christine Cole** (Facilitator), Executive Director, Program in Criminal Justice Policy and Management, John F. Kennedy School of Government, Harvard University

**Commissioner Edward Davis,** Boston Police Department (retired)

**Chief Michael Davis,** Director, Public Safety Division, Northeastern University

**Mr. Ronald Davis,** Director, Office of Community Oriented Policing Services, United States Department of Justice

**Ms. Madeline deLone,** Executive Director, The Innocence Project

**Dr. Richard Dudley,** Clinical and Forensic Psychiatrist

**Chief Edward Flynn,** Milwaukee Police Department

**Colonel Rick Fuentes,** Superintendent, New Jersey State Police

**District Attorney George Gascón,** San Francisco District Attorney's Office

**Mr. Gil Kerlikowske,** Director, Office of National Drug Control Policy

**Professor John H. Laub,** Distinguished University Professor, Department of Criminology and Criminal Justice, College of Behavioral and Social Sciences, University of Maryland, and former Director of the National Institute of Justice

**Chief Susan Manheimer,** San Mateo Police Department

**Superintendent Garry McCarthy,** Chicago Police Department

**Professor Tracey Meares,** Walton Hale Hamilton Professor of Law, Yale Law School

**Dr. Bernard K. Melekian,** Director, Office of Community Oriented Policing Services (retired), United States Department of Justice

**Ms. Sue Rahr,** Director, Washington State Criminal Justice Training Commission

**Commissioner Charles Ramsey,** Philadelphia Police Department

**Professor Greg Ridgeway,** Associate Professor of Criminology, University of Pennsylvania, and former Acting Director, National Institute of Justice

**Professor David Sklansky,** Yosef Osheawich Professor of Law, University of California, Berkeley, School of Law

**Mr. Sean Smoot,** Director and Chief Legal Counsel, Police Benevolent and Protective Association of Illinois

**Professor Malcolm Sparrow,** Professor of Practice of Public Management, John F. Kennedy School of Government, Harvard University

**Mr. Darrel Stephens,** Executive Director, Major Cities Chiefs Association

**Mr. Christopher Stone,** President, Open Society Foundations

**Mr. Richard Van Houten,** President, Fort Worth Police Officers Association

**Lieutenant Paul M. Weber,** Los Angeles Police Department

**Professor David Weisburd,** Walter E. Meyer Professor of Law and Criminal Justice, Faculty of Law, The Hebrew University; and Distinguished Professor, Department of Criminology, Law and Society, George Mason University

**Dr. Chuck Wexler,** Executive Director, Police Executive Research Forum

**Learn more about the Executive Session at:**

www.NIJ.gov, keywords "Executive Session Policing"

www.hks.harvard.edu, keywords "Executive Session Policing"

NCJ 246328